**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**Case No.: 2:17-cv-14302-ROSENBERG/MAYNARD**

Dennis McWilliams and
Lori McWilliams,

                Plaintiffs,

vs.

Novartis AG, a Global Healthcare
Company; Novartis Pharmaceuticals
Corporation, a Delaware Corporation,

                Defendants.

_____/

**DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATION'S**
**MOTION TO EXCLUDE TESTIMONY OF DR. SONAL SINGH**
**WITH SUPPORTING MEMORANDUM OF LAW**

## TABLE OF CONTENTS

REQUEST FOR HEARING..........................................................................................................ii

INTRODUCTION ................................................................................................................... 1

FACTUAL STATEMENT ........................................................................................................ 1

ADMISSIBILITY STANDARDS UNDER *DAUBERT* AND RULE 702 ................................... 1

ARGUMENT .......................................................................................................................... 2

I.      THE COURT SHOULD EXCLUDE DR. SINGH'S META-ANALYSIS....................... 2

    A.      Dr. Singh Did Not Follow His Own Standard Methodology ..................................... 2

    B.      Dr. Singh's Meta-Analysis Relies on Unsupported Assumptions and Methodologic
        Errors. ....................................................................................................................... 5

        1.      *Dr. Singh failed to take into account the adjudication of patient-level data.* ....... 5

        2.      *Dr. Singh failed to take into account that Gleevec® may be
            cardio-protective.* .............................................................................................. 8

        3.      *Dr. Singh failed to distinguish between cerebrovascular and other adverse
            events.* ............................................................................................................. 12

        4.      *Dr. Singh's meta-analysis only relied on non-blinded clinical trials* ................ 13

II.     THE INADMISSIBILITY OF DR. SINGH'S META-ANALYSIS RENDERS HIS
       OTHER CAUSATION RELATED OPINIONS INADMISSIBLE ................................. 14

    A.      Bradford-Hill Analysis ............................................................................................ 14

    B.      Characterization of "severe" or "rapidly progressive" is unsupported ..................... 14

CONCLUSION...................................................................................................................... 17

LOCAL RULE 7.1(A)(3) CERTIFICATION ......................................................................... 17

## **REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), NPC hereby requests oral argument on NPC's Motion to Exclude Testimony of Dr. Sonal Singh and a *Daubert* evidentiary hearing, where the Court can see Dr. Singh testify and even ask him questions directly.  Oral argument will streamline the Court's consideration of NPC's Motion and allow for a more efficient resolution of the issues raised therein.  An evidentiary hearing would assist the Court in discharging its obligation as a *Daubert* gatekeeper.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) ("[D]istrict courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant.").  Evidentiary hearings are particularly important in "less usual or more complex cases," such as this, "where cause for questioning the expert's reliability arises."  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also City of Tuscaloosa v. Harcras Chem. Inc.*, 158 F.3d 548, 564-65 n.21 (11th Cir. 1998) (*Daubert* hearings "are almost always fruitful uses of the court's time and resources in complicated cases involving multiple expert witnesses, such as the instant case.").

NPC proposes a full day hearing for oral argument and evidentiary hearings on this and NPC's concurrently filed pre-trial motions.

## INTRODUCTION

Novartis Pharmaceuticals Corporation ("NPC") moves to exclude the expert testimony of Dr. Sonal Singh, MD, MPH pursuant to Federal Rules of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).   NPC requests a live evidentiary hearing to address these *Daubert* concerns.[1]

## FACTUAL STATEMENT

Plaintiffs retained Dr. Sonal Singh, MD, MPH, solely to address whether Tasigna® can cause atherosclerosis (general causation).   In this case, the plaintiff, Mr. McWilliams, experienced stroke and does not have peripheral arterial occlusive disease or ischemic heart disease.   Sonal Singh Dep.15:15-21, May 2, 2018 (Ex. 1) ("5/2/18 Singh Dep.").   Dr. Singh's opinion should be excluded in its entirety because it is based on a litigation-driven meta-analysis he performed that did not follow his own standard methodology, does not fit this case (in which the only alleged injury at issue is a cerebrovascular event), and which relies on unsupported assumptions and methodological errors.   Even if Dr. Singh's meta-analysis did not suffer from unsupported assumptions and methodological errors, the meta-analysis does not provide reliable evidence to prove general causation for the event at issue in this case – cerebrovascular events – because the result is not statistically significant.   At a minimum, Dr. Singh should be precluded from opining that atherosclerotic events associated with Tasigna® use are uniquely "severe" or "rapidly progressing," because he admits there is no statistical support for such opinions.

## ADMISSIBILITY STANDARDS UNDER *DAUBERT* AND RULE 702

In *Daubert*, the Supreme Court addressed the admissibility of expert testimony and established "the exacting standards of reliability such evidence must meet."   *See Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000).   Under Federal Rule of Evidence 702 and *Daubert*, the court must determine whether "(1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is 'sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*'; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (quoting *United States v. Frazier*, 387 F. 3d

---

[1] In circumstances such as those presented below, district courts should conduct a *Daubert* hearing to fully evaluate an expert witness' expertise and methodologies. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564 n.21 (11th Cir. 1998).

1244, 1260 (11th Cir. 2004)).  "[D]istrict courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Frazier*, 387 F. 3d at 1260 (internal quotation marks and citation omitted).

In particular, plaintiffs must establish that the expert witness has the necessary expertise, in the form of "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, to render an opinion on the specific issue addressed by his proposed testimony.  Second, plaintiffs must establish that the expert's testimony is "reliable" – *i.e.*, that the testimony is "ground[ed] in the methods and procedures of science[,]" as opposed to the expert's "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590 (quotation marks omitted).  Third, plaintiffs must establish that the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue," Rule 702, which means that the testimony must have "a valid scientific connection" to – *i.e.*, must "fit" – the pertinent inquiry in the lawsuit, *Daubert*, 509 U.S. at 591-92.   "Because of the powerful and potentially misleading effect of expert evidence," even opinions that "otherwise meet the admissibility requirements may still be excluded [under] Rule 403." *Id. Frazier*, 387 F. 3d at 1263.

## ARGUMENT

## I.     THE COURT SHOULD EXCLUDE DR. SINGH'S META-ANALYSIS.

To determine whether Dr. Singh's opinions are admissible under *Daubert* and Rule 702, the Court should rigorously scrutinize each step in his analysis that he devised for this litigation.

### A.     Dr. Singh Did Not Follow His Own Standard Methodology

A proffered expert must follow the methodology of his own discipline.  *See Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (an expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)); *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1175 (E.D. Wash. 2009) (to be reliable, expert must use "the same level of intellectual rigor that characterizes practice of an expert in the relevant field."); *In re Rezulin*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004) (where an expert "violates his own standard of proper methodology," it suggests that the expert "does not apply the same rigor in the courtroom that he would apply to his [scientific] endeavors").  Dr. Singh has conducted several meta-analyses for

2

publication.[2] When he prepares a meta-analysis for publication he conducts a systematic search of publicly available literature, reviews the results to determine which publications are relevant to his analysis, then extracts data from those publications and finally performs a statistical analysis on that data.  Sonal Singh Dep., 48:20-50:2, July 20, 2017 (Ex. 2) ("7/20/17 Singh Dep.").  Dr. Singh states that when he prepares a meta-analysis for publication he *always* employs a second scientist to perform these four steps.  *See id.* at 90:8-11 ("Q.  So that's consistent amongst all your published meta-analysis, that there are two reviewers, correct, and we – A. Yes, and sometimes even three."); *id.* at 102:9-15 (stating that he always has two people extract and review data independently).  Dr. Singh described the purpose of these additional reviewers:

> Q.  So there's two different people that look through the studies.
> And what if there's a dispute between those two folks?
>
> A.  So we adjudicate them. You know, we talk about it, discuss
> them.  In some case there's a third person that adjudicates.
> Usually, most, and especially if it's an expert, like me, and
> others, you know, we have less discrepancies.  Doesn't mean
> that we don't have any discrepancies, but –
>
> Q.  But none of that happened here because you were the only
> person reviewing –
>
> A.  Exactly.
>
> Q. – the papers, correct?
>
> . . .
>
> A.  Yes.

*Id*. at 76:9-25.[3]  A court should assess whether an expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.  Fed. R. Evid. 702, advisory committee's note (2000); *see also Sumner v. Biomet, Inc.*, No. 7:08-CV-98 HL, 2010 WL 4736320, at *5 (M.D. Ga. Nov. 16, 2010) ("[T]he fact that Dr. McLellan developed this theory for this lawsuit weighs against a finding of reliability."), *aff'd*, 434 F. Appx. 834 (11th Cir. 2011); *Dishman v. Wise*, No. CIV A 7:08CV45(HL), 2009 WL 1938968, at *3 n.3 (M.D. Ga. July 7,

---

[2] *See* Expert Report of Dr. Sonal Singh ("Singh Report") (Ex. 3) at Appendix A.

[3] Dr. Singh agrees that "yes, it would be nice to have one more person."  *Id.* at 110:8-111:16.

2009) (Courts may consider additional factors in assessing the reliability of expert testimony, including "whether he has developed his opinion expressly for purposes of testifying").

Dr. Singh has never before prepared a meta-analysis for the purpose of litigation. *See* 7/20/17 Singh Dep. 27:5-29:5 (Ex. 2). In the only other litigation in which he has participated, Dr. Singh had already prepared his meta-analysis *before* being retained as an expert witness. *See id.* Moreover, Dr. Singh has not published, or submitted for publication, any paper related to the subject of his meta-analysis in this case. 5/3/18 Singh Dep. 8:7-19 (Ex.1). A court should consider in its *Daubert* analysis "[w]hether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Hoffman v. Monsanto Co.*, No. 2:05–CV–00418, 2007 WL 2984692, at *3 (S.D.W. Va. Oct. 11, 2007) (quoting Fed. R. Evid. 702 advisory committee's note).

Dr. Singh failed to follow his own standard procedure for the meta-analysis he prepared for this litigation. *See* 7/20/17 Singh Dep. 70:19-71:7 (Ex. 2). Dr. Singh testified that he mistakenly believed that he was not *permitted* to employ a second scientist to assist him in conducting the meta-analysis because the meta-analysis was intended for litigation (as opposed to for publication). *See id.* at 69:24-70:16. Thus, the data selection and analysis in Dr. Singh's meta-analysis performed for the purpose of this litigation were *not* subject to more than one review, and were *not* adjudicated by more than one person, as per Dr. Singh's standard procedure. In fact, Dr. Singh did not adjudicate his data at all. In the past, in preparing a meta-analysis for publication, Dr. Singh had subjected extracted information to adjudication to assess the strength of the adverse drug reaction reporting, *see id.* at 97:13-22, and had reconciled the data drawn from published reports with the drug manufacturers' clinical trials register, *see id*. at 96:9-15. Plaintiffs' counsel had access to all the clinical trial files that were produced in this litigation and in numerous safety submissions that NPC made to FDA that contained patient level adverse event data. Plaintiffs' counsel apparently did not offer this patient-level data to Dr. Singh, and he apparently did not ask if it was available. *Id.* at 154:17-155:11. Dr. Singh also did not attempt to access patient-level data from public sources like clinicaltrals.gov or the FDA website. *Id.* at 89:21-90:2. Accordingly, Dr. Singh did not consider any of the available patient-

specific data related to the 63 cases he evaluated in his meta-analysis. *Id.* at 96:16-20, 97:23-98:1.[4]

Moreover, according to industry standards, "[d]oing a meta-analysis correctly . . . almost always requires collaboration between clinicians and an experienced statistician." John Bailar, *The Promise and Problem of Meta-*Analysis, N. Engl. J. Med. 337:559 (1997) (Ex. 4). Dr. Singh is an internist, not a cardiovascular specialist or oncologist. Though he has written prior meta-analyses addressing cardiovascular events, he has often consulted with clinicians in these analyses. 7/20/17 Singh Dep. 62:20-63:4 (Ex. 2). In conducting his litigation-driven meta-analysis here, Dr. Singh failed to consult with any clinicians or experts in oncology or cardiovascular diseases—even though plaintiffs' counsel has retained such experts to provide testimony in this case. *Id.* at 69:24-70:4. Since Dr. Singh was the only one to review his data, this industry practice was not followed either. Dr. Singh's meta-analysis for this case was not performed according to his own or his industry's methodology, and is therefore unreliable and should be excluded.

### B.     Dr. Singh's Meta-Analysis Relies on Unsupported Assumptions and Methodologic Errors.

Dr. Singh's meta-analysis considers only four, unblinded clinical trial studies, all of which compare patients treated with Tasigna® to patients treated with Gleevec®. Singh Report at 6 (Ex. 3).

#### 1.     *Dr. Singh failed to take into account the adjudication of patient-level data.*

Dr. Singh acknowledged that misclassification of adverse events is possible in clinical trials. 7/20/17 Singh Dep. 141:11-20 (Ex. 2) ("Q. The next sentence says, 'Misclassification of adverse events is possible, particularly where the outcomes are collected through spontaneous reports from trial participants rather than' systemic – 'systematic monitoring.' Did I read that correctly? A. Yes. Q. And do you agree that that's a true statement? A. Yes."). If adverse event reports are misclassified by the study physician as the wrong injury, then they no longer support the statistical analyses that are based upon them. *See id.* at 155:24-156:3.

---

[4] Dr. Singh confirmed has his deposition in this matter that he has conducted no further literature reviews or research beyond those he had completed at the time of his deposition in July 2017 in the *Lauris* case. *See* 5/2/18 Singh Dep. 9:7-16 (Ex. 1).

Dr. Singh did not account for potential misclassification of adverse event reports in his meta-analysis. This is particularly important in this case because in 2014 NPC convened a panel of outside cardiovascular experts to participate in a "Cardiovascular Safety and Research Committee Meeting" to independently review and adjudicate the exact same 63 adverse events that Dr. Singh relies on in his meta-analysis. "Cardiovascular Safety Review and Research Committee Meeting 2: ENESTnd Meeting Minutes" at TPROD01556256 - 80 (Ex. 5). The committee of outside experts concluded that only 29 of the 63 adverse events could be fully confirmed as cardiovascular events and two others were only partially confirmed. The remaining events (more than half of the total relied on in Dr. Singh's analysis) could not be confirmed to be cardiovascular events. *Id.* at TPROD01556259.

Dr. Sing was not made aware of the existence of this adjudication document by plaintiffs' counsel prior to performing his meta-analysis, even though the document had been produced in discovery and used at prior fact depositions of an NPC employee:

> Q. Let me ask it another way. You were not aware of any adjudication of any of the adverse events reported in the clinical trials that you included in your meta-analysis that you prepared for this case, correct?
>
> A. I was just aware of them being reported as adverse events in the trials.
>
> Q. And you weren't aware of any adjudication, correct?
>
> A. Yes.

7/20/17 Singh Dep. 101:21-102:5 (Ex. 2). Dr. Singh testified at deposition that he would have wanted to see this adjudication document as part of conducting his analysis:

> Q. Would you be interested in seeing that adjudication?
>
> A. I would.
>
> Q. You didn't see any adjudication like that in your work in this case, did you?
>
> A. No.

*Id.* at 157:1-6.

> Q. If you knew this document was available in which some adjudication body determined that 29 -- only 29 of the 63 events

> could be confirmed, would you have wanted to see that as part of
> your analysis?
>
> A.  I mean, I feel that that's sort of a hypothetical question.  If I
> knew that more -- if I knew more about the 29 events, yes, I
> would like to see more of everything.
>
> Q.  So you'd like to know more about what's in this paper?
>
> A.  More about everything.  *I'd like to know more about how to
> form an opinion.*

*Id*. at 169:11-170:13 (emphasis added).

Plaintiffs' counsel also failed to share with Dr. Singh many other documents containing specific information about these 63 patients that plaintiffs obtained through discovery.  Dr. Singh did not, for example, have an opportunity to review NPC's actual study reports for these clinical trials.  *Id.* at 115:7-9 ("Q.  Okay.  But you haven't reviewed the manufacturer's actual study reports, correct?  A. No, I have not.").  Even more alarmingly, plaintiffs' counsel had access to this data and did not provide it to Dr. Singh.  Nor did Dr. Singh ask for it:

> Q.  Are you aware that plaintiff's counsel has those reports
> available to them?
>
> A.  You know, I -- the focus of my work was on published
> reviews, and as you can see, you know, most of my work or the
> entirety is based on published reviews.  So I don't think I have
> this question that they had access to it or not.
>
> Q.  Let me ask you the question again.  Were you aware that
> plaintiff's counsel had access to the actual study reports for all of
> these clinical trials?
>
>                . . .
>
> A.  I mean, I never asked this question, so obviously, I'm
> unaware.

*Id.* at 115:10-23.  Upon learning that plaintiffs' counsel had this data, Dr. Singh agreed that the clinical trial reports or underlying patient data also "would be of interest" to him in preparing his litigation opinion:

7

Q.  If you knew that the plaintiff's counsel had the full clinical trial reports for these trials, would that have been of interest to you?

A.  I mean, everything is of interest.  But I -- you know, it depends, I mean, you know, what it adds.  I'm doing a published meta-analysis of published data.  I mean, everything is of interest.  If I have details on each specific event, what had happened, that would be of interest as well.

Q.  So if you had specific details on each event, that would be of interest to you?

A.  Yes.

Q.  Okay.  Are you aware that the plaintiff's counsel had access to detailed narratives for all of the adverse events in those clinical trials?

A.  No, I was not aware.

Q.  You didn't ask them to provide you patient-level data from those clinical trials on these adverse events, did you?

A.  That was not my focus.  My focus was on, you know, conducting a meta-analysis of the peer-reviewed literature.

*Id.* at 115:24-116:20.

Clearly, Dr. Singh's analysis was performed on a faulty assumption about the number of underlying case reports that could be confirmed and a faulty assumption that there was not patient level data available.  Moreover, this information was at all times available to plaintiffs' counsel, who failed to provide it to Dr. Singh or even mention its existence.  Because a key assumption that Dr. Singh used in the multi-step process that led to his causation opinion is not based on a scientifically reliable methodology, his analysis is rendered inadmissible.

> ### 2.      *Dr. Singh failed to take into account that Gleevec® may be cardio-protective.*

In preparing his meta-analysis, Dr. Singh failed to address the growing body of evidence that Gleevec® may be cardioprotective, which would make it an improper comparator for his meta-analysis.  *See id.* at 221:22-222:6.  Dr. Singh's failure to account for this possibility renders his meta-analysis unreliable.  This failure is further compounded by Dr. Singh's failure to

undertake any evaluation of how the incidence of cerebrovascular events observed in patients receiving Tasigna® compares to the background rate for such events in the general population. 5/2/18 Singh Dep. 50:25 – 51:22 (Ex. 1). This failure to consider the background rate for cerebrovascular events renders his meta-analysis unreliable. *See McClain v. Metabolife International, Inc.*, 401 F. 3d 12331243 (11th Cir. 2005) ("A reliable methodology should take into account the background risk."); *See Chapman*, 766 F.3d at 1308 (excluding experts who lacked knowledge of the "background risk of disease").[5]

In conducting clinical trials, the medicine under investigation is often compared to a placebo control in a two arm study. Where there is already a standard of care medicine for the treatment of a particular disease, it is considered unethical to expose a group of patients to a placebo. In such circumstances, a standard-of-care medicine is usually used as a comparator to the medicine under investigation. The standard of care comparator is referred to as an "active control."

Dr. Singh acknowledges that when "active controls" are used in a clinical trial it can be difficult to tell whether a difference between the two medications is due to the effect of the investigatory medication or the active control:

> Q. "Another challenge is assessing whether the estimates of effect from active controlled trials reflect the *beneficial effect of one intervention* or the *harmful effect of another*." Did I read that correctly?
>
> A. Yes.
>
> Q. Do you agree that that's a challenge when a randomized control trial -- when the new trial subject is compared against an active control?
>
> A. Yes, it is.

---

[5] See also *In re Denture Cream Prods. Liab. Litig.*, 795 F. Supp. 2d 1345, 1355 (S.D. Fla. 2011) ("Because epidemiology aims to identify agents that are associated with an increased risk of disease, one must know the background prevalence of a disease before one can determine if exposure to an agent has increased the risk of that disease." (internal quotation marks and citation omitted); *Kilpatrick v. Breg, Inc.*, No. 08-10052-CIV, 2009 WL 2058384, at *8 (S.D. Fla. June 25, 2009) (expert's testimony was unreliable because he failed to offer a sufficient explanation of background risk of disease), *aff'd*, 613 F.3d 1329 (11th Cir. 2010).

7/20/17 Singh Dep. 179:13-23 (Ex. 2) (emphasis added) (citing from Exhibit 308 to Singh Deposition (Singh S, et al., *Methods for Benefits and Harm Assessment in Systematic Reviews.* Rockville (MD): Agency for Healthcare Research and Quality (US); 2012 Nov., https://www.ncbi.nlm.nih.gov/books/NBK115750/)).  Even though all four of the clinical trials that Dr. Singh included in his meta-analysis compare Tasigna® (nilotinib) to the active control Gleevec® (imatinib), Dr. Singh refuses to acknowledge that he needed to evaluate whether the observed effects in those trials related to atherosclerotic events were due to a negative effect of nilotinib or a positive ("protective") effect of Gleevec®.

Gleevec® is an unreliable comparator.  Several case reports have shown that Gleevec® may be cardio-*protective*, meaning that there are fewer adverse events in CML patients on Gleevec® than in CML patients without TKI therapy.  7/20/17 Singh Dep. 198:19-22 (Ex. 2) (agreeing that many scientists have hypothesized that imatinib has cardioprotective effects).  For example, one of the articles Dr. Singh reviewed in his report states that:

> Imatinib has been reported to lower fasting blood glucose levels, to protect from diabetes mellitus-associated arteriosclerosis in a disease model in mice, to reverse pulmonary arterial hypertension and to attenuate in-stent restenosis in an animal model.

Giles FJ, et al., *Rates of peripheral arterial occlusive disease in patients with chronic myeloid leukemia in the chronic phase* treated *with imatinib, nilotinib, or non-tyrosine kinase therapy: a retrospective cohort analysis*, Leukemia (2013) 27, 1310-1315 (Reference 41 to Singh's Report) (Ex. 7) (finding that nilotinib had no impact on PAOD rates compared with no TKI, whereas imatinib had decreased rates of PAOD compared with no TKI).[6]  Another report Dr. Singh reviewed states:

---

[6] In this section of his paper, Giles cites to four other case reports with similar findings.  *See* Agostino NM, et al., *Effect of the tyrosine kinase inhibitors (sunitinib, sorafenib, dasatinib, and imatinib) on blood glucose levels in diabetic and nondiabetic patients in general clinical practice*, J Oncol Pharm Pract 2011; 17: 197–202 ("Clinicians should keep the potential hypoglycemic effects of these agents in mind"); Lassila M, et al., *Imatinib attenuates diabetes-associated atherosclerosis*, Arterioscler Thromb Vasc Biol 2004; 24: 935–942 (concluding that "imatinib appears to be a novel therapeutic option to retard the development of atherosclerosis, specifically in the context of diabetes"); Hatano M, et al., *Imatinib mesylate has the potential to exert its efficacy by down-regulating the plasma concentration of platelet-derived growth factor in patients with pulmonary arterial hypertension*, Int Heart J 2010; 51: 272–276 (case report of imatinib easing pulmonary arterial hypertension); Masuda S, et al., *Imatinib mesylate-*

On the other hand we cannot exclude that imatinib even protected our patients from PAOD-development, so that PAOD could only develop after switching to nilotinib.  In this regard it is noteworthy that imatinib has been described to lower fasting blood glucose levels and to protect from diabetes mellitus-associated arteriosclerosis.

Aichberger KJ, et al., *Progressive peripheral arterial occlusive disease and other vascular events during nilotinib therapy in CML*, Am J Hematol. 2011, 86:533-539, at 538 (Reference 41 to Singh's Report)[7] (Ex. 9). In fact, at the American Diabetes Association meeting in summer 2017 the first year findings were presented from a clinical trial that is studying the use of imatinib to slow the onset of type 1 diabetes.  *See* Busco M. *Cancer Drug Imatinib May Slow New-Onset Type 1 Diabetes*, Medscape, June 26, 2017, http://www.medscape.com/viewarticle/882089 (Ex. 6).

Despite this medical literature, Dr. Singh is dismissive of the idea of using TKI-naïve patients as a proper comparator.  In the Giles study, TKI-naïve patients were used as a comparator, and when this was done no strong association was found between Tasigna® and the TKI-naïve patients.  See Giles 2013 (Ex. 7) (finding that nilotinib had no impact on PAOD rates compared with no TKI, whereas imatinib had decreased rates of PAOD compared with no TKI). However, Dr. Singh conveniently ignores this finding:

> Q.  And that study comparing nilotinib to [TKI-naïve] in a youth
> population and doing an adjustment for confounders found that
> there was no difference between nilotinib and the TKI naive
> population, did it?
>
> A.  Well, that study, as I point out, had several reasons why it
> found this.  Number one reason, it created an artificial comparator

---

incorporated nanoparticle-eluting stent attenuates in-stent neointimal formation in porcine coronary arteries, J Atheroscler Thromb 2011; 18: 1043–1053 (imatinib "shows promise" in this field).

[7] The Aichberger paper cites to the same Lassila article as Giles, and also cites to Breccia M, Muscaritoli M, Aversa Z, et al., *Imatinib mesylate may improve fasting blood glucose in diabetic Ph1 chronic myelogenous leukemia patients responsive to treatment*, J Clin Oncol 2004;22:4653–4655 (concluding that the "role of imatinib on glucose metabolism warrants further investigation both in diabetic and nondiabetic CML patients.).

> which didn't exist before that study.  It was never conducted
>
> against an OT kinase (phonetic).  It also -- so you asked the
>
> question.

7/20/17 Singh Dep. 205:5-15 (Ex. 2).  And when asked point-blank whether he considered the fact that Gleevec® is cardioprotective in performing his meta-analysis, Dr. Singh admitted that he did not adjust his analysis to take into account the possible positive effect of Gleevec® on atherosclerotic events:

> Q.  Find it for me where in your report you discuss the possibility
>
> that imatinib is cardioprotective and either adjust your analysis for
>
> that or dismiss that conclusion.
>
> A.  There's no single statement that provides that, that I adjust.
>
> For example, it is not – I think it's improper to adjust for that
>
> analysis.  These are direct randomized trials, which compare
>
> nilotinib to imatinib, so how would one adjust for that.

*Id.* at 221:22-222:6.  By yet again failing to take into account inconvenient literature that Gleevec® may be an improper comparator, Dr. Singh relies on unsupported assumptions, rendering his meta-analysis unreliable.  *See Kilpatrick*, 613 F.3d at 1342 (expert who "ignore[s] available evidence about background risk "place[s] the reliability of [his] conclusions in … doubt").

### 3.     *Dr. Singh failed to distinguish between cerebrovascular and other adverse events.*

The only adverse event relevant to this litigation is Mr. McWilliams' stroke—a cerebrovascular event.  Dr. Singh admits that he considered only four clinical trial studies in his meta-analysis.  Singh Report at 6 (Ex. 3).  According to Figure 3 in Dr. Singh's report, only two of the four studies that Dr. Singh relied on for his meta-analysis reported *any cerebrovascular events at all*.  And among the controlled observational studies that Dr. Singh reviewed for his overall causation opinion, few studies reported any cerebrovascular events, and one that did reported four times as many cardiovascular events in Gleevec® patients as in Tasigna® patients. *See id*. at Appendix B – Table 2.[8]  This data cannot support a statistical finding that the

---

[8] As discussed in NPC's concurrently filed Motion to Exclude the Testimony of Dr. Cheryl Blume, the adverse event reports pulled by Dr. Blume similarly do not show an appreciable difference between cerebrovascular events ("CVEs") in nilotinib and imatinib patients prior to

relationship between Tasigna® and *cerebrovascular events* was causal.  Accordingly, Dr. Singh's failure to distinguish between cerebrovascular events and other injuries renders his meta-analysis a poor "fit" for this case, which is about a cerebrovascular event.  *See Daubert*, 509 U.S. at 591-92; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (finding expert testimony unreliable based on "analytical gap" between data and conclusions).  Notably, Dr. Singh's opinion has been excluded before where it did not fit the facts of the case.  In *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products Liability Litigation*, Dr. Singh's causal opinion as to the lower dosage of Lipitor was excluded because "he did not look at the effect of different dosages of Lipitor, and if a study showed an increased risk of diabetes, he simply 'ascribe[d] the risk to all doses.'"  174 F. Supp. 3d 911, 921 (D.S.C. 2016).  Here, Dr. Singh is similarly – and impermissibly – extrapolating his findings as to PAOD and heart events to cover cerebrovascular events as well.

### 4.    *Dr. Singh's meta-analysis only relied on non-blinded clinical trials*

Generally, meta-analysis is "of limited value in combining the results of epidemiologic studies based on observation."  *Knight v. Kirby Inland Marine, Inc.*, 363 F. Supp. 2d 859, 866 n.13 (N.D. Miss. 2005).   Here, the meta-analysis Dr. Singh conducted considered four randomized clinical trials, none of which were blinded.  7/20/17 Singh Dep. 113:7-13 (Ex. 2); Singh Report at 6 (Ex. 3).  Dr. Singh agrees that the lack of blinding introduces potential bias in the trials. 7/20/17 Singh Dep. 113:14-19 (Ex. 2).  The absence of blinding introduces potential biases in adverse event reporting.  For example, in a blinded trial a physician is more likely to report all adverse events because the physician does not known whether the patient is being treated with the study drug or a comparator drug.  In contrast, in an unblinded trial, study physicians may be less likely to report events that occur in the active control population (here Gleevec® or imatinib) because that medication has been on the market for a substantial period of

---

2011.  *See* Blume Report at 62 (attached to NPC's contemporaneously filed motion to exclude Dr. Blume):

| Year | Nilotinib (Tasigna®) CVE/All (%) | Imatinib (Gleevec®) CVE/All (%) |
|------|----------------------------------|----------------------------------|
| 2008 | 5.3% | 3.6% |
| 2009 | 3.5% | 3.2% |
| 2010 | 3.9% | 4.4% |

In fact, this data shows a higher rate of cerebrovascular events for Gleevec® in 2010 than for Tasigna®.

time and its side-effect profile is considered well known.  Dr. Singh's meta-analysis makes no effort to evaluate whether there was any bias in results due to the fact that the trials at issue were all unblinded.

In sum, Dr. Singh's methodology in this made-for-litigation report is "simply inadequate to support the conclusions reached," and the Court should exclude it.  *See, e.g.*, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

## II.   THE INADMISSIBILITY OF DR. SINGH'S META-ANALYSIS RENDERS HIS OTHER CAUSATION RELATED OPINIONS INADMISSIBLE

Dr. Singh performed his meta-analysis because he "wanted [his] own analysis of that data before [he] could form [his] opinion."  7/20/17 Singh Dep. 29:4-5 (Ex. 2).  As discussed above, Dr. Singh's meta-analysis is inadmissible, and his derivative causation opinions should be excluded as well.

### A.   Bradford-Hill Analysis

Dr. Singh purported to perform a Bradford-Hill analysis to assess causation.  *See* Singh Report at p. 32 (Ex. 3).  But such an analysis can be used to evaluate whether an association is causal only after a statistically significant association is established.  *Jones v. Novartis Pharm. Corp.*, 235 F. Supp. 3d 1244, 1269 (N.D. Ala. 2017), *aff'd in part* No. 17-11063, 2018 WL 2015488 (11th Cir. Apr. 30, 2018) (citing *In re Lipitor*, 174 F. Supp. 3d at 924 (D.S.C. 2016) ("it is well established that the Bradford Hill method used by epidemiologists ***does*** require that an association be established through studies with statistically significant results" (emphasis in original)); *Dunn. v. Sandoz Pharm. Com.*, 275 F. Supp. 2d 672, 678, 680 (M.D.N.C. 2003) (first step of analysis is a "statistically significant" association "between two variables"); *Soldo v. Sandoz Pharm., Corp.*, 244 F. Supp. 2d 434, 569 (W.D. Pa. 2003) (without such an association, "application of the Bradford-Hill criteria is unwarranted").  Dr. Singh's analysis breaks down at the very first step because his flawed meta-analysis does not establish the existence of a statistically significant association.  A Bradford-Hill analysis "is only as reliable as the underlying data upon which it is based."  *Knight*, 363 F. Supp. 2d at 864.  Because Dr. Singh's analysis is premised on his defective meta-analysis, it too must be rejected.

### B.   Characterization of "severe" or "rapidly progressive" is unsupported

In the first sentence of his report, Dr. Singh states that he was retained to "analyze the epidemiological data and, based on these data" to provide his opinion about whether Tasigna® "is causally related to the development of *rapidly progressive* atherosclerosis-related conditions."

Singh Report at 1 (emphasis added) (Ex. 3).  This statement in Dr. Singh's introduction is the first and last time the description "rapidly progressive" is used in Dr. Singh's initial report to *describe* the atherosclerotic disease that he opines is causally associated with Tasigna® use. Elsewhere in his initial report, Dr. Singh only refers to "rapidly developed" incidents from case reports as *supporting evidence* of a causal association.[9]  Notably, all of Dr. Singh's opinion statements in his initial report leave out a "rapidly progressive descriptor."[10]  It is only in his supplemental report that he states (without providing basis) that Tasigna® is "causally related to the development of *severe* [atherosclerotic disease]" which "develop rapidly after [Tasigna®] exposure . . . ."  *See* Dr. Singh's Rebuttal Report at 1 (Ex. 8).

Dr. Singh admits that he is "not offering an opinion on whether there's increased mortality or decreased mortality."  7/20/17 Singh Dep. 274:5-13 (Ex. 2).  He also acknowledged that he has no statistical support for an opinion that Tasigna® is associated with atherosclerosis that is "rapidly progressive."  *See id.* at 35:18-36:2 ("Q.  Okay.  What evidence do you have in your report that shows that there is a statistically significant association between the use of nilotinib and a uniquely rapidly developing and aggressive form of atherosclerotic events?  A. So -- so to that particular question, these case reports do not provide statistical significant evidence.  They just describe, you know, the occurrence of these rapidly progressive events.");  *id.* at 39:24 – 40:12 ("Q.  Okay.  So you have evidence of statistical significance from the ENESTnd trials that you believe shows that nilotinib has a uniquely aggressive and rapidly progressing form of atherosclerosis associated with it; is that your testimony? A.  I'm not saying that it's -- so whatever words you used.  . . . Whether it's a unique form, whether it is – I don't

---

[9] *See, e.g.*, *id.* at 10 ("This rapidly-developing and treatment resistant form of the disease, which is different than the normal expected progression of the disease with aging, *provides further evidence of an association.*"); *id.* at 27 ("The rapid occurrence of events immediately after exposure to nilotinib, the severity and multiplicity of atherosclerotic events, and the occurrence of events in some without risk factors are consistent with the meta-analysis of randomized controlled trials which *provide evidence in support of a causal association*"); and *id.* at 29 ("Several case reports describe the rapid occurrence of peripheral atherosclerosis, heart attacks, and cerebrovascular accidents in patients with nilotinib. These and other cases *provide support of an association between nilotinib therapy and cardiovascular events.*") (emphasis added).

[10] *See, e.g.*, *id.* at 1 ("In summary, it is my opinion, to a reasonable degree of scientific certainty, that nilotinib causes the development of atherosclerotic-related cardiovascular events …."); and *id.* at 39 ("[I]t is my opinion with a reasonable degree of scientific certainty that nilotinib causes cardiovascular events ….").

know that.  I don't have enough evidence and with the underlying data to report on that."). Indeed, no existing meta-analysis would support a causal association between Tasigna® and an atherosclerotic condition that is characterized as "rapidly progressing."  *Id.* at 245:2-14 ("Q.  Do any of the meta-analyses, yours or the others, evaluate whether there is a unique type of rapidly progressing, severe atherosclerosis that is associated in a statistical way with the treatment with nilotinib? A.  I mean, they evaluate the events as reported in the primary studies.  I don't think any of the trials that I evaluated reported the atherosclerosis as such. Q.  And how about any of the other meta-analyses you reviewed, did any of them address that? A.  No.").

Dr. Singh's characterization of "rapidly progressing" comes solely from case reports, and as such must be excluded as unreliable.  The Court should preclude Dr. Singh from presenting his case-report-based opinions because the proposed testimony does not satisfy the requirements that an expert's testimony must be based on scientifically reliable data and methodologies. Courts frequently have rejected case reports as unreliable causation proof because they "reflect only reported data, not scientific methodology. . . .  Simply stated, case reports raise questions; they do not answer them."  *See McClain*, 401 F.3d at 1254 (11th Cir. 2005) (citation omitted); *see also Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1133 (D. Ariz. 2001) ("[C]ase reports do not provide reliable scientific evidence of causation.  Rather, they are merely compilations of occurrences, and have been rejected as reliable scientific evidence supporting an expert opinion that *Daubert* requires"); *Jones v. United States*, 933 F. Supp. 894, 899 (N.D. Cal. 1996) (finding that anecdotal case reports, reviews of research done by other people, and studies lacking a control group were not derived through scientific methods and experts' reliance on same did not satisfy *Daubert* standard), *aff'd*, 127 F.3d 1154 (9th Cir. 1997); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1411 (D. Or. 1996).  Consequently, relying on anecdotal case reports to support a causation opinion "is contrary to . . . good scientific practice."  *Soldo*, 244 F. Supp. 2d at 542.

Since Dr. Singh cannot base a causation opinion solely on case-reports, Dr. Singh should not be permitted to opine that Tasigna® is causally associated with atherosclerosis characterized as *severe* or *rapidly progressive.*

## **CONCLUSION**

For the foregoing reasons, plaintiffs cannot satisfy their burden of establishing that Dr. Singh's opinions are admissible. Accordingly, the Court should grant NPC's motion and preclude Dr. Singh from testifying about the opinions addressed herein.

## **LOCAL RULE 7.1(a)(3) CERTIFICATION**

Counsel for NPC has conferred with counsel for plaintiffs regarding the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so.

Dated: May 21, 2018                       Respectfully submitted,

                                            s/ Michael J. Thomas

                                            Michael J. Thomas
                                              PENNINGTON MOORE WILKINSON
                                              BELL & DUNBAR
                                              215 South Monroe Street, 2nd Floor
                                              Tallahassee, FL 32301
                                              Phone: 850-222-3533
                                              Fax: 850-222-2126
                                              mike@penningtonlaw.com

                                          Robert E. Johnston (admitted *pro hac vice*)
                                          (rjohnston@hollingsworthllp.com)
                                          Andrew L. Reissaus (admitted *pro hac vice*)
                                          (areissaus@hollingsworthllp.com)
                                              HOLLINGSWORTH LLP
                                              1350 I Street, NW
                                              Washington, DC 20005
                                              Phone:  (202) 898-5800
                                              Fax:  (202) 682-1639

                                          *Attorneys for Defendant*
                                          *Novartis Pharmaceuticals Corporation*

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on May 21, 2018, the foregoing was filed with the Clerk of the Court and served in accordance with the Southern District of Florida's Rules on Electronic Service upon the following parties and participants:

    Bryan F. Aylstock, Esq.
    AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
    17 E. Main Street, Suite 200
    Pensacola, Florida 32502
    Miami, FL  33130

    Richard M. Elias, Esq.
    Greg G. Gutzler
    Tamara M. Spicer
    ELIAS GUTZLER SPICER LLC
    130 South Bemiston Avenue, Suite 302
    St. Louis, MO  63105

    James G. Onder
    Evan Murphy
    ONDER LAW
    110 East Lockwood
    St. Louis, MO

            s/ Michael J. Thomas
            Michael J. Thomas