# Exhibit
# 1

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF FLORIDA

3    FORT PIERCE DIVISION

4    CASE NO.:  2:17-cv-14302-ROSENBERG/MAYNARD

5

6    DENNIS MCWILLIAMS and

7    LORI MCWILLIAMS,

8         Plaintiffs,

9    vs.

10   NOVARTIS AG, a Global Healthcare Company;

11   NOVARTIS PHARMACEUTICALS CORPORATION, a

12   Delaware Corporation,

13        Defendants.

14   --------------------------------------------

15

16        VIDEO DEPOSITION of SONAL SINGH, M.D.

17             Framingham, MA

18             May 2, 2018

19

20

21

22

23   Reported by:

24   Dana Welch, CSR, RPR, CRR, CRC

25   Job #140715

1

2

3

4

5                              May 2, 2018

6                              7:29 a.m.

7

8

9          Video deposition of SONAL SINGH, M.D.,

10   held at the offices of Regus, 945 Concord Street,

11   Framingham, Massachusetts, before Dana Welch,

12   Certified Shorthand Reporter, Registered

13   Professional Reporter, Certified Realtime Reporter

14   and Notary Public of the Commonwealth of

15   Massachusetts.

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES:

2    ELIAS GUTZLER SPICER

3    BY:  RICHARD ELIAS, ESQ.

4    130 South Bemiston

5    Clayton, MO 63105

6    Attorney for Plaintiffs

7

8

9    HOLLINGSWORTH

10   BY:  ANDREW REISSAUS, ESQ.

11   1350 I Street, N.W.

12   Washington, DC 20005

13   Attorney for Defendants

14

15

16   Also present:  David Woodford, Videographer

17

18

19

20

21

22

23

24

25

1                          SINGH

2               P R O C E E D I N G S

3          THE VIDEOGRAPHER:  This is the start of

4     media labeled number one in the video-recorded

5     deposition of Sonal Singh, M.D.  This is in the

6     matter of Dennis McWilliams and Lori McWilliams

7     versus Novartis AG, et al.  It's being heard in the

8     United States District Court, Southern District of

9     Florida, Fort Pierce Division, Case Number is

10    2:17-cv-14302.

11         This deposition is being held at the Regus

12    office at 945 Concord Street, Framingham,

13    Massachusetts on May 2nd, 2018, beginning at

14    7:29 a.m.  My name is David Woodford.  I am the

15    legal video specialist from TSG Reporting Inc.,

16    headquartered at 747 Third Avenue, New York, New

17    York.  The court reporter is Dana Welch, also in

18    association with TSG.

19         Will counsel present please introduce

20    yourselves and your affiliations and the witness

21    will be sworn.

22         MR. REISSAUS:  Andrew Reissaus for

23    Novartis Pharmaceuticals Corporation.

24         MR. ELIAS:  Rich Elias for the plaintiffs.

25                    SONAL SINGH, M.D.,

1                            SINGH

2          having been first duly sworn on oath,

3     was examined and testified as follows:

4          (Exhibit 1, Amended Notice of Deposition

5      of Dr. Sonal Singh, marked for identification.)

6                         EXAMINATION

7     BY MR. REISSAUS:

8          Q.  Dr. Singh, my name is Andrew Reissaus.  It

9     was nice to meet you just before the deposition.

10          I'm going to hand you what I've marked as

11    Exhibit 1.  Do you see that's an Amended Notice of

12    Deposition?

13          A.  Yes.

14          Q.  Okay.  Have you seen this before?

15          A.  No.

16          Q.  I saw that you brought a little red folder

17    with you today.

18          A.  Sure.

19          Q.  What documents did you bring with you

20    today?

21          A.  So I brought my updated CV and I brought

22    my, you know, history of deposition and trial

23    testimony, and I brought hours spent on this case.

24          MR. REISSAUS:  Okay.  I'm going to go

25    ahead and mark as Exhibit 2 a copy of your expert

1                         SINGH

2      report in the McWilliams case.

3                (Exhibit 2, Expert Report of Sonal Singh,

4         MD, MPH, marked for identification.)

5         Q.  Can you confirm that that's your expert

6      report?

7         A.  Yes.

8         Q.  Okay.  And it's dated February 20th, 2018

9      on the signature page on page 39?

10        A.  Pages are a little off, but 39, yeah.  Did

11     I say 39, maybe I heard --

12        Q.  Oh, oh, I'm sorry.  Okay.  But this is

13     your report from this case?

14        A.  Yes.

15        Q.  Okay.  And Appendix A in your report is a

16     copy of your CV?

17        A.  Yes.

18        Q.  Okay.  And you brought with you today your

19     CV as well.  Is that a different --

20        A.  Updated.

21        Q.  It's updated, okay.

22        A.  I mean, not much different, but I just

23     thought I'd bring an updated one.

24                (Exhibit 3, Rebuttal Expert Report of

25     Sonal Singh, MD, MPH, marked for identification.)

1                          SINGH

2       Q.  I'm going to hand you what has been marked

3  as Exhibit 3.  Is this a copy of your supplemental

4  expert -- or excuse me -- rebuttal expert report in

5  this case?

6       A.  Yes.

7       Q.  Turning to the CV that you brought with

8  you, I'd like to -- would it be all right if we

9  marked that as Exhibit 4 and leave it with the

10  court reporter?

11      A.  Sure.

12          (Exhibit 4, Curriculum Vitae Sonal Singh,

13      MD, MPH, marked for identification.)

14      Q.  Let me take a look at that, please.

15          Thank you.

16          This is dated April 30th, 2018?

17      A.  Yes.

18      Q.  Okay.  And I haven't had an opportunity to

19  look at this before.  Could you identify what

20  updates or changes you've made from the version

21  that's with your expert report to the version here?

22      A.  Just some publications.  So I don't know

23  if that -- you know, I try to bring an updated CV

24  to -- so page 28, maybe there's an updated

25  editorial.  Then there are some papers on page 17,

1                          SINGH

2      I think maybe the first five papers are new.

3             And then there may be one -- and then

4      page 14, I have two invited presentations.  And

5      then on the same page, I have another presentation

6      at number 1.

7          Q.  Let me ask you it this way:  Have you

8      published any papers on the topic of TKI

9      medications and atherosclerotic conditions?

10         A.  No.

11         Q.  Okay.  Do any of the updates to your CV

12     address CML or TKIs?

13         A.  No, they don't.

14         Q.  Okay.  Have you submitted any papers or

15     abstracts for publication regarding TKIs or CML?

16         A.  No.

17         Q.  And by TKIs, I mean tyrosine kinase

18     inhibitors; is that --

19         A.  Yes.

20         Q.  Okay.  In your expert report in this case,

21     you offer opinions on general causation, correct?

22         A.  Yes.

23         Q.  Okay.  You have not offered any opinions

24     about Dennis McWilliams as an expert in this case,

25     have you?

1                              SINGH

2        A.  No.  I will -- I have not and I will not

3   offer.

4        Q.  And it's correct that you haven't reviewed

5   any of his medical records?

6        A.  No, I haven't reviewed medical records.

7        Q.  You were deposed approximately a year ago

8   in another case by a colleague of mine, Robert

9   Johnston.

10       Do you recall that?

11       A.  Yes.  I don't recall the specifics, but

12   yeah, around sometime in the summer.

13       Q.  Since that time, have you undertaken any

14   additional literature reviews or research regarding

15   CML or TKIs?

16       A.  No.

17            MR. REISSAUS:  I'd like to go ahead and

18   mark as Exhibit 5 the list of testimony that you

19   brought with you.

20            (Exhibit 5, Trial testimony and expert

21       depositions, marked for identification.)

22       Q.  I see you list a deposition in -- I'm just

23   going to go through this in order.

24            On Exhibit 5, the first entry you have is

25   Wyche, W-y-c-h-e, versus Tenet Health System in

1                       SINGH

2   Georgia state court.

3       A.  Yes.

4       Q.  What was your role in that case?

5       A.  It was about Wernicke's, so it was a

6   medical/legal case of Wernicke encephalopathy, I

7   think after gastric bypass, and I testified on

8   behalf of the plaintiff.

9       Q.  Was it your testimony in that case about

10  whether or not the physicians violated a standard

11  of care in their treatment of the plaintiff?

12      A.  Yes.

13      Q.  And it was your opinion that the doctors

14  did violate some standard of care in that case?

15      A.  Yes.  I don't know if it was specifically

16  doctors, or the system, but this was around ten

17  years ago, so really I don't have much more

18  recollection than that.

19      Q.  Okay.  And number 4 on your list is a case

20  in Missouri Circuit Court, Camden County, Grace

21  Arlene Rahm -- R-a-h-m-o-e-l-l-e-r, Rahmoeller --

22      A.  Rahmoeller.

23      Q.  -- versus Walmart.  And you were deposed

24  on April 16th of this year?

25      A.  Yes.

1                    SINGH

2        Q.  What type of case is that?

3        A.  So that was a -- I don't know what type of

4    case, but I was asked to be deposed on behalf of

5    the plaintiffs, again looking at the development of

6    neuropathy with Levofloxacin.

7        Q.  Did you create an expert report in that

8    case?

9        A.  No.  No expert report was required.  It

10   was just a deposition.  I think in Missouri that's

11   how it works.

12       Q.  Is there a trial date set in that case?

13       A.  20 -- there's no trial date, it's 2019.

14   They move very slowly.

15       Q.  And is it your opinion that you're

16   offering in that case that a medication caused the

17   plaintiff to develop neuropathy?

18       A.  Yes.

19       Q.  Did you perform a meta-analysis or

20   systematic review of the literature for that case?

21       A.  It was a medical record review, so it was

22   different.

23       Q.  So in that case, you're offering an

24   opinion on specific causation?

25       A.  Yes.  Pertaining to that case, I mean

SINGH

1

2  general always comes in, but yes.

3      Q.  I'm going to mark as Exhibit 6 the last

4  page you brought with you, which is records of time

5  that you've spent; is that correct?

6      A.  Yes.  Beyond what has been noted until the

7  previous deposition.

8      Q.  Okay.  So at your previous deposition, you

9  testified that you had spent a total of about

10  70 hours leading up to your deposition working on

11  the case.

12          Does that sound about right?

13      A.  Yeah.

14      Q.  Okay.  And then you would have spent the

15  day in the deposition, seven or eight hours, right?

16      A.  Yeah.

17      Q.  Did you bill for that time?

18      A.  I think so.

19      Q.  Okay.  And you've done no further work in

20  that matter since your deposition?

21      A.  So we did meet once, I think because there

22  was a tentative trial date, and so I met for three

23  or four hours -- I don't remember exactly -- and I

24  did bill for that.

25      Q.  Is that three or four hours that you spent

1                          SINGH

2    included in what we're -- the list that you brought

3    today of time?

4        A.   No, I don't think so.

5        Q.   Okay.

6        A.   This is specific to this McWilliams

7    report.

8             MR. REISSAUS:   Okay.   And I'm sorry, we

9    may not have marked this.

10            (Exhibit 6, List of work performed, marked

11        for identification.)

12       Q.   So in the McWilliams case, you've spent a

13   total of ten hours; is that correct?

14       A.   Something like that, yeah, five, six --

15   yeah, six, three -- nine, ten, yeah.

16       Q.   It says for March 14th that you've

17   reviewed testimony.   What testimony did you review?

18       A.   The reports, expert reports of Dr. Giles

19   and Dr. Moslehi, so should be expert reports.

20       Q.   Okay.   So that was work that you did in

21   conjunction with preparing your rebuttal report

22   that we marked as Exhibit 3?

23       A.   Yes.   And that should say rebuttal report

24   rather than supplemental.

25       Q.   It lists that you did deposition

1                        SINGH

2    preparation on two hours on April 29th and three

3    hours on May 1st.  What did you do to prepare for

4    your deposition?

5         A.  I reviewed my expert report, my expert

6    report and I reviewed my previous deposition.

7         Q.  Did you do anything else?

8         A.  No.

9         Q.  Okay.  In addition to the cases that are

10   identified in Exhibit 5, have you been disclosed as

11   an expert witness in any other case?

12        A.  Yes.

13        Q.  What other cases?

14        A.  So there's a case in -- and this is, what

15   do you call, a general causation expert in PDE5

16   inhibitors in malignant melanoma.

17        Q.  Where is this litigation?

18        A.  I don't remember.

19        Q.  What plaintiffs' attorneys are you working

20   with in that case?

21        A.  I can get you the details after this.  I

22   don't remember the names.

23        Q.  Okay.  But you have generated an expert

24   report and been disclosed there?

25        A.  Yes, I have.  But there has been no

```
                              SINGH
1
2    deposition.  This is just a listing of depositions.
3         Q.  Thank you.
4              Did you perform a meta-analysis for that
5    case?
6         A.  No.
7         Q.  Did you perform a systematic review of the
8    literature for that case?
9         A.  I performed a literature review.
10        Q.  We discussed your updated CV a moment ago.
11   Since your deposition last year, have you had any
12   change in your qualifications or professional
13   positions?
14        A.  No.
15        Q.  Are you aware that this case involves a
16   patient who had a stroke?
17        A.  Yes.
18        Q.  Are you aware that this patient did not --
19   does not have PAOD or been diagnosed with ischemic
20   heart disease?
21        A.  Yes.
22        Q.  How did you become aware of that?
23        A.  I was provided a brief summary of that by
24   -- you know, by Attorney Elias.
25        Q.  I'm going to hand you what we're going to
```

1                          SINGH

2     mark as Exhibit 7.

3              (Exhibit 7, Chatree Chai-Adisaksopha paper,

4         Major arterial events in patients with chronic

5         myeloid leukemia..., marked for

6         identification.)

7         Q.  You've seen this article before, correct?

8         A.  Yes.

9         Q.  And this is one of the articles that you

10    cite in your report, correct?

11        A.  Yes.

12        Q.  All right.  That's -- you cite it on --

13    this article, Chai-Adisaksopha, C-h-a-i, hyphen,

14    A-d-i-s-a-k-s-o-p-h-a, 2016, on page 14 of your

15    report, correct?

16        A.  Page you said, 14?

17        Q.  14.

18        A.  Yes.

19        Q.  Okay.  And the authors of this study found

20    a rate of cerebrovascular disease of .3 per hundred

21    patient years for nilotinib, correct?

22        A.  Yes.

23        Q.  And less than .1 per hundred patient years

24    for imatinib?

25        A.  Yes.

1                         SINGH

2      Q.   And you include that in your report, that

3  data, correct?

4      A.   Yes.

5      Q.   Okay.  The authors of this article also

6  provide data on other TKIs in addition to nilotinib

7  and imatinib, correct?

8      A.   Yes.

9      Q.   Okay.  Like you to turn to page 1306 --

10         MR. ELIAS:  Of?

11     Q.   -- of the -- of Exhibit 7, the

12  Chai-Adisaksopha article.

13         You see the heading Cerebrovascular

14  Disease?

15     A.   Yes.

16     Q.   And it reports a rate of .7 per hundred

17  patient years for dasatinib, correct?

18     A.   Yes.

19     Q.   The rate of .7 per hundred patient years

20  for dasatinib is higher than the rate of .3 per

21  hundred patient years for nilotinib, correct?

22     A.   Yes.

23     Q.   You did not include in your report the

24  rate of cerebrovascular diseases in patients

25  receiving dasatinib when you discussed this

1                        SINGH

2    article, correct?

3         A.  If I did not, I did not, yeah.

4         Q.  And if you look at page 14, you did not,

5    correct?

6         A.  Yes.

7              (Exhibit 8, Douxfils paper, Association

8              between BCR-ABL Tyrosine Kinase Inhibitors...,

9              marked for identification.)

10        Q.  I'm going to hand you another exhibit,

11   Exhibit 8.

12             Have you seen this article before?

13        A.  Yes, I have.

14        Q.  And this is the Douxfils 2016 article,

15   correct?

16        A.  Yes.

17        Q.  And this is something else that you --

18   another publication that you cite in your report,

19   correct?

20        A.  Yes, I do.

21        Q.  And if you look at the Results section of

22   the abstract here, it reports that risk of vascular

23   occlusive events was increased with dasatinib OR

24   3.86, correct?

25        A.  Yes.

1                          SINGH

2        Q.  And it reports that nilotinib's OR was

3   3.42, correct?

4        A.  Yes.

5        Q.  So these authors in their data found that

6   the odds ratio for dasatinib of 3.86 was higher

7   than the odds ratio for nilotinib, correct?

8        A.  The point estimate was, but the confidence

9   intervals were overlapping.

10       Q.  And sitting here today, you don't have any

11  reason to disagree with their analysis or the

12  methods that they report in the article, do you?

13       MR. ELIAS:  Object to the form.

14       A.  I mean, I have lots of disagreements.  You

15  know, I would perform it differently.  But, you

16  know, I've included that in the rate, and I've

17  cited some of the limitations as well, so...

18       Q.  In your report, you do not attempt to

19  compare the incidence rates of cardiovascular

20  events between nilotinib and other TKIs, like

21  dasatinib, only imatinib?

22       MR. ELIAS:  Object to the form.

23       A.  Yes.  Because I was looking for studies

24  that have compared this directly and, you know,

25  we'd have trials that compare nilotinib and

Page 20

1                          SINGH
2    imatinib.
3         Q.  But you did not do an analysis to compare
4    rates with nilotinib and dasatinib, for example?
5         A.  No, I have not.
6         MR. ELIAS:  Mr. Reissaus, I'll state for
7    the record none of that questioning on that
8    document was specific to the issue in this case, as
9    ordered by the court.  This is something that could
10   have been asked and I think was asked about at the
11   prior deposition.
12        And so we're not going to give you a very
13   long leash on this, and, you know, we want to get
14   out of here as quickly as possible.  So please keep
15   your questions focused on what we're here today to
16   talk about, the McWilliams' case and the court's
17   order.
18        MR. REISSAUS:  I note your objection, but
19   I don't agree with it and I'll continue.
20        I'd like to mark --
21        MR. ELIAS:  Well, if you do continue like
22   that, then we will have to cut it off.  I'm sorry.
23        MR. REISSAUS:  If you need to, you can do
24   that and we'll seek appropriate leave from the
25   court.

1                          SINGH

2          MR. ELIAS:  Good.

3          MR. REISSAUS:  I would like to mark as

4    Exhibit 9...

5          (Exhibit 9, Nathaniel Erskine paper, A

6       systematic review and meta-analysis on herpes

7       zoster and the risk of cardiac and

8       cerebrovascular events, marked for

9       identification.)

10      Q.  What I've marked as Exhibit 9 is an

11   article that you authored, correct?

12      A.  Yes.

13      Q.  And it's titled "A systematic review and

14   meta-analysis on herpes zoster and the risk of

15   cardiac and cerebrovascular events."

16      A.  Yes.

17      Q.  And this was published July 27, 2017; is

18   that right?

19      A.  Yes.  Sometime in the summer.

20      Q.  And in the Background on the first page

21   you write, "Patients who develop herpes zoster or

22   herpes zoster ophthalmicus may be at risk for

23   cerebrovascular and cardiac complications"; is that

24   right?

25      A.  Yes.

1                         SINGH

2        Q.  So you undertook a meta-analysis to

3    evaluate the hypothesis that herpes zoster is

4    associated with higher rates of cerebrovascular and

5    cardiac disease, correct?

6        A.  I mean, the hypothesis was whether it is

7    associated.  It could be higher; it could be lower.

8        Q.  And your -- so you conducted an analysis.

9    Did you find an increased risk of cerebrovascular

10   disease with exposure to herpes zoster?

11       A.  Yes.  We found unspecified herpes zoster

12   and ophthalmicus will increase.

13       Q.  And by "unspecified herpes zoster," that

14   just means generalized in location, correct?

15       A.  Yeah.  The studies did not really, you

16   know -- so for example, it wasn't dermatomal or

17   more than one dermatome, so we took whatever

18   definitions of zoster that the studies --

19       Q.  And if you turn to page 11, the Discussion

20   section, the first sentence states, "Our systematic

21   review and meta-analyses of 12 published

22   epidemiological studies identified associations

23   with exposure to herpes zoster with increased odds

24   of 20 to 40 percent and 10 to 30 percent of

25   experiencing a cerebrovascular and cardiovascular

1                         SINGH

2    event respectively over periods of three months to

3    over a year after onset," correct?

4         A.  Yeah.

5         Q.  Okay.  So your analysis found that the

6    odds of a cerebrovascular event were increased 20

7    to 40 percent in the three-month to over a year

8    period after a patient had herpes zoster, correct?

9         A.  Yeah.  I can't see the figures, but, I

10   mean, I -- we probably wrote it correctly, yeah.

11   Let me just look at this for one second.

12            Increase in a period of three months to

13   over a year.

14            Yes.

15            (Exhibit 10, The effects of lowering LDL

16       cholesterol with statin therapy in people at

17       low risk of vascular disease:  Meta-analysis of

18       individual data from 27 randomised trials,

19       marked for identification.)

20         Q.  I'm going to hand you what we've marked as

21   Exhibit 10.  It's an article titled "The effects of

22   lowering LDL cholesterol with statin therapy and

23   people at low risk of vascular disease:

24   Meta-analysis of individual data from 27 randomised

25   trials."

1                          SINGH

2       A.  Yes.

3       Q.  You've reviewed this article before,

4   correct?

5       A.  Yes.

6       Q.  And in fact, you cite it in your

7   supplemental report in this case, correct?

8       A.  Yes.  Many publications, yeah.

9       Q.  And if you look at the Methods section of

10  the abstract here, the authors report that they

11  included individual participant data from 22 trials

12  of statins versus control therapies; is that

13  correct?

14      A.  Yes.

15      Q.  All right.  In sort of more simple terms

16  for a jury, that means they compiled data from 22

17  studies, correct?

18      A.  Yes.

19      Q.  Okay.  And after that, they report the

20  number of patients that were included in the

21  analysis, correct?

22      A.  Yes.

23      Q.  And that was 134,537, correct?

24      A.  Yes.

25      Q.  Okay.  You would agree that the population

1                          SINGH

2    in this meta-analysis is much, much larger than the

3    patient population in the studies that you examined

4    involving nilotinib and CML, correct?

5           MR. ELIAS:  Object to the form.

6    A.  Yes.

7    Q.  Under the Interpretation portion of the

8    abstract, the authors note that in individuals with

9    a five-year risk of major vascular events lower

10   than 10 percent, each one millimole per liter

11   reduction in LDL cholesterol produced an absolute

12   reduction in major vascular events of about 11 per

13   thousand over five years; is that correct?

14   A.  Yes.

15   Q.  And by "11 per thousand," that means over

16   a five-year period --

17          MR. REISSAUS:  Strike that.

18   A.  You want me to explain that?

19   Q.  It's okay.  I didn't write a -- or I

20   didn't ask a good question there.

21          Let me ask you about table or Figure 1 on

22   page 584.

23   A.  Figure 1 or Table 1?  Yeah.

24   Q.  And this figure is titled "Effects on

25   major coronary events, strokes, coronary

1                           SINGH

2    revascularization procedures and major vascular

3    events per 1 millimole per liter reduction in LDL

4    cholesterol at different levels of risk," correct?

5        A.  Yes.

6        Q.  And it has Any Stroke listed as one of the

7    categories of events that they're looking at,

8    correct?

9        A.  Yes.

10       Q.  Okay.  And there's an Overall row at the

11   bottom there within Any Stroke, right?

12       A.  Yes.  That suggests a 15 percent

13   reduction, approximately.

14       Q.  And the 15 percent reduction that you're

15   observing is based on the .85 relative risk; is

16   that correct?

17       A.  Yes.

18       Q.  Okay.  And that's per one millimole

19   reduction in LDL, correct?

20       A.  Yes.

21       Q.  So if you -- if someone were to have a

22   greater than one millimole reduction in LDL, this

23   data would suggest a larger decrease in risk of

24   stroke than just 15 percent, correct?

25       A.  It would depend on where they started out

1                           SINGH

2    from.  I mean, they just present data on one

3    millimole, so I'm taking that data at its face

4    value.

5         Q.  Well, it's saying "per one millimole

6    reduction," right?  So it's -- it's looking at --

7    if someone achieved more than that, they -- it

8    would be a bigger effect, they're controlling to

9    get it -- to get a reduction per one millimole,

10   correct?

11        A.  Yes.  It's reporting data on one millimole

12   reduction.  But to what effect, you know, whether

13   this would be .84 or to .5, we won't know from this

14   data, because that makes assumptions about, you

15   know, how these -- whether it's an exponential

16   effect or whether it's a linear effect, whether

17   there's a ceiling effect.

18        Q.  And you don't know if it's linear or

19   exponential in this case?

20        A.  I think neither they do.  I mean, I said

21   neither do they.

22             (Exhibit 11, Valent paper, Risk factors and

23        mechanisms contributing to TKI-induced vascular

24        events in patients with CML, marked for

25        identification.)

1                         SINGH

2        Q.  I've handed you an article titled "Risk

3   factors and mechanisms contributing to TKI-induced

4   vascular events in patients with CML."

5            Have you seen this article before?

6        A.  I don't recall.  I may have in my report,

7   but I don't recall.

8        Q.  And this is dated May 12, 2017, correct,

9   at the bottom of the first page?

10       A.  Yes.

11       Q.  And it's correct, isn't it, that you

12  conducted your literature searches for this case

13  prior to the publication of this article?

14       A.  I don't remember the date, again, yeah,

15  but it was sometime in -- I can take a look at it.

16       Q.  Okay.

17       A.  Yeah, must be before that.

18       Q.  It doesn't -- you don't see a date in your

19  report, though, do you to --

20       A.  No.  No.

21       Q.  Okay.  And if you look -- this isn't an

22  article that you referenced in your expert report,

23  correct?

24       A.  I don't recall.

25       Q.  Would you turn to page 49.  Let's go to 48

1                        SINGH

2    first, sorry.

3            Do you know who Dr. Valent is?

4    A.  I don't.

5    Q.  Okay.  If you look under Section 3,

6    "Frequencies of VAE in TKI-treated patients with

7    CML."

8    A.  Yes, I am there.

9    Q.  Okay.  And the -- one, two, three, four,

10   five, six lines up from the bottom, it's -- there's

11   a sentence that begins, "The frequency of VAE in

12   patients receiving imatinib is substantially lower

13   than that reported for patients receiving nilotinib

14   or ponatinib."

15           Do you see that?

16   A.  Yes.

17   Q.  And it continues:  "In fact, in most

18   studies, less than 1 percent of all patients

19   developed VAE while on imatinib," correct?

20   A.  I see that.

21   Q.  Do you have any reason to disagree with

22   that statement?

23   A.  No.  I would just -- give me a second to

24   look at the references.

25           Yeah, I mean, all those references are in

1                          SINGH

2    my report, so...

3         Q.  Safe to say you don't have any reason to

4    disagree with the conclusion that the incidence of

5    VAEs was in most studies less than 1 percent for

6    patients on nilotinib therapy -- or imatinib

7    therapy?

8         A.  Yes.

9         Q.  And then the authors continue, "It is also

10   noteworthy that in contrast to nilotinib, imatinib

11   is lowering blood glucose levels," correct?

12        A.  Yes, that's what the authors say.  But I

13   disagree with their conclusions.

14        Q.  You disagree that imatinib is lowering

15   blood glucose levels?

16        A.  Yes.

17        Q.  "In addition" -- the authors continue, "In

18   addition, nilotinib may suppress diabetes

19   mellitus-associated atherosclerosis."

20             Did you take into account their statement

21   in forming your opinion?

22        A.  Yes.  I think a similar statement was in

23   Dr. Giles' report, or I don't know if that

24   particular reference, but I did -- and I, in fact,

25   went back and evaluated the data for both the

1                          SINGH

2     statement on glucose levels and the ENESTnd trial

3     because these are all hypothesis studies and

4     actually they suggest that nilotinib increases

5     glucose levels and there's no substantial

6     glucose-lowering effect with imatinib in the

7     ENESTnd trials.

8          And similar for lipid levels.  Lipid

9     levels increase with nilotinib greater than

10    imatinib, and in fact, even for blood pressure.  So

11    I disagree with their conclusions.

12          MR. ELIAS:  And it's the -- for the court

13    reporter's benefit, E-N-E-S-T-n-d trials.

14          MR. REISSAUS:  And to make it really

15    confusing, n-d is lower case.

16          COURT REPORTER:  Thank you.

17    Q.  So you disagree with Dr. Valent's

18    conclusion in this article that imatinib may

19    suppress diabetes-associated atherosclerosis?

20          MR. ELIAS:  Asked and answered.

21    A.  Yeah.  I disagree with his interpretation.

22    Q.  In your expert report, you include a

23    discussion of some disproportionality analyses

24    involving cardiovascular events and nilotinib.

25          Do you recall that?

1                          SINGH

2       A.  Yes, I do.

3       Q.  Okay.  Can you describe in lay terms what

4  a disproportionality analysis is?

5       A.  So a disproportionality analysis would be

6  analysis of usually case reports that are submitted

7  to regulatory agencies, whether it's the WHO or the

8  FDA, where one takes into account whether

9  particular event pairs with the drugs are

10  disproportionate to other event pairs with a

11  control compared to drugs.

12       Q.  And when you -- you mentioned the FDA.

13  You're talking about FDA's Adverse Event Reporting

14  system; is that right?

15       A.  Yes.

16       Q.  Okay.  And you have experience publishing

17  in the realm of conducting disproportionality

18  analyses using data like FDA's, correct?

19       A.  Yeah.  We have published.  In fact, I'm

20  working on one right now.

21       Q.  And you've actually published several

22  articles related to disproportionality analyses in

23  the last year or two, correct?

24       A.  So clarify, I have sort of done an

25  editorial on a disproportionality analysis, that

1                           SINGH

2    should be on my CV, and then -- yeah, so that

3    wasn't my study; it was somebody else's study.  I

4    provided my editorial opinion on it.

5         Q.  When you conduct those analyses, the

6    disproportionality analyses, do you use

7    proportional reporting ratios?

8              MR. ELIAS:  And I'm just going to object

9    that it lacks foundation just to the -- and maybe

10   you want to clarify, Drew, you say "when you

11   conduct those analyses," when he just -- I think he

12   just said that he didn't actually do them, but

13   editorialized on them.

14             MR. REISSAUS:  Well, let's clarify a

15   little bit because I...

16        Q.  It is correct that you have performed

17   disproportionality analyses, correct?

18        A.  In the past, yes.

19        Q.  Your clarification was just about

20   specifically what the most recent articles were

21   about, not your experience conducting the analyses.

22        A.  In the last year, yes.

23        Q.  Okay.  So just to make sure I have this

24   correct, when you perform disproportionality

25   analyses in your work as an epidemiologist and

1                         SINGH

2    physician, one of the tools you use is proportional

3    reporting ratios, correct?

4         A.  Yes.

5         Q.  And that is a -- that's considered one of

6    the foundational concepts in the field of

7    disproportionality analyses, correct?

8              MR. ELIAS:  Objection to the form.

9         A.  Yes.

10        Q.  And there are -- there are, of course,

11   flaws with using PR --

12             MR. REISSAUS:  Let me strike that.  Let me

13   start over.

14        Q.  There are potential drawbacks to using a

15   PRR, correct?

16        A.  I mean, there are drawbacks to the

17   database itself for where we are, you know, getting

18   -- getting data of -- to conduct, so I wouldn't

19   even -- so, you know, these are reports to the FDA,

20   so we don't have good denominators.  A lot of them

21   are incomplete.

22             So I think PRR, there are other methods

23   you can do that, but the methods won't solve the

24   problem about data itself.

25        Q.  Okay.  So setting aside the data quality

```
1                           SINGH
2    issues, which I think you've testified to that some
3    last time, and I don't want to ask you about that.
4    You mentioned there are other tools for -- other
5    statistical tools for disproportionality analyses
6    in addition to the PRR, correct?
7         A.  Yes.
8         Q.  Okay.  What are those methods?
9         A.  So it's like the EBGM, Poisson Shrinker,
10   which the FDA uses and some people use, yes, so
11   there are, you know, Bayesian methods to do that.
12   But there's no consensus that one is better than
13   the other.
14        Q.  By "one better than the other," you're
15   talking about a PRR versus an EBGM?
16        A.  Yes.
17        Q.  Would you agree that tools like a PRR or
18   an EBGM are important to have available and to use
19   when you're trying to perform a disproportionality
20   analysis using FDA's data?
21        A.  They are tools that, you know, are
22   applied.
23        Q.  When you're performing your
24   disproportionality analyses, do you -- do you ever
25   rely on just the percentage of overall reports
```

1                          SINGH

2     involving a single drug in assessing whether or not

3     there's a signal?

4          MR. ELIAS:  Object to the form.

5     A.  So percent -- can you repeat that?

6     Q.  Yeah.

7          When you're performing your

8     disproportionality analyses, do you ever rely on

9     just the percentage of overall reports of an

10    adverse event involving a single drug in assessing

11    whether or not there's a signal?

12    A.  It really depends on, you know, what is

13    the context of the drug and what is the context of

14    the event.  So for example, if you were thinking

15    about a very rare event, such as aplastic anemia,

16    so you could just rely on the percentage of events

17    to make, you know, an assessment about signals.  So

18    you wouldn't necessarily need a disproportionality

19    analysis.

20         But in most -- you know, if the outcome is

21    non -- not so rare, you would have to perform an

22    analysis.

23    Q.  And that would include things like

24    cardiovascular events?

25    A.  Yes.

1                          SINGH

2        Q.  So with cardiovascular events, you would

3    need to perform a disproportionality analysis?

4        A.  Exactly.

5            MR. REISSAUS:  If we could take a

6    couple-minute break.

7            THE VIDEOGRAPHER:  Off the record at

8    8:25 a.m.

9            (Proceedings interrupted at 8:25 a.m. and

10           reconvened at 8:35 a.m.)

11           THE VIDEOGRAPHER:  On the record,

12   8:35 a.m.

13   BY MR. REISSAUS:

14       Q.  Doctor, I'd like to turn to your report

15   and your meta-analysis and keto odds ratio for

16   stroke events, Figure 3 on page 8.

17       A.  Can I do a clarification of a previous

18   section?  I want to say something about this.

19       Q.  By "this," you mean your testimony list?

20       A.  Yeah.

21       Q.  Okay.

22       A.  So I have been asked to review a medical

23   legal case of Tasigna and QT prolongation.  I don't

24   know if I've been disclosed as an expert, and I

25   haven't written a report or -- and as soon as I

```
1                      SINGH
2    find out more, obviously I can disclose, but I
3    wanted to make sure that -- because your questions
4    were about expert report, I wanted to make sure
5    that you have it.  And as I have case number, I'll
6    forward it to you.  Sorry about that.
7              MR. ELIAS:  And to be clear, he mentioned
8    this off the record to me as he recalled it.  I
9    don't want him disclosing a case name or plaintiff
10   or defendant if he -- well, he's probably not
11   working for Novartis, but if he hasn't been
12   disclosed and he doesn't think he's been
13   disclosed --
14             MR. REISSAUS:  I think that clarifies my
15   one question.
16       Q.  It's not -- you're not working with the
17   lawyers involved in this case on that one?
18             MR. ELIAS:  He's not.
19       Q.  It's somebody else?
20       A.  It's somebody else, but --
21             MR. ELIAS:  He's not.
22       Q.  Have you been asked to --
23             MR. REISSAUS:  Strike that.
24       Q.  Turning to your report and the stroke
25   analysis that you performed --
```

1                          SINGH

2        A.   Figure 3?

3        Q.   Yeah, Figure 3.  Are you there?

4        A.   Yes.

5        Q.   Okay.  You only included data here from

6   two studies within your analysis, correct?

7        A.   Yes.  Two trials.

8        Q.   The ENEST China and the ENESTnd studies,

9   correct?

10       A.   That is correct.

11       Q.   And when you performed the meta-analysis

12   on the -- your composite cardiovascular event

13   analysis, you included four studies, correct?

14       A.   Yes.  Those studies that have data.

15       Q.   So you'd agree that the data is less

16   robust with regard to stroke compared to PAOD or

17   composite cardiovascular endpoints?

18            MR. ELIAS:  Object to the form.

19       A.   I mean, I don't know I would say it's less

20   robust.  The point estimates are slightly lower.

21   But, you know, the confidence intervals are, you

22   know, similarly from 1.2 to 10, yeah, so the point

23   estimates are slightly lower.

24       Q.   But you would agree that the data going

25   into the meta-analysis is smaller and less robust

Page 40

1                          SINGH

2     in that regard than the data for other endpoints,

3     correct?

4               MR. ELIAS:  Object to the form.

5          A.  I would clarify it as the database is

6     smaller for that meta-analysis.

7          Q.  And is it correct that you excluded the

8     LASOR and ENESTcmr studies from the stroke analysis

9     because they did not indicate that strokes had

10    occurred in patients in those studies?

11         A.  Yes.  They did not.  They reported no

12    stroke event.

13         Q.  So in those studies, the -- where there

14    are no stroke events in either arm, the odds ratio

15    would be 1, correct?

16         A.  Well, I don't know how you'd say that the

17    odds ratio is 1 there.

18         Q.  So an odds ratio is a measure of the rates

19    of events in two arms in comp -- or in two

20    treatments and comparing, is it more likely in this

21    group that gets nilotinib when you compare it to

22    the group with imatinib, correct?

23         A.  I'm not sure the odds ratio -- I'm just

24    not understanding your question.

25         Q.  Well, so if there -- if you have a study

SINGH

1
2  in which no events happen in both arms, the -- if
3  you calculate an odds ratio for that event, it
4  would be the same because the chance of having a
5  stroke in either arm is the same, correct?
6      A.  Well, you didn't have any events, so those
7  are similar.  I'm not sure it would be 1.  You
8  know, it would be hard to say what the odds ratio.
9  It can range from -- I think, from 0 to infinity,
10 but both would be similar.
11          I'm not sure how you'd get an odds ratio.
12 You need to have an event to get an odds ratio,
13 that's what I'm trying to clarify.  There would be
14 similar risk, but the odds ratio estimation would
15 be problematic because you don't have events.
16     Q.  Okay.  So the LASOR and ENESTcmr trials
17 found similar risks for stroke between the imatinib
18 and the nilotinib arms?
19         MR. ELIAS:  I'm going to object to the
20 form of the question.  "Found similar risks."
21     A.  I would say they were non-informative in
22 stroke because they didn't -- you know, they didn't
23 report on stroke, and then you can assume that
24 those risks are similar, but you know, that's
25 making assumption about data that doesn't exist

Page 42

1                          SINGH

2    within that studies.

3        Q.  Well, that data does exist.  The clinical

4    study kept track of when the strokes occurred,

5    correct?

6        A.  Yeah, I mean --

7        MR. ELIAS:  Object to the form.

8        A.  -- it took -- I don't think they keep

9    track -- any of these studies kept track on for

10   when stroke occurred.  They counted strokes when

11   they occurred.  So whether it's ENESTcmr or

12   ENESTnd, they was all collected as adverse events,

13   so it wasn't tracked.

14       Q.  You would agree, wouldn't you, that the

15   LASOR and ENESTcmr studies provide data to show

16   that --

17       MR. REISSAUS:  Let me try a different

18   question.

19       Q.  The LASOR and ENESTcmr studies did not

20   find a difference in risk with regard to stroke,

21   correct?

22       MR. ELIAS:  Objection, asked and answered.

23   And I object to the form of the question in terms

24   of "did not find."

25       A.  Yes.  They do not indicate a difference in

1                          SINGH

2      the risk of stroke because they do not report on

3      that event.

4              (Exhibit 12, Hochhaus paper, Long-term

5         benefits and risks of frontline nilotinib vs

6         imatinib..., marked for identification.)

7         Q.  You've been handed Exhibit 12, "Long-term

8      benefits and risks of frontline nilotinib and

9      imatinib for chronic myeloid leukemia in chronic

10     phase:  5-year update of the randomized ENESTnd

11     trial," correct?

12        A.  Yes.

13        Q.  And this is an article that you've

14     reviewed before, correct?

15        A.  Yes.

16        Q.  And it's the -- one of the two studies in

17     your stroke meta-analysis table, correct?

18        A.  Yes.

19        Q.  And it contributes the large majority of

20     the weight to the results of your meta-analysis,

21     correct?

22        A.  Yes.

23        Q.  I'd like to turn to page 1052 and Table 3.

24     This table reports adverse events data, correct,

25     and incidence?

Page 44

1                        SINGH

2        A.  Yes.

3        Q.  All right.  And if you go to the "Other

4   AEs of Interest" section, and at the bottom of

5   that, there's "Cardiovascular events" listed.

6           Do you see that?

7        A.  Yes.

8        Q.  And it breaks down Ischemic

9   Cerebrovascular Event as one of the three there,

10  correct?

11       A.  Yes.

12       Q.  And it's your understanding that the

13  plaintiff in this case experienced an ischemic

14  cerebrovascular event, correct?

15       A.  Yes.

16       Q.  And it reports a prevalence after five

17  years of 1.4 percent in the nilotinib 300-milligram

18  twice daily arm; is that correct?

19       A.  Yes.

20       Q.  And it reports a prevalence of 3.2 percent

21  in the nilotinib 400-milligram twice daily arm,

22  correct?

23       A.  Yes.

24       Q.  And a .4 percent incidence --

25           MR. REISSAUS:  Strike that.

1                          SINGH

2      Q.  And it reports one event in the imatinib

3  arm after five years, correct?

4      A.  Yes.

5      Q.  And that's equivalent to .4 percent,

6  right?

7      A.  Yes.

8      Q.  And if we wanted to express these in

9  annualized rates, we could divide those by five to

10  get an average incidence per year of the study,

11  correct?

12      A.  Approximately.

13      Q.  All right.  So if we do that for the

14  nilotinib -- well...

15          (Exhibit 13, Frontline nilotinib vs

16      imatinib for CML, A. Hochhaus, et al, (page

17      1052 of Exhibit 12), marked for

18      identification.)

19      Q.  I'm handing you what's being marked as

20  Exhibit 13.

21          MR. ELIAS:  Counsel, do you have a copy?

22          MR. REISSAUS:  It's actually -- you'll

23  have one in a second with highlighting, too.

24      Q.  And you'll see that the -- this is a page

25  that includes an excerpt of Table 3, correct?

1                    SINGH

2        A.   Yes.

3        Q.   Okay.   And it has highlighted the line

4   that we just discussed about ischemic

5   cerebrovascular events, correct?

6        A.   Yes.

7        Q.   Okay.   And there were four events in the

8   nilotinib 300-milligram twice daily arm after five

9   years, correct?

10       A.   Yes.

11       Q.   And nine events in the 400-milligram twice

12   daily arm, correct?

13       A.   Yes.   It's just a repetition of the above

14   numbers.

15       Q.   Okay.   And below that excerpt of the

16   table, there's -- it calls out the percentage after

17   five years that we just went over, 1.4 percent, 3.2

18   and .4 percent, correct?

19            Do you see that?

20       A.   Yes.

21       Q.   Okay.   And we just said you can get an

22   approximate average annual incidence by dividing by

23   five each of those percentages, correct?

24       A.   Yes.

25       Q.   Okay.   And so in the 300-milligram

1                        SINGH

2     nilotinib twice daily arm, the annual incidence of

3     ischemic cerebrovascular events would be

4     .28 percent per year, correct?

5          A.  Yes.

6          Q.  And in the 400-milligram twice daily arm,

7     the average annual incidence would be .64 percent,

8     correct?

9          A.  Yes.

10         Q.  And in the imatinib 400-milligram once

11    daily arm, it would be .08 percent as an annual

12    incidence rate, correct?

13         A.  Yes.

14         Q.  If you turn to 1053, page 1053 in the

15    article, there's a Figure 5.

16              Do you see that?

17              MR. ELIAS:  Back on Exhibit 12?

18              MR. REISSAUS:  Back on Exhibit 12.

19         Q.  Do you see that?

20         A.  Yes, I do.

21         Q.  And it reports at-risk patients at each

22    six-month interval, correct?

23         A.  Yes.

24         Q.  Okay.  And using that data, it's possible

25    to calculate the number of patient years that were

SINGH

1
2  followed in each arm of the trial over the five
3  years, correct?
4      A.  Approximately.
5      Q.  Okay.  And you would calculate that by
6  adding up the at-risk patients in each period and
7  then dividing that -- well, multiplying it by half
8  years since it's reporting every six months,
9  correct?
10     A.  Yeah.  I don't -- I mean, I get your
11 point.  I'm not sure that's how I would do it.  I
12 mean, I would -- I would -- just because they're
13 reported by six months doesn't make that the best
14 method.  I mean, you would -- you would want to
15 count -- you know, there are, say, 279 or 277 and
16 280, so you'd want to count this patient for how
17 many years, this patient for how many years, and
18 that's how you would get total patient years.
19         So each patient for years, how many --
20 what is the duration of follow-up.
21     Q.  So you're saying ideally, you would want
22 to know the exact date each person dropped out so
23 that you could get a precise measurement down to
24 the day for the length for each of them?
25     A.  Yeah.

                              SINGH

1

2      Q.  But you would agree that this would --

3   using the table, we could get within six months for

4   any patient that dropped out, right?

5      A.  Yeah.  But I mean, I'm not sure how

6   informative that analysis would be compared to

7   already your approximation.  You know, if you want

8   to get at -- you know, this is an average, so --

9   that you've shown in Exhibit 13.

10          I haven't seen it done this way, that

11   people cut it by six months.  And either -- either

12   you make an approximation like this or you have

13   individual data to follow up for.

14      Q.  Okay.

15      A.  I'm not saying that it can't be done, but

16   I would either do it one way or the other, sort of

17   make a broad estimate or make such a precise

18   estimate.

19      Q.  Okay.  All right.  Just to make sure I

20   understood the answer, your choice would be to use

21   the approximation we just went over in Exhibit 13

22   or to try to do patient level data, assuming you

23   had that available to you, correct?

24      A.  Yes, yes.

25      Q.  Okay.

1                        SINGH

2        A.  I'm just not familiar with the approach.

3        Q.  In Exhibit 13, with an approximate

4   incidence rate of .28 percent per year in the

5   nilotinib 300-milligram arm, if we were to put that

6   into a measure of thousand patient years, we would

7   multiply this number by a thousand.

8        A.  Yes.

9        Q.  Correct?

10          Or excuse me.  By -- it would be

11  multiplied by ten, correct, since it's already in a

12  percent?

13       A.  Percent.

14       Q.  So .28 percent would be -- per year would

15  be equivalent to 2.8 events per thousand patient

16  years; is that correct?

17       A.  Yes.

18       Q.  Okay.  And so in the nilotinib 400 arm,

19  that would be 6.4 ischemic cerebrovascular events

20  per thousand patient years, correct?

21       A.  Yes.

22       Q.  Okay.  And nilotinib, it would be .8

23  events per thousand patient years, correct?

24       A.  Yes.

25       Q.  Okay.  All right.  In conducting your

1                          SINGH

2    analysis for your report, did you -- you did not

3    undertake to evaluate the background incidence of

4    ischemic cerebrovascular events in the general

5    population, correct?

6         A.   No.

7         Q.   So you did not compare the incidence rates

8    from ENESTnd to a general population background

9    rate, correct?

10        A.   Yeah.   I would -- I would hesitate to do

11   that for several reasons, because what is reported

12   in ENESTnd is an event rate and these are

13   spontaneously reported events.   And when we talk

14   about background rates, those are background rates,

15   whether they are measured in epidemiology studies,

16   which are different from the trials, and those

17   would be, you know, rates of stroke or incidence or

18   prevalence.

19            So it would really depend on what kind of

20   population you're looking at, what is the age

21   ratio, what is the stroke.   So I would find that

22   comparison flawed, but I did not do it.

23            MR. REISSAUS:   Let's go off the record for

24   a few minutes.   I want to go through my notes.

25            THE VIDEOGRAPHER:   This is the end of tape

1                    SINGH

2     number one.  Off the record, 8:58 a.m.

3          (Proceedings interrupted at 8:58 a.m. and

4     reconvened at 9:03 a.m.)

5          THE VIDEOGRAPHER:  This is the beginning

6     of tape number two.  On the record, 9:04 a.m.

7     BY MR. REISSAUS:

8          Q.  Doctor, on page 49 of Exhibit 11, there's

9     a paragraph that begins on the left-hand column

10    toward the bottom that states, "Recent data

11    suggests that clonal hematopoesis increases with

12    age, and that in these patients, the risk for

13    development of both hematologic neoplasms and

14    severe cardiovascular disorders increases."

15         Do you see that?

16         A.  Yes.

17         Q.  Sitting here today, do you have -- is it

18    your opinion that CML is not a risk factor for

19    atherosclerosis?

20         A.  No.

21         Q.  Is it your opinion that CML is a risk

22    factor for atherosclerosis?

23         A.  You term it a risk factor, but it is

24    increases in a patient with CML have, you know,

25    more cardiovascular disease than the general

```
 1                        SINGH

 2    population.

 3        Q.  And that's independent of receiving a TKI,

 4    correct?

 5        A.  Any therapy.

 6            MR. REISSAUS:  Thank you.

 7            Rich, do you have any questions?

 8            MR. ELIAS:  No.

 9            THE VIDEOGRAPHER:  This is the end of tape

10    number two.  This will conclude the videotaped

11    deposition of Sonal Singh, M.D.

12            Off the record, 9:06 a.m.

13            (Whereupon, this deposition was concluded

14        at 9:06 a.m.)

15                      _____

16                      SONAL SINGH, M.D.

17        Subscribed and sworn to before me

18     this _____ day of _____, 2018.

19                      _____

20

21

22

23

24

25
```

1                     CERTIFICATE

2   Commonwealth of Massachusetts

3   Suffolk, ss.

4

5        I, Dana Welch, Registered Professional

6   Reporter, Certified Realtime Reporter and Notary

7   Public in and for the Commonwealth of

8   Massachusetts, do hereby certify that SONAL SINGH,

9   M.D., the witness whose deposition is hereinbefore

10  set forth, was duly sworn by me and that such

11  deposition is a true record of the testimony given

12  by the witness.

13       I further certify that I am neither related

14  to nor employed by any of the parties in or counsel

15  to this action, nor am I financially interested in

16  the outcome of this action.

17       In witness whereof, I have hereunto set my

18  hand and seal this 7th day of May, 2018.

19

20       _____

         Dana Welch

21       Notary Public

         My Commission Expires:

22       September 13, 2024

23

24

25

1                      I N D E X

2   WITNESS:

3     SONAL SINGH, M.D.

4

5   EXAMINATION:                              PAGE:

6     BY MR. REISSAUS                          5

7   EXHIBITS MARKED:

8    NO.   DESCRIPTION                        PAGE:

9     Exhibit 1, Amended Notice of Deposition of  5

10    Dr. Sonal Singh

11    Exhibit 2, Expert Report of Sonal Singh,    6

12    MD, MPH

13    Exhibit 3, Rebuttal Expert Report of Sonal  6

14    Singh, MD, MPH,

15    Exhibit 4, Curriculum Vitae Sonal Singh,    7

16    MD, MPH

17    Exhibit 5, Trial testimony and expert       9

18    depositions

19    Exhibit 6, List of work performed          13

20    Exhibit 7, Chatree Chai-Adisaksopha paper,  16

21    Major arterial events in patients with

22    chronic myeloid leukemia...

23    Exhibit 8, Douxfils paper, Association      18

24    between BCR-ABL Tyrosine Kinase

25    Inhibitors...

1    INDEX (CONT'D)

2    NO.              DESCRIPTION                    PAGE

3    Exhibit 9, Nathaniel Erskine paper, A          21

4    systematic review and meta-analysis on

5    herpes zoster and the risk of cardiac and

6    cerebrovascular events

7    Exhibit 10, The effects of lowering LDL        23

8    cholesterol with statin therapy in people

9    at low risk of vascular disease:

10   Meta-analysis of individual data from 27

11   randomised trials

12   Exhibit 11, Valent paper, Risk factors and     27

13   mechanisms contributing to TKI-induced

14   vascular events in patients with CML

15   Exhibit 12, Hochhaus paper, Long-term          43

16   benefits and risks of frontline nilotinib

17   vs imatinib...

18   Exhibit 13, Frontline nilotinib vs             45

19   imatinib for CML, A. Hochhaus, et al,

20   (page 1052 of Exhibit 12)

21

22

23

24

25

1    ERRATA SHEET

2    NAME OF CASE: McWilliams v. Novartis AG, et al.

3    DATE OF DEPOSITION: May 2, 2018

4    NAME OF WITNESS:  Sonal Singh, M.D.

5    Reason codes:

6          1.  To clarify the record.

7          2.  To conform to the facts.

8          3.  To correct transcription errors.

9    Page _____ Line _____ Reason _____

10   From _____ to _____

11   Page _____ Line _____ Reason _____

12   From _____ to _____

13   Page _____ Line _____ Reason _____

14   From _____ to _____

15   Page _____ Line _____ Reason _____

16   From _____ to _____

17   Page _____ Line _____ Reason _____

18   From _____ to _____

19   Page _____ Line _____ Reason _____

20   From _____ to _____

21   Page _____ Line _____ Reason _____

22   From _____ to _____

23   Page _____ Line _____ Reason _____

24   From _____ to _____

25          Sonal Singh, M.D. _____