# Exhibit 2

```
 1            IN THE UNITED STATES DISTRICT COURT FOR

 2             THE EASTERN DISTRICT OF CALIFORNIA

 3

 4   KRISTI LAURIS, et. al,     )

 5         Plaintiffs,          )   CASE NO. 1:16-CV-00393-SEH

 6   vs.                        )

 7   NOVARTIS AG, et. al,       )

 8         Defendants.          )

 9

10         VIDEO DEPOSITION OF SONAL SINGH, M.D.

11               Marlborough, Massachusetts

12                   July 20, 2017

13

14

15

16

17

18

19

20

21

23

24   Reported by: Dana Welch, CSR, RPR, CRR, CRC

25   Job No: 127352
```

```
 1

 2

 3

 4

 5                    July 20, 2017

 6                    9:56 a.m.

 7

 8

 9          Video deposition of SONAL SINGH, M.D.,

10    held at the offices of Regus, 225 Cedar Hill

11    Street, Suite 200, Marlborough, Massachusetts,

12    before Dana Welch, Certified Shorthand Reporter,

13    Registered Professional Reporter, Certified

14    Realtime Reporter and Notary Public of the

15    Commonwealth of Massachusetts.

16

17

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL

 2   On behalf of the Plaintiffs:

 3   ELIAS GUTZLER SPICER

 4   BY:  RICHARD ELIAS, ESQ.

 5   130 South Bemiston Avenue

 6   St. Louis, MO 63105

 7

 8

 9

10   On behalf of Novartis Pharmaceuticals Corporation:

11   HOLLINGSWORTH

12   BY:  ROBERT JOHNSTON, ESQ.

13   1350 I Street Northwest

14   Washington, DC 20005

15

16

17

18   Also present:  Crystal Strawbridge, Videographer

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2           (Exhibit 296, Subpoena to Testify at a
 3     Deposition in a Civil Action, marked for
 4     identification.)
 5           THE VIDEOGRAPHER:  This is the start of
 6     labeled tape number one of the videotaped
 7     deposition of Dr. Sonal Singh, in the matter of
 8     Kristi Lauris, et al., versus Novartis AG, et al.,
 9     in the United States District Court for the
10     Eastern District of California, Case Number
11     1:16-cv-00393-LJO-SAV [sic].
12           This deposition is being held at 225 Cedar
13     Hill Street, Marlborough, Massachusetts, on
14     July 20, 2017, at approximately 9:56 a.m.  My name
15     is Crystal Strawbridge from TSG Reporting, Inc.,
16     and I am the legal video specialist.  The court
17     reporter is Dana Welch, in association with TSG
18     Reporting.
19           Will counsel please introduce yourself.
20           MR. JOHNSTON:  Robert Johnston here for
21     the defendant, Novartis Pharmaceuticals
22     Corporation, and I'll be asking questions today.
23           MR. ELIAS:  Rich Elias for plaintiffs.
24           THE VIDEOGRAPHER:  Will the court reporter
25     please swear in the witness.
```

```
 1                    SONAL SINGH, M.D. sworn

 2                          EXAMINATION

 3   BY MR. JOHNSTON:

 4       Q.  Good morning, Dr. Singh.  How are you?  We

 5   met earlier.

 6           MR. JOHNSTON:  For the record, I just want

 7   to correct that the case action number is actually

 8   1:16-cv-00393-SEH.  It's been reassigned to another

 9   judge and we have failed to update the caption.  So

10   I apologize for that.

11       Q.  Dr. Singh, thank you for coming this

12   morning.  I'm just going to talk to you about your

13   expert report in this case.  First exhibit I've

14   marked as Exhibit 296, which is the subpoena in

15   this case.

16           Have you ever seen this before?  Subpoena

17   for your testimony --

18       A.  No.

19       Q.  -- have you seen it?

20           Okay.  That's fine.

21           MR. JOHNSTON:  So I've marked that as that

22   exhibit.  I'm going to go ahead and mark as

23   Exhibit 297 your initial expert report in this

24   case.

25           (Exhibit 297, Expert Report of Sonal Singh,
```

1          MD, MPH, marked for identification.)

2     A.  Do you want me to hang onto these?

3     Q.  Yes.  They're exhibits for you to look at.

4          Can you confirm for me that 297 appears to

5     be your initial expert report that you submitted in

6     this case?

7     A.  It is.

8          (Exhibit 298, Supplemental Expert Report of

9          Sonal Singh, M.D., MPH, marked for

10         identification.)

11    Q.  I'm going to hand you what I've marked as

12    Exhibit 298 and ask you to confirm that that is a

13    copy of your supplemental report that you submitted

14    in this case.

15    A.  Yes.

16    Q.  And I wanted to mark those up front

17    because we may need to refer to those at some point

18    through the deposition and I wanted you to have

19    those handy.

20         You have been deposed, correct?

21         MR. JOHNSTON:  Strike that.

22    Q.  You have been deposed before; is that

23    correct?

24    A.  Yes.

25    Q.  And I know you identified that you had

1    testified in the in re:  Lipitor case as a

2    deponent, right?

3        A.  Yes.

4        Q.  How many depositions have you given in the

5    in re:  Lipitor case?  Was it just one, or have you

6    given multiple depositions?

7        A.  It was two.

8        Q.  Two depositions, okay.

9            Have you given any other depositions other

10   than those two depositions?

11       A.  At what timeline are you talking about?

12       Q.  I just -- all I'm trying to do right now

13   is figure out what your experience is being

14   deposed, so I'm trying to figure out --

15       A.  I have.

16       Q.  -- whether you've done a bunch of other

17   depositions or --

18       A.  Yeah.  I mean, over, I would say, the last

19   ten years, I have -- you know, I've been deposed in

20   one another case.  And then one -- and the third

21   case was about -- you know, it's about Workers'

22   Comp.  So altogether three.

23       Q.  And so that's four depositions?  Because

24   you had two in the Lipitor case --

25       A.  Yes.

1     Q.  -- right?  Okay.

2          MR. ELIAS:  Four or three?

3          MR. JOHNSTON:  He had three cases, two

4    depositions in the Lipitor case, so that's a total

5    of four depositions.

6          MR. ELIAS:  Okay.

7     Q.  You said one of those other two cases was

8    a Workers' Comp case.

9     A.  Yes.  I don't --

10    Q.  Was the -- was the other one a products

11   liability case or a medical malpractice case?

12    A.  It was a medical standard of care case.

13    Q.  Okay.  Thank you.

14         And were you an expert witness in that

15   case?

16    A.  Yes.

17    Q.  Okay.  Were you an expert witness in the

18   Workers' Comp case, too, or were you a fact

19   witness?

20    A.  I was a fact witness.

21    Q.  So you've given three depositions as an

22   expert.  You've done this before.  I will do my

23   best to try to ask discrete questions and stop and

24   let you answer.

25         One of the things we have to try to do is

1    not talk over each other.  I doubt that will be a

2    problem with us.  Mr. Elias and I have a history of

3    having a problem with that, but hopefully we'll

4    avoid it today.

5           I have instructed the court reporter to

6    raise her hands should she not be able to take down

7    transcription because we're talking over each

8    other.  But I'll try to stop, let you answer.  When

9    you're done, I'll try to wait and then ask another

10   question.

11          Now, your -- your report states that your

12   rate for your consultation was $600 an hour.  Is

13   that what you're charging for your time here today

14   as well?

15       A.  No.

16       Q.  So what are you charging for your time

17   here at deposition today?

18       A.  750 an hour.

19       Q.  And you didn't disclose that in your

20   expert report, did you?

21       A.  Because it was about my expert report.  I,

22   you know, I charge 600 for consultation and I

23   charge 750 if I need to appear.

24       Q.  Okay.  And all you disclosed in your

25   report is that you charge 600 for consultation,

Page 10

1    correct?

2        A.  Yes.

3        Q.  And does that 600 apply whether you're

4    writing your report or whether you're doing

5    document -- record review?  Is it the same rate for

6    each of those topics?

7        A.  It is the same rate.

8        Q.  Okay.  So whether you were looking at

9    Mr. Lauris' medical records or drafting your

10   report, you were charging $600 an hour for that

11   time, correct?

12       A.  Yes.  Just to clarify, I was not reviewing

13   Mr. Lauris' medical record, because I'm providing a

14   report on general causation.

15       Q.  Thank you.  And we're going to talk about

16   that later.  Let me rephrase it then.

17           Whether you were looking at the nearly

18   thousand articles you identified in your searchs or

19   writing your report, you charge the same rate for

20   those different activities, correct?

21       A.  Yeah.  I don't know if the number is

22   thousand, but yes, the number of articles or where

23   I'm preparing the report, the rate is $600.

24       Q.  And how many hours have you spent so far

25   consulting for the plaintiffs in this case?

1      A.   So as to the time of preparation of

2   report, it was around 58 hours, and then from then

3   point on, it's around 12 hours more.  I mean, it

4   could be an hour less or hour more.

5      Q.   Yeah, I'm just asking for an estimate.  I

6   understand.

7           So the 58 hours, does that include both

8   the preparation of your initial report and your

9   supplemental report?

10     A.   No.  The 58 hours to the first report, and

11  then after that, you know, preparation of the

12  supplement and then preparation, you know, coming

13  here for the trial, just reviewing the documents.

14     Q.   So the 12 hours would be for preparing

15  your supplemental report and then --

16     A.   Yeah.

17     Q.   -- preparing for today's deposition

18  basically?

19     A.   Exactly.

20     Q.   And you met with Mr. Elias, I assume, to

21  prepare for this deposition.

22     A.   I did.

23     Q.   Okay.  And when did you first meet or

24  consult with anyone from the plaintiff's office

25  about this case; do you recall?

1      A.  I don't recall an exact date, but sometime

2   earlier this year.

3      Q.  Well, so we can start with quarters.  Was

4   it first quarter, second quarter?

5      A.  It must have been -- I can't say.  It must

6   have been -- it was around April is what I will

7   say, that's what I can recall.

8      Q.  You say in your introduction that you've

9   relied on your own systematic review of the

10  literature.  Do you apply any standardized

11  methodology in conducting a systematic review of

12  the literature?

13     A.  Yes, I do.

14     Q.  Whose -- whose methodology do you rely on?

15     A.  I mean, you know, standardized Cochrane

16  methodology, methods that -- a lot of which I have,

17  you know, used in my prior systematic reviews,

18  several of which are cited in -- in my CV and

19  others.

20     Q.  So one of the ones you mentioned first was

21  Cochrane, and that would be using the Cochrane

22  Handbook of Systemic -- Systematic Reviews,

23  correct?

24     A.  Yes, when it's appropriate.

25     Q.  And did you use those processes in

Page 13

1    preparing your report in this case?

2         A.   Yes, when it was appropriate.

3         Q.   Well, can you tell me when it wasn't

4    appropriate in your report to use Cochrane's?

5         A.   I've been using standard systematic review

6    methodology, as you can see, for 30 systematic

7    reviews, so it's not that I was going and referring

8    to the Cochrane Handbook.  And I, you know, I use

9    them.  I -- you can see my previous systematic

10   reviews.  And sometimes they do, because you have

11   to make choices about decisions and, you know,

12   there's not agreement.

13        Q.   And you can't -- you can't tell me here

14   where you intentionally deviated from the Cochrane

15   Systematic handbook --

16             MR. ELIAS:  Objection.

17        Q.   -- in preparing your report?

18             MR. ELIAS:  Objection, misstates his

19   testimony, assumes facts not in evidence.

20        Q.   You can answer the question.

21        A.   I don't know when you say that

22   intentionally deviated from the -- the Cochrane

23   Handbook.  The methods are what are reported here.

24   And I think it's okay for you to criticize that

25   these are deviations, and I can answer them to the

Page 14

1  best of my ability.  But there was no intentional

2  deviation from any methodology.

3       Q.  Well, the reason I said "intentional" is

4  because you said you have to make choices.  So I'm

5  assuming choices are an intentional decision --

6       A.  Yeah.

7       Q.  -- as opposed to a mistake.  And so I was

8  actually giving you credit for having thought about

9  it and decided to not apply it.

10           And I'm wondering if there are any places

11  you can think of in your methodology used in your

12  report where you said this is not a place that

13  Cochrane's systemic [sic] handbook applies and I

14  should do something different here?

15           MR. ELIAS:  Objection to form.

16       A.  I mean, I -- I can't, you know, just

17  remember that offhand.  You know, as we go through

18  that, we can -- we can, you know, delve into that.

19       Q.  Well, that would be hard for me since

20  you're the one who knows when you deviated and I

21  don't.  But we'll see what we can do with that.

22           You graduated from medical school in India

23  in 1988, correct?

24       A.  '98, it should say.

25       Q.  Sorry.  My mistake.  1998, correct?

1      A.   Yes.

2      Q.   And you did a residency in India; is that

3   right?

4      A.   Yes.  I started a residency in India.  I

5   didn't complete it because I came over here.

6      Q.   When did you come to the United States?

7      A.   2000, July 2000.  July 6, 2000.

8      Q.   And you started your internship and

9   residency at University of Rochester School of

10   Medicine in 2000?

11      A.   2002.

12      Q.   What did you do between 2000 and 2002?

13      A.   I, one, prepared for my U.S. MLE exams,

14   and I was a research associate at Ohio State

15   University participating in clinical trials,

16   Phase 1 and Phase 2 clinical trials for various

17   pharmaceutical companies and other, you know,

18   companies that conducted physical clinical trials,

19   so I was gaining research experience.

20      Q.   What kind of drugs did you -- or medicines

21   did you work on in that role at Ohio State, or what

22   were the -- what were the indications for those

23   medicines?

24      A.   I mean, I'm not sure I can disclose all

25   the companies and -- and drugs --

Page 16

1      Q.  I don't want to know that.  I just want to

2   know what diseases basically were the --

3      A.  I mean, there were a range of diseases,

4   you know, range:  Diabetes, cancer, erectile

5   dysfunction, migraines.  Yeah, there were a range

6   of -- there were numerous trials.  But I was not

7   the principal investigator; I was a research

8   associate.

9      Q.  I understand.  I'm just trying to get a

10  sense of what your --

11     A.  Sure.

12     Q.  -- breadth of your experience is.

13         And then your internship and residency was

14  in internal medicine; is that correct?

15     A.  Yes.

16     Q.  Do you have to do rounds in that role?

17     A.  Yes, I do.

18     Q.  Okay.  Are there rotations between

19  different groups or departments?

20     A.  Yes.

21     Q.  Okay.  Did you rotate through the entire

22  hospital, or did you have specific rotations that

23  you did during your residency and internship?

24     A.  So it's a compulsory rotating internship,

25  so you rotate through medicine, surgery, oncology,

Page 17

1    hematology, endocrinology.  And the primary focus

2    is on inpatient/outpatient medicine, but, you know,

3    you have to gain experience of other specialties.

4    So that's -- I don't know the relative time I spent

5    in each of these.

6         Q.  So you get exposure essentially to a

7    number of different specialties?

8         A.  Exactly.

9         Q.  Okay.  And you didn't specialize out of

10   that except as an internal medicine doctor,

11   correct?

12        A.  Exactly.

13        Q.  Okay.  Are you board-certified?

14        A.  Yes.

15        Q.  Are you a member of any professional

16   organizations?

17        A.  American Board of Internal Medicine;

18   also, American College of Physicians, the

19   International Society of Pharmacoepidemiology.

20        Q.  What was the second one?  Never mind, I

21   got it right here.

22        A.  ECP.  And yeah, sometimes it's hard for me

23   to keep track of unless it's in the CV.

24        Q.  And are you a member or are you a fellow

25   of any of those organizations?

Page 18

```
 1          A.   I'm not a fellow.  I'm a member.
 2          Q.   Of all three?
 3          A.   The ABIM is a certification.  It's -- you
 4     know, it's not a fellowship.  You -- once you're
 5     board-certified, you're a member.  The other two --
 6          Q.   So ABI is your board certification --
 7          A.   Board certifi --
 8          Q.   -- in internal medicine.
 9          A.   And the ACP, the American College of
10     Physicians, and ISPE, which is the International
11     Society of Pharmacoepidemiologies are memberships.
12          Q.   And do those organizations have a
13     fellowship level of membership?
14          A.   Yes, they do.
15          Q.   But you're not a fellowship -- fellow?
16          A.   I am not.
17          Q.   Looking at your CV, with respect to your
18     residency, you have these initials PGY1, PGY2,
19     PGY3.  Can you just tell me what those mean?
20          A.   So that's the first year of --
21     postgraduate year one, postgraduate year two,
22     postgraduate year three.  So postgraduate year one
23     is -- is intern, you know, the intern that is
24     thought of as the lowest rung of the ladder.  Then
25     the second is the -- the, you know, junior resident
```

1    is sort of does -- has more supervisory role.  And

2    then the third year you're doing a lot more

3    independent practice and, you know, supervision.

4         Q.  Are you a part of any medical practice as

5    far as patients practice right now?

6         A.  Yes.

7         Q.  Okay.  Is there a name for that practice?

8         A.  Yes.  It -- I mean, it is -- the name is

9    University of Massachusetts Memorial Group, so it's

10   UMMG.

11        Q.  And I'm -- and not a criticism, but I

12   don't see that on your CV.  Is that listed and I

13   just missed it or --

14        A.  No.  Because it's just spot -- you know,

15   because it's a part of the faculty appointment at

16   University of Massachusetts, so...

17        Q.  So do you have an office where you see

18   patients currently?

19        A.  Yes.

20        Q.  What kind of patients do you see?

21        A.  It's an internal medicine practice.  I'm

22   an internist, and I see a internal medicine

23   patients across a spectrum of conditions:

24   Diabetes, hypertension, migraines, common cold.  So

25   it could be anything, whatever walks through the

Page 20

1    door.

2         Q.   So you -- you essentially serve as a

3    primary care physician for your patients?

4         A.   I do.

5         Q.   Okay.  And do you have any idea how many

6    patients you currently see annually?

7         A.   A lot.

8         Q.   I don't mean visits.  I mean discrete

9    patients.

10        A.   A lot.

11        Q.   Any idea?

12        A.   Yeah.  So in a half day week, I'm -- so I

13   have three half-day clinics, and in each half-day

14   clinic I see around 10 patients, so that's around

15   30 patients a week so you multiply that by 52,

16   that's -- that's the number of visits.

17        Q.   Right.

18        A.   I don't know what would be my panel; I

19   have no idea.

20        Q.   And when you say "clinic," I think a lot

21   of people hear that and think, you know, maybe a

22   class or you're actually going into a clinic.  But

23   you're using that to describe the period that

24   you're available at your outpatient office to

25   consult with patients; is that correct?

1       A.   Yeah.   I mean, I do go into a clinic.   I

2   mean, we have -- so they are scheduled

3   appointments.   So, you know, for example, I have a

4   clinic on Friday at 1:00.   So that means I have 10

5   patients scheduled between 1:00 to 5:00 and I --

6   some of them are my own and others are my

7   colleagues.   And I will go through at 1:00, and I'm

8   responsible for, you know, whatever ailment.

9       Q.   And so this is actually a clinic at the

10  hospital?

11      A.   Right.

12      Q.   Okay.   So you don't have, like, a practice

13  outside of the hospital?

14      A.   No.

15      Q.   Have you ever treated a patient that had

16  chronic myeloid leukemia?

17      A.   When I say treated, I mean I have

18  comanaged it with other oncologists.   I haven't

19  been, you know --

20      Q.   You're not an oncologist, are you?

21      A.   No.

22      Q.   Okay.   So what I'm asking is whether

23  you've ever had a patient that you treated in any

24  capacity first that had chronic myeloid --

25      A.   I have.

1      Q.  -- leukemia?

2          Okay.  How many patients have you seen

3   with -- that had chronic myeloid leukemia?

4      A.  I cannot give you a number.  I cannot

5   recall.

6      Q.  Was it one?  Is it ten?  Is it a thousand?

7      A.  It's -- it's not a thousand.  It's not

8   ten, so it's somewhere in between.

9      Q.  So hundreds?

10     A.  I wouldn't say hundreds either.

11     Q.  That would probably be every CML patient

12  in the country if you'd seen hundreds.

13     A.  No.

14     Q.  So you think it's 20?

15     A.  I don't know.  I mean, I can't -- I don't

16  know the number.

17     Q.  And have you ever prescribed any therapy

18  for CML?

19     A.  No, I have not.  I mean, I have treated

20  their complications, other things, but I have not

21  prescribed.

22     Q.  That would be an oncologist or

23  hematologist that would prescribe that therapy,

24  correct?

25     A.  Oncologist, I would assume.

Page 23

1      Q.  You know there are hematologists that
2   specialize in oncologic hematology too, correct?
3      A.  Yeah.  But in the practice location that
4   I'm at, you know, it's mostly oncologists.
5      Q.  Okay.  You're not a surgeon, are you?
6      A.  No, I'm not.
7      Q.  Well, let me just go back to your work
8   overall right now and then we'll come back to some
9   of these specifics.
10         So you're -- you said you have three
11   half-day clinics where you see patients.  Do you
12   see patients at any other time during a regular
13   week other than those clinics?
14      A.  Other than those scheduled clinics, I
15   don't see patients, but, you know, I attend to
16   their calls and their requests for prescriptions.
17   And so it's not really totally nonclinical time,
18   but I'm not in clinic physically.
19      Q.  So other than attending to those calls
20   that you might have, what else are you doing during
21   a week with your time?
22      A.  Sure.  So I'm a pharmacoepidemiologist,
23   and I do, you know, design studies, work on
24   projects.  So the majority of my time is spent on,
25   you know, studies and writing grants, trying to

Page 24

1    obtain funding to obtain grants and, you know,

2    working on various funded projects, working with

3    the FDA on various projects, writing papers,

4    mentoring students, and --

5        Q.   And do you teach?

6        A.   Not here at UMass, but I have taught at

7    Johns Hopkins, and I'm still getting used to this

8    new institution.  I've just been here, I think,

9    seven months, so... I don't teach in a didactic

10   setting.  I have mentees that I teach in a more --

11       Q.   Let's -- let's just talk about --

12            MR. ELIAS:  Hold on.  Hold on.

13            Go ahead and finish.

14       A.   I was still finishing the teaching

15   question.

16       Q.   Sorry.  Go ahead.

17       A.   I don't teach in a didactic classroom

18   setting here, but I have mentees whom I teach on a

19   one-to-one basis.

20       Q.   I think that you had said that before.

21   But let me ask another question.  So when you say a

22   "didactic setting," you mean like a classroom,

23   correct?

24       A.   Yes.  Yes.  Currently I don't have a

25   classroom lecture.

1        Q.   And do you do rounds with any students in

2    your current role?

3        A.   I don't do inpatient medicine, so I don't

4    do rounds.

5        Q.   And did you do rounds at Johns Hopkins

6    with students?

7        A.   I did.

8        Q.   Okay.  And how do you get a mentee in a

9    one-on-one setting at UMass?  How does that happen?

10       A.    In fact, it happens because I have an

11   expertise in certain areas where it's related to

12   systematic reviews or pharmacoepidemiology or my

13   other area of research around decision-making, so

14   people send thi -- send mentees to me.

15            So I have currently a mentee who's looking

16   at -- he's an M.D./Ph.D. student looking at herpes

17   zoster and cardiovascular disease through a

18   systematic review, so I'm mentoring him on the

19   process of systematic reviews.

20            I have mentees that work on FDA trial data

21   and comparing it to clinicaltrials.gov.  They are

22   master students.  So they get sent over.  I have

23   faculty who want training in shared decision-making

24   methods and people send them over.  So it's just

25   through networks.

Page 26

1      Q.   Yeah.  So I guess what I was really asking

2  is there -- is there a formal system at UMass to

3  direct people to you and to assign you mentees or

4  is it something that just happens organically?

5           MR. ELIAS:  Object to form.

6           But go ahead.

7      A.   There is a formal mentor/mentee program

8  where the institution identifies appropriate

9  mentors for mentees.  But the mentees that I have

10  been assigned are informally.

11     Q.   Are informal?

12     A.   Yes.

13     Q.   Okay.  You also obtained a master's in

14  public health at Johns Hopkins in 2008, correct?

15     A.   Yes.

16     Q.   Did you have any focus or specialty in

17  that master's program?

18     A.   So the master's was focused on

19  epidemiology.

20     Q.   You do not have a Ph.D.; is that correct?

21     A.   Yes.

22     Q.   Yes, you don't have one?

23     A.   Yes, I don't have one.

24     Q.   And are you pursuing a Ph.D.?

25     A.   No.

Page 27

```
1          Q.   Let's talk about your deposition

2     experience in the Lipitor case.   You served as an

3     expert witness there, correct?

4          A.   Yes.   I was deposed, so...

5          Q.   Did you prepare a report in that case

6     similar to what you did here where you did a

7     meta-analysis in the applied Bradford Hill

8     criteria?

9          A.   It was similar.   I don't have all the

10    details in front of me, what exact -- the exact

11    contents.   But it was a review of, you know, the

12    existing literature and, you know, existing studies

13    and then a report.

14         Q.   Did you prepare meta-analysis in that

15    case?

16         A.   I had already done a meta-analysis on that

17    topic, so I don't think I did an independent

18    meta-analysis of -- you know.

19         Q.   So you had done a meta-analysis before you

20    were retained for the litigation, correct?

21         A.   Yes.

22         Q.   Then you relied on the meta-analysis you

23    had done outside of the litigation to form your

24    opinions for the litigation; is that correct?

25         A.   No, that is not correct, because I relied
```

Page 28

1    on that opinion, and then there were a lot of other

2    studies and other meta-analysis that were also

3    conducted by others, and that was the basis of the

4    opinion.  So it was not just the meta-analysis that

5    I had conducted.

6         Q.  But one of the things you relied --

7             MR. JOHNSTON:  Okay.  Strike that.

8         Q.  You did not conduct a meta-analysis for

9    the Lipitor case specifically, though, correct?

10        A.  I did not conduct a meta-analysis, but I

11   had already conducted a meta-analysis.

12        Q.  Whereas here, you conducted the

13   meta-analysis at the request of plaintiff's

14   counsel, correct?

15        A.  I did conduct a meta-analysis at the

16   request of plaintiff counsel -- plaintiff's

17   counsel.  I conducted a meta-analysis at my own,

18   you know, discretion.  I did not conduct it at the

19   request of plaintiff counsel.

20        Q.  Well, you conducted it because you decided

21   you wanted that data for forming your opinion about

22   whether there was association, correct?

23        A.  I'm not sure that -- I'll try to rephrase

24   it in the way I see it.  There were already several

25   other meta-analysis, but I wanted my own look at

1    that data before I could form an opinion.  So it's

2    not that I could not have formed an opinion without

3    that or I needed that to form an opinion, but I

4    wanted my own analysis of that data before I could

5    form an opinion.

6        Q.  So your testimony is you didn't need to do

7    a meta-analysis, but you charged plaintiffs to do

8    one anyway; is that correct?

9            MR. ELIAS:  Objection, misstates

10   testimony.

11       A.  No, that's okay.  You can state whatever

12   you like.  I'm going to respond to what I think is

13   appropriate.

14           I was always going to do a systematic

15   review, which I -- and I'm not going to compare it.

16   And the meta-analysis part was my discretion, and I

17   felt it was appropriate for the data for my own --

18   I did not want to come to this testimony or write

19   an expert report without knowing what is the best

20   insight into this data.

21           So the meta-analysis is my own initiative.

22   It was not at the request of -- it was my own

23   initiative.  Neither was the systematic review the

24   -- you know -- in fact, it's interesting for me to

25   review the expert reports and the rebuttal; none of

1   them conducted neither a systematic review nor a

2   meta-analysis.

3        Q.   I understand that, Doctor, and you don't

4   understand the rules of evidence, so there's

5   reasons why that's the case.  But --

6             MR. JOHNSTON:  Let the record reflect that

7   Mr. Elias cackled, which he does at every

8   deposition.  I would appreciate it, even if you

9   think it's funny, if you keep that to yourself,

10  Mr. Elias.

11            MR. ELIAS:  I cackled because of your tone

12  and the content of your statement to the witness.

13            MR. JOHNSTON:  Mr. Elias, it's

14  inappropriate for you to laugh in the middle of

15  depositions and you do it at every single one of

16  them.  And I know that you think you're smarter

17  than everyone else in the room, but I'd appreciate

18  it if you could try to control yourself during this

19  deposition today.

20  BY MR. JOHNSTON:

21       Q.   So you believe that you could have

22  rendered an opinion on causality in this case

23  without conducting your own meta-analysis?

24       A.   Yes.  I could have.  I mean, you could

25  render an opinion on causality without, you know,

1    looking at case reports.  So there's always the

2    possibility that you could render an opinion

3    without conducting --

4         Q.  And you --

5             MR. ELIAS:  No, no.  Go ahead and finish.

6         A.  -- without conducting any statistical

7    analysis.  I mean, people render causality

8    opinions, as a lot of the experts that I've

9    reviewed have done, without conducting any sort of

10   analysis.

11        Q.  Do you know whether those opinions are

12   admissible in court as causality opinions?

13        A.  I don't know that.

14        Q.  You don't know that, correct?

15        A.  Yeah.

16        Q.  And, in fact, are you aware that opinions

17   on causality based only on case reports are

18   generally considered not admissible in court?

19            MR. ELIAS:  Objection, calls for

20   speculation as to what's admissible in court and

21   not admissible in court.

22        A.  So I will answer that.  I mean that -- I

23   don't know the legal definitions of -- you know, I

24   think you're asking me a legal question that -- and

25   I don't think I'm -- I don't think I know all the

Page 32

1    evidence to answer that.  But people can offer

2    opinions based on evidence, and that evidence could

3    be case report and that evidence could be against,

4    that there is no causality.  But to say that you

5    cannot offer an opinion just because there's only

6    case reports is -- to me, I don't understand that.

7        Q.  You realize that you were excluded in the

8    Lipitor case because you offered an opinion on the

9    10-milligram dose based only on statistical trends

10   and not statistically significant evidence of an

11   association, correct?

12           MR. ELIAS:  Objection to form, misstates.

13       A.  Yes.  I mean, that's obvious, and that is

14   on appeal as you are aware as well.

15       Q.  I'm well aware of that.  I'm just asking

16   what's happened so far --

17       A.  Yes.

18       Q.  -- and so far you've been excluded on that

19   because you relied on something less than

20   statistical significant proof of a causal

21   association, correct, according to the Court?

22       A.  According to Judge Gergel, yes.  And just

23   to clarify that in context, my testimony was

24   admitted for the 18-milligram dose because there

25   was evidence of a statistical significance and a

1    host of other contextual evidence.

2         Q.   Did I ask you that question?

3         A.   I'm just putting that in the appropriate

4    context.  Your questions have to be answered in --

5    you cannot ask me to stop.  If you want my answers,

6    you have to listen to them.

7         Q.   I'm just telling you that it's going to go

8    longer if you answer questions I didn't ask you.

9    You asked me this morning before we started how

10   long it will take.  The more you answer questions I

11   didn't ask you, the longer it will take.

12        So you have been excluded so far at least

13   in the only pharmaceutical case --

14        MR. JOHNSTON:  Sorry.  Strike that.

15        Q.   In the only pharmaceutical case you have

16   testified in, you have been excluded in part by the

17   Court as of today, correct?

18        A.   In part, and the lowest dose, when there

19   was no evidence of statistical significance.

20        Q.   Now, let's try --

21        MR. ELIAS:  But you were not excluded at

22   the higher doses where there was statistical

23   significance?

24        MR. JOHNSTON:  Counsel, you don't testify,

25   Counsel.

Page 34

1          MR. ELIAS:  Sorry.  But you were not

2     excluded with your opinions --

3          MR. JOHNSTON:  Don't answer that question.

4          MR. ELIAS:  -- relating to the higher

5     doses where there was statistical significance --

6          MR. JOHNSTON:  Don't answer that.

7          MR. ELIAS:  You can answer.

8          MR. JOHNSTON:  Don't answer that question.

9          Counsel, you're not allowed to ask

10    questions during my examination.  If you would like

11    to redirect at the end, you may do that.  He may

12    not answer this question.

13          You've done this before; you are not going

14    to do it today.

15          MR. ELIAS:  You can answer it.

16          MR. JOHNSTON:  You cannot answer the

17    question.

18          MR. ELIAS:  Go ahead.

19    BY MR. JOHNSTON:

20       Q.  Don't answer the question.  It's not his

21    time to ask questions.  He can ask questions later.

22          Now, I was going to try to move to some

23    easy stuff, I thought.  But, you know, Mr. Elias

24    likes to take me off of where I'm going and take me

25    off on these tangents.  I'm sure it's intentional

1    on his part.

2         So let's start with something that I think

3    is pretty easy.  Page 10 of your report, you state,

4    "Several case reports have described a rapidly

5    developing and aggressive form of atherosclerotic

6    events, particularly peripheral arterial occlusive

7    disease affecting patients, many of which had no

8    known preexisting vascular disease, and some of

9    which had no known risk factors for the disease."

10        Did you say that?

11        MR. ELIAS:  Let's let him get there and --

12   I don't think he was there.  So what page are we

13   on, Robert?

14        MR. JOHNSTON:  He's there.  Page 10.

15        MR. ELIAS:  Where are you referring to?

16        MR. JOHNSTON:  He can find it.

17   A.  Yes, I see it.

18   Q.  Okay.  What evidence do you have in your

19   report that shows that there is a statistically

20   significant association between the use of

21   nilotinib and a uniquely rapidly developing and

22   aggressive form of atherosclerotic events?

23   A.  So -- so to that particular question,

24   these case reports do not provide statistical

25   significant evidence.  They just describe, you

1      know, the occurrence of these rapidly progressive

2      events.

3          Q.   So is it correct that there is no data in

4      your report that demonstrates a statistically

5      significant association between the use of

6      nilotinib and rapidly developing and aggressive

7      forms of atherosclerotic-related disease?

8              MR. ELIAS:   Object to the form of the

9      question, misstates.

10         A.   It depends what your perspective is on

11     rapidly developing.  And if you look at data from

12     the ENESTnd trial, there is data that as early as

13     two years, these atherosclerosis and PAD.  So it

14     depends on your definition of what timeline.

15         Q.   If somebody had atherosclerosis that

16     became symptomatic one day after they started

17     taking Tasigna, would you believe that is an

18     attributable event to Tasigna?

19             MR. ELIAS:   Objection, unfirm

20     hypothetical.

21         A.   I mean, that's a hypothetical question.  I

22     don't know what that means.

23         Q.   You don't know from the ENESTnd trial,

24     what the prior status -- atherosclerotic status of

25     the patients were before they started Tasigna

1    therapy, do you?

2         A.  I do not know that.  But I do know that

3    patients with cardiovascular disease, who, you

4    know, were excluded, you know, patients with MI.

5         Q.  And you're aware there were also patients

6    that had -- that were diagnosed with

7    atherosclerotic-related conditions in the Gleevec

8    group within the first year too, correct?

9         A.  Yes.  But not -- not PAD.

10        Q.  Are you relying on Hochhaus, Figure 5,

11   which you've got as Figure 6, "Kaplan-Meier

12   Estimated Time to First Cardiovascular Event on

13   Study"?

14        A.  Which page is this?  I'm sorry.

15        Q.  On page 18 of your report.

16        A.  Yes.  I'm relying on that, and that is a

17   time to first cardiovascular event.

18            If you'll go back and look at page 16 and

19   look at the tables, there is no PAD in imatinib.

20   So there were no atherosclerotic peripheral

21   arterial events.  There were -- obviously there

22   were ischemic heart disease events and

23   cerebrovascular events.

24        Q.  Well, why is that important to you?

25   Because your opinion is that there is a

1    statistically significant relationship between all

2    atherosclerotic events and nilotinib, correct?

3        A.   Yes.

4        Q.   So why are you pointing out PAOD in this

5    discussion where I'm talking about it at a higher

6    level than that?

7        A.   I think you asked rapidly progressing

8    atherosclerosis, and I understood to be about PAD.

9        Q.   So your view is that the rapidly

10   progressing atherosclerosis described in those case

11   reports is focused on PAOD; is that correct?

12       A.   Yes.

13       Q.   Okay.  Not on cerebrovascular events?

14       A.   I mean, there are other atherosclerotic

15   events that were rapidly progressive as well.

16       Q.   Well, I'm trying -- that's why I'm trying

17   to figure out why you're talking about PAOD if you

18   believe that there were cerebral and cardio events

19   that were rapidly progressing in those reports, why

20   are we talking about PAOD?

21           MR. ELIAS:  I object to the form of the

22   question.

23       A.   You have to restate your question clearly

24   because I don't know how to answer it.

25       Q.   My question is -- the fundamental question

Page 39

1   is:  Do you agree that your report does not provide

2   any statistically significant evidence of an

3   association between nilotinib and rapidly

4   progressing -- and aggressive atherosclerosis

5   events?

6          MR. ELIAS:  Asked and answered.

7          You don't have to give a different answer

8   than you gave before.

9       A.  I don't agree with it because I agree that

10  there is a statistically significant evidence of an

11  association with nilotinib and atherosclerotic

12  events.  How rapid is it depends on your definition

13  of the timeline, you know.  Here it's occurring as

14  early as two years.  So if you look at statistical

15  significance, you have it in the trials.

16      Q.  Well --

17         MR. ELIAS:  Let him finish.  Let him

18  finish.

19      Q.  Go ahead.

20      A.  Yeah.  And it you want to look at days and

21  others, you have it in the -- so, yes, there is

22  evidence of the statistical significance, but the

23  case reports don't provide that.

24      Q.  Okay.  So you have evidence of statistical

25  significance from the ENESTnd trials that you

Page 40

1    believe shows that nilotinib has a uniquely

2    aggressive and rapidly progressing form of

3    atherosclerosis associated with it; is that your

4    testimony?

5         A.   I'm not saying that it's -- so whatever

6    words you used.   I'm saying the ENESTnd trial,

7    shows there's a statistically significant increased

8    risk of atherosclerosis, including ischemic heart

9    disease, stroke, and PAD that occurs rapidly.

10   Whether it's a unique form, whether it is -- I

11   don't know that.   I don't have enough evidence and

12   with the underlying data to report on that.

13        Q.   With respect to -- well, on page 30 --

14   sorry, not 30.

15        Page 27 of your report, you have a

16   Section (f) titled "Disproportionality Analyses,"

17   correct?

18        A.   Yes.

19        Q.   And that section refers to two reports

20   from the FDA, "Adverse Event Reporting Database,"

21   correct?

22        MR. ELIAS:   Go ahead and review it.   Make

23   sure you understand the question and what he's

24   asking.

25        A.   In fact, there are four.

Page 41

1        Q.  Well, I was going to enumerate the whole

2    list.  So two of them were FDA reports, correct?

3        A.  Yes.

4        Q.  There's one French report?

5        A.  Yes.

6        Q.  From the French pharmacovigilance

7    database, correct?

8        A.  Yes.

9        Q.  And then you talk about another study.  I

10   guess we'll have to look back at your references to

11   figure out where that one is from.

12       A.  Both of them are from the French.

13       Q.  Have you ever published a systematic

14   analysis in the peer-reviewed literature that

15   relies on disproportionality analyses?

16       A.  When you say have you ever published a

17   systematic analysis that relies on, can you clarify

18   that?

19       Q.  All right.  You do systematic reviews,

20   right?

21       A.  Uh-huh.

22       Q.  That's your bread and butter, that's your

23   forte, correct?

24       A.  Sure.

25       Q.  Have you ever published in the

Page 42

1    peer-reviewed literature a systematic review that

2    relies on disproportionality analysis?

3        A.  I'll say that in the areas that we've

4    reviewed, in the studies that I've done, we've

5    looked at all levels of evidence.  So I have

6    published a study, in fact, where we've looked just

7    at case reports, not even disproportionality

8    analysis, because it didn't exist in that

9    particular domain of questions.

10           So I published a study, and you can look

11   at it in my CV, on -- 2006, on thiazolidinediones

12   and cardiovascular outcomes and we looked at all of

13   it.  So this approach is known as a TD analysis

14   where you look at all sources of evidence.

15           COURT REPORTER:  I'm sorry, you need to

16   slow down, please.

17           MR. ELIAS:  And if you could clarify the

18   medical term --

19           THE WITNESS:  Sure.

20           MR. ELIAS:  -- that you were using because

21   she's trying to get what you're saying.

22           MR. JOHNSTON:  I'm asking questions,

23   Counsel, these are my questions.

24       Q.  Go ahead.

25       A.  So I have published studies that have

1    included case reports, and in that particular

2    domains, these disproportionality analyses did not

3    exist, and that's why they didn't make it.  It's

4    not that have you --

5        Q.  Have you ever published a report in which

6    you cited to Naranjo analyses as part of your

7    systematic review?

8        A.  Not as a part of systematic review.

9        Q.  In fact, you state in your report that as

10   to disproportionality analyses, the following:

11   "Because the data" -- this is on page 27 --

12   "Because the data do not contain information on

13   other variables and lack a denominator, these

14   analyses alone cannot be used to determine or

15   refute a causal association"; is that correct?

16       A.  Correct.

17       Q.  And, in fact, what disproportionality

18   analyses are used for is to detect signals in the

19   postmarketing pharmacovigilance context, correct?

20       A.  That is one use of them.

21       Q.  What else are they used for?

22       A.  They're used for, you know, informing

23   evidence on how to use drugs.  They're used for

24   labeling.  You have a study in my CV where you can

25   go and look, that the primary FDA-labeling source

1    of information is based on case reports.

2         Q.  Well, you understand that the FDA requires

3    things to be put on the label that -- for which

4    there's an association but which causality has not

5    been determined, correct?

6         A.  The FDA requirement --

7              MR. ELIAS:  Misstates.

8              Go ahead.

9         A.  My response is that, you know, obviously,

10   I'm not a regulatory expert and I'm not offering a

11   regulatory opinion, but my understanding is that

12   the FDA labeling does not require causation, but

13   does not mean that there is no causation.  So it

14   does not require that a causal association be

15   present before it's labeled.

16        Q.  So the fact that the FDA has required

17   something to be placed on the label does not mean

18   that they have used a disproportionality analysis

19   to conclude that something causes something else,

20   correct?

21        A.  You have made three or four jumps in that

22   question.  So if you can ask that specific

23   question, then I can answer it.

24        Q.  Well, I think maybe the answer you gave

25   already is adequate for my purposes, so...

Page 45

1           If you attempted to cite a Naranjo-type

2     analysis or even an empirical Bayesian geometric

3     mean in a peer-reviewed publication as evidence of

4     causality, would the peer reviewer allow that to go

5     through?

6           MR. ELIAS:  Objection, calls for

7     speculation, unfirm hypothetical.

8           Go ahead.

9     A.   But I will respond.  I did not use these

10    Naranjo analysis or the, you know,

11    disproportionality analysis as the sole basis of my

12    opinion.  My opinion is based on the entire body of

13    evidence, including case reports and views, you

14    know, and it would be part of a peer reviewed -- I

15    mean, I'm not sure -- if I only stated that this is

16    what I'm using to form the causal opinion alone,

17    and so the qualification is these analysis alone

18    cannot be used.  But in the gamut of other studies,

19    they can and should be used to inform an opinion.

20    Q.   So you agree that if the only thing you

21    had was the disproportionality -- the four

22    disproportionality analyses you cite in your

23    report, that you could not draw a causal conclusion

24    just from those four analyses, correct?

25    A.   Yes.  On those analysis alone.

Page 46

1          MR. JOHNSTON:  Let's take a break for a

2     minute.  I drank too much coffee.

3          THE VIDEOGRAPHER:  We're going off the

4     record at 10:44.

5          (Proceedings interrupted at 10:44 a.m. and

6        reconvened at 10:53 a.m.)

7          THE VIDEOGRAPHER:  Back on the record at

8     10:53.

9     BY MR. JOHNSTON:

10     Q.  Dr. Singh, I want to go back to something

11     you sort of mentioned earlier, that your

12     opinions -- the only opinions you've offered are on

13     general causation, correct?

14     A.  Yes.

15     Q.  You have not offered any opinions about

16     the -- about Dainis Lauris in this case at all,

17     have you?

18     A.  I've not even reviewed the records to

19     offer that opinion.

20     Q.  So you haven't reviewed any documents

21     related to his medical course or his medical

22     records or anything like that?

23     A.  No.

24     Q.  And at this point you don't intend to

25     offer at trial any specific opinions about

1   Dainis Lauris, correct?

2       A.  No.  And I've clearly stated that because

3   it's -- my area of expertise is, you know,

4   epidemiology, so I intend to, you know, limit

5   myself to my area of expertise.

6       Q.  And do you agree that your opinions on

7   general causation that are expressed in this report

8   are based exclusively on information that is

9   available in the public scientific literature that

10  address what you call cardiovascular events in

11  patients treated with various tyrosine kinase

12  inhibitors?

13      A.  They're based on, you know, systematic

14  review of the published literature.

15      Q.  Okay.  But the dataset that you're relying

16  on for your opinions is what's in the public

17  literature, correct?

18      A.  I agree.  I have not obtained, you know,

19  additional data from Novartis.

20      Q.  And none of that literature takes into

21  account Mr. Lauris' particular circumstances as far

22  as you know, does it?

23      A.  I don't -- I'm not aware of the specifics

24  of Mr. Lauris' case to say one way or the other.

25  So I've just not reviewed his case.

Page 48

1       Q.   And should you -- should that change and

2    should you be asked or decide to offer any

3    particular opinions about Mr. Lauris, you'll let me

4    know, I assume?

5       A.   I'm not going to do it.

6       Q.   You haven't done any unique, original

7    scientific research on the relationship between TKI

8    medicines and atherosclerotic conditions other than

9    this report; is that correct?

10      A.   I mean, I have not studied the -- you

11   know, in an epidemiologic way, TKIs and

12   atherosclerosis.

13      Q.   The only work you've done on this topic is

14   what's presented in your expert report, correct?

15      A.   All of it is here.

16      Q.   And you're not -- you haven't published

17   any papers on this topic, correct?

18      A.   As of today, no.

19      Q.   I want to talk to you about the

20   methodology you applied in conducting your

21   systematic review.  The first step, as you

22   described in it in Section 3 of your report, which

23   starts on 13 of your report, is -- well, hold on a

24   second.  So let's look at Section 2, which is your

25   systematic review methods.

Page 49

1              Do you see that?

2        A.  Yes, I do.

3        Q.  And you describe the methods as being, A,

4   a systematic search, correct?

5        A.  Yes.

6        Q.  And what you mean by that is a systematic

7   search of the publicly available literature,

8   correct?

9        A.  Yes.

10       Q.  Okay.  B, or the second step, would be to

11  study selection, correct?

12       A.  Yes.

13       Q.  And that essentially is going through the

14  results of the search that you run and determining

15  what within that is relevant to your analysis,

16  correct?

17       A.  That is true.

18       Q.  C is data extraction, correct?

19       A.  Yes.

20       Q.  And that would be the third step.  And

21  that refers to going through the papers you've

22  selected and taking the data that are presented

23  there out so you can analyze them, right?

24       A.  That is true.

25       Q.  And then D is your statistical analysis,

1      correct?

2          A.   And that is the meta-analysis.

3          Q.   And that's the work you do that you bring

4      to that dataset that you have extracted from the

5      public literature, correct?

6          A.   Just to back out a little bit, all of this

7      is work.   I mean, I search, you know, so search

8      through -- so it's not that that is the only thing

9      that --

10         Q.   Right.

11         A.   It takes me longer to do A, B, C than to

12     do D.   So just so that you know what time it takes

13     for each.

14         Q.   But the component that you add that's not

15     available in the literature is that statistical

16     analysis?

17             MR. ELIAS:   Objection, misstates.

18         A.   I can answer that.   I mean, the component

19     that I add is I put it all together.   I mean, all

20     these pieces are -- you know, the biological

21     evidence is somewhere else, the disproportionality

22     analysis, and I look at them simultaneously at the

23     same time and then obviously do the meta-analysis.

24         Q.   In this case, on page 11, let's talk about

25     what you did for each of those steps.   You started

Page 51

1    with the systematic search.  And on page 11 you

2    identify search terms that you used to search

3    PubMed, Embase, Embase Classic and MEDLINE and

4    Scopus.

5          Are those the databases you identify here?

6    A.   Yes.

7    Q.   What is Scopus?

8    A.   Scopus is -- so for a systematic review,

9    there could be various databases.  You know, Scopus

10   is an additional database that we search for -- we

11   also have studies.  So there is some overlap

12   between these databases, but some databases pull in

13   -- so, for example, they could pull in abstracts.

14   So Scopus might have more abstracts than PubMed.

15   PubMed doesn't have presentations, meetings, and

16   abstracts.  Embase is a much more -- in fact,

17   Embase is quite handy and specially for systematic

18   reviews of drugs because it has a good index of

19   drugs and also is geared towards indexes of

20   European literature.  So all these databases have

21   some strengths and weakness.

22   Q.   What is MEDLINE?

23   A.   MEDLINE is just another older version of

24   PubMed.

25   Q.   So just an obvious question is:  Why would

1    you use a different search strategy in MEDLINE than

2    in PubMed if they're essentially the same database?

3        A.   Just to make sure that there is -- you

4    know, you're not -- so it's not the same database.

5    It's an older version.  And you want to make sure

6    that you're not missing out on older studies.

7        Q.   Are you saying those older studies aren't

8    in PubMed?

9        A.   Yes.  Some of them could not be -- you

10   know, may not be in PubMed.  And you also -- so

11   remember, these databases are overlapping, so you

12   want to search overlapping databases.  And that's

13   why, you know, citation counts are overlapping

14   because some studies are in both databases.

15       Q.   Why do you use different search strings in

16   each of the different databases?

17       A.   The different search strings are used -- I

18   wouldn't call them search strings.  They have

19   different names here.  Because that's the way the

20   drugs and terms are indexed in different databases.

21       Q.   So you're saying you couldn't search on

22   4-methyl-N-(3-(4-methylimidazol-1-yl)-5, et cetera,

23   you couldn't search that in Embase or Scopus?

24       A.   It's not that you can't search on that .

25   When you search on it, it tells you that these are

Page 53

1    the ones that are most appropriate for this

2    database, and then you go with the search that's

3    most appropriate.

4        Q.   So the database tells you which terms to

5    use?

6        A.   Yeah.   The database doesn't tell you which

7    term to use, but the database says if you use these

8    terms, this is what -- you know, this is sort of

9    what your search is.

10       Q.   So did you input your PubMed search terms

11   into Embase, and Embase told you to use this other

12   string instead?

13       A.   So what you are seeing in the PubMed is

14   sort of the expanded -- what PubMed is doing behind

15   the scenes, when you look at, you know,

16   cerebrovascular events, cardiovascular events with

17   nilotinib, I put the original PubMed search terms

18   in Embase and the same terms are used here, and

19   this is what you see here.

20       Q.   I don't understand that, so let me ask you

21   to try it again.

22            You said you put -- are you telling me

23   that you typed in the terms that are listed in the

24   PubMed box on page 11 into Embase and Embase told

25   you that for that search you needed to run the

Page 54

1    query that you have listed in the Embase box?

2         A.  No.  It's -- it's -- it's more like you

3    put the simpler terms in PubMed and what you see

4    out of PubMed is a much more -- so PubMed is giving

5    you much more of what it did in the search.  These

6    other databases are the -- so the way to think

7    about this is the terms used were the terms used

8    that you see in Scopus and Embase.  And similar

9    terms were used in PubMed, but the PubMed also

10   gives you the background of what's going on.  So

11   what I pasted from PubMed is the details of that

12   search because it gives you a level of detail that

13   these other databases don't provide.

14        Q.  All right.  Let me keep going because I'm

15   still confused.

16             Are you telling me that PubMed generated

17   this search, or did you choose the words in the

18   PubMed search on here?

19        A.  I chose the words, which gave this search.

20        Q.  So you're telling me you did not put in

21   benzamide in your search term to PubMed; is that

22   correct?

23        A.  No.  When you put in nilotinib, that's

24   what it gives off.  What I'm trying to say is you

25   put in nilotinib, peripheral arterial disease,

1    cerebrovascular events, ischemic heart disease,

2    then you get a search of studies and these are the

3    studies -- these are the search terms.  It will

4    have a popup box by the side that will say, okay,

5    these are the number of studies and these are the

6    details of the -- I mean, this is best explained

7    with a computer.  We can talk about it all we can.

8         Q.  Well, what I'm just trying to do is figure

9    out how much of this PubMed search is you and how

10   much of it is PubMed, is all I'm trying to figure

11   out.

12        A.  So the top terms are mine, but then what

13   you get out -- what I've pasted is what PubMed

14   gives out.  And Embase and Scopus don't give that

15   level of detail for the search, so that's why

16   you're not seeing all these terms in there.

17   Because from the PubMed, you are getting additional

18   layers, whereas from these other databases, you're

19   just getting the top layers of the search.

20        Q.  So do you have somewhere the actual search

21   you typed into PubMed in your records?

22        A.  I mean, this is the detail of that.

23        Q.  I understand.  But that's not what you

24   typed in, is it?

25        A.  It is the detail.

1      Q.   You typed in benzamide?

2      A.   No, I didn't.

3      Q.   If I want to know what you typed in, do

4  you have somewhere the string that you yourself

5  chose to type into PubMed?

6      A.   I would have to go back and look in, you

7  know, my -- sort of my library of, you know, where

8  and when I search PubMed, what words are typed.

9      Q.   You didn't tell me what you searched in

10 this; you told me what PubMed interpreted your

11 search as; is that correct?

12      MR. ELIAS:  Objection, misstates.

13      A.   No.  This is what I searched because this

14 is what PubMed does.  And this is what -- so if I

15 type "Sonal Singh" or if you type, say, "statin,"

16 it will -- so, for example, it will show statin

17 HMG-CoA, whatever it is, that's what the search is.

18      Q.   I realize that's the search that PubMed

19 ran, but that isn't the search that you --

20      A.   Well, that's the search that I --

21      COURT REPORTER:  I'm sorry.  Please.

22      Q.   That isn't the search you typed in,

23 correct?

24      A.   It's the search that I ran.

25      Q.   Okay.  That's not what I'm asking you.

Page 57

1    I'm asking you:  Do you have a copy of the search

2    that you yourself typed in to PubMed that resulted

3    in this search string being used by PubMed?

4          MR. ELIAS:  Asked and answered.

5    A.   I would have to go back and look at.

6    Q.   You certainly didn't tell me what that was

7    in your report, did you?

8          MR. ELIAS:  Objection, misstates, asked

9    and answered.

10   Q.   You didn't tell me what you typed into

11   PubMed that resulted in PubMed expanding to this

12   search in your report, correct?

13   A.   The reason I didn't is because this is

14   even more detailed.  So I offered as much detail as

15   I could provide on the transparency of my search

16   because this is more transparent than whatever term

17   that I typed.

18   Q.   So the answer to my question is that you

19   didn't tell me what you typed into PubMed that

20   resulted in PubMed expanding this search to your

21   report, correct?

22         MR. ELIAS:  Misstates.

23   Q.   Your answer is no, right?

24         MR. ELIAS:  Misstates.

25   A.   The answer is that I provided you the

1    results of my search in PubMed and the terms that

2    PubMed used to conduct the search.

3        Q.   But you didn't tell me what your input was

4    that resulted in this output, correct?

5            MR. ELIAS:  Misstates, asked and answered.

6        A.   I offered much more detail.

7        Q.   That's not what I'm asking you.  I don't

8    care whether PubMed gave me more detail than you

9    intended.

10           I'm trying to understand the process you

11   employed to reach these results, and I would like

12   to know what you typed in to PubMed, you yourself,

13   to get these results.  And the answer is you can't

14   tell me that sitting here today, correct?

15       A.   No, I can.  I can tell you because as soon

16   as I typed these terms, these additional terms come

17   out and then I use these terms to put it in PubMed.

18   So this is what is the search that's ran.

19       Q.   Do you agree that under the Cochrane

20   Handbook approach, you should consult with a

21   medical librarian to establish your search

22   strategy?

23       A.   It's dependent on their level of

24   expertise.  I've conducted over 30 systematic

25   reviews and meta-analysis, and medical librarians

Page 59

1    come to me at several institutions to develop

2    searches.

3        Q.  Did you consult with a medical librarian

4    to establish your search strategy in this case?

5        A.  No.

6        Q.  Are you aware that in your 2011 paper on

7    "The Efficacy and Safety of Statin Treatment for

8    Cardiovascular Disease, a Network Meta-Analysis of

9    170,255 Patients from 76 Randomized Trials," that

10   you consulted a medical librarian in order to

11   develop your search strategy?

12       A.  In several studies, we have; that is not

13   the only one.

14       Q.  So in several of your published studies,

15   you have consulted a medical librarian on the

16   search strategy, correct?

17       A.  Dependent on, you know, the nature of the

18   question and -- so it's -- in some studies I would

19   say we've consulted in other studies we've done.

20   And that study was done in 2000 -- I don't remember

21   the exact.

22       Q.  '11.

23       A.  Yeah.  '11.  I do my own searches most of

24   the time right now.

25       Q.  Okay.  I'm just trying to establish what

Page 60

1    you did.

2         A.  Yeah.

3         Q.  You didn't consult a librarian in this --

4    for your meta-analysis in your expert report?

5         A.  As I have done in many other systematic --

6    published systematic reviews and meta-analysis as

7    well.

8         Q.  Did the plaintiff's lawyers tell you what

9    to search for in this systematic review?

10        A.  No.  I don't think they have any idea.

11        Q.  Did you consult any medical dictionaries

12   or -- let me ask not a compound question.

13            Did you consult in medical dictionaries as

14   part of your creation of your systematic search

15   string?

16        A.  No, I did not.

17        Q.  Did you consult any MedDRA-type

18   hierarchies of terms in conducting your search

19   string?

20        A.  No, I did not.

21        Q.  So what did you do, just sat at your desk

22   and thought about what you should put in here?

23            MR. ELIAS:  Objection to the form,

24   argumentative.

25        A.  I did what is transparent here.

Page 61

1    Obviously, I had to sit at my desk, think about,

2    you know, the question nilotinib and cardiovascular

3    events, develop the terms, and enter the terms

4    provided here and see what the search came out.

5         Q.   Are you a cardiovascular surgeon?

6         A.   No.  I think we've been through this

7    before that I'm not.

8         Q.   I asked you if you were a surgeon.  I'm

9    being more specific now.  You're not a

10   cardiovascular surgeon, correct?

11        A.   No, I'm not.

12        Q.   And you are not a cardiovascular

13   specialist, are you?

14        A.   No.  But I've done several studies of

15   drugs and cardiovascular disease; that's my

16   expertise.

17        Q.   And all those studies have been similarly

18   analyses of the public literature, correct?

19        A.   Yes.

20        Q.   Okay.  Not analyses of patient-level data,

21   correct?

22        A.   No, I've not been.

23        Q.   You've not evaluated patient-level data on

24   cardiovascular disease, correct?

25        A.   Yes, that is correct.

Page 62

1      Q.  So you wouldn't be qualified, for example,

2   to decide whether or not something was a heart

3   attack in a clinical trial, would you?

4           MR. ELIAS:  Object to --

5           MR. JOHNSTON:  Let me strike that.  Heart

6   attacks might be too easy.

7      Q.  You wouldn't be qualified to decide

8   whether somebody had peripheral arterial occlusive

9   disease reported in a clinical trial, would you?

10          MR. ELIAS:  Objection, assumes facts,

11   misstates, unfirm hypothetical.

12      A.  I'll answer that question.  When you say I

13   wouldn't be qualified, I don't understand why you

14   wouldn't be.  Who is qualified?  It depends on what

15   the clinical trial has set up.  Is it the cardio --

16   unless it is specified that a surgeon is assessing

17   the PAD, then, yes, I'm not qualified.  But on the

18   other hand, if it's an investigator assessing the

19   PAD, then I am qualified.

20      Q.  Would you be qualified to conduct a --

21   blanking on the word -- an adjudication of

22   cerebral -- of cardiovascular events in a clinical

23   trial?

24      A.  I would be qualified if, you know, that's

25   part of the adjudication committee.  If I'm part of

Page 63

1      it, then I'm qualified.  You know, some

2      adjudication committees have different members:

3      They have internists; they have cardiovascular

4      specialists.

5             MR. JOHNSTON:  Let me mark your 2011

6      analysis.

7             (Exhibit 299, Efficacy and safety of statin

8          treatment for cardiovascular disease:  A

9          network meta-analysis of 170,255 patients from

10         76 randomized trials, marked for

11         identification.)

12     Q.  I've handed you what's been marked as

13  Exhibit 299, which is a paper published in the

14  Quarterly Journal of Medicine; is that right?

15     A.  Yes.

16     Q.  And it's titled "Efficacy and Safety of

17  Statin Treatment for Cardiovascular Disease:  A

18  Network Meta-Analysis of 170,255 Patients from 76

19  Randomized Trials," correct?

20     A.  It is.

21     Q.  And you're listed as the fifth author on

22  this paper, correct?

23     A.  Yes.

24     Q.  And the first author is E.J. Mills, right?

25     A.  Yes.

Page 64

1      Q.  And on page 110 of this article, just to

2   put it in the record, under Search Strategy it

3   states, "In consultation with a medical librarian,

4   we established a search strategy (available from

5   authors upon request)."

6          Do you see that?

7      A.  I'm sorry.  I'm --

8      Q.  Under Search Strategy on page 110, which

9   is in the right column, first sentence, "In

10  consultation with a medical librarian, we

11  established a search strategy (available from

12  authors upon request)."

13         Correct?

14     A.  Correct.

15     Q.  "We searched independently in duplicate

16  the following 12 databases (from inception to

17  August 2010):  MEDLINE, Embase, Cochrane CENTRAL,

18  AMED, CINAHL, TOXNET, Development and Reproductive

19  Toxicology, Hazardous Substances Databank,

20  Psych-info and Web of Science"...

21         I read that correctly, correct?

22     A.  Yes.

23     Q.  It says you also searched ScienceDirect

24  and Ingenta, I-n-g-e-n-t-a, correct?

25     A.  Yes.

1      Q.   That's a lot more databases than you

2   searched for your meta-analysis that you presented

3   in your expert report, isn't it?

4      A.   It is.

5      Q.   Why did you search more -- and this was an

6   effort to identify cardiovascular events associated

7   with a drug, right?

8      A.   Yes.

9      Q.   Why would you not search all of those

10   databases in your review in this case if you

11   searched those in a peer-reviewed case --

12   literature?

13      A.   So that -- you've presented one out of my

14   30 systematic reviews.  And if you will go through

15   more of them, and I -- you know, if you have more,

16   you can bring them on and I can -- you'll find that

17   several -- there's no consensus of the exact number

18   of databases to be searched for a systematic

19   review; depends on the question at hand, what

20   you're trying to evaluate.

21          In other systematic reviews where we have

22   evaluated cardiovascular disease, you know, the

23   number of databases have been different.  And as

24   long as the recommendations are you're searching

25   multiple databases, it's an appropriate, you know,

Page 66

1    systematic review.

2           So, yes, we didn't search twelve.  We --

3    given, you know, timeline and other factors.  But,

4    I mean, it would be interesting to know, because

5    has Novartis identified additional clinical trials,

6    which I was unable to identify?  So that is the

7    key, that did the systematic review identify

8    adequate trials of nilotinib and, you know,

9    cardiovascular, and if it did, then that would be

10   interesting.

11       Q.  We're going to talk about all that later.

12       A.  Sure.

13           But I'm trying to provide a context for

14   that answer.

15       Q.  My question is simply, there are ten

16   databases listed in your paper that you wrote with

17   Dr. Mills from 2011 evaluating cardiovascular

18   disease associated with a drug that you did not

19   search in your systemic -- systematic review in

20   this case, correct?

21       A.  Yes.  And I provided context for that

22   answer that several systematic reviews don't do the

23   same search for their databases.  If you go and

24   look at my other systematic reviews, there are

25   searchs of, you know, lesser number of databases,

1    depending on the question at hand.  As long as

2    there is a multiple database search.

3        Q.  Well, this question at hand in your 2011

4    paper was the efficacy and safety of statin for

5    cardiovascular disease.  So it's a similar sort of

6    inquiry to the one you did in this case, isn't it?

7        A.  We've done other inquiries on -- most of

8    my systematic reviews have been focused on, you

9    know, varenicline and cardiovascular disease.

10   We've looked at thiazolidinedione and

11   cardiovascular disease.  So if you go through them

12   one by one, you'll find that -- I can't recite from

13   memory which one of them, but, you know, all of

14   them have been a varying number of databases.

15       Q.  I have a bunch of them, and we can talk

16   about varying databases.  None of them only had

17   three databases, though, did they?

18       A.  Well, it doesn't matter because we have

19   all the studies that we could identify.  We can go

20   through them.

21       Q.  If it doesn't matter, then why would you

22   search more databases in other contexts?

23       A.  You know, you're trying to maximize your

24   database in terms of what is the data you have.

25       Q.  But you agree with me that at least as to

Page 68

1    this 2011 paper, you did not search the same

2    databases in your work here as you searched in this

3    peer-reviewed paper on cardiovascular disease,

4    correct?

5        A.  I think I've answered this twice, and I

6    don't think -- I don't understand what is unique to

7    this paper as compared to my other papers.

8        Q.  Well, maybe I'm going to go through all

9    your papers.

10       A.  We will love that.

11       Q.  My questions is:  It is true that there

12   are ten databases cited in this 2011 paper on

13   cardiovascular disease that you did not consult in

14   doing your search in this case in your expert

15   report, correct?

16       A.  Yes.  I think I've answered that fourth

17   time.

18       Q.  In 2016, you were an author on an abstract

19   published in Value in Health titled "Cardiovascular

20   Risks of Exogenous Testosterone Use Among Men, a

21   Systematic Review and Meta-Analysis"; is that

22   correct?

23       A.  Yes.

24           (Exhibit 300, Cardiovascular Risks of

25           Exogenous Testosterone Use Among Men:  A

Page 69

1          Systematic Review and Meta-Analysis, Alexander,

2          marked for identification.)

3          A.  Actually, this is not correct.  This is

4     not the abstract in Value in Health.  This is the

5     published paper.  So there's a difference between

6     what you said and what you're handing out.

7          Q.  Before we go to the document I marked as

8     Exhibit 300 -- we'll come back to it.  If you turn

9     back to page 110 of --

10          MR. ELIAS:  Which document?

11          MR. JOHNSTON:  I'm going to tell you right

12     now.

13          Q.  Turn back to 110 of Exhibit 299, please.

14     The second sentence under Search Strategies starts

15     "We searched independently."

16          Do you see that?

17          A.  Yes.

18          Q.  What does that mean?

19          A.  Meaning that two people were doing the

20     search.

21          Q.  So two people were conducting the search,

22     correct?

23          A.  Yes.

24          Q.  Who else conducted your search of the

25     literature in this case that you present in your

Page 70

1    expert report?

2          A.   I did not ask anyone else because I could

3    not use anybody else for this, you know, legal

4    consultation.

5          Q.   Why not?

6          A.   Why can?  I was the expert.  I can't, you

7    know, disclose any information about this to anyone

8    else.

9          Q.   You can't disclose any information about

10   the public literature to anyone else?

11         A.   Well, it's specific to a litigation.

12         Q.   So you're assuming that somehow that

13   precludes you from bringing anyone else in to your

14   analysis; is that correct?

15         A.   Yes.

16         Q.   Okay.

17         A.   I mean, that's my understanding and I may

18   be --

19         Q.   Have you ever done a published

20   meta-analysis where only one person reviewed the

21   search?

22         A.   No.

23         Q.   Always two people?

24         A.   Yes, you have.

25         Q.   So that's something that's different from

Page 71

1    what happens when you do a published meta-analysis

2    in this case?

3        A.   Yeah, because of, you know -- because of

4    this issue of bringing in somebody else.

5             So I do have to clarify that.   I may have

6    sourced my office staff to get some articles, but

7    they were not aware of...

8        Q.   Let me stay with 299 for a second.   Under

9    Search Strategy, the last two sentences on page 110

10   of Exhibit 299, you wrote, "We also contacted the

11   authors of all trials for study clarifications,

12   where required, and the authors of the only

13   individual patient data meta-analysis of statins,

14   that included 14 trials."

15            Do you see that?

16       A.   Yes.

17       Q.   And are you aware that in Cochrane's

18   Handbook, Section 7.2.3 and number 6 -- I can pull

19   it out if you need to look at it -- it says that

20   you "should correspond with investigators where

21   appropriate to clarify study eligibility."   And it

22   also goes on say, "It may be appropriate to request

23   further information such as missing results at the

24   same time."

25            Are you aware of that?

1      A.  Yes.

2      Q.  Okay.  Did you reach out to any of the

3  study authors or investigators to clarify studies

4  or to investigate missing data in this case when

5  you prepared your --

6      A.  No.

7      Q.  Let me finish my question before you

8  answer.

9          -- when you prepared your expert report in

10  this case?

11      A.  No.

12      Q.  So that's something that you didn't do

13  that you did do in, for example, the 2011 paper

14  with Mills, correct?

15      A.  And that -- you know, just to clarify that

16  in context, that has not been done in multiple --

17  in fact, the majority of meta-analysis that I've

18  done, we've not contacted authors because we

19  realize that it is an inefficient process.  Most of

20  the time you don't get a response.  And so in

21  several meta-analysis that we have done that are

22  peer-reviewed and published, and probably in your

23  pile, authors have not been contacted.

24      Q.  So you agree that often, even in your

25  peer-reviewed literature, you disregard the

1    instruction in Cochrane's Handbook 2.1.3 to

2    correspond with the investigators, correct?

3            MR. ELIAS:  Objection, misstates and

4    assumes facts.

5            Go ahead.

6       A.   Yeah.  I'll ask.  I mean, I've written the

7    Cochrane guidance on how to do systematic reviews

8    of harms, and it's in my CV.  So in terms of

9    adverse effects, I'm one of the Cochrane experts on

10   that.  And so we've done this work on 30 systematic

11   reviews or some -- in that some number, and we are

12   aware of what is efficient and what is not

13   efficient, and several systematic reviews we

14   haven't.

15           So as I said, several parts of the

16   Cochrane review, you know, are not applicable.

17   It's not that they're disregarded because, you

18   know, they're just not applicable to every step of

19   the process.

20      Q.   Well, so did you write Cochrane's Handbook

21   7.2.3 --

22      A.   No, no.  But I wrote, you know, the PRISMA

23   harms checklist that assesses -- not I wrote, I

24   mean, a group of authors that I was part of --

25   wrote on how to assess systematic reviews of harm.

Page 74

1      Q.  So you're an insider at the Cochrane

2   Handbook because you're an author of some of them,

3   correct?

4      A.  So to clarify, those are not publications

5   of the Cochrane Handbook, but they're part of, you

6   know, a particular subgroup that's the adverse

7   effect group.

8      Q.  Have you told anyone at the Cochrane's

9   Handbook that they should take out suggestion

10   number 6 in 7.2.3 to contact investigators because

11   it's not efficient?

12      A.  We've had this discussion, you know, from

13   the members.  I haven't told the person writing it

14   that you should take it out.  But we have had lots

15   of recommendations to change their handbook.

16      Q.  And they haven't taken that one to heart

17   and changed their handbook, have they?

18      A.  I've not made a specific recommendation to

19   the editor of that handbook that you should take it

20   out.

21      Q.  Now, when we look at the next section on

22   this paper, Two Investigator -- "Study selection:

23   Two investigators (E.M., P.W.) working

24   independently, in duplicate, scanned all abstracts

25   and obtained the full text reports of records that

Page 75

1    indicated or suggested that the study was a RCT

2    evaluating statin therapy on the outcomes of

3    interest."

4         Did I read that correctly?

5    A.   Yes.

6    Q.   So in this paper you had two independent

7    reviewers, correct?

8    A.   Yes.

9    Q.   And it goes on to say -- oh, sorry.

10        MR. JOHNSTON:   Strike that.

11   Q.   Did you have another reviewer look at the

12   results of your systematic search in the

13   preparation of your expert report?

14   A.   I think I qualified that statement

15   earlier, that I conducted this and there was not

16   another reviewer for the reasons stated in my

17   prior --

18   Q.   Well, so it was unclear to me because I

19   asked if you had somebody else conduct the search

20   and sometimes you talk about conducting the search

21   separately from actually reviewing the output of

22   the search.  So I'm sort of focused on reviewing

23   the output.

24        No one but you reviewed the output of the

25   searches in --

1       A.   Exactly.

2       Q.   -- the database, correct?

3            And that's different than what happens in

4   the meta-analysis that you publish in the

5   literature, correct?

6            MR. ELIAS:   Objection, overbroad.

7       A.   So, yeah.   I mean, we do have another, you

8   know, independent investigator review the data.

9       Q.   So there's two different people that look

10  through the studies.   And what if there's a dispute

11  between those two folks?

12      A.   So we adjudicate them.   You know, we talk

13  about it, discuss them.   In some case there's a

14  third person that adjudicates.   Usually, most, and

15  especially if it's an expert, like me, and others,

16  you know, we have less discrepancy.   Doesn't mean

17  that we don't have any discrepancies, but --

18      Q.   But none of that happened here because you

19  were the only person reviewing --

20      A.   Exactly.

21      Q.   -- the papers, correct?

22            (Interruption by the reporter).

23      Q.   None of that happened here because you

24  were the only person reviewing the papers, correct?

25      A.   Yes.

Page 77

1          Q.   Let's look now at the 2016 paper that we

2     marked as Exhibit 300.

3               By the way, I just thought of this, was

4     there a prespecified protocol for your systematic

5     analysis that you performed in this case?

6          A.   I mean, I wrote the methods down, so it

7     wasn't like there was something else.  The

8     prespecified protocol means that, you know, the

9     methods were written prior to the conduct of the

10    study and then -- so I think that's what it is.

11    But there's not a sitting document somewhere that I

12    could, you know, provide.

13         Q.   For the peer-reviewed publications that

14    you have, is there a prespecified methodology that

15    is written out as a -- as a protocol?

16         A.   Yeah.  For most of the recent papers -- we

17    weren't doing that until a couple of years ago.

18    But for most recent papers, we do.  But in either

19    case, put it in the document itself or attach it as

20    a supplement.

21         Q.   So if you look, for example, at

22    Document 300, in the footnote on Authorship, it

23    says, "SS drafted the study protocol."

24               That's you, SS, right?

25         A.   Yes.

Page 78

1      Q.   So in this paper, there actually was a

2   prespecified study protocol, correct?

3      A.   Yes.   We drafted it.

4      Q.   You didn't do that when you prepared

5   your meta-analysis?

6      A.   No, I did do that.

7      Q.   You did?

8      A.   Yeah.

9      Q.   Have you produced --

10      A.   That is the protocol in terms --

11      Q.   You have to let me finish my question.

12           Have you produced as part of your report

13   the document on which you drafted your prespecified

14   protocol?

15           MR. ELIAS:   Asked and answered.

16      A.   That protocol has been incorporated into

17   the systematic -- into the report.

18      Q.   Did you write down a protocol before you

19   started this project?

20           MR. ELIAS:   Asked and answered.

21      A.   Yes.

22      Q.   And where is that document where you

23   wrote it --

24      A.   It's incorporated into this.

25      Q.   I understand you incorporated.   I want to

1    know where the physical document you --

2         A.   The physical document was incorporated

3    into it.

4         Q.   How is that?  You've got a study report

5    here.  Where is the protocol in the study report?

6         A.   I mean, that -- you know, that document

7    was modified and into the search methods.  So if

8    you look at the methods, that's the study protocol.

9         Q.   So your testimony is that you drafted a

10   document on Word or whatever word processor you

11   used that prespecified what you were going to do,

12   and then as you did the analysis you modified that

13   same document and created your report?  Is that

14   your testimony?

15        A.   No.  So you have to understand, the

16   document that I'm trying to say is -- and can I

17   refer to my report?

18        Q.   Sure.

19        A.   So the study protocol is from Section 2,

20   page 11 to section -- same section to page 13.

21   That was the segment of the methods that were

22   drafted and that is directly incorporated in the --

23        Q.   I understand that the substance of your

24   protocol may be incorporated in your report, and

25   that it's in the methods section -- and all papers

1    that are published --

2        A.   Sure.

3        Q.   -- have a methods section, correct?

4            Is it your belief and testimony today that

5    when there's a paper that has a methods section in

6    it, that that actually constitutes the protocol?

7            MR. ELIAS:  Objection, overbroad.

8        A.   I don't know what -- I mean, in terms of

9    peer-reviewed literature, yes.  If you're providing

10   something else, then there is a protocol.  And here

11   if you're incorporating it, it's a methods section.

12       Q.   Okay.  So my question is this:  So let's

13   talk -- let's step outside this box for a second.

14   If we were doing a clinical trial, we would write a

15   protocol that would prespecify endpoints, correct?

16       A.   Yes.

17       Q.   And that document would exist even after

18   the study report was written, wouldn't it?

19           MR. ELIAS:  Objection, overbroad, lacks

20   foundation.

21       A.   Yes.

22       Q.   Did you create a prespecified protocol

23   before you started your work in this case?

24       A.   Yes.

25       Q.   Where is that document?

1      A.   I did not create a prespecified protocol,

2   but I wrote what -- prespecified the methods of the

3   study.  So whether you call it a protocol, whether

4   you call it -- whatever you want to call it --

5      Q.   Okay.  Where is that document?

6      A.   It's incorporated right in the report.

7   There's no separate --

8      Q.   The reason you do a protocol is so that

9   you can at the end of the study see whether you

10  actually met your protocol.  If you change your

11  protocol without -- during the study, we need to

12  know that you did that, don't we?

13        MR. ELIAS:  Objection, compound, assumes

14  facts, overbroad.

15        Go ahead.  Argumentative.

16     A.   I prespecified the methods for this

17  systematic review and that is included in this

18  report.  There is no other document or protocol, if

19  you like to call it, that exists somewhere else

20  that I can produce.

21     Q.   Did you write one at some point before you

22  started your actual analysis?

23     A.   Yes.  And that's been included here.

24     Q.   So are we going back to this question.

25  Are you telling me that you had a Word document

Page 82

1    where you wrote out your prespecified points and

2    that you then added to that as you conducted your

3    analysis?

4         A.   I added to the results of that.  The

5    methods were written up in advance.  So this 2(a)

6    to 213 was as it was written, that's the document.

7         Q.   And is there a document on your computer

8    that has those that don't have the rest of the

9    report, or are you telling me that you added the

10   results to that same document on your computer?

11        A.   I don't know how it works in terms of -- I

12   can't recall whether I added the results to that

13   document or took that and pasted it.

14        Q.   So there's no way for me to know today

15   whether your protocol changed during your conduct

16   of the study, is there?

17             MR. ELIAS:  Objection, lacks foundation,

18   assumes facts.

19             Go ahead.

20        A.   Had I provided something that's

21   independent of it and shown those changes, then you

22   would know.  But right now, you have to, you know,

23   you have to believe my word that this is --

24        Q.   I have to trust you.

25        A.   Yeah, exactly.

1        Q.   So looking at Exhibit 300 --

2             MR. JOHNSTON:  Give me one second.

3             (Exhibit 301, Value in Health 19 (2016)

4        A1-A318 article, marked for identification.)

5        Q.   So you correctly pointed out that what I

6   handed you and marked as Exhibit 300 was the final

7   paper regarding the "Cardiovascular risks of

8   exogenous testosterone use among men, a systematic

9   review and meta-analysis."  And you indicated there

10  was also an abstract, correct?

11            MR. ELIAS:  Object to the form.

12            Go ahead.

13       A.   Yeah.

14       Q.   Okay.  301, which I've just handed you,

15  Exhibit 301, is it correct that on the right column

16  of that page at PCV24, is that the abstract that

17  was associated with this paper?

18       A.   Yes.

19       Q.   And you are listed as the final author of

20  that abstract, correct?

21       A.   Yes.

22       Q.   Now, does that mean that you were the

23  senior author on the abstract?

24       A.   Yes.

25       Q.   And it also means on Exhibit 300 that you

Page 84

1    were the senior author on the paper because you're

2    the last listed author, correct?

3        A.   Yes, I am.

4        Q.   And that's what that denotes usually, is

5    that the last listed author is usually the senior

6    author on the paper, correct?

7        A.   It is.

8        Q.   If we look at the Methods section of the

9    abstract, 301, it says, "We searched PubMed,

10   MEDLINE, Embase, Cochrane Collaboration Clinical

11   Trials, clinicaltrials.gov and the U.S. Food & Drug

12   Administration website through August 28, 2015."

13           Do you see that?

14       A.   Yes.

15       Q.   You didn't search Cochrane Collaboration

16   Clinical Trials as part of your meta-analysis in

17   this case, did you?

18       A.   No, I did not.

19       Q.   You did not search clinicaltrials.gov as

20   part of your meta-analysis for your systematic

21   review in this case, did you?

22       A.   No.  As it is clear from this and the

23   previous statin review that you cited, the number

24   of databases searched is different and it varies

25   from study to study.

Page 85

1      Q.  My question is:  You did not search

2  clinicaltrials.gov as part of your meta-analysis in

3  this case, correct?

4      A.  No, I did not search it.

5      Q.  Did you search the U.S. FDA website as

6  part of your review in this case?

7      A.  No, I did not.

8      Q.  By the way, how did you get the two FDA

9  disproportionality analysis that you discuss in

10  your paper?  Did they come up in your systematic

11  literature search?

12      A.  Yes.  They're not FDA -- so they're not --

13  so to clarify, they're not necessarily -- they are

14  part of the literature review.

15      Q.  So let me just follow-up on that real

16  quick.  Actually -- so Exhibit 72 you say is an

17  updated analysis from FAIRs.  You don't mean it's

18  an analysis by the FDA, correct?

19      A.  Exactly.  I don't mean that this was

20  conducted by the FDA.  It's just an analysis of the

21  FDA adverse event database.

22      Q.  So these are not FDA analyses that you're

23  referring to in here?

24      A.  I don't know who the authors are.  I mean,

25  these are analysis of --

Page 86

1        Q.   Well --

2        A.   -- it could be FDA authors, could be

3    somewhere else, but I don't know.

4        Q.   We know their names because they're in

5    your -- in your -- so 71 is --

6            MR. ELIAS:  Let's go to the report, make

7    sure -- if we're getting into specifics.  What page

8    are you on in terms of the section and then what

9    in-notes or --

10       Q.   I'm going to talk about in-note -- all I'm

11   trying to do is, say, in Footnote 71 and 72, you

12   know the names of the people; you just don't know

13   their affiliation, right?

14           MR. ELIAS:  In-note 71 and 72.

15       A.   Yeah.  They could be affiliated with any

16   institution, the FDA, I don't know that.

17       Q.   You don't know whether they are or not?

18       A.   No.

19       Q.   But the reason you have them is because

20   they were papers that somebody had written in the

21   public literature, correct?

22       A.   They are published articles from analyzing

23   data from the FD --

24       Q.   All right.  Thank you.

25           Why would you choose to search in this

1    testosterone paper, clinicaltrials.gov?

2        A.  Well, a lot of search strategy is, you

3    know, about trying to maximize the database that we

4    can search.  And, you know, we had a large team --

5    we had a large team of people and we wanted to

6    search, you know, all the clinical trials of

7    testosterone.

8        Q.  And so because you were the only one doing

9    it, you didn't have as many resources to search a

10   large number of trials, correct -- a large number

11   of databases, correct?

12       A.  Yeah.  I mean, that, and the timeline as

13   well.  I mean, it's -- so it's a pragmatic choice.

14   It's not -- so as you can see, the numbers vary

15   from study to study.

16       Q.  Do you know whether the clinical trials

17   that you focused on in your meta-analysis are

18   reported on clinicaltrials.gov?

19       A.  I do, because, you know, these studies, as

20   I reviewed them, they have an NCT number, so that I

21   can safely assume that all studies after a certain

22   year, I'm aware of clinicaltrials.gov reporting it.

23       Q.  And do you know whether the data in the

24   clinicaltrials.gov database differs from what you

25   looked at in the published literature in any

Page 88

1    material way?

2        A.   I have not examined for those data

3    discrepancies.

4        Q.   So you don't know?

5        A.   No, I don't.

6        Q.   Wouldn't it be a reasonable thing to do if

7    you're relying on -- in this day and age when

8    everything is on clinicaltrials.gov, wouldn't it be

9    a reasonable thing if you're relying on published

10   literature to go back and compare what is in the

11   published literature to what is in the actual study

12   reports on clinicaltrials.gov?

13       MR. ELIAS:   Object to form.

14       A.    In this day and age, I mean, I reply on

15   these published studies published in New England

16   Journal of Medicine, the Lancet, I mean, top

17   medical journals, and I don't have any reason to

18   doubt the veracity of the data.  I mean, these are

19   the data which form the basis of regulatory

20   approval for nilotinib.  So why would I doubt that

21   these data are somehow, you know, not being

22   reported?

23       Q.   Not to be pedantic, but the regulatory

24   approval is not based on the papers that are in the

25   public literature, is it?

1       A.   I mean, regulatory approval is based on

2    these studies and clinical trials.

3       Q.   And when you write a 12-page, 15-page

4    paper about a clinical trial, you're going to have

5    to make some editorial judgments about which data

6    you discuss, aren't you?

7       A.   Well, that is the same that applies to my

8    report as well.  So you have to make some judgments

9    about what to report.

10      Q.   Sure you do.  And the question is:  As

11   somebody who is trying to evaluate the research

12   that is out there in the literature, did you go

13   back to the original materials to determine whether

14   or not there were other data not reported in the

15   short articles that would have been useful for your

16   analysis on clinicaltrials.gov?

17           MR. ELIAS:  Objection, compound,

18   mischaracterizes assumed facts.

19      A.   I relied on the data in the published

20   literature.

21      Q.   So you did not check clinicaltrials.gov in

22   this case?

23      A.   I did not.

24      Q.   You also did not search the U.S. Food &

25   Drug Administration website in doing your

Page 90

1    meta-analysis for this case, did you?

2         A.   No.   And it was a pragmatic choice.

3         Q.   Just trying to establish that you didn't.

4    Thank you.

5             Let's stick with the abstract.   In the

6    abstract, you state, "The two reviewers

7    independently conducted all stages of review."

8             So that's consistent amongst all your

9    published meta-analysis, that there are two

10   reviewers, correct, and we --

11        A.   Yes, and sometimes even three.

12        Q.   Do you remember in 2007 you were the first

13   author on a paper titled "Long-Term Risk of

14   Cardiovascular Events With Rosiglitazone"?

15            Do you recall that?

16        A.   Yes.

17            (Exhibit 302, Long-term Risk of

18            Cardiovascular Events with Rosiglitazone,

19            marked for identification.)

20        Q.   Let's look at the Exhibit 302, which is a

21   meta-analysis -- which is a document you were the

22   first listed author titled "Long-term Risk of

23   Cardiovascular Events with Rosiglitazone,"

24   published in the Journal of the American Medical

25   Association on September 12, 2007, correct?

Page 91

1     A.  Yes.

2     Q.  And let's start with the study Methods

3  section and the Search Strategy.  You see that in

4  May -- it says, about six lines down after Footnote

5  4, it says "in May 2007."

6          Do you see that?  In the center column?

7     A.  Yes.

8     Q.  It says, "We conducted an updated search

9  in MEDLINE and of the manufacturers' clinical

10  trials register, the U.S. Food & Drug

11  Administration website, and product information

12  sheets."

13          Do you see that?

14     A.  Yes.

15     Q.  Did you search the manufacturers' clinical

16  trial register for your report in this case?

17     A.  No, I did not.

18     Q.  And we already established that you didn't

19  search the U.S. Food & Drug Administration website.

20          Did you search product information

21  sheets -- well, first of all, what are product

22  information sheets?

23     A.  I understand it to be product labels.

24     Q.  Did you search the labels as part of your

25  review in this case?

Page 92

1        A.   No.   And just to put this in context, as

2   you look at the Methods section of this paper,

3   there is no prespecified protocol.   And so this

4   idea that there is some document that exists for

5   every systematic review is -- this was published

6   in -- I think it was the Journal of the American

7   Medical Association.

8        Q.   How can I tell from looking at this that

9   there's no prespecified protocol?

10       A.   Because that's what's stated in the

11   Methods section.

12       Q.   Where does it say that?

13       A.   The methods is the protocol.

14       Q.   Where does it say we didn't have a

15   prespecified protocol?

16       A.   That's what I'm trying to clarify, that

17   the Methods section of a systematic review serves

18   as the protocol.

19       Q.   My point is, this doesn't tell me that you

20   didn't have a prewritten set of methods before you

21   started your review, does it?

22            MR. ELIAS:   What's "this"?   You're talking

23   about 302?

24            MR. JOHNSTON:   Yeah.   What we're talking

25   about, 302.

1        A.   What I'm trying --

2        Q.   Nowhere does it say that we didn't write

3   down what we intended to do ahead of time, does it?

4        A.   No.  And both are similar.  Neither -- and

5   in this case too.  We, you know, we didn't say that

6   we have an additional document.  The Methods

7   section of the document is the protocol.  So either

8   in this -- so you brought another review in which

9   you say there's an additional document, but there

10  are some systematic reviews in which the Methods

11  section serves as a protocol.

12       Q.   I don't know whether there's an additional

13  document or not because I didn't do this review and

14  it doesn't say one way or the other in your Methods

15  section in this paper whether there's an additional

16  document that constitutes a protocol.

17            MR. ELIAS:  That's not a question.

18       Q.   Does it?

19       A.   I'm not sure what you're asking.  I'm

20  saying there are systematic reviews in which there

21  are no additional documents that provide a

22  prespecified protocol because the prespecified

23  methods have been incorporated into the systematic

24  review.

25       Q.   You state -- you state that you -- down

Page 94

1    below "193 hits," it says "We also searched for"

2    systemic -- "systematic reviews in PubMed with the

3    filter systematic [sb] and rosiglitazone (24

4    hits)."

5              Is it your testimony that the search

6    system chose those words, or did the investigators

7    in this paper choose those words?

8              MR. ELIAS:  Well, he hasn't testified on

9    it yet.  So can we ask the question differently?

10             MR. JOHNSTON:  I'm asking him.

11        A.   So when you say the search terms chose, I

12   mean, we had to include those words, systematic

13   and --

14        Q.   I understand.  And you investigators

15   decided to include those words, correct?

16        A.   Yeah.  As we have done in this review.

17        Q.   Well, PubMed, you said, selected a whole

18   bunch of additional terms --

19        A.   PubMed just clarified --

20             COURT REPORTER:  I'm sorry.  Please.  I

21   did not get the end of your question.

22        Q.   PubMed suggested additional terms beyond

23   those you typed in, correct?

24        A.   PubMed did not provide additional pubs

25   [sic].  PubMed just provided a layering of those

Page 95

1   terms that was displayed in the search.  There was

2   no additional terms that -- PubMed indexes

3   nilotinib as various chemical compounds and that's

4   what it provided.  So there's no additional terms

5   that I put in.

6       Q.  You didn't type all those words that were

7   in your PubMed search into the computer, did you?

8       A.  I did.

9           MR. ELIAS:  Asked and answered.

10      Q.  You typed all those words in your --

11      A.  Yeah --

12      Q.  -- search?

13      A.  -- I did.

14      Q.  After PubMed told you to use those --

15      A.  Yes --

16      Q.  -- words?

17      A.  -- I did.

18          COURT REPORTER:  You know, I need to take

19  a break.

20          MR. JOHNSTON:  Sure.

21          THE VIDEOGRAPHER:  We are going off the

22  record at 11:51.

23          (Proceedings interrupted at 11:51 a.m. and

24      reconvened at 11:59 a.m.)

25          THE VIDEOGRAPHER:  We are back on the

Page 96

1     record at 11:59.

2     BY MR. JOHNSTON:

3         Q.   Looking back at Exhibit 302, in Data

4     Extraction, nine lines down in the -- under the

5     heading Data Extraction in the center column, it

6     starts "We also."

7              Do you see that?

8         A.   Yes.

9         Q.   Okay.   You wrote, "We also extracted data

10    on overall mortality from the included trials.

11    Published reports were reconciled with trials in

12    the GlaxoSmithKline clinical trials register when

13    possible."

14             Did I read that correctly?

15        A.   Yes.

16        Q.   Did you, in conducting your meta-analysis

17    and systematic review for this case, reconcile the

18    data from the included trials with the Novartis

19    clinical trials register?

20        A.   No, I did not.

21        Q.   It goes on to say, "If there were multiple

22    reports available for a particular study, we chose

23    to extract adverse events data from the most

24    up-to-date journal published version."

25             Did I read that correctly?

Page 97

1      A.  Yes.

2      Q.  Is that what you did in this meta-analysis

3   and systematic review, look at the most recent

4   version if there were multiple papers on the same

5   trial?

6      A.  To an extent, yes.  I mean, we were

7   looking at the longest duration of follow-up.  So

8   whatever was the most -- you know, because there

9   were multiple reports on trials, some two years,

10   three years, four, up.  So at the time of the

11   search, to the best of my ability, I was looking at

12   the most updated version.

13      Q.  Okay.  The next sentence says, "We also

14   extracted information on whether any cardiovascular

15   adverse events were subjected to adjudication to

16   assess the strength of adverse drug reaction

17   reporting."

18          Did I read that correctly?

19      A.  Yes.

20      Q.  And did you do that in your paper from

21   2007 that appears at 302?

22      A.  Yes.

23      Q.  Did you do that with respect to your

24   meta-analysis that you prepared for this case and

25   your meta-analysis and systemic [sic] review?

Page 98

1          A.   No.

2          Q.   So you did not determine whether any

3     adverse events were subjected to adjudication,

4     correct?

5          A.   No.  And part of it is because when I

6     reviewed the clinical trials, these adverse events

7     of clinical trials were reported as spontaneously

8     reported adverse events.

9          Q.   Well, that would have been true in this

10    trial, too, where you were looking at RCT reports.

11         MR. JOHNSTON:   Sorry.  Let me strike that

12    and start over.

13         Q.   Weren't you looking at randomized clinical

14    trials only in the document that we marked as 302?

15         A.   Yes.

16         Q.   So it would have been true there also that

17    you would have been looking at publications of

18    randomized clinical trials, correct?

19         A.   Yes.

20         Q.   But in that case, you chose to go back and

21    determine whether there was adjudication of those

22    events, correct?

23         A.   Yes.  If those were reported in the

24    published clinical trials.

25         Q.   And you didn't do that here, correct?

1      A.   I did not find, you know, adjudication

2   data in the published clinical trials.

3      Q.   Are you testifying that in these papers

4   that it stated there was adjudication data in the

5   published clinical trials?

6      A.   If there was there, I -- you know, this is

7   ten-year old study and I don't remember all the

8   details of the study, but it is what it is.  We

9   were --

10      Q.   But --

11         MR. ELIAS:  Hold on.  Let him finish.

12      A.   We were looking at cardiovascular events,

13   and if there was adverse events, we extracted data.

14      Q.   Sitting here today, you don't remember

15   whether or not these trials identified adjudication

16   in the published reports, do you?

17      A.   I don't remember.

18      Q.   So it's possible that you did something

19   more to evaluate adjudication than just read the

20   published reports, correct?

21         MR. ELIAS:  Objection, calls for

22   speculation.

23      A.   When you said "something more," I don't

24   know what that would be.  The only thing more I

25   would say is the clinical trial would state there

1    are -- you know, these cardiovascular events were

2    adjudicated and then noted it as such.

3         Q.  Well, in this case, you validated the

4    published report against the manufacturer's

5    clinical trial registry, correct?

6         A.  I did not validate it.  There's no such

7    thing as value -- actually, it's quite clear that

8    the most valid version was the general updated

9    version.  So there was no sort of a valid reference

10   standard.

11        Q.  Ignore valid.

12             In this case, you took the paper and you

13   compared it against what was reported in the

14   manufacturer's -- not in this case.

15             In the publication that's marked 302, you

16   all took the published trials and you compared the

17   results to the manufacturer's clinical trial

18   database, correct?

19        A.  That's not how it evolved and that's not

20   what's stated.  What is stated is we also searched

21   the clinical trials register for the manufacturer

22   and, you know, we also used the data from the most

23   updated general published versions.

24        Q.  And isn't it possible that you would be

25   able to determine from the register that there had

1    been adjudications, even if it wasn't in the paper

2    that was published?

3         A.   No.  The way the clinical trials register,

4    or for that matter, are set up is they have

5    numerical frequency on adverse events.  So the

6    adjudication is probably more likely in the

7    clinical paper because it will talk about it.

8    Clinical trial registries just have -- and

9    including clinicaltrials.gov have numerical

10   frequency of -- they don't have qualitative

11   descriptions of adjudication.

12        Q.   So in this case when you prepared your

13   meta-analysis and systematic review, you did not

14   make any effort to determine whether any of the

15   cases in the clinical trials had been adjudicated,

16   correct?

17        A.   When you say I did not make an effort, I

18   reviewed the data and I looked at whether they were

19   adjudicated or not, and, you know -- but I didn't

20   go to Novartis' register or seek, you know.

21        Q.   Let me ask it another way.  You were not

22   aware of any adjudication of any of the adverse

23   events reported in the clinical trials that you

24   included in your meta-analysis that you prepared

25   for this case, correct?

Page 102

1      A.   I was just aware of them being reported as

2   adverse events in the trials.

3      Q.   And you weren't aware of any adjudication,

4   correct?

5      A.   Yes.

6      Q.   Okay.  One of the things you do after the

7   search is you do data extraction, correct?

8      A.   Yes.

9      Q.   Okay.  When you do data extraction for a

10  peer-reviewed published journal article, do you

11  have two people extract the data independently and

12  compare those results?

13     A.   Yes.

14     Q.   You didn't do that here, did you?

15     A.   No, I do not.

16     Q.   Okay.  Are you aware that Cochrane's

17  Handbook states that CENTRAL, Cochrane CENTRAL, is

18  considered to be the best single source of reports

19  in trials for inclusion in Cochrane reviews?

20     A.   Yes.  But nobody has identified additional

21  clinical trials beyond what I have identified in my

22  systematic -- and they might exist, I'm just not

23  aware of them.

24     Q.   Okay.  Let me ask my question again.  Are

25  you aware that Cochrane's handbook states that

1    CENTRAL is considered to be the best single source

2    of reports for trials for inclusion in Cochrane

3    reviews?

4         A.  I'm not aware of every single line of the

5    Cochrane Handbook.

6              (Exhibit 303, 6.2.4 Summary points

7         document, marked for identification.)

8         Q.  Are you aware that the Cochrane Handbook

9    is available online?

10        A.  Yes.

11        Q.  And I've handed you a document that we've

12   marked as Exhibit 303.  Do you recognize that as

13   being Section 6.2.4, Summary Points, from the

14   Cochrane Handbook?

15        A.  Yes.

16             MR. ELIAS:  Lacks foundation.

17        Q.  And you see that the second bullet on that

18   page says, "CENTRAL is considered to be the best

19   single source of reports of trials for inclusion in

20   Cochrane reviews."

21             Do you see that?

22        A.  Yes.  And it is immaterial here because I

23   identified all the trials.

24        Q.  That's what it says, isn't it?  It says,

25   "CENTRAL is considered to be the best single source

1   of reports of trials for inclusion in Cochrane

2   reviews," correct?

3       A.   Yes.   And I've identified all the trials.

4       Q.   You did not search CENTRAL in your

5   meta-analysis and --

6       A.   No, I --

7       Q.   Can I finish the question, please, sir.

8   This is a problem we've been having.   You've got to

9   let me finish the question.

10          Did you search CENTRAL in conducting your

11  meta-analysis and systematic review that you

12  prepared for this case?

13      A.   No.   And I've not searched CENTRAL in many

14  other peer-reviewed systematic reviews and

15  meta-analysis.

16      Q.   I didn't ask you about anything else.

17          I simply asked you whether or not you had

18  searched CENTRAL in conducting your meta-analysis

19  and systemic -- systematic review that you prepared

20  for this case?

21      A.   No.   And I have to put it in the context

22  of how I do systematic reviews and meta-analysis,

23  which does not include searches of CENTRAL in all

24  cases.

25      Q.   Did you, as part of your search, review

1    the reference list and other reviews, guidelines,

2    included and excluded studies and other related

3    articles for inclusion in your meta-analysis and

4    systematic review that you prepared for this case?

5         A.   That's too long a question.  You have to

6    repeat that for me.

7         Q.   Look at Section 303.

8              MR. ELIAS:  I'm sorry.

9         Q.   Look at Exhibit 303, Section 4.2.4 from

10   the Cochrane Handbook.

11             MR. ELIAS:  That's Exhibit 304.

12             MR. JOHNSTON:  It's 303.  Look at the

13   sticker.

14             MR. ELIAS:  You're right.  Sorry.  My bad.

15        Q.   I'm looking at Exhibit 303.  The sixth

16   bullet point says, "Reference lists and other

17   reviews, guidelines included (and excluded) studies

18   and other related articles should be searched for

19   additional studies."

20             Did I read that correctly?

21        A.   Yes.

22        Q.   Did you do that in preparing your

23   meta-analysis and systematic review in this case?

24        A.   Yes, part of it.

25        Q.   Which part?

1      A.   The reference list of other systematic

2   reviews.  But, again, the Cochrane guidelines are

3   not sort of the -- every element of the Cochrane

4   Handbook is not to be taken for its word.  I mean,

5   I looked at the reference list of other systematic

6   reviews.  I looked at the reference list of the

7   published trials to identify studies.

8      Q.   Okay.

9      A.   But not all of these other parts of

10  reviews and so, you know --

11     Q.   So there are parts of this you did not --

12     A.   Yeah, parts of it I --

13     Q.   -- do in this case.

14          Next two bullets -- three bullets later

15  says, quote -- last bullet on this page, "Trials,

16  registers and trial results registers are an

17  important source of ongoing and unpublished

18  trials."

19          Do you see that?

20     A.   Yes.

21     Q.   Do you realize that the ENESTnd trial is a

22  ten-year trial?

23     A.   I know it has long duration of follow-up.

24  I don't know what is the exact.

25     Q.   You don't know the term of the ENESTnd

1   trial?

2        A.   I mean, I know it's a long-term trial.

3        Q.   Okay.  Well, you looked at the 60-month

4   data, that's five-year data, correct?

5        A.   Yeah.

6        Q.   Are you aware that there's five years more

7   data to come in that trial?

8        A.   I'm aware of the duration of follow-up.  I

9   mean, I'm not aware of how much -- because these

10  are being published at every frequency.

11       Q.   Well, so you're not aware that the

12  protocol mandates a ten-year trial, correct?

13       A.   I'm not aware of all the specifics of the

14  protocol.

15       Q.   Okay.  You see at the bottom, it

16  says "Trials" -- I read this a minute ago --

17  "Trials registers and trial results registers are

18  an important source of ongoing and unpublished

19  trials."

20            Did I read that correctly?

21       A.   Yes.

22       Q.   Did you look at that, those materials, in

23  conducting your meta-analysis and systematic review

24  in this case?

25       A.   No.

1          (Exhibit 304, 7.2.4 Implementation of the

2          selection process document, marked for

3          identification.)

4      Q.  I've handed you what we've marked as

5   Exhibit 304.  Do you recognize that as being

6   Section 7.2.4, "Implementation of the Selection

7   Process" from the Cochrane Handbook of Systematic

8   Reviews online version?

9      A.  I don't know which edition of it is.  I

10  mean, there are various versions.  So you have to

11  tell me which edition it is.

12     Q.  Is the current version online?

13     A.  I don't know if it's online.  I mean, they

14  have different versions.  So which version is

15  online, I don't know.  So you have to tell me that.

16     Q.  Version 5.1, is that the current version?

17     A.  I don't think so, if I recall correct.

18     Q.  Updated March 2011?

19     A.  No, I don't think so.  But, you know,

20  their online version may lag a bit, too.

21     Q.  How do I get anything more recent than

22  that?  Do you have it in your possession?

23     A.  Yeah.

24     Q.  Okay.  I should have asked you to bring it

25  with you, I guess.

1      A.  Well, it's not that I'm relying on every

2   person.  And I also use the online version.  It's

3   not that I don't use it.

4      Q.  So the online version is something that

5   you use in your practice, correct?

6      A.  Yeah.  I use it to refer to when I, you

7   know, need to.

8      Q.  I'm not saying you follow everything in

9   there.  I'm just saying it's something you consult,

10  correct?

11     A.  Yeah.  Sometimes it's much more easily

12  accessible.

13     Q.  Okay.  And so this is 7.2.4 of the online

14  version.  Does that look correct to you?

15     A.  Yes.

16     Q.  And in the first paragraph of this section

17  states, "Decisions about which studies to include

18  in a review are among the most influential

19  decisions that are made in the review process."

20         I read that correctly?

21     A.  Yes.

22     Q.  It goes on to say, "However, they involve

23  judgment."

24         Did I read that right?

25     A.  Yes.

1       Q.   "To help ensure that these judgments are

2    reproducible, it's desirable for more than one

3    author to repeat parts of the process."

4            Did I read that correctly?

5            MR. ELIAS:  The exhibit is cut off, so no.

6       Q.  You can answer the question.

7       A.  I'm sorry.  Can you repeat it?

8       Q.  Do you agree that in practice that to help

9    ensure that judgments are correct, that more than

10   one person should be involved?

11      A.  I mean, you know, that's part of the

12   process in this step to ensure more than one

13   process.  I'm not sure how it -- how it plays into

14   the fact that these judgments are correct, but,

15   yes, it would be nice to have one more person.

16      Q.  Do you agree that experts in a particular

17   area frequently have preformed opinions that can

18   bias their assessments of both the relevance and

19   validity of articles?

20      A.  Yes.  I just don't have any expertise in

21   that particular area, particular opinion about this

22   prior to performing this review.

23      Q.  I don't understand what you just said.

24   All I asked you is:  Do you agree that experts in a

25   particular area frequently have preformed opinions

1    that can bias their assessments of both the

2    relevance and validity of articles?  Do you agree

3    with that statement?

4        A.  Yes.

5        Q.  Cochrane suggests that it may be an

6    advantage to have a second author who is not a

7    content expert because of those possible biases,

8    correct?

9        A.  Yes.

10       Q.  Do you agree with that suggestion?

11       A.  Yes.

12       Q.  You didn't have a second author here, did

13   you?

14       A.  I think I've answered that question so

15   many times, that this was done by one person.  I'm

16   happy to repeat it whenever you ask.

17       Q.  In most of the papers we've looked at --

18   you can tell me if there are others out there --

19   but most of the ones that we looked at for purposes

20   of conducting a meta-analysis, you guys have

21   focused -- you and your colleagues have focused on

22   randomized control trials, correct?

23           MR. ELIAS:  Object to the form, misstates,

24   assumes facts.

25       A.  When you say we have looked at, what do

1    you mean by that?

2         Q.  You and your coauthors on your published

3    papers.

4         A.  No, that is not correct.  We've looked at

5    randomized trials; we've looked at observational

6    studies; we've analyzed -- we've done meta-analysis

7    of observational studies when appropriate.  So that

8    is not correct.

9         Q.  Let me rephrase it.  One thing that you're

10   looking for and almost always include is any

11   randomized control trials you can find in your

12   meta-analysis, you and your coauthors, correct?

13        A.  If they're available.

14        Q.  Sometimes you also include observational

15   studies, correct?

16        A.  Yes.

17        Q.  But you only include those if the measure

18   of heterogeneity allows you to in your

19   meta-analysis, correct?

20             MR. ELIAS:  Object to the form.

21        A.  So to clarify, if the -- you know, if the

22   methods of the systematic review, you know, want to

23   look at observational studies, we look at

24   observational studies and include them -- part of

25   that systematic review.  Whether we include them in

```
 1    a meta-analysis is a judgment question that

 2    includes one assessment of statistical

 3    heterogeneity, another assessment of clinical

 4    heterogeneity, are studies similar or not.

 5         Q.   Do you agree -- have you included --

 6         MR. JOHNSTON:   Strike that.

 7         Q.   The meta-analysis you conducted in this

 8    case was based on four randomized clinical trials,

 9    correct?

10         A.   Yes.

11         Q.   Now, none of those trials was blinded;

12    isn't that right?

13         A.   Yes.   These were open label trials.

14         Q.   So that means that there's a potential

15    bias in the trial of some sort, and I don't

16    necessarily know what it is, but the lack of

17    blinding introduces potential bias in the trial,

18    correct?

19         A.   It does.

20         Q.   And your analysis was based only on the

21    published literature about those trials, correct?

22         A.   Whatever data was available in the

23    published literature.

24         Q.   You didn't actually review the study

25    reports for those trials created by the
```

Page 114

1    manufacturer, did you?

2         A.   Can you clarify?  What do you mean by

3    "study reports"?

4         Q.   Well, when you conduct a clinical trial,

5    don't you end up publishing a study at the end of

6    the clinical trial --

7              MR. JOHNSTON:  Sorry.  Strike that.

8         Q.   You've conducted clinical trials, correct?

9         A.   I've been -- participated in them.

10        Q.   So you're aware that you start with a

11   protocol?

12        A.   Yes.

13        Q.   Then you actually conduct the trial.  And

14   at the end of the trial, you prepare a study report

15   about what happened in the trial, correct?

16        A.   Yes.

17        Q.   And usually you may provide some interim

18   analysis of the trial, correct?

19        A.   If the trial protocol allows it.

20        Q.   And the protocol specifies when and how a

21   study report or an interim analysis is prepared,

22   correct?

23        A.   Yes.

24        Q.   Okay.  So at the end of the trial at the

25   very least, there should be a study report, right?

Page 115

1          A.   Yes.   Somebody has it.

2          Q.   Okay.   Have you reviewed the study reports

3      for any of the trials that you included in your

4      meta-analysis?

5          A.   I mean, I have reviewed the published

6      versions of the trials.

7          Q.   Okay.   But you haven't reviewed the

8      manufacturer's actual study reports, correct?

9          A.   No, I have not.

10          Q.   Are you aware that plaintiff's counsel has

11      those reports available to them?

12          A.   You know, I -- the focus of my work was on

13      published reviews, and as you can see, you know,

14      most of my work or the entirety is based on

15      published reviews.   So I don't think I have this

16      question that they had access to it or not.

17          Q.   Let me ask you the question again.   Were

18      you aware that plaintiff's counsel had access to

19      the actual study reports for all of these clinical

20      trials?

21              MR. ELIAS:   Assumes facts.

22          A.   I mean, I never asked this question, so

23      obviously, I'm unaware.

24          Q.   If you knew that the plaintiff's counsel

25      had the full clinical trial reports for these

1   trials, would that have been of interest to you?

2       A.  I mean, everything is of interest.  But

3   I -- you know, it depends, I mean, you know, what

4   it adds.  I'm doing a published meta-analysis of

5   published data.  I mean, everything is of interest.

6   If I have details on each specific event, what had

7   happened, that would be of interest as well.

8       Q.  So if you had specific details on each

9   event, that would be of interest to you?

10      A.  Yes.

11      Q.  Okay.  Are you aware that the plaintiff's

12  counsel had access to detailed narratives for all

13  of the adverse events in those clinical trials?

14      A.  No, I was not aware.

15      Q.  You didn't ask them to provide you

16  patient-level data from those clinical trials on

17  these adverse events, did you?

18      A.  That was not my focus.  My focus was on,

19  you know, conducting a meta-analysis of the

20  peer-reviewed literature.

21      Q.  You've written some articles about how to

22  conduct systematic reviews, haven't you?

23      A.  I don't know when.  I mean, I've written

24  hundreds of articles.  I don't know which one

25  specifically you're talking about.

1      Q.  Well, let's first talk about what Cochrane

2  has to say.  Do you agree that a meta-analysis of

3  invalid studies may produce a misleading result,

4  yielding a narrow confidence interval around the

5  wrong intervention effect estimate?

6      A.  Where are you?

7      Q.  Would you like to see it?  I can get it

8  for you.

9      A.  Yeah.

10         (Exhibit 305, 8.1 Introduction, marked for

11         identification.)

12     A.  I'm sorry.  This is cut off on the right.

13  It's hard to read.

14     Q.  I can call them up on my computer if we

15  need to do that.

16     A.  Yes.  Go ahead.

17     Q.  This one's cut off, so I'm going to let

18  you look on my iPad.  The second sentence there

19  starts "In particular."  Do you see that?  "In

20  particular a meta-analysis," do you see where I'm

21  reading?

22     A.  Yes.

23     Q.  So I'm going to read it.  "In particular,

24  a meta-analysis of invalid studies may produce a

25  misleading result yielding a narrow confidence

1    interval around the wrong intervention effect

2    estimate."

3            Do you agree with that statement?

4       A.  Yes.  But in this case -- I mean, the

5    studies were valid and provided valid estimates.

6       Q.  I asked you if you agreed with that

7    statement.  Do you --

8       A.  Yes, I do.

9       Q.  -- agree with that statement?

10           Next statement says, "The evaluation of

11   the validity of the included studies is therefore

12   an essential component of a Cochrane review and

13   should influence the analysis interpretations of

14   the review."

15           Did I read that correctly?

16      A.  Yes.

17      Q.  Do you agree with that statement?

18      A.  Yes.

19      Q.  Cochrane 8.2.1, addresses bias, correct?

20      A.  Is there an exhibit number?

21      Q.  Well, I can mark an exhibit, but you're

22   going to tell me you can't read it.  So I was going

23   to let you read it off the online version, marking

24   it by saying it's Cochrane's 8.2.1 in the online

25   version.

1      A.   Yeah.  I just wanted something here.

2      Q.   I can get you a piece of paper, too.

3      A.   Which paragraph?

4      Q.   Hold on a second.

5           (Exhibit 306, 8.2.1 Bias and risk of bias

6      document, marked for identification.)

7           THE WITNESS:  Can I speak now?

8      Q.   There's no question pending.  Hold on.

9      A.   No.  I'm just stating that these are cut

10 off, that's what I'm trying to say.

11     Q.   Right.  That's why I'm showing you the

12 computer where it's not cut off.  I mean, I was

13 just going to show you the computer and then you

14 complained about not having something in writing,

15 so I'm giving you that and now you're complaining

16 about it being cut off.

17     A.   I'm just showing --

18     Q.   I'm showing you what's not cut off on the

19 computer.

20          MR. ELIAS:  Robert, Robert, that's out of

21 line.  He's asking to see a piece of paper, and

22 then you've shown him the computer.  Now he has

23 both.

24          Ask your question.  It's not his fault

25 that the paper's cut off.

1          MR. JOHNSTON:   Thank you for your speaking

2     objection, Mr. Elias.

3          MR. ELIAS:   Actually, it's more than a

4     speaking objection.   I'm actually asking you to

5     treat the witness with a little more respect.

6          MR. JOHNSTON:   I think I'm treating the

7     witness with plenty of respect and certainly more

8     respect than I have seen you treat some of my

9     witnesses.

10    BY MR. JOHNSTON:

11       Q.   In 8.2.1, it discusses bias and the risk

12    of bias, correct?   This is Exhibit 306, and it's

13    also on the screen in front of you.

14       A.   Sure.

15       Q.   The third paragraph states, "It is

16    important to assess risk of bias in all studies in

17    a review irrespective of the anticipated

18    variability and either the results or the validity

19    of the included studies.   For instance, the results

20    may be consistent among studies but all the studies

21    may be flawed."

22          Did I read that correctly?

23       A.   Give me a second.

24          Yes.

25       Q.   And do you agree with that statement?

1        A.  Yes.

2        Q.  Okay.  If you look at the last paragraph,

3   the second line down on the published -- on the

4   printed version that's been marked 306, there's a

5   sentence that starts "The results of smaller

6   studies."

7            Do you see that?

8        A.  Yes.

9        Q.  Okay.  "The results of smaller studies are

10  subject to greater sampling variation and, hence,

11  are less precise.  Imprecision is reflected in the

12  confidence interval around the intervention effect

13  estimate from each study, and in the weight given

14  to the results of each study in a meta-analysis,

15  more precise results are given more weight."

16           Did I read that correctly?

17       A.  It is, but it's also incomplete because

18  more, uh, studies that have larger sample size will

19  generate more precision, are given more weight.  So

20  that's just a qualification on how to do it.

21       Q.  That's where it talks about weight.

22  You're going to weight the more precise studies

23  more highly than less precise studies, correct?

24       A.  Yeah.  And that is a reflection of the

25  sample size of the study.  So studies that have

1    larger, you know, larger sample size generate more

2    precise estimates and then they get more weight.

3        Q.  Right.  So you agree with this paragraph,

4    correct?

5        A.  Yes, I do.  But I just want to qualify

6    what it means.

7        Q.  Do you agree that as different methods of

8    monitoring adverse effects will yield different

9    results, it may be difficult to compare studies and

10   pointless to do a formal meta-analysis?

11       A.  Where is that stated?

12       Q.  I'm just asking you whether you agree with

13   that statement.

14       A.  You know, it's sort of a very generic

15   statement.  I mean, different methods of

16   monitoring.  I feel that adverse events, and we've

17   done that across studies, they are monitored.  If

18   they are saying spontaneously monitored adverse

19   events, they can be combined across studies.

20       Q.  Can be what?

21       A.  Combined across studies in a

22   meta-analysis.

23       Q.  What if the methods of reporting and

24   detecting are different between studies?

25       A.  Can you clarify that as an example, like

1    how is it different before I answer.

2        Q.  One guy thinks something is angina

3    pectorias -- pectoris that another person thinks is

4    not.

5        A.  When you're saying "one guy," meaning the

6    patient or --

7        Q.  No, reporter.

8        A.  So the patient.

9        Q.  We're talking about clinical trials.  You

10   referred -- in your meta-analysis you reviewed

11   clinical trials, correct?

12       A.  Yes.

13       Q.  And in those clinical trials, you're

14   dealing with adverse event reporting, correct?

15       A.  Yes.

16       Q.  Well, let me just read some more quotes to

17   you.  That one comes from Cochrane's 14.6.1.  Do

18   you disagree with the statement that "As different

19   methods of monitoring adverse effects will yield

20   different results, it may be difficult to compare

21   studies and pointless to do formal meta-analysis"?

22       MR. ELIAS:  Objection, lacks foundation.

23   And you're assuming facts.

24       A.  It's a generic statement, so there's

25   hardly anything to disagree with.

1      Q.   How about, "Although a low risk of bias

2    may be assigned to the primary outcomes, the way in

3    which harmful effects of the interventions are

4    monitored may not permit a similar rating."

5          Do you agree with that?

6      A.   Yeah.  Could be vice versa as well.  It's

7    a generic statement.

8      Q.   "The recommended risk of bias tools

9    implemented in RevMan allows for a different" --

10   "for different assessments of blinding and of

11   incomplete outcome data for each outcome or for a

12   class of outcomes as defined by the review author,"

13   correct?

14     A.   Yes.

15     Q.   What is RevMan?

16     A.   RevMan is a statistical, you know, unit --

17   not a unit -- a software where -- where reviews

18   are -- data are entered and you can generate your

19   review from that.

20     Q.   That's owned by Cochrane's, correct?

21     A.   I mean, it is free to download, so I have

22   it.  You know, lots of other reviewers have it.

23     Q.   Do you agree that --

24          MR. JOHNSTON:  Well, let me mark this one.

25          (Exhibit 307, 14.6.1 Clinical trials

1          document, marked for identification.)

2          Q.  I've handed you Cochrane's Section 14.6.1

3    from the online version.  Have you ever seen that

4    before?  Have you looked at that section before?

5          A.  Let me just read it.

6          Q.  Sure.

7          A.  I have read it in the past.

8          Q.  I can --

9          A.  Go ahead.

10          MR. ELIAS:  So this is -- this is cut off

11    as well.

12          MR. JOHNSTON:  Yeah, I'm calling it up

13    right now.

14          Q.  I've pulled up on my iPad the online

15    version of 14.6.1.  Take a second to familiarize

16    yourself with that and then I have some questions

17    about it.

18              I'm going to ask you questions after the

19    examples of Potentially Useful Questions to

20    Consider in Assessing the Quality of Evidence on

21    Adverse Effects, I'm going to ask you about that

22    section.  All right?

23              Are you ready?

24          A.  Yes.

25          Q.  So the first section of Useful Questions

Page 126

1    to Consider in Assessing the Quality of the

2    Evidence on Adverse Effects is on Conduct, correct,

3    conduct of the trial?

4        A.  Yes.

5        Q.  And the first one is -- are "Definitions

6    of reported adverse effects given."

7            Did I read that correctly?

8        A.  Yes.

9        Q.  In the randomized controlled trials that

10   you looked at as part of your meta-analysis, were

11   definitions of the adverse events for

12   cardiovascular disease given in the protocol?

13       A.  Yes.  They were defined as cardiovascular

14   disease, so I assume these are definitions that

15   the, you know, investigators use.

16       Q.  Well, do you know what the definition of

17   cardiovascular disease were?

18       A.  I focused only on ischemic cardiovascular

19   events, peripheral arterial disease, and

20   ischemic --

21       Q.  Okay.

22       A.  -- cerebrovascular events.

23       Q.  I'm not asking you about the outcome.  I'm

24   asking you about the input.

25           Were definitions, to your knowledge, given

1   to the investigators who reported the adverse

2   reactions about how to categorize adverse events as

3   part of the trial -- cardiovascular adverse events?

4        A.   Of course definitions are given, as they

5   are part of a trial, so they have to be given.

6        Q.   Not on adverse events.

7        A.   I mean, these are spontaneously reported.

8   So patients came back and said I have peripheral

9   arterial disease.  And there's no reason to assume

10   that these are nondifferential.

11        Q.   So the patient self-diagnosed themselves

12   with peripheral arterial occlusive disease?

13        A.   So how did the diagnosis come into the

14   clinical trial report?

15        Q.   That's a good question, isn't it?

16             Did you do anything to try to figure that

17   out?

18        A.   I did.  I reviewed the peer-reviewed

19   literature, and that's what it said, that

20   peripheral arterial disease was reported in X

21   number of patients in this arm and X number of

22   patients in that arm.

23        Q.   Were the methods used -- next one, next

24   bullet, "Were the methods used for monitoring

25   adverse effects reported?"

1          Did I read that correctly?

2     A.   Yes.

3     Q.   Do you agree that that's an important

4  question to consider when evaluating the quality of

5  the evidence of a trial?

6     A.   Yes.

7     Q.   Did you look to see whether there was a

8  description of the methods for monitoring

9  cardiovascular events in those trials?

10    A.   There was no specific prospective

11 monitoring.  There was spontaneous reporting of

12 cardiovascular events.  There was --

13    Q.   Continuing --

14         MR. ELIAS:  Hold on.  Let him finish.

15         Go ahead.

16    A.   And there was specific evaluation for EKGs

17 because of the prior, you know, concern about that,

18 but for the specific events that are part of my

19 meta-analysis, there was spontaneous reporting.

20    Q.   So if we continue with Cochrane's, it

21 says, "Use of prospective or routine monitoring,

22 spontaneous reporting, patient checklist,

23 questionnaire or diary, systematic survey of

24 patients."

25         Those are possible methods, correct?

1        A.   Yes.

2        Q.   And whether or not the trial would be

3    valid may depend on which of those methods are

4    employed, correct?

5        A.   I don't think that question goes to the

6    validity.  It just says examples of potentially

7    useful questions to consider in the quality of

8    evidence.

9        Q.   Okay.

10       A.   And so, you know, it doesn't go to the --

11   it's like yes, you need to know what is -- what's

12   going on.

13       Q.   The quality of evidence may be affected by

14   the selection of which of these methods are used in

15   a trial to monitor adverse reactions, correct?

16            MR. ELIAS:   Objection, vague.

17       A.   The quality of -- yeah, the quality of

18   evidence will depend on the kind of monitoring.

19   So, for example, if there had been more prospective

20   ABI monitoring, the rates of adverse events could

21   have been higher.  In this case there was only

22   spontaneous reporting and the rates of adverse

23   events for PAD were lower.

24       Q.   Well, that's completely speculative, isn't

25   it, that ABI --

Page 130

1        A.  Well, you --

2        Q.  -- resulted in a higher rate of adverse

3   events?

4        A.  It depends on prospective monitoring.  We

5   already know that spontaneously reporting is --

6   there's higher rates of PAD.

7        Q.  I'm not asking you any of those questions,

8   Doctor.  I'm simply trying to establish your

9   methodology.

10       A.  I'm trying to answer your questions about

11  spontaneous reporting and how they differed in

12  terms of quality.

13       Q.  We'll keep going on this, don't worry.  I

14  got a whole lot more to talk about on this.

15           Do you agree that individual patient

16  review should be considered in a meta-analysis, in

17  a systematic analysis, where outcome measures have

18  been defined differently across different studies?

19       A.  If data available, yes.

20       Q.  Do you agree that we generally see more

21  reliable and more robust data on benefits as

22  compared with harms of interventions?

23           MR. ELIAS:  Objection, vague, overbroad.

24       A.  I'm sorry.  Can you repeat it?

25       Q.  Do you agree that we generally see more

Page 131

1    reliable and more robust data on benefits as

2    compared with harms of interventions?

3            MR. ELIAS:  Objection, vague, overbroad,

4    lacks foundation.

5        A.  Where is that assertion coming from?

6        Q.  It's a question I'm asking, do you agree

7    with the statement or not?

8        A.  I don't think so.

9        Q.  Okay.  Hold on.

10           Have you ever participated as an

11   investigator for the Agency for Healthcare Research

12   and Quality of the Department of Health and Human

13   Services?

14       A.  Several times.

15       Q.  Have you ever prepared a research report

16   called Methods for Benefit and Harm Assessment in

17   Systematic Reviews?

18       A.  I have.

19           (Exhibit 308, Methods for Benefit and Harm

20       Assessment in Systematic Reviews, marked for

21       identification.)

22       Q.  Have you turn to page 7 -- first of all,

23   you agree that you are listed -- this is a

24   document, 308, called Methods Research Report:

25   Methods for Benefit and Harm Assessment in

Page 132

1    Systematic Reviews, written for the Agency for

2    Healthcare Research and Quality, which is a

3    department of the Department of the Health and

4    Human Services, correct?

5        A.  Yes.

6        Q.  And you were one of the investigators who

7    prepared this report while you were at Johns

8    Hopkins University, correct?

9        A.  Yes.

10       Q.  So you're an author on this?

11       A.  Yes.

12       Q.  Now, turn to page 7.  Under Outcomes, the

13   second sentence says, "We generally see more

14   reliable and more robust data on benefits as

15   compared with harms of interventions."

16           Do you see that?

17       A.  Yes.

18       Q.  Did I read that correctly?

19       A.  Yes.

20       Q.  Did you write that?

21       A.  I don't know if I wrote it, but our team,

22   yes.

23       Q.  You signed off as an author on this

24   publication, correct?

25       A.  Yes.  I am an author on the publication.

1      Q.   And you, as an author with your

2   co-authors, wrote that sentence, didn't you?

3      A.   I did.

4      Q.   On page 8, the paragraph that's right

5   before "Time," first sentence, "Studies generally

6   prespecify and measure benefit outcomes with great

7   reliability."

8           Did I read that correctly?

9      A.   Yes.

10     Q.   Do you agree with that statement?

11     A.   Yes.

12     Q.   Next sentence, "This is not always true

13   with harm outcomes, which are often unexpected and

14   have much more variability in definition across

15   RCTs."

16          Did I read that correctly?

17     A.   Yes.

18     Q.   Do you agree with that statement?

19     A.   Yes.

20     Q.   Next sentence, "Unless researchers know

21   the harms of an intervention a priori, e.g.,

22   particular type of adverse event or may include" --

23          MR. JOHNSTON:  Sorry.  Strike that.  I'll

24   start over.

25     Q.   "Unless researchers know the harms of an

1    intervention a priori (e.g., bleeding with

2    anticoagulants) researchers may not have a

3    prespecified way of defining a particular type of

4    adverse event or may include events in the category

5    of other adverse events."

6         Did I read that correctly?

7    A.  Yes.

8    Q.  Do you agree that is a potential issue

9    with randomized control trials?

10   A.  Yes.

11   Q.  It goes on to say, "In a recent systemic

12   [sic] review, the outcome of congestive heart

13   failure reported as an adverse event ranged from

14   heart failure events that are diagnosed only based

15   on symptoms of breathlessness to congestive heart

16   failure requiring hospitalization that is confirmed

17   by echocardiography."

18        Did I read that correctly?

19   A.  Yes.

20   Q.  Are you familiar with that example?

21   A.  I may be.  I have to look at the reference

22   and see.

23   Q.  You were the author -- one of the authors

24   on this?

25        MR. ELIAS:  Whoa, whoa, whoa, whoa, whoa.

Page 135

1      A.   But I don't remember each specific study

2   of that.   I have to look at the reference.

3      Q.   Take a look.

4           MR. ELIAS:   Please, Dr. Singh.

5      A.   I think that's inappropriate.

6           Yeah, that's a review that we did.

7      Q.   So you did the review that found that some

8   reporters had reported breathlessness as congestive

9   heart failure in a randomized control trial,

10  correct?

11     A.   Yes.

12          MR. JOHNSTON:   Why don't we take a break

13  for lunch.

14          THE WITNESS:   Your choice.

15          THE VIDEOGRAPHER:   We are going off the

16  record at 12:46.

17          (Proceedings interrupted at 12:46 p.m. and

18      reconvened at 1:31 p.m.)

19          THE VIDEOGRAPHER:   We are back on the

20  record at 1:31.

21  BY MR. JOHNSTON:

22     Q.   Dr. Singh, before lunch we were looking at

23  Exhibit 308.   I'm going to continue in that vein,

24  although not necessarily on those pages.

25          Do you agree that randomized control

1    trials are often designed and powered to detect the

2    effect of treatments on selected benefit outcomes

3    while harm outcomes receive less attention in terms

4    of quality of data ascertainment and statistical

5    power?

6        A.   Yes.

7        Q.   Do you agree that randomized control

8    trials may be statistically underpowered for

9    detection of rare but potentially serious harms

10   because of the limited size and duration of trials?

11       A.   Yes.

12            MR. ELIAS:   Object to form.

13       Q.   Do you agree that estimates concerning

14   harm tend to have more uncertainty compared with

15   estimates of benefits in randomized controlled

16   trials?

17       A.   Yes.  And the reason for that being mainly

18   statistical power.  They may be infrequently

19   reported.

20       Q.   Do you agree that the strength of evidence

21   rating for harm outcomes are more complicated than

22   the ratings for benefit outcomes because

23   definitions for harms are often not as explicit as

24   they are for benefits?

25       A.   Is it more complicated?  Yes.  But what

1    level of threshold, you know, for harm outcomes

2    would you say is sufficient to make a determination

3    whether it's related to the drug is different.

4         Q.  Okay.  Do you agree with the statement:

5    The strength of evidence ratings for harms outcomes

6    are more complicated than the ratings for benefit

7    outcomes because definition for harms are often not

8    as explicit as they are for benefits?

9              MR. ELIAS:  Asked and answered.

10        A.  I, yeah, answered.  I mean, I agree that

11   they're more complicated.  But the reason is not

12   only the one.  There are other -- multiple other

13   reasons why they're more complicated.

14        Q.  Okay.  Look at page 9 of Exhibit 308,

15   please, the report that you were a coauthor on,

16   under Strength of Evidence, second paragraph.  The

17   sentence says, "The strength of evidence ratings

18   for harm outcomes are more complicated than the

19   ratings for benefit outcomes because definitions

20   for harms are often not as explicit as they are for

21   benefits."

22              Did I read that correctly?

23        A.  Yes.

24        Q.  And you wrote that as part of a panel of

25   authors, correct?

1      A.  Yes.

2      Q.  Okay.  "Harm assessments" -- I'll read the

3  next sentence, "Harm assessments are also more

4  complicated because of the need to incorporate

5  lower level evidence from heterogenous data sources

6  as well as the fact that studies on harms may not

7  be as reliable, valid, or robust as the studies on

8  benefits."

9          Did I read that correctly?

10     A.  Yes.

11     Q.  Do you agree with that statement?

12     A.  Yes.

13          (Exhibit 309, Drug safety assessment in

14      clinical trials:  Methodological challenges and

15      opportunities, Sonal Sigh and Yoon K. Loke

16      paper, marked for identification.)

17     Q.  Doctor, I've handed you what's been marked

18  as Exhibit 309, which is an article titled "Drug

19  Safety Assessment in Clinical Trials:

20  Methodological Challenges and Opportunities,"

21  written by you and Yoon K. Loke, correct?

22     A.  Yes.

23     Q.  And this was published in Trials journal,

24  correct?

25     A.  Yes.

1          Q.   And that was in 2012?

2          A.   Yes.

3          Q.   Have you look under the Review, Background

4    section.  On page 1 of 8, you'll see that this is

5    numbered as 1 of 8 rather than in the journal, this

6    exhibit is.  So I'm looking at the first page,

7    page 1 of 8.

8               You see in the left-hand column under

9    Review, Background, the second paragraph, the first

10   sentence, says "Since trials are typically carried

11   out to define therapeutic benefit for regulatory

12   approval, safety receives less attention?"

13              Did I read that correctly?

14         A.   Yes.

15         Q.   Did you write that?

16         A.   I mean, me and my coauthors wrote it.

17         Q.   Okay.  If you go over on the right column

18   after the reference, the solo reference to [12],

19   starts "The lack of."  Do you see that sentence?

20   Still on page 1.

21         A.   The "lack of access to individual"...

22         Q.   Yes.  I'm going to read it, "The lack of

23   access to individual participant data, the

24   heterogenous nature of safety data, and the

25   statistical challenges of analyzing rare events

1    make safety data from such meta-analyses difficult

2    to analyze and interpret."

3         Do you agree with that statement?

4    A.  Yes.

5    Q.  Under Lack of Evidentiary Gold Standard on

6    the second page of this exhibit, the first sentence

7    says, "There is no universally acceptable gold

8    standard for determining whether a drug safety

9    signal represents a true risk versus a false

10   positive signal."

11        Did I read it correctly?

12   A.  Yes.

13   Q.  And do you agree with that statement?

14   A.  Yes.

15   Q.  Down under Limited Statistical Power, the

16   second sentence says, "Randomized controlled trials

17   are usually statistically underpowered to detect

18   the specific harm, either by recruitment of a

19   low-risk population or low intensity of

20   ascertainment of events."

21        Did I read it correctly?

22   A.  Yes.

23   Q.  And do you agree with that statement?

24   A.  Yes.

25   Q.  Under Lack of Adequate Ascertainment and

1    Classification of Adverse Events on page 2, right

2    column, the first sentence says, "The

3    inconsistencies in adverse effects reported in

4    clinical trials can create challenges.  Adverse

5    events are recorded as secondary outcomes in trials

6    and are usually not prespecified."

7            Did I read that correctly?

8    A.   Yes.

9    Q.   Do you agree with those two sentences?

10   A.   Yes.

11   Q.   The next sentence says, "Misclassification

12   of adverse events is possible, particularly where

13   the outcomes are collected through spontaneous

14   reports from trial participants rather than"

15   systemic -- "systematic monitoring."

16           Did I read that correctly?

17   A.   Yes.

18   Q.   And do you agree that that's a true

19   statement?

20   A.   Yes.

21   Q.   And you describe later in that paragraph a

22   study you did looking at congestive heart failure

23   in patients with thiazolidinedione,

24   t-h-i-a-z-o-l-i-d-i-n-e-d-i-o-n-e.  I don't know.

25   Can you pronounce that?

1          A.   Thiazolidinedione.

2          Q.   And the point of those two -- that section

3     of this paragraph is that some cases of congestive

4     heart failure may have been misreported as

5     pneumonia, correct?

6          A.   Let me just check the reference.

7          Q.   Sure.

8          A.   Yes.

9          Q.   So in that instance, your view was that

10    the congestive heart failure cases might have been

11    undercounted in the randomized controlled trials

12    because the reporters had misclassified the event

13    as pneumonia, correct?

14             MR. ELIAS:   Misstates.

15         A.   I'm not sure I would use that word

16    "undercounted."  I'm just saying that they could

17    have been misclassified as pneumonia.  I'll stick

18    with the word that I used in the --

19         Q.   And if they'd been misclassified as

20    pneumonia and you had done a meta-analysis for

21    congestive heart failure, you wouldn't have caught

22    those events in your analysis, would you?

23         A.   Yes.

24         Q.   That's a correct statement that I just

25    said, right?

1       A.  Yes, but under-- I mean, you used a

2   particular term I wouldn't have used.  I would use

3   "misclassification."

4       Q.  I said if they'd been misclassified as

5   pneumonia and you'd done a meta-analysis looking

6   for congestive heart failure events, you wouldn't

7   have caught those pneumonia events in your

8   analysis, would you?

9       A.  No, I wouldn't have.  But, you know, if

10  these are randomized trials, and these are, then

11  the misclassification would occur in both trial --

12  you know, both arms.  So it doesn't invalidate the

13  results, but they are misclassified.

14      Q.  Why would you point out the lack of

15  ascertainment in classification of adverse events

16  being a challenge to drug safety assessment in

17  clinical trials in your paper?

18      A.  It is a challenge.

19      Q.  Okay.  And by the same token, if you were

20  trying to do a meta-analysis on pneumonia in those

21  patients, you would have overstated the number of

22  cases of pneumonia as a result of the

23  misclassification of congestive heart failure as

24  pneumonia, wouldn't you?

25          MR. ELIAS:  Objection, misstates.

Page 144

1        A.   So you are sort of reversing the

2    question --

3        Q.   Correct.

4        A.   -- between -- I'm not sure I would have

5    overstated that.  I would have misclassified -- the

6    analysis would have misclassified.

7        Q.   And would have, then, if you were trying

8    to do -- let's assume you were doing a

9    meta-analysis here on pneumonia.

10       A.   Sure.

11       Q.   And there were congestive heart failure

12   cases that had been misclassified as pneumonia,

13   that would give you more pneumonia cases than there

14   actually were as a result of that

15   misclassification, wouldn't there?

16       A.   Yes.  But remember, these are randomized

17   control trials and the misclassification is going

18   to be nondifferential in both arms.  It's going --

19       Q.   So there's never been a randomized

20   controlled trial in which there was some sort of

21   ascertainment bias or a randomization bias that

22   might affect something like that?

23       A.   There could be.  But I'm just looking at

24   the randomized control trial and when it says

25   adequate randomization, such as an ENESTnd, I have

Page 145

1   to go with that assessment.

2       Q.  So that's an assumption you're making,

3   that if the report says that there is adequate

4   randomization, you assume it's randomized; you

5   don't do any tests to validate that assumption?

6       A.  I look at the protocol and it says this

7   was a randomization done through CENTRAL IVAR,

8   which I looked, and, you know, the randomization

9   seemed adequate.  I look at Table 1 of the trial.

10  The characteristics are adequately distributed

11  between two groups.  That suggests that

12  randomization is adequate.

13      Q.  Let's look at Table 1, which is on page 4

14  of this paper.  Table 1 is titled, "Key features

15  and limitations of different approaches to

16  assessing adverse effects of healthcare

17  interventions," correct?

18      A.  Yes.

19      Q.  And this is essentially a summary of the

20  conclusions of your paper on -- based on type of

21  study, correct?

22      A.  Yes.

23      Q.  Okay.  So we look at Study Design, the

24  first one is "Spontaneous or voluntary reporting

25  systems, including journal-published case reports."

Page 146

1   The "Key Features" are that it "captures very wide

2   range of events," correct?

3       A.   Yes.

4       Q.   That it's "particularly useful for

5   detecting signals of rare (low background incidence

6   in treated population) and/or unexpected events,"

7   correct?

8       A.   Yes.

9       Q.   And the third is that "sophisticated

10  statistical techniques have been developed for

11  signal detection," correct?

12      A.   Yeah.  That refers to disproportionality

13  analysis.

14      Q.   On the Limitations, you state that there

15  is "no denominator or control group, difficult to

16  quantify risk," correct?

17      A.   As it relates to case reports, yes.

18      Q.   Yes.  That's what we're talking about

19  right now.

20           You agree with that statement, though, as

21  it relates to case reports, correct?

22      A.   Yeah.  I just want to clarify that, for

23  example, the disproportionality analysis there is a

24  quantification of risk.

25      Q.   But you wrote, "Difficult to quantify

1    risk" with respect to case reports, correct?

2         A.  That is true.

3         Q.  The next one says, "Format and type of

4    information differ substantially among regulators

5    and journals."

6              Is that a challenge for spontaneous or

7    voluntary reporting systems or limitations?

8         A.  Yes.

9         Q.  The next is "clinical details may be

10   incomplete, causality uncertain."

11             Is that a limitation on spontaneous

12   reporting systems?

13        A.  Yes.

14        Q.  And then "selective reporting or

15   underreporting of cases."

16             That is also a limitation of spontaneous

17   voluntary reporting systems, correct?

18        A.  Yes.

19        Q.  The next one you discuss is "randomized

20   clinical trials," correct?

21        A.  Yes.

22        Q.  It says -- the first one on Key Features

23   is "randomization reduces possibility of

24   confounding at baseline," correct?

25        A.  Yes.

1      Q.   Does randomization eliminate entirely the

2    possibility of confounding at baseline?

3      A.   Nothing eliminates it entirely.

4      Q.   So there's always a chance of confounding?

5      A.   There's always a possibility but, you

6    know, randomization, you know, ensures that

7    baseline groups are compatible.

8      Q.   Ensures that that possibility is reduced

9    is all it ensures, correct?

10     A.   To a large extent, you know, 95 percent,

11   99 percent.  You know, is there a small chance that

12   that's present, yes.

13     Q.   The next one says, "Certain adverse

14   effects can be prospectively specified for detailed

15   monitoring," correct?

16     A.   Yes.

17     Q.   Were adverse reactions for cardiovascular

18   disease specified for monitoring in the trials that

19   you looked at in this case?

20     A.   Not the events that I evaluated.

21     Q.   And next point is, "Intervention is

22   typically well defined."

23          You agree with that, correct?

24     A.   Yes.  And it was in this case.

25     Q.   And the limitations on randomized clinical

1    trials are first, rigid recruiting criteria may

2    lead to exclusions of patients who are at risk for

3    adverse effects.

4            You agree with that, correct?

5    A.   Yes.   And some people with, you know,

6    cardiovascular disease may have been excluded.

7    Q.   And the next one says, "Powered for

8    detection of significant difference between groups

9    for beneficial effect, estimates for adverse

10   effects may lack precisions."

11           That's what you wrote, right?

12   A.   Yes, because of underpower.

13   Q.   And you agree with that limitation, right?

14   A.   Yes.

15   Q.   The next one is, "Monitoring for rare or

16   unexpected events may be less rigorous and the

17   trials may not be of sufficient duration to detect

18   long-term problems."

19           Do you agree with that statement as a

20   criticism?

21           I'm sorry.   I moved on there.

22           MR. JOHNSTON:   Strike that all.

23   Q.   Let's look at -- over on page 5 of 8, the

24   Ascertainment of Adverse Events section.

25   A.   Sorry.

1    Q.  And here we're talking -- when we talk

2    about ascertainment, we're talking about the

3    initial capture of an adverse event in the dataset,

4    correct?

5    A.  I mean, I define ascertainment as, you

6    know, both capture and then counting and how it's

7    reported.

8    Q.  Okay.

9    A.  So I don't just believe it's just

10   counting.

11   Q.  Right.  It includes how you -- the method

12   of capture, the fidelity of the reporter's report,

13   what kind of information there is.  All that kind

14   of stuff is about ascertainment, right?

15   A.  Yes.  How were they monitored.

16   Q.  Okay.  So the first sentence says, new or

17   unexpected adverse events cannot --

18        COURT REPORTER:  Excuse me.

19   Q.  The first one says, "New or unexpected

20   adverse effects cannot be prespecified in trial

21   protocols."

22        Is that true?

23   A.  Yes.  I mean, if you don't know what the

24   adverse event is, how can you prespecify it?

25   Q.  In this article you offer an example over

1    on the right-hand column of page 5, again, of the

2    potential misclassification of heart failure in the

3    thiazolidinedione trial.  And in that case, there

4    was a readjudication of heart failure in the

5    proactive trial that showed that the impact of such

6    misclassification was likely minimal, correct?

7         A.   Yes.

8         Q.   So the issues with the misclassification

9    were detected through a readjudication process in

10   that trial, correct?

11        A.   Yes.  I mean, and I have to be careful

12   because I don't know the readjudication occurred

13   during the trial or after the trial.  But, yes.

14        Q.   One way to deal with problems of

15   misclassification would be to adjudicate the

16   adverse reactions in a trial, correct?

17        A.   Yes, if they are prespecified.  Post hoc,

18   if you're going to do adjudication, that creates

19   additional problems.

20        Q.   Let's go back to -- hold on one second.

21             MR. ELIAS:  You okay?

22        Q.   Back to Exhibit 308.

23        A.   It's the same one?

24        Q.   No, it's the one before.  The one you

25   wrote for the government.

Page 152

1         A.   Thank you.

2         Q.   I'd ask you to look at page 10 of

3    Exhibit 308.  In the first full paragraph on

4    page 10, you write, "In rare cases, individual

5    patient data are available to systematic reviewers.

6    Such data could include individual patient data

7    from a subset of all studies, sufficient patient

8    data from all studies, only marginally available

9    patient data, or any combination thereof.  The

10   availability of individual participant data still

11   requires careful consideration of salient

12   analytical principles, such as whether all studies

13   used in an intervention-to-treat analysis or

14   whether all studies had a sufficient duration of

15   follow-up."

16         Did I read that correctly?

17        A.   Yes.

18        Q.   Do you agree with what's written there?

19        A.   Yes.  And I, you know, agree with that and

20   the example that we present of individual patient

21   data meta-analysis where the results were sent at a

22   one-year follow-up, and so it wasn't clear whether

23   if some of the meta-analysis wasn't, in fact,

24   better than the individual meta-analysis.

25        Q.   So if patient data, individual patient

1  data are available, is that something that a

2  meta-analysis and systemic analysis epidemiologist

3  should be looking at?

4        MR. ELIAS:  Objection, overbroad, unfirm

5  hypothetical, misstates.

6        A.  That's another study design, and, you

7  know, all study designs should be available.  And I

8  haven't seen a published individual meta-analysis,

9  at least in the published literature, of outcomes

10  of interest.  And, you know, if they had showed up

11  in my search -- and maybe you have it and are going

12  to show me later -- then yes.  And I -- I -- I --

13  my search missed it if there's such, you know,

14  individual patient data meta-analysis.

15        Q.  You're aware that the company Novartis

16  Pharmaceuticals Corporation has extensive

17  patient -- specific patient data in its clinical

18  trials database, I assume, correct?

19        A.  But my search was limited to the peer --

20        Q.  I understand.

21        A.  Yeah.

22        Q.  Answer my question.

23        Are you aware that Novartis Pharmaceutical

24  Corporation has extensive individual patient data

25  in its files related to the patients in these

1    studies?

2         MR. ELIAS:  Objection, calls for

3    speculation.

4        A.  First of all, I'll tell you that I don't

5    know what the specific when you're saying

6    individual patient-level data.  I -- and I haven't

7    seen what the database is, but all these trial

8    registries, including the ones I've used in the

9    past, such as clinicaltrial.gov, they just report

10   data by participants.

11        When you're talking about individual

12   patient-level data, whether you're talking about a

13   level of granularity that says time to event, how

14   are these events adjudicated, I don't think in the

15   public available domain, I would have access to

16   that or anybody else.

17        Q.  You probably don't.  But are you aware

18   that plaintiff's lawyers have access to not only

19   all the regulatory submissions which provide

20   narratives for each of these events as well as the

21   actual files in which those events were reported to

22   the company?

23        MR. ELIAS:  Calls for speculation,

24   misstates.

25        Q.  I'm just asking if you're aware.  It's

1    not --

2         A.   I don't.   I'm not aware.

3         Q.   -- speculation.

4              You don't know.

5              Did you ask them to look at that

6    information?

7         A.   No.

8         Q.   Did you ask them if they possessed

9    individual patient information from these clinical

10   trials?

11        A.   I evaluated the peer-reviewed literature.

12        Q.   Are you aware that there are narratives

13   for each of the cases in the 63, or each of the

14   events in the 63 that you evaluated in the clinical

15   trials, each of those, that there are narratives in

16   the regulatory submissions Novartis provided to the

17   FDA?  Are you aware of that?

18        A.   I'm sure they provided submissions.

19        Q.   Did you ask to see those narratives?

20        A.   From the FDA?

21        Q.   From plaintiff's counsel.

22        A.   Why would I want -- I'm doing a systematic

23   review of the published literature.

24        Q.   Well, one of the things we just talked

25   about is the fact that there's a risk of

1    misclassification, correct?

2         A.   Yeah.   When those data are available.

3    They were not available to me.

4         Q.   Well, if plaintiff's counsel have them,

5    they are available to you, aren't they?

6              MR. ELIAS:   Objection, argumentative.

7         A.   The scope of my work was limited to the

8    peer-reviewed literature.

9         Q.   If the 63 events you included in your

10   meta-analysis from the ENESTnd trial had been

11   adjudicated, would you want to consider the output

12   of that adjudication as part of your systemic --

13   systematic analysis?

14        A.   It would depend on was that adjudication

15   prespecified in the ENESTnd protocol as

16   adjudication of cardiovascular events.   And I would

17   look at them, evaluate them, but the weight I would

18   give to them would depend on how was that

19   adjudication done.   Was it central?   Was it post

20   hoc?   So it would --

21        Q.   Let's assume it was done in response to

22   the adverse event reports.   It was not

23   prespecified.   It was done as part of a safety

24   analysis.

25        A.   Yeah, so --

Page 157

1        Q.   Would you be interested in seeing that

2    adjudication?

3        A.   I would.

4        Q.   You didn't see any adjudication like that

5    in your work in this case, did you?

6        A.   No.

7        Q.   Were you aware that Novartis asked a group

8    of cardiovascular experts to adjudicate all 63

9    events that you have included from the ENESTnd

10   trial as an independent analysis?  Are you aware of

11   that?

12       A.   As a published peer-reviewed article?

13       Q.   It's a question.  Are you aware that

14   Novartis formulated a panel to independently review

15   those 63 events and adjudicate them?

16            MR. ELIAS:  Wait a minute.  He asked you a

17   question.

18            MR. JOHNSTON:  I changed the question.

19            MR. ELIAS:  Well, but --

20            MR. JOHNSTON:  I don't have to answer his

21   question, Counsel.  I can ask whatever question I

22   want.

23            MR. ELIAS:  He wanted to know, do you mean

24   as a published pear-reviewed article or internally?

25            MR. JOHNSON:  I didn't ask him that.

1           MR. ELIAS:  Specify.

2      Q.  Listen to my question.  It's a very simple

3  question.

4           Are you aware that Novartis formulated a

5  panel to independently review those 63 events and

6  adjudicate them?  Are you aware of that?

7      A.  I'm not aware of Novartis, what they did

8  or what they did not do internally.  I'm aware of

9  the published literature.

10          (Exhibit 310, TPROD01556256 - 1556280,

11      marked for identification.)

12      Q.  Handing you what's been marked as

13  Exhibit 310.  It's a document that was produced to

14  plaintiff's counsel in this litigation.  It begins

15  on TPROD01556256, titled "Cardiovascular Safety

16  Review and Research Committee Meeting 2:  ENESTnd

17  Meeting Minutes."

18          Have you ever seen this document before?

19      A.  No.

20      Q.  So plaintiff's counsel did not show you

21  this document as part of the materials they made

22  available to you to evaluate in formulating your

23  opinion; is that correct?

24      A.  They did not make any material available

25  to me for evaluating.  I mean, I conducted an

1    independent evaluation based on the systematic

2    review and --

3        Q.  I'm going to refer to what's called the

4    Bates number.  I don't know --

5            MR. ELIAS:  You've got -- Robert, you got

6    to let him finish his answer.

7            MR. JOHNSTON:  He finished his answer.

8            MR. ELIAS:  No.

9        Q.  I'm going to refer to what's on the bottom

10   of the page, on the right-hand corner is the Bates

11   number to help you with pagination.  So I'll

12   probably refer to the last three numbers.

13           MR. ELIAS:  Were you finished with your

14   answer?

15       A.  I don't think so, but that's okay.  You

16   don't want my answer, go ahead.

17       Q.  Mr. Elias does that all the time, too.  I

18   apologize.  Unlike Mr. Elias, I wasn't

19   intentionally trying to cut you off.

20           If you look at the page that ends in 258,

21   which is actually, I guess, the third page.  This

22   is a double-sided copy.  The document states, "As

23   stated in its charter, the purpose of the

24   cardiovascular safety review and research committee

25   (CV-SRRC) is to 'act as an expert committee to

1    provide Novartis Oncology with safety assessments

2    related to cardiovascular events (CVEs) occurring

3    following exposure to either nilotinib or imatinib

4    and to provide advice on further research that may

5    elucidate mechanisms related to the pathogenesis of

6    CVEs in patients with CML receiving tyrosine kinase

7    inhibitors.'"

8             Did I read that correctly?

9    A.   Yes.

10   Q.   The next sentence says, "The CV-SRRC acts

11   without influence from Novartis."

12            Did I read that correctly?

13   A.   Yes.

14   Q.   Were you aware that a group of outside

15   cardiovascular safety experts was convened to

16   independently review the 63 events that were

17   included in your meta-analysis from ENESTnd?

18   A.   I'm aware of what was reported in the

19   studies.  I'm not aware of this document.

20   Q.   Okay.  And you see that these meetings

21   occurred in February 2014, correct, according to

22   the next paragraph?  I don't ask you to validate

23   that.  That's what the paragraph says, that they

24   occurred in February of 2014, right?

25   A.   They occurred whenever they are stated to

1    have occurred.

2         Q.  And you see the list of attendees there is

3    on 258 to 259.  Do you recognize any of those

4    names?

5         A.  I recognize as you mean in --

6         Q.  Do you know any of them?

7         A.  I know several of them.

8         Q.  Okay.  Who do you know?

9         A.  I know Will Hiatt.  I know Alan -- I mean,

10   I don't know them personally, but I know of them.

11   They're good investigators, yeah.

12        Q.  Just William Hiatt and Alan Hirsch are the

13   only two?

14        A.  Yeah.

15        Q.  What is their specialty?

16        A.  I don't know exactly.  Hiatt is -- I would

17   be -- I don't want to speculate.  I know his name.

18        Q.  Do you know Hirsch?  Do you know what his

19   specialty is?

20        A.  I don't know.  I don't want to speculate.

21        Q.  Do you know whether these gentlemen and

22   ladies, if there are any, are all cardiovascular

23   experts?

24        A.  I don't know that.

25        Q.  You don't know one way or another?

1      A.   No.   They may be, but I just don't know.

2      Q.   That's because you're not really familiar

3   with who are nationally known cardiovascular

4   experts, correct?

5      A.   I mean, cardiovascular experts are

6   thousands of them, so whether these classify as the

7   nationally known, there are other nationally known

8   thousands of experts.

9      Q.   And these ten physicians are from

10  hospitals actually all over the world, aren't they,

11  including Liverpool University Hospital?

12     A.   Yes.

13     Q.   Would it be appropriate --

14          MR. JOHNSTON:   Excuse me.   Strike that.

15     Q.   On page 259, Bate number ending in 259, it

16  says in the second sentence under Agenda, "Note

17  that in the first meeting of the CV-SRRC, which

18  discuss patients on the ENESTcmr study, the

19  committee addressed the question of causality and

20  determined that there was insufficient information

21  available to determine causality."

22          Do you see that?

23     A.   Yes.

24     Q.   Is ENESTcmr one of the studies you

25  included in your meta-analysis?

1          A.   Yes.

2          Q.   And these experts determined that the data

3     in ENESTcmr was inadequate to evaluate causality

4     according to this document, correct?

5               MR. ELIAS:   Calls for speculation.

6               Go ahead.

7          A.   Yeah.   I mean, causality is not based on a

8     statistical opinion.   You know, it's based on the

9     overwhelming body of evidence.   So ENESTcmr in and

10    of itself, you know, would not be expected to say

11    well, this is causal.

12         Q.   The next sentence says, "Given that

13    similar data were available for the ENESTnd study,

14    the committee decided not to address the question

15    of causality for ENESTnd cases until more

16    information could be provided."

17              Do you see that?

18         A.   Yes.

19         Q.   Goes on to say, "In addition, the question

20    of baseline risk profile was amended to the

21    identification of any risk factors apparent in the

22    patient narrative and profile."

23              Do you see that?

24         A.   I see that, but I don't understand what

25    that means.

Page 164

1      Q.  Well, you didn't see the narratives or

2    profiles for these patients, did you?

3      A.  And neither did they have all the

4    narratives.  Because if you go back to 258 in the

5    first that you showed me earlier, as noted below,

6    patient narratives were available for some but not

7    all of the cases reviewed.  And then as you -- we

8    stayed on the same document that you provided, 259,

9    while they did not address causality, they

10   concluded that there was an increased risk in

11   patients with nilotinib.  So the same study team

12   did assess and see an increased risk.

13     Q.  Well, let's see whether they really said

14   that or not.

15     A.  Well, they stated -- no, no, no.

16     Q.  We're going to keep going through the

17   document.

18        MR. ELIAS:  Wait a minute.

19     A.  No.  Wait.  Let me answer the question

20   because you asked that.

21        At the bottom of page 259, the committee

22   identified a clear -- you're showing me this

23   document for the first time and you're not giving

24   me time to review it.

25        For patient serious facts -- factors

1    worsening while on treatment --

2           COURT REPORTER:  I'm sorry.  I can't

3    understand you.

4           MR. ELIAS:  Just read it slower.  Just

5    read it slower and start over at the beginning of

6    the sentence.

7        A.   "The committee identified a clear trend

8    for patients' cardiovascular risk factors worsening

9    while on treatment, particularly with nilotinib,

10   and concluded that there appeared to be an

11   increased risk of events -- cardiovascular events

12   in patients treated with nilotinib compared with

13   imatinib, though no statistical analysis was

14   performed."

15       Q.   Thank you for reading that.

16          If you look on the page 5 -- 259, it says,

17   "For each of the 63 patients, the CV-SRRC addressed

18   the two questions below."

19          Do you see that?

20       A.   Yes.

21       Q.   And the first one is, "Is there sufficient

22   data to conclude that the event occurred as

23   listed?"

24          That was the first question they asked

25   according to this paper, right?

1       A.  Yes.

2       Q.  The second question was, "What baseline

3   risk factors were present for this patient?"

4           Do you see that?

5       A.  Yes.

6       Q.  Down under -- and I agree with you, it

7   says that "patient narratives were not available

8   for patients who had not had an SAE, (cases 41 to

9   60), and, therefore, the source materials for the

10  cases consisted solely of the patient profile."

11          Is that what it says?

12      A.  Yes.

13      Q.  Well, you didn't even look at the patient

14  profile, did you?

15      A.  As I said earlier, I have not -- I have

16  not had -- you know, looked at any data beyond the

17  published literature.

18      Q.  And for Patients 1 through 40 and 61

19  through 63, there was both a patient profile and a

20  narrative because those were the serious adverse

21  events according to this document, correct?

22      A.  That's what they're reporting, but I --

23  you know, I can't sort of examine the veracity.

24  For example, I would like to know how much of these

25  are occurring in the nilotinib arm versus the

1    imatinib arm.  They just are adjudicating the

2    events.  Are the investigators blinded to the

3    adjudication or they already know it?  I don't know

4    that.  So these --

5         Q.  Well, no one was ever blinded in this

6    trial, were they?

7         A.  That is a treatment assignment blinding.

8    I don't know about the outcome assessment blinding,

9    so --

10        Q.  So let's --

11             MR. ELIAS:  Whoa, whoa, whoa.

12        Q.  Are you done?

13        A.  No.  I'm just trying to clarify when you

14   say it was an open label trial, it was open label

15   for treatment assignment.  Whether this process was

16   blinded or not, I don't know.

17        Q.  The next -- in the Summary and

18   Recommendation paragraphs, the committee states its

19   findings, the first being, "The committee

20   identified risk factors present in nearly all of

21   the patients who experienced a CV event."

22             Did I read that correctly?

23        A.  Yes.

24        Q.  And it does go on to talk about two

25   younger patients who had no obvious risk factors at

Page 168

1    the start of treatment, correct?

2        A.  Yes.

3        Q.  Okay.  With the data -- going down below

4    that discussion, "With the data available, the

5    committee was able to confirm that the events

6    occurred as listed in 29 cases.  The committee was

7    not able to confirm the events for any of the cases

8    with no narrative.  Additional information was

9    requested for the majority of cases with narrative

10   provided and for all cases with no narrative."

11       Do you see that?

12       A.  Yes.

13       Q.  And did I read that correctly?

14       A.  Yes.

15       Q.  And if we look at the table below, of the

16   63 events, the committee confirmed 29 of them,

17   could not confirm 32, and partially confirmed

18   2 events, according to this table, correct?

19       A.  And I don't know what they mean by

20   "confirmed."  I need to know, do you have a

21   definition of your --

22       Q.  You didn't take this into account in your

23   analysis, did you?

24       A.  Well, that was not reported in the

25   peer-reviewed literature.

Page 169

1          Q.   And the plaintiffs didn't bother to make

2     you aware of the existence of this document, did

3     they?

4               MR. ELIAS:  Object.

5               Don't answer that question.

6          Q.   You do need to answer that question.

7               MR. ELIAS:  Don't answer that question.

8          Q.   Plaintiff's counsel --

9               MR. ELIAS:  Didn't bother?

10              Don't answer that question.

11         Q.   Plaintiff's counsel did not make you aware

12    of the existence of this document, did they?

13         A.   So I was asked to form an opinion on this

14    issue, and I, you know, reviewed the

15    peered-reviewed literature and provided an opinion.

16    So, for example, if you had made this document

17    available, I would have -- you know, there are

18    other questions.  What is adjudication?  How is it

19    defined?  How is it differential between groups?

20         Q.   If you knew this document was available,

21    would you have wanted to see it as part of your

22    analysis?

23         A.   It's not verified.  I was looking at the

24    peer-reviewed literature.

25         Q.   I understand that.

Page 170

1           If you knew this document was available in

2     which some adjudication body determined that 29 --

3     only 29 of the 63 events could be confirmed, would

4     you have wanted to see that as part of your

5     analysis?

6           A.  I mean, I feel that that's sort of a

7     hypothetical question.  If I knew that more -- if I

8     knew more about the 29 events, yes, I would like to

9     see more of everything.

10          Q.  So you'd like to know more about what's in

11    this paper?

12          A.  More about everything.  I'd like to know

13    more about how to form an opinion.

14          Q.  If plaintiff's counsel had said I have an

15    adjudication, I don't know if it's any good or not,

16    but I have an adjudication in which they can't

17    confirm 32 of the 63 events, would you have wanted

18    to see that?

19          A.  So I don't approach it that way.  I

20    approach it as what is the data available out there

21    and is it sufficient to form a causal opinion.  And

22    I reviewed the systematic literature, and it was

23    sufficient for me to provide a causal opinion.

24          Q.  But this calls into question whether all

25    of those 63 events were correctly classified,

1    doesn't it?

2         MR. ELIAS:  Objection.  That misstates the

3    document.

4         A.  They were classified as cardiovascular

5    events because that's what the primary studies by

6    report of the New England Journal.  So unless I

7    view those as falsification of data, which they

8    aren't, then those are cardiovascular events.

9         Q.  Well, there actually is patient-level data

10   in this report.

11        MR. ELIAS:  That's not a question.

12        MR. JOHNSTON:  I'm getting to the

13   question, Counsel.

14        A.  And I will answer that these are not

15   considered patient-level data.  Just because they

16   list what happened to patients, that's not really

17   patient-level data.

18        Q.  And do you see -- by the way, before we do

19   that, look on page 260, under the first paragraph

20   under Value of Adjudication of Cases with No

21   Narrative Provided.

22        MR. ELIAS:  Hold on.  260?

23        MR. JOHNSTON:  Bates number 260.

24        Q.  Value of Adjudication of Cases with No

25   Narrative Provided is the heading.

1          Do you see that, Doctor?

2          A.   Yes.

3          Q.   It says, "Prior to discussing the cases

4   for which no narratives have been provided, the

5   committee debated the possible merits of evaluating

6   the information available in the patient profiles.

7   Some felt that the data could be useful to help

8   identify trends (e.g. increases in lipids, glucose,

9   or insulin levels).  Others felt very strongly that

10  there was little to be gained from the exercise in

11  the absence of relevant data needed to inform the

12  process.

13          "Dr. Hiatt commented that adverse event

14  reporting is fairly nonspecific and cautioned that

15  the results of such an exercise would be" biased

16  [sic] on consider -- based -- sorry, not biased --

17  "based on considerable uncertainty?"

18          Did I read that correctly?

19          A.   Yes.

20          Q.   Do you agree with Dr. Hiatt?

21          A.   No.

22          Q.   You don't believe that adverse event

23  reporting is fairly nonspecific?

24          A.   No.  I want you to refer to you present in

25  my article, Exhibit 309, and where I talk about my

1    study where we talk about adjudication in clinical

2    trials.  The study is "Drug Safety Assessment in

3    Clinical Trials:  Methodologic Challenges and

4    Opportunities."  And I'm going to the section,

5    page 5, Ascertainment of Adverse Events.

6         Q.  Which paper are we talking about?

7              MR. ELIAS:  309.

8         A.  Yes.  So I'm reading from Ascertainment of

9    Adverse Events, second paragraph:  "The true role

10   of adjudication of safety events in clinical trials

11   remains unclear."  And there's a cited reference by

12   Granger, Vogel, Cummings, Held, Fiedorek, Lawrence.

13   And "the reliance only on adjudicated major events

14   may further reduce statistical power because of the

15   lower number of adverse events recorded.  Thus,

16   sensitivity analysis using both should be

17   considered."

18              So I don't agree with him completely, that

19   only adjudicated events should be considered.

20        Q.  That's not what he said.  What he said is

21   that adverse event reporting is fairly nonspecific

22   and cautioned that the results of such an exercise

23   would be based on considerable uncertainty, that's

24   what he said.

25              Do you disagree with that statement?

Page 174

1          A.   I disagree with him.

2          Q.   Dr. Hiatt goes on to state under the

3     section titled "Recommendations to improve

4     robustness of adjudication process," it says,

5     "Dr. Hiatt made specific recommendations for

6     improvements to the process of adjudicating these

7     cases.  He stated that adverse event reporting is

8     normally performed by the local site investigator.

9     Using the medical history and the clinical

10    information in front of them, they're asked to make

11    a judgment based on medical dictionaries for

12    standardized codes.  The process of making that

13    determination is notoriously inaccurate."

14            Do you see that?

15        A.   Yes.

16        Q.   So do you agree with Dr. Hiatt that the

17    process of making the determination of how to code

18    an adverse reaction is notoriously inaccurate?

19        A.   I don't.

20        Q.   So Dr. Hiatt, who you recognized was a

21    well-respected expert, he's wrong, correct?

22        A.   I don't agree with all his statements.

23    I'm not saying he --

24            MR. JOHNSTON:  Quit laughing, Counsel.

25        A.   He's a well-respected investigator.

1    Doesn't mean that I have to agree with all the

2    statements that you're showing me for the first

3    time.

4         Q.   I'm just asking you whether you agree or

5    not.

6         A.   No.  I disagree.

7         Q.   Well, that's fine.

8              So your testimony is -- and by the way,

9    they did evaluate these by trial group.  If you

10   look at the individual cases, they identify which

11   ones are in the nilotinib 400, the nilotinib 300,

12   and the imatinib group.  So they did evaluate all

13   of that.

14        A.   Sure.

15        Q.   But their conclusion was that for 32 of

16   these events, they could not verify that it was, in

17   fact, a cardiovascular event based on the data

18   available to them, correct?  Based on this

19   document, is that a fair summary in your opinion?

20        A.   That's what they identified.  But as you

21   said, you know, the Methods paper, which you

22   already discussed, my -- I raise the value of

23   adjudication of adverse events because that reduces

24   statistical power, as this has shown.

25        Q.   So your testimony is --

1          MR. ELIAS:  Whoa, whoa, whoa.

2     Q.  -- you don't care whether or not this

3  document exists and you wouldn't want to know about

4  it as part of your analysis, correct?

5     A.  It's not that I don't care, but I -- you

6  know, I would rely on both the published and, you

7  know, if published, there was an adjudicated

8  adverse event data available.  So you cannot just

9  look at ascertainment, reduce the power, remove

10  events, and then say, well, there's no statistical

11  power to detect.  I mean, there's already power.

12  it --

13     Q.  That's --

14          MR. ELIAS:  Hold on.

15     Q.  Go ahead.  You done?

16     A.  Yeah.  There's always power in the adverse

17  events that are spontaneously reported.  I -- as I

18  have on record, I say that the value of

19  adjudication is unclear.

20     Q.  So if 32 percent of those reports were

21  miscalculated -- misclassified, your testimony is

22  that wouldn't change anything?

23     A.  First of all, it is not 32 percent of

24  those reports.

25     Q.  32 --

1      A.   That is inaccurate.

2      Q.   Let me rephase my question to get it

3  accurate.

4           If 32 of the 63 events were misclassified,

5  your testimony is that wouldn't change your

6  conclusions at all, correct?

7           MR. ELIAS:   Objection, misstates.

8      A.   Let me answer that.  We don't know these

9  32 were misclassified.  They are just saying that

10  these were not confirmed.  So I need to know what

11  is the gold standard against which these are before

12  I'm saying that it would or would not affect.

13     Q.   And wouldn't you want to know that as

14  part of doing this sort of analysis --

15     A.   If it was available as -- yeah.

16          COURT REPORTER:  I'm sorry.  Would you

17  repeat your question, please.

18     Q.   Wouldn't you want to know that as part of

19  doing this analysis?  And you said...

20     A.   If it was available as a, you know,

21  peer-reviewed manuscript and I had this, yes.

22     Q.   And how about if it was available from

23  plaintiff's counsel, wouldn't you want to know

24  about it?

25          MR. ELIAS:   Objection, asked and answered.

1      A.   I mean, I was only looking at the

2   peer-reviewed literature, so I cannot speculate if

3   it was available.

4      Q.   So if you knew it was available, you would

5   not have asked for it; is that your testimony?

6           MR. ELIAS:   Objection, misstates, and it's

7   argumentative.

8      A.   It's not that I wouldn't have asked for

9   it.  I made a decision, and I can tell you that, I

10  made a decision to focus on the peer-reviewed

11  literature and base my causality opinion on that.

12     Q.   So you chose to ignore what you knew was

13  in the possession of plaintiff's counsel, which is

14  the entire clinical trial record and any

15  adjudications of those trials in formulating your

16  opinion, correct?

17          MR. ELIAS:   Objection, that's --

18     A.   I did not choose to ignore.  I was not

19  aware of what was in their possession.

20     Q.   And that's because they didn't tell you,

21  correct?

22     A.   I mean, we never had this conversation.

23  My review was focused on peer-reviewed literature.

24     Q.   Well, it's certainly true that you did not

25  take into account in doing your analysis the

1    document that we've marked as Exhibit 310, correct?

2           MR. ELIAS:  Asked and answered.

3       A.  Yes.  I have not had access to that

4    document until now.

5       Q.  Let's go back to your 308, the paper you

6    were co-author on for Department of Health and

7    Human Services.

8       A.  Yes.

9       Q.  Look at page 7 of that document.  There's

10   a heading Comparators.  Do you see that?  Do you

11   see the heading, Doctor?

12      A.  Yes.

13      Q.  And the first sentence says:  "Another

14   challenge is assessing whether the estimates of

15   effect from active controlled trials reflect the

16   beneficial effect of one intervention or the

17   harmful effect of another."

18           Did I read that correctly?

19      A.  Yes.

20      Q.  Do you agree that that's a challenge when

21   a randomized control trial -- when the new trial

22   subject is compared against an active control?

23      A.  Yes, it is.

24      Q.  And if you look after cite 12, it says,

25   "The estimates of benefits and harms may vary based

Page 180

1    on the comparators used in randomized controlled

2    trials, such as placebo or active controls.

3    Estimates of treatment effect from active

4    controlled trials may either be interpreted to

5    reflect the beneficial effect of one intervention

6    or the harmful effect of another."

7            Did I read that correctly?

8        A.   You did.

9        Q.   Do you agree with those two sentences in

10   your paper?

11       A.   Yes.

12       Q.   And you give an example where five times

13   higher risk of myocardial infarction was seen with

14   rofecoxib 50 milligrams compared with naproxen 500

15   milligrams daily, correct?

16           Do you remember that?

17       A.   Yes.

18       Q.   And the initial interpretation was that

19   naproxen was having a beneficial effect on the

20   occurrence of myocardial infarctions, correct?

21       A.   One of the initial interpretations.

22       Q.   And you concluded eventually that it was

23   actually the harmful effects of rofecoxib, correct?

24       A.   I mean, not only I, several others

25   concluded; so it wasn't my conclusion.

1      Q.   The point is that no one was initially

2    sure whether it was the benefit of naproxen or a

3    bad side effect of the other drug when this first

4    came out, correct?

5      A.   I couldn't say no one was initially sure.

6    I mean, it is what it says, one of the initial

7    interpretations offered.

8           MR. ELIAS:  Go ahead.  Are you okay?

9           THE WITNESS:  Yeah.

10     Q.   Okay.  Now --

11          THE WITNESS:  Excuse me.  Can I get some

12   water?

13          MR. JOHNSTON:  Would you like to take a

14   break for a minute?

15          MR. ELIAS:  Do you want to take a break,

16   or I'll get you some water?  It's up to you.

17          THE WITNESS:  Water is fine.

18          MR. ELIAS:  Let me grab you some water.

19          (Exhibit 311, Epidemiology of peripheral

20          arterial disease and critical limb ischemia in

21          an insured national population, Nehler paper,

22          marked for identification.)

23     Q.   Dr. Singh, I've handed you what I've

24   marked as Exhibit 311, which is a paper written by

25   a Mark R. Nehler, titled "Epidemiology of

1    Peripheral Arterial Disease and Critical Limb

2    Ischemia in an Insured National Population."

3         A.  Yes.

4         Q.  This was published in the Journal of

5    Vascular Surgery in September of 2014; is that

6    correct?

7         A.  It must be.  I can't see it right off.

8         Q.  If you look at the second or third page --

9    third page, 688, up at the heading it says

10   September 2014, correct?

11        A.  You're correct.

12        Q.  I want you to look at page 691, at

13   Table 2.  This table is titled "Incidence

14   Population for Peripheral Arterial Disease (PAD)

15   and Critical Limb Ischemia (CLI) Subgroups:

16   Baseline Demographic Characteristics and

17   Comorbidities of the Study Population in 2004 to

18   2008," correct?

19        A.  Table II.A?

20        Q.  Uh-huh.

21        A.  Yes.

22        Q.  Do you agree that this table reports the

23   incidence of PAD and critical limb ischemia during

24   that period from U.S. data?

25        A.  I'm seeing this study for the first time.

1    Is it in patients with CML?

2        Q.  No.

3        A.  So it's not in patients with CML.  And how

4    do they define PAD?  Means their active

5    ascertainment of PAD, or are these administrative

6    codes, or are these spontaneous reports?  I mean,

7    unless I know that detail...

8        Q.  Well, the table reports that for the 40-

9    to 49-year-old population, that there is --

10            MR. ELIAS:  This isn't reporting

11    incidence.

12            MR. JOHNSTON:  Yes, it is.

13            MR. ELIAS:  Go ahead.  It's a breakdown of

14    the incidence population.

15            MR. JOHNSTON:  Correct.

16        A.  And incidence is a rate, so they would

17    have person time, and they would say it's 2.2 per

18    hundred-thousand years.  This is prevalence of PAD.

19        Q.  If you look at the primary CLI, you see

20    for patients aged 40 to 49, the -- it's 7.9,

21    correct?

22        A.  7.9 what?  I mean, percentage, per

23    thousand people or what is it?  I mean, percentage.

24            MR. ELIAS:  This is the break -- Robert,

25    this is not.  This is the breakdown.  It's not an

1    incidence of 7.9 percent.  This a breakdown of the

2    overall incidence number, which is much -- which is

3    like two-point something.

4         MR. JOHNSTON:  I know you don't like this

5    data, but I don't really care whether you like this

6    data or not.

7         MR. ELIAS:  I'm telling you what the data

8    is.  I mean, it's not -- you're misrepresenting the

9    data.

10        MR. JOHNSTON:  I'm not misrepresenting the

11   data.  I haven't made any representation.

12   BY MR. JOHNSTON:

13      Q.  This is reporting the incidence of PAD in

14   critical limb ischemia, correct?

15      A.  No.  Because if I go to page 689, it just

16   says that Table II.A describes the incident

17   population, describes the prevalent population.  In

18   2004, incident population, age was similar.

19      Q.  II.B is the prevalence population.

20      A.  Yeah.  Yeah, but it just describes it.  It

21   doesn't tell you that these are the rates.  They

22   may be, but I just have to see where they are.

23        MR. ELIAS:  If you look --

24      Q.  If you look at the text --

25        MR. ELIAS:  Robert, let me help you out.

Page 185

1    This is not --

2            MR. JOHNSTON:  I don't want you to help me

3    out.

4            MR. ELIAS:  Unless you're trying to --

5    okay.

6        Q.  If you look at the text under Discussion,

7    it says, "In the eligible population, PAD had an

8    annual incidence of 2.35 percent and an average

9    annual prevalence of 10.69 percent, and CLI had an

10   annual incidence of .35 percent and an average

11   prevalence of 1.33 percent."

12           Do you see that?

13       A.  Yes.

14       Q.  Okay.  So if we take the annual incidence

15   of PAD and the annual incidence of CLI, according

16   to this paper, that would be a rate of 2.7 percent

17   per year, correct?

18       A.  2.7?  Where would that come from?

19       Q.  It would be the 2.35 plus the .35 for CLI.

20       A.  I have no way or agreeing or disagreeing

21   with that.

22       Q.  That's what this paper says.

23           MR. ELIAS:  Wait a minute.  Wait a minute.

24           Go ahead and answer it.  He hasn't read

25   the paper.

1      Q.   I don't care whether you've read the paper

2    or not.   That's what this paper says, doesn't it?

3           MR. ELIAS:   You can answer.   Finish

4    your --

5      A.   What was your question?

6      Q.   The paper says, that according to their

7    data, the annual incidence is -- of PAD is 2.35 and

8    the average -- the annual incidence of CLI is .35,

9    which is a total .7 percent incidence annually for

10   those events.

11     A.   I don't know.   Because I, you know, are

12   they double counting?   Are they -- what is their

13   definition of PAD?   Are they doing coding?   So we

14   need to know what was the underlying.

15     Q.   Did you check to see whether anyone was

16   double counting any events of atherosclerotic

17   events reported in the ENESTnd trial?

18     A.   As far as they were available.

19     Q.   So you are unwilling to accept these

20   numbers as a representation of the incidence?

21     A.   I'm not unwilling to accept the numbers as

22   a representation of incidence.   I'm just stating

23   that these numbers may represent an incidence of

24   PAD as defined by codes, as defined as they have

25   defined it.   I need to read the paper to answer.

1      Q.  Well, let's look at how they define it.

2   Two subgroups of CLI presentation were identified:

3   Primary CLI, patients without any prior PAD or

4   subsequent PAD diagnostic code, more than 30 days

5   after CLI diagnostic code.

6         So these were based on diagnostics codes

7   for PAD and CLI in the database of an insured

8   national population -- we can figure out which

9   population.

10     A.  That's a market scan.

11     Q.  What does that mean?

12     A.  That's a claims database.  We work with

13  these databases all the time.

14     Q.  So these are evaluating the incidence of

15  codes for CLI and PAD in an insurance payor

16  database?

17     A.  Yes.

18     Q.  Okay.  So let's go back to the thing I was

19  asking you about.

20         Do you have any reason to argue, to say

21  that it's not correct that PAD had an annual

22  incidence of 3 -- 2.35?

23     A.  As defined by these codes and if these

24  codes that they're using, I haven't seen what those

25  codes are accurate.  So as defined by the codes and

Page 188

1    the predictive value of these codes.

2         Q.  And CLI had an annual incidence of .35

3    according to this paper, correct?

4         A.  As defined by these diagnostic codes.

5         Q.  And that means that the cumulative, as

6    defined by these diagnostic codes, rate of

7    incidence was 2.7 per year, correct?

8         A.  Yes.

9         Q.  And that's equivalent to 27 events per

10   1,000 patient-years, correct?

11        A.  Yes.

12             I do have to add that this is based on the

13   eligible population, which is a whole range from

14   68 years.  So any comparison that you will do to

15   any other studies will have to take that into

16   account.

17        Q.  Let's look at the rate of myocardial

18   infarction.

19             (Exhibit 312, AHA Statistical Update:

20        Heart Disease and Stroke Statistics - 2017

21        Update, marked for identification.)

22             MR. ELIAS:  I notice you laughed again,

23   Counsel.  It's not my fault that the American

24   Cancer Society writes really big papers.

25        A.  It's the American Heart Association.

1        Q.   They write big ones too.

2             If we look on page E371 of 459,

3    Chart 20-5.  Are you there?

4        A.   Yes.

5        Q.   And this is the annual Heart Disease and

6    Stroke Statistics Update published by the American

7    Heart Association every year, correct?

8        A.   Yes.

9        Q.   Do you ever use this in your practice?

10       A.   I do.  I mean, not in my practice; in my

11   research.

12       Q.   Well, we'll consider research practice as

13   well.

14            In your work you occasionally consult this

15   document, correct?

16       A.   Yes.

17       Q.   Chart 20-5 provides incidence of

18   myocardial infarctions, correct?

19       A.   Yes.  And to clarify, this is the ARIC

20   study, which is the atherosclerosis.  It's a

21   community-based study where they prospectively

22   measure, so that's the difference.  You showed me

23   rates of PAD.  Now here talking about prospective

24   monitoring of cardiovascular events.  So you can

25   see how differences in rates arise from differences

1    in measurement.

2          Q.  Well, these are different events.  These

3    are myocardial infarctions; those are PAD and CLI

4    that we were talking about, correct?

5          A.  Exactly.  And I point out the way that you

6    can go to various data sources and get various

7    rates for various events, depending on how they are

8    measuring.

9          Q.  So depends on the classification that they

10   have chosen in order to determine what the rates

11   are; is that what you're saying?

12         A.  Yes.  I mean, apart from Reagent 6 risk

13   factors, this is ARIC, so I'm aware of the

14   processes in ARIC for measuring cardiovascular

15   events.  That is prospective monitoring, and that

16   is what is reflected here.

17         Q.  And you see on this chart, 20-5, for ages

18   54 -- sorry -- 45 to 54, the incident ranges from

19   1 to 3.8 per 1,000 patient-years, correct?

20         A.  Yes.

21         Q.  And for ages 75 to 84, it ranges from 9.1

22   to 14.9 per thousand patient-years, correct?

23         A.  Yes.

24         Q.  So the range of incidence of myocardial

25   infarction range -- ranges from 1 to 14.9 per

1    1,000 patient-years over the age range of 45 to 54

2    and then 75 to 84, correct?

3        A.  Yeah.  Based on age, sex, and race, and

4    other factors, it could be even higher or lower.

5        Q.  And if we look at chart on page E252,

6    Chart 14.5 [sic], we have a chart about stroke,

7    correct?

8        A.  Let me just get there.

9            Yes.

10       Q.  And that chart shows an age-adjusted

11   incidence of stroke transient ischemic attack;

12   isn't that right?

13       A.  Yes.

14       Q.  And for the age group 45 to 54, the

15   incidence ranges from 2.4 to 7.2 per 1,000

16   patient-years.

17       A.  Sorry.  Can you repeat that?

18       Q.  Yes.

19           For the group 45 to 54, the incidence

20   ranges from 2.4 to 7.2 per 1,000 patient-years.

21       A.  No.  Actually, it's 2.4 to 9.7.  Is

22   that -- if I'm reading it correctly.

23       Q.  Hold on a second.

24           Correct.

25           MR. JOHNSTON:  So we now mark the report

1    in ENESTnd that you relied on as part of your

2    meta-analysis.

3         A.   Put this aside, the other one?

4         Q.   You may need it, but I think you can put

5    it aside for now.

6              (Exhibit 313, Long-term benefits and risks

7         of frontline nilotinib vs imatinib for chronic

8         myeloid leukemia in chronic phase:  5-year

9         update of the randomized ENESTnd trial, marked

10        for identification.)

11        Q.   Let's look at Table 3 on page 1052 of

12   Exhibit 315 [sic], which is the article titled

13   "Long-Term Benefits and Risks of Frontline

14   Nilotinib vs. Imatinib for Chronic Myeloid Leukemia

15   in Chronic Phase:  5-year update of the randomized

16   ENESTnd trial."  First author is Hochhaus,

17   H-o-c-h-h-a-u-s.

18        A.   I have the study, I'm not sure.  Which

19   table are we looking at?

20        Q.   I'll get it.  I just want to get on the

21   record for her.

22             I'm looking at Table 3 on page 1052.

23             MR. ELIAS:  You okay?

24             THE WITNESS:  Yeah.

25             MR. JOHNSTON:  Actually, why don't we take

1    a couple of minutes.  I've got to check something

2    and I know you've been needing some water.

3              MR. ELIAS:  I think so, yeah.

4              MR. JOHNSTON:  Let's take a break for a

5    minute or two.

6              THE VIDEOGRAPHER:  We are going off the

7    record at 2:37.

8              (Proceedings interrupted at 2:37 p.m. and

9         reconvened at 2:46 p.m.)

10             THE VIDEOGRAPHER:  We are back now on the

11   record at 2:46.

12   BY MR. JOHNSTON:

13       Q.  Before we took a break we were looking at

14   Exhibit 315 [sic], which is the Hochhaus paper from

15   2016 for ENESTnd, correct?

16       A.  Yes.

17       Q.  And we were looking at Table 3 on

18   page 1052.  And what I want to look at -- this

19   table is titled "Adverse events (regardless of

20   relationship to drug study [sic]) and newly

21   occurring or worsening hematologic and biochemical

22   laboratory abnormalities reported by the data

23   cutoff."  That's the title, correct --

24       A.  Yes.

25       Q.  -- of the table?

Page 194

1          What I want to focus on are the

2    cardiovascular events on this list and there's

3    three listed:  Ischemic heart disease, ischemic

4    cerebrovascular event, and peripheral artery

5    disease, correct?

6         A.  Yes.

7         Q.  And there are a number of events listed

8    for each of the arms in the study, which is

9    imatinib 400, nilotinib 400, and nilotinib 300,

10   correct?

11        A.  Yes.  Just to clarify, the nilotinib arms

12   are twice daily.

13        Q.  Twice daily.  So it ends up being 800 a

14   day, but the dose is 400.

15          So we can take these numbers and create an

16   estimated incidence of these events in the study

17   population, can't we?

18        A.  In that study population?

19        Q.  Yes.

20        A.  Yes.

21        Q.  So, for example, if we take 21 events over

22   five years, an easy way to do it, if you'll allow,

23   would be to simply divide the reported incidence,

24   the number in the table by five, correct?

25        A.  I'm sorry.  Can you go through that?

1      Q.   Yeah.

2          So if we have 11 incidents over five years

3      of ischemic heart disease, we could figure out the

4      annual incidence by dividing that by five over the

5      number of patient-years.

6          I mean, I know it's a simplistic one.  And

7      then we would multiply by a thousand, right?

8      Trying to find a method that you'll allow for the

9      discussion.  I don't want to make this complicated.

10     A.   Yeah.  So just so that I understand it,

11     you take the number of events and you multiply -- I

12     mean, you divide it by number of patients and then

13     patient-years.

14     Q.   Well, I'm saying is you divide it by five,

15     which gives you the annual number, times a thousand

16     patient-years.  What I'm trying to get to is a

17     thousand patient-years.

18     A.   I'm sorry.  I'm not following that.

19     Q.   Well, let's look at it another way.  In

20     Figure 5 on this paper -- and you've talked about

21     Figure 5 elsewhere.  I don't want to focus on the

22     graph itself.  I see that underneath we have the

23     at-risk events tally in Figure 5.

24         Do you see that?

25     A.   Yes.

1    Q.   Okay.  So that if we added all those up,

2  we could figure out what the cumulative number of

3  events over the five years is, correct?

4    A.   Yes.

5    Q.   And we could, for example, with nilotinib

6  300 milligrams, we would take 2,292 -- where do I

7  get that?

8        So if you add up all the nilotinib at-risk

9  numbers, you end up with 2,292.  And they're

10  six-month patient periods.  If you divide it by two

11  to convert it to patient-years, because it's

12  reported in half-year periods, you do 2,292 divided

13  by two equals 1,046 patient-years, correct?

14    A.   Where are you getting the 2,292 from?

15    Q.   If you add up all of the at-risk patients.

16    A.   I don't know if that's correct, but, you

17  know --

18    Q.   Well, if you add up all the at-risk

19  patient -- I have a calculator.  Would you like to

20  do it?

21    A.   Yeah.  And when you're saying "at risk,"

22  it means the 279 and 254 and --

23    Q.   Yeah.  The left number is -- if you look

24  at it, it says "At risk:  Events."  So it's 279 at

25  risk with zero events in the first period.

Page 197

1        A.   I mean, I just need to know what I'm

2    discussing about.

3        Q.   Yeah.  I understand.

4        A.   So 279, plus 254, plus 240, plus 236,

5    plus -- no, no.

6        Q.   223.

7        A.   Sorry.  I don't -- that's why I just need

8    to know what it is.  240, plus 223, plus 209, plus

9    202, plus 192, plus 185, plus 179, plus 178, plus

10   151, plus 43, plus 0.  I get 2,335.

11       Q.   I think you might have unfortunately put

12   in a wrong number somewhere along the way because I

13   heard you say a wrong number, and I was hoping I

14   was wrong.

15            MR. ELIAS:  I didn't hear him say a wrong

16   number.

17       A.   I'm sorry.  This is a tough practice --

18            MR. JOHNSTON:  I'm sorry, you didn't hear

19   him say a wrong number.

20       Q.   Try it again.  Let's just see.  What was

21   the number you got?

22       A.   2,335.

23            MR. ELIAS:  Do you want him to do it

24   again?

25            MR. JOHNSTON:  Yes.

1        A.  279, plus 254, plus 240, plus 223,

2   plus 209, plus 202, plus 192, plus 185, plus 179,

3   plus 178, plus 151, plus 43, plus 0.

4        Q.  Yes.

5        A.  2,335.

6             MR. JOHNSTON:  Going to take a quick break

7   here.

8             THE VIDEOGRAPHER:  We are going off the

9   record at 2:53.

10            (Proceedings interrupted at 2:53 p.m. and

11       reconvened at 3:01 p.m.)

12            THE VIDEOGRAPHER:  We are back on the

13   record at 3:01.

14            (Exhibit 314, Progressive peripheral

15       arterial occlusive disease and other vascular

16       events during nilotinib therapy in CML, marked

17       for identification.)

18   BY MR. JOHNSTON:

19       Q.  Do you agree that many scientists have

20   hypothesized that imatinib has cardioprotective

21   effect?

22       A.  Some have.

23       Q.  Okay.  Well, one of the papers you cite in

24   your meta-analysis is this article that we've

25   marked as Exhibit 314 by Aichberger and others,

 1   including Professor Valent, correct?

 2        A.   I don't know the other authors, but we

 3   cite this.

 4        Q.   You cite this in your paper?

 5        A.   We do -- in my report.

 6        Q.   Right.  And this is essentially a case

 7   report or a case series of, I think, 3 patients.

 8   Three of the 24 patients that he had in his

 9   practice is what this addresses, correct?

10        A.   Just give me a second again.

11             Examined 24 patients.

12        Q.   He had 24 CML patients and 3 of them

13   developed peripheral arterial occlusive disease.

14             Do you see that in the abstract?

15        A.   Yes.

16             MR. ELIAS:  Four did.

17             MR. JOHNSTON:  Well, that's not what it

18   says, Counsel.

19             MR. ELIAS:  It does.  It says, "Three

20   developed the severe peripheral artery disease and

21   one developed the less severe."  So I just want to

22   make sure we're accurately citing the record if

23   you're talking about peripheral arterial occlusive

24   disease.

25             MR. JOHNSTON:  You're not taking this

1    deposition, Counsel.

2             MR. ELIAS:  I'm clarifying.

3    A.   Yeah.  On page 5 --

4             MR. JOHNSTON:   Clarify later.

5    A.   535, it says, "Case reports in three of

6    the four patients who developed PAOD using

7    nilotinib 14, 19, and 20 in Table 1."

8             (Clarification by the reporter.)

9    A.   So I'll read again.  In three of the four

10   patients who developed PAOD" -- and PAOD stands for

11   peripheral arterial occlusive disease -- during

12   nilotinib are numbers 14, 19, 20 in Table 1 are

13   rapidly progressive severe arterial occlusive

14   disease was observed.  Table 2, close parentheses,

15   period.

16   Q.   If you look on page 538, in the first full

17   paragraph, five lines down there's a sentence that

18   starts "likewise."

19            Do you see that?

20   A.   The left side or the right?

21   Q.   I'm sorry.  I'm in the wrong spot.

22            Left column, 538, about halfway down the

23   first full paragraph, there's a sentence that

24   starts "On the other hand."

25            Do you see that?

Page 201

1       A.   This is in the second paragraph?

2       Q.   First full paragraph.  So there's a

3   continuing paragraph that carries over from the

4   page before.  I'm looking at the paragraph -- the

5   first word in the paragraph is "An intriguing

6   aspect."

7            Do you see that paragraph?

8       A.   Yes.

9       Q.   Halfway down is a sentence on the left

10  margin that starts "On the other hand."

11           Do you see that?

12      A.   I see the next sentence is "This

13  observation," then I see it's "likewise."

14           "On the other hand," yes.

15      Q.   I'm going to start right there.  "On the

16  other hand, we cannot exclude that imatinib even

17  protected our patients from PAOD-development, so

18  that PAOD could only develop after switching to

19  nilotinib.  In this regard, it is noteworthy that

20  imatinib has been described to lower fasting blood

21  glucose levels and to protect from diabetes

22  mellitus-associated arteriosclerosis."

23           Do you see that?

24      A.   Yes.

25      Q.   And Aichberger cites two articles at 27 --

1    26 and 27 in the papers for the proposition that

2    it -- that imatinib reduces fasting blood glucose

3    and also protects from diabetes mellitus-associated

4    arteriosclerosis.

5            Do you see that?

6        A.  Yes.

7        Q.  Did you look at those papers in

8    formulating your opinions in this case?

9        A.  No, I don't think so.  If they're not

10   cited in my report.

11           (Exhibit 315, Imatinib Mesylate May Improve

12       Fasting Blood Glucose in Diabetic Ph+ Chronic

13       Myelogenous Leukemia Patients Responsive to

14       Treatment, marked for identification.)

15       Q.  I've marked as 315 a letter to the editor

16   titled "Imatinib Mesylate May Improve Fasting Blood

17   Glucose in Diabetic Ph+ Chronic Myelogenous

18   Leukemia Patients Responsive to Treatment."

19           Do you see that?

20       A.  I see the title.

21       Q.  You didn't take that article into account

22   in formulating your opinions in this case; is that

23   correct?

24       A.  Yes.  I was formulating -- I did not take

25   that into account because I was formulating an

1    opinion on nilotinib and cardiovascular events.

2         Q.  Well, your opinion on nilotinib was based

3    on a comparison to imatinib, correct?

4         A.  Unless I'm aware -- I'm not aware of any

5    other randomized trials that were done or

6    observational studies or other studies that

7    compared.  For example, this study does not compare

8    nilotinib and imatinib.

9         Q.  Okay.  My question is:  Your finding of an

10   association is based on a comparison of the rates

11   in nilotinib patients to patients treated with

12   imatinib, correct?

13        A.  That is not the only finding in my report.

14        Q.  Which other finding do you refer to?

15        A.  There are -- my report covers the entire

16   body of evidence.  There are mechanistic studies;

17   there are observational studies; there are

18   controlled observational studies.  These are case

19   supports, and there are, you know, and --

20        Q.  Do any --

21             MR. ELIAS:  No, wait.  Hold on.

22             Go ahead.  Let him finish.

23        A.  I'm not finished with my answer.

24             I'm saying that we've already pointed out

25   some of the limitations of case reports and, you

1    know, you're presenting me a case report of

2    imatinib being protective.  An hour ago we discuss

3    that case reports do not provide evidence of a

4    causal association.  So in that same vein, how

5    could this be, you know, protective?

6        Q.  Your statistical analysis is entirely

7    based on -- your meta-analysis is entirely based on

8    the comparison of events in nilotinib-treated

9    patients to imatinib-treated patients, correct?

10       A.  Because there are no other randomized

11   trials.

12       Q.  That's fine.  But that's what it's based

13   on, correct?

14       A.  The meta-analysis is based on.

15       Q.  Correct.

16       A.  Not my causal opinion.

17       Q.  The meta-analysis is based on a comparison

18   of nilotinib to Gleevec, correct?

19       A.  Yes.

20       Q.  And all the other observational studies

21   that you cite are based on a comparison of

22   nilotinib to Gleevec, correct?

23           MR. ELIAS:  Objection, misstates.

24       A.  I don't -- that is incorrect.  Because if

25   you look at my report, and we can look at it,

Page 205

1    whatever is available, nilotinib to imatinib is

2    available.   There are some others -- for example,

3    the Giles study which I cite is not based on

4    nilotinib/imatinib compare.

5         Q.   And that study comparing nilotinib to TK

6    in a youth population and doing an adjustment for

7    confounders found that there was no difference

8    between nilotinib and the TKI naive population, did

9    it?

10        A.   Well, that study, as I point out, had

11   several reasons why it found this.   Number one

12   reason, it created an artificial comparator which

13   didn't exist before that study.   It was never

14   conducted against an OT kinase (phonetic).   It also

15   -- so you asked the question.

16        Q.   Finish your answer.

17        A.   It also broke randomization.   We have

18   randomized evidence from trials that showed that

19   there was evidence of statistically significant

20   association.   It brought in data from TOPS and

21   IRIS, which were trials that did not inform on

22   nilotinib and diluted the risk of cardiovascular

23   events between the two.

24             It also adjusted for exposure time, which

25   further attenuated the risks.   Despite all these

1    limitations, it still found a higher risk of

2    nilotinib compared to imatinib.

3        Q.  Not after adjustment for confounders, did

4    it?

5        A.  It found a higher risk.  Whether that risk

6    was statistically significant or not is different.

7        Q.  Well, if it's not statistically

8    significant in the world of epidemiology, and in

9    court makes all the difference in the world,

10   doesn't it?

11       A.  It doesn't.

12       Q.  Well, we'll see what happens with your

13   opinions before the Fourth Circuit.

14           MR. JOHNSTON:  Now, let me mark --

15       A.  Actually, I'm going to respond to that.  I

16   haven't --

17       Q.  I didn't ask you a question.

18           MR. ELIAS:  No, go ahead.

19       A.  No, I want to clarify --

20           MR. JOHNSTON:  He doesn't have a question

21   on the table.  There's no question on the table.

22           MR. ELIAS:  Go ahead.

23       A.  You asked the question about --

24       Q.  I didn't ask the question.

25       A.  -- statistical significance.

Page 207

1      Q.  You answered it.

2      A.  No, I haven't.

3      Q.  Do you want me to ask it again?

4      A.  Yes.

5      Q.  I don't want to ask it again.  I don't

6   have to ask it again.

7           MR. ELIAS:  Listen, I'm going to tell you,

8   he's going to put --

9           MR. JOHNSTON:  No, he's not.

10          COURT REPORTER:  This is impossible.

11          MR. ELIAS:  He's going to put it on the

12   record or we're going to leave.

13          MR. JOHNSTON:  Then leave.  Because he's

14   not -- you're not -- he's not your witness right

15   now.  He's my witness.

16          MR. ELIAS:  You've cut him off and --

17          MR. JOHNSTON:  Yes.

18          MR. ELIAS:  -- he's going to answer the

19   question.

20          MR. JOHNSTON:  You know, Counsel, if I

21   went back and found all the times that you've cut

22   my witnesses and my experts off, you would trump me

23   repeatedly.

24      Q.  I apologize.  I am not intending to cut

25   you off and I did not cut you off.  You changed the

Page 208

1    topic.

2           MR. ELIAS:  Go ahead.

3           MR. JOHNSTON:  So we're going to ask

4    another question.

5           MR. ELIAS:  Go ahead.

6    BY MR. JOHNSTON:

7       Q.  Did you take into account the Lassila

8    paper from 2004 cited by Aichberger in formulating

9    your opinion in this case, which states, as it's

10   titled "Imatinib attenuates diabetes-associated

11   atherosclerosis"?

12      A.  If it's not cited in my report, which it

13   isn't, I did not.

14          MR. JOHNSTON:  I need to take a break.

15          THE VIDEOGRAPHER:  We are going off the

16   record at 3:13.

17          (Proceedings interrupted at 3:13 p.m. and

18       reconvened at 3:22 p.m.)

19          THE VIDEOGRAPHER:  We are back on the

20   record at 3:22.

21   BY MR. JOHNSTON:

22      Q.  You mentioned the Giles paper a moment

23   ago.

24          (Exhibit 316, Rates of peripheral arterial

25       occlusive disease in patients with chronic

```
 1        myeloid leukemia in the chronic phase treated

 2        with imatinib, nilotinib, or

 3        non-tyrosine-kinase therapy:  A retrospective

 4        cohort analysis, Giles paper, marked for

 5        identification.)

 6        Q.  Do you remember talking about this paper a

 7   moment ago?

 8        I asked a question.  You mentioned the

 9   Giles paper a moment ago, earlier, correct?

10        A.  Yes.  I'm sorry.  I didn't know we were on

11   record.

12        Q.  This is that paper, correct, that you were

13   referring to?

14        A.  Yes.  He's authored several other papers

15   as well.

16        Q.  Right.  This is the one you were referring

17   to, isn't it?

18        A.  Yes.

19        Q.  Okay.  This is the one you cited in your

20   report?

21        A.  I cited another paper of his as well by

22   Chemitall (phonetic) where he screened people with,

23   you know, on nilotinib and found higher rates of

24   PAD that he said were, you know, were -- nilotinib

25   may increase the risk of cardiovascular.  So there
```

1    are a couple of different papers.

2         Q.   He screened them with --

3         A.   ABI.

4         Q.   -- ABI, which is ankle-brachial indexes?

5         A.   Yes.  ABI means ankle-brachial indexes.

6         Q.   Have you ever performed one of those?

7         A.   I've interpreted -- I mean, I've read

8    several of them.

9         Q.   Have you ever performed an ankle-brachial

10   index?

11        A.   I'm not a radiologist that would do it or

12   a vascular surgeon that would do it.

13        Q.   So you have never performed an

14   ankle-brachial index; is that correct?

15        A.   That is not part of my clinical practice.

16        Q.   So the answer is no, you've never

17   performed an --

18        A.   No.

19        Q.   -- ankle-brachial index, correct?

20        A.   No.

21        Q.   If you look on page 1312 of this paper, on

22   the right column it says, "Intracohort comparisons

23   between nilotinib and imatinib."

24             Do you see where I am?

25             I'm sorry.  I should have described it.

1    It's the second-to-last paragraph or last full

2    paragraph on page 1312.

3           It says, "Intracohort comparisons between

4    nilotinib and imatinib revealed higher rates of

5    PAOD with nilotinib compared with imatinib."

6           Did I read it correctly?

7    A.   Yes.

8    Q.   "Nilotinib therapy has been associated

9    with elevated glucose and lipids in some patients.

10   Imatinib has been reported to lower fasting blood

11   glucose levels to protect from diabetes

12   mellitus-associated arteriosclerosis in a disease

13   model in mice, to reverse pulmonary arterial

14   hypertension, and to attenuate instant retinosis in

15   an animal model."

16          Did I read that correctly?

17   A.   Yes.

18   Q.   Did you review the studies cited by

19   Dr. Giles, numbers 28 to 31, as part of your

20   evaluation of this case?

21   A.   I reviewed the study by Dr. Giles, not all

22   the references that he --

23   Q.   So you didn't review the references that

24   suggest that imatinib might have a cardioprotective

25   effect?

1      A.  I did review the cited references.

2      Q.  Okay.  It says:  "It's also been

3  hypothesized that inhibition of the

4  platelet-derived growth factor receptor (PDGFR) may

5  contribute to the effects of imatinib on the

6  vasculature, although nilotinib also targets PDGFR

7  with similar potency to that of imatinib," correct?

8      A.  I'm not sure what to make of it.  That's

9  not my area of expertise.  I only reviewed studies

10  which provide -- I was evaluating studies that

11  provide any plausible hypothesis.  I don't provide

12  an opinion that this a definitive hypothesis of how

13  nilotinib causes cardiovascular events.

14      Q.  Well, this is actually a hypothesis of how

15  imatinib protects cardiovascular -- against

16  cardiovascular disease, isn't it?

17      A.  It's not entirely clear.  But, for

18  example, it talks about reverses pulmonary arterial

19  hypertension.  I mean, that is not ischemic

20  cardiovascular disease.  There are other data to

21  suggest that imatinib increases cardiomyopathy.

22  So, you know, I was not going to delve into the

23  details of -- you know, I'm not providing a causal

24  opinion of that.

25      Q.  So when you look at the Hochhaus report,

1    which we've marked previously as exhibit -- oops,

2    that's not it.

3            Exhibit 315, do you have that?

4       A.  Yes.

5       Q.  You make the point that -- look at

6    Table 3, that there are no PAD events reported for

7    patients treated with imatinib, correct?

8       A.  Yes.

9       Q.  Did you do anything to evaluate what the

10   background rate of expected patients in the age

11   match population would be for a PAD event?

12      A.  Why would I do that?

13      Q.  Well, if there were zero, but ten events,

14   for example, happened in the age matched

15   population, that would suggest that imatinib

16   lowered the risk of PAD, wouldn't it?

17      A.  So I'll answer that question.  You know,

18   you presented data earlier on age matched risk of

19   PAD.  We'll stick with PAD.  Those are coded

20   events.  Here we're talking about spontaneously

21   reported events.  There's no way to compare the

22   incidence rate.  And, again, those are age

23   adjustment comparisons.  Why would I need to go

24   outside the trial population to look for a control

25   rate when I already have a nice randomized within

1    trial comparison?

2         Q.  Because, as you noted in your own paper,

3    that when you're comparing against an active

4    control you have to decide whether what you're

5    seeing is an adverse effect related to one drug or

6    a beneficial effect related to the other drug.

7    That's what you wrote, isn't it?

8         A.  That is true.

9         Q.  What did you do to evaluate whether what

10   we're seeing here is actually in the comparison of

11   imatinib to nilotinib?  What did you do to evaluate

12   whether or not you are, in fact, seeing a positive

13   benefit from imatinib rather than an adverse

14   reaction from nilotinib?  What analysis did you do

15   on that?

16        A.  So if you're talking about analysis --

17   statistical analysis, there's no appropriate

18   statistical analysis.  For example, the

19   inappropriate statistical analysis is what

20   Dr. Giles did and colleagues did by pulling out a

21   non-TKI comparator, adjusting it for various

22   things, breaking randomization, adjusting for

23   exposure time and other meta-analysis, which have

24   looked at a non-TKI comparator, such as by

25   Chai-Adisaksopha, which is in our report, have

1    found increased risk against a non-TKI comparator.

2          In terms of what did I do, I reviewed the

3    entire literature.  So I didn't do a mathematical

4    calculation, but I looked at biologic plausibility.

5    I looked at case supports.  I looked at controlled

6    studies.  I looked at disproportionality.  I looked

7    at these meta-analysis.

8       Q.  Did you conduct a search for biological

9    plausibility papers that addressed the question of

10   whether imatinib was cardioprotective as part of

11   your search?

12      A.  No.

13      Q.  So you didn't take that possibility into

14   account in your meta-analysis that nilotinib might

15   be cardioprotective, correct?

16          MR. ELIAS:  Misstates.

17      Q.  It's a question.

18      A.  You asked me a different question.

19      Q.  You didn't take into account in your

20   meta-analysis the possibility that imatinib is

21   cardioprotective, did you?

22          MR. ELIAS:  Misstates.

23      A.  The meta-analysis shows that nilotinib is

24   statistically significantly associated with an

25   increased risk of cardiovascular.

1      Q.   Compared to what?

2      A.   Imatinib.

3      Q.   Okay.

4      A.   Based on the four trials.

5      Q.   If imatinib was reducing the risk of

6   cardiovascular, it's possible that that would be

7   the feature that's being tested in that

8   meta-analysis, isn't it?

9           MR. ELIAS:  Objection, lacks foundation,

10  unfirm hypothesis.

11     A.   That is an interesting hypothesis, and you

12  present, you know, some studies.  But if imatinib

13  is protective, let's extend that line of reasoning.

14  So you cite and, you know, the meta-analysis in

15  other studies say that nilotinib increases PAD by

16  five-fold.  So by that line of reasoning, we are

17  talking about an 80 percent reduction in

18  cardiovascular risk with, you know, imatinib.  The

19  most -- yes.  I mean, you have to let me answer.

20     Q.   I'm letting you answer.

21     A.   So the most effective cardioprotective

22  drugs known to man are aspirin, statins, 30 to

23  50 percent.  So hey, if imatinib reduces

24  cardiovascular risk, I would start taking it as

25  soon as I walk out of this room.

Page 217

1     Q.  Well, that's not exactly true what you

2  just said.

3     A.  Why?

4     Q.  I'm going tell you why.  Because your

5  statistical significance range doesn't require an

6  80 percent reduction in order for there to be

7  overlapping statistical significance between a

8  reduction of Gleevec and whether or not there's

9  increase associated with nilotinib.  It doesn't

10  have to go the full 80 percent to start to have

11  overlapping statistical significance.

12     A.  Let me answer that.  That statistical

13  significance range is a measure of --

14        COURT REPORTER:  I'm sorry, I couldn't

15  understand what you were saying.

16        THE WITNESS:  Sorry.

17     A.  The statistical significance range is a

18  measure of uncertainty, but the point estimate is

19  still fivefold, and so that would bring about an

20  80 percent reduction.  And I don't think that any

21  drug that I've seen developed brings about an

22  80 percent reduction in cardiovascular risk.

23     Q.  You didn't do anything to evaluate the

24  question of whether imatinib is protective against

25  cardiovascular disease as part of your analysis,

Page 218

1    did you?

2            MR. ELIAS:  Objection, that misstates.

3        A.  I evaluated the causal association between

4    nilotinib and cardiovascular events and provided --

5        Q.  That's not what you did --

6            MR. ELIAS:  Wait a minute.  Let him

7    finish.

8        Q.  You evaluated --

9            MR. ELIAS:  Stop.

10       Q.  -- the causal association --

11           MR. ELIAS:  Stop.

12       Q.  -- the association between nilotinib and

13   Gleevec, that's what you evaluated; is that

14   correct?

15           MR. ELIAS:  Finish your prior answer.

16       Q.  Isn't that correct?

17           MR. ELIAS:  You're not cutting him off

18   again.

19       Q.  Isn't that correct?

20       A.  Which question do you want me to answer?

21   The prior one --

22       Q.  The one I asked.  The one I asked just

23   now.

24           What you evaluated was the statistical

25   difference between treatment with Gleevec and

1    treatment with imatinib on a statistical basis.

2    Isn't that the only thing you evaluated

3    statistically in your report?

4         A.   I evaluated -- provided a causal opinion

5    based on the meta-analysis that compared nilotinib

6    and imatinib, and whole body of evidence from

7    different studies, different investigators.  So,

8    you know, I can't exclude all that other evidence

9    as a part of my analysis.

10        Q.   Well, none of that was statistical

11   evidence, was it?

12        A.   Oh, there was a ton of statistical

13   evidence.  I mean, there were four separate

14   meta-analysis that provided statistical evidence.

15        Q.   Which included -- which included

16   observational studies that you excluded because

17   they were too heterogenous from your meta-analysis,

18   correct?

19        A.   Yes.  As some did and some, you know,

20   looked at different study designs, but I evaluated

21   all of them.

22        Q.   Well, you didn't include them in your

23   meta-analysis because you thought they were too

24   heterogenous, correct?

25        A.   I included them in my systematic review.

Page 220

1        Q.   But that's not the question I asked you.

2             You didn't include them in your

3   meta-analysis because they were too heterogenous,

4   correct?

5        A.   Yes.

6        Q.   Are you aware of papers suggesting that

7   Gleevec had a cardioprotective effect?

8        A.   You've provided them right now.

9        Q.   Before now, were you aware of those

10  papers?

11       A.   No, I was not.

12       Q.   Even though you cited the Giles paper,

13  which cited them, and you testified earlier that

14  you had reviewed the references in the papers that

15  you selected.

16       A.   To identify additional studies on

17  nilotinib and cardiovascular events.

18       Q.   So you didn't look in the references for

19  studies that might have shown a cardioprotective

20  effect for imatinib; is that right?

21       A.   Yes, I did not.

22       Q.   You didn't even consider the possibility

23  in your analysis that nilotinib is

24  cardioprotective, did you?

25       A.   I mean, it's considered in the analysis

1    because what I am reporting is an increase in

2    cardiovascular events.  I'm looking at the causal

3    opinion.

4        Q.  Well, nowhere in your causal opinion do

5    you try to adjust for or explain how you concluded

6    that imatinib is not cardioprotective, did you?

7            MR. ELIAS:  Objection.  That misstates his

8    report and his testimony.

9        Q.  It's a question.

10       A.  Yes.  It's a question.  And I address

11   this.  I mean, I address this issue in the context

12   of the Giles paper, because it's comparing that and

13   in the context of other studies which have other

14   comparators which --

15       Q.  Find --

16           MR. ELIAS:  Wait a minute.  Wait a minute.

17   Stop.

18           Go ahead and finish your answer.

19       A.  Yeah.  So I address this issue of other

20   comparators in the non-TKI analysis with Chai,

21   which still shows an increased risk with nilotinib.

22       Q.  Find it for me where in your report you

23   discuss the possibility that imatinib is

24   cardioprotective and either adjust your analysis

25   for that or dismiss that conclusion.

1      A.   There's no single statement that provides

2   that, that I adjust.   For example, it is not -- I

3   think it's improper to adjust for that analysis.

4   These are direct randomized trials, which compare

5   nilotinib to imatinib, so how would one adjust for

6   that.

7      Q.   Well, how would you solve the dilemma that

8   your own paper that we looked at earlier sets up,

9   how do you determine whether or not the active

10  comparator is protective as opposed to the testing

11  agent being adversely affecting things?   How would

12  you test for that?

13     A.   Sure.   So, you know, you go back and look

14  at, first of all, your own results, look at the

15  consistency of results.   So it's not just one

16  trial.   Does this effect present across trials.

17  Then you look at other evidence and, you know, you

18  see, well, is this effect being seen in other

19  studies and -- of use versus nonuse.   You effect

20  what other investigators are reporting and you

21  evaluate, you know, plausible biologic hypothesis.

22     Q.   Okay.   Now, I want you to list for me all

23  the studies, observational studies you think are

24  out there -- so we've got one, Giles -- all the

25  other ones that you believe have comparators other

1    than to Gleevec in your meta-analysis.

2        A.  Sorry.  Can you repeat that?

3        Q.  Yeah.  I want you to identify for me all

4    the studies you think have comparators with

5    statistically significant results other than

6    imatinib that you looked at as part of your study.

7        A.  So first, you put a question about

8    observational studies, then you said studies.

9    Which of that is the question?

10       Q.  We know there's no randomized controlled

11   studies that do that, correct?

12       A.  Yeah.

13       Q.  All right.  So I guess we're only talk --

14   so you got four meta-analyses which contain papers

15   that you didn't think were adequate to include your

16   meta-analyses.

17           MR. ELIAS:  Wait a minute.  Wait a minute.

18       Q.  And you've got a handful of other

19   observational studies.

20           Of those, tell me which ones compare other

21   than Giles to something other than Gleevec?

22           MR. ELIAS:  I'm going to object to the

23   form of the question, the statement.  It was

24   argumentative and it was assuming facts that have

25   not been established.

Page 224

1        Q.   You can answer the question.

2             MR. ELIAS:  I don't know what the question

3    is.

4             MR. JOHNSTON:  I don't care what you

5    think.

6        Q.   You can answer the question.

7             MR. ELIAS:  Please reask the question.

8        A.   I'll answer the first part of the

9    question.  It is not true that all the four

10   meta-analysis included studies that are -- which

11   are -- several of the meta-analysis included

12   randomized controlled trials, which are also

13   included.  And so that is an incomplete statement

14   that I -- some of them included observational

15   studies, which I found to be heterogenous and did

16   not include.

17       Q.   Right.

18       A.   So that's the first part.

19       Q.   So your meta-analysis is duplicative of

20   those to the extent they took into account the same

21   RCTs you took into account, right?

22       A.   Yes.  But I wanted an independent

23   assessment.

24       Q.   Now, which of those involve an

25   observational study where imatinib and the risk of

1    atherosclerotic-related events is compared to

2    something other than Gleevec?

3        A.  Let me look at my --

4        Q.  Sure.  We got Giles already, you don't

5    have to flag that one.

6        A.  And when you say these analysis, any

7    studies?

8        Q.  Anything that you relied on that's not a

9    case report.

10       A.  Yeah.  Let me just get there.

11           If you go to page 14 of the report, the

12   Chai study also reported an increased risk.  It

13   also evaluated no TKIs.

14       Q.  How did it do that?

15       A.  I mean, you know, I reported on the

16   incidence of major events.  But it did.  And if you

17   go -- and if you can bring the reference of that

18   paper, we can look at it.

19           MR. ELIAS:  I'm happy -- would you like to

20   see that reference?

21           MR. JOHNSTON:  I don't want you to keep

22   talking.  I want you to stop talking.  This is my

23   deposition.

24           MR. ELIAS:  Do you have the paper?

25           MR. JOHNSTON:  I might have the paper, but

1   I'll decide whether I want to show him the paper.

2           MR. ELIAS:  If you don't want to ask him

3   questions about the paper --

4       Q.  I want to ask you whether or not --

5           MR. ELIAS:  It would be helpful to see --

6       Q.  -- there was a comparison in that paper of

7   any other comparator to nilotinib, any study that

8   does that.

9           Now, there are studies where -- there are

10  papers, and I think this is one of them, where some

11  other TKI is compared to Gleevec.  They're all

12  compared to Gleevec, and then you can try to

13  extrapolate from those comparisons.

14          But I'm talking about a situation where

15  you did a comparison directly of nilotinib to some

16  other TKI or other agent.

17      A.  So step back.  The second part first, I

18  did not do that comparison but they have and I

19  think it would be best to look at the paper before

20  we make that assertion.  So I think you have to

21  produce it.

22      Q.  I don't have to produce it.

23      A.  Well, then you're asking me this question

24  and you want me to answer --

25          MR. JOHNSTON:  He does have to answer the

1    question.

2              MR. ELIAS:  Let me just say this.  He's

3    looked at hundreds of papers, and if you're going

4    to ask him specific questions --

5              MR. JOHNSTON:  Then we'll be here for

6    several more days because he's cited hundreds of

7    papers.

8              MR. ELIAS:  Please don't interrupt.  What

9    I --

10             MR. JOHNSTON:  I can interrupt you as much

11   as I want to, Counsel.

12             MR. ELIAS:  You sure can.

13             What I would say is, please, if you're

14   going to ask him about a particular article, as you

15   have with the other articles, please put the

16   article in front of him.  I've got a copy here on

17   my computer, I'm happy to pull it up.

18             MR. JOHNSTON:  Thank you.

19             MR. ELIAS:  I've got all the articles.

20             MR. JOHNSTON:  Thank you.

21             MR. ELIAS:  Would that be helpful?

22             MR. JOHNSTON:  No, it wouldn't be helpful.

23             MR. ELIAS:  Do you want to get to the

24   truth, or do you want to --

25             MR. JOHNSTON:  Counsel --

Page 228

1          MR. ELIAS:  -- or do you want to

2     interrupt --

3          MR. JOHNSTON:  Your positioning in these

4     depositions and your arguing of the merits during

5     these depositions is baffling to me.  The judge

6     will decide and the jury will one day decide who

7     wins this case.  And this posturing that you do

8     about getting to the truth and all that is just not

9     useful.  It's not useful.

10         MR. ELIAS:  Okay.  Well, I'm just saying

11    for the record --

12         MR. JOHNSTON:  I'm not going to show him

13    the article right now.

14         MR. ELIAS: -- I have the Chai article.  I

15    have Chai article.

16         MR. JOHNSTON:  I'm not showing it to him

17    right now.

18         MR. ELIAS:  I will state for the record

19    that the Chai article that you don't want to show

20    him compares a meta-analysis of non-TKI treatments:

21    desatinib, imatinib, pazopanib, erlotinib and

22    ponatinib.

23         MR. JOHNSTON:  Those are all TKI

24    treatments.

25         MR. ELIAS:  It has a non-TKI treatment as

1   well.  And if you want to look at the article and

2   ask him the question, please pull it up.

3            MR. JOHNSTON:  I don't want you to

4   testify, Counsel, and you're testifying.  I don't

5   want you to do that, and I don't think you're

6   allowed to do that.

7            MR. ELIAS:  I'm not testifying.

8            MR. JOHNSTON:  You are testifying.  You

9   just testified what's in that article.  He hasn't

10   told me what's in that article.  You just did.  And

11   that's inappropriate.

12   BY MR. JOHNSTON:

13       Q.  Now, I want you to look at -- let's look

14   at your meta-analysis.  So I'm going to go back to

15   exhibit -- I put that one aside.  It's the second

16   exhibit we marked today.

17       A.  297.

18       Q.  297.  I want to look at Figure 1, which is

19   your "Peto odds ratio meta-analysis of nilotinib

20   versus imatinib on composite cardiovascular events

21   in randomized controlled trials."

22            COURT REPORTER:  Could you try that again,

23   please?

24       Q.  Figure 1:  "Peto odds ratio meta-analysis

25   of nilotinib versus imatinib on composite

Page 230

1    cardiovascular events in randomized controlled

2    trials."

3            This is your -- is this sometimes called

4    the forest plot?

5        A.   It is.

6        Q.   And let's just look at the events.  You

7    considered the LASOR trial, correct?

8        A.   Yes.

9        Q.   The ENESTchina trial?

10       A.   Yes.

11       Q.   The ENESTcmr trial?

12       A.   Yes.

13       Q.   And the ENESTnd trial?

14       A.   Yes.

15       Q.   Four trials, correct?

16       A.   Yes.

17       Q.   Would you agree with me that the

18   ENESTchina lower bound to the confidence interval

19   is below 1?

20       A.   I agree.

21       Q.   So that suggests that there is within the

22   95 percent confidence interval, a possibility that

23   the odds ratio for the ENESTchina trial for

24   atherosclerotic-related events is below 1, correct?

25       A.    In that one trial, yes.

1        Q.   And you will agree with me, I assume, that

2    the LASOR lower bound of the confidence interval is

3    below 2, correct?

4        A.   Yes, in that trial.

5        Q.   And, in fact, the lower bound is 1.3,

6    correct?

7        A.   1.30, yes.

8        Q.   And the upper bound is 44.89, correct?

9        A.   Yes.  And that reflects the small size of

10   the trial.

11       Q.   That's a very broad confidence interval,

12   isn't it?

13       A.   I can't create those.  Those are what they

14   are.

15       Q.   I'm just trying to establish what they

16   are.

17            The ENESTchina has an upper bound of the

18   confidence interval of 369.63, correct?

19       A.   Sure.

20       Q.   And a lower bound of .15, right?

21       A.   Yes.

22       Q.   ENESTcmr also has the lower bound of its

23   confidence interval near 1, correct, 1.14?

24       A.   I don't say "near 1," I just say the

25   number 1.14.

1      Q.  Well, you realize there are

2    epidemiologists who believe that risk ratios

3    between 1 and 2 are somewhat unclear as to what

4    they mean, correct?

5      A.  I don't believe that way, but I know of

6    people who do.

7      Q.  People who have published a lot of papers

8    do believe that, correct?

9      A.  Yes.  Because there's, you know --

10     Q.  And, in fact, the ENESTnd lower bound of

11   the confidence interval is even below 2, isn't it?

12     A.  Yes.

13     Q.  Where do you tell me the weighting of the

14   various trials in your forest plot in your report?

15     A.  It's not exhibited directly on the plot.

16   Sometimes people do, and I don't, you know.

17     Q.  So tell me what is the weight you gave to

18   the ENESTnd trial in your meta-analysis.

19     A.  It's probably the most disproportionate.

20   So I can say qualitatively you can get from the

21   size of -- so if you look at ENESTnd -- I mean,

22   it's the most heavily weighted, then ENESTcmr, but

23   from -- so there's a qualitative description, but

24   there's no quantitative number that this is

25   80 percent.

1      Q.   So I can't tell what the weighting is?

2      A.   You can tell the weighting.  You can look

3   at the figure and tell the weighting.

4      Q.   So what is the weighting?

5      A.   Well, it's not a number.  It is -- it's

6   most heavily weighted.  ECMR is less heavily

7   weighted; ENESTchina is the least; and the LASOR is

8   in between.

9      Q.   You didn't put in this report what weights

10  you gave to --

11     A.   No.

12     Q.   -- each study, correct?

13     A.   I didn't give the weights.

14          COURT REPORTER:  Please wait for a

15  question.

16     Q.   You didn't put in your report what weights

17  you gave these studies, correct?

18     A.   Yes.

19     Q.   And, in fact, as you said, do you think

20  the ENESTnd trial was weighted more than 90 percent

21  of your study?

22     A.   I can't tell you a number, but it was

23  heavily weighted.

24     Q.   Okay.  So why do you need to do a

25  meta-analysis if 90 percent, let's say, of the data

1    comes from ENESTnd?  Why not just go with ENESTnd?

2        A.  You do need to do a meta-analysis because

3    you want to evaluate consistency of study effects.

4    If it isn't 90 percent or 80 percent, as it might

5    be, you still have to see what is the direction of

6    effect in all studies.  And importantly, all four

7    studies point in the same direction.  Despite being

8    of lower magnitude and lower imprecision, all of

9    them go in the opposite direction of suggesting an

10   increased risk.

11       Q.  Well, one of them only goes in the same

12   direction by .15 at its lower bound of the

13   confidence interval, correct?

14           MR. ELIAS:  Objection, misstates.

15           Go ahead.

16       A.  Yeah.  No, I'm looking at the point

17   estimates.  I'm pointing out all the point

18   estimates are on the same side, so you have to

19   evaluate consistency.  You cannot evaluate

20   consistency in one body of evidence.

21       Q.  Well, you agree with me that a confidence

22   interval indicates that the true number is

23   somewhere within the confidence interval, correct?

24       A.  Not exactly.  The true number is, you

25   know, this is a 95 percent confidence interval, so

1    you have a 95 percent probability that the true

2    value rides between these, you know, ranges.

3         Q.   And what -- you don't have a 95 percent

4    probability that the point estimate is the correct

5    number, do you?

6         A.   No.  It is more -- most likely that the

7    point estimate is a true value, but the 95 percent

8    of the chance is within that range of value.

9         Q.   So it's possible that, in fact, the true

10   value, for example, according to this, for

11   ENESTchina is .15?

12        A.   Yes.

13        Q.   Possible?

14        A.   Anything is possible.

15        Q.   Within a 95 percent confidence interval?

16        A.   Within.  But the most likely estimate is

17   still 7.33.

18        Q.   Well, how do you do that statistically?  I

19   mean, why do you have a confidence interval if you

20   think that's your most likely estimate?

21        A.   The confidence interval is done to reflect

22   the uncertainty of your estimates.

23        Q.   Well, in fact, it's a bell curve, isn't

24   it?  It's an imposed bell curve, essentially, on

25   the data, right?

1      A.   We've already talked about 95 percent.

2  You can visualize it as a bell curve.

3      Q.   Right.  So that number at your point

4  estimate is at the top of the bell curve, but there

5  are still a lot of numbers on either side of that

6  that could be the true number, correct?

7      A.   Yeah.  95 percent of the time.

8      Q.   Okay.  Let me look at Figure 2, your Peto

9  odds ratio meta-analysis of nilotinib versus

10  imatinib on ischemic heart disease events in

11  randomized controlled trials.

12           Did I read that correctly?

13           Why did you include ischemic heart disease

14  events in your meta-analysis?

15      A.   I did because I was -- the primary reason

16  for doing the study was to evaluate cardiovascular

17  events, and I believe that ischemic heart disease

18  and ischemic cardiovascular events were important

19  to evaluate.

20      Q.   If the patient here did not have an

21  ischemic heart event, how would this be relevant to

22  this case?

23           MR. ELIAS:  Objection.  He's not offering

24  any --

25           MR. JOHNSTON:  I know he's not.

1          MR. ELIAS:  -- patient-specific testimony,

2     so we're not -- don't answer that question.

3       A.  I don't know details about --

4          MR. JOHNSTON:  You're instructing him not

5     to answer that question?

6          MR. ELIAS:  That question is --

7          MR. JOHNSTON:  Is what, Counsel?

8          MR. ELIAS:  He's not here to offer

9     specific testimony about --

10         MR. JOHNSTON:  I understand that.  I'm not

11    asking specific testimony about --

12         MR. ELIAS:  Well, you actually just did.

13         MR. JOHNSTON:  No, I didn't.

14         MR. ELIAS:  Yes, you did.

15         MR. JOHNSTON:  No, I didn't, Counsel.

16         Are you instructing him not to answer that

17    question?

18         MR. ELIAS:  Go ahead and answer the

19    question because I think I know what you're -- go

20    ahead.

21      A.  I mean, I don't know enough information

22    about the case to tell you that it's -- an ischemic

23    heart disease is relevant or not.  It is relevant

24    to my evaluation.

25      Q.  So your evaluation was focused not on any

1    particular adverse reaction within the world of

2    cardiovascular events.  You were asked to do an

3    overall analysis of cardiovascular events, correct?

4        A.  No.  So I focused my review on ischemic

5    cardiovascular events as I defined it as, you know,

6    ischemic heart disease and PAD and stroke.

7        Q.  If I had a patient, hypothetically, who

8    only had PAD and I wanted to know what the rate of

9    increase of risk nilotinib provided for PAD, if I

10   wanted to only know that, this number wouldn't be

11   useful, would it, that's in Figure 2?

12           MR. ELIAS:  Objection.  Unfirm

13   hypothetical and calls for speculation as to what's

14   relevant to you.

15       A.  So if you wanted to know the rate only,

16   then this number would not have been useful.  But

17   if you're providing a causal opinion on

18   atherosclerosis and nilotinib, you have to look at

19   other events, whether they are increased risk or

20   decreased risk to inform that opinion.  So, yes,

21   the PAD rate would come from meta-analysis,

22   whatever far you reach to.  But in terms of the

23   overall opinion, you have to look at, you know,

24   other ischemic events.

25       Q.  Well, if I wanted to know whether

1    nilotinib causes PAD, what I would I look at?

2        A.   I mean, you would look at PAD, but you

3    would also look at other relevant events of

4    interest.

5        Q.   What if my patient didn't have a heart

6    event, how would that be relevant?

7        A.   So I can't inform you on a causal-specific

8    patient.

9        Q.   I'm not asking you specific questions.

10   I'm asking you hypothetically if we were dealing

11   with a case that didn't involve a heart event, why

12   would we care about the Figure 2?

13           MR. ELIAS:   Asked and answered.

14       A.   So if you're dealing with a case that

15   informed on nilotinib and PAD, I wouldn't do a

16   meta-analysis.  You can look at the details of that

17   case.

18       Q.   So a meta-analysis wouldn't be helpful in

19   evaluating a case of a patient who suffered a side

20   effect associated with nilotinib; is that your

21   testimony?

22       A.   No.  I'm saying that if you give me that

23   case, I would look at that data.  Now I'm providing

24   a general causation opinion on nilotinib and PAD,

25   and I'm looking at the atherosclerotic events,

1    including ischemic heart disease.

2        Q.   Figure 2, you excluded ENESTchina in your

3    meta-analysis of ischemic heart disease, didn't

4    you?

5        A.   I didn't exclude it.  I mean, there were

6    no relevant data on that.

7        Q.   So you only had three trials that you did

8    a meta-analysis on for the topic of ischemic heart

9    disease, correct?

10       A.   I actually call it meta-analysis of four

11   trials, but, you know, one trial did not have data.

12       Q.   Well, one trial contributed no data to

13   your analysis, correct?

14       A.   Yeah, and no weight.

15       Q.   And in Figure 3 you did a Peto odds ratio

16   meta-analysis of nilotinib versus imatinib on

17   stroke events in randomized controlled trials,

18   correct?

19       A.   Yes.

20       Q.   And you didn't -- you excluded LASOR in

21   that one; I assume, because there were no events?

22       A.   Yes, both of those two studies were --

23       Q.   And you excluded ENESTcmr, correct?

24       A.   Yes.  They also had no events.

25       Q.   And you included ENESTchina, although I'll

1    note, you know, I think maybe some of this stuff

2    got cut off or maybe it got cut off --

3         A.  It did.  I'm sorry.  That is my --

4         Q.  Do you know what the relative weightings

5    on this two study --

6         A.  I can't give a specific number, but, you

7    know, it is overly weighted for the ENESTnd.

8         Q.  So really the ENESTchina didn't provide

9    any meaningful additional information to this

10   meta-analysis, did it?

11        MR. ELIAS:  Objection.

12        A.  It did.  It did.  Because as you can see,

13   it provides evaluation of consistency of effects.

14   You know, the point estimates are in the same

15   direction; the confidence intervals are wide, and

16   as noted, cross 1.  So it allows one to evaluate

17   consistency.

18        Q.  Again, it crosses 1 barely -- it crosses 1

19   considerably -- sorry.

20            ENESTchina, the lower bound of the

21   confidence interval goes way below 1.  It goes all

22   the way down to 0.15, correct?

23        A.  It is.

24        Q.  And it goes all the way up to 369.63,

25   correct?

1        A.   Reflection of its sample size.

2        Q.   Right.  So it's not really adding much to

3    this analysis, is it?

4        A.   It is, because it's adding evaluation of

5    consistency.

6        Q.   If you took that out, would your rates

7    change?  Your estimated odds ratio in the combined

8    number, would that change at all?

9        A.   It is.  I mean, because you can see the

10   ENESTnd estimates, it's 3.32, 1.08 to 10.17, and it

11   changes to 3.53.  So you can see the two

12   differences.

13       Q.   So you actually were able to make it a

14   higher odds ratio using data with a 350 point

15   spread in the confidence interval, correct?

16       A.   I wasn't able to do anything.  I just

17   analyzed the data and report it as such.

18       Q.   Right.  You're doing statistics, and they

19   may or may not have any relevance to reality,

20   right?

21       A.   It's not that statistics don't have.  I'm

22   just reporting and analyzing the data as reported.

23       Q.   Well, you're analyzing data you selected

24   as reported, and you haven't taken into account the

25   adjudication of the ENESTnd data, which is weighted

Page 243

1    the most significantly in your meta-analyses,

2    correct?

3         MR. ELIAS:  Objection, compound,

4    misstates.

5         A.  I mean, I'm analyzing the published

6    peer-reviewed data that I have available.

7         Q.  And you weighted ENESTnd the highest

8    amongst your meta-analysis?

9         A.  Self-evident.

10        Q.  Okay.  And you didn't take into account

11   any readjudication of that date in weighting that

12   study in your meta-analysis, correct?

13        MR. ELIAS:  Objection.

14        A.  Yeah.  There's no adjudication, these are

15   just reported events.

16        Q.  On Figure 5 you provide a forest plot of

17   the other meta-analyses of cardiovascular outcomes

18   with nilotinib, including your own, correct?

19        A.  Yes, that's just a visual display.  There

20   is no statistical analysis here.  It's just to look

21   at the data side by side.

22        Q.  And there's four meta-analyses you cite in

23   addition to your own, correct?

24        A.  Yes.

25        Q.  Did you do anything in looking at these

1   papers to adjust for data overlap between any of

2   them?

3        A.   No.  And that was not my purpose.  I mean,

4   I'm not trying to make a claim that these -- my

5   data are somehow independent of these.  I mean,

6   there's obviously overlap between these studies.

7   If I had pooled these meta-analysis together, then

8   there would a question of data overlap, but I'm not

9   making a claim that these are independent studies.

10       Q.   Why didn't you pool the data?

11       A.   How would I pool the data?  There is

12  overlap between studies.

13       Q.   Well, how come you didn't do a

14  meta-analyses of the meta-analyses?

15            MR. JOHNSTON:  You laugh.  It's in the

16  literature.  He's actually written about how to do

17  it.

18       A.   Yeah, I didn't do a meta-analysis of

19  met -- I can tell you how it would be done is you

20  would have, first of all, to know which of the

21  studies I included and excluded.  So, you know,

22  you'd have to trace each meta-analysis out, trace

23  out each study, and then you can do an overview of

24  meta-analysis.  And, again, that is not going to be

25  a meta-analysis of meta-analysis; it's going to be

1    an overview of systematic reviews.

2         Q.  Do any of the meta-analyses, yours or the

3    others, evaluate whether there is a unique type of

4    rapidly progressing, severe atherosclerosis that is

5    associated in a statistical way with the treatment

6    with nilotinib?

7         A.  I mean, they evaluate the events as

8    reported in the primary studies.  I don't think any

9    of the trials that I evaluated reported the

10   atherosclerosis as such.

11        Q.  And how about any of the other

12   meta-analyses you reviewed, did any of them address

13   that?

14        A.  No.

15        Q.  You stated here in your statistical

16   analysis that -- well, first of all, do you have a

17   list of all the studies that were identified using

18   your search strategies in PubMed, Embase, Embase

19   Classic, MEDLINE and Scopus?

20        A.  I mean, I excluded studies.  I have a list

21   of included studies.  I didn't keep track of all

22   studies that I excluded.

23        Q.  So you don't have a list of what resulted

24   from running those searches on those databases?

25        A.  I have a list of everything that was

1    relevant.

2         Q.  But you don't have a list of everything

3    that those searches found, correct?

4         A.  Yeah.  I mean, the list, you know, they

5    were done in the database and then the relevant

6    ones were brought into the studies that, you know,

7    I report here.

8         Q.  Did you read them on the screen to decide

9    which ones were relevant or did you print them out?

10        A.  Yeah.  A lot of them were reviewed by

11   title and abstract; some of them were reviewed in

12   full text on the screen; and then, you know, the

13   ones that were relevant were brought in.

14        Q.  So you don't have a list of what the

15   searches gave you to evaluate.  You just have a

16   list of what you chose from those searches,

17   correct?

18        A.  No.  What I -- what I deemed as relevant

19   for inclusion and exclusion.

20        Q.  Right.  I mean, I'm just trying to

21   clarify.

22        A.  No.

23        Q.  So you've got this set that you've

24   addressed in your paper of literature.

25        A.  Yeah.

1      Q.  And you've got a table that would be in

2   the back.

3            Whatever else was out there that those

4   searches returned, you don't have any record of at

5   this point other than what's in your report,

6   correct?

7      A.  Yeah.  I mean, I had a -- you know, I did

8   a search and then it came with the list of

9   included -- it didn't come with a list of included

10  studies.  It came with studies I deemed to be

11  relevant, and I brought them in.

12     Q.  Now, you talk about on page 12 evaluating

13  heterogeneity, correct?  Page 12 of your report.

14  I'm sorry.  Correct?

15     A.  Yes.

16     Q.  And you talk about statistical

17  heterogeneity and qualitative heterogeneity,

18  correct?

19     A.  Yes.

20     Q.  Okay.  And you say you used the I-squared

21  as a major -- measure of statistical heterogeneity.

22  What is -- tell the jury what the I-squared method

23  is.  What are you trying to find out there?

24     A.  This is a difficult concept to explain to

25  a jury, but I'll do my best.  You know, it's sort

1    of -- so, for example, I'll explain it by what it

2    does not do.  For example, I-square doesn't tell us

3    what the differences in population were, you know,

4    these were older or younger.  What it does tell us,

5    the -- for specific to the meta-analysis, how is

6    the variation difference as compared to chance.

7    That's as best as I can -- I'm sorry.

8         Q.  Yeah, I don't think a jury will understand

9    that at all.  So what is your value for chance in

10   that analysis?

11        A.  Yeah.  So, I mean, if you look at -- I

12   think I did report -- and I have to go back and

13   look.

14        Q.  You didn't give any math on this at all,

15   so...

16        A.  No, I do.

17             So if you go and look at page 14, you see

18   the I-square.  The third line, I-square is

19   0 percent, so that is the value of the I-square.

20   And I have to look at where else this was reported.

21   So that's 0 percent.  So not --

22        Q.  What does it mean that the I-squared

23   equals 0 percent?

24        A.  So what it means is that there was not

25   enough variation due to chance, you know, the

1    heterogeneity due to chance to prevent pooling.

2    So, for example, if you had obtained an I-square of

3    95 percent, then you could say there is substantial

4    statistical heterogeneity that you might want to

5    evaluate the results separately.

6         Q.   Okay.  Do you know whether the authors of

7    the other meta-analyses you cite in your forest

8    plot earlier, whether they applied statistical

9    measures of heterogeneity with respect to the

10   papers they included?

11        A.   Just to clarify, on page 6 I cited

12   I-squares for all the analyses.  So I just want to

13   clarify.

14        Q.   Let me find that.  Hold on.  For all of

15   the clinical trials --

16        A.   Yes.

17        Q.   -- that you include?

18        A.   Yeah.

19        Q.   How does -- so I-square is a

20   trial-specific value, or is it a value for the

21   entire collection of trials?

22        A.   It's a value for the meta-analysis itself.

23        Q.   So why are there separate I-squares for

24   each of the input trials?

25        A.   No.  There's no -- there are separate

1    I-squares for the endpoints of my meta-analysis.

2    So, for example, let me read it:  "The

3    meta-analysis of the ENESTnd, ENESTcmr, ENESTchina,

4    LASOR demonstrates a statistically significant

5    increase risk in patients with CML for the

6    composite endpoint of cardiovascular events."

7         And then the Peto odds ratio ranges from

8    3.70.  The 95-point confidence interval is 2.31 to

9    5.93.  And then the I-square is 0 percent.  And

10   that is -- goes on for the individual endpoints of

11   ischemic heart disease, stroke, and peripheral

12   arterial disease.

13   Q.  What I think I asked you or what I

14   intended to ask you is on page 10 with respect to

15   the four meta-analyses that you line up in

16   Figure 5, did those meta-analyses do heterogeneity

17   testing, to your knowledge?

18   A.  I mean, I -- so I -- I obviously would

19   need to see them in person -- not see them in

20   person -- but the analysis in person.  It would be

21   nice to look at them to see what their methods were

22   for I-square.  But I would assume all of them did

23   because that's traditional to do.  But their

24   estimates may be different because some of them

25   included observational studies and the

Page 251

1    heterogeneity estimates may be higher.

2        Q.  Right.  But you didn't note that in your

3    report, correct?

4        A.  No.  It's not noted.

5        Q.  Did you consider that in your discussion

6    of how your meta-analysis, which seems to me

7    arguably superior to some of these, how it relates

8    to these?

9        A.  I mean, I made a decision to include

10   trials and they made different decisions.  I'm

11   not -- you know, they made decisions of including

12   observational studies, so their I-square, just

13   looking at them, would be higher.  And remember,

14   that would have been much more -- sort of, if I was

15   pooling any of these studies, I was not pooling

16   their studies.  I'm providing my own estimate.

17       Q.  Well, you actually state on page 13, "the

18   data from observational studies were too

19   heterogenous to be pooled in a single meta-analysis

20   and were synthesized qualitatively," correct?

21       A.  Yes.

22       Q.  So that indicates to me that you did your

23   I-squared on those studies and determined that they

24   were too heterogenous for inclusion in your

25   meta-analysis.

1      A.  That's where you have to make a

2    distinction between statistically heterogeneity and

3    clinical heterogeneity.  So you don't even need an

4    I-square estimate of those studies to determine

5    whether they're heterogenous.  I mean, you can look

6    at the studies and the populations and the

7    adjustments and make a determination.  So

8    statistical heterogeneity is one reason to decide

9    what it is.  I never pooled them in any analysis.

10      Q.  So you just eyeballed them and decided

11    that they looked too heterogenous to include,

12    correct?

13          MR. ELIAS:  Objection, misstates and

14    argumentative.

15      A.  I don't eyeball data.  I look at them and

16    I evaluated the data.  I evaluated the studies.  I

17    looked at differences in populations.  I looked at

18    differences in follow-up, and I decided that a

19    single estimate from each of -- overall, would not

20    add more information to what I was doing.

21      Q.  And yet you cited a bunch of meta-analyses

22    that included many of these observational studies

23    as supportive of your -- your meta-analyses,

24    correct?

25      A.  I mean, I cited case supports.  I cited

1     lots of other studies, so --

2         Q.   You didn't put case reports in a forest

3     plot with your meta-analysis like you did for the

4     other meta-analysis, did you?

5         A.   That's just -- I didn't pool them

6     together.  So I cited them because they were done

7     and they were conducted, and that's what they

8     reported.  So how -- so you would -- I mean, the

9     other option would be to exclude them?  I couldn't

10    exclude them.  They had done that work.  And so

11    they needed to be included.

12        Q.   One of the four, the confidence interval

13    falls entirely between 1 and 2; isn't that correct?

14        A.   I'm sorry.  I need to get back to --

15        Q.   Page 10.

16        A.   Yes.

17        Q.   Okay.  It's the Chai-Adisaksopha 2015

18    paper, right?

19        A.   Yes.  And there are various reasons for

20    it, how were -- what analytic methods they used,

21    what studies they counted.  So there are various

22    methods.

23        Q.   In evaluating qualitative heterogeneity --

24    which is not using I-squared, correct?

25        A.   Yes.

1      Q.   -- in evaluating qualitative

2   heterogeneity, would the possibility of

3   misclassification of events reported in -- safety

4   events in a clinical trial be something you should

5   consider in evaluating qualitative heterogeneity?

6      A.   I mean, most of the -- you know, a lot of

7   things are considered.  So differences in

8   population, differences in -- yeah, I mean, there's

9   no reason to not consider misclassification as

10  events.  But, you know, these are all spontaneously

11  reported events, so it wasn't that one study was

12  adjudicating and another study was not.  And these

13  are all -- in the context of trials, at least,

14  these are all randomized trials.

15     Q.   I understand.

16          But you agree that evaluating the

17  possibility of misclassification is something that

18  you might want to take account -- into account in

19  evaluating qualitative heterogeneity?

20     A.   I mean, that would be one consideration in

21  addition to others.

22     Q.   If you look on page 16, you see that

23  you've got a chart of the various events, correct,

24  Table 1?

25     A.   Sure.

1     Q.  And you see that ischemic heart disease

2     for nilotinib combined -- by the way, why did you

3     combine nilotinib 300 and 400 in your

4     meta-analysis?

5     A.  Yeah.  So I combined because I was focused

6     on the question of nilotinib and cardiovascular

7     events, and that's sort of the question that I

8     looked at.

9     Q.  Do you agree that none of those studies

10    were adequately powered to detect any differences

11    between nilotinib 300 and nilotinib 400 with

12    respect to cardiovascular events?

13    A.  I mean, I did not look at nilotinib 300

14    and nilotinib -- sorry -- nilotinib 300 and

15    imatinib 400 specifically.

16    Q.  No.  I said nilotinib 300 and nilotinib

17    400.  So let me make sure we're talking about the

18    same thing.

19    A.  Yeah.

20    Q.  Do you agree that those clinical trials

21    you evaluate in your meta-analysis were not

22    adequately statistically powered to detect

23    differences between the rate of cardiovascular

24    events in nilotinib 300 versus nilotinib 400?

25         MR. ELIAS:  Objection.  That question

Page 256

1   lacks foundation and it assumes facts and is

2   compound.

3        A.  I mean, why would I be looking at studies

4   that compared 300 to 400; you know, that's not what

5   my database is.

6        Q.  Okay.  I'm trying to just make sure I

7   understand what you did.  You didn't attempt to

8   evaluate statistically the difference in the rates

9   of cardiovascular events between nilotinib 300 and

10  nilotinib 400; is that correct?

11       A.  No, I did not.

12       Q.  And, therefore, you may not know whether

13  or not there's adequate statistical power in those

14  studies to reach any conclusions about those two

15  things.  Do you know?

16       A.  No, I do not have statistical, you know.

17  I see evidence of trend that one dose is higher

18  than the other, but I don't have, you know, P-value

19  that I can assign to that.

20       Q.  Did you take into account in evaluating

21  the dataset the possibility that some of the -- the

22  events reported in the nilotinib 400 dose were

23  rescue doses from people who had failed Gleevec

24  therapy?

25       A.  Can you explain that a little more?

1        Q.  So you start on Gleevec.  You go into

2   blast crisis or you somehow have evidence that your

3   disease is progressing while on imatinib.  The

4   protocol then dictated that you would switch to the

5   second-line dose of nilotinib, which is

6   400 milligrams.

7            Did you do any evaluation to determine

8   whether or not some number of the 400-milligram

9   nilotinib cases were folks who had switched from

10  imatinib because of a need for rescue therapy?

11       A.  I mean, that's not how -- intention to

12  treat -- you know, clinical trials are analyzed.  I

13  mean, they're tried by -- analyzed by, you know,

14  treatment randomization.  If that's how they're

15  randomized, that's how I looked at it.  And so, you

16  know, that's not the analysis.  The analysis is if

17  you randomize to that arm, then that's the arm you

18  should be evaluating the outcome of.

19       Q.  Well, you point to Hochhaus.  Let's look

20  at Exhibit 315, which is Hochhaus, Figure 5 -- you

21  actually call it Figure 6 in your report on

22  page 1053.  Tell me when you're there.

23       A.  Yes.

24       Q.  Looking at that graph, you can't tell

25  whether any of the nilotinib 400 cases were

1    individuals who had switched off of imatinib in

2    order to go on rescue therapy, can you?

3         A.   Why not?  I mean, these are people

4    randomized to the 400 arm, so that's what they are

5    in.

6         Q.   So the imatinib 400 arm?

7         A.   No.  For, you know, the nilotinib 400 arm.

8         Q.   Somebody -- my question is:  If somebody

9    were randomized to the imatinib 400 arm,

10   progressed, their disease progressed, and so they

11   were switched to nilotinib 400 as rescue therapy,

12   and then had a CVE, you don't know which line on

13   this graph they would be counted on, do you?

14        A.   They should be counted on that arm that

15   they were randomized.

16        Q.   So even though the event happened while

17   they were on nilotinib --

18        A.   Yeah, that's --

19        Q.   -- they should be counted on the imatinib

20   arm?

21        A.   They should be counted on the arm they

22   were randomized.

23        Q.   Is there any data that allows you to

24   verify that that's what this graph shows?

25        A.   I mean, I would say -- assume that that's

1    a basic statistical principle that, you know,

2    people are following.

3         Q.  So you're making an assumption about this

4    graph on that?

5         A.  I'm not making any assumption about this

6    graph.  I'm just analyzing the statistical data

7    that you analyze based on randomization.

8         Q.  Going back to Table 1, on page 16 of your

9    report, we sort of -- I don't exactly know how, but

10   I got distracted.  You agree with me that there are

11   35 heart disease events in the nilotinib combined,

12   13 cerebrovascular events, and 14 peripheral

13   arteri -- artery disease events listed, correct?

14       A.  Yes.

15       Q.  And that's a total of 62 events, correct?

16       A.  Yes.

17       Q.  So more than half of the total number of

18   events are ischemic heart disease, correct?

19       A.  Yes.

20       Q.  If what you're interested in is

21   cerebrovascular disease or peripheral artery

22   disease, the inclusion of more than half of the

23   events that are heart disease would skew that

24   analysis in favor of heart disease, wouldn't it?

25            MR. ELIAS:  Objection, that is -- that

1    question lacks foundation and is overbroad.

2         Q.  You can answer the question.

3         A.  So if I'm interested in providing a

4    statistical estimate of the incidence or the

5    relative risk of PAD, then I will focus on PAD, as

6    I have done and provided that estimate.

7         Q.  All right.

8         A.  If I'm interested in a causal opinion on,

9    you know, nilotinib and atherosclerotic

10   cardiovascular events, I have to include all

11   relevant data, and I have provided that data.  So

12   they both are informative.

13        Q.  In patients -- well, they're informative.

14   But including heart disease events, if the patient

15   only had cerebrovascular and peripheral artery

16   disease events would overstate the rate of events

17   as to that -- that are relevant to that person,

18   wouldn't it?

19             MR. ELIAS:  Objection.  That lacks

20   foundation and is speculative.

21             Go ahead.

22        A.  I have not done that.  The composite

23   cardiovascular endpoint is a composite endpoint

24   that shows what happens.  Each of the analysis have

25   analyzed PAD separately, the ischemic

1    cardiovascular separately.  So I have not, you

2    know, said that you overinflate the composite.

3         Q.  When you looked at these numbers in

4    Table 1, you see that imatinib has only one

5    ischemic cerebrovascular event and peripheral

6    artery disease has zero, correct?

7         A.  Yes.

8         Q.  And you understand that the patients in

9    this trial are going to be folks ranging from

10   middle age, 40s, up to 60 or 70 years old, correct?

11        MR. ELIAS:  Hold on.  Wait a second.

12   Lacks foundation.

13        A.  I don't know the specific age group of the

14   trial.

15        Q.  You didn't look at the age group --

16        A.  I did.

17        Q.  -- as part of your analysis?

18        A.  I did look at these, but I don't know the

19   specific number.

20        Q.  You don't remember today what they were?

21        A.  Yes.

22        Q.  You understand they were older folks.

23        A.  Yeah, older folks.  I mean, they could be

24   in age range.  I don't know.

25        Q.  A range from 45 to 70 would be a pretty

1    big range, wouldn't it?

2         A.  Yes.

3         Q.  All right.  And you've done cardiovascular

4    meta-analyses before, correct?

5         A.  Yes.

6         Q.  Do you think it's possible that of 283

7    patients, that there would be no events of

8    peripheral arterial occlusive disease?

9         A.  You know, again, these are spontaneously

10   reported events.  If you had screened them with

11   ABIs, they would be different.  So, yes, I mean, I

12   can't say what is possible.  I just have to look at

13   the data and to analyze based on that.

14        Q.  If we had a healthy population of 283

15   people, not with CML, not on TKIs, do you think

16   that you would find zero cases of PAD in that

17   collection of people based on your prior work

18   evaluating cardiovascular events?

19             MR. ELIAS:  I'll object that PAD is

20   undefined and overbroad as phrased.

21        Q.  Defined as you defined it.

22        A.  I didn't define anything.  I defined it as

23   the ENESTnd trial defined it.

24        Q.  Then defined that way.

25        A.  Yeah.  So if you had a healthy population,

1    and, again, that depends on the presence of risk

2    factors, you know.  Did they have an age?  Were

3    they smokers?  Were they diabetic?  Were they

4    have -- and we have, are they obese?  Did they have

5    other risk factors for PAD?

6         So there is no one number I can say, well,

7    283 people for five years, you would have no PAD.

8    If they had risk factors, yes, there would be many.

9    Q.  I'm asking you if you just grab 283 random

10   people in the age group of 45 to 70, what do you

11   think the chances of there being no PAOD cases in

12   those 283 people are?

13       MR. ELIAS:  I'm going to object that PAD

14   is undefined and overbroad as phrased.

15       MR. JOHNSTON:  I agree with that a hundred

16   percent.  PAD and PAOD are very overbroad in many

17   ways.

18   Q.  But I'm defining it in the terms that you

19   defined it in your report, whether that's in

20   reference to ENESTnd or anything else.

21       MR. ELIAS:  Well, can I --

22   Q.  Do you think there's a chance that you

23   would have no cases of peripheral arterial disease

24   in 283 patients if you collected 283 patients from

25   the general population?

1          MR. ELIAS:  Are you asking about

2    symptomatic and asymptomatic or symptomatic --

3          MR. JOHNSTON:  Really, you want to start

4    playing that game, Counsel?

5          MR. ELIAS:  I just think that the question

6    as phrased the question is overbroad and vague with

7    respect to PAD.

8          MR. JOHNSTON:  You can quit coaching the

9    witness, Counsel.

10     Q.  You can answer my question.  My question

11   was:  Do you think there's a chance that you would

12   have no cases of peripheral arterial disease in 283

13   patients if you collected 283 patients from the

14   general population over a five-year period?

15         MR. ELIAS:  Same objection.

16     A.  So using the definition of the ENESTnd

17   trials, spontaneously reported PAD, I cannot come

18   up with a probability because I don't believe that

19   you should come up with hypothetical probabilities

20   unless you know the specifics, you know, what is

21   the age?  What's the sex?  And that's why

22   comparison to a hypothetical population, again, we

23   have no CML.  We have CML here.  I'm not sure what

24   that informs, and I can't tell you a number here.

25     Q.  And we actually don't know what the impact

1    of CML is on the atherosclerotic condition, do we,

2    because there have been no studies about that?

3        A.  Yeah.  And, you know, thankfully we have

4    randomized controlled trials which provide data on

5    two groups.  So, you know, we have one group

6    showing an increase.  But exactly.  So we need

7    those kinds of risk factors to give you the exact

8    rate.

9        Q.  And the other group hypothesized to be

10   cardioprotective, correct?

11       A.  That's a hypothesis that, you know --

12       Q.  We saw in a paper earlier that the

13   incidence, according to that paper of peripheral

14   arterial disease, was 2.7 per year.

15           Do you recall that?

16           MR. ELIAS:  What paper?  Can we just be

17   specific?

18           MR. JOHNSTON:  Well, he can tell me if he

19   needs the paper or not.

20           MR. ELIAS:  Well, I --

21       Q.  Do you remember we talked about it?

22       A.  Yeah.  It's the Hiatt paper and --

23       Q.  Okay.  So that would mean that there

24   should be four or five people in the imatinib, 283

25   peripheral arterial disease per year.  So really, I

1   guess, potentially times five, we could be talking

2   20 or 30 people that ought to be in that based on

3   that incidence, right?

4        A.  I don't know where you're getting all

5   these numbers from.  I mean, the number 27 by

6   thousand is correct.  But, then, again, I wouldn't

7   do that comparison because Hiatt is looking at

8   diagnostic codes for PAD in a general healthy

9   population.

10           Here we are looking at CML and

11   spontaneously reported PAD.  So there's comparing

12   really apples and oranges.  So I can't give you an

13   estimate.  You like that estimate?  That's okay.

14        Q.  I don't want an estimate.  I just want you

15   to acknowledge that zero seems to be below the

16   appropriate rate for 283 patients over five years

17   in the imatinib trial.

18           MR. ELIAS:  Objection, lacks foundation.

19        Q.  If you can give me that, we don't need to

20   worry about anything else.

21           MR. ELIAS:  Objection.

22        Q.  Isn't that a number that seems unusually

23   low to you?

24           MR. ELIAS:  Objection, lacks foundation,

25   misstates, asked and answered.

1      A.   To give a number is unusually low, we'd

2   have to provide, you know, unusually low -- I mean,

3   are these two populations comparable, you know,

4   before -- what is the reference when we compare and

5   adjust, then you can provide a rate.  Maybe they

6   are low, but I just don't have, you know, to have

7   that comparison to tell you it is.

8      Q.   You can't tell me one way or the other

9   whether the imatinib rate in PAD is lower than

10  should be expected in that population; isn't that

11  right?

12     A.   Yes.

13     Q.   Because you haven't done any analysis on

14  that, and there may not be any data from which to

15  do that analysis.

16     A.   I don't know that, yeah.

17     Q.   Okay.  Do you agree that the observational

18  studies you cite are not useful in and of

19  themselves alone to determine causality in this

20  case?

21     A.   Yes, I agree.

22     Q.   So you can use them in support following

23  your meta-analyses and maybe other people's

24  meta-analyses, but you can't reach a causal

25  conclusion based only on those observational

Page 268

1    studies; is that right?

2         MR. ELIAS:  Objection, that is compound

3    and misstates, overbroad.

4         A.  So I could clarify that, you know, we

5    can't -- I mean, we can't tell about these over

6    observational studies that we have.  I mean, I'm

7    not relying on a single study to make a causation

8    opinion, whether it's Giles or whether it's, you

9    know, just ENESTnd.  I'm relying on the whole body

10   of evidence and that could be said of observational

11   studies.

12        Q.  You don't -- you're not relying on the

13   statistical significance of any of those

14   observational studies alone to reach your causal

15   conclusion in this case, correct?

16        A.  I don't think I have relied on the

17   statistical significance.  I have reported the data

18   as they happen.

19        Q.  Now, you talked -- we were talking about

20   some mechanistic evidence earlier about whether --

21   whether Gleevec could be cardioprotective based on

22   looking at some animal data, et cetera.

23        Do you recall that?

24        A.  Yes.  You showed me two studies.

25        Q.  And then you have a section as part of

Page 269

1    your evaluation, mechanistic evidence.  And you use

2    that mechanistic evidence in support of your

3    Bradford Hill plausibility opinion, correct?

4        A.   That's what it is.

5        Q.   None of the studies that you cite show the

6    induction of atherosclerotic conditions in humans,

7    correct?

8        A.   I have to take a look.

9             So I would disagree with this because if

10   you look at my page 31 where it says "nilotinib has

11   been shown to induce hyperglycemia and

12   hyperlipidemia and influence subclinical markers of

13   atherosclerotic" --

14            COURT REPORTER:  Please start over.

15       A.   "Nilotinib has been shown to induce

16   hypoglycemia and hyperlipidemia and influence

17   subclinical markers of atherosclerotic

18   cardiovascular disease in humans."

19       Q.   "Subclinical" means not symptomatic and

20   not causing any problem, right?

21       A.   These are just markers.  I mean, they are

22   biological and that's why this is a biologic

23   section.

24       Q.   My question is:  None of those mechanisms

25   has been shown to induce atherosclerosis in a human

1   being because of the exposure to nilotinib; isn't

2   that right?

3       A.  This is a section on biologic mechanisms.

4   So, for example, there is hyperinsulinemia,

5   homeostatic model assessment insulin-resistance are

6   markers of atherosclerosis, and nilotinib

7   influences subclinical markers.  So there is a link

8   between the drug, subclinical markers of

9   atherosclerosis.  The link between nilotinib

10  subclinical markers of atherosclerosis and events

11  are not evaluated in these mechanistic studies.

12      Q.  And it's possible that a drug might have

13  one effect that is promoting an adverse outcome,

14  but also have another effect that could cancel that

15  out mechanistically; isn't that possible?

16      A.  It's plausible, and I think I cite some

17  studies that, you know, have not provided all

18  consistent evidence.  So it's plausible.

19      Q.  So you agree that your conclusion on

20  plausibility is based on evidence that might, in

21  fact, in some instances show something that cuts

22  against nilotinib as a mechanism for

23  atherosclerosis, correct?

24      A.  And I want to quote from my statement.

25  Yeah, I mean, the results from a few studies have

1    been mixed, so I agree that there may be, you know,

2    evidence that is inconsistent.  But I was -- I

3    think overall body of evidence was suggestive of

4    biologic plausible mechanism of action, and I'm not

5    a biochemist or I don't do biologic studies, so I

6    cannot say for definitive what is the mechanism.

7         Q.  And you're not a cardiovascular surgeon or

8    a cardiologist or anything like that either, are

9    you?

10        A.  I think we've gone through this a couple

11   of times.

12        Q.  Well, I just want to return to it.

13            So you aren't really qualified to evaluate

14   what exactly those mechanistic studies mean

15   prospectively, correct?

16        A.  I mean, I'm qualified to evaluate the

17   epidemiologic significance on those studies.

18        Q.  Okay.  Section 9 of your Bradford Hill is

19   Analogy, and you mention there that you have

20   concluded that ponatinib is an appropriate analogy.

21            That's what you wrote, right?

22        A.  So just to clarify, I mean, I haven't

23   concluded anything.  It just says that another

24   tyrosine kinase inhibitor has been shown to

25   increase the risk of, no, so I haven't concluded

1    that.

2        Q.  You wrote "this drug serves as an

3    appropriate analogy."

4        A.  Yes.  It is an analogy showing that other

5    drugs can also -- so analogy just means that, you

6    know, okay, are there possible explanations of

7    similar effects.

8        Q.  Dasatinib could also be another analogy,

9    correct?

10       A.  Could be an analogy.

11       Q.  Another TKI that could be analogy might be

12   imatinib, correct?

13       A.  I mean, I didn't see that data, but, you

14   know, we don't see that here.

15       Q.  You didn't see what data?

16       A.  That imatinib increases cardiovascular,

17   you know -- yeah, imatinib increases, and that's

18   the analogy.

19       Q.  That's putting the cart before the horse.

20   The analogy is the mechanistic question of, you

21   know, these drugs are all in the same class and

22   have some similar mechanistic principles, correct?

23           MR. ELIAS:  Objection, argumentative,

24   compound.

25       A.  No.  I think your -- your interpretation

1    and my interpretation of analogy is different.  The

2    interpretation that I'm commenting on in analogy

3    is, are there explanations of this that are

4    analogous, and sometimes they're not even members

5    of -- you know, are there drug cardiovascular

6    disease explanations that exist in any -- you know,

7    in reasonable similar drugs.

8           So, for example, in a diabetes drug and

9    amputations, are there other drugs in that class.

10   So that's how analogies -- it's not necessarily

11   about biological mechanisms.

12          It's, like, what are things that -- for

13   example, one vaccine causes demyelination.  Then

14   are there examples of other vaccines, so that is

15   analogy.  It doesn't go into biologic mechanisms

16   necessarily.

17      Q.  And there are other drugs in that class

18   that aren't analogous, correct --

19      A.  Yes.

20      Q.  -- with imatinib?

21          So what good does that do us to point out

22   ponatinib, which has a dramatically higher rate of

23   all of the events compared to other TKIs, how does

24   that help reach our Bradford Hill conclusion?

25      A.  To point out what?  I'm sorry.  Can you

1    clarify?

2         Q.  To point to ponatinib, which has a

3    dramatically higher rate of death, by the way --

4    let me stop that.

5              Do you agree that there is no increased

6    rate of death associated with nilotinib use due to

7    atherosclerotic events?

8              MR. ELIAS:   Object to the form, lacks

9    foundation.

10         A.  I did not evaluate the risk of mortality

11    with these drugs, so I don't -- so again, I'm not

12    offering an opinion on whether there's increased

13    mortality or decreased mortality.

14         Q.  Well, let's look at 315, Hochhaus,

15    Table 1, and let's start with Overall Survival in

16    that table.  Do you see that nilotinib

17    400 milligrams is statistically superior to

18    imatinib with respect to total deaths on study?

19         A.  In which figure or number are you

20    referring to that?

21         Q.  So if you look at Table 1, you look down

22    to OS, which is overall survival.  See that?

23         A.  Yes.

24         Q.  And you look across, you have column --

25    first column is nilotinib 300, second column is

1    nilotinib 400, third column is the imatinib

2    400-milligram arm.  You see that there were 22

3    deaths on imatinib?

4        A.  Yes.

5        Q.  18 deaths on 300-milligram nilotinib and

6    10 deaths on nilotinib 400, correct?

7        A.  Yes.

8        Q.  And the statistical analysis indicates

9    that nilotinib 400 milligrams reduces death in a

10   statistically significant way, correct?

11       A.  Yes.

12       Q.  Wouldn't you expect if this nilotinib drug

13   had such a high rate of atherosclerotic events

14   compared to imatinib, that it would not reduce

15   overall death to that extent?

16           MR. ELIAS:  Objection, lacks foundation.

17       A.  No.  I mean, these are two different

18   outcomes.  You know, if nilotinib is improving

19   overall survival through other mechanisms, then you

20   can't -- we'd have to break down what is the

21   cardiovascular death rate and death rate from other

22   causes, and then you would know what is the

23   difference.

24           So I can't really comment on whether this

25   is incongruent with the data I present.  This could

1    be entirely congruent with my analysis.

2         Q.  And, in fact, if you look at the next

3    line, "Deaths due to advanced CML," you can see

4    that imatinib 400 had 16 deaths at five years due

5    to advanced CML and nilotinib 400 had four and

6    nilotinib 300 had six.  And in both of those

7    instances, I believe those were statistically

8    significant improvements over imatinib, correct?

9         MR. ELIAS:  Objection, compound, lacks

10   foundation.

11        A.  Yeah.  There's no reason for me to not --

12   not believe this data.

13        MR. JOHNSTON:  Let's take a break and let

14   me think about whether there's anything else I want

15   to do.

16        THE VIDEOGRAPHER:  We are going off the

17   record at 4:38.

18        (Proceedings interrupted at 4:38 p.m. and

19      reconvened at 4:48 p.m.)

20        THE VIDEOGRAPHER:  We are back on the

21   record at 4:48.

22        MR. JOHNSTON:  I'm going to end my

23   questioning at this time although I obviously

24   reserve the right if you ask any questions to

25   follow up.

1              MR. ELIAS:  I have just a few questions.

2              Can we get this marked, please?

3              (Exhibit 317, Major arterial events in

4         patients with chronic myeloid leukemia treated

5         with tyrosine kinase inhibitors:  A

6         meta-analysis, Chai-Adisaksopha paper, marked

7         for identification.)

8                         EXAMINATION

9    BY MR. ELIAS:

10        Q.  Okay.  Dr. Singh, I've handed you

11   Exhibit 317.  And before we go into this exhibit, I

12   want to ask some questions.

13             Do you remember questioning today about

14   comparisons between nilotinib and imatinib in some

15   of the observational studies and clinical trials

16   and meta-analysis that you reviewed in connection

17   with your report?

18             MR. JOHNSTON:  Objection, vague.

19        A.  I remember the line of questions.  I don't

20   remember the specific questions.

21        Q.  And in your report, in the literature that

22   you reviewed, did the studies analyze nilotinib

23   versus imatinib exclusively?

24        A.  Yeah.  I mean, the randomized controlled

25   trials that I evaluated, the meta-analysis did.

1    But there were other, you know, studies that

2    compared nilotinib to -- you know, like the Giles

3    study, for example, which brought in a non-TKI

4    comparator and discussed that.  And, for example,

5    this study, which reported on rates in non-TKI

6    treatments.

7         Q.  Okay.  We'll get there.

8         So some of the literature that you

9    reviewed, is it fair to say, compared nilotinib to

10   comparators other than imatinib?

11        A.  Yes.

12        Q.  Okay.  And does that include some of the

13   meta-analysis that you analyzed?

14        A.  Yes.  I think this is included in my

15   study.  I don't know which reference number it is.

16        MR. JOHNSTON:  Counsel, that copy does not

17   have a copy.  So give me a second and I'll pull one

18   out of my box.

19        MR. ELIAS:  Actually, it does.  It's just

20   the abstract.  That's what it got.  And I may or

21   may -- and it's going to be sufficient for our

22   purposes to look at the abstract.

23        MR. JOHNSTON:  Well, I doubt that.  That

24   may be sufficient for your purposes.  So if that's

25   what you want to look at, fine.

1          MR. ELIAS:  You know, Robert, if you'd

2     rather, and I'm happy to do it, if you have a copy

3     of -- because I just had these copies made -- if

4     you have a copy of the full article, I'm happy to

5     present the witness with that if that will --

6          MR. JOHNSTON:  I didn't ask about this, so

7     I don't know why we're even doing this.  He wrote

8     about it.  What he wrote in his report, he can't

9     embellish his report now through your questioning.

10    So I don't know why you're asking him about it, but

11    if you want it, I'll get it.

12         MR. ELIAS:  Let's just go with this

13    exhibit, Exhibit 317.

14       Q.  Did some of the meta-analysis you looked

15    at --

16         MR. ELIAS:  Strike that.

17       Q.  In your report you describe meta-analysis

18    that was done in addition to the meta-analysis that

19    you did, correct?

20       A.  Yes.  I describe four of them.

21       Q.  Okay.  And is 317, Exhibit 317, one of the

22    meta-analysis that you reviewed?

23       A.  Yes.  It was reviewed in my report.

24       Q.  And describe what the article is, just the

25    title, Exhibit 317.

1        A.  It's "Major Arterial Events in Patients

2    With Chronic Myeloid Leukemia Treated with Tyrosine

3    Kinase Inhibitors:  A Meta-Analysis."

4        Q.  And you describe this article in your

5    report, correct?

6        A.  Yes.

7        Q.  And is it true that you cite this article

8    in your references section on page 40 of your

9    report?

10        A.  I have to look at it.

11            Yes, I do.

12        Q.  And is it also true that you describe this

13    article on Exhibit 317 on page 14 of your report?

14        A.  I do.

15        Q.  Okay.  And will you briefly describe what

16    this article, what this meta-analysis compares and

17    what the conclusions are?

18        A.  So this meta-analysis was done to estimate

19    the incidence of arterial events in patients with

20    chronic leukemia treated with tyrosine kinase

21    inhibitors.  They had around 29 studies and more

22    than -- at 15,706 patients, which means they

23    included studies other than randomized trials.  And

24    the incident rates of composite of major arterial

25    events was --

1      Q.   Before I go there, can we break it down

2   just a little bit?  Do they report the incidence

3   rate amongst various arms of CML patients?

4      A.   Yes.  I was getting there.

5      Q.   Okay.  And what are those arms that they

6   report?

7      A.   So they have a composite on non-TKI

8   treatment of .8, again per hundred patient-years;

9   then a higher risk among dasatinib of 1.1.  And

10   then they have a .1 for imatinib, and a .4 per

11   patient-years for ponatinib.

12          And then they provide a relative

13   comparison of nilotinib and imatinib of major

14   arterial events with a relative risk of 5.3, with a

15   broad confidence interval from 3 to 9.3, that's

16   statistically significant, with a P-vale of .001.

17          And they conclude that this study

18   demonstrates that, "Patients who received nilotinib

19   or ponatinib had a greater number of major arterial

20   events when compared to non-TKI imatinib, dasatinib

21   and bosutinib-treated patients."

22      Q.   Okay.  And so based on the meta-analysis,

23   is it true that the authors concluded that there

24   was an increased cardiovascular risk in patients

25   taking Tasigna, nilotinib, and ponatinib versus

1    patients who have CML who either were not treated

2    with TKIs, were on imatinib, dasatinib, or

3    bosutinib?

4         MR. JOHNSTON:   Objection.

5         A.   First of all, this is major arterial

6    event, so that's what they concluded on.   So they

7    concluded major arterial events, yes.   And they

8    were increased relative to non-TKIs for, you know,

9    nilotinib and ponatinib and dasatinib.

10        Q.   I'm sorry.   They were increased -- is it

11   true that they were increased for ponatinib and

12   nilotinib versus major arterial events versus

13   patients who had no TKI treatment, imatinib,

14   dasatinib, or bosutinib?

15        A.   Yes, that's what they conclude.

16        Q.   Okay.

17             (Exhibit 318, Cardiovascular events in

18        patients with chronic myelogenous leukemia

19        treated with tyrosine kinase inhibitors:   A

20        systematic review and meta-analysis (retained

21        by counsel), marked for identification.)

22        Q.   I'm handing you Exhibit 318.   Do you

23   recognize this exhibit?

24        A.   Yes.

25        Q.   What is this exhibit?

1      A.   This is systematic review and

2   meta-analysis titled, "Cardiovascular Events in

3   Patients with Chronic Myelogenesis Leukemia Treated

4   with Tyrosine Kinase Inhibitors, A Systematic

5   Review and Meta-Analysis.

6      Q.   Okay.  Do you -- did you review this

7   meta-analysis, 318, in preparing your report and

8   drawing the conclusions that you've drawn in the

9   case?

10      A.   Yeah.

11      Q.   And do you cite this article as one of the

12   articles that you analyzed in your report?

13      A.   I think I do.  I don't know the reference

14   number.

15      Q.   Let's go to page 41 of your report and

16   reference number 13.

17      A.   Yeah.  It doesn't tell me the -- but

18   that's what the study is.  Yeah, 3315.

19      Q.   So this does appear to be -- Exhibit 318

20   is cited as reference 13 in your report?

21      A.   Yeah.  The reference could have been more

22   clear in terms of what comes after 15, 7056, 7056,

23   yeah.

24      Q.   I'm sorry.  You're saying the reference

25   could have been more clear in your report.  But we

1    are referring to --

2        A.   Yeah--

3        Q.   -- the same article.  You did cite to this

4    article in Reference 13 in your report?

5        A.   Yes.

6        Q.   Okay.  And what meta-analysis was done,

7    what were the comparators, and what was the

8    conclusion?

9        A.   So the question was where they were

10   evaluating tyrosine kinase inhibitors, whether they

11   may be associated with an increased risk of

12   cardiovascular events.  And, again, they only

13   searched three databases.  In this case, MEDLINE,

14   Embase and Cochrane CENTRAL, and obviously, found

15   that to be sufficient.  They included studies that

16   were randomized controlled trials.  They also

17   included cohorts of inhibitors.  And they had

18   patients with tyrosine kinase for chronic or

19   accelerated CML.

20       Q.   Okay.  And what conclusions did they

21   reach --

22           MR. ELIAS:  Strike that.

23       Q.   Were they looking -- was one of the things

24   they were looking at was whether there was an

25   association between an increased risk of

Page 285

1    cardiovascular events amongst any of the TKIs?

2         MR. JOHNSTON:  Objection, this violates

3    Rule 26.

4         Q.  Go ahead.

5         A.  I'll get into methods before I get into

6    what they looked at.  I mean, they looked at --

7         MR. JOHNSTON:  And it's compound, by the

8    way.

9         MR. ELIAS:  I'll rephrase the question.

10        Q.  What did they -- what particularly were

11   they analyzing?

12        MR. JOHNSTON:  Objection.  It violates

13   Rule 26.  It's not stated in his expert report in

14   this case.

15        Q.  You can answer.

16        A.  It's included in my report.  I mean,

17   there's --

18        MR. JOHNSTON:  That's not what you're

19   about to say, is it?

20        Q.  Don't worry about his objection.

21        What specifically were they analyzing in

22   this report?

23        MR. JOHNSTON:  Same objection.  Violates

24   Rule 26.

25        Q.  Don't worry about it.

1        A.   They identified 32 studies of nilotinib,

2    imatinib, ponatinib.  And the incidence rate was,

3    you know, 8 percent for nilotinib, 1 percent for

4    imatinib, 2 percent for dasatinib, 10 percent for

5    ponatinib, and 13 percent for bosutinib and

6    6 percent for non-TKI studies.

7             And they did a direct comparison between

8    nilotinib and imatinib, which suggested that

9    nilotinib treatment was associated with a

10   significantly increased risk of cardiovascular

11   events, and that's cited in my report.  And they

12   conclude that the pooled proportion, that when

13   compared to non-TKI treatments, patients who

14   received imatinib had lesser events whereas the

15   incidence was greater among nilotinib, ponatinib,

16   and bosutinib.

17       Q.   Did they conclude actually, Dr. Singh, if

18   you look at the Conclusion section, did they

19   conclude that the pooled proportion suggested that

20   when compared to non-TKI-treated patients, patients

21   who received imatinib and dasatinib had lesser

22   cardiovascular events, whereas the incidence was

23   greater among patients receiving nilotinib,

24   ponatinib and bosutinib?

25            MR. JOHNSTON:  Objection, Rule 26.

1      A.   I read the results and that's what they

2    concluded.

3      Q.   And that is exactly what they concluded,

4    correct?

5      A.   Yes.

6           MR. JOHNSTON:   Objection, Rule 26.

7      A.   I read the results and cited the study, so

8    I'm not sure what -- why can't -- but anyway.   I

9    mean, I concluded what they wrote.

10     Q.   Okay.   And bear with me for one moment.

11          Do these --

12          MR. ELIAS:   Strike that.

13     Q.   I'm trying to find a reference in your

14   report.

15     A.   For these studies?

16     Q.   Yes.   Hold on one second.

17          And do you describe this study that we

18   discussed, 318, Exhibit 318 on page 14 of your

19   report?

20     A.   Yeah.   I mean, the language is the same.

21   We identified, you know, another meta-analysis of

22   32 studies, 1,621 patients.   So I describe it.

23     Q.   Okay.   Do these studies that we reviewed

24   just now and that you reviewed and described in

25   your report, Exhibit 317 and 318, do they support

1    or do they not support the hypothesis that

2    Mr. Johnston presented to you today that imatinib

3    is protective against cardiovascular events?

4           You can answer.

5           MR. JOHNSTON:  Objection, calls for

6    speculation based on his prior testimony.

7        A.  So these support my causal opinion that

8    nilotinib is causally associated -- you know,

9    causally associated in the development of

10   atherosclerosis as was cited.  And, actually, you

11   know, the study clearly shows that compared to that

12   non-TKI comparator, the rates of arterial events

13   were higher.

14          MR. JOHNSTON:  Objection, move to strike

15   as nonresponsive.

16       Q.  Do these studies, the two studies that we

17   reviewed, 317 and 318, do they support the

18   hypotheses that nilotinib is causally associated

19   with cardiovascular events?

20       A.  Yes.

21          MR. JOHNSTON:  Objection.

22       Q.  And why is that?

23          MR. JOHNSTON:  Objection, his report is

24   his report.  This is not an opportunity to expand

25   upon his report.  It violates Rule 24 -- 26.

1      A.   I mean, as I've stated in my report, you

2    though, these analyses along with others show that

3    the -- you know, for example, the rates are 2.8 per

4    hundred patient-years for nilotinib compared to,

5    you know, .8 for non-TKI treatments.  And so these

6    support an increased risk of cardiovascular events

7    with nilotinib, and that is causal.

8           MR. ELIAS:  Thank you.  That's all I have.

9           (Exhibit 319, Major arterial events in

10         patients with chronic myeloid leukemia treated

11         with tyrosine kinase inhibitors:  A

12         meta-analysis, Chai-Adisaksopha paper, marked

13         for identification.)

14                       EXAMINATION

15   BY MR. JOHNSTON:

16     Q.   I hand you what's been marked as

17   Exhibit 319, which is the full publication by

18   Chatree Chai-Adisaksopha that you were shown an

19   abstract, which I believe was marked as 317 a

20   moment ago; is that correct?

21           I'll ask it another way.  Is 317 the

22   abstract for what I've just marked as 319?

23     A.   Just give me a second because --

24     Q.   Sure.

25     A.   -- there's so many meta-analyses going on

Page 290

1    that I want to make sure I'm looking at the same

2    one you are.

3        Q.  I'm just trying to make sure it's the same

4    thing as what Mr. Elias showed you.

5        A.  Yeah, this is the same.

6        Q.  But this one actually contains the full

7    article, not just the abstract, correct?

8        A.  It does.

9        Q.  I want you to turn, please, to page 1302

10   in Exhibit 319.  There's a heading Peripheral

11   Arterial Occlusive Diseases.

12            Do you see that?

13       A.  Yes.

14       Q.  It says, "Overall the pooled rate of PAOD

15   was .3 per 100 patient-years among CML patients.

16   The subgroup analysis for each TKI showed a rate of

17   PAOD of 1.3 per 100 patient-years for nilotinib,

18   .1 per 100 patient-years for imatinib, .2 per

19   100 patient-years for dasatinib, 3.9 per 100

20   patient-years for ponatinib.  1. -- 0.1 per 100

21   patient-years for bosutinib and .8 per 100

22   patient-years for non-TKI-treated patients."

23            Do you see that?

24       A.  Yes.

25       Q.  So the rate of PAOD according to this

Page 291

1   paper for imatinib-treated patients was .1 per 100

2   patients, right?

3        A.  Yes.

4        Q.  But the rate for TKI naive patients was .8

5   per 100 years, right?

6        A.  For non-TKI patients.

7        Q.  TKI naive patients.

8        A.  They're the same?

9        Q.  People that haven't been exposed to TKIs.

10       A.  Yeah.  Non-TKI population.

11       Q.  It's .8 per 100 patient-years, right?

12       A.  Yes.

13       Q.  So if you take .8 per 100 patient-years in

14   a population of 283 people exposed over five years,

15   how many events would you expect to see if you

16   assume that rate?

17       A.  Again, you know, I think I've answered

18   this question.  This is, again, four trials and

19   then a host of observational studies.  So I don't

20   know what rate you would see.

21            MR. JOHNSTON:  Move to strike as

22   nonresponsive.

23       Q.  My question is:  If you have an incidence

24   rate as per this paper of .8 per 100 patient-years

25   and you had 283 people who were exposed for five

Page 292

1    years, what should be the expected number of events

2    based on that .8 per 100 patient-years incidence

3    rate?

4              MR. ELIAS:  Asked and answered.

5         A.  The application of an incident rate taken

6    from a composite of trials and observational

7    studies to data that includes trials is

8    inappropriate.

9         Q.  So you refuse to do it?

10        A.  I think it's inappropriate, and I --

11        Q.  I will do it for you because I don't

12   really care what you think is inappropriate.  What

13   I want to know is how many cases would happen in a

14   hundred patient-years -- a rate of .8 per hundred

15   patient-years if that occurred in the imatinib arm

16   of the ENESTnd trial, hypothetically.

17             MR. ELIAS:  Objection.

18        A.  I don't know that.  I don't know.  And I

19   won't calculate it.  If you want to and you can put

20   that number --

21        Q.  I'll cross you with it at trial.

22             You agree with me that .8 per 100

23   patient-years is higher than .1 per 100

24   patient-years, correct?

25        A.  Yes.

1      Q.   So, in fact, this paper shows that

2    imatinib patients have a lower rate of PAOD than

3    non-TKI-treated patients, right?

4      A.   No.   This paper shows that nilotinib has a

5    higher rate of --

6      Q.   That's not the question I asked you.

7      A.   -- PAOD compared to, you know, both

8    non-TKI populations that, you know -- and imatinib.

9         MR. JOHNSTON:  Move to strike as

10   nonresponsive.

11     Q.   That's not the question I asked you.

12        MR. ELIAS:  Denied.

13        MR. JOHNSTON:  You're not the judge, thank

14   God.

15     Q.   .1 per 100 patient-years is for imatinib,

16   right?

17     A.   Yes.

18     Q.   .8 per 100 patient-years is no TKIs,

19   right?

20     A.   Yes.

21     Q.   So the rate of PAOD in patients treated

22   with imatinib is lower than the rate in patients

23   who haven't received any TKI treatment, right?

24     A.   How do I know it's lower?  I mean, if you

25   look at the confidence interval, it's 0 to 0.3

1    for -- where is imatinib?  0 to 0.1.  And here it's

2    0 to 1.8.  So how do I know it's lower?  The

3    confidence intervals are overlapping there.

4         Q.  Well, the numbers are lower, right?

5         A.  Yeah.  The number itself is lower.

6         Q.  So this is supportive of the idea that

7    imatinib might be cardioprotective, isn't it?

8         A.  I don't think this is supportive of the

9    idea.  I mean, you know, that's an

10   interpretation -- your interpretation of the data.

11   I didn't interpret it that way.

12        Q.  And the number -- confidence interval for

13   nilotinib is also 0 to 0.1, correct?

14        A.  Yes.

15        Q.  So it's not statistically significant

16   either.

17        A.  Yes.

18        Q.  So you can't draw any conclusions about

19   nilotinib from this study either, can you?

20        A.  I can only draw conclusion about the point

21   estimate, that it's higher.

22        Q.  But it's within the overlap of statistical

23   significance.

24             So your same reason why you can't say that

25   imatinib is cardioprotective applies to you being

1    unable to say that this study proves that nilotinib

2    causes PAOD, correct?

3              MR. ELIAS:  Objection, compound.

4         Q.  You can't have it both ways.

5         A.  I can't.  And I'm saying the, you know,

6    confidence intervals for nilotinib are as well as,

7    you know,

8    0 to 0 -- are -- and I'm sure -- how are they

9    overlapping?  They are .8 to 1.8, so how is that?

10   I mean, the confidence intervals for imatinib are

11   0 to 0.1, so they are not overlapping.

12             So I'm looking at a rate of 1.3 per

13   hundred patient-years.  The confidence interval is

14   .8 to 1.8 for nilotinib.  I'm looking at a rate of

15   .1 per hundred patient-years.  95 percent

16   confidence interval is 0 to 0.1.  So I can say that

17   it has a higher rate because they don't cross.  So

18   I'm not having it both ways.

19        Q.  The nilotinib rate crosses the imatinib

20   rate.

21        A.  How does it?  Nilotinib is point --

22        Q.  Because one ends at .1 and one is .1,

23   that's the same number.

24        A.  No.  The nilotinib range is at .8 to 1.8.

25   What number are you looking at?

Page 296

1          Q.   Nilotinib is at 0 to 0.1.

2               MR. ELIAS:  No.

3          Q.   On page 1304, for nilotinib -- oh, I see

4     what you're saying.

5               MR. ELIAS:  You're reading it wrong.

6          A.   I'm going to read this line.

7          Q.   That's --

8          A.   No, no.  I'm going to read it.

9          Q.   I'm going to withdraw the question.

10         A.   I'm going to read it.

11         Q.   There you go, I'm withdrawing the

12    question.

13              MR. ELIAS:  Go ahead and read it.

14         A.   The rate of POD was 1.3 per hundred

15    patient-years, 95 percent confidence interval, .8

16    to 1.8 for nilotinib, and .1 per hundred

17    patient-years, 95 percent confidence interval, 0 to

18    0.1 for imatinib, which is non-overlapping.

19         Q.   So it's your testimony that this paper

20    provides no evidence that imatinib could be

21    cardioprotective, correct?

22         A.   Yeah.  I mean, this paper doesn't provide

23    no -- I mean, nothing provides no evidence, but

24    this paper doesn't provide evidence that it is

25    cardioprotective.

1      Q.   If we had 283 patients and a rate of -- a

2   background rate of .8 per 100 patient-years -- hold

3   on a second -- shouldn't we have more than two

4   events per year in the bisphosphonate -- in the TKI

5   naive population?

6      A.   You know, the question --

7      Q.   If you assume that, if you make those

8   assumptions.

9      A.   What assumptions?  Let's talk about them.

10     Q.   .8 per 100 patient-years and a population

11   of 283 patients over five years.

12     A.   So which population are we talking about?

13   Are we talking about the .8 population, 29 studies?

14     Q.   I'm assuming they're equivalent.

15     A.   How are you assuming they're equivalent?

16     Q.   Because I just fiated it to be so.

17     A.   Well, that's your assumption.

18     Q.   You're right, it is my assumption.  I want

19   you to answer my question based on my assumption.

20          If there's .8 events per 100 patient-years

21   in a population of 283 people exposed for five

22   years, how many PAOD events would there be?

23     A.   You did the estimation and that's what it

24   is.

25     Q.   You do it for me.

Page 298

1          You agree that it's a little over two a

2    year?

3          A.   That's your calculation.

4          Q.   Do you agree with me that the calculation

5    results in a little over two a year, or would you

6    like to do the calculation yourself?

7          A.   I like to do calculations always myself.

8               I'm sorry.  What was the population

9    number?

10         Q.   285 -- I'm taking it from your report, so

11   let's look at your report.  N equals 283.

12         A.   Okay.  And you multiplied by?

13         Q.   That's over five years.

14         A.   Into five, that's what you did?  I'm just

15   trying to reproduce.

16         Q.   I want you to just do it.

17              MR. ELIAS:  Just tell him what calculation

18   you want him to do.  He's going to type it into the

19   calculator.

20              MR. JOHNSTON:  I want him to tell me what

21   the incidence rate of .8 per 100 patient-years is

22   in a population of 283 over five years.

23              MR. ELIAS:  Objection.

24         A.   I'm not going to do that right here

25   because for that calculation, I'd have to take the

1    population, I would have take patient over time,

2    I'd have to compare that.

3         Q.   Do it.

4         A.   I'm not going to do it.

5         Q.   You're refusing to do it?

6         A.   No.  I --

7         Q.   You're refusing to do it.

8         A.   I'm not refusing to do it here, but I'm

9    just saying that that's not the appropriate way to

10   do it.

11        Q.   I don't care whether it's appropriate.  I

12   want you to do it.

13        A.   Do what?

14        Q.   Find out what the rate of .8 per 100

15   patient-years is in a population of 283 over five

16   years.

17        A.   That's an inappropriate estimation and --

18        Q.   So you're refusing to do it?

19        A.   It's not that I'm refusing to do it.  I'm

20   saying what are the methods that you're using.  I

21   would do it, I would get different numbers.  So I

22   mean --

23        Q.   So do it and give me your numbers.

24        A.   I'm not going to do it right off here.

25   You're asking me to do a statistical analysis in

1    the middle of a deposition.

2         Q.  Yes, I am.

3         A.  No, I --

4         Q.  That's entirely appropriate.  And, in

5    fact, are you refusing do it?

6         A.  I'm not refusing to do it.  I'm just

7    saying --

8         Q.  Or are you not capable of doing it?

9         A.  Well --

10             MR. ELIAS:  Argumentative.

11        A.  -- you can make that assumption.

12        Q.  No.  I'm just asking what the answer is.

13        A.  No.

14        Q.  Are you refusing or are you not able?

15        A.  I think it's inappropriate; that's my

16   answer.

17        Q.  So you're refusing?

18        A.  That's your estimation.

19        Q.  Okay.  Thank you.  You refuse to do it.

20             MR. JOHNSTON:  Thank you.  I have no

21   further questions at this time.

22             THE WITNESS:  Thank you.

23             MR. JOHNSTON:  Mark for the record that

24   the witness refused to answer the final question.

25             MR. ELIAS:  I think that misstates the

Page 301

1    record.  The record speaks for itself.

2            MR. JOHNSTON:  Anything else?

3            MR. ELIAS:  No.

4            MR. JOHNSTON:  We're done.  Thank you.

5            THE VIDEOGRAPHER:  We are going off the

6    record at 5:22.

7            (Whereupon, this deposition was concluded

8        at 5:22 p.m.)

9

10                    _____

11                    SONAL SINGH, M.D.

12        Subscribed and sworn to before me

13    this _____ day of _____, 2017.

14                    _____

15

16

17

18

19

20

21

22

23

24

25

Page 302

```
 1                        CERTIFICATE

 2    Commonwealth of Massachusetts

 3    Suffolk, ss.

 4

 5          I, Dana Welch, Registered Professional

 6    Reporter, Certified Realtime Reporter and Notary

 7    Public in and for the Commonwealth of

 8    Massachusetts, do hereby certify that SONAL SINGH,

 9    M.D., the witness whose deposition is hereinbefore

10    set forth, was duly sworn by me and that such

11    deposition is a true record of the testimony given

12    by the witness.

13          I further certify that I am neither related

14    to nor employed by any of the parties in or counsel

15    to this action, nor am I financially interested in

16    the outcome of this action.

17          In witness whereof, I have hereunto set my

18    hand and seal this 1st day of August, 2017.

19
                      Dana Welch
20          _____
                      Dana Welch
21                    Notary Public
                      My commission expires:
22                    October 6, 2017

23

24

25
```

```
 1                       I N D E X

 2   WITNESS:

 3     SONAL SINGH, M.D.

 4

 5   EXAMINATION:                              PAGE:

 6     BY MR. JOHNSTON                            5

 7     BY MR. ELIAS                             277

 8     BY MR. JOHNSTON                          289

 9   EXHIBITS MARKED:

10    NO.   DESCRIPTION                       PAGE:

11     Exhibit 296, Subpoena to Testify at a     4

12     Deposition in a Civil Action

13     Exhibit 297, Expert Report of Sonal Singh,  5

14     MD, MPH

15     Exhibit 298, Supplemental Expert Report of  6

16     Sonal Singh, M.D., MPH

17     Exhibit 299, Efficacy and safety of statin  63

18     treatment for cardiovascular disease:  A

19     network meta-analysis of 170,255 patients

20     from 76 randomized trials

21     Exhibit 300, Cardiovascular Risks of       68

22     Exogenous Testosterone Use Among Men:  A

23     Systematic Review and Meta-Analysis,

24     Alexander

25     --- index continues ---
```

Page 304

1    INDEX (CONT'D)

2    EXHIBITS MARKED:

3    NO.              DESCRIPTION              PAGE

4    Exhibit 301, Value in Health 19 (2016)    83

5    A1-A318 article

6    Exhibit 302, Long-term Risk of            90

7    Cardiovascular Events with Rosiglitazone

8    Exhibit 303, 6.2.4 Summary points document  103

9    Exhibit 304, 7.2.4 Implementation of the  108

10   selection process document

11   Exhibit 305, 8.1 Introduction             117

12   Exhibit 306, 8.2.1 Bias and risk of bias  119

13   document

14   Exhibit 307, 14.6.1 Clinical trials       124

15   document

16   Exhibit 308, Methods for Benefit and Harm 131

17   Assessment in Systematic Reviews

18   Exhibit 309, Drug safety assessment in    138

19   clinical trials:  Methodological

20   challenges and opportunities, Sonal Sigh

21   and Yoon K. Loke paper

22   Exhibit 310, TPROD01556256 - 1556280      158

23

24

25   --- index continues ---

1    INDEX (CONT'D)

2    EXHIBITS MARKED:

3    NO.              DESCRIPTION              PAGE

4    Exhibit 311, Epidemiology of peripheral    181

5    arterial disease and critical limb

6    ischemia in an insured national

7    population, Nehler paper

8    Exhibit 312, AHA Statistical Update:    188

9    Heart Disease and Stroke Statistics - 2017

10   Update

11   Exhibit 313, Long-term benefits and risks    192

12   of frontline nilotinib vs imatinib for

13   chronic myeloid leukemia in chronic phase:

14   5-year update of the randomized ENESTnd

15   trial

16   Exhibit 314, Progressive peripheral    198

17   arterial occlusive disease and other

18   vascular events during nilotinib therapy

19   in CML

20   Exhibit 315, Imatinib Mesylate May Improve    202

21   Fasting Blood Glucose in Diabetic Ph+

22   Chronic Myelogenous Leukemia Patients

23   Responsive to Treatment

24   --- index continues ---

25

Page 306

1     INDEX (CONT'D)

2     EXHIBITS MARKED:

3     NO.                    DESCRIPTION                      PAGE

4     Exhibit 316, Rates of peripheral arterial    208

5     occlusive disease in patients with chronic

6     myeloid leukemia in the chronic phase

7     treated with imatinib, nilotinib, or

8     non-tyrosine kinase therapy:   A

9     retrospective cohort analysis, Giles paper

10    Exhibit 317, Major arterial events in        277

11    patients with chronic myeloid leukemia

12    treated with tyrosine kinase inhibitors:

13    A meta-analysis, Chai-Adisaksopha paper

14    Exhibit 318, Cardiovascular events in        282

15    patients with chronic myelogenous leukemia

16    treated with tyrosine kinase inhibitors:

17    A systematic review and meta-analysis

18    (retained by counsel)

19    Exhibit 319, Major arterial events in        289

20    patients with chronic myeloid leukemia

21    treated with tyrosine kinase inhibitors:

22    A meta-analysis, Chai-Adisaksopha paper

23   NOTATIONS:

24    Transcript marked by counsel                 300

25   Exhibits retained by reporter.

```
 1      NAME OF CASE:

 2      DATE OF DEPOSITION:

 3      NAME OF WITNESS:

 4      Reason Codes:

 5           1.  To clarify the record.

 6           2.  To conform to the facts.

 7           3.  To correct transcription errors.

 8      Page _____ Line _____ Reason _____

 9      From _____ to _____

10      Page _____ Line _____ Reason _____

11      From _____ to _____

12      Page _____ Line _____ Reason _____

13      From _____ to _____

14      Page _____ Line _____ Reason _____

15      From _____ to _____

16      Page _____ Line _____ Reason _____

17      From _____ to _____

18      Page _____ Line _____ Reason _____

19      From _____ to _____

20      Page _____ Line _____ Reason _____

21      From _____ to _____

22      Page _____ Line _____ Reason _____

23      From _____ to _____

24

25                        _____
```