# Exhibit 3

```
 1          IN THE UNITED STATES DISTRICT COURT

 2        FOR THE EASTERN DISTRICT OF CALIFORNIA

 3   -----------------------------X

 4   KRISTI LAURIS, et al,

 5                      Plaintiff,

 6

 7           vs.     No. 1:16-cv-00393-LJO-SAB

 8   NOVARTIS AG, et al,

 9                      Defendants.

10   -----------------------------X

11

12           DEPOSITION OF MARK WEISS, M.D.

13               New York, New York

14                July 14, 2017

15

16

17

18

19

20

21

22

23

24   Reported by: MARY F. BOWMAN, RPR, CRR

25   Job No: 127196
```

1

2

3

4                         July 14, 2017

5                         10:10 a.m.

6

7

8           Deposition of MARK WEISS, held at

9     the offices of Regus, One International

10    Plaza, Philadelphia, Pennsylvania, Newark,

11    New Jersey, before Mary F. Bowman, a

12    Registered Professional Reporter, Certified

13    Realtime Reporter, and Notary Public of the

14    State of New Jersey.

15

16

17

18

19

20

21

22

23

24

25

```
 1                    APPEARANCES:

 2

 3   For Plaintiff:

 4   ELIAS GUTZLER SPICER

 5        130 South Bemiston Avenue

 6        Clayton, MO 63105

 7   BY:  RICHARD ELIAS, ESQ.

 8

 9

10

11   For Defendants:

12   HOLLINGSWORTH

13        1350 I Street Northwest

14        Washington, DC 20005

15   BY:  ANDREW REISSAUS, ESQ.

16

17

18   Also Present:

19        Gerard Alfe, Videographer

20

21

22

23

24

25
```

1              THE VIDEOGRAPHER:  This

2         deposition is now beginning.  The date,

3         July 14, 2017.  The time 10:02.

4              This is the deposition of Mark

5         Weiss M.D. taken in the matter of

6         Kristi Lauris, et al., versus Novartis

7         AG, et al., in the United States

8         District Court for the Eastern District

9         of California, number 16 -- excuse me,

10        number 1-16-CV-00393-LJO-SAB.

11             Counsel will now introduce

12        themselves.

13             (Whereupon, Counsel placed their

14        appearances on the audio record.)

15   MARK WEISS, M.D.,

16        called as a witness by the defendants,

17        having been duly sworn, testified as

18        follows:

19   EXAMINATION BY

20   MR. REISSAUS:

21        Q.    Doctor, I'm going to hand how

22    what we will mark as Exhibit 269 which is a

23    notice of deposition for today.

24             (Exhibit 269, Notice of

25        Deposition and Subpoena marked for

1          identification, as of this date.)

2          Q.    Have you seen this document

3     before?

4          A.    Yes, I have.

5          Q.    You see number 1 there on the

6     first page?

7          A.    Yes.

8          Q.    And that's a document request.

9     Did you bring any materials with you today

10    in response to that?

11         A.    Yes, I brought a paper copy of my

12    expert report and also a paper copy of the

13    supplemental expert report that I made.

14         Q.    I would like to mark those as

15    Exhibits 270 and 271.  If that's all right.

16              (Exhibit 270, Expert Report of

17         Mark Weiss, M.D. marked for

18         identification, as of this date.)

19              (Exhibit 271, Supplemental Expert

20         Report of Mark Weiss, M.D. marked for

21         identification, as of this date.)

22         Q.    You do not have any other

23    documents that you didn't bring today that

24    would be responsive to that request?

25         A.    No.  The only thing that I have

1    is reports that turned into this.

2         Q.    Do you mean draft reports?

3         A.    Draft reports, yes, I'm sorry.  I

4    could have said that clearer.

5         Q.    When were you retained by

6    plaintiffs as an expert for this case?

7         A.    I want to say maybe February or

8    March of this year.  To be fair, my memory

9    is not precise on that.

10        Q.    How many -- plaintiff's Counsel,

11   I assume, reached out to you somehow and

12   asked you to participate in the case.  Is

13   that how you came to be --

14        A.    Yes, we had a phone conversation/

15   interview, I guess, and we came to a mutual

16   understanding and they offered me an expert

17   position and I accepted it.

18        Q.    Is it correct that your rate for

19   your work in this case is 650 dollars an

20   hour?

21        A.    It's my -- 650 dollars an hour

22   for my standard review.  I do charge

23   slightly more for depositions and for

24   in-court testimony.

25        Q.    How much do you charge for

1    depositions and in-court testimony?

2        A.    So depositions are 800 dollars an

3    hour, and in court testimony, I believe I

4    charge a flat fee of 5,000 dollars per day

5    for any amount of time spent in court.

6        Q.    Since you were retained earlier

7    this year by plaintiffs, how many hours

8    have you worked on this case?

9        A.    This is just a rough estimate,

10   but I would estimate it to be about 100

11   hours at this point.

12       Q.    Have you billed for those 100

13   hours?

14       A.    Yes, it's my practice to bill on

15   the first of every month for the preceding

16   month.  So the last invoice I would have

17   sent would have been on and around July 1.

18       Q.    And so as of July 1, you have

19   billed for approximately 100 hours of work

20   on this case?

21       A.    Yeah, maybe a touch less because

22   I've, in the last -- yesterday, I've done

23   some work and I'm doing some work today.

24   So it may --

25       Q.    Your estimate includes today --

1      A.    I -- again, it's just a coarse

2    estimate, yeah.  I would say probably

3    between 90 and 110 would bracket it, but I

4    haven't counted them.

5      Q.    Have you worked as an expert

6    before?

7      A.    Yes, I have.

8      Q.    How many cases approximately?

9      A.    I currently estimate the number

10   of cases to be between 30 and 35.  But for

11   many years, I didn't keep accurate records

12   because my job as an academic and treating

13   physician was my main profession and I

14   would do this primarily as, you know, a

15   side light, side line.

16     Q.    Of those 30 to 35 cases that you

17   would estimate that you have been an expert

18   in, how many of those have been in the last

19   say five years?

20     A.    Probably five to eight, maybe as

21   many as ten.  I'm -- again, not completely

22   sure.

23     Q.    What -- in your work as an

24   expert, what has your role been?  What

25   opinions have you been providing in cases?

1          MR. ELIAS:  I'll object to the

2     extent it's over-broad, but go ahead.

3     A.    I've done, I've worked in a

4   number of medical malpractice cases.  I've

5   also worked in several causation of

6   leukemia cases.  And in one case, I

7   actually was the judge's expert in what I

8   believe was called a Daubert hearing in

9   which I helped her adjudicate the quality

10  of testimony from the plaintiff and the

11  defense experts.

12     Q.    In that case where you served as

13  the judge's appointed expert to assist in

14  the Daubert hearing, you did not provide a

15  substantive opinion one way or the other

16  about whether causation had been

17  established in that case, is that correct?

18          MR. ELIAS:  Object to form.

19     Q.    You can answer.

20          MR. ELIAS:  Misstates.  I'm --

21     assumes facts.  Sorry.

22     A.    I did not express an opinion on

23  causation in that case, my role was to

24  assist the judge in assessing the quality

25  of the content of the other two experts.

Page 10

1      Q.    Did you issue a written report in

2   that case?

3      A.    No, I did not.

4      Q.    What percentage of the cases in

5   which you have served as an expert were

6   medical malpractice cases?

7            MR. ELIAS:  To the extent you

8      can --

9      A.    I would estimate it to be perhaps

10   two-thirds of the cases.

11     Q.    Have you represented plaintiffs

12   in those medical malpractice cases?

13     A.    Sometimes.  I -- I think I'm

14   pretty much an equal opportunity person.  I

15   listen to an outline of the case, and if I

16   think it falls within my expertise, I agree

17   to assist, you know, if I have time and

18   other factors.  And I view my job as giving

19   the people who hired me my best opinion,

20   whether it's favorable for them or not.

21     Q.    In the 30 to 35 cases that you

22   have been retained as an expert where you

23   have provided opinions, out of those that

24   are malpractice cases, the two-thirds of

25   those, in how many of those cases did you

1    serve as an expert for plaintiffs?

2         A.    I really don't know.  Again, my

3    crude estimate of this is it's about 50/50.

4         Q.    I noticed in your report you said

5    that you now serve as a part-time

6    consultant.  Am I stating that correctly?

7         A.    I'm -- yes.  I retired from

8    academic medicine right around a year ago

9    now.  And you know, to keep myself busy,

10   I've always had, as you have heard, a small

11   consulting business, some of it being

12   expert witness testimony, but I also did

13   some other things, and I've retained that

14   business and perhaps I, in the expert

15   testimony thing, I'm now a little bit more

16   active because I have more time to do it.

17              But I'm really semi-retired, I

18   view myself that way.

19        Q.    Is it correct to say that you

20   retired in the summer of 2016?

21        A.    That's correct.

22        Q.    Were you treating patients up

23   until that time?

24        A.    Yes, I was.

25        Q.    Since -- in the last year, you

1    have not been treating patients, correct?

2         A.    That's more or less correct.  I

3    have many long-standing patients, patients

4    who I have taken care of since I was at

5    Memorial Sloan Kettering, some people, 15,

6    20 years, and they still contact me and I

7    give them sort of broad medical advice if

8    they need it.  These are people who I know

9    very well.

10             In fact, one of my patients

11   texted me last night.  But I don't have a

12   formal practice.  I'm sorry.

13        Q.    You're not -- you don't have

14   patients coming to see you in doctor as

15   office?

16        A.    No.

17        Q.    Instead, you have people who you

18   have forged a relationship with over the

19   years who you stay in contact with and if

20   something comes up related to their cancer

21   that they want to pick your brain about,

22   you will lend them a hand?  Is that --

23             MR. ELIAS:  Misstates.

24        A.    I don't have a formal practice,

25   so patients do not have formal appointments

Page 13

1    to come see me in a medical practice

2    setting.

3          Q.    Are they paying you through

4    your -- paying you through your consulting

5    business for this?

6          A.    I usually do not charge people

7    for this kind of advice.

8          Q.    In the last five years, in the

9    five to eight or maybe ten cases that you

10   have served as an expert in, what was the

11   breakdown of those cases in terms of type

12   of case?

13         A.    I think most of those cases were

14   malpractice cases.  There were one or two

15   cases related more to product liability

16   issues and actually most of those are still

17   ongoing.

18         Q.    Have you been deposed in any of

19   those matters?

20         A.    No.  The last deposition I gave

21   as an expert was almost four years ago now.

22         Q.    Was that the case in Hawaii state

23   court that's in your report?

24         A.    Um-hm, yes.

25         Q.    What are the product liability

Page 14

1    matters in which you're serving as an

2    expert?

3              MR. JOHNSTON:  Do you understand

4         the question?

5         A.    Maybe you could be more explicit.

6         Q.    Um-hm.  Can you describe the

7    basic facts of the one to two product

8    liability cases in which you're serving as

9    an expert?

10        A.    One case that I remember quite

11   clearly is a patient who was treated on an

12   investigational drug who died of

13   complications from the therapy.

14        Q.    What medication was it?

15        A.    I don't think I can tell you

16   that.

17             MR. ELIAS:  Is this ongoing?

18             THE WITNESS:  Yes.

19             MR. ELIAS:  Have you been

20        disclosed as an expert yet?

21             THE WITNESS:  I believe so.

22             MR. ELIAS:  Have you ever written

23        a report in that case yet?

24             THE WITNESS:  No, I have not.

25             MR. ELIAS:  Do you know one way

1      or the other whether you have been

2      disclosed as an expert yet?

3            The reason that I say this -- and

4      don't speculate if you -- is that if

5      you're working with lawyers on another

6      case and until you're actually

7      disclosed as a testifying expert, there

8      is a privilege that attaches to your

9      communications and even your identity

10     with respect to the case.

11           I don't want you to divulge that

12     and a protective order can't even

13     remedy that.

14           So I don't -- you know, I think

15     you can talk about the generalities as

16     you are now about what the case is, but

17     nothing specific to the drug or to the

18     plaintiffs or to the causes of action,

19     et cetera.

20           So that's what I am going to say

21     just because I'm -- I feel like he

22     might be getting into a work product

23     area.

24     Q.   Have you issued a report in the

25   case we were just discussing involving an

Page 16

1    investigational drug?

2         A.    No, I haven't.

3         Q.    Is it your understanding you have

4    been disclosed as an expert in that case,

5    however?

6         A.    I guess I'm not a hundred percent

7    sure.

8         Q.    You think you might have been but

9    you're not sure?

10              MR. ELIAS:  Well --

11        A.    Correct.  Well, the case is at a

12   much, much earlier stage than this.  I

13   don't believe any depositions have been

14   taken yet.  I haven't written a report.  I

15   haven't had all of the records sent to me

16   even.

17        Q.    Have you been retained by

18   plaintiffs or defendants in that case?

19        A.    In that case, I have been

20   retained by the defendants.

21        Q.    What other product liability

22   matters have you served as an expert in?

23              MR. ELIAS:  And just so we're

24        clear, because we have a nonlawyer --

25        Q.    When I say matters --

1          MR. ELIAS:  -- can we define

2     product liability and also can we

3     define, are you talking ever?  Or are

4     you talking the last five years?

5     Because before, you were talking about

6     the last five years.

7     Q.    Doctor, you used the term product

8  liability earlier.  Does that have a

9  meaning to you?

10     A.    It does, but I think I was also

11  lumping in with that issues of causation of

12  leukemia.

13     Q.    And when you say causation of

14  leukemia issues, what do you mean by that?

15     A.    Over the last 25 years or so, on

16  several occasions, I've been asked to opine

17  on whether or not a specific exposure to a

18  medicine, to an industrial chemical, to

19  household appliances, whether or not they

20  have been the cause of a patient developing

21  leukemia.

22     Q.    In those cases, the defendant was

23  not a doctor, it was someone responsible

24  for whatever chemical or product the

25  patient had been exposed to?

Page 18

1      A.    Yes.

2      Q.    So those were cases where there

3  were claims that the manufacturer of the

4  product should be liable because their

5  product caused cancer?

6      A.    Yes, though more typically, I

7  want to say that the employer or the person

8  responsible for the environment in which it

9  occurred was the defendant.

10          MR. ELIAS:  Premise.

11     Q.    So your -- this includes also

12  where the defendant was the person in

13  charge of the place where the plaintiff was

14  exposed to whatever was involved?

15     A.    Yes.

16     Q.    All right.  So taking product

17  liability as you have just described it

18  broadly, including the causes of leukemia

19  cases, in the past five years, have there

20  been additional cases in which you have

21  served as an expert?

22     A.    The only one I remember is the

23  one I've already mentioned.

24     Q.    OK, broadening, looking further

25  back beyond just the last five years, what

1    other broadly-defined product liability

2    type cancer or cause of cancer does he --

3              MR. ELIAS:  Just for clarity, I

4         just think it would be helpful, rather

5         than product -- can we say toxic

6         exposure?  Isn't that a more accurate

7         term.

8         Q.    In your view, would toxic

9    exposure capture the nonmedical malpractice

10   cases in which you have opined on a --

11        A.    I think that's a good way to

12   characterize it.

13        Q.    So looking -- taking away the

14   restriction of the last five years, how

15   many toxic exposure cases have you served

16   as an expert on?

17        A.    I want to say perhaps five,

18   something like that.

19        Q.    That includes the one that we

20   just discussed where you haven't been --

21   haven't issued a report yet, correct?

22        A.    Correct.

23        Q.    Does that include the case in

24   which you served as an expert at the

25   court's appointment?

Page 20

1        A.    Yes.

2        Q.    So you think there may be three

3    other toxic exposure cases?

4        A.    I can distinctly remember two

5    others and I suspect there is one or two

6    that I just can't.

7        Q.    Can you tell me about the two

8    that you remember, please?

9        A.    So one was a man who worked in a

10   printing shop developed leukemia and I was

11   retained by his Counsel to opine on whether

12   or not exposure to various solvents could

13   have caused his leukemia.

14            And the second case that I

15   remember clearly was a psychiatrist in

16   Manhattan developed leukemia and ultimately

17   succumbed to it and his estate was

18   including the owner of the building that

19   his office was in, claiming that the air

20   conditioner caused his leukemia.

21       Q.    Who did you -- who retained you

22   in that case?

23       A.    The defendants retained me in the

24   second case.

25       Q.    Do you recall the name of that

Page 21

1    second case?

2         A.    I don't.

3         Q.    Do you recall who you worked with

4    on that case?

5         A.    I don't.

6         Q.    Was this case in federal or state

7    court?

8         A.    I'm sorry, I don't remember that.

9    I -- I wrote an affidavit for that case and

10   the matter was dismissed.

11             MR. ELIAS:  This is the air

12        conditioning exposure case?

13             THE WITNESS:  Yes.

14        Q.    When approximately was your work

15   in this air conditioner case?

16        A.    I want to say it's probably 20

17   years ago.

18        Q.    Turning to the first case with

19   the printing shop, do you recall the name

20   of that case or any of the parties

21   involved?

22        A.    No, I don't.

23        Q.    Do you recall any of the lawyers

24   you worked with on that case?

25        A.    No names, no.

Page 22

1      Q.    Do you recall the -- any law

2   firms that were involved?

3      A.    No.  My only memory is a hazy

4   memory of actually speaking to the lawyer

5   who retained me about my opinions.

6      Q.    Did you issue a report in that

7   case?

8      A.    Just the phone conversation.

9      Q.    Do you know if you were disclosed

10   as an expert in that case?

11      A.    I do not know.

12      Q.    Were you -- is it fair to say you

13   were not deposed in either of those cases?

14      A.    I was not deposed in either of

15   those two cases.

16      Q.    Have you been deposed in any case

17   related to toxic exposures?

18      A.    I don't think so.

19      Q.    Have you testified in -- at trial

20   in any toxic exposure case?

21      A.    No, I have not.

22      Q.    The Hawaii case in your report,

23   it's correct you were deposed in that case

24   about four years ago?

25      A.    Yes.

1          Q.    Do you recall any of the

2     attorneys involved in that case?

3          A.    I'm blocking on the name of the

4     lead attorney.

5          Q.    Do you remember the firm?

6          A.    I think he was the founder of the

7     firm, so if I remember the firm, I'd

8     remember him, but.

9          Q.    Attached to your report is a copy

10    of your curriculum vitae.  Is that included

11    in the copy that you brought today?

12         A.    Yes, it is.

13         Q.    I wanted to ask you a little bit

14    about some of your publications and your

15    work.

16         A.    Sure.

17         Q.    It looks like you have published

18    quite a bit on leukemias.  That's fair to

19    say, right?

20         A.    Yes, this was my focus while I

21    was at Memorial Sloan Kettering.

22         Q.    You were at Memorial -- well,

23    when were you at Memorial Sloan Kettering?

24         A.    I did my fellowship there which

25    is specialty training in medical oncology

Page 24

1    and hematology from 1987 through 1990.

2    When I finished that, I was hired on to the

3    faculty in 1990 and I stayed there until

4    late 2009.

5        Q.    Is it correct that you came to

6    know Dr. Francis Giles during that time?

7        A.    Yes.

8        Q.    Can you explain how you came to

9    know him?

10       A.    I believe I first met Giles while

11   he was working at a hospital in Los

12   Angeles, maybe Cedars Sinai.  I don't

13   remember specifically.

14           But soon thereafter, he moved to

15   MD Anderson where I had a lot of very close

16   contacts with members of their leukemia

17   department.  You know, we traveled a lot in

18   the same circles, so I met him a lot of

19   times and he certainly was friends with

20   people who I was friends and colleagues

21   with, yes.

22       Q.    And the field you're talking

23   about is leukemia treatment and research?

24       A.    Yes.

25       Q.    Do you hold -- would you agree

Page 25

1    that he is a well-regarded

2    hematologist/oncologist?

3        A.    Yes.

4        Q.    Within hematology and oncology,

5    is it fair to say that you have a specialty

6    in lymphoid leukemias?

7            MR. ELIAS:  I will object to the

8        form.

9            Go ahead.

10       A.    So when I was at Sloan Kettering

11   working on the leukemia service, I was

12   responsible to care for the entire spectrum

13   of leukemias.  Much of my own personal

14   research, but not my research overall, but

15   my personal research was in lymphoid

16   leukemias.  Not exclusively, but as part of

17   the group.

18           We did a great deal of research

19   in myeloid leukemia as well as my patient

20   care was probably 50/50.  I mean, I was --

21   we ran a general leukemia service, and

22   within it, each of us would run certain

23   protocols in care for the research results.

24   But we cared commonly for all the patients.

25       Q.    So that your clinical treatment

Page 26

1    of cancer patients had a split between

2    myeloid and lymphoid leukemias and you said

3    that may have --

4         A.    And some other rare kinds as

5    well.  I think any leukemia service at a

6    major academic center usually has a mixture

7    of these patients.

8         Q.    When you turned to your personal

9    research that -- the things that you

10   focused on in your publications, did that

11   have a -- did you specialize in myeloid

12   leukemias specifically or were most of

13   your -- strike that.  Let me ask this a

14   third way.

15            Is it fair to say that you have

16   published pretty extensively on lymphoid

17   leukemias, ALL, CLL?

18        A.    I've certainly published on ALL

19   and CLL.  But as a collaborating physician

20   and researcher, my research included all

21   different types of leukemia, including the

22   myeloid leukemias.  Most of the research

23   while I was at Sloan Kettering on the

24   leukemia service was on myeloid leukemias.

25        Q.    Would that research have led to

Page 27

1    publications in which you would have been

2    an author?

3        A.    Some of them did.  And some of

4    them I just collaborated but was not a

5    listed author on the paper.

6        Q.    Looking at your CV, within your

7    peer-reviewed publications, can you

8    identify any that would be specific to

9    chronic myeloid leukemia?

10       A.    So number 6 is a myeloid leukemia

11   paper that I wrote.

12       Q.    That, just for the record, that

13   is titled, "Two Cases of Extra Medullary

14   Acute Promyelocytic Leukemia, Cytogenics,

15   Molecular Biology, Phenotypic in Clinical

16   Studies," correct?

17       A.    This was actually a seminal paper

18   in this field and I was the first to

19   recognize that -- a new treatment for acute

20   promyelocytic leukemia or APL --

21            MR. ELIAS:  Can you help our

22       court reporter.

23       A.    P-R-O-M-Y-E-L-O-C-Y-C-T-I-C.

24            That, at that point in time, a

25   recently introduced treatment which, in the

1    United States, only Sloan Kettering had

2    produced a different type of recurrence

3    than was seen with prior treatments, and

4    subsequently, I was actually, for at least

5    a period of time, viewed as a world expert

6    on this aspect of acute leukemia, acute

7    myeloid leukemias.

8        Q.    This article didn't address

9    chronic myeloid leukemia; it was a

10   treatment about -- a new treatment for this

11   form of acute myeloid leukemia?

12       A.    I'm sorry, can you repeat that.

13       Q.    This article was in the -- and

14   the treatment you're discussing is not for

15   chronic myeloid leukemia, correct?

16       A.    That's correct.  This was for

17   acute promyelocytic leukemia.

18       Q.    So setting aside acute myeloid

19   leukemia, do you have publications that are

20   specifically addressing chronic myeloid

21   leukemia?

22       A.    So I do not see a specific

23   reference to chronic myeloid leukemia.

24   However, it is important to remember that

25   essentially every paper that I wrote on

Page 29

1    acute lymphoblastic leukemia includes a

2    very closely related disease which is

3    Philadelphia chromosome positive acute

4    lymphoblastic leukemia, and in that group,

5    I also treated patients with another

6    related condition of lymphoid blast crisis

7    of chronic myelogenous leukemia.

8            So there are things that are

9    associated with CML that I have studied and

10   researched, specifically am a named author

11   on.

12           But also, you have to remember

13   that I worked in a milieu where we did

14   research on all the types of leukemia,

15   including chronic myeloid leukemia, and I

16   was involved in discussions both of patient

17   care and protocol design and state of the

18   art treatment.

19       Q.    But it is correct that you don't

20   have any publications listed in your CV

21   that are specific to chronic myeloid

22   leukemia?

23           MR. ELIAS:  Asked and answered.

24       Q.    You can answer.

25       A.    It's not mentioned in the title,

1   but in these papers, there are some

2   patients who have lymphoid blast crisis of

3   chronic myelogenous leukemia.  So there is

4   some published research with my name on it

5   that does deal with CML.

6       Q.    So what do you, what do you

7   call -- when you say lymphoid blast crisis

8   of chronic myelogenous leukemia, what term

9   would allow me to look at the list of your

10  55 publications to know which ones include

11  those patients?

12          MR. ELIAS:  I object to the form.

13      I don't understand the question.

14      Q.    Doctor, you can answer.

15          MR. ELIAS:  Vague, compound.

16      A.    Every paper that speaks about

17  acute lymphoblastic leukemia may have

18  included patients with lymphoid blast

19  crisis of CML because I was responsible for

20  treating those patients and researching

21  those patients specifically.  So for a

22  subset of CML patients, they were part of

23  my primary personal portfolio.

24          But you have to remember,

25  research is, in large part, also a group

1    effort.  I think you can tell by how many

2    authors end up on these publications that

3    it's a group effort, and I was a member of

4    the leukemia group for -- I was on the

5    faculty for 19 plus years.

6         Q.    Do any of your publications deal

7    with the treatment of patients with chronic

8    phase CML who have not gone into any sort

9    of blast crisis?

10        A.    No, I don't have any publications

11   on people who started with chronic phase --

12   though, again, patients with lymphoid blast

13   crisis of CML, when they go into

14   remission -- which thankfully many of them

15   did -- they would then be in chronic phase.

16   That's what the remission state is of the

17   lymphoid blast crisis.

18        Q.    Your publications, however, dealt

19   with the treatment during the acute phase

20   of their disease, is that -- in the -- you

21   had mentioned that you developed the

22   revolutionary treatment for that acute

23   specific type of myeloid leukemia, correct?

24             MR. ELIAS:  That question is

25        compound.  You kind of lost your

1       thought.

2              MR. REISSAUS:  That's fair

3       enough.

4       Q.    You said earlier reference 6 was

5       about a new treatment for acute

6       promyelolytic leukemia?

7       A.    Promyelocytic.

8              So that's not Philadelphia

9       chromosome positive ALL.  This is a form of

10      myeloid leukemia which the second author on

11      that paper, Ray Laurel, was the scientist

12      who brought a specific, one of the first

13      targeted therapies to the United States

14      following studies in China and France, and

15      he and I worked together as we observed the

16      change in the natural history of this form

17      of myeloid leukemia and this was the first

18      recognition of the change in behavior

19      with -- when patients were treated with

20      this new medication.

21      Q.    You mentioned in your report that

22      you coauthored a book chapter in cancer

23      principles and practice of oncology.  Is

24      that right?

25      A.    Yes.  So this refers to DeVita's

1    textbook which is, at least back then, was

2    viewed as, you know, the reference textbook

3    for cancer and along with two of my other

4    Sloan Kettering colleagues, we wrote, for

5    three separate editions, a chapter on

6    leukemia.

7         Q.    Would this be, in your CV

8    reference 21, the editorials, reviews

9    chapters section?

10        A.    Actually, let me ask that again a

11   little more specifically -- or differently.

12             The cancer principles and

13   practice of oncology sections that you

14   authored with your -- with two of your

15   colleagues, is it correct that those are

16   items 2, 3, 11, and 21 in the editorials,

17   reviewers chapter section of your CV?

18        A.    So 2, 3, 11 and 21 are definitely

19   that chapter in various forms.  There is

20   actually I think in a sense two separate

21   chapters that we did and I haven't reviewed

22   to see if there is any other mention of it,

23   but those four, yes.

24        Q.    You said that you had written

25   chapters for three different editions of

1   the book?

2       A.   That's my memory, yes.

3       Q.   And so these references cover the

4   '96 edition, the 2001 and 2005 editions,

5   right?

6       A.   That makes sense to me, yes.

7       Q.   And the titles of those chapters

8   were "Acute Leukemias," in all three of the

9   editions, and in the first edition, there

10  was also a chapter on myelodisplastic

11  syndromes, correct?

12      A.   Yes.

13      Q.   You did not author a chapter

14  about CML for this textbook, correct?

15      A.   No.  But again, in the section on

16  acute lymphoid leukemia, we did talk about

17  the closely related disease of Philadelphia

18  chromosome positive acute lymphoid leukemia

19  which, after effective therapy, becomes

20  chronic phase CML, and I believe in the

21  2005 edition, we specifically speak about

22  the role of imatinib in the treatment of

23  this disorder.  So there is some connection

24  there.

25      Q.   Again, this textbook has its own

1    chapter about CML specifically, right?

2         A.    Yes, it does.

3         Q.    Have you published on the

4    treatment of chronic phase CML and its

5    treatment with tyrosine kinase inhibitors?

6         A.    I've worked with my colleagues on

7    manuscripts involved with this.  I don't

8    remember being a named author on any of

9    them, but we did a lot of work on certain

10   side effects of imatinib in patients with

11   chronic phase myeloid leukemia.

12        Q.    To your knowledge, you were not a

13   named author on any papers?

14        A.    I don't believe so.

15        Q.    Papers involving imatinib.  What

16   side effects of imatinib did your

17   colleagues research?

18        A.    Imatinib has an unexpected side

19   effect in that it inhibits bone turnover in

20   patients.  And our group was the first to

21   report that.

22        Q.    Can you explain what you mean by

23   inhibiting bone turnover?

24        A.    Again, orthopedics is not my

25   specialty.  I do not claim to have

Page 36

1    expertise in this.

2            But your bones are constantly

3    remodeling based on what you do, your

4    exercises, pieces of bone are being

5    dissolved and then remade, and imatinib

6    apparently has an inhibitory effect to some

7    degree on that process.  That's my

8    understanding.

9        Q.    Did you identify patients in

10   which this led to clinical outcomes?  Or --

11   how did -- let me ask a different question.

12       A.    OK.

13       Q.    How did your group identify this

14   potential side effect?

15       A.    It was initially identified

16   through the finding of abnormal laboratory

17   tests.

18       Q.    How did -- was it -- did this

19   process take a while for your group to

20   reach any conclusions or publish anything

21   on this?

22            MR. ELIAS:  Object to form of the

23       question.  Vague.

24       A.    It was a long time ago and my

25   specific memory isn't perfect.

1          I would say almost every

2    scientific medical paper that is written,

3    particularly if it has to do with patient

4    care, undergoes a long road from inception

5    of an idea until publication of the paper,

6    and in my experience, it's typically a year

7    or more.

8        Q.    And then once you have an initial

9    publication, I assume there is follow-up

10   work that's done as well to continue to

11   look into what was identified?

12       A.    Often.

13       Q.    To your knowledge, was that --

14   was the work continued at your facility?

15            MR. ELIAS:  Are you talking about

16       bone turnover?

17       Q.    With regard to the bone turnover

18   issue?

19       A.    My memory is that it was.  But

20   again, I want to add the caveat that that

21   specific memory is a little bit hazy given

22   the time that it took.  But I believe there

23   was at least one follow-up publication as

24   well.

25       Q.    OK, have you published on

1    tyrosine kinase inhibitors and any

2    association with atherosclerosis?

3         A.    No, I have not published on it.

4         Q.    Have you published on nilotinib?

5         A.    I don't remember publishing on

6    nilotinib.

7         Q.    When you were -- in 2009, you

8    moved to Thomas Jefferson, is that correct?

9         A.    In November of 2009, I accepted a

10   leadership position at Thomas Jefferson.

11        Q.    And what was that leadership

12   position?

13        A.    The division of hematology,

14   oncology was promoted to a department, and

15   the chair of the department was somebody

16   I'd known for 20 plus years.  I knew him

17   actually back at Sloan Kettering.  He was

18   there in the late '80s and early '90s.

19             And he told me that he wanted to

20   create a division specific for the

21   hematologic malignancies and their

22   treatment and its research, so that would

23   also include the stem cell transplantation

24   program, what we used to call bone marrow

25   transplants.

1          So I was the inaugural director

2     of that division, really helped sort of

3     create it, craft what it would do.

4          Q.    Sorry, when you say the inaugural

5     head of that division, does that mean the

6     stem cell portion of it or the transplant

7     portion or the broader hematologic

8     division?

9          A.    The broader division.

10          Q.    Did you -- during your time at

11     Thomas Jefferson, did you -- what was your

12     breakdown of your leadership

13     responsibilities versus clinical practice?

14          A.    My administrative

15     responsibilities, which did include the

16     conduct of research by my faculty members

17     in leukemias, including CML, but I was

18     really responsible for the research in

19     every type of hematologic malignancy now.

20     Those responsibilities, I usually viewed as

21     50 percent of my effort.

22          Q.    Sorry, the other 50 percent would

23     have been --

24          A.    Education, clinical care, and my

25     own personal primary research interests.

Page 40

1       Q.    It sounds pretty busy.

2       A.    It was a change for me and

3   actually a very invigorating change from

4   what I had been doing at Sloan Kettering.

5       Q.    During the time at Thomas

6   Jefferson, you said about 50 percent of

7   your time or responsibility was for

8   education, clinical care and your primary

9   personal research.  What percentage of that

10  was specific to clinical care?

11      A.    It's a frequently asked question,

12  but to tell you the truth, I think it is

13  very hard to pinpoint because most of the

14  teaching that I do is of senior trainees at

15  the bedside.

16          So there is this pretty dense

17  intertwining of clinical care with training

18  and educating, you know, interns,

19  residents, medical students, and more

20  typically even fellows in their specialty

21  training and also junior faculty.

22      Q.    Let me try to ask a little

23  differently then.  When you were at Thomas

24  Jefferson, how many cancer patients would

25  you see in a typical week, let's say?

1     A.     So I saw outpatients twice a week

2     for actually one and a half days a week

3     because one day, I only did half a day of

4     outpatient care, and then typically for

5     about two and a half, three months a year,

6     I would attend on one of the inpatient

7     services, which would be a lot more

8     intensive and a lot more voluminous.

9     Q.     This, the period we are talking

10    about right now would be 2009 until last

11    year in 2016?

12    A.     Yes.

13    Q.     If you had to estimate, what

14    would be the breakdown of the patients that

15    you treated in terms of the types of

16    cancers they had?

17         MR. ELIAS:  Throughout his entire

18         career?

19    Q.     At Thomas Jefferson.  We will

20    start there.

21    A.     So at Thomas Jefferson, because

22    of my new responsibilities, I did see a

23    somewhat broader spectrum of diseases than

24    I did at Sloan Kettering.  So there were

25    some patients who weren't specifically

1    leukemia patients.  But the vast majority

2    of patients I saw had leukemia.

3         Q.    How many CML patients did you

4    treat during that period at Thomas

5    Jefferson?

6         A.    I would estimate that at any

7    given time, I probably took care of 10 to

8    15 patients with CML.  Though I, of course,

9    would be aware of essentially every patient

10   with CML who was part of the group because

11   we presented every new patient every Friday

12   and we'd have a discussion about

13   management -- it was a long conference, to

14   be honest, but we had a conversation about

15   management and research goals and again, I

16   was responsible for all of the research.

17          So even though I may not have

18   been the front point person for it, I

19   assigned the front point person and I

20   worked with that person for all of these

21   different cancers to help craft treatment

22   maps and clinical research projects.

23        Q.    So at any given time at Thomas

24   Jefferson, you personally, under your care,

25   had 10 to 15 CML patients?

1      A.    Outpatients.  When I would round

2    in the hospital, the numbers would go up

3    because that would include a broader

4    spectrum of patients, and so yes, I came in

5    contact with a much larger number of CML

6    patients during my time there.

7      Q.    And thank you, you anticipated

8    what I was going to ask about, outpatient

9    versus in patient.

10          Can you describe the state, the

11    general state of your patients that you saw

12    in the outpatient clinic who had CML?  What

13    their -- what stage their disease would be

14    in generally?

15          MR. ELIAS:  Over-broad, but go

16      ahead.

17      A.    While I was at Thomas Jefferson,

18    imatinib had already been available on the

19    market for at least eight or nine years,

20    and soon thereafter, nilotinib and

21    dasatinib came on the market and following

22    that, bosutinib and ponatinib came on the

23    market.

24          And so essentially, all of my

25    patients were in various stages of

Page 44

1    remission of their CML because of how

2    wonderfully active these drugs are.

3        Q.    When you say wonderfully active,

4    what do you mean by that?

5        A.    So I guess everything, when you

6    describe drugs, is usually a comparison to

7    what other therapies were, and for the

8    first ten years of my career on the faculty

9    at Sloan Kettering, we didn't have this

10   class of drugs sometimes called a tyrosine

11   kinase inhibitors or TKIs, and at that

12   point, with the exception of bone marrow

13   transplant, CML was essentially a terminal

14   disease for patients with average life

15   expectancies in the three to five-year

16   range.  There were occasional long-term

17   survivors without transplant, but it was

18   quite unusual.

19           And then with the introduction of

20   the first of imatinib, we learned that you

21   know, in excess of 90, 95 percent of

22   patients were doing fine even at five years

23   after initiation of therapy.

24           So it was a very big contrast to

25   the pre-imatinib era to the post-imatinib

Page 45

1    era.  And that's not just my observation,

2    there are multiple reports that speak about

3    the improvement in survival for CML

4    patients following the introduction of

5    imatinib.

6         Q.    In your practice at Memorial

7    Sloan Kettering, right, that was where you

8    were from around 1980 up through 2009,

9    right?

10        A.    I was a fellow there from 1987 to

11   1990, and I was on the faculty from 1990 to

12   late 2009.

13        Q.    I'm sorry, I  --

14             MR. ELIAS:  He didn't mean any

15        insult to that.

16        A.    I am old, old enough without you

17   adding another seven years to it.

18        Q.    So when you first started as a

19   fellow in your advanced medical training at

20   Memorial Sloan Kettering, I assume you saw

21   patients with CML during that time?

22        A.    Absolutely.

23        Q.    And during that time, early in

24   your career, absent a bone marrow

25   transplant, those patients would have an

1    expected survival in the three to

2    five-year, potentially less --

3         A.    When I say three to five years,

4    as I think when physicians are talking

5    about life expectancy, we are talking about

6    a median survival, which means half of the

7    patients will die by that time period, and

8    half will live beyond it.

9              And my memory is that in the

10   pre TKI era and in the pre imatinib -- in

11   the pre Interferon era, the median survival

12   was on the order of three to five years for

13   most series -- and that might have actually

14   been a little longer than average because

15   most of the series come out of academic

16   medical centers.  And both for patient mix

17   reasons and for doctor skill reasons, those

18   patients probably tend to live a little bit

19   longer than patients treated in the

20   community.

21        Q.    So as a general matter in the pre

22   TKI era, before Gleevec first became

23   available, the -- your average, your median

24   survival for CML was dramatically reduced

25   compared to people who did not have CML?

Page 47

1       A.    Yes, that's true.

2       Q.    Is it correct, as a result of the

3    availability of Gleevec, survival

4    expectations for people with CML increased

5    dramatically?

6       A.    Yes, it is.  I believe I've

7    actually included something like that in my

8    report.

9       Q.    Is it true that not everybody

10   will respond to Gleevec?

11          MR. ELIAS:  Object to form.

12       Unfirm hypothetical and vague.

13       Q.    Let me ask it a little

14   differently but fair enough.

15          MR. ELIAS:  Keep answering this

16       line, but we need to take a break when

17       you get to a stopping point because I

18       have got to go to the restroom.

19          (Pause)

20       Q.    You said that many people respond

21   very, very well to Gleevec and can have

22   durable responses to it, right?

23       A.    Yes.

24       Q.    There are some people who either

25   do not respond initially to Gleevec or,

Page 48

```
1    over time, their CML becomes resistent to

2    it, is that correct?

3         A.    I think that with almost every

4    treatment, probably of every disease, it's

5    never -- never say always and never say

6    none -- there is gray.

7              And certainly though imatinib

8    improved the outcome for CML patients

9    dramatically over what we had available

10   before it, it is not 100 percent effective.

11        Q.    For those people that fall into

12   that gray area where Gleevec doesn't work

13   or doesn't work as well as it needs to,

14   it's important for them to have additional

15   options available to treat their CML, isn't

16   it?

17        A.    Yes, it is.

18        Q.    And medications like nilotinib

19   are one of those options for those people

20   who cannot have control of their CML

21   through imatinib?

22        A.    Yeah, for patients who do not

23   have adequate control of their CML who are

24   on imatinib, there are several different

25   choices as I mentioned previously.  There
```

1    are four different TKIs that are available.

2    There is varying types of bone marrow and

3    stem cell transplantation and then there is

4    occasional unusual drugs that people use

5    very infrequently but can use to control

6    the disease so there are many options.

7         Q.    In your opinion, it's important

8    to have those options available for

9    oncologists so that they can select the

10   best and appropriate option for their

11   patients?

12        A.    Correct.  I think the more

13   options you have, you will be able to, you

14   know, treat a broader range of patients.

15   Of course, as you get more options, the

16   choices can become more bewildering and

17   confusing because I guess the old

18   expression is there are different ways to

19   skin a cat.

20             MR. ELIAS:  Can we --

21             MR. REISSAUS:  I was just about

22        to say, it's a good time.

23             MR. ELIAS:  Thank you.

24             THE VIDEOGRAPHER:  We are now

25        going off the video record.  That

Page 50

1          concludes DVD number 1.  The time is

2          11:20.

3                  (Recess)

4                  THE VIDEOGRAPHER:  We are now

5          back on the video record and this

6          commences DVD number 2.  January 14 --

7          excuse me, July 14, 2017.  The time

8          11:31.

9          Q.    Doctor, during your time at Sloan

10    Memorial Kettering, you also saw, you said

11    you have seen -- he let me start over

12    again.

13                  Before you were at Thomas

14    Jefferson, you saw cancer patients at

15    Sloane Memorial Kettering, right?

16          A.    Memorial Sloan Kettering.  I know

17    what you mean.

18          Q.    Did you see more or less CML

19    patients when you were treating patients

20    there?

21                  MR. ELIAS:  More or less than

22          what?

23          Q.    Can you give me an estimate of

24    how frequently you saw and how many CML

25    patients you saw at Memorial Sloan

1    Kettering?

2        A.    Yeah, Memorial Sloan Kettering is

3    obviously one of if not the leading cancer

4    center in the United States and perhaps the

5    world, and our group was particularly

6    effective in capturing a large fraction of

7    the leukemia patients in the New York

8    metropolitan area.

9            So basically, every time I would

10   see patients, be it in outpatient clinic or

11   after making rounds on the in-patient

12   service, there would be one or more

13   patients with CML that I would see and help

14   care for.

15       Q.    That would be in the -- you're

16   just saying on a daily basis when you were

17   in clinic, you would see one or two

18   patients, whether that was in the

19   outpatient basis or you were on rounds in

20   the hospital?

21           MR. ELIAS:  Misstates.

22       A.    Really in any venue that I was

23   seeing patients, there were always -- some

24   of them had CML, some of them had other

25   leukemias.  We were a general leukemia

Page 52

1    group.

2         Q.    Did you have a group of CML

3    patients that you would have seen on an

4    ongoing basis in the outpatient setting?

5         A.    Yes.

6         Q.    Can you quantify how many people

7    you would see at a given time that were CML

8    patients in the outpatient setting?

9         A.    Can you try to make that more

10   specific, please.

11        Q.    Thomas Jefferson, you said in

12   your outpatient practice, you probably were

13   following 10 to 15 CML patients at one

14   time.  I'm just trying to get an equivalent

15   number for Memorial Sloan Kettering.

16        A.    It would be more than that.  I

17   really can't put a number on it easily.

18   And that's just the patients who I was

19   personally primarily caring for.

20             I think it is important to

21   remember that in a group practice, where

22   you have an academic medicine, most of your

23   patient exposure is patients of the group

24   or patients who you're covering for other

25   doctors.

1          Most of the patient encounters

2     that we have in the practice of leukemia is

3     in-patient encounters, and those were,

4     again, a completely disbursed

5     representation of all the different types

6     of leukemia.

7          Q.    Did you just say that in the

8     practice of leukemia, most of your patient

9     encounters are occurring in the in-patient

10    context?

11         A.    That was my experience, yes.

12         Q.    And why is that the case?

13         A.    Because as opposed to solid tumor

14    oncology, which is primarily an outpatient

15    practice, leukemia patients, on average,

16    are sicker, have more complicated

17    treatments, and are in the hospital a lot

18    more.  And in addition to that, we were,

19    as I said, we were a really busy group.

20              So when you would be taking care

21    of in-patients, I mean there were times

22    when I might see 30 to 35 patients a day.

23    And that is every day including weekends

24    and -- so numerically, it adds up to more

25    than I would have seen or any of my

Page 54

1    colleagues at Sloan Kettering would have

2    seen in their outpatient practices.

3        Q.    For those patients who, with

4    leukemia, who require in-patient care,

5    looking at that group and focusing on the

6    ones with CML, what state would their

7    disease be in for them to show up at the --

8    for in-patient care with you?

9        A.    I'm sorry, can you repeat that.

10       Q.    So you said patients with

11   leukemia tend to have to be -- receive

12   in-patient care more often than those with

13   solid tumors because they send to be sicker

14   as a result of their cancer, right?

15       A.    Yes.

16       Q.    And when someone with CML is sick

17   enough to show up as an in-patient at the

18   hospital, can you describe what their

19   disease state would be to present at the

20   hospital?

21           MR. ELIAS:   Over-broad.

22       A.    It really could be any disease

23   state.  Patients with the more aggressive

24   forms or more aggressive treatments would,

25   as a fraction, be represented in a higher

Page 55

1    proportion.  But because at any given time

2    the amount of time a patient spends in the

3    more advanced stages is brief compared to

4    the amount of time they spend in chronic

5    phase.

6              So numerically, it may well be a

7    wash.  I really never thought to calculate

8    that splitting of the pie that way.

9        Q.    Let me maybe ask a simpler

10   question then.

11       A.    OK.  I would be happy for --

12       Q.    It's not meant to be that

13   complicated.  Sorry.

14             Did you see patients whose CML

15   progressed to accelerated phase?

16       A.    Yes.  Among the patients who I

17   cared for, I saw patients, as far as I can

18   tell, with every different stage of CML.

19       Q.    And can you describe what

20   accelerated phase CML is?

21       A.    So most of these concepts and

22   terms are primarily germane and were

23   developed in the pre TKI, pre imatinib era,

24   and in those days, the disease of CML

25   typically went through three primary phases

1    before the patient died.

2              The first phase would be called

3    chronic phase, and during that phase, the

4    patients -- we could use various methods to

5    keep the disease under some kind of control

6    and patients would be relatively

7    asymptomatic, sometimes completely

8    asymptomatic.  Other times they would have

9    minor symptoms from their disease.

10             And then at a certain point, the

11   disease would become more aggressive.  And

12   when it became very aggressive, so that it

13   looked under the microscope like acute

14   leukemia, we would call that the blast

15   phase or the blast crisis sometimes.  There

16   are different terms for it.

17             And then there was this gray

18   area, when the patient was behaving kind of

19   like halfway between blastic phase and

20   chronic phase and that's been called

21   accelerated phase.  So that was the three

22   main stages that we thought about for this

23   disease.

24        Q.   Does a patient's prognosis change

25   as they move from chronic phase to gray

1    accelerated phase and then the blast

2    crisis?

3         A.    Yes, it does.

4         Q.    How does it change?

5         A.    In general -- and this is

6    definitely true in the pre TKI era, though

7    still true but to a lesser extent even now,

8    patients with accelerated phase disease

9    overall have a somewhat worse prognosis,

10   and obviously some patients do just as

11   well.

12              And patients with blastic phase

13   disease do even worse than accelerated

14   phase.  So with each step in the stage, in

15   general, the prognosis worsens.

16              MR. ELIAS:  At that time?

17        A.    Beginning with the time that they

18   go into the next phase.

19              Again, when you speak about this,

20   you are talking about generalities in

21   groups of patients.  Any specific patient

22   may or may not fit this typicality.

23              As we said, the median survival

24   before we used imatinib may have been in

25   the three to five-year range, but it's not

Page 58

1    like the average person died between years

2    three and five.  That's not what that

3    means.

4              It's actually very confusing to

5    patients when doctors talk about median

6    survival and they think that's their life

7    expectancy.  Because for many of these

8    things, the -- it's more common for

9    patients to die at times less than three

10   years and more than five years than between

11   three and five years.

12             So the mathematical concept and

13   the human concept can diverge in some

14   cases, if that's makes sense to you.

15   Q.    You're saying that there is a

16   statistical number that tries to capture

17   what the average is in some way, but there

18   are people that will do worse than that

19   average, there are people that will do a

20   lot better, and for any individual person,

21   it can be hard to know ahead of time which

22   end they're going to fall on?

23   A.    Yes.  There is a very famous

24   humanist essay written that was entitled,

25   "The Median is not the Message."

1          And it talks about a man who is

2     diagnosed with a cancer that is largely

3     viewed as incurable, and one of those -- he

4     was only expected to live a year or so, and

5     of course 30 years later, he was still

6     alive.  I'm paraphrasing.  I don't remember

7     the exact details of it.

8          And his message was that, you

9     know, even if the typical patient or the

10    average patient is going to have prognosis

11    "X," that doesn't mean everybody is going

12    to die at that point and, you know, I

13    always say that there are some diseases

14    that are 5 percent curable, and if you're

15    in that 5 percent, it's like -- well, I am

16    sorry about everybody else, but he-he-he,

17    I'm fine, and there are some diseases that

18    95 percent curable, but if you are in the 5

19    percent who aren't, it's -- well, that's

20    great for everybody else, but I'm still

21    dying of this cancer.

22          So there are objective truths and

23    there are emotional truths and I think it

24    is very important for doctors and for

25    everybody to appreciate what these

1    statistical truths really mean.

2        Q.    Would you agree that it's

3    important to try, for your CML patients, to

4    treat them in a way that minimizes the

5    chances of their CML progressing

6    potentially all the way to blast crisis?

7        A.    The goals of therapy for any

8    patient probably in any circumstances but

9    certainly any leukemia patients, including

10   CML patients, is to, as best as you can, to

11   balance the risks and benefits of every

12   decision, to try to come up with optimal

13   algorithm for that person.

14            In the case of CML, we recognize

15   that the prognosis is worse with more

16   advanced stages.  So we are always happier

17   when our patients are not in more advanced

18   stages.

19            But, you know, some people can

20   get to advanced stages and some do very

21   well.  Again, it goes back to that essay I

22   just talked about.

23       Q.    Even though some patients may

24   have -- may survive going into blast

25   crisis, that doesn't mean it's your goal

Page 61

1    for your patients to reach that point, you

2    are still trying to prevent that from

3    happening, always?

4        A.    Yes, if at all possible.  You

5    know, what's that joke if I were king of

6    the world, no patient with CML would go

7    into blast crisis.

8        Q.    Did you prescribe TKIs when you

9    were in practice?

10       A.    Yes.

11       Q.    Do you recall when you first

12   started prescribing Gleevec to patients?

13       A.    I believe -- well, the first

14   patient that I prescribed it was a little

15   bit before the drug was commercially

16   available as part of a clinical trial.

17            But then once the drug was

18   approved, I prescribed it commercially to

19   people and I remember at some point the

20   company kicked the patients off the

21   clinical trial after results had been

22   analyzed and reported, so they wouldn't

23   have to keep giving them free drug, which

24   is typical for clinical trials, and then

25   this patient had to go and buy it on the

Page 62

1    open market as it were.

2        Q.    So you had a patient that

3    started -- had the opportunity to take

4    Gleevec before it first became available

5    and approved by FDA in the United States?

6        A.    Yes, before it was commercially

7    available.  Correct.

8        Q.    And their outcome was good enough

9    that they survived until Gleevec had been

10   approved and then they started taking it on

11   the commercial market after that?

12       A.    Eventually.  This person wasn't

13   kicked off the study -- I don't think

14   anyone was kicked off the study

15   immediately, but I don't know, after six

16   months or a year, my memory is hazy -- this

17   is probably the year 2000, 2001 we are

18   talking about -- he transferred over to

19   commercial drug.  But in the meantime, I

20   had been prescribing commercial drug to

21   other patients.

22       Q.    Have you had patients for whom

23   Gleevec has not worked to control their

24   CML?

25       A.    I don't -- I mean, I don't mean

1    to tell you your business because heaven

2    knows, I couldn't do your job.  I don't

3    know if you phrased that exactly the way

4    you want to.

5              I would say I've taken care of

6    some patients for whom imatinib has not

7    adequately controlled their disease or

8    optimally controlled their disease.  But

9    the vast majority of patients, it actually

10   does.

11       Q.    For patients of yours whose CML

12   has not adequately or optimally been

13   controlled by Gleevec, did you change their

14   treatment?

15       A.    The change in treatment, I think

16   as I said before, is always driven by what

17   the alternatives are that are available.

18             So early on, when imatinib was

19   the only practically available choice, we

20   would use it except in very extreme cases

21   of truly intolerable side effects or, you

22   know, complete lack of any ability to

23   control the disease.

24             And that was quite uncommon when

25   it's your only alternative, people can

1    tolerate a lot more side effects than if

2    you have other choices that have less side

3    effects.

4            And in the vast majority of

5    cases, even for patients who don't get what

6    I would consider adequate or optimal

7    control, it still offers some control.

8            So in the early days, we really

9    clung to Gleevec except in the rarest of

10   cases.  Subsequently, with the introduction

11   of nilotinib and dasatinib, we suddenly had

12   two very good alternatives with different

13   side effect profiles that we could choose

14   for our patients.

15           So we were willing to change

16   treatments for a lesser degree of side

17   effects and a less worrisome type of

18   failure to control leukemia.

19   Q.    Once dasatinib and nilotinib

20   became available, is it correct to say that

21   you did have occasions where you switched

22   your patients from Gleevec to one of those

23   other TKIs?

24   A.    Yes, there were some patients

25   who, for reasons of either toxicity or

Page 65

```
 1    suboptimal response, were changed to either

 2    nilotinib or dasatinib.

 3        Q.    Just to be clear, can you maybe,

 4    in more lay terms, say what suboptimal

 5    response means?

 6        A.    I was smiling because I was

 7    thinking of, I think it was the Supreme

 8    Court justice who talked about pornography.

 9    I don't know how to define it, but I know

10    it when I see it.

11            Again, suboptimal response really

12    is circumstance specific.  So as I said, in

13    days when you only had Gleevec, it had to

14    be really, really bad to be considered

15    really, you know, an inadequate response

16    requiring a change of therapy.

17            As more and more options

18    became available, there was a greater

19    willingness to make changes for less

20    extreme circumstances, both on the toxicity

21    side but also on the antileukemic effect

22    side.

23        Q.    When you say circumstance

24    specific in terms of making a decision

25    whether or not to try different treatments,
```

Page 66

1    I think you said one aspect of that is what

2    other treatment options are available,

3    right?

4        A.    Yes.

5        Q.    Sorry --

6        A.    No, you're right.

7        Q.    Does that also include, when we

8    are talking about circumstance-specific

9    information, the particular patient and

10   their medical condition and their

11   presentation of their disease?

12       A.    Yes.  A good physician, a good

13   clinician will always do their best to

14   analyze the risk/benefit ratio proportion

15   for every medical decision they make and

16   that tries to include every possible

17   factor, not just medical or pharmaceutical,

18   but social, economic, cultural.

19            Obviously things have different

20   weightings in the calculus of figuring this

21   out and a lot of clinicians do this

22   undoubtedly most of the time

23   subconsciously, but yeah, many things need

24   to be considered in making an optimal

25   choice.

1        Q.    At the end of the day, the

2   prescribing decision ends up being a

3   decision that a particular doctor is making

4   for that particular patient in that moment

5   based on what they know then?

6        A.    I'm sorry, can you restate that.

7        Q.    Yeah, let me try it again.

8              I think that you said that a good

9   physician is going to try and analyze the

10  risk/benefit ratio for their medical

11  decisions?

12       A.    Yes.

13       Q.    And the factors go beyond just

14  the medical or pharmaceutical contents?

15       A.    That is correct.

16       Q.    Within the medical context, that

17  includes the context of that particular

18  patient and everything the doctor knows

19  about their history, their disease, how

20  they present at that time?

21       A.    Yes, I think, you know, a good

22  clinician tries to take into account the

23  entire picture of a patient.  I mean,

24  obviously as sometimes happens, a patient

25  with terminal lung cancer develops, let's

Page 68

1     say CML and if they have only got a week or

2     two to live, you might not give them

3     imatinib.

4              Everything needs to be put into

5     the caldron of decision making, if you

6     will.  And I think the best doctors try to

7     do this very decisively and do it well.

8          Q.    When Tasigna became available on

9     the market in 2007, did you begin to use it

10    with your patients?

11         A.    I definitely prescribed both

12    nilotinib and ponatinib to patients under

13    my care and patients treated by my

14    colleagues in my division.  I don't

15    remember the exact year that I may have

16    first used it, but as I said, at various

17    times, I have prescribed both of those

18    drugs.

19         Q.    As a hematologist, what do you do

20    to stay abreast of developments in your

21    area of expertise?

22         A.    So I don't think it's specific to

23    hematologists.  I think as a good

24    clinician, we try to stay up to date as

25    much as possible, remembering that the

Page 69

1   narrower the field of expertise, the more

2   in depth understanding you have time to

3   develop.

4           So if you were -- the average

5   oncologist sees -- I mean, 90 percent of

6   cancer in the United States is what we call

7   solid tumors and the big four are lung,

8   breast, colon and prostate.  Only 10

9   percent of all cancers diagnosed are

10  hematologic malignancies of which an even

11  smaller fraction are leukemias.

12          So to really have an in depth

13  understanding of all things leukemia, you

14  really need to be at one of the few

15  specialized medical centers.  Leukemias are

16  rare diseases and CML is not the most

17  common of the leukemias even.  I think most

18  experts put it at maybe 4,000 or 5,000 new

19  patients a year in the United States and

20  there is 10 to 15,000 practicing medical

21  oncologists.

22          So you do the math and if it were

23  evenly disbursed, the average oncologist

24  might see one patient every two or three

25  years, one new patient every two or three

1    years.  But of course it is not evenly

2    disbursed because many of these patients

3    end up at specialized centers.

4              So the average oncologist, in

5    fact, sees even fewer patients.

6        Q.    Why do you say that many patients

7    with CML end up at specialized centers?

8        A.    Because the treatment of leukemia

9    is a rare disease and because for some

10   things, including bone marrow transplant,

11   the treatments are not performed

12   universally.  There is often a consultation

13   at least, at a specialized center.

14             This is now less true in the TKI

15   era since, in general, the care of these

16   patients has become less complex, but there

17   are still complexities to it and I don't

18   have the exact numbers, but certainly my

19   gestalt was that many patients did -- I

20   mean a larger fraction of patients with the

21   disease, with leukemia, go to major centers

22   than with, let's say, breast cancer or lung

23   cancer.

24             I know at Sloan Kettering, the

25   leukemia group had the -- I may have

1    mentioned this earlier in the deposition --

2    had the largest fraction of what the guys

3    there call the market share of leukemia

4    patients compared to any of the other

5    cancer disciplines.

6              So, you know, this may not be

7    true in every setting for every thing, but

8    from my background, it seemed to be most

9    leukemia patients ended up the major

10   medical centers.

11       Q.    At the major medical centers,

12   that's where you get doctors who are more

13   specialized in treating rarer types of

14   cancer like CML?

15       A.    There is a concentration of

16   experience though even at major medical

17   centers, it's very rare for a patient to

18   have -- I'm not sure I know of anybody who

19   just sees CML patients or just sees AML

20   patients.  They're rare enough diseases

21   that even at major centers, most people

22   have a mix of different leukemias that they

23   would see.

24       Q.    When you first are making a

25   decision to describe -- to prescribe a new

Page 72

1    medication, I assume you do some research

2    to make sure you understand the medication?

3        A.    Yes.

4        Q.    Do you do things like looking at

5    the product label?

6        A.    Yes.

7        Q.    Do you talk to your colleagues?

8        A.    Yes.  Particularly because I'm

9    fairly specialized, I mean, most recently

10   it was the broader category of all

11   hematologic malignancies, but that right

12   away excludes 90 percent of cancers.

13            So it is already pretty focused,

14   and certainly at Memorial Sloan Kettering,

15   where I primarily took care of leukemia

16   patients, that would again be just the

17   subset of that 10 percent, you know, I

18   believe that I was an expert in taking care

19   of patients with these diseases, and as an

20   expert, I would look at things like the

21   product label or talk to my colleagues, but

22   I also did -- I think the expression is I'm

23   from Missouri and I trust almost no one as

24   it turns out in this world.

25            So I would, when possible, look

Page 73

1    at a lot of the original research and you

2    see it get published, and before you see it

3    get published, I would go to some of the

4    larger annual meetings where some things

5    would be presented sort of in a, you know,

6    a news flash kind of a situation.  And it's

7    important to remember that not everything

8    that's presented first as shiny is going to

9    pan out.  So there is a layer of skepticism

10   there compared to more mature results.

11           But yes, I would try my best to

12   understand the treatment as best I could,

13   and to do research, including all the

14   things we have mentioned.  If I didn't feel

15   I was sufficiently expert at that point, I

16   would bring my level of expertise up until

17   I felt comfortable that I was giving a

18   patient a very, very high quality decision.

19        Q.   So your process of bringing up

20   your level of expertise in the event that

21   you were thinking about prescribing a new

22   medication that you hadn't prescribed

23   before would include things like looking at

24   the literature, and if it had -- seeing if

25   it had been discussed at annual meetings

Page 74

1    that you had been at, you would take all of

2    that into account?

3                MR. ELIAS:   Misstates and

4        compound.

5        Q.    You can answer.

6        A.    Yeah, it's -- it was important

7    for me -- and I think it is important for

8    all good clinicians to use as many reliable

9    tools at their disposure that they have.

10                But it's like everything else,

11    it's not just getting the information.

12    Something that's even more important than

13    the specific information is the quality of

14    the information.

15                So you know, if you go to a chat

16    room and you say, well, this person said

17    leukemia does this or that, that may be

18    totally wrong and erroneous; whereas if you

19    see peer-reviewed data, particularly from a

20    randomized clinical trial, you can have a

21    greater level of confidence that it will be

22    correct.

23                But even then we know that -- I

24    mean, if you watch television, you see

25    this, that they can run ten trials and get

1    opposite results in half of them.  It can

2    be very confusing and its not always

3    apparent.

4              So part of I think being a good

5    clinician and a good scientist is, you

6    know, to maintain some healthy degree of

7    skepticism and keep an open mind that the

8    world isn't completely black or white, it's

9    usually varying shades of gray.

10        Q.   When did you become aware of a

11   potential association between nilotinib and

12   atherosclerosis?

13        A.   I think I first heard about it

14   in -- I want to say probably like 2012, but

15   I don't think that I was completely

16   convinced that there was this linkage

17   probably until 2013 I would say.

18        Q.   How did you hear about this in

19   2012?

20        A.   I believe the first time I heard

21   about it was from one of my colleagues.

22        Q.   What did your colleague tell you?

23        A.   I don't remember the specific

24   meeting, but I remember sort of hearing in

25   vague terms that there were some concerns

Page 76

1    coming out of Europe that something odd was

2    happening in patients on nilotinib.  That's

3    sort of the hazy memory I have of that

4    conversation.

5         Q.    What did you -- you said you

6    thought there was a linkage.  You came to

7    that conclusion in 2013.

8         A.    About.  These dates are coarse.

9         Q.    What additional information did

10   you learn to lead up to that?

11        A.    Oh, there were more publications

12   describing a connection between nilotinib

13   and atherosclerotic changes and I think

14   most telling was I started to get a sense

15   that there was something different than

16   this being just run-of-mill atherosclerosis

17   as people get older, that, you know, there

18   were really quite severe consequences.

19              I remember the first time I heard

20   that a patient needed an amputation, I

21   thought I can't remember the last CML

22   patient I had who needed to have something

23   amputated, and through the course of the 20

24   years I was at -- 22 years total, 19 on the

25   faculty that I was at Sloan Kettering, you

Page 77

1    know, we took care of literally hundreds of

2    patients with CML during that time period,

3    and you know, something important like

4    that, whether I was primarily caring for

5    the patient or the team, one of my

6    colleagues was caring, that would have been

7    discussed.

8              And I will admit my memory is not

9    perfect, but I don't remember -- I think I

10   would, hearing that.  And the other thing I

11   really remarked on -- and this did come I

12   think from one of the original reports --

13   is a spinal cord infarct which is very rare

14   compared to an infarct in your -- which

15   many people as they get older -- have

16   infarcts in their brains which we routinely

17   call strokes.

18             So certainly the quality, the

19   intensity of it that struck me as very

20   unusual and this was really, I think, the

21   first time that I started to believe that

22   there was something different about

23   nilotinib compared to either imatinib or

24   dasatinib and then as this became --

25   obviously it became an issue because the

Page 78

1    publications for the trial that randomized

2    patients do either imatinib or two

3    different doses of nilotinib started

4    talking about cardiovascular events.

5              And in those papers it became

6    obvious that patients treated with

7    nilotinib had a higher likelihood of

8    developing such events compared to patients

9    who are on the imatinib arm.

10        Q.    Have you prescribed to Tasigna to

11   any of your patients after you first heard

12   of this issue in 2012?

13        A.    Yes.

14        Q.    Did you prescribe Tasigna to any

15   of your patients after, after you became

16   more convinced that there was a linkage the

17   next year or so?

18        A.    Yes.  As I have said, every

19   decision you make for a patient is a

20   balance of the risks and the benefits.  And

21   therefore, you need to know what the

22   potential toxicities are and the potential

23   benefits are and there were selected

24   patients who I believe nilotinib was still

25   a good choice for.

Page 79

1      Q.    You mentioned that you don't

2  recall having a patient who required a limb

3  amputation during the time -- within --

4  well, strike that.

5           Do you recall ever having a

6  cancer patient that required a limb

7  amputation as a result of anything?

8      A.    Yes.   These -- the patients who I

9  remember though did not have CML.

10     Q.    You have had cancer patients that

11  have required amputations from causes like

12  PAOD though?

13           MR. ELIAS:   Misstates.

14     A.    Yes, particularly during my

15  fellowship when I was taking care of many

16  patients with solid tumors, many of those

17  cancers are cigarette-related, and

18  cigarette smoking also is one of the

19  largest factors in developing, you know,

20  peripheral arterial occlusive disease.

21           Subsequently, when I was more

22  focused on leukemia, most of the limb

23  amputations are usually part of a limb

24  amputation that I saw were related to

25  people who got extraordinarily sick and had

Page 80

1    the syndrome we call septic shock, and

2    during this period of time lost the ability

3    to send adequate blood to a part of their

4    extremities; sometimes the hand, sometimes

5    the arm, sometimes the feet, sometimes the

6    leg.  And if it was bad enough, they would

7    need to have an amputation for that.

8         Q.    So in your overall cancer

9    population, you have seen patients who have

10   required amputations for peripheral

11   arterial disease where those patients had

12   known risk factors like smoking, for

13   example?

14             MR. ELIAS:  Misstates.

15        A.    I've certainly seen patients who

16   have needed limb amputations and I do not

17   doubt or dispute that in the world

18   somewhere, there are CML patients who have

19   needed amputations.

20             It's just it's a rare thing in

21   the general population and it's

22   particularly rare in leukemia patients, and

23   in my experience, I don't recall ever

24   seeing it in a CML patient.  I'm sure we

25   can find a case somewhere.  I mean,

1    everything under the sun has happened.

2           We are really talking about

3    questions of frequency and degree or at

4    least that's what I am trying to express.

5       Q.    So you're saying part of it is

6    that we are talking about a rare amputation

7    is a rare event in any population and the

8    CML population is a small group of people

9    so we are looking at rare on top of rare?

10      A.    Yeah.  Again, I don't view myself

11   as an expert in the cardiovascular system

12   in nonleukemic patients and my degree of

13   expertise even in leukemia patients is

14   limited.  So I don't know if characterizing

15   amputations as rare or if we should

16   characterize them as uncommon would be the

17   right word.

18          But I would definitely call CML a

19   rare disease and since amputations are not

20   common, that I feel fairly certain of and I

21   think most people, you don't have to be a

22   doctor to know that you are not -- every

23   third patient on the street hasn't had a

24   limb amputated, it is not common.

25          So the intersection of the two

Page 82

1    are rare in my experience which I consider

2    to be fairly extensive.  I can't remember

3    ever seeing a CML patient require a limb

4    amputation.  So it struck me as unusual.

5         Q.    Is it fair to say in the first of

6    ten years or maybe a little bit more of

7    your practice that during that time, your

8    CML patients did not have the life

9    expectancy they do today so you weren't

10   following them for the same length of time

11   that you do today?

12             MR. ELIAS:  Object to form.

13        A.    Yes, I think you raise a very

14   important consideration is that the more

15   rapidly a person succumbs to one disease

16   diminishes the likelihood that over their

17   lifetime, they will develop a different

18   disease.  I think that is true.

19             And you're right, as I stated

20   before imatinib, CML substantially impacted

21   patients' life expectancies, and if you're

22   40 years old and you live three years, the

23   likelihood of developing severe

24   atherosclerotic disease is less than if

25   your 40 years old and you live 25 years.

1      Q.    Have you had patients with CML

2    who have developed peripheral arterial

3    disease to your knowledge?  I know you

4    don't necessarily know everything about all

5    of their histories.

6      A.    To the best of my memory, I don't

7    remember seeing a CML patient with that,

8    because that's a less extreme event.  It's

9    possible.  I just don't remember that.

10          Amputation is something that

11    sticks out in your mind, and I feel a lot

12    more comfortable that if that had happened,

13    the likelihood of my remembering it would

14    be much greater and I don't remember that.

15      Q.    Have you had CML patients who

16    have experienced heart attacks?

17      A.    I believe so.

18      Q.    Do you know if -- did you

19    attribute nilotinib as the cause of any of

20    those heart attacks?

21      A.    No, I -- I don't think the subset

22    of patients who I treated with nilotinib

23    had any heart attacks, not in my memory.

24      Q.    So you have seen, to your

25    recollection, you think you have seen heart

Page 84

1    attacks in CML patients you have treated,

2    but not in any that received Tasigna?

3        A.    Correct.

4        Q.    Have you had CML patients who

5    have experienced strokes?

6        A.    Yes.

7        Q.    Were any of those patients on

8    nilotinib?

9        A.    Not that I remember.

10            And of course we have discussed,

11   you know, the intersection between rare and

12   uncommon events, and I think it is

13   important to indicate, again, that the

14   number of patients who I treated with

15   nilotinib was only a small subset of all

16   the patients with CML.  So we are talking

17   about subsets of subsets of subsets here.

18       Q.    Once you began prescribing

19   Tasigna to patients in your practice, what

20   proportion of your patients would have

21   received nilotinib?

22       A.    Well, initially, I gave it only

23   to patients who were intolerant or who had

24   inadequate responses to imatinib.

25            Subsequently, when the first

Page 85

1    results came out of that trial I earlier

2    described between these two different doses

3    of nilotinib versus imatinib, I went

4    through a period of time where the majority

5    of newly diagnosed patients I put on

6    nilotinib.

7              And then as the information came

8    out that there was some concerns related to

9    this very aggressive vascular condition

10   occurring in a subset of patients, I

11   started being more cognizant of this and

12   trying to, again, as any good clinician

13   would, weigh the risks and benefits for

14   individual patients, and I also essentially

15   referred all of these patients to see

16   cardiologists.

17        Q.   OK.  Starting with when you first

18   were initially prescribing Tasigna, you

19   said that was -- you would have prescribed

20   it then for patients who were intolerant of

21   or had an inadequate response to imatinib,

22   right?

23        A.   Yes.

24        Q.   Is it fair to say that would be,

25   in lay terms or put another way, that

Page 86

1    second line use?

2         A.    Yes.  It's a subsequent line of

3    therapy, and for patients who are initially

4    treated with imatinib who then go on

5    nilotinib, we would consider nilotinib

6    second line therapy there, yes.

7         Q.    Did you also prescribe dasatinib

8    during that period?

9         A.    Yes, I did.

10        Q.    And how did you select between

11   nilotinib and dasatinib during that time?

12             MR. ELIAS:  Which time?

13        Q.    When you were initially

14   prescribing Tasigna?

15             MR. ELIAS:  As a second line

16        only?

17        Q.    Yes.  That's what you testified,

18   right?

19             MR. ELIAS:  I just want to be

20        sure --

21        A.    Well, that's one's time subset,

22   yes.

23             So for that time subset, I

24   believe most of the patients I would

25   probably prescribe nilotinib to because my

Page 87

1    concern was dasatinib had a worse toxicity

2    profile, and the drugs and second line

3    therapy seemed to have equivalent or near

4    equivalent antileukemic activity.

5              There is one exception for that

6    and that's for patients who had CML in

7    accelerated or blastic disease, and for

8    those patients, with the closely related

9    disorder of pH positive acute lymphoblastic

10   leukemia, I would usually prefer dasatinib

11   over nilotinib because of a theoretical

12   consideration that by inhibiting a somewhat

13   different and somewhat more expensive array

14   of enzymes, that it might be more effective

15   in a disease that was more complex than

16   just having an abnormal Philadelphia

17   chromosome.

18             Again, every patient I try my

19   best to weigh risks and benefits, and that

20   includes patient-specific factors and

21   disease-specific factors and social and

22   environment and everything I can get my

23   head around.

24   Q.    You said a second phase of your

25   prescribing Tasigna began when you learned

1   about results from ENESTnd about the use of

2   nilotinib in first line, front-line therapy

3   for patients who are newly diagnosed with

4   CML, correct?

5        A.    Yes, I -- if we want to break it

6   down like that, I would say the second time

7   period or era of nilotinib use came after

8   the publications about the efficacy of both

9   nilotinib and dasatinib in the initial

10  treatment of CML.

11       Q.    And you're aware that FDA, based

12  on that data that you have mentioned,

13  approved Tasigna for newly diagnosed

14  patients?

15       A.    Yes, that's my understanding.

16       Q.    Would that -- do you recall if

17  you would have started prescribing Tasigna

18  for newly diagnosed patients before or

19  after that approval?

20       A.    The approval, per se, is not the

21  most important factor in my choice of a

22  drug.  I sometimes use -- it's an old

23  example, but the medicine the dentist gives

24  you to numb your gum, lidocaine, was

25  originally designed, promoted, approved to

1    be a numbing medicine.

2          But for many years, it proved to

3    be the most effective drug in suppressing

4    lethal cardiac arrhythmias, for which it

5    had no FDA approval but it was still the

6    best drug and was widely used.

7          I think the data from the

8    clinical trials that compared nilotinib to

9    imatinib and compared to dasatinib to

10   imatinib convinced me that there were some

11   benefits in the initial prescription of

12   second generation TKIs and that needed to

13   be considered in addition with the other

14   factors we have talked about before in

15   making these decisions.

16         Actually -- no.  I'll wait for

17   you to ask the question.

18   Q.    During the time after you started

19   prescribing for first line use, did you

20   continue to prescribe nilotinib to patients

21   for second or third line use?

22   A.    Yes, where appropriate.

23   Q.    Was nilotinib still your --

24   prescribed more than dasatinib during that

25   period that we are talking about?

Page 90

1        A.      Can you please make that a little

2    more specific.

3        Q.      So in the period between the

4    learning of ENESTnd first line results and

5    the benefits it provided in newly diagnosed

6    patients, through when you learned about,

7    for the first time, of a potential

8    association between nilotinib and PAOD,

9    did -- was nilotinib still your preferred

10   second line medication?

11       A.      Second line or first line?

12       Q.      Second line.

13       A.      So again, you know, every patient

14   is unique and you need to balance a whole

15   panoply of things.

16              But in terms of a generalization

17   of what I perceive to be similar or perhaps

18   for nilotinib even better antileukemic

19   activity with what I perceive to be overall

20   a better toxicity profile, it would

21   certainly be considered favorable for many

22   patients, but I'm sure not all.

23       Q.      Did you just say that in your

24   mind, during this period, nilotinib had a

25   better toxicity and potentially

Page 91

1    antileukemic profile than dasatinib in

2    second line therapy?

3             MR. ELIAS:  Misstates.

4        A.    In second line therapy, -- I

5    assume that these drugs were near

6    equivalent in terms of antileukemic

7    activity, but that nilotinib had a

8    favorable toxicity profile in general.  Not

9    in every possible situation, but in

10   general.

11            And I apologize, I think I

12   misspoke before, the possibility of better

13   antileukemic effect was most striking to me

14   when the results of the ENESTnd study was

15   published.

16       Q.    So --

17       A.    So that would be first line --

18       Q.    OK, so the large ENESTnd data set

19   suggested to you that there may be an

20   improved antileukemic profile compared to

21   dasatinib in some contexts?

22       A.    Yes, recognizing the limitations

23   of comparing two different studies that --

24   I mean, the gold standard would have been

25   to have a study that randomized patients to

1    imatinib, nilotinib anybody and dasatinib.

2    But that study, to my knowledge, hasn't

3    been done and certainly wasn't done at that

4    time.

5         Q.    Just to ask you about that point,

6    when you're saying a head-to-head study, is

7    it your point that the best way to get a

8    comparison between two different

9    medications is to have both of them tested

10    in the same randomized controlled study?

11         A.    Yes, I think it's generally

12    accepted that taking patients who meet

13    certain entry criteria and randomly

14    assigning them to two or more different

15    medications helps to even out the unique

16    other features that patients go into a

17    study with to make what we call the arms

18    more balanced.

19              In other words, the patients in

20    one group are much more similar to the

21    patients in the other group than if you are

22    trying to compare one trial to another

23    where maybe in one study, you're treating

24    Spaniards and in another study, you're

25    treating people from England and they may

Page 93

1    have very different issues going on.

2              (Pause)

3              MR. ELIAS:  Andrew, whenever you

4         get to a stopping point, we should

5         probably take a quick lunch.

6              MR. REISSAUS:  Let me ask you a

7         couple more questions and then we

8         will --

9              MR. ELIAS:  That's fine.

10        Q.      You said a little earlier you

11   wouldn't consider yourself a general expert

12   in the vascular system, especially outside

13   of the context of leukemia or cancer,

14   correct?

15        A.      Yes.

16        Q.      Would you hold yourself out to be

17   an expert in the U.S. FDA's regulations for

18   pharmaceutical products?

19        A.      Can you rephrase that.

20        Q.      Do you have any specialized

21   training or expertise in FDA's regulatory

22   scheme for pharmaceutical products?

23        A.      I have some experience in FDA

24   regulations, but primarily at the

25   intersection of where my patient care or my

Page 94

1    clinical research would intersect with

2    things that the FDA does.

3         But I think I now understand

4    better the way you initially phrased your

5    question is, I don't believe myself an

6    expert on any aspect of the United States

7    Government.

8         MR. ELIAS:  We are not offering

9         him as an expert on any aspect of the

10        United States Government.

11        Q.    You mentioned you did a -- your

12   clinical trial work occasionally has

13   involvement with the FDA.  Have you had any

14   involvement with FDA regarding the labeling

15   for pharmaceutical products?

16        A.    No, I don't believe so.

17        Q.    Have you ever reviewed a

18   company's labeling submissions that are

19   made to FDA in the process of leading to

20   the final approved label?

21        A.    I don't remember having done so.

22        MR. REISSAUS:  All right, this is

23        a good point to take a break.  Thank

24        you.

25        THE VIDEOGRAPHER:  We are now

Page 95

1    going off the video record, that

2    concludes DVD number 2, the time is

3    12:42.

4              (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 96

1          AFTERNOON SESSION

2               1:41 p.m.

3          THE VIDEOGRAPHER:  We are now

4      back on the video record.  This

5      commences DVD number 3.  The date, July

6      14, 2017.  The time, 13:41.

7          off video.

8          (Pause)

9          THE VIDEOGRAPHER:  Back on,

10     13:42.

11 BY MR. REISSAUS:

12     Q.    Doctor, before the break, you

13 referenced a couple times Sprycel's

14 toxicity profile.

15          In your view, what terms of

16 Sprycel's toxicity's profile were inferior

17 to nilotinib?

18          MR. ELIAS:  Objection, that

19     misstates and assumes facts.

20     A.    My concern, my main concern about

21 dasatinib was the risk of pleural

22 effusions.

23     Q.    What is a pleural effusion and

24 why was that the main concern for you?

25     A.    Our lungs are surrounded by a

1   membranous lining called the pleura, as it

2   turns out, and this space, which normally

3   is almost collapsed and nonexisting, on

4   occasion, have fluid develop in it, and

5   this is obviously part of the chest cavity

6   that it occurs in.

7          And when that happens, the fluid

8   -- you can compress the lung which has more

9   of a spongy kind of texture and decrease

10   the lung's capacity for breathing and

11   oxygen exchange and that sort of a thing.

12          So it's a potentially severe

13   complication, and if it needs to be treated

14   other than stopping the medicine, it often

15   requires an invasive approach and

16   specifically while dasatinib was an

17   investigational drug, we had one patient

18   who had a very severe pleural reaction

19   which stood out clearly in my mind.

20   Q.   In that case of a pleural

21   effusion in the patient on dasatinib, what

22   treatment was required for that serious

23   case?

24   A.   This patient needed something

25   called a chest tube which is a tube,

Page 98

1   usually the size of a man's finger, not in

2   length but in width and diameter,

3   surgically inserted in the space, into the

4   pleural space which is between the lung

5   itself and the chest wall.  And that's

6   usually attached to a very light amount of

7   suction to withdraw the fluid from it and

8   reexpand the lung and that can stay in

9   sometimes for very long periods of time.

10          And it's both relatively a

11  painful experience and also does carry some

12  risk of more serious complications

13  primarily bleeding and infection.

14      Q.   If a pleural effusion is not

15  treated, does that pose health risks to a

16  patient?

17      A.   Yes.  As a pleural effusion

18  worsens, patients can develop difficulty

19  breathing and that's probably the main

20  reason patients present to healthcare

21  facilities with pleural effusions is when

22  they become symptomatic since small amounts

23  of fluid in the space tends not to affect a

24  person's perception of how well they're

25  breathing and doesn't cause the patient to

1   be seen or evaluated for it.

2       Q.    What is atherosclerosis?

3       A.    So atherosclerosis, which is very

4   common in industrial western countries, is

5   when there is a build-up of a certain

6   material, usually made of things like

7   cholesterol and fats and some clotting

8   factors and some other things which starts

9   to affect the diameter of the arteries that

10  take the blood from the heart and deliver

11  it to the tissues.

12          And depending on degree, it can

13  be asymptomatic, it can be mild to

14  moderately symptomatic, or in cases of

15  clogging of crucial arteries such as

16  arteries that feed the heart or arteries

17  that feed the brain, it can be lethal.

18      Q.    I would like to break down that

19  answer a little bit.  I think you just said

20  that atherosclerosis can affect the

21  arteries throughout the body, not just in

22  any one particular place.  Is that right?

23      A.    That's my understanding.  Again,

24  I do not hold myself out to be an expert in

25  atherosclerosis.  From my general medical

Page 100

1    training and just from being a member of

2    the American public and reading CNN and

3    seeing the news, I have a general idea

4    of -- about atherosclerosis, but my sense

5    is that it is a, typically it's a

6    generalized disorder.

7        Q.    To your knowledge, is it a

8    condition that generally takes years to

9    develop?

10       A.    In its most traditional form, it

11   takes years or decades to become clinically

12   important from the first evidence of it.

13             There are some recognized

14   syndromes, usually abnormalities in

15   cholesterol metabolism which can lead to a

16   much more accelerated form of the disease.

17             But for the vast majority of, for

18   instance, Americans, the first traces of

19   atherosclerosis, my understanding is, can

20   start in your teens or your 20s, but yet

21   most people don't have problems with it

22   until they are 50, 60, 70.

23       Q.    I think you said that

24   atherosclerosis can be present without it

25   causing overt clinical symptoms; it could

Page 101

1    be asymptomatic for a period of time?

2        A.    Absolutely.

3        Q.    And the first time a patient may

4    find out that they have atherosclerosis is

5    when they have some sort of serious health

6    problem happen, like a heart attack or a

7    stroke or the development of claudication?

8        A.    That can certainly happen.  It's

9    really driven by, you know, the medical

10   sophistication of the individual patient.

11          I'm sure many people who -- the

12   circles I travel in understand that

13   atherosclerosis is very, very common, and

14   it affects almost every American or every

15   person eating a western diet and it is

16   still the leading cause of death in the

17   United States, even more so than cancer.

18       Q.    In terms of it actually being --

19   atherosclerosis actually being detected by

20   a doctor through a diagnostic imaging, the

21   first time that may occur can be after a

22   serious event like a heart attack or a

23   stroke, isn't that true?

24          MR. ELIAS:  Objection, that is

25       over-broad and lacks foundation.  It is

1          an unfirm hypothetical.

2          A.     Well, in the most extreme form of

3     course anything is possible.  But yes, this

4     is one of several possibilities.

5          Q.     Are you aware of well-established

6     risk factors for atherosclerosis in the

7     general population?

8          A.     Again, I do not hold myself out

9     to be a cardiovascular expert, but I think,

10    along with my general medical education and

11    perhaps equally important just being sort

12    of a well-educated person in our society, I

13    think I have a fairly good grasp of the

14    most important risk factors.

15         Q.     Some of those include diabetes,

16    is that right?

17         A.     Diabetes I perceive as commonly

18    viewed as a risk factor for

19    atherosclerosis.

20         Q.     How about hypertension?

21         A.     I would say the same for

22    hypertension.

23         Q.     High cholesterol?

24         A.     I would say the same for high

25    cholesterol, though there is probably some

1    more subtleties to it which I'm less expert

2    in, but again, I have some limited

3    understanding about the subtleties of

4    interpreting cholesterol levels.

5         Q.    Family history can be a risk

6    factor for atherosclerosis?

7         A.    Absolutely.

8         Q.    Diet?

9         A.    Yes.

10        Q.    And weight?

11        A.    Yes.

12        Q.    Have you seen these risk factors

13   in your CML patients over the course of

14   your career?

15        A.    I have had some patients with CML

16   who have had one or more of these risk

17   factors.

18        Q.    When you see these risk factors

19   in your patients, when you were practicing,

20   did you recommend that they do anything to

21   modify those risk factors?

22        A.    In terms of risk factors for

23   events that might not take place for many,

24   many years, as part of my total evaluation

25   of the risk benefits for individual

Page 104

1    patients, their prognosis related to their

2    leukemia becomes very important.

3              So in the years before imatinib,

4    if I had a 35-year-old guy whose reasonable

5    life expectancy or median life expectancy

6    was three to five years, I wouldn't be very

7    concerned if he had high cholesterol and

8    probably would not personally be checking

9    it.  I would usually recommend all my

10   patients keep a more general internist to

11   see.

12             But on the other hand, in the

13   post-TKI era, particularly if I have an

14   older person or one with risk factors, we

15   start to be concerned about the, what we

16   call morbidity which is unpleasantness

17   related to your health or mortality meaning

18   death from things unrelated to the cancer.

19             So again, depending on the

20   available treatments and the prognosis for

21   the cancer, that has a powerful effect on

22   how I would interact with risk factors, but

23   primarily speaking, I do not view myself as

24   an expert in that area, and for somebody

25   with significant problems, I would urge

1   them to see somebody who is better versed

2   in these things.

3        Q.    So in the post-TKI world, if you

4   had a patient who came to you and you were

5   observing hypertension or diabetes and you

6   didn't feel it was adequately controlled,

7   you would counsel them to obtain additional

8   care for those conditions from someone

9   else?

10       A.    Yes, I believe as a

11   generalization, that's a fair statement.

12       Q.    We have been talking about risk

13   factors for atherosclerosis.  When we say

14   risk factors, do you understand that to

15   mean that if you have the risk factor, the

16   chance that you may develop atherosclerosis

17   in the future is increased compared to

18   somebody who is not?

19            MR. ELIAS:  Hold on.  Let me look

20       at the question.

21            I will object to form, but go

22       ahead.

23       A.    Can you say that one more time.

24       Q.    I can try.

25            When we use the term "risk

1    factors," does that mean that if you have

2    one of them, that it corresponds to having

3    an increased chance of developing the

4    problem in the future?

5         A.    So I believe in general, that's

6    true or close to the truth.  But it does

7    depend on specific diseases and specific

8    factors because there are some settings

9    were you may need the intersection of more

10   than just one factor to change the person's

11   prognosis, and again, depending on the

12   power of the risk factors, sometimes the

13   incremental risk can be negligible.  Again,

14   there is always caveats and

15   patient-specific issues that come in.  But

16   in general, having a risk factor is that;

17   it increases your risk of something

18   happening.

19              I think it is very important to

20   remember that atherosclerosis as is the

21   case with most human body function,

22   physiology, whatever you want to call it,

23   is rarely or perhaps as close to never as

24   we get the result of one thing.

25              There is always an interplay of

1    multiple things; some which can promote

2    atherosclerosis, some which may diminish

3    atherosclerosis even, and it's the balance

4    of all of these factors together that

5    determine whether or not a person is going

6    to develop clinically important

7    atherosclerosis.

8              So I think it is always a little

9    bit of an oversimplification to say if you

10   have one risk factor -- I mean, for large

11   groups of patients, you can generate

12   statistical models.  But for advising

13   individual patients, you know, you need

14   some common sense and you need to

15   understand that the human body is actually

16   incredibly complex.

17       Q.   So in your view, it's important

18   to consider the kaleidoscope of risk

19   factors that may be in play when you're

20   looking at a particular patient's level of

21   risk for a disease?

22       A.   Yes, I believe whenever you're

23   trying to make a diagnosis or make a

24   treatment, a good clinician will always

25   balance the sum of risks, benefits,

1    alternatives, and trying to understand what

2    the likelihood of "X" happening, and I'm,

3    by nature, a skeptical person and I'm not

4    sure that we really can say anything is 100

5    percent certain.  I guess I've said that

6    already, sorry.

7         Q.    Just because a particular patient

8    doesn't have risk factors for developing a

9    disease like atherosclerosis, let's say,

10   that doesn't mean that they will not

11   develop it, is that right?

12            MR. ELIAS:  Object to form.

13        A.    I believe if I have got all the

14   double negatives and everything else in

15   there, that, yes, there are some people who

16   can die of a heart attack who don't have

17   any of these recognizable risk factors.

18   Perhaps they have a risk factor that's not

19   yet been recognized, I don't know.

20            But the point is that I think it

21   implicit or explicitly in the term "risk"

22   it doesn't imply everybody with this is

23   going to get it, and if you don't have it,

24   you won't get it.  It's a degree of

25   incremental risk.

1      Q.     Thank you.

2             Would you agree that

3    atherosclerosis can be a serious disease

4    for patients?

5      A.     Yes.  As I think I mentioned

6    earlier, it's the leading cause of death in

7    the United States is atherosclerosis-

8    related conditions.

9      Q.     And peripheral arterial disease

10   can lead to amputations in patients,

11   correct?

12     A.     Yes.  If it is severe enough.

13     Q.     And that's especially true in

14   patients with diabetes?

15            MR. ELIAS:  Object to form of the

16        question.

17     A.     Earlier we discussed risk factors

18   for developing atherosclerosis and there is

19   no question that diabetes is one of the

20   things on the list.  But so is smoking,

21   family history, hypertension.

22            And as we just discussed, the

23   less common, occasionally, I guess, this

24   happens in people without recognized risk

25   factors.

1      Q.    You would agree that vascular

2   surgeons perform surgeries all the time to

3   treat patients with peripheral arterial

4   disease who have never received TKIs?

5      A.    I'm not sure I can really speak

6   to their practice, but in my mind, I think

7   that probably most patients who require

8   amputations for peripheral vascular disease

9   are not on TKIs.  The fraction of people on

10  TKIs is very, very small, looking at the

11  entire population.

12     Q.    And in your mind, those vast

13  majority of procedures, not all of those

14  are going to be successful in treating the

15  patient -- isn't that --

16          MR. ELIAS:  I object to the form.

17      That's vague, over-broad, unfirm

18      hypothetical, and is calling for

19      speculation.

20     A.    Well, now I forgot what the

21  question was.

22          MR. ELIAS:  So he says, in your

23      mind, the vast majority of procedures,

24      not all of those are going to be

25      successful in treating the patient?

1          And I keep those objections.

2     A.    As a general rule, as I have

3     stated before, I don't believe anything in

4     medicine is ever a full 100 percent or zero

5     percent.  So yeah, I'm sure there are some

6     procedures that do not have the desired

7     outcome.

8     Q.    Turning to your report, which I

9     think we marked as 270 --

10    A.    270 is what I have here.

11    Q.    I would like to ask you some

12    questions related to that.  In that

13    original report there, you list things that

14    you reviewed in forming your opinions,

15    correct?

16    A.    I believe so, yes.

17    Q.    I took a look at that list and it

18    appears to me that you were not asked to

19    review Mr. Lauris' medical records in

20    preparing your initial report there.  Is

21    that correct?

22    A.    That's correct.  I reviewed a

23    very limited amount of records related to

24    the patient involved in this litigation.

25          I was asked by counsel to really

1   speak to the more general issues of

2   treatment of CML, toxicities of the various

3   TKIs, choice of TKIs, and I was also asked

4   to speak towards whether I thought the

5   product label for nilotinib gave, in my

6   mind, whether it gave adequate warning

7   about the risk of potentially lethal

8   atherosclerotic problems.

9       Q.    When you say you reviewed limited

10  medical records, would that have been --

11  are you talking about the records that are

12  referenced in your supplemental report or

13  something else?

14      A.    Do you mind if I look at what I

15  referenced?

16      Q.    Absolutely, please.

17      A.    Even though I just wrote this

18  report and my memory is not as perfect as

19  it once was.

20      Q.    So I saw two citations to medical

21  records on page 2 at the beginning and end

22  of that page.

23      A.    So in this first reference, which

24  is how Mr. Lauris was followed for his CML,

25  I believe I reviewed one of the various

1    medical records, but a fairly complete set

2    of that record.  And then for the comments

3    about the cardiologic evaluation, again, I

4    read the records I was provided with

5    relating to Dr. Sohn and his colleagues,

6    and I believe I also reviewed that entire

7    record.  It was, I don't know, 13 or 15

8    pages.

9        Q.    And that -- that corresponds to

10   this citation here?

11       A.    OK, good.

12             MR. ELIAS:  For the record, with

13       respect to the oncology, whose records

14       did you review?

15             THE WITNESS:  This would be the

16       records of his treating physician.

17             MR. ELIAS:  Dr. Hoffmann?

18             THE WITNESS:  Yeah, a German kind

19       of name.

20       Q.    When did you review those

21   records?

22       A.    I did not review those medical

23   records in their entirety until I wrote the

24   supplemental report or was developing the

25   first draft of the supplemental report.

Page 114

1        Q.     So in your initial report, the

2    medical records were not a part of the

3    basis for the opinions that you express

4    there?

5        A.     In the exact timeline when I did

6    these things, it's possible that I looked

7    at one or two or maybe more pieces of

8    paper.   I believe I did see the autopsy

9    report before I did this and perhaps there

10   were some other snippets that I saw.

11            But I did not by any means do

12   anything near a comprehensive review of the

13   medical records and I wasn't asked to.

14       Q.     Just to be clear, you're not here

15   offering an opinion today about the cause

16   of Mr. Lauris' death, correct?

17       A.     Right.   I do not feel that I have

18   reviewed enough of his medical records.

19            MR. ELIAS:  Let's just make clear

20        so we don't have to -- he is not -- he

21        is offering the opinions in his report.

22        He is not being offered on -- with

23        respect to Mr. Lauris to offer any

24        opinions other than what's in his

25        report, so that includes the issues of

1          specific causation with respect to

2          Tasigna which is covered by other

3          experts.  I just want to save time.

4          Q.    We have been talking about the

5     process of a prescribing physician making a

6     risk/benefit calculation and deciding what

7     medication to give their patients, right?

8          A.    Yes.

9          Q.    And I think you have testified

10    that that's patient-specific decision that

11    the treating physician makes himself based

12    on the information that he knows and the

13    context in which his patient presents.  Is

14    that correct?

15         A.    I think so, but please say that

16    again because towards the end there, I got

17    a little lost.

18         Q.    All right.  I think you --

19              MR. ELIAS:  Compound.

20         A.    Maybe that's why I got lost.

21         Q.    I think you have testified --

22    well, I will ask it a little differently.

23              Is it true that a prescribing

24    decision is a patient-specific

25    determination?

1     A.     The -- in my mind, the

2  appropriate way to make a decision is it

3  needs to be patient-specific.

4     Q.     And part of being

5  patient-specific is having -- is being

6  aware of all the information involved with

7  that particular person?

8     A.     You know, again, when you say all

9  or none, I don't think anybody ever knows

10  everything they need to know.

11          But you try in a diligent fashion

12  to obtain as much relevant information as

13  you can.  And then you integrate all of the

14  information you have and balance it out

15  with your general knowledge of the disease

16  and the drugs and whatever you're deciding,

17  and by weighing, again, the risks and the

18  benefits, you try to steer an optimal path

19  for that patient.

20     Q.     In your supplemental report, you

21  lay out potential options that were

22  available for a CML patient like

23  Mr. Lauris?

24          MR. ELIAS:  Which supplemental?

25          MR. REISSAUS:  The supplemental

1        report.

2               MR. ELIAS:  Where are you

3        referring?

4        Q.    So if you turn to page 3 of your

5    supplemental report.

6        A.    All right, I've got page 3.

7        Q.    The last two sentences, they

8    read, "Therefore, continuing imatinib or

9    changing to dasatinib would be reasonable

10   alternatives to nilotinib, particularly

11   given the patient's risk factors for

12   vascular --

13       A.    I'm sorry, I'm not seeing it on

14   my page 3, the last two sentences --

15       Q.    Of the section before B, I'm

16   sorry.

17       A.    Oh, I see, I see.

18       Q.    I am sorry.

19       A.    I was looking at the bottom

20   thinking like -- somebody -- either one of

21   us is dyslexic.

22               Yes, I see what you are saying.

23       Q.    Just to be clear, I'm looking at

24   page 3 which is the end of section 2A and

25   the last two sentences and you note that

Page 118

1    continuing imatinib or changing to

2    dasatinib would be reasonable alternatives

3    to nilotinib, particularly given the

4    patient's risk factors for vascular

5    occlusive disease of diabetes mellitus and

6    hypertension.

7              Did I read that correctly?

8       A.    Yes, you did.

9       Q.    So in Mr. Lauris' case, your

10   understanding is that options that were

11   available were taking nilotinib, continuing

12   imatinib, or switching to dasatinib?

13             MR. ELIAS:  Objection.  Vague as

14      to time.

15      A.    There were, in fact, of course

16   more options than that, but I would say

17   that group would be the three most

18   appealing options I think to most

19   oncologists.

20      Q.    And then you continue, "The

21   decision as to what drug to prescribe is

22   ultimately up to the treating physician who

23   must be properly informed of all

24   significant risks in order to make the

25   appropriate treatment decision."

1          Did I read that correctly?

2     A.    Yes, yes, you did.

3     Q.    Do you agree with that statement?

4     A.    Yes, I do.  I think it's --

5     though it's often done particularly with

6     people who have very big egos, it's always

7     dangerous to make specific patient

8     recommendations without having had the

9     opportunity to completely review the

10    patient, to see the patient physically

11    yourself, to examine the patient, and to

12    review all of the primary data.

13          Operating, if you will, on

14    hearsay can lead to some very, on occasion,

15    can lead to some bad consequences.

16    Q.    And I understand your original

17    report and the supplemental lay out the

18    options that are available, but is it fair

19    to say that you're not offering an opinion

20    in this case about what specific treatment

21    choice should have been made for Mr. Lauris

22    in this case?

23    A.    I believe that my opinion here

24    discusses possible options and that I do

25    not believe that at the time I wrote this

Page 120

1    or now, I have a complete enough set of

2    information and understanding to make a

3    specific prescribing decision for this

4    patient at this time.

5        Q.    On the previous page on page 2,

6    you have some discussion of BCR-ABL levels?

7        A.    Yes.

8        Q.    Do you see what I am referring

9    to?

10       A.    Yes, it starts at the top of page

11   2.  I think extends to the first paragraph.

12       Q.    You are aware that Mr. Lauris'

13   BCR-ABL levels increased in 2012 and again

14   in 2013 when Dr. Hoffmann made a decision

15   to switch TKI therapies for Mr. Lauris?

16       A.    There was some fluctuation in his

17   levels which is, in fact, pretty common

18   when we care for CML patients on TKIs and I

19   believe he had two successive measurements

20   that were numerically higher than the third

21   one before that, if you follow what I am

22   saying.

23            But still, as I wrote in my

24   report, even at its worst, his disease was

25   really only detectable by the most

1    sophisticated, sensitive tests we had.

2            So he would not -- without having

3    that test, he would not be diagnosed as

4    somebody having CML.  Any of the normal

5    approaches, including blood tests and bone

6    marrow tests and standard chromosomal

7    analysis, you couldn't tell he had it, even

8    at the worst point.

9        Q.    Do you criticize in any way

10   Dr. Hoffmann's decision that it was

11   appropriate to switch therapies at the

12   times that he did based on what he was

13   observing with increases in BCR-ABL?

14       A.    You know, again, I don't believe

15   I have adequate information, knowledge,

16   experience with this patient to really

17   comment on the prescribing decisions.

18            I think my report kind of speaks

19   for itself in terms of what my general

20   opinion is for people with CML who have an

21   excellent response to TKI therapy, what the

22   possible alternatives could be.

23       Q.    If you turn to your original

24   report on page 3.  Are you there?

25       A.    Yes.

Page 122

1       Q.     You offered the opinion that

2    nilotinib is causally associated with

3    atherosclerosis-related conditions.  Do you

4    see that?

5       A.     Yes, I do see that.

6       Q.     What does atherosclerosis-

7    related condition mean to you?

8       A.     Again, as we discussed,

9    atherosclerosis is something that in and of

10   itself isn't something a patient, you know,

11   feels or knows about.  What the patient

12   experiences and what's medically

13   problematic is the reduced blood flow that

14   atherosclerosis causes.  And so I meant all

15   of the clinically relevant or clinically

16   important downstream effects that

17   atherosclerosis can produce, of which, I

18   think we have already mentioned three very

19   important ones which is heart attack,

20   stroke and peripheral vascular disease.

21      Q.     So regardless of the downstream

22   event, we are talking about the, in your

23   mind, it's the atherosclerosis that's the

24   underlying mechanism of the morbidity that

25   you're making a causal opinion about?

1        A.     The atherosclerosis is part of

2    the problem.  But I believe that a very

3    important part of nilotinib's deleterious

4    effects in this regard are related to the

5    fact that not only can it accelerate

6    atherosclerosis, but more importantly, the

7    body has, you know, built into it certain

8    mechanisms to improve circulations to areas

9    that have reduced circulation because of,

10   let's say, atherosclerosis.

11          And based on preclinical evidence

12   and some clinical evidence and some case

13   reports, it seems that a powerful part of

14   the effect is that nilotinib inhibits some

15   of these compensatory mechanisms that can

16   ameliorate symptoms related to

17   atherosclerosis decrements and blood flow.

18   I hope that make sense.

19       Q.     Let me ask the question a little

20   differently and maybe see whether or not I

21   understood the response.

22          In your opinion, nilotinib may

23   promote atherosclerosis, but it may also

24   inhibit processes that counteract

25   atherosclerosis, is that --

1          MR. ELIAS:  I'm going to object

2      to the form of the question, because it

3      has been asked and answered and

4      misstates the testimony.

5          But go ahead.

6      A.   So I don't agree with and

7  hopefully I didn't say what you just

8  repeated back to me because it's not -- I

9  do believe that nilotinib causes an

10 acceleration of atherosclerosis, that is

11 true, but I also believe a major and

12 perhaps equally important contributor isn't

13 that it reverses atherosclerosis, but it

14 ameliorates some of the deleterious effects

15 that atherosclerosis causes.  I don't think

16 I helped you.

17          MR. ELIAS:  You said --

18     Q.   Ameliorates some of the

19 deleterious effects that atherosclerosis

20 causes.  Do you mean that nilotinib is

21 preventing the body from coping with the

22 effects of atherosclerosis within it?

23     A.   Yeah.  Hopefully what I said and

24 what I think is that -- again,

25 atherosclerosis itself is not something you

1    can feel that you have got.

2            What you can feel is certain

3    tissues aren't getting enough blood.  You

4    can get that with heart pain.  You can get

5    muscle cramps in your legs.  You can have a

6    stroke.  That is what a patient feels and

7    primarily what brings patients to medical

8    attention.

9            Now, atherosclerosis, which

10   causes both hardening and narrowing of the

11   arteries which makes it so that some

12   tissues get inadequate blood flow, the body

13   has some ways of compensating for that.

14   And I believe nilotinib has a potent effect

15   suppressing the body's ability to

16   compensate for the effects of

17   atherosclerosis.

18           Did I say that clearer?

19   Q.    Thank you.

20   A.    I am sorry, it's --

21   Q.    The word "ameliorate" was what I

22   wasn't understanding the first time so

23   thank you.

24           MR. ELIAS:  You said it clearly.

25   A.    Maybe I didn't use it in the

Page 126

1    right context.

2        Q.    You used the term "accelerated"

3    several times to describe the type of

4    atherosclerosis that you believe is

5    causally related to nilotinib.  What do you

6    mean when you use that term "accelerated"?

7        A.    Well, again, as I said before,

8    atherosclerosis is very, very common in

9    developed countries such as the United

10   States and I think.

11           If you did a careful enough

12   investigation, you would probably find that

13   everybody, by the time they're 80, has got

14   at least some atherosclerosis in their

15   body, though obviously for many people, it

16   never causes clinically important problems.

17   Though again, it's the leading cause of

18   death in the country.  So for many people,

19   it does.

20           And as we said, the earliest

21   signs can be detected when people are, at

22   least to my understanding, in their teens

23   and even 20s.  So over time,

24   atherosclerosis is a progressive problem.

25           So whether you get nilotinib or

Page 127

1    not, there is some risk or a very high

2    likelihood that your atherosclerosis will

3    worsen, but it may or may not worsen to the

4    point where it becomes clinically relevant

5    or meaningful in your life.

6              From my analysis, I believe that

7    nilotinib makes that progression happen

8    faster in some patients.

9        Q.    When you say faster in some

10   patients, is there any objective time

11   period that you can apply to that?

12             MR. ELIAS:  Object to form.

13       A.    Well, there is, you know, in the

14   reading, you get some sense of timing based

15   on the reports of how long people were on

16   nilotinib when this happened, but the best

17   data in my mind comes from the analysis of

18   a patient who actually had a fairly

19   thorough evaluation before starting

20   nilotinib, including CT angiograms, and was

21   reported to have no apparent

22   atherosclerosis at that point, and then I

23   believe it was a year following the

24   initiation of nilotinib developed symptoms

25   of atherosclerosis; reduced blood flow, in

1    this case to his legs, and they redid the

2    CT angiograms at that point and found that

3    within a fairly short period of time, in

4    terms of how we normally measure the

5    development of atherosclerosis, this

6    patient had developed clinically important

7    atherosclerosis in his legs and

8    atherosclerosis in many other areas of his

9    body, even though at that point in time, I

10   don't believe they were clinically

11   important.

12              MR. ELIAS:  In the other areas of

13       the body?

14       A.    Yes, such as I think his kidney,

15   his mesentery.

16              But these were all changes from

17   the pretreatment evaluation and that

18   general sense is further buttressed by a

19   prospective study that I reviewed and I

20   believe is in this list.

21              Here, we're doing somewhat less

22   invasive tests.  The researchers

23   demonstrated that the development of

24   indications of atherosclerosis were much

25   more common in patients that received

Page 129

1    nilotinib compared to patients who had

2    imatinib.

3              If you want, I can tell you

4    specifically which.

5         Q.    I actually will ask you questions

6    about those articles specifically as well.

7         A.    OK, so we will get to it.

8         Q.    Based on those articles, can you

9    provide an objective standard for the

10   amount of time that would indicate what

11   accelerated atherosclerosis is?

12             MR. ELIAS:   Object to the form,

13        vague and asked and answered.

14             But go ahead.

15        A.    Again, I do not hold myself out

16   to be a cardiovascular expert, but my

17   general sense is that in most settings,

18   atherosclerosis is a disease that takes

19   years, if not decades, to develop a

20   clinically important problem.

21             So for this to happen within a

22   year, and for that matter, within two or

23   even three years, and other short time

24   points, perhaps even less than a decade,

25   would represent a more rapid course than

Page 130

1    people who aren't taking nilotinib would on

2    average have.

3            So I can't -- it's again, the

4    pornography issue.  I can't -- I know it

5    when I see it or at least I have a sense of

6    it when I see it, but I don't know that I

7    can define it as an exact, you know, period

8    of time.

9        Q.    You identified, identified a

10   particular case report that was

11   particularly meaningful to you and I

12   think -- was that the Maurizot article?

13       A.    I believe so.  Let me just --

14            MR. ELIAS:  Let him get there and

15       make sure he can confirm that's the

16       right one.

17       A.    Now I'm not thinking it is

18   Maurizot.

19            MR. ELIAS:  Mirault or Maurizot.

20       A.    It might be Mirault, let me look

21   a little bit more though to confirm.

22            I think the Maurizot report was

23   the patient who dramatically improved very

24   quickly after stopping nilotinib.

25       Q.    So Mirault.

1          A.     I think Mirault better.  Let me

2     confirm it so we are all saying the same

3     thing.

4                Would you --

5          Q.     Just a second, Doctor.  I was

6     giving the names.

7                You can go ahead, sorry.

8          A.     Yeah, so it's the report by

9     Mirault, et al.

10               MR. ELIAS:  Which is, let's be

11          clear for the record because we kind of

12          mixed them up.

13         Q.     "Rapid Onset of Peripheral Artery

14    Disease in a Chronic Myeloid Leukemia

15    Patient Without Prior Arterial Disorder,

16    Direct Relationship with Nilotinib Exposure

17    in Clinical Outcome"?

18         A.     That's the one.

19         Q.     That article reports on a single

20    patient.  It's a case report?

21         A.     Yes, it is.

22         Q.     We spoke a little bit earlier

23    about the different levels of evidence that

24    you come -- come from -- that come about in

25    science, right?

1          A.     Yes.

2          Q.     At one level at the top, we have

3    randomized controlled studies, is that

4    right?

5          A.     Yes, and there are subsets of

6    those with -- we usually view something we

7    call double-blinded which is neither the

8    patient nor the clinicians know what

9    treatment the patient is getting, placebo

10   controlled, which usually means a nonactive

11   therapy.

12              But in same cases where it is not

13   ethical to give a nonactive therapy, you

14   would give a sort of standard of care

15   treatment, and you would try to disguise it

16   in a way that neither the patient nor the

17   clinician could figure out which treatment

18   you're actually getting and randomly

19   assigning patients to one or the other

20   which helps balance the other known risk

21   factors so that both groups are essentially

22   equivalent types of patients.  That's

23   usually viewed as optimal.

24              Obviously, if you're dealing with

25   laboratory rats, you can do -- you can do

1    this in almost any setting.

2           When you're dealing with human

3    beings, however, it is often not

4    appropriate to necessarily do the types of

5    testing that would lead to the highest

6    level of research.

7           So again, we have to balance the

8    quality of the research against the rights

9    of individual patients.

10    Q.    And then below -- so the

11    randomized clinical trials are the highest

12    level when they can be done.  Below that,

13    there are other levels, correct?

14    A.    Yes --

15           MR. ELIAS:  Object to form.

16    Q.    Are there -- cohort studies?  Is

17    that right?

18    A.    Yes.

19    Q.    And that would be a level below,

20    and then case reports would be a level

21    below all of that, correct?

22           MR. ELIAS:  Object to form,

23    over-broad.

24    A.    I really think it depends.

25    Certain case studies can be extraordinarily

1    informative.

2             I happen to believe that this one

3    which did relatively, you know, high level

4    sensitive testing for atherosclerosis gave

5    us a lot of very important insight and

6    probably is more valuable than certain

7    types of cohort studies or actually certain

8    types of even randomized trials because you

9    have to remember, when you do a randomized

10   trial, the trial is designed to test

11   typically one primary end point and the

12   statistics are designed such that you have

13   a high likelihood that you will be able to

14   discern if one outcome is better than the

15   other.

16             Once you start piling on other

17   questions, like if the primary end point

18   is -- let's say the antileukemic activity

19   of the drug, once you start adding on

20   secondary questions such as did people

21   develop atherosclerosis, the trial wasn't

22   designed or powered to do that and it loses

23   a lot of its authority or at least some of

24   its authority depending on how the

25   information is collected, how it's

Page 135

1    analyzed.

2              So, you know, each study I think

3    needs to be evaluated for its strengths and

4    weaknesses and, you know, to some degree, I

5    don't think any one study is completely

6    definitive for this or probably any medical

7    result.

8              It's, again, like a lot of things

9    we do, it's trying to have as complete a

10   picture as you can and weighing the

11   different pieces for their relevance and

12   importance and then putting that all

13   together into a paradigm that you have for

14   how things happen.

15        Q.     Are you aware of any other

16   article that reports findings like Mirault

17   after having conducted pre and post

18   nilotinib imaging of the vasculature?

19        A.     I've not seen another report.   It

20   certainly doesn't mean that it couldn't

21   exist somewhere.  I suspect as this problem

22   became more apparent, that there have been

23   several patients at the same center or

24   possibly elsewhere, I think they actually

25   said this became their standard of care of

1    patients they were putting on nilotinib, so

2    I'm sure there were other patients out

3    there who had it, but we don't necessarily

4    know the result.

5         Q.    You're not aware of any

6    publication reporting results using this

7    type of pre and post imaging?

8         A.    I haven't seen other reports like

9    this, no.

10        Q.    Do you know the term "ICD codes"?

11        A.    I would prefer not to, but I have

12   a passing familiarity with them, yes.

13        Q.    As a physician, that is something

14   you deal with or you dealt with -- had to

15   deal with on a routine basis?

16        A.    Yes, though they have become so

17   complex that there are specialists;

18   administrative, finance, medical, technical

19   people who really now bear the brunt of

20   doing that.

21        Q.    And ICD stands for International

22   Classification of Disease?

23        A.    I'm going to take your word for

24   it.  I don't know, but it sounds certainly

25   reasonable enough.

1          Q.    Are you aware of any ICD code for

2     TKI-associated atherosclerosis?

3          A.    No, I certainly don't know the

4     codes well enough to get to that level of

5     detail.  Although I suspect there will be,

6     it may require another iteration but --

7     it's now fairly well-established that some

8     TKIs promote atherosclerosis.

9          Q.    By some, you mean more than just

10    nilotinib?

11         A.    Well, in CML, the most dramatic

12    example is this medicine ponatinib and I

13    think I discussed those issues in my

14    report.

15              And again, I don't take care of

16    patients with solid tumors, so I'm not

17    really in a position to say, but I believe

18    that there are also some kinase inhibitors

19    used in the treatment of solid tumors that

20    promotes this as well.  But I don't hold

21    myself out to be an expert there.

22         Q.    Are you aware of any ICD code for

23    accelerated and severe atherosclerosis?

24         A.    Again, this the ICD 9 codes and

25    10 codes are a little bit outside really

Page 138

1    what I was responsible for at any point in

2    my career, and then when you further

3    subcategorize it to include cardiovascular

4    events, which was certainly never the

5    primary focus of my clinical care or my

6    research career, I don't really know the

7    relevant codes there.

8         Q.    You cite the Aichberger article.

9    Do you recall that?

10        A.    Yes.

11              Is that the way you pronounce his

12   name?

13        Q.    The best I know.

14        A.    I know exactly who you mean.  I

15   just it sounds like one of those names I

16   would probably butcher if I tried to say it

17   out loud, so I'm not going to attempt that.

18        Q.    You mentioned earlier a patient

19   with a case report of a spinal cord

20   infarct?

21        A.    Yes.

22        Q.    That from this article,

23   Aichberger?

24        A.    I think it was, but let me double

25   check.

1          Yes, you can see here in my

2     report, I say, after I described the three

3     patients with lower extremity problems, I

4     say an additional patient suffered a spinal

5     cord stroke, which again, is quite uncommon

6     based on both my lay knowledge and my

7     general medical knowledge, it's quite

8     uncommon compared to strokes in your brain

9     in the general population, and certainly I

10    don't remember ever seeing a CML patient

11    have a spinal cord stroke in my experience

12    and experience that I would have been

13    exposed to both at Memorial Sloan Kettering

14    and subsequently at Thomas Jefferson.

15         Q.    Are you aware of any other

16    literature reporting cases of patients who

17    received nilotinib who had spinal cord

18    infarctions?

19         A.    I don't remember seeing anything

20    in print about other patients with spinal

21    cord strokes.

22         Q.    Would you consider yourself an

23    expert in the causes of spinal cord

24    infarctions?

25         A.    No, I do not.

Page 140

1      Q.    Are you aware of any data from

2    Aichberger that allows you to reach the

3    conclusion that the spinal cord infarction

4    reported in that one patient was related to

5    atherosclerosis and not some other cause?

6           MR. ELIAS:  Would it help you to

7      see the article or -- in answering this

8      question.

9      A.    Yeah, I probably -- refreshing my

10   memory would be helpful.

11          MR. ELIAS:  If you want, I'm fine

12     with us just referencing the article

13     and not marking it again as an exhibit.

14          MR. REISSAUS:  Yes, and actually

15     for the record, I'll say this has been

16     previously marked as Exhibit 24.

17          MR. ELIAS:  Why don't you just

18     take a minute before he asks you

19     questions about it to -- I don't want

20     you to take excessive time, but as much

21     time as you need in order to get

22     yourself refamiliarized with the

23     article.

24     A.    Sure.

25          So in this report --

Page 141

1          MR. ELIAS:  Well, let's stop.

2      Let's make sure there is a question.

3      Q.    I'll read the question back to

4  you.

5          MR. ELIAS:  Sorry.

6          THE WITNESS:  Thank you.

7      Q.    I got the impression you

8  remembered the question, but are you aware

9  of any data from Aichberger that allows you

10  to reach the conclusion that the spinal

11  cord infarction reported in that one

12  patient was related to atherosclerosis and

13  not some other cause?

14      A.    From this report, it doesn't

15  appear that they did any testing to

16  ascertain the underlying cause of the

17  stroke.

18          Now, having said that, I think it

19  is important to remember that the most

20  common by far cause of stroke in the United

21  States and western Europe is related to

22  atherosclerosis, and in addition, as I

23  discussed earlier, the adverse vascular

24  events associated with nilotinib are not

25  due just to the progression of

1    atherosclerosis.

2             So as is often the case with any

3    particular problem, it can be very

4    difficult, if not impossible, to know with

5    absolute certainty what's the mechanism by

6    which something happens, and I think there

7    is a body of evidence overall that suggests

8    that these vascular events may have been in

9    part exacerbated or precipitated by the

10   deleterious effects of nilotinib on the

11   vasculature and particularly in the setting

12   where people have other things that promote

13   vascular events and atherosclerosis.

14       Q.    I'm setting aside other vascular

15   events and just want to ask about this

16   particular spinal cord infarction in this

17   case.

18             Aichberger doesn't report any

19   data that would allow you to conclude that

20   in this particular patient, there was

21   atherosclerosis present in the spine.

22   Instead, you're relying on the fact that

23   many strokes are caused by atherosclerosis?

24             MR. ELIAS:  Objection, misstates,

25       asked and answered.

1           But go ahead.

2      A.    Yes, again, it's probably never

3    completely appropriate to say "always" or

4    "never" or to speak with absolute

5    certainty, and certainly we don't have the

6    information and could there theoretically

7    be a different etiology for this stroke?

8    Yes, of course.  And any individual case,

9    it's hard to know the confluence of

10   factors, including factors that aren't yet

11   known to us that may precipitate a specific

12   problem.

13           My concern is that spinal -- the

14   reason why I highlighted this, because

15   there are other vascular events that were

16   reported in this paper, but the reason why

17   I highlighted the spinal cord stroke is

18   that it's a very unusual event and for a

19   drug that I believe can promote

20   atherosclerosis for a patient to get this

21   very rare event, it's a worrisome sign that

22   nilotinib likely contributed to this.

23           But I would not say that I am

24   absolutely certain that nilotinib caused

25   this and could it ever happen in patients

1    who don't take nilotinib?  I'm sure there

2    are reports of it.  It's rare, but it

3    occurs.

4              I'm just saying that based on the

5    way I put these things together, when you

6    have very rare occurrences all of a sudden

7    happening, it lends credence to the

8    association that we are discussing.

9              So three cases of severe

10   peripheral arterial occlusive disease and

11   the spinal cord stroke, those four cases

12   struck me was sufficiently unusual to ring

13   a warning bell, let's say.  Whereas other

14   things I found less persuasive such as the

15   myocardial infarction, those are relatively

16   common in western societies.

17             It is certainly possible that

18   nilotinib contributed to that occurring at

19   the time it happened, but I think that's

20   much less convincing.  We know that, you

21   know, a lot of people have heart attacks

22   who never were treated with nilotinib.

23             MR. ELIAS:  Drew, whenever you

24        are at a point, we have been going

25        about an hour and 20 and I just again,

1       go ahead.

2              MR. REISSAUS:  Two minutes.

3              MR. ELIAS:  I will let you finish

4       with up with this, obviously.

5       Q.    In your view, case reports of

6   more common events such as myocardial

7   infarction do not carry as much weight to

8   them as case reports of more unusual events

9   or more rare events such as in this case

10  subdural -- or excuse me, spinal

11  infarction?

12      A.    So yes, you know, as I said

13  before, when you evaluate the quality of

14  the data or the evidence, you really need

15  to put the full picture together and, you

16  know, if you were studying, you know, an

17  antibiotic used in urinary tract infections

18  in a group of teenagers and you reported

19  that 20 percent of them had acne, you would

20  be more likely to think that it's probably

21  not related because acne is very common in

22  teenagers, whether they're getting this

23  antibiotic for an urinary tract infection

24  or not.

25              But on the other hand, if you

1    heard they were developing a heretofore

2    extremely rare kind of cancer, it would be

3    very worrisome.

4              And, in fact, something like that

5    led to the understanding that a drug that

6    used to be given to prevent miscarriages,

7    DES -- which I butcher the name so I won't

8    say the whole name of it -- produced a very

9    specific type of cancer in women who, while

10   in utero in their mothers, were exposed to

11   this drug because it was given to their

12   mothers to prevent miscarriage, and that

13   type of cancer is almost never seen in any

14   other circumstance.  So that's what led to

15   the discovery that there was actually a

16   causal relationship.

17             So yes, you have to put together

18   all of the information you can when you

19   analyze this.

20        Q.    It's important to consider the

21   general rates for these events in the

22   overall population in comparing it to what

23   the exposure is you're looking at?

24        A.    This is certainly one of the

25   factors that I assess when I'm trying to

1    determine how powerful the importance of

2    the information is.

3              MR. REISSAUS:  OK.  Let's take a

4        break.  Thank you.

5              THE VIDEOGRAPHER:  Now going off

6        the video record.  That concludes DVD

7        number 3.  The time 15:05.

8              (Recess)

9              THE VIDEOGRAPHER:  We are now

10       back on the video record.  This

11       commences DVD number 4, July 14, 2017.

12       The time is 15:24.

13       Q.    Doctor, you also cite a case

14   report by Tefferi from 2011.  It is number

15   2 on page 3 of your report.  Do you see

16   that?

17       A.    Yes.  To be perfectly technical a

18   case is reported, I think it was two

19   patients, not one, but yes.

20       Q.    Excuse me, yes, so this one I

21   think was --

22       A.    Sometimes I can be obnoxiously

23   technical.  I apologize.

24       Q.    You're correct, this is a letter

25   from the American Journal of Hematology

Page 148

1    from April of 2011 that states or that

2    gives information on two patients on

3    nilotinib who had adverse events, correct?

4        A.    Yes.

5        Q.    One of those patients died

6    suddenly, is that right?

7        A.    Yes.

8        Q.    The authors of the paper didn't

9    reach a conclusion about the cause of that

10   patient's death, correct?

11           MR. ELIAS:  Do you need to see

12       the paper?

13       Q.    If you need to see it, let me

14   know.  I'm just trying to --

15       A.    Let me take a look at it.

16       Q.    This has previously been marked

17   as Exhibit 248.

18           (Pause)

19       A.    So the authors do not explicitly

20   state or appear to know the cause of this,

21   but we know that sudden death is in one of

22   the original black box warnings for

23   nilotinib.  So -- and that warning I

24   believe was adequate.

25           I mean, put it right where they

Page 149

1    should have.  There is a severe problem,

2    even if it is infrequent or even if it is

3    rare, if it is potentially lethal, it needs

4    to be prominently displayed.

5              So no, I don't think we know --

6    again, it's very hard to know with absolute

7    certainty, but we know there was one case

8    of sudden death in the Aichberger report.

9    Now there is another one.  And while this

10   happens -- and it happens more commonly

11   than a spinal cord infarction, it's not

12   like people are just dropping dead every

13   day around you.

14             It's uncommon, it's rare, and to

15   have two of these reports -- and they

16   happen to be on nilotinib, is very

17   concerning, and there is an implication

18   that they may be driven by nilotinib.  Or

19   nilotinib could have contributed to their

20   occurrence, I should say.

21   Q.    You said that sudden death is

22   something that has always been in a boxed

23   warning for Tasigna, right?

24   A.    I believe so.  I probably haven't

25   reviewed every label on it, but my memory

Page 150

1    was even in the earliest days, there were

2    warnings, what we used to call black box

3    warnings.  Now we just call them box

4    warnings.  QTC prolongation and events of

5    sudden death.

6        Q.    In your mind, do these case

7    reports raise the possibility that sudden

8    deaths on nilotinib are related to

9    atherosclerosis?

10       A.    Again, knowing something with

11   absolute certainty is very difficult if not

12   impossible.

13            I believe that my own personal

14   opinion, when this was first described, I

15   was concerned that the sudden death was

16   related to a lethal arrhythmia associated

17   with the QTC prolongation.

18            However, once we started getting

19   these reports, and it seemed that people

20   were paying more attention to QTC

21   prolongation and addressing it with

22   electrolyte replacement, avoidance of other

23   drugs that prolonged their QTC or whatever

24   else people may have done, that QTC

25   prolonged associated lethal arrhythmias

1    perhaps wasn't the mechanism for sudden

2    death, and we know that -- I mean, in the

3    United States, as a whole, heart attack and

4    stroke and a third one which is also

5    related to clotting, pulmonary embolism,

6    are I believe are the three -- well,

7    excepting the unfortunate opioid epidemic,

8    are the three most common causes of sudden

9    death that we see.

10            So again, from a statistical

11   standpoint, I think that it's very possible

12   that this is related to a complications

13   from atherosclerotic disease.

14       Q.    The authors, though, don't state

15   that conclusion with regard to that patient

16   in their letter, do they?

17       A.    They don't, but of course, you

18   have to remember that it's included in a

19   report that's attaching itself to a report

20   on accelerated atherosclerosis associated

21   with nilotinib.

22            So certainly though it is not

23   explicitly stated, it seems implicitly -- I

24   mean, you know, I don't know any other way

25   to interpret it, but obviously the authors

1   thought there was a strong possibility this

2   was related.  Otherwise, it's a non

3   sequitur.

4       Q.    In the items that you cite in 1

5   through 5 in your report --

6       A.    I'm sorry, can you clarify it, is

7   it these or --

8       Q.    In section 4A1, there is five key

9   reports that you identify.

10      A.    Yes.  I got that.

11      Q.    I'm -- I was going ask a question

12  about those as a group.

13      A.    OK.

14      Q.    Out of those five key reports

15  that you cite, do any of those data contain

16  any statistical control to account for

17  atherosclerosis risk factors in comparing

18  head to head Tasigna with a non-Gleevec

19  comparator?

20      A.    With a non-Gleevec competitor?  I

21  don't believe there are any randomized

22  trials that compared nilotinib to anything

23  other than imatinib, and certainly, I think

24  most of us would believe it would be

25  unethical to test nilotinib against a

1    non-TKI arm.  So I don't think that's a

2    thing that can be possibly known with

3    absolute certainty.

4         Q.    Do any of these key reports that

5    you cite attempt to do a statistical

6    analysis to compare the rates observed with

7    nilotinib to a non-TKI cohort?

8         A.    Again, a comparison to a non-TKI

9    cohort really has not been done since the

10   approval of imatinib in the early 2000s.

11         So that data really isn't

12   available, nor is it ethical to try to

13   obtain it.  And the only state that I can

14   think of that I have seen reported was when

15   people tried to abstract data out of the

16   initial IRIS so-called trial which in

17   previously in untreated patients compared

18   the combination of Interferon and

19   Cytarabine, C-Y-T-A-R-A-B-I-N-E, to

20   imatinib, you know, the trial was not

21   designed to assess for vascular problems.

22   So anything that would be caught would be

23   incidental and not done in a systematic

24   fashion.

25         So I really don't know what to

1    make of any non-TKI comparator to

2    nilotinib.  The best data we have for

3    trying to assess the effects of nilotinib

4    is in the randomized trial to imatinib.

5         Q.    The article you were discussing

6    is the Giles 2013 analysis that took

7    Tasigna versus Gleevecs trials and included

8    a Gleevec versus the pre Gleevec treatment

9    that you discussed a second ago?

10        A.    Well, in fact, the trial I was

11   referring to was the original publication

12   of the IRIS trial and the IRIS trial was

13   one of, I believe, three trials that in the

14   paper by Giles, et al., they tried to

15   combine to come up with some kind of

16   comparator groups.

17             But again, we know that that type

18   of analysis is very problematic because not

19   a primary end point of any of these

20   studies, not systematically reported

21   whether or not patients were even having

22   these events, and finally, unless you do a

23   formal, you know, what's called a meta

24   analysis of this, I think it's really hard

25   to know what to make of it.

Page 155

1          So I personally didn't find the

2     comparison of those three trials

3     informative, but when possible, I would

4     like to go back and look at the original

5     publications that I can.

6          You know, people had leukemia and

7     when CML had a bad prognosis, people were a

8     lot less concerned about the possibility

9     that it might accelerate atherosclerosis.

10    Again, if your survival is expected to be

11    three to five years, you worry a heck of a

12    lot less of problems that may occur in 10,

13    15, 20 years.

14          But once your survival starts to

15    approach an age and sex match control, then

16    you start looking at second tier issues

17    and, you know, having somebody die suddenly

18    or die of a heart attack or a stroke who

19    now has a relatively normal life

20    experience, that now becomes more

21    important.

22          So again, everything needs to be

23    analyzed individually and you have to put

24    together the entire picture to understand

25    these things.

1      Q.    So understanding of adverse

2    events evolves over time as you get more

3    data and as the disease course changes as a

4    result of new treatments?

5              MR. ELIAS:  Hold on, hold on.

6      A.    Sorry.

7              MR. ELIAS:  I will object to the

8        form.

9              Go ahead.

10      A.    In general, I think as we get

11   more information, our understanding

12   improves and is refined.  I'm sure there is

13   some exceptions to that.  But yes, and I

14   mean, I personally believe the story about

15   nilotinib and its association with

16   cardiovascular problems is a clear-cut

17   example of that.

18              When it was first approved for

19   up-front use, and I think probably perhaps

20   everybody was unaware of this and because

21   it is a very good antileukemic agent, I

22   prescribed it and other people prescribed

23   it.  But over time, first with a case

24   report, then with another case report, then

25   with some prospective studies looking at

1    noninvasive techniques to assess the

2    development of it, from the randomized

3    ENESTnd trial analysis, the body of

4    evidence became much more convincing and

5    you try to take all of this into account.

6            So at a certain time, you

7    wouldn't have this information and the

8    prescribing of nilotinib might be a much

9    more preferable choice for many patients.

10   And later on, I think you would become more

11   concerned and there would be certain

12   patients you would probably try to avoid

13   prescribing for if you had suitable

14   alternatives.  Remember, everything is

15   always about what's your choices.

16       Q.    Out of the key reports that you

17   cite there, none of those involved pre

18   nilotinib imaging of the vasculature,

19   correct?

20       A.    I think, correct me if I am

21   wrong, but I think the Kim report, which is

22   number 4 here, they did a prospective study

23   assessing one aspect of vascular disease

24   before the initiation of nilotinib and

25   afterwards.

Page 158

1      Q.     Kim involved ABI testing,

2    correct?

3      A.     Yes, and I think also they did

4    some sonography, but I would like to look

5    at the paper again to be sure, but yes,

6    that is testing for atherosclerosis, yes.

7      Q.     CT imaging wasn't used like what

8    you describe in the Mirault article for any

9    of these key reports, correct?

10            MR. ELIAS:  Objection, assumes

11        facts not in evidence.

12            Would you like to look at the

13        papers before you answer that question?

14            THE WITNESS:  Yeah, I guess so.

15            MR. ELIAS:  I mean would you like

16        to look at Kim?

17      A.     I mean, certainly one of the

18    things that made Mirault's report so

19    important was the type of testing they did

20    before and after, and even though it was

21    only one patient, the test was a very high

22    quality test with a very high level of

23    certainty.

24            So I think I said this earlier,

25    but it is not just the number of patients

1    that determine the value of a particular

2    study.

3         Q.    Yeah, and I -- you did say that

4    earlier.  My question was has the

5    methodology in terms of the imaging pre and

6    post, the specific type from Mirault, has

7    that been applied in any of the other

8    reports that you discussed?

9         A.    I don't remember that it had

10   been, but for me to give you a definitive

11   answer, I would want to look at these

12   papers again.

13        Q.    Would you need to look at all of

14   them or is it just Kim?

15        A.    Any report that you want me to

16   say I didn't -- I think or I don't think

17   they did CTR arteriography, I would need to

18   see that report.

19        Q.    In your expert report though, you

20   don't state that that imaging was done for

21   any of these patients that were reported,

22   do you?

23        A.    It's not in my description on

24   pages 3 and 4.

25        Q.    I am going to hand you what has

Page 160

1     been previously marked as 67 which was the

2     Hochhaus article from 2016.  Have you seen

3     this article before?

4          A.    Yes, I have.

5          Q.    I would like to ask you some

6     questions regarding table 1.  That table is

7     long-term patient outcomes, right?

8          A.    Gotcha.

9          Q.    You will see in the left column,

10    First treatment arm, nilotinib, 300

11    milligrams twice a day, right?

12               I am sorry for the court

13    reporter.

14         A.    I am sorry.  Yes.  The first

15    column is nilotinib 300 milligrams twice

16    daily.

17         Q.    And then what is the second

18    column?

19         A.    Nilotinib, 400 milligrams, twice

20    daily.

21         Q.    And the third arm is on the far

22    right and that's imatinib 400 milligrams

23    once a day, correct?

24         A.    Once daily, yes.

25         Q.    And on the rows on the left-hand

1   side that go down the page describe

2   different outcomes that were measured in

3   ENESTnd, correct?

4        A.    That is correct.

5        Q.    And it gives p-values for each of

6   those outcomes, correct?

7              Let me ask a different question,

8   maybe make it easier.  Does this table

9   compare the effectiveness of the two

10  nilotinib arms to imatinib?

11       A.    As we said, this table compares

12  three separate groups.  One is a lower dose

13  nilotinib arm; one is a higher dose

14  nilotinib arm; and the third one is

15  imatinib and it compares them to each

16  other.

17       Q.    There is, in terms of statistical

18  comparisons, it compares the nilotinib 300

19  arm to the imatinib 400 and the nilotinib

20  400 arm to the imatinib 400 arm, right?

21       A.    I see a p-value versus imatinib.

22       Q.    And then the line above it says

23  HR versus imatinib, correct?

24       A.    Hazard ratio, yes.

25       Q.    So by hazard ratio versus

Page 162

1    imatinib, it's saying that it's a

2    comparison of whether that particular

3    treatment reduces your risk of having a

4    certain event happen compared to imatinib,

5    right?

6         A.    Yes, there are, again, of course

7    always some qualifiers to this, some of it

8    is very technical stuff related to the

9    statistical analysis in that even for a

10   randomized trial, the statistical analysis

11   is only valid for predetermined end points.

12             And the more end points you

13   study, the greater the likelihood that you

14   will find some end points just by random

15   luck that will appear to be statistically

16   significant and yet aren't.

17             And the other germane thing to

18   this is this is not a reflection of what I

19   would consider should really be the

20   alternative that they should have looked at

21   which would be a group that would be

22   started on imatinib and switched to

23   nilotinib for those people who do not have

24   an appropriate acceptable response to

25   imatinib, thereby sparing a fraction of the

Page 163

1    patients, actually the vast majority of

2    patients, exposure to nilotinib.

3              Instead, they kind of put people

4    on either this or this and you were tied to

5    it, and I do think that nilotinib has a

6    more potent antileukemic effect than

7    imatinib.  I certainly wouldn't dispute

8    that.  I think -- as I said, the original

9    publication of this paper I found to be

10   quite persuasive.

11      Q.    It is true that patients in this

12   trial could, if they -- they could move to

13   another treatment during the course of the

14   study?

15      A.    Any patient in a free society can

16   stop investigational therapy and take

17   whatever they want when they want.  It's a

18   question of trial design and what is the

19   systematic approach to doing this.

20              So certainly once people have

21   entered blast phase or accelerated phase on

22   one drug, they would most likely, I

23   imagine, be switched to another.  I don't

24   know that for sure, but I imagine and --

25   but there is not something to say -- if you

1    don't achieve surrogate end point by three

2    months or six months or whatever the design

3    would be in that way you will switch over.

4              So I don't know that this

5    accurately reflects what could be pragmatic

6    practice.  This is a little bit of an

7    artifice.

8         Q.    This study did have an extension

9    included for patients who discontinued,

10   correct?

11        A.    I'm sorry, can you tell me where

12   you're seeing this?  I must have glazed

13   over it.

14        Q.    Just to be clear, this is not the

15   first article about ENESTnd.

16        A.    Correct.

17        Q.    There were publications of yearly

18   data as it continued to come out?

19        A.    That is correct.

20        Q.    And so this article doesn't

21   contain every piece of information about

22   the study design, correct?

23        A.    Yes.

24        Q.    If you turn to figure 1 in the

25   text description there below it, the second

1    line toward the end there says, "Safety

2    analyses were based on patients who

3    received greater than 1 dose of study

4    treatment," and then it gives A, reasons

5    for discontinuation.  "AEs, abnormal

6    laboratory values, suboptimal response,

7    treatment failure, withdraw of consent,

8    death, disease progression, other.

9         "On discontinuation, 24 patients

10   entered the extension study."

11        A.    I guess I would need to see the

12   prior article to remind myself of what the

13   extension study was comprised of.

14        Q.    But you would agree that patients

15   continued to be followed even if they had a

16   suboptimal response for treatment failure?

17        A.    Yes, I -- I believe that they

18   were followed even after they came off

19   study for major end points.

20        Q.    Turning back to table 1, in the

21   300 milligram arm of table 1, they -- the

22   article reports statistically significant

23   results for three out of the seven end

24   points listed, is that right?

25        A.    I think for technical reasons,

Page 166

```
 1   some of these are hard to adjudicate or

 2   decide if they're correct, but yes, there

 3   are several end points where there is

 4   differences amongst three columns.  Most

 5   frequently, a difference between one of the

 6   nilotinib arms and the imatinib arm, but --

 7   such as, if you look down to PFS, which is

 8   progression-free survival, events on study,

 9   the likelihood of events in the nilotinib

10   300 twice a day arm is substantially worse

11   than it is in the 400 milligram arm.

12              So there are differences --

13        Q.    That's exactly what I want to ask

14   you about.  Sorry, maybe I asked too broad

15   of a question.  Maybe we just take this end

16   point by end point.  We can do that exact

17   comparison that you're doing because that's

18   what I want to ask you about.

19              So the first end point listed in

20   table 1 is progression to -- table 1 of the

21   first end point listed is progression to

22   accelerated phase blast crisis.

23        A.    Accelerated phase or blast crisis

24   on core treatment.  That's why I was saying

25   that the next one is kind of problematic
```

Page 167

1    because it occurs at any time on study.

2              So some of those patients may

3    have stopping on treatment, may have been

4    switched to another treatment, and so it's

5    a more complicated issue than the one on

6    core treatment which speaks directly to a

7    comparison of if you're started on

8    nilotinib or you're started on imatinib,

9    and you stay on them, what happens.

10       Q.    So looking at on core treatment

11   then, the nilotinib 300 milligrams was

12   conferred a benefit on the end point of

13   progression to accelerated phase or blast

14   crisis that was statistically significant

15   compared to imatinib, correct?

16       A.    Yes.

17       Q.    And nilotinib, 400 milligrams,

18   was also statistically significantly

19   superior to imatinib on progression to

20   acute -- or accelerated phase for blast

21   crisis in on core treatment?

22       A.    Yes, that's correct.

23       Q.    Looking at EFS, event-free

24   survival, in events on core treatment,

25   there was not -- there was not a

Page 168

1    statistically significant benefit shown for

2    nilotinib, 300 milligrams, twice daily, is

3    that correct?

4         A.    Correct.

5         Q.    There was, however, a

6    statistically significant benefit on

7    event-free survival events, on core

8    treatment for patients who received the 400

9    milligram dose?

10        A.    Correct.  And I think this

11   highlights the concern I said before, when

12   you're evaluating for multiple end points,

13   it is hard to know which are because of the

14   drug or which are because of chance because

15   you just looked at a million things and

16   like dumb luck, some of them will come out,

17   you can see that in some of these, it looks

18   like nilotinib 300 milligrams might be

19   better than 400 milligrams, but in other

20   measures, it's reversed, that the 400 looks

21   superior to the 300.

22        Q.    So this study was not designed to

23   directly compare 300 to 400 milligrams, it

24   was not powered for that to do those

25   analyses, correct?

1      A.    I believe it probably was not

2  powered to do many of these analyses that

3  were done, these sort of post hac

4  analyses -- I mean, we would need a

5  statistician to check this, but there are

6  certain calculations you can do for what we

7  call multiple looks at the data which,

8  first of all, reporting the results every

9  year for five years changes what the level

10  of statistical significance means.

11          There is a notorious study that

12  they were constantly looking at one group

13  comparing to the next group and the groups

14  had no difference until one time point

15  after seven or eight years, way beyond what

16  would be expected, and then they saw a

17  difference between the two groups, and

18  guess what they did, they stopped looking

19  after that.

20          So we don't know if that was one

21  point in time or if really eventually the

22  curves do separate.

23          So there is inherent risk with

24  looking at the data multiple times that the

25  things you will find may or may not be

Page 170

1   related.

2              Now, having said this, I believe

3   I've said on several occasions that

4   personally, I believe nilotinib has a

5   superior antileukemic effect to imatinib.

6   If that's really what you are asking me,

7   I'm in agreement with that.  It's the

8   toxicity profile that raises the concerns

9   for me.

10        Q.    My question though is that at

11  this point in time, at the five-year

12  analysis when they ran this statistical

13  test to look at comparisons between a

14  nilotinib dose and imatinib, they found

15  that more of the outcomes were

16  statistically better for nilotinib 400 than

17  they were for nilotinib at the 300

18  milligram dose?

19        A.    Yes, some but not all.

20        Q.    Well, all of the end points for

21  nilotinib 400 milligram were statistically

22  significant when compared to imatinib 400,

23  correct?

24        A.    Yeah.  Again, I know this will

25  sound very nitpicky, but I don't believe

Page 171

1    they did the proper statistical corrections

2    to assess for multiple looks at the data.

3              I know this is very highly

4    technical and, again, in general, yeah,

5    I've said it now several times, I believe

6    nilotinib has superior antileukemic

7    activity to imatinib.

8              But I think there are issues

9    about the way you are phrasing this

10   question which, in a very rigorous

11   scientific fact, this may not be -- these

12   p-values may not have any value because

13   they are not adjusted for people looking at

14   this information on multiple occasions.

15   When the trial is undoubtedly designed and

16   powered -- you can look it up -- for one

17   specific end point at one specific time.

18        Q.    Would this point that you're

19   talking about with statistical looks more

20   than once apply also to adverse events?

21        A.    Yes.

22        Q.    Did you review table 5 in this

23   article?

24              MR. ELIAS:  Figure 5?

25        Q.    Sorry, yes, figure 5.

Page 172

1           MR. ELIAS:  Do you have a color

2      version for him just in -- the one we

3      have, you can't see really.

4           MR. REISSAUS:  Here, I have my

5      notes on this one but there is none on

6      the figure itself.

7           MR. ELIAS:  Do you need this?

8           MR. REISSAUS:  That's fine.

9      Q.    Are you familiar with that

10 figure?

11      A.    Yes, I am.

12      Q.    And it shows in different colors

13 a line for each of the arms in the study,

14 correct?

15      A.    Yes, it does.

16      Q.    If would you agree that from

17 figure 5, you cannot calculate the average

18 time to a first cardiovascular event?

19      A.    Can you rephrase that.

20      Q.    Yeah, so let me ask a little

21 different question.  Each line, vertical

22 line on figure 5 marks a point in time when

23 a first cardiovascular event was observed

24 during the course of the study, right?

25      A.    Yes.

1      Q.    And from looking at this figure,

2   can you mathematically calculate the

3   average time it took to a first

4   cardiovascular event in each of the arms?

5      A.    I think you could estimate the

6   median time and I'm sure if you had the raw

7   data, you could calculate even the mean

8   time for each of the arms.

9           But looking at this relatively

10  low definition graph, you know, other than

11  a very coarse estimate of median times, no,

12  I don't think I could.

13     Q.    You would need the underlying

14  data to be able to make that calculation

15  accurately?

16     A.    Yeah, you would need access to a

17  lot of data if you want to calculate the

18  mean time to an event.  The median time is

19  less complicated and we probably could even

20  look at these at risk events at different

21  time points and establish a median time to

22  first event.

23     Q.    And if you used that bottom table

24  to do that, that would only get you within

25  12 months -- it doesn't provide granular

Page 174

1    data over shorter periods of time?

2        A.    Yeah, I know I'm always being

3    very -- I would like to say precise, but

4    another person might say picky, but I think

5    this does this in six-month intervals, not

6    annual intervals, and yes, that's why it

7    would only be an estimate.

8        Q.    Do you know whether the 400

9    milligram dose line in that figure includes

10   rescue patients who switched over from

11   other arms in the trial after their

12   treatment failed or was not tolerated?

13           MR. ELIAS:  Object to form of the

14       question.  Vague.

15       A.    Can you say that again for me.

16       Q.    Do you know whether the 400

17   milligram dose line in -- for Tasigna in

18   that figure includes patients who switched

19   over from the other arms in the trial after

20   their treatment failed or was not

21   tolerated?

22       A.    I would have to go back and look

23   at the publication that stipulates what

24   happened to patients after they failed

25   their core therapy.

Page 175

```
 1        Q.    So as you're sitting here now,

 2   based on what you know, it's possible it

 3   could?

 4              MR. ELIAS:  Object to the form,

 5        calls for speculation.

 6        A.    I don't know.

 7        Q.    Can I have back the copy in your

 8   hand, please.

 9        A.    Yeah, of course, sure.  Just much

10   easier to read in color.

11        Q.    It is.  I am sorry, I didn't

12   intend to give you the black and white.

13        A.    That's OK.

14        Q.    In your report, do you cite the

15   rates for atherosclerosis-related events in

16   the general population?

17        A.    You are talking about my initial

18   report?

19        Q.    Yes.

20        A.    I don't believe that I compared

21   either incidence or prevalence in my

22   initial report.  I speak to it a little bit

23   in my supplemental report.

24        Q.    In your supplemental report, you

25   discuss incidents and prevalence in -- is
```

Page 176

1      it pages 3 through 5?  Something right

2      about that?

3          A.      Yes.

4          Q.      Correct me if I am wrong, but you

5      don't offer an opinion on the -- on what

6      the specific incidence or prevalence of

7      atherosclerosis-related conditions are in

8      the general population?

9          A.      My concern was that it's

10     inappropriate and in a sense measuring --

11     comparing apples to oranges to compare the

12     incidents which is what occurred and

13     reported in the ENESTnd trial to the

14     prevalence -- it's not a fair or valid

15     comparison, that was primarily my concern,

16     that you need to compare suitably matched

17     groups to one another to get any sense for

18     whether something is occurring more

19     frequently or less frequently.

20         Q.      When you say it is important to

21     compare suitably matched groups, that would

22     include the patient populations risk

23     profile for developing atherosclerosis?

24             MR. ELIAS:  Object to form of the

25         question.  Vague, over-broad.

Page 177

```
 1        A.    I'm sorry, can you say that

 2    again.

 3              MR. ELIAS:  Are you OK?  Do you

 4        need a break?  You look a little tired.

 5              THE WITNESS:  This is starting to

 6        wear on me.

 7              THE VIDEOGRAPHER:  We are now

 8        going off the video record.  The time

 9        is -- that concludes DVD number 4.  The

10        time is 16:16.

11              (Recess)

12              THE VIDEOGRAPHER:  We are now

13        back on the video record, this

14        commences DVD number 5, July 14, 2017.

15        The time, 16:31.

16        Q.    Doctor, we discussed earlier that

17    diabetes and increased glucose or increased

18    cholesterol are risk factors for the

19    development of atherosclerosis over time,

20    correct?

21        A.    Yes, we did.

22        Q.    And increased glucose or

23    increased cholesterol, those don't lead

24    to -- are the effects of increased glucose

25    and increased cholesterol part of the
```

1    development of atherosclerosis over the

2    course of years in the typical setting?

3           MR. ELIAS:  Object to the form of

4      the question.

5      A.    Yeah, can you restate that.  I'm

6    having trouble understanding.

7      Q.    What -- what role do increased

8    glucose and increased cholesterol have on

9    the development of atherosclerosis over

10   time?

11     A.    I'm sure there are some

12   subtleties involved in this, but in

13   general, patients with diabetes mellitus

14   and/or hypercholesterolemia in general have

15   an increased risk of developing

16   atherosclerosis and developing it at an

17   earlier age than people who do not have

18   diabetes mellitus and have lower levels of

19   cholesterol.

20           Again, there is some subtlety to

21   it and I'm sure just living in America

22   watching the news, you know there is good

23   cholesterol, bad cholesterol.  There's

24   degrees of having high blood sugar and

25   degrees of diabetes and control -- so it is

1    not just a black and white answer.

2           But as a generalization, I think

3    those are two recognized risk factors for

4    atherosclerosis.

5      Q.    Are you aware of any way in which

6    increased glucose or increased cholesterol

7    would cause rapidly developing

8    atherosclerosis?

9      A.    Again, I really don't hold myself

10   out to be an expert in cardiovascular

11   disease and most of my understanding and

12   knowledge of it is, again, related to my

13   general medical education, what I see in

14   the lay press.  So I don't feel like I can

15   answer that question.

16     Q.    In your report, you talk about

17   nilotinib's data showing an association

18   between its use and increased glucose and

19   increased cholesterol, correct?

20     A.    Yes.

21     Q.    Are you aware of any data

22   demonstrating a link between those

23   increases in the development of rapidly

24   developing atherosclerosis?

25     A.    Well, I -- the way I put this all

Page 180

1    together is I believe the link is in the

2    cases of atherosclerosis that have been

3    associated with nilotinib use, and again, I

4    think it is stated clearly in my report, I

5    don't think it's any one thing, and it is

6    hard to know with certainty the relative

7    contribution of each of these mechanisms.

8             But there are, in my opinion,

9    both blood vessel specific mechanisms and

10   metabolic mechanisms which means high blood

11   sugar and high cholesterol which contribute

12   to an acceleration of atherosclerosis.

13            But to say this one is 98 percent

14   responsible for it or 3 percent

15   responsible -- I don't think -- I don't

16   know if anybody is smart enough to know it,

17   but I don't think I have the expertise to

18   adjudicate it to that level.

19            THE VIDEOGRAPHER:  One moment.

20      Off video, the time, 16:36.

21         (Recess)

22            THE VIDEOGRAPHER:  Back on,

23      16:39.

24      Q.    Doctor, do you have any data

25   showing that increases of glucose or

1    cholesterol have any difference in effect

2    in patients who are on nilotinib than in

3    patients who are not?

4              MR. ELIAS:  In what sense?

5        Q.    You can answer.

6        A.    Yeah, I'm not entirely sure I

7    understand the question.

8        Q.    So you agree that increased

9    glucose and increased cholesterol increase

10   atherosclerotic burden in the general

11   population?

12       A.    Risk.

13       Q.    Risk in the general population.

14   Do you have any data showing that increased

15   glucose or increased cholesterol in

16   patients who have received Tasigna confers

17   any different risk than in patients who

18   have not received Tasigna?

19       A.    I'm not sure how you can even

20   obtain such data since the end points are

21   having hardening and narrowing of your

22   arteries and tissue-based effects and

23   patients have a compilation of many

24   different factors that either work to make

25   this worse or work to make it better, and

Page 182

1    it's at least my coarse view of this is

2    that it is some integration of all of these

3    features that help determine what the end

4    clinical result would be, and again, trying

5    to figure out what is the fractional

6    contribution of each thing, I don't know

7    fully how you would understand it.

8              So I believe the mechanism by

9    which nilotinib increases your risk of

10   cardiovascular events is likely to be

11   partly on the basis of these metabolic

12   issues, that it makes your cholesterol

13   worse and it makes your glucose worse and

14   partly on more direct effects at the

15   vascular endothelial cell level.

16             But whether or not, if you

17   independently, unrelated to the nilotinib

18   in some way, have higher blood sugar, is

19   that a more dramatic impact on what will

20   happen to you if you're taking nilotinib

21   than not, I don't know.

22             I think, I think it is because,

23   again, these are additive or maybe that's

24   technically not the right term, but these

25   risk factors, you know, accumulate and

1    having more risk factors in general is

2    worse than having fewer risk factors,

3    again, depending on the specific factor and

4    the degree to which that factor has

5    occurred.

6         Q.    To your knowledge, are you aware

7    of any data showing that increased glucose

8    for a period of six months to a year causes

9    accelerated atherosclerosis?

10        A.    I don't believe my expertise is

11   sufficient to answer that question.

12        Q.    Would that be the same with

13   regard to cholesterol increases?

14        A.    Yes, again, I don't feel that my

15   expertise is sufficient to answer that

16   question.

17        Q.    In your report, you discuss off

18   target effects of Tasigna.  Do, in your

19   report, do you discuss -- well, off target

20   effects are effects that can occur with all

21   TKIs, not just Tasigna, right?

22        A.    Presumably all medications have

23   both the effect they're designed to have

24   and then effects that aren't what people

25   want, and I mean, that's why there are side

Page 184

1    effects to medicine and why medicine

2    designed for "X" sometimes also with

3    benefit people with patient "Y" -- problem

4    "Y."

5         Q.    In your report when you're

6    discussing off target effects, you are

7    specifically looking at more molecular

8    cellular level effects, correct?

9         A.    Yes, the TKIs, as is evidenced by

10   their names, are inhibitors of specific

11   enzymes called tyrosine kinases and

12   they're, according to the paradigm that I

13   think I and most experts use, chronic phase

14   CML is driven primarily by a single

15   tyrosine kinase which is the BCR-ABL hybrid

16   molecule and the inhibition of any other

17   enzyme in that setting would be considered

18   off target.

19             It's possible some of those

20   inhibitions are responsible for side

21   effects and it's also possible that some

22   solitary effects may be because of these

23   off target effects.

24             Again, it's a very complicated

25   system and it's hard to know anything with

Page 185

```
 1    100 percent certainty.

 2         Q.    In your report, do you discuss --

 3    well, sorry, in your report, you discuss

 4    some of the -- do you discuss the

 5    mechanisms -- in your report, you discuss

 6    some of the inhibitions that nilotinib

 7    causes in the body, correct?

 8         A.    I describe a few of the enzymes

 9    that can be inhibited by nilotinib.

10         Q.    Do you, in your report, undertake

11    to explain the enzymes that are inhibited

12    by some of the other second generation TKIs

13    and by Gleevec?

14         A.    I'm sorry, can you say that

15    again.

16         Q.    Do you conduct a similar analysis

17    of the other TKIs and the enzymes that are

18    inhibited by those medications?

19         A.    No, I wasn't asked to do an

20    analysis for the other TKIs and what their

21    off target effects would be.

22         Q.    So based on your report here, you

23    cannot say that there is a mechanistic

24    explanation for off target effects of

25    nilotinib posing an increased risk for
```

1    atherosclerosis as compared to other second

2    generation TKIs?

3                    MR. ELIAS:  Objection.  Misstates

4         the report, assumes facts not in

5         evidence, misstates testimony.

6         Q.    You can answer.

7         A.    The comparative data among TKIs

8    and the clinical end result is the most

9    persuasive argument tying nilotinib to an

10   increased frequency.

11                  In this specific section on page

12   6 that I believe you're referencing, this

13   speaks about possible mechanisms of action

14   with specific -- specific inhibition of

15   enzymes that may help explain, if you will,

16   the molecular underpinnings of some of the

17   pro-atherogenic forces that nilotinib may

18   bring to bear.

19                  So in putting together this

20   report, just as in taking care of a patient

21   with a complex disease, I need to put

22   together all of the information that I have

23   into a paradigm, an interpretation that is

24   most consistent with the synthesis of this

25   data.

Page 187

```
 1        Q.    We talked a little bit earlier
 2   about bosutnib.  Is that a medication that
 3   you have prescribed to patients in your
 4   practice?
 5        A.    Within our group, we have used
 6   it.  I don't believe I've needed to put any
 7   of my specific patients on it.
 8        Q.    In what circumstances was it used
 9   in your practice, to your knowledge, not by
10   you personally, but by other people in your
11   group?
12        A.    Right, and remember, while I was
13   division director at Jefferson, I was
14   ultimately responsible for the care of all
15   these patients, so I would be involved in
16   these decisions.
17              And we typically used it as a
18   bridge to transplant for patients who had
19   failed both nilotinib and dasatinib or were
20   insufficiently intolerant to it that they
21   essentially failed it, and most, but not
22   all, of those patients would have also
23   failed imatinib.
24              It was our assumption that once
25   you had failed dasatinib and nilotinib, you
```

1    would ultimately fail bosutnib, and for

2    that matter even ponatinib, and we thought

3    that was the proper time to take people to

4    transplant.

5              But in order for patient's

6    disease to be as best controlled as

7    possible, we thought using bosutnib would

8    get them into a low disease state making

9    the likelihood of success of the transplant

10   better and we didn't want to wait for

11   people to fail bosutnib as well because, at

12   that point, we were concerned it would be

13   too late to save them.

14   Q.    Once a patient has progressed

15   through imatinib and either -- and one

16   second line therapy -- never mind, let me

17   ask a different question.

18             Did you prescribe ponatinib in

19   your practice?

20   A.    In our group, we had a couple of

21   patients, both of them had the so-called

22   T315I abnormality which ponatinib is the

23   only TKI that seems to work in that subset

24   of patients, and we gave those two people

25   ponatinib, and one actually suffered a

Page 189

1    cardiovascular event.

2          But again, I think that's well

3    recognized to be probably the most likely

4    to cause this even more so than nilotinib.

5          THE VIDEOGRAPHER:  Off video

6       16:53.

7          (Recess)

8          THE VIDEOGRAPHER:  Back on 16:55.

9    Q.    We have talked about one of the

10   risks associated with dasatinib.  There are

11   others as well, correct?

12   A.    Yes.

13   Q.    Those include bleeding-related

14   events?

15   A.    Again, there is a long list of

16   potential associated events with all of

17   these drugs.

18          The things that are usually most

19   concerning to patients and their clinicians

20   is things that occur very commonly but may

21   be relatively minor in its degree of danger

22   or things that are very dangerous even if

23   they occur only rarely.

24          So at least for me, the way I

25   think about dasatinib is that the major

1    important problems to be cognizant of

2    include pleural effusion, pulmonary

3    hypertension, rarely pericardial infusion.

4    And I think those are the things that

5    really worry me the most.  That's what I am

6    on sort of high alert for, I would say.

7         Q.    Just to make sure we have gotten

8    wind of what these terms are, pulmonary

9    artery hypertension, what is that?

10        A.    So I think most people know that

11   there are four chambers in the human heart;

12   two chambers represent the right side of

13   the heart, the right atrium and right

14   ventricle, and two chambers represent the

15   left side of the heart, the left atrium and

16   left ventricle.  They each pump blood into

17   a different vascular system.

18             So the right side of the heart

19   pumps blood into the lungs and it goes

20   through the lungs based on that squeeze and

21   it returns to the heart into the left

22   atrium.  The left side of the heart pumps

23   it out to the general circulation.

24             So normally when we talk about

25   hypertension, we are talking about things

1   in the general circulation which reflects

2   pumping from the left side of the heart.

3           Well, as it turns out, you can

4   also have hypertension in the pulmonary

5   vasculature which is driven by issues or at

6   least it's related to the pumping of the

7   right side of the heart and it's possible

8   to have one without the other.

9       Q.   So Sprycel, one of the risks that

10  you took into account when you were

11  deciding whether or not to prescribe it,

12  was it's effect on the arteries that are

13  coming out of the heart, including the

14  pulmonary artery?

15          MR. ELIAS:  Objection, misstates.

16      A.   As with nilotinib and I guess to

17  some extent all medicines, the concern that

18  I and most people had about potential

19  toxicities associated with dasatinib

20  evolved over time, and during my earliest

21  period of use, my main concern was really

22  pleural effusion.

23          I think my concern about

24  pulmonary hypertension occurred at a

25  somewhat later time point.  I don't know

1    that I can give specific year of when I

2    started worrying about that.

3          Q.    But it is something that's --

4    that made it on to your radar?

5          A.    Yes, absolutely.

6          Q.    And you also mentioned

7    pericardial infusion.  Is that inflammation

8    or fluid building in the tissue surrounding

9    the heart?

10         A.    Yes.

11         Q.    Or can you explain it in more lay

12   terms, sorry?

13         A.    Yes.  As we discussed before,

14   there is a line around the lung, there is

15   an analogous lining around the heart.  The

16   heart actually sits in a membranous sac

17   and, naturally, there is a tiny little bit

18   small amount of fluid in that sac which I

19   guess helps lubricate the heart, so it is

20   not rubbing against things as it beats.

21              But there are times, we think

22   usually driven by inflammation of the

23   membrane, but perhaps there are other

24   causes -- again, I do not hold myself out

25   to be an expert in pericardial effusions --

Page 193

 1    there are times when an excessive amount of

 2    fluid occurs in that space, and at its

 3    worst and most dangerous, it can become a

 4    very tense collection of fluid such that

 5    the heart doesn't have the ability to

 6    expand with blood returning to it.  So it

 7    can kill a person by preventing the heart

 8    from being able to pass the blood through

 9    the body.

10        Q.    Are you aware that instances of

11    congestive heart failure that are reported

12    with dasatinib?

13        A.    Yes, I am.

14        Q.    You mentioned earlier that your

15    practice became, came to a point with

16    prescribing nilotinib where you would, when

17    you chose to prescribe it, you would refer

18    the patient to a cardiologist, is that

19    right?

20        A.    Yes, that became at least my

21    intended algorithm.  I believe at a certain

22    point, everyone who I decided to start on

23    nilotinib, I also recommended that our

24    cardiology team see the patient on an

25    ongoing basis.

Page 194

1      Q.    Do you know at what point you

2  instituted that?

3      A.    I can't give you a precise date.

4      Q.    Was it -- do you know if it would

5  have been before or after Tasigna's

6  prescribing information changed and the

7  section on cardiac and vascular events was

8  added?

9          MR. ELIAS:  Don't speculate.

10     A.    Yeah, I don't know.

11     Q.    You don't know.

12          After 2012, let's say, when you

13  became aware of reports an association

14  between Tasigna and atherosclerosis, did

15  you ever prescribe Tasigna as a second line

16  therapy to someone with risk factors for

17  atherosclerosis?

18     A.    We are talking about second line

19  therapy?

20     Q.    Yes.

21     A.    To be honest, I don't remember

22  the exact time frame, but obviously, as I

23  would weigh the risk/benefit analysis, this

24  would factor into my consideration.

25     Q.    I understand.  You have -- your

Page 195

1    practice is to consider all the risks and

2    once you were aware of the association with

3    atherosclerosis, that was something you

4    took into account?

5        A.    That would come into the mix.

6    Absolutely.

7        Q.    Would you -- once you were aware

8    of that association, and any point going

9    forward then, was it your view that

10   nilotinib should not be given to patients

11   in a second line setting if they had risk

12   factors for cardiovascular disease?

13       A.    Again, I don't think that I would

14   be that black and white.  It is an

15   important consideration from my

16   perspective, but let's say a patient was

17   seen by another doctor and was initially

18   started on dasatinib and then either failed

19   or had intolerable side effects and was

20   referred to me for consideration of second

21   line therapy, I could see where,

22   particularly before bosutnib was approved,

23   where I might recommend nilotinib to him.

24              But I would have heightened

25   awareness.  I would want to be more

1    proactive in terms of having his other

2    vascular risk factors taken care of, and I

3    would follow the patient or have somebody

4    else follow the patient much more closely

5    for the development of these things.

6           So again, I'm not saying that

7    nilotinib should never be used for anybody.

8    I think nilotinib has very good

9    antileukemic activity.  It's a good

10   medicine.  I've used it myself on many

11   occasions.

12          But what I am saying is that you

13   need to take into account all of these

14   possible side effects and balance it

15   against what are the potential benefits and

16   know what your possible other alternatives

17   are in order to make the best treatment

18   decision for any individual patient.

19   Q.    So there are circumstances even

20   today in which it would be appropriate to

21   prescribe a patient with risk factors for

22   atherosclerosis nilotinib?

23          MR. ELIAS:  Over-broad and unfirm

24       hypothetical.

25   A.    I can certainly envision a

1    scenario where nilotinib could be

2    appropriate to prescribe to a patient, yes.

3          Q.    In your rebuttal report, you

4    discuss cardiac evaluations that were done

5    on Mr. Lauris in the 2010 to 2013 range,

6    correct?

7          A.    That is correct.

8          Q.    You will agree Mr. Lauris had an

9    episode of congestive heart failure in 2002

10   when he was hospitalized for treatment for

11   his leukemia, correct?

12         A.    I was told that happened.  I did

13   not review those medical records.  So for

14   me, it was a hypothetical event in a sense.

15         Q.    So you didn't have the

16   opportunity to look at the hospital records

17   from that admission?

18         A.    No, I did not.

19               MR. ELIAS:  You did look at

20         Dr. Hoffmann's records, though,

21         correct?

22               THE WITNESS:  Yes.

23               MR. REISSAUS:  Objection, you can

24         ask your questions later.  This is not

25         how a deposition works, Rich.

Page 198

1          MR. ELIAS:  Don't tell me how a

2      deposition works, Drew.

3      Q.    Doctor, Doctor, you didn't list

4  Dr. Hoffmann's records as a material

5  considered in your report, your original

6  report, did you?

7          MR. ELIAS:  That misstates

8      actually -- in his original report?

9          MR. REISSAUS:  Yeah.

10          MR. ELIAS:  Or his supplemental

11      report?

12          MR. REISSAUS:  I asked about his

13      original report.

14      Q.    Did you, do you cite

15  Dr. Hoffmann's records?

16      A.    I don't believe I reviewed his

17  records for the original report.

18      Q.    Thank you.  And in your

19  supplemental report, do you cite any

20  medical records beyond the two Bates rages

21  we discussed earlier today that are on page

22  2 of report?

23      A.    I'm sorry, can you please restate

24  that.

25      Q.    Yes, on page 2 of your report --

Page 199

1    well, let me put it this way, let me ask it

2    differently, in your supplemental report,

3    you note in the first sentence that you

4    reviewed some of the expert reports as well

5    as certain medical records of Mr. Lauris,

6    correct?

7          A.    Yes, that is correct.

8          Q.    On page 2 of your report, you

9    have citations to two sets of records?

10         A.    Yes.

11         Q.    Two Bates ranges?

12         A.    Um-hm.  Yes.

13         Q.    Other than those two references,

14   do you identify anywhere in your report

15   medical records that you reviewed?

16         A.    I think in the report, these are

17   the only two references that I use to

18   support comments in the report itself.

19   It's not an exclusive list of all of the

20   medical records I reviewed, but only the

21   things that I felt were pertinent to

22   produce this report.

23         Q.    And there is no identification

24   here in the supplemental report at which

25   medical records had been provided to you

Page 200

1    and reviewed by you?

2        A.    No.  It's -- I don't see it in

3    the report.

4        Q.    You discuss the Bauer article

5    about prognosis for patients with CML

6    having improved as a result of TKI

7    therapies.  Do you recall that?

8        A.    Let me find the section.  I am

9    sorry, is that any my supplemental report

10   or my initial report?

11            MR. ELIAS:  I think it is an

12       initial one.

13            Drew, can you give him a page

14       number?

15            MR. REISSAUS:  Yes, I will.

16       A.    Maybe page 10?  Is that looking

17   right?

18       Q.    Yes, page 9 into page 10, yeah.

19       A.    Yes, I see that.

20       Q.    To your knowledge, does that

21   article provide data on the prognosis for

22   patients who have experienced blast crisis?

23       A.    No, this is registry data from

24   Sweden and so there are pronounced

25   limations in the detail of the medical

1    record that's involved.

2              This was, at least my remembrance

3    and understanding, is that this was a

4    description if you lived in Sweden and

5    developed CML during this period of time,

6    what was your life expectancy compared to

7    an age and sex match control group.

8              MR. ELIAS:  Just for

9         clarification, does your question -- is

10        it specific to patients in blast crisis

11        or include patients who may at one time

12        have been in blast crisis but have been

13        in remission for over a decade?  I'm

14        curious.  Can you clarify?

15             MR. REISSAUS:  Counsel, I would

16        like your coaching of the witness --

17             MR. ELIAS:  I'm not.  I'm

18        actually asking for clarification for a

19        clear record.

20        Q.    Let's break it down.  Does it

21   have data for either of those propositions

22   that Counsel asked you?

23        A.    I don't remember seeing any data

24   that -- specific to individual patient

25   records, no.

Page 202

1      Q.    To your knowledge, does this

2   article provide data on the life expectancy

3   for patients who eventually required a

4   switch to a second line treatment?

5      A.    Again, this kind of registry data

6   in general, and I believe also in specific,

7   does not include that level of detail of an

8   individual patients' care.

9          This is a -- I guess the term

10  would be a 30,000 foot view of what happens

11  to a population of people with a certain

12  disease, and it actually doesn't tell you

13  for sure how many people and for how long

14  were taking TKIs.

15          There is a presumption that the

16  improvement in survival coincided with the

17  time period of the introduction of TKIs

18  and, furthermore, there was this sentence

19  that very old patients -- I believe their

20  cut-off was 80 -- didn't have as much

21  benefit in terms of improved survival and

22  they hypothesized, which I think was

23  probably reasonable, is because probably

24  many older patients weren't offered this

25  very expensive medicine.

Page 203

1            But I don't think they recorded

2    this level of detail and I certainly don't

3    remember seeing it recorded.

4        Q.    You note in your report that you

5    reviewed an internal document created by

6    the Canadian regulator for medications,

7    Health Canada?

8        A.    Health Canada, yes, I reviewed a

9    report, and I believe I also saw two of

10   their communications; one to the Canadian

11   public and one to the healthcare providers.

12       Q.    And I'll ask you about the

13   communications in a moment.  The -- are you

14   an expert in any way on the regulatory

15   process for pharmaceuticals in Canada?

16       A.    I'm sorry, can you rephrase that

17   one.

18       Q.    Yes, I can rephrase it.

19            Have you ever -- do you have any

20   expertise in the regulation of

21   pharmaceuticals, medications in Canada?

22       A.    I certainly do not hold myself

23   out to be an expert in Canadian regulation,

24   regulatory stuff.

25       Q.    You don't know what standards or

Page 204

```
 1    rules Health Canada has in place regarding

 2    the level of evidence needed to add a new

 3    warning or to include certain information

 4    in a label?

 5         A.    I was able to infer some of this

 6    based on my reading of the report.

 7         Q.    So any knowledge you have is

 8    based on your review that the -- I think it

 9    is a 57-page document --

10         A.    Yes, I think that's fair to say.

11         Q.    You didn't review any other

12    communications back and forth between the

13    company and Health Canada subsequent to

14    that report?

15         A.    I think I may have.

16         Q.    What do you think you reviewed?

17         A.    You know, I do not specifically

18    remember, but I know there were a few

19    e-mails that I saw and I believe at least

20    one of them was related to an interaction

21    between Health Canada and Novartis.

22              But my -- I would have to look

23    through it again to know with absolute

24    certainty.

25         Q.    That's -- those aren't discussed
```

Page 205

1    in your report?

2        A.    No.

3        Q.    Did those form any basis for your

4    opinions expressed here today?

5        A.    No.  My opinions, again, are

6    based on the things that I stated I

7    reviewed, in combination with, you know, my

8    knowledge, my experience, my clinical care

9    and research.

10       Q.    Did you get to review Novartis

11   Canada's response to Health Canada about

12   the signal assessment that you read?

13       A.    Again, I don't have a distinct

14   memory of that, but I may well.

15       Q.    But it is not listed in your

16   report or discussed or -- it's not

17   discussed or listed in --

18       A.    Correct.

19       Q.    -- in your report or the

20   materials you considered?

21       A.    Yes.  I did not use that in any

22   way in the preparation of my report.  Not

23   every piece of paper I read did I feel is

24   materially important to include in my

25   report.  So --

1        Q.     So there are materials that you

2   reviewed that did not make the bibliography

3   at the end of your report?

4        A.     Well, I mean, I think as a

5   clear-cut example, we already talked about

6   the patient-specific medical records, and

7   here I cite the record labeled 25 in pages

8   77 to 217.  I believe I looked at pages 1

9   to 76 as well, but I didn't find them

10  relative to include in the report I

11  generated.

12             So typically in a report I cite

13  the sources that I used to generate the

14  report.  If I read an e-mail and it didn't

15  have any bearing on this, you know, there

16  wouldn't be an actual citation for it.  As

17  I said, my memory of this is not precise.

18       Q.     So there are e-mails and records

19  that you reviewed in the course of your

20  evaluation of this case that are not listed

21  within your report or your supplemental

22  report?

23       A.     I believe that's probably true.

24       Q.     I'm going to hand you the public

25  communication we will mark that as a new

1    exhibit.  It has been previously marked but

2    I don't know the number.

3                  (Exhibit 272, document dated

4         April 12, 2013 marked for

5         identification, as of this date.).

6         Q.    Is this a document that you have

7    seen before?

8         A.    Yes, it is.

9         Q.    And this is the public

10   communication from April 2013 that was sent

11   in Canada, correct?

12        A.    Yes.

13        Q.    Would you agree that nowhere in

14   this report in this communication does it

15   say that nilotinib is associated with

16   rapidly progressing atherosclerosis?

17        A.    I don't see it explicitly stated,

18   but obviously there is an implication and

19   that this report was issued in 2013, and at

20   most, the use of nilotinib in Canada would

21   have been five or six years and they have

22   reports of this event happening over

23   this -- within this time frame.

24                  So it's not sort of, you know,

25   decades kind of long thing from the

Page 208

1    17-year-old has some streaks of cholesterol

2    in their aorta, and then by the time they

3    are 77, they needed aortic bypass

4    procedure.

5            So I mean, implicit in this is

6    things in these reports seem to happen in a

7    relatively faster time frame, but no, this

8    report does not explicitly state that the

9    atherosclerosis is accelerated.

10   Q.    This communication also doesn't

11   provide any -- doesn't provide a time to

12   event, does it?

13   A.    No, it doesn't.

14   Q.    It doesn't say that these events

15   happen after any particular amount of time

16   of treatment, correct?

17   A.    No, but there is a maximum time

18   of treatment that occurred because of when

19   nilotinib was available for use and then

20   this report came out.

21   Q.    This report notes down toward the

22   bottom of the first page that the global

23   safety database was searched for January 1,

24   2005 through January 31, 2013.  Correct?

25   A.    That is correct.  It says that.

1        Q.     So the data pool that was

2    examined for that particular paragraph

3    covers at least eight years, correct?

4        A.     Yes, but of course, what we don't

5    have here is the fraction of patients who

6    started the drug at different time points.

7    The way normal drug development works is in

8    the earliest years, very few people are

9    exposed to a medication and then as more

10   experience is gained, larger and larger

11   numbers.

12             So when you're talking about

13   patient years, in other words, you know,

14   how many patients were on it for three

15   years, five years, eight years, multiplied

16   by the number of patients who did this,

17   presumably the average amount of time on

18   drug would be substantially less than the

19   eight-year period that they talk about in

20   their review.

21       Q.     That's just a presumption because

22   that data is not presented here though,

23   correct?

24       A.     Yes, it's a highly likely

25   presumption.  But again, we would -- and

Page 210

1    I'm sure this is available.  I mean, they

2    did it by searching the Novartis global

3    safety database.  I'm sure it can be

4    searched and we could find out the answer

5    to that question specifically.

6         Q.    Did you know that even following

7    the signal assessment that you looked at

8    from Health Canada, that Health Canada

9    agreed that a favorable risk benefit

10   profile remained for Tasigna in second line

11   patients?

12              MR. ELIAS:  Object to the form of

13        the question.  It assumes facts and I

14        think it misstates the record.

15        A.    Well, I think my answer to you

16   would be twofold.  First, I clearly and

17   freely admit that there are circumstances

18   where nilotinib is an appropriate choice

19   for selected patients, and, yes, to my

20   memory, I believe Health Canada indicated

21   the same thing.

22              This was an announcement and a,

23   you know, a broadcast warning of a

24   potentially very, very dangerous side

25   effect that had't been well publicized up

1   until this point that in Canada.  Health

2   Canada thought it important enough to have

3   Novartis broadcast this warning so it would

4   be more apparent and more widely dispersed.

5        Q.    In your report, you discuss the

6   Tasigna label that was in effect at the

7   time that Mr. Lauris was first prescribed

8   Tasigna in the fall of 2013 -- 2012, excuse

9   me?

10       A.    2012.  Yeah, if memory serves me

11  correct, there were a total of three

12  different labels that were full,

13  operational during the time period he took

14  it, and I'll look it up, but I believe I

15  put in the dates that each of the labels

16  were revised.

17       Q.    I actually was going to ask you

18  about that.  It's page 12 where you discuss

19  that.  Have you found that page?

20       A.    Yes.

21       Q.    What was your -- how did you

22  determine when the label changes were made

23  for Tasigna?

24       A.    I believe the date was actually

25  on the copy of the label that I saw, but I

1   would need to look at the document again to

2   state that with certainty.

3        Q.    Where did you go to get the

4   labels for each time that you document

5   here?

6        A.    I asked the counsel that retained

7   to me to obtain those documents for me.

8        Q.    So you relied on counsel to

9   provide you the labels that were in effect

10  during the time Mr. Lauris was prescribed

11  Tasigna?

12       A.    I asked to see every version of

13  the label that -- yes, would be in effect

14  during the period of time the patient was

15  on this medication.

16       Q.    The initial label in effect in

17  October of 2012, would you agree that it

18  included in the section 6.2, the term

19  "PAOD," peripheral arterial occlusive

20  disease?

21            MR. ELIAS:  Do you want to see

22       the label?

23       A.    I think I would like to see the

24  label, yes.

25       Q.    You do state in the -- in your

Page 213

1    report that that term is in section 6.2 of

2    the label, don't you?

3        A.    So on page 13, the first full

4    paragraph, I state, "It is only when we get

5    to the section of the label entitled

6    'additional data from clinical trials,'"

7    which is on page 13, if I remember

8    correctly of 22 pages total, so really

9    buried in the middle of the document, where

10   there are these two phrases, coronary

11   artery disease and peripheral arterial

12   occlusive disease that were mentioned in a

13   very long list of other things that were

14   seen in clinical trials that patients

15   received nilotinib.

16       Q.    And I understand.  So section 6.2

17   which describes data from the clinical

18   trials identifies peripheral arterial

19   occlusive disease and coronary artery

20   disease as events that were observed,

21   correct?

22              MR. ELIAS:  Object to form.

23              Go ahead.

24       A.    Yes.

25       Q.    Do -- were you aware that an

Page 214

1    additional term was added to section 6.2

2    during the time Mr. Lauris received Tasigna

3    related to atherosclerosis?

4         A.    I would need to see the reports.

5    I don't remember offhand.

6         Q.    And that wasn't something you

7    noted in your report?

8         A.    No, I didn't mention this in my

9    report.

10        Q.    Do you have any recollection of

11   the term "arteriosclerosis" being in the

12   label for Tasigna?

13        A.    I would have to look at the label

14   to be sure.

15        Q.    But you don't have a recollection

16   one way or the other without looking at the

17   label?

18        A.    I don't have specific memory of

19   that.

20        Q.    The title of section C on page 10

21   states, "The nilotinib U.S. product label

22   in effect during the time of Mr. Lauris'

23   Tasigna treatment did not appropriately

24   warn of the severe atherosclerosis-related

25   risks associated with the drug."

1        A.    Yes, that's my opinion.

2        Q.    And then on page 12, you note

3    that at the bottom of the page, the

4    second-to-last line, "There is no such

5    warning for progressive atherosclerosis

6    which can lead to -- lead to events as

7    serious as heart attack, stroke or limb

8    amputation."

9        A.    Well, that is actually qualified

10   related to the boxed warnings which they

11   have warnings for a QT interval

12   prolongation and sudden death.

13            But these other very dangerous

14   possible complications are not mentioned in

15   the place that I think they would be most

16   appropriate to mention which is kind of

17   front and center.

18            So that a doctor, particularly a

19   doctor who is not specialized in the care

20   of CML and the use of this drug would be

21   able to find it without using a microscope

22   and going through a 22-page document with a

23   fine-tooth comb.

24       Q.    What warning would have been

25   adequate, in your mind, in October of 2012?

Page 216

1          A.    I think that this level of

2     problem which can cause loss of limb,

3     stroke and death really requires a boxed

4     warning.  I mean, they have a boxed warning

5     for QT interval prolongation.

6          Q.    Are you aware of FDA ever

7     requiring a boxed warning for Tasigna

8     regarding atherosclerosis?

9          A.    I'm not aware.  I assume that if

10    the FDA required it, they would have to do

11    it and the fact is at this time point, they

12    didn't do it.

13         Q.    If FDA wanted such a boxed

14    warning, they could demand it and it would

15    be added, correct?

16              MR. ELIAS:   Objection, he is not

17         here to be a -- he is not an FDA

18         expert.  He is not an expert on FDA

19         regulations.  He has already said that.

20              Go ahead.

21         A.    I believe they could insist on

22    it.  I think the label to be valid needs to

23    be in agreement between the company and the

24    regulatory agency.

25              I'm sure if they didn't want it,

1    they could fight this as a legal battle and

2    try to prevent it going around the FDA.  I

3    think on rare occasions, that actually

4    happens.

5              But I think in general, if the

6    FDA takes a very strong stand, most

7    companies agree to follow their

8    recommendation.  But yes, I am not an

9    expert in this area.

10       Q.    What would you -- what

11   information would you include in the boxed

12   warning?

13             You include in this section of

14   your report, the term "progressive

15   atherosclerosis."  Would you include that

16   in the label?

17       A.    I don't think I'm really prepared

18   off the top of my head to construct such an

19   important clause in an important document.

20   I think with sufficient time, I -- I -- and

21   that is a goal of what I was doing, I could

22   craft such language.  But I don't think I

23   can, you know, at this immediate point in

24   time.

25       Q.    So sitting here today, you can't

Page 218

1      give me language for a boxed warning that

2      would be adequate in your mind?   You

3      haven't come here today with that in mind?

4          A.    I don't think that's exactly what

5      I said.   Maybe it is.   I don't feel that at

6      this immediate time point I'm prepared to

7      construct an off-the-cuff warning that

8      would be completely accurate.   I try to be

9      very deliberate in my work and I try to

10     check and double-check everything.

11              So for me to create such a thing,

12     which I believe I could do, would require

13     me sitting down and, again,

14     cross-referencing all of this work.   But

15     certainly I think as a first pass, we saw

16     what Novartis sent out to the Canadian

17     public and the Canadian health

18     professionals and that might be a

19     reasonable starting point.   But to give you

20     the exact language, I'm not prepared to do

21     that right now.

22         Q.    In your report, you list some of

23     the label related -- let me say that again.

24              In your report, at the end, you

25     list labeling related documents and you

1   list four things there, four paragraphs.

2   The first is paper of 2012, nilotinib U.S.

3   prescribing information, right?  I am

4   sorry, take your time.

5        A.    How far into this am I going?

6        Q.    Page 18.  Let me start over then.

7   On page 15 of your report, that's the start

8   of your bibliography, correct?

9        A.    Yes.

10        Q.    And then page 18 is a

11   continuation of that?

12        A.    That is correct.

13        Q.    And there is a section titled,

14   "Labeling Related Documents"?

15        A.    Yes.

16        Q.    And does that section list the

17   nilotinib labeling-related documents that

18   you reviewed?

19        A.    Yes.

20        Q.    So you looked at an April 2012

21   prescribing information from the U.S. for

22   nilotinib?

23        A.    Yes.

24        Q.    And also a June 2013 and

25   September of 2013 U.S. prescribing

Page 220

1    information?

2         A.    Yes, I did.

3         Q.    And then the Canadian materials

4    that we discussed earlier, correct?

5         A.    Correct.

6         Q.    You don't list here the current

7    label for Tasigna, correct?

8         A.    Correct.

9         Q.    Or any label changes made after

10   September 2013?

11        A.    No, I was -- I was asked to

12   render an opinion on the adequacy of the

13   label during the time frame that this

14   patient -- that I was told this patient was

15   treated with nilotinib.

16             Again, I did not review those

17   records.  So it was a scenario that was

18   created and I asked for the relevant

19   reports to that time period and those are

20   what I reviewed.

21        Q.    Were you -- you're not offering a

22   life expectancy opinion specific to

23   Mr. Lauris in this case, are you?

24        A.    No, I am not.

25             MR. ELIAS:  Other than what's in

Page 221

1      your report?

2      A.    In my supplemental report, I

3  discuss issues that touch on -- that are

4  related to his life expectancy and

5  prognosis.  I don't believe in my original

6  report I said anything about that.

7      Q.    So let's talk about your

8  supplemental report then and the opinion

9  you have expressed there.  That's --

10          MR. ELIAS:  Dr. Weiss, how are

11      you doing?

12          THE WITNESS:  It's been a long

13      day.

14          MR. ELIAS:  Are you -- do you

15      want a breather or you want to try to

16      plow through this?

17          THE WITNESS:  I think at this

18      point, I'm now becoming more eager to

19      complete the deposition than to take a

20      break.

21          MR. ELIAS:  I understand, OK.

22          THE WITNESS:  Certainly I meant

23      no disrespect to you when I said that.

24      I understand you need to do your job.

25          MR. REISSAUS:  I understand that.

Page 222

1           THE WITNESS:  I'm perfectly

2      agreeable to answer your questions to

3      the best of my ability.

4      Q.    I asked you questions earlier

5  about the Bauer article.  We are talking

6  about page 6 of your report, correct?  The

7  supplemental report?

8      A.    My supplemental report.  Yes,

9  section D, you are referring to response to

10  Giles' opinion 5.

11      Q.    And you offer the opinion that

12  the prognosis for long-term survival

13  following myeloid blast crisis of CML is

14  only applicable at the time the blast

15  crisis is diagnosed and a short period

16  thereafter, is that --

17      A.    Yes.  Even when you have very

18  dangerous diseases, I think I alluded to

19  this before, where 95 percent or for that

20  matter, 99 percent of people die, if you're

21  in that 1 percent or even .1 percent of

22  people who are cured of it, then the

23  prognosis is a general prediction.  It's

24  not a specific prescription for each

25  individual patient.

1            So there is no question that this

2    is a very unusual event.  But the fact of

3    the matter is, this patient apparently was

4    cured of his myeloid blast crisis of CML,

5    and once you are cured of something, it no

6    longer impacts on your prognosis.

7            If you have lung cancer, the

8    average survival is, I don't know, two

9    years.  But if you have completely resected

10   lung cancer, your survival will be the same

11   as anybody else who probably smoked too

12   much or whatever they did to get their lung

13   cancer.

14       Q.    Can you cite any literature data

15   on the life expectancy of a patient who has

16   survived blast crisis after five years?

17       A.    I'm sorry, what specifically are

18   you asking me?

19       Q.    Can you identify any articles or

20   data that show the life expectancy of a

21   patient who had blast crisis with their

22   CML, survived it --

23            MR. ELIAS:  Was cured?

24       Q.    -- and then five years out from

25   that?

Page 224

1        MR. ELIAS:  By survived, do you

2    mean was cured?

3        MR. REISSAUS:  My question is as

4    it stands.  You can object.

5    A.    All right, do you want to say it

6    one more time?  I'm sorry.

7    Q.    Can you identify any articles or

8    data that show the life expectancy of a

9    patient who had blast crisis but survived

10   it for five years after that?

11       MR. ELIAS:  Objection, vague.

12   A.    Yes, there are papers that

13   discuss long-term survival after developing

14   blast crisis of CML, absolutely.

15   Q.    Can you tell me some of those

16   sitting here today?

17   A.    I know for sure there are papers

18   from Fred Hutchinson which talks about

19   long-term survival of patients who at one

20   point had blast crisis of their CML.

21       I believe we generated data while

22   I was still at Sloan Kettering that talked

23   about this.  I would have to actually look

24   up the specific references to find the

25   papers.

```
 1              And again, because I haven't done
 2      a search on this, I don't have them all at
 3      my fingertips, but it is well-recognized
 4      that a fraction of patients who cell blast
 5      crisis of CML are cured of their blast
 6      crisis, and those people obviously have a
 7      prognosis that's not impacted by the fact
 8      that they at one point in their lives had
 9      that specific subtype of cancer.
10      Q.    Is a patient having gone - let me
11      in this -- does having required treatment
12      with two different TKIs impact a patient's
13      prognosis with their CML?
14              MR. ELIAS:  Objection, over
15          broad.  Lacks foundation -- unfirm
16          hypothetical.
17      Q.    Let me ask a different question.
18              Are you aware of any published
19      data showing that a patient who requires a
20      switch to a second line TKI has the same
21      survival outlook as a patient who, whose
22      disease stays completely responsive to
23      their initial therapy?
24              MR. ELIAS:  Same objection.
25      A.    I think in part, in large part,
```

Page 226

```
1    the answer to this question has to do with

2    the reason why people were switched.

3              I think it's highly likely that

4    data exists that people who are changed

5    because of side effect concerns probably

6    don't suffer any decrement in their

7    prognosis.

8    Q.    How about we set that part aside

9    and deal with cases where the doctor switch

10   because they are not happy with the

11   response they are getting regard to the CML

12   itself?

13             MR. ELIAS:  I object.  It is

14        vague and also over-broad and an unfirm

15        hypothetical.

16             Go ahead.

17   A.    It is actually, my comments for

18   that is, I wouldn't phrase it that way

19   because what one doctor may view as

20   inadequate response may not be viewed as an

21   inadequate response by another doctor and

22   so I think, again, the prognosis is driven

23   by what was the quality of the failure.

24             I have no doubt in my mind for

25   people who fail by developing accelerated
```

1    or blast crisis, their average survival is

2    worse than people who remain in chronic

3    phase.

4            In my opinion, patients who

5    maintain a very low disease burden of CML,

6    which based on my review of the PCR results

7    was the case for Mr. Lauris, and I think

8    his prognosis was so good that you could

9    essentially discount the leukemia as being

10    a major impediment to his long-term

11    survival.

12    Q.    Do you cite any literature in

13    your supplemental report for that

14    proposition that you just stated?

15    A.    I certainly have that statement

16    here on page 6.  I don't believe I included

17    the specific references.

18            But if people feel that they need

19    to see published data on this, I can

20    certainly find some.  This I put more into

21    the generally accepted knowledge

22    standpoint.  And also, there was some

23    discussion of at least the Swedish study in

24    my initial report.  But there have been

25    studies from Italy and other places that

Page 228

1   also speak about the prognosis for

2   well-controlled CML in the TKI era, having

3   a life expectancy that is predicted to

4   approach that of patients of the same age

5   and sex who don't have leukemia.

6        Q.    Now, Mr. Lauris had years on

7   Gleevec where his BCR-ABL was undetectable,

8   correct?

9        A.    That's my memory, yes, the report

10  did not detect it.  Remember, the assay

11  changes over time, and with time, it

12  becomes more and more sensitive.

13             So we don't know for sure if

14  reports from his BCR in the early --

15  reports of it being not detectable is

16  different than it being detectable in

17  reports from the early 2010s.

18       Q.    Did you identify any change in

19  the testing methodology when you reviewed

20  the records between the zero that was

21  undetectable that was reported immediately

22  before the first time his BCR-ABL was

23  detectable?

24       A.    I don't believe that information

25  was included in the medical reports.

1    Usually that methodology is not issued in a

2    regular medical report.

3              But it's, again, I think widely

4    known and, for people in the field, common

5    knowledge that these tests have improved

6    over time, and in general, the improvement

7    has been they have become more and more

8    sensitive.

9              But even saying that, even with

10   more sensitive tests, there are differences

11   between the tests done at a medical

12   facility A compared to medical facility B.

13   And so it's very difficult to compare tests

14   done at different laboratories or by

15   different and improved methodologies.

16        Q.   You don't dispute, though, that

17   Mr. Lauris had, in 2012, at least two tests

18   in a row where it showed an increase,

19   correct?

20        A.   I saw -- I saw reports in which

21   there was a numerical increase.  At these

22   very low levels, the real question is

23   what's the clinical importance of having

24   some fluctuations, and I don't think anyone

25   knows for certain in individual patients

1    what it means.

2            There are certainly some patients

3    who do fluctuate at very low levels.

4    Sometimes you can detect it, sometimes you

5    can't.  But it doesn't seem to, for those

6    patients, predict a problem, and I think

7    that's a possibility for Mr. Lauris, but I

8    don't discount the possibility if they

9    continue to wait that it's possible his

10   disease burden would increase over time.

11           I just don't think you can know

12   with certainty, based on the data that was

13   available, what course his disease would

14   take.

15       Q.    OK.

16       A.    Again, I think in my report, my

17   main objection was to Dr. Giles'

18   description of this being overtly

19   resistent.  That seemed to me to be an

20   exaggeration of what we could conclude

21   based on what we had.

22       Q.    You took issue with the overt

23   term to describe the results that were

24   seen.

25       A.    Right, I think as I stated, by

Page 231

1    all standard measures, this guy was still

2    in a very high quality remission and to in

3    some ways call that an overt failure

4    doesn't jive with the facts that unless you

5    did this very fancy test, you couldn't tell

6    this guy had CML at all.

7              So to call it a failure is kind

8    of a -- I wouldn't use it the term that

9    way.

10    Q.    You would agree that BCR-ABL is

11    an important tool to guide your treatment

12    as a hematologist?

13    A.    When used appropriately, it can

14    be helpful, yes.

15    Q.    And BCR-ABL testing can allow you

16    to detect the progression of CML in advance

17    of it becoming clinically overt?

18    A.    In some cases, it's -- it can be

19    predictive of downstream overt failure.

20              My concern was that the levels

21    that I saw reported for Mr. Lauris, I do

22    not believe it reached those levels to have

23    a high level of confidence that this was

24    going to definitively be a clinical problem

25    for the patient.

Page 232

1          Q.      It was possible but not

2     definitive?

3          A.      Yes.

4                  MR. REISSAUS:  Let's go off the

5          record for a minute.  I want to look at

6          my notes.

7                  THE VIDEOGRAPHER:  Now going off

8          the video record.  The time, 18:03.

9                  (Recess)

10                 THE VIDEOGRAPHER:  Back on,

11         18:17.

12    EXAMINATION BY

13    MR. ELIAS:

14         Q.      Doctor, I want to make sure I

15    understand one of the opinions that you

16    have offered today specific to Mr. Lauris

17    and Tasigna's label.

18                 It's your opinion that the label

19    in October of 2012 did not adequately warn

20    his prescribing physician about the risk of

21    atherosclerosis, correct?

22         A.      You are referencing the label

23    that was in force in October of 2012?

24         Q.      Correct.

25         A.      Because I don't think there was a

1    label dated.

2         Q.    Sorry, the label in effect in

3    October 2012 was inadequate to warn

4    Mr. Lauris' prescribing physician?

5         A.    Yes, that's my opinion.

6         Q.    And you have offered opinions

7    about the different treatment modalities

8    that were available to treat Mr. Lauris,

9    correct?

10         A.    I discussed what I considered to

11   be two of the other important options that

12   could be used or alternatives to nilotinib

13   therapy at that time, yes.

14         Q.    But because you didn't treat

15   Mr. Lauris and review his full medical

16   records, you are not offering an opinion in

17   this case that Mr. Lauris in particular

18   should not have been prescribed Tasigna?

19   Is that correct?

20              MR. ELIAS:    Object to the form.

21         It has been asked and answered in a --

22         I think it misstates, to an extent, his

23         prior testimony.

24              Go ahead.

25         A.    Yes, as I said before, and as I

Page 234

1    believe it is written in my report, I

2    believe only a physician directly caring

3    for the patient who has physically seen

4    them and examined them and talked to them

5    is an appropriate person to make the

6    specific medical recommendation to a

7    specific patient.

8                MR. REISSAUS:  Thank you.

9                MR. ELIAS:  I just have a few

10        questions.  Can I get one exhibit

11        number.

12                (Exhibit 273, Tasigna label,

13        October 2012 marked for identification,

14        as of this date.)

15        Q.    I'm going to mark an exhibit

16   Dr. Weiss as Exhibit 273.  I believe it's

17   an exhibit that we have already marked in

18   this case and I'll make a representation to

19   you that it is an copy of the label that

20   was in effect in October 2012 when

21   Mr. Lauris' prescribing physician,

22   Dr. Hoffmann, made his decision to

23   prescribe Tasigna.

24                I'll hand it to you and please

25   just leaf through it and confirm for

Page 235

1    yourself that that appears to be a label

2    with a cover letter dated by the label

3    April 2012.

4         MR. REISSAUS:  I'll just note at

5       approval letter is dated May 1, 2012.

6    A.    I see there is, again, as we just

7    heard, a cover letter to a specific person

8    at Novartis and then subsequently attached

9    is a product label for nilotinib.

10   Q.    Does the product label that is

11   attached indicate that it was revised April

12   of 2012?  On the bottom?

13   A.    Yes.  It says, "Revised 04/2012."

14   Q.    And to the best of your

15   knowledge, is this one of the labels that

16   you reviewed in making the opinions in your

17   report?

18   A.    Yes, it was.

19   Q.    Is one of your opinions in

20   your -- that you are going to offer at

21   trial that this label did not adequately

22   warn of the risk of vascular occlusive

23   events by Novartis?

24        MR. REISSAUS:  Object to form.

25   A.    Yes, I don't believe this label

1    adequately warned physicians of the

2    specific problem related to atherosclerotic

3    occlusive disease in various locations.

4        Q.    And you're familiar with product

5    labels, is that right?

6        A.    Yes.

7              MR. REISSAUS:  Object to form.

8    Vague.

9        Q.    In your career as a doctor, you

10   have reviewed product labels?

11       A.    For multiple different drugs on

12   multiple different occasions, yes.

13       Q.    Including product labels

14   associated with tyrosine kinase inhibitors?

15       A.    Yes.

16       Q.    On this product label, there is a

17   highlights of prescribing information.  Do

18   you see that?

19       A.    Yes, it's at the very top on the

20   first page.

21       Q.    OK, and that first page has a

22   number of sections.  Is that right?

23       A.    Yes, it does.

24       Q.    Is there a warning, a black boxed

25   warning section?

Page 237

1        A.     Yes, there is.

2        Q.     Is there also a warnings and

3    precautions section?

4        A.     Yes, that's also on the first

5    page.

6        Q.     And is there also an adverse

7    reactions section?

8        A.     Yes.  All of these elements are

9    on the first page of the monograph.

10        Q.     And anywhere on this page, is

11    there any description whatsoever of a risk

12    of vascular occlusive events associated or

13    potentially associated with the drug?

14              MR. REISSAUS:  I am going to

15        object to form.  Vascular occlusive

16        events?  That's a brand new term.  The

17        doctor testified about atherosclerotic

18        occlusive disease in his previous

19        answer.

20        Q.     Do you know what I -- I'll just

21    make sure that I'm clear.

22              First of all, does the term

23    "vascular occlusive events" have meaning to

24    you?

25        A.     Yes.  Not to be overly picky, but

1    I think more specifically my concern with

2    nilotinib is for primarily arterial

3    occlusive events as opposed to venous

4    occlusive events.  But --

5        Q.    Let's be specific.  I'll use the

6    word "arterial occlusive events."  Do we

7    both understand that to include diseases

8    such as peripheral arterial disease, heart

9    attacks and stroke?

10            MR. REISSAUS:  Object to form.

11       A.    Absolutely.  They would be under

12   the umbrella of arterial occlusive diseases

13   and events, yes.

14       Q.    Thank you, Doctor.

15            Doctor, anywhere on this page,

16   highlights of prescribing information, is

17   there any reference to an association

18   between Tasigna and arterial occlusive

19   events?

20       A.    Not that I see right now and not

21   to my memory from prior reviews of this

22   document.

23       Q.    Would you expect that -- strike

24   that.

25            Would you have -- we described

1    earlier today the seriousness of arterial

2    events, right?

3         A.    Yes, they can lead to, again,

4    major and sometimes permanent disability

5    and death.  So I don't think you get things

6    much more major than that.

7              In fact, I personally hold the

8    belief that there is something worse than

9    dying and having a severe stroke is one of

10   those things.

11        Q.    Is it true that -- strike is

12   that.

13             Would you expect that an

14   association such as arterial occlusive

15   events -- strike is that.

16             Would you expect that an

17   association between Tasigna and a disease

18   as serious as arterial occlusive events

19   would appear as a black boxed warning?

20             MR. REISSAUS:  Object to form.

21        A.    Yes, I believe the appropriate

22   place to warn physicians about this

23   potential adverse event would be with the

24   highest level of warning, and I'll point

25   out it's not that they don't have boxed

Page 240

1    warnings here.  They have a boxed warning

2    for QT interval, which ultimately proved to

3    be a much less important problem than

4    originally thought.  But they don't have a

5    black box for people having their legs

6    chopped off or having heart attacks or

7    strokes.

8              So yeah, I think it properly

9    belongs in the most prominent place.

10        Q.    Would you have expected, given

11   the literature that was available to the

12   company, and the information that you know

13   was available to the company, that the

14   company would have sought to include

15   arterial occlusive events as a black boxed

16   warning?

17        A.    Yes.

18        Q.    Is there any -- in addition to

19   the black boxed warning, there is a

20   warnings and precautions section.  Do you

21   see that?

22        A.    Yes, I do.

23        Q.    Would you have expected the

24   company to have included arterial occlusive

25   events in the warnings and precautions

Page 241

1    section?

2            MR. REISSAUS:  Object, calls for

3        speculation.  Presupposes review of

4        internal company documents and

5        deliberations and he has already said

6        he is not an expert on FDA labeling.

7        Q.    I'm going to ask a different

8    question.

9            Would you expect a proper warning

10   to have included including arterial

11   occlusive events under the warnings and

12   precautions section?

13           MR. REISSAUS:  I will object

14       again to "arterial occlusive events" as

15       vague and undefined and beyond the

16       scope of his expert report.

17       Q.    You can answer.

18       A.    So yes, I believe the things that

19   we are discussing, peripheral arterial

20   occlusive disease, heart attack and stroke,

21   even if they occur only in a small fraction

22   of patients, are serious enough events that

23   they needed to be highlighted and that

24   would include being included in the

25   warnings and precautions section.

Page 242

1    Q.   And will you confirm, if we turn

2  the pages of the label to section 5, when

3  we get to the body of the label, which is

4  the warnings and precautions section, in

5  that section, is there any discussion of a

6  risk or association between Tasigna and

7  arterial occlusive events?

8       MR. REISSAUS:  I will object

9     again to the use of the term.

10    A.   No, there is not.

11    Q.   And would you expect a proper

12  warning to contain such a reference to

13  arterial occlusive events under the

14  warnings and precautions of this section of

15  the label?

16    A.   Yes.  In my opinion -- and I have

17  stated this before -- that the things that

18  I believe are important for both doctors

19  and patients to understand are common

20  events, even if they are not that serious,

21  but more importantly, events that have

22  severe sequela including permanent

23  disability and/or death, and those need to

24  be publicized sufficiently so that a

25  reasonable, in this case, oncologist would

Page 243

1    have a high level of certainty of being

2    made aware of it.

3         Q.    OK.  If you turn a few pages to

4    section 6.  Do you see the heading "adverse

5    reactions"?

6         A.    Yes.

7         Q.    Do you see that underneath the

8    heading, there is this language, "The

9    following serious adverse reactions can

10   occur with Tasigna and are discussed in

11   greater detail in other sections of the

12   package insert.  See boxed warning,

13   warnings and precautions 5."

14             Did I read that correctly?

15        A.    Yes, you did.

16        Q.    Does -- do arterial occlusive

17   events, are they included in the list of

18   serious adverse reactions underneath this

19   language?

20             MR. REISSAUS:  Same objection to

21        the use of the term.

22        A.    I don't see any mention of

23   arterial occlusive events or, for that

24   matter, any of the other terms we have used

25   to describe these arterial problems seen

1   with nilotinib.

2       Q.   If we go to section 6.2.  Doctor,

3   if you would, explain roughly how far into

4   the document does section 6.2 begin?

5       A.   I didn't do it right now, but I

6   believe when I initially reviewed this

7   document, I counted and if memory serves me

8   correctly it was on page 13 of 22 pages.

9       Q.   Does 6.2 -- is it titled,

10  "Additional data from clinical trials"?

11      A.   Yes.

12      Q.   Does it list by body system,

13  under this section, side effects?

14           I'm going to actually say that --

15  I'm going to ask the question differently.

16           Are there a number of side

17  effects that are listed -- I'm going to ask

18  the question differently.

19           Does this section report a number

20  of adverse drug reactions that were

21  reported in patients in clinical studies?

22      A.   That's my understanding of it,

23  yes.

24      Q.   How many, if you could

25  estimate -- I don't want you to count

Page 245

1    them -- but roughly how many adverse drug

2    reactions are listed?

3              MR. REISSAUS:   Object to the

4         extent it calls for speculation.

5         Q.    Please don't speculate.   Please

6    give me your best approximation based on

7    your review of the document.

8         A.    Yeah, based on my review, I

9    estimate there is at least 200 distinct

10   syndromes that are mentioned here.

11        Q.    OK.   Somewhere in here, do you

12   see reference to -- and I'll make -- I'll

13   quote, the term, "Peripheral arterial

14   occlusive disease"?

15        A.    It's hard to find, but I've

16   looked at this before.   So yes, I do, I do

17   see that.   You know, if you look at this

18   page, which is only one part of this

19   section, it's a small clause that's right

20   here.

21              So I mean, it's obviously

22   difficult to pick out of the crowd.

23        Q.    And is peripheral arterial

24   occlusive disease listed as an event of

25   uncommon frequency?

1      A.    Yes, it is.

2      Q.    There is also, I believe, a

3   reference somewhere -- and I'm looking for

4   it myself -- to coronary artery disease, is

5   that right?

6      A.    Yes.  And I think it's actually

7   right above where we see peripheral

8   arterial occlusive disease.

9      Q.    OK.  Is that listed as uncommon?

10     A.    Yes, it is.

11     Q.    Mr. Reissaus earlier asked you if

12   you had seen a version of the label that in

13   addition to those terms included in the

14   same section, 6.2, a term arterial

15   sclerosis.  Do you remember him asking

16   that?

17     A.    Yes, I do.

18     Q.    And do you recall one way or the

19   other whether you reviewed a label that

20   contained that term?

21     A.    My memory is imperfect as to

22   whether or not I remember it.

23     Q.    Assuming that there is a label

24   that added that term, "arterial sclerosis,"

25   somewhere in section 6.2, do you think that

Page 247

```
 1   would adequately warn doctors of the risk

 2   of arterial occlusive disease that has been

 3   associated with Tasigna?

 4           MR. REISSAUS:  Objection, calls

 5       for a legal conclusion.

 6       A.    From a perspective of a

 7   practicing physician looking at the product

 8   insert, I don't think anything in this

 9   morass of words would constitute adequate

10   warning for something that can kill you.

11   We are talking about an extraordinarily

12   dangerous possibility and these are

13   people's lives we are talking about now.

14       Q.    And Doctor, in addition to this

15   label, would you have expected the drug

16   company to have taken other steps to warn

17   doctors of such a serious side effect?

18           MR. REISSAUS:  Objection, vague,

19       calls for speculation, goes beyond the

20       scope of his expert report.

21       A.    I mean, I think the precedent was

22   set when they notified both the public and

23   healthcare professionals in Canada with a

24   direct communication that for the Canadian

25   population, the Canadian prescribers, they
```

```
 1    believed it was important enough to warn

 2    them, and I don't see how being on the

 3    south side of the 50th parallel, whatever

 4    that is, in some way diminishes the

 5    importance of knowing this information.

 6         Q.    As a doctor who has prescribed

 7    drugs through the course of a distinguished

 8    career, do you find "Dear Healthcare

 9    Professional" letters to be helpful?

10         A.    Yes, I do.

11         Q.    Why?

12         A.    Having a specific letter really,

13    in a way, puts it in front of your face, so

14    it is something that makes an imprint on

15    you.  Whereas this is a 22-page document

16    in, I don't know, 10 point font or whatever

17    it is, 12 point font, and to bury it in

18    here, I don't think it is reasonable to

19    consider this adequate warning,

20    particularly to a practicing oncologist who

21    isn't immersed in the treatment of patients

22    with leukemia.

23               I think it is unrealistic, you

24    know, to think that that's enough to warn

25    somebody.
```

Page 249

1      Q.     Do you think that Novartis should

2    have sent, in addition to updating a label,

3    should have sent American doctors a "Dear

4    Healthcare Professional" letter warning

5    them of the risk of developing -- of

6    patients developing arterial occlusive

7    events while on Tasigna?

8            MR. REISSAUS:   Objection, calls

9    for a legal conclusion.

10     A.     I believe that the ethical thing

11   to do would be -- because this is a

12   dangerous and potentially lethal event

13   would be to warn both physicians and the

14   public as was done in Canada that this

15   would occur in the best publicized way

16   possible.   This message needed to get out.

17           MR. ELIAS:   OK, no further

18   questions.

19           THE VIDEOGRAPHER:   Now going off

20   the video record.   That concludes DVD

21   number 5.   Time is 18:40.

22           (Recess)

23           THE VIDEOGRAPHER:   Back on the

24   video record.   This commences DVD

25   number 6.   July 14, 2017.   Time, 18:45.

Page 250

1   EXAMINATION BY

2   MR. REISSAUS:

3       Q.    Counsel, a few minutes ago,

4   introduced a term "arterial occlusive

5   events" and asked you questions using that

6   term.  That is a term that you did not use

7   in your expert report in expressing your

8   opinions, is it?

9       A.    Not that specific combination of

10  words, but I believe I understood what was

11  meant by it.

12      Q.    You're not here expressing an

13  opinion today that Tasigna causes any

14  adverse events that are unrelated to

15  atherosclerosis, are you?

16      A.    I'm sorry, can you say that

17  again.

18      Q.    So you have offered your -- one

19  of your has to do with causation for an

20  adverse event with Tasigna, and that I

21  believe that's opinion number 1 in your

22  report, right?

23      A.    Yes.  I'm sorry.

24      Q.    And in your report, in expressing

25  your opinions, you don't use -- excuse me,

Page 251

1    let me start over.

2            The opinion that you have

3    expressed here is that Tasigna is causally

4    associated with atherosclerosis-related

5    conditions, correct?

6        A.    That's my opinion, yes.

7        Q.    You're not offering the opinion

8    that Tasigna causes events that are

9    unrelated to atherosclerosis, correct?

10           MR. ELIAS:  Object to form.

11       A.    I believe that nilotinib does

12   have other adverse events associated.  I

13   think in the deposition, we alluded to the

14   fact that I'm very certain that it prolongs

15   the QT interval.

16           And as I said, there are some

17   potentially dangerous problems that I think

18   they have adequately warned for.

19           My concern is that as this type

20   of problem became more and more prominent,

21   I don't feel that this is an appropriate

22   degree of warning for something that's so

23   potentially dangerous.

24       Q.    You have not expressed an opinion

25   that Tasigna causes any arterial occlusive

Page 252

1    events that are unrelated to

2    atherosclerosis, correct?

3        A.    I don't think that is correct.  I

4    think we have discussed, or I've discussed

5    on several occasions, that not all of the

6    effects of diminished blood flow to tissues

7    in patients treated with nilotinib, not all

8    of those effects are completely on the

9    basis of atherosclerosis.  I believe there

10   is also perhaps even a major effect or at

11   least a substantial effect from the

12   nilotinib's ability to interfere with the

13   body's ability to compensate for

14   atherosclerotic reduced blood flow.

15           So I think there is two sides to

16   this coin and that actually makes a

17   distinction between just atherosclerosis

18   and the broader category of hypo, meaning

19   too little blood, profusion to various

20   important tissues.

21           So it's -- I may not be

22   expressing myself well.  If that's the

23   case, I apologize.  It's beyond just

24   arteriosclerosis or atherosclerosis.

25       Q.    Do you express an opinion in your

1    report on when in time there was adequate

2    information on Tasigna potentially -- so

3    you have offered an opinion here today that

4    nilotinib may impede the ability of the

5    body to interfere -- excuse me.  I'm trying

6    to read what you said and get it right.

7        A.    I'm sorry.

8        Q.    I'm doing my best.

9            So one side of the issue is

10   whether nilotinib interferes with the

11   body's ability to compensate for

12   atherosclerotic reduced blood flow,

13   correct?

14       A.    Yes, and I believe there is

15   sufficient evidence to support that

16   thinking.

17       Q.    And what -- you have cited the --

18   well, what literature supports that

19   particular opinion?

20       A.    I believe one of the strongest

21   indications for that -- do you want me to

22   look up the specific report?

23       Q.    Yes, please.

24       A.    Let me get my bibliography.  So

25   if you turn to page 17, the first complete

Page 254

1    reference that the first author is

2    Maurizot, M-A-U-R-I-Z-O-T, along with other

3    authors, discuss the patient who really

4    developed severe clinical symptoms while on

5    nilotinib and had a high level but not

6    complete arterial occlusion in one of the

7    main arteries that go to the leg.

8            And then when they stopped it, he

9    rapidly improved his clinical situation,

10   but when they re-imaged him they saw the

11   degree of atherosclerosis was unchanged.

12           I find that to be very striking

13   evidence to support the concept that it's

14   not just the atherosclerosis alone that's a

15   problem.  And this dovetails nicely with

16   some of recognized effects at the cellular

17   level that nilotinib has and I'm

18   specifically referring to its depletion of

19   let's call it KIT-positive mass cells,

20   which is one of the, at least my

21   understanding of it, it is one of the few

22   cells -- it's not the only cell -- in the

23   human body that can secrete both tissue

24   plasminogen activator and Heparin which are

25   really the stand-bys of treatment for

Page 255

1    people who have acute atherosclerotic

2    events.

3              If you go to the hospital with a

4    heart attack or a stroke, this is way they

5    treat people is by giving them these

6    medicines, and there is a cell in your body

7    that can do that to help ameliorate the

8    effects of the arterial occlusion, but this

9    cell is greatly diminished if not

10   eradicated in patients who have nilotinib.

11             So from both of these angles,

12   I'm -- I personally believe that both of

13   these play a role in what's happened to

14   some of these patients.

15   Q.    So in terms of literature, you

16   cited the Maurizot article in support of

17   this opinion.  That's an individual case

18   report that we talked about earlier today,

19   right?

20   A.    Yes, a very striking case report

21   as it turns out.

22   Q.    And is there any other human

23   clinical data, any articles that you would

24   cite in addition to this one?

25             MR. ELIAS:  Object to the form as

1       vague.

2           A.      Offhand, I can't remember one at

3   this point, but it's possible if I looked

4   back through my records, I would find other

5   things to support this.

6           Q.      You haven't cited any other in

7   your report that are -- clinical data other

8   than this Maurizot article?

9           A.      I believe that's correct.  But

10  again, I think I would really need to go

11  through this entire document with a

12  fine-tooth comb to be absolutely certain

13  that there wasn't other reports that had

14  implications or suggestions that this was

15  part of the mechanism.

16          Q.      But you didn't identify those,

17  that, and call that issue out with regard

18  to any of the other articles you discuss in

19  your report?

20          A.      I think that's right.  That, of

21  course, is not the same as me saying that

22  it's not mentioned in the report.

23          Q.      Well, if you don't call it out as

24  an issue in your report, how could it be in

25  your report?

1        A.     Well, I think when you say call

2    it out, we are talking about things that

3    are stated explicitly, but there are

4    certainly things that are implied that

5    might not be expressed expressly.

6              And as I said, at this juncture,

7    I apologize, and as I said, I can't

8    remember for sure everything that's in this

9    report.

10       Q.    I want to did you --

11       A.    But I agree I didn't cite a

12   specific article and say, you know, these

13   are other articles that support this

14   concern.

15             I think the case report itself,

16   along with particularly the depletion of

17   these specific type of mass cell, is very

18   concerning that this, in fact, is an

19   important mechanism.

20       Q.    With regard to the KIT positive

21   mass cell point, what literature do you

22   cite in support of that point?

23       A.    I don't think I included the

24   reference in my report.  Again, if you

25   would like me to supply it, I can certainly

1    find it and supply it to you.

2              MR. ELIAS:  I will just say that

3         the report speaks for itself.  So I

4         think he has a whole section on

5         plausible mechanisms with literature

6         references.

7         Q.    That's why I am asking, because I

8    didn't see what article you had in mind for

9    that point.  It doesn't have a citation by

10   that sentence, I believe.

11        A.    I do not have a citation for the

12   entire section that I call off target

13   effects.

14             I will in part say that for

15   people with specific expertise in leukemia,

16   the inhibition of off target enzymes is

17   well known and generally accepted.

18             But yes, it is based on evidence

19   in literature, and if you would like, I can

20   certainly find references that will allude

21   to this fact.  I mean, they exist.  I just

22   didn't specifically indicate them in the

23   report.

24        Q.    And in your report, you didn't

25   undertake to compare the effect of imatinib

Page 259

 1      versus nilotinib versus other TKIs with

 2      regard to any effect they might have on KIT

 3      positive mass cells?

 4              MR. ELIAS:   You already asked

 5          this question.

 6              MR. REISSAUS:   Object, asked and

 7          answered.

 8          You can answer.

 9              MR. ELIAS:   It is 7 o'clock.   It

10          becomes more than just an asked and

11          answered objection.   It becomes -- you

12          already asked him this question.

13          A.    Yes, we discussed this earlier

14      and I'm sure you can read back what I what

15      I said.

16              But to my memory, I said that I

17      was not asked to give an opinion on the

18      inhibitory profile of drugs other than

19      nilotinib.   That was the specific charge I

20      received, and the report I generated was

21      based on specific requests of areas that I

22      was asked to talk about.

23          Q.    You were asked some questions

24      about the Tasigna's label and you went

25      through some of the sections of it.

Page 260

1    Correct?

2         A.    Yes.

3         Q.    And you understand that the

4    general label format and the section had

5    headings are set by FDA, correct?

6         A.    I -- I mean, that makes sense to

7    me that that's the case, yes.

8         Q.    And it makes sense that FDA has

9    made a decision that it's important to

10   include information on adverse reactions

11   within the prescribing information,

12   correct?

13             MR. ELIAS:  Object to form.

14        A.    I'm sorry --

15             MR. ELIAS:  It calls for

16        speculation.

17        Q.    It makes sense to you if FDA is

18   setting the sections, their choice to

19   include a section on adverse reactions

20   means this they made a determination that

21   that's important to include that type of

22   information in the label?

23             MR. ELIAS:  Object to form, calls

24        for speculation.

25        A.    I believe if the FDA is concerned

1    about a particular toxicity, then they have

2    the authority to at least strongly urge the

3    company to do certain things.

4              I mean, we talked about the areas

5    of --

6         Q.   My question -- that wasn't

7    quite --

8         A.   I am sorry.

9         Q.   My question was just that FDA --

10   you don't dispute that section 6, adverse

11   reactions, is important information that

12   FDA has determined should be included in

13   the prescribing information for medications

14   in the United States?

15             MR. ELIAS:  Object to the form.

16        A.   I'm not really following you, I'm

17   sorry.

18        Q.   It's not your testimony, is it,

19   that because there are lots of different

20   adverse events observed with medications

21   that they shouldn't be reported in the

22   product labeling, is it?

23        A.   You have too many negatives in

24   there for me to keep it straight.  Can you

25   streamline.

Page 262

```
 1      Q.    Is it important to have adverse

 2   reactions in the label for products in the

 3   United States?

 4           MR. ELIAS:  Over-broad.

 5      A.    Yes, I think that one of the --

 6   you know, the FDA's mandate, as I

 7   understand it, is to assess medications to

 8   be acceptably safe and acceptably

 9   effective, and so my feeling is the product

10   label should include these things since the

11   principal tenet of medical care is above

12   all else, do no harm.  I think it is

13   particularly incumbent to warn people and

14   to clearly publicize any extremely

15   dangerous potential risk.  I think that's

16   the point I'm trying to make.

17      Q.    Do you have any reason to believe

18   that the categorizations of coronary artery

19   disease, PAOD, and arteriosclerosis, in

20   section 6.2, with regard to them being

21   common, uncommon or unknown incidents, do

22   you have any reason to believe those are

23   incorrect based on the clinical trial data

24   at the time of this label?

25      A.    The designation between common,
```

Page 263

1    uncommon, unknown frequency, I

2    personally -- and I think I've expressed

3    this several times, I personally don't

4    believe that's the issue because uncommon

5    and even rare events, if they're dangerous

6    enough, need, in my opinion, to have a

7    clear warning so that it wouldn't be lost

8    among the laundry list of other things.

9        Q.    I understand that your opinion is

10   that it should have been elevated beyond

11   section 6 to --

12       A.    Yes.

13       Q.    -- a boxed warning.  What I am

14   asking though is, is it more factual.  For

15   the section 6.2 provides a rough incidence

16   level from the clinical trials for each of

17   these events by categorizing each adverse

18   event as common, uncommon, or unknown in

19   incidences, right?

20       A.    Yes, it does.

21       Q.    Sitting here today, you're not

22   expressing an opinion that it was -- that

23   Novartis miscategorized where in those

24   common and uncommon and unknown categories

25   they put PAOD, arterial sclerosis or

Page 264

1    coronary artery disease?

2        A.    No, I really think that's a

3    secondary issue of the frequency.  I think

4    the primary issue -- again, I know I sound

5    like a broken record, I apologize.  The

6    primary issue is the seriousness of these

7    problems, even if there is only one chance

8    in a thousand it will kill somebody, I

9    think that needs to be known, particularly

10   if that person is me or you.

11       Q.    Thank you.

12       A.    Thank you.

13           MR. ELIAS:  Thank you.

14           THE VIDEOGRAPHER:  That now

15       concludes this deposition and DVD

16       number 6.  The time is 19:07.  Thank

17       you.

18

19                    _____

20                    MARK WEISS, M.D.

21   Subscribed and sworn to

22   before me this      day

23   of MO            , 2017.

24   _____

25

Page 265

```
 1                      INDEX:

 2    WITNESS              EXAM BY:            PAGE:

 3    M. Weiss            Mr. Reissaus        4, 250

 4                        Mr. Elias           232

 5

 6                      EXHIBIT INDEX:

 7    NUMBER              DESCRIPTION          PAGE:

 8    Exhibit 269 Notice of Deposition and         5

 9                Subpoena

10    Exhibit 270 Expert Report of Mark Weiss,     6

11                M.D.

12    Exhibit 271 Supplemental Expert Report of    6

13                Mark Weiss, M.D.

14    Exhibit 272 document dated April 12, 2013   208

15    Exhibit 273 Tasigna label, October 2012     235

16

17

18

19

20

21

22

23

24

25
```

Page 266

```
 1                    CERTIFICATE

 2     STATE OF NEW JERSEY )
                          )ss:
 3     COUNTY OF UNION    )

 4          I, MARY F. BOWMAN, a Registered

 5     Professional Reporter, Certified

 6     Realtime Reporter, and Notary Public

 7     within and for the State of New Jersey,

 8     do hereby certify:

 9          That MARK WEISS M.D. , the

10     witness whose deposition is

11     hereinbefore set forth, was duly sworn

12     by me and that such deposition is a

13     true record of the testimony given by

14     such witness.

15          I further certify that I am not

16     related to any of the parties to this

17     action by blood or marriage and that I

18     am in no way interested in the outcome

19     of this matter.

20          In witness whereof, I have

21     hereunto set my hand this 26th day of

22     July, 2017.

23
                         Mary F. Bowman
24     _____
                MARY F. BOWMAN, RPR, CRR
25
```

Page 267

1    NAME OF CASE:

2    DATE OF DEPOSITION:

3    NAME OF WITNESS:

4    Reason Codes:

5          1.  To clarify the record.

6          2.  To conform to the facts.

7          3.  To correct transcription errors.

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                        _____