# Exhibit 5

1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
2               FORT PIERCE DIVISION
    _____
3   Dennis McWilliams and        )
    Lori McWilliams,             )
4                                )
                Plaintiffs,      )
5                                )
           -vs-                  ) Case No:
6                                ) 2:17-cv-14302-ROSENBERG/
    NOVARTIS AG, a Global        ) MAYNARD
7   Healthcare Company;          )
    Novartis Pharmaceuticals     )
8   Corporation, a Delaware      )
    Corporation,                 )
9                                )
                Defendants.      )
10  _____)
11
12                  REGUS
        1650 MARKET STREET – SUITE 3600
13      PHILADELPHIA, PENNSYLVANIA  19103
                APRIL 24, 2018
14                10:25 A.M.
15
16          VIDEOTAPED DEPOSITION OF
              MARK A. WEISS, M.D.
17
18
19
20
21
22
23      REPORTED BY:
24      DEBRA SAPIO LYONS, RDR, CRR, CRC, CCR, CLR, CPE
25      JOB NO. 140714

1

2

3

4

5                        April 24, 2018

6

7        Videotaped deposition of Mark A. Weiss, M.D.,

8    held at the offices of Regus, 1650 Market Street,

9    Suite 3600, Philadelphia, Pennsylvania  19103,

10   before Debra Sapio Lyons, a Registered Diplomat

11   Reporter, a Certified Realtime Reporter, a

12   Certified Realtime Captioner, a Certified

13   LiveNote Reporter, an Approved Reporter of the

14   United States District Court for the Eastern

15   District of Pennsylvania, a Certified Court

16   Reporter of the State of New Jersey, a Notary

17   Public of the States of New Jersey, New York and

18   the Commonwealth of Pennsylvania.

19

20

21

22

23

24

25

1    APPEARANCES:

2        ELIAS GUTZLER SPICER
         BY:  TAMARA SPICER, ESQUIRE
3        130 S. Bemiston Avenue
         St. Louis, Missouri  63105

4
         Attorneys for Plaintiffs

5

6        HOLLINGSWORTH
         BY:  ROBERT JOHNSTON, ESQUIRE
7            CATHERINE STOLAR, ESQUIRE
         1350 I Street, N.W.
8        Washington, D.C.  20005

9

10
         Attorneys for Defendant Novartis
11       Pharmaceuticals Corporation

12   ALSO PRESENT:

13        GERARD ALFE, VIDEOGRAPHER
          TSG REPORTING

14

15

16

17

18

19

20

21

22

23

24

25

1        MARK A. WEISS, M.D.

2         (Exhibit Weiss-1, Amended Notice Of

3    Deposition of Dr. Mark A. Weiss, is marked

4    for identification.)

5         (Exhibit Weiss-2, Expert Report of

6    Mark Weiss, M.D., is marked for

7    identification.)

8         (Exhibit Weiss-3, Supplemental

9    Expert Report of Mark Weiss, M.D., is

10   marked for identification.)

11                 -  -  -

12       THE VIDEOGRAPHER:  This deposition

13   is now beginning.  The date April 24th,

14   2018.  The time 10:27.  This is the

15   deposition of Mark A. Weiss, M.D. taken in

16   the matter of Dennis and Lori McWilliams

17   versus Novartis AG, et al. in the

18   United States District Court, Southern

19   District of Florida, Fort Pierce Division

20   Number 2-17-CV-1402 [sic].

21       Counsel will now introduce

22   themselves.

23       MS. SPICER:  Tamara Spicer on behalf

24   of Plaintiffs.

25       MR. JOHNSTON:  Robert Johnston for

1              MARK A. WEISS, M.D.

2         Novartis Pharmaceuticals Corporation, one

3         of the defendants, and I am joined today by

4         Catherine Stolar, also of

5         Hollingsworth LLP.

6                    - - -

7              MARK A. WEISS, M.D., having been

8         first duly sworn, was examined and

9         testified as follows:

10                   - - -

11    EXAMINATION

12    BY MR. JOHNSTON:

13         Q.   Good morning, Dr. Weiss.  My name

14    is Robert Johnston.  We met briefly before the

15    deposition this morning.  I know that you met

16    my partner, Drew Reissaus, back in July of

17    last year.  I'm going to take the deposition

18    today, but I have looked over the deposition

19    that was taken and I will try to, to the

20    extent possible, focus on your opinions in

21    this case rather than the opinions that you

22    offered in the Lauris case, which your

23    deposition was taken in at that time.

24              I have a couple of quick

25    questions.  And let me go ahead and hand you

1                    MARK A. WEISS, M.D.

2     Exhibit 1, which we've premarked, which is the

3     Notice Of Deposition.  And if you look at the

4     Notice Of Deposition, it has with it a request

5     for documents on the second page.  This is

6     all -- all of my exhibits are going to be

7     two-sided copied to try make volumes smaller.

8              A.    Yes.

9              Q.    Have you brought anything with

10    you -- first of all, have you seen this Notice

11    Of Deposition before?

12             A.    Yes, I have.

13             Q.    Okay.  Have you brought anything

14    with you today that would be responsive to the

15    requests for additional documents on Page 2 of

16    Exhibit 1?

17             A.    No, I have not.

18             Q.    Okay.  Do you -- let me -- I need

19    to get into a little bit -- and we didn't ask

20    for your bill, so I'm going to have to do this

21    verbally.  I want to talk a little bit about

22    your work for the Plaintiffs in this case.

23                   The -- and let me start by marking

24    your main -- well, we've got your main report

25    marked as Exhibit 2 and your rebuttal report

1            MARK A. WEISS, M.D.

2    marked as Exhibit 3, so we can hand both of

3    those to you so that you have those for

4    reference.

5            A.   Thank you.

6            Q.   And these are the reports that

7    were served on -- the first report, which is

8    marked as Exhibit 3, was served on

9    February 20th or thereabouts of this year; and

10   the rebuttal report, which is Exhibit 3, was

11   served around March 20th of this year.

12           Does that seem about right to you?

13           A.   Yes, it does.

14           Q.   Okay.  So I want to start with

15   Exhibit 2, which is your initial report in the

16   McWilliams case, the case we're here for

17   today.

18           Your counsel -- not your counsel.

19   Plaintiff's counsel represented to the Court

20   and to us that this report was essentially

21   identical to the report, your initial report

22   in the Lauris matter, which is the case in

23   which you were deposed last July.  Do you --

24           MS. SPICER:  Object to the form of

25       the question.  Misstates what we

1            MARK A. WEISS, M.D.

2        represent -- misstates what we represented

3        to the Court.  Go ahead.

4              MR. JOHNSTON:  I hadn't asked the

5        question yet, Counsel.  If you'd wait

6        until --

7              MS. SPICER:  I'm objecting from

8        the --

9              MR. JOHNSTON:  -- I was -- if you'd

10       wait until I --

11             MS. SPICER:  I'm objecting to the --

12       the prelude to the question, which is not

13       accurate, but --

14             MR. JOHNSTON:  You can wait till I

15       ask the question and then you can object.

16             MS. SPICER:  Okay.

17   BY MR. JOHNSTON:

18        Q.   Is this report basically the same

19   as the report that you served initially in the

20   Lauris matter back last year, to your

21   knowledge?

22             MS. SPICER:  You can answer.

23             THE WITNESS:  Yes, the report is

24       basically the same.

25   BY MR. JOHNSTON:

1          MARK A. WEISS, M.D.

2          Q.    In fact --

3          A.    There is --

4          Q.    Go ahead.   Sorry.

5          A.    I was going to say there are some

6    minor changes, but most of the minor changes

7    is -- is the different person.

8          Q.    And I know that some of the minor

9    changes are a couple of sentences where you

10   addressed Mr. McWilliams and his particular

11   circumstances or what you understood about

12   them as opposed to Mr. Lauris; correct?

13          MS. SPICER:   Object to form.

14          THE WITNESS:   Maybe you could point

15       that out to me because I don't really

16       remember that being the case.   I tried to

17       be -- to limit my opinions to what I was

18       asked to do, which was to provide an

19       opinion about general causation.

20          The person's name obviously is

21       different at the top.

22   BY MR. JOHNSTON:

23          Q.   Well, there are sentences where

24   you talk about his name and the dates he used

25   the drugs; correct?

Page 10

```
 1            MARK A. WEISS, M.D.

 2       A.   Yes, so that would also be

 3  individualized for the patient.

 4       Q.   Okay.

 5       A.   But that -- I don't think that's a

 6  matter of my opinion.

 7       Q.   I'm just trying to clarify --

 8       A.   Okay.

 9       Q.   -- what the differences between

10  the pieces of paper are.

11       A.   Okay.

12       Q.   Do you know any other differences

13  besides differences about the Plaintiff and

14  the dates of use that occur in your report in

15  this case as compared to the Lauris case?

16       A.   I know that in this report on

17  Page 1 what's listed under, In summary, my

18  opinions are as follow, Opinion 2, my general

19  opinion is that patients with preexisting risk

20  factors for atherosclerotic-related events,

21  there are safer and better-suited treatment

22  alternatives to nilotinib for a fully

23  informed --

24            (Reporter clarification.)

25       A.   -- nilotinib, N-I-L-O-T-I-N-I-B,
```

1          MARK A. WEISS, M.D.

2    for a fully informed physician to choose from.

3    But in this report I use as examples of

4    preexisting risk factors, I use smoking and

5    hypertension, as opposed to I believe in the

6    Lauris report I used examples of diabetes and

7    hypertension.

8          Q.   Are you aware of any other

9    differences between this report and that

10   report that you can recall?

11         A.   I can't recall at this time any --

12         Q.   Okay.

13         A.   -- other differences.

14         Q.   And then we've marked as Exhibit 3

15   your rebuttal report or your -- it's actually

16   termed a -- yes, as a rebuttal report.  Well,

17   actually, it's -- it's titled "Supplemental

18   expert report of Mark Weiss, M.D.," and that

19   report addresses the facts of this particular

20   case for the most part, would you agree?

21              MS. SPICER:  Object to form.

22              THE WITNESS:  I think this report

23         was primarily a response to my reading of

24         the expert report of Dr. Giles and some

25         differences I had with opinions he

1            MARK A. WEISS, M.D.

2       expressed in his report.

3   BY MR. JOHNSTON:

4       Q.   But the topics are addressed to

5   the McWilliams fact situation; correct?

6            MS. SPICER:  Object to form,

7       misstates his report.

8            THE WITNESS:  Can you, please,

9       rephrase that?

10  BY MR. JOHNSTON:

11      Q.   Yeah.  You were dealing with

12  case-specific facts related to Mr. McWilliams

13  in this supplemental report, those that were

14  raised by Dr. Giles; correct?

15           MS. SPICER:  Just same objection.

16      The report speaks for itself.

17           THE WITNESS:  There were some

18      case-specific facts, but I wouldn't view

19      that as the main thrust of this report.  I

20      thought that's what you asked, what this

21      report was primarily.  I'm sorry.

22  BY MR. JOHNSTON:

23      Q.   Well, you discuss Mr. McWill --

24  certain facts related to Mr. McWilliams' case

25  in this supplemental report, don't you?

Page 13

                    MARK A. WEISS, M.D.

1

2          A.   Yes.

3          Q.   Where did you disclose in any of

4    your expert reports that you reviewed any

5    medical records of Mr. McWilliams in preparing

6    your reports in this case?

7          A.   I'd have to look.

8          Q.   Take a look.

9          A.   (Reviewing document.)

10              Well, on the bottom, last

11   paragraph of Page 1 of this report I state

12   that "is not supported by the medical oncology

13   records that I reviewed."

14         Q.   Okay.  Where did you identify what

15   records you reviewed?

16         A.   I don't know that I have that

17   information.

18         Q.   Okay.  So you have a bibliography

19   at the end of this supplemental report;

20   correct?

21         A.   Yes.

22         Q.   You don't list any medical records

23   that you reviewed in the bibliography, do you?

24         A.   No, I don't.

25         Q.   You understand that under the

1              MARK A. WEISS, M.D.

2    Federal Rules you're required to list all

3    materials considered in forming your expert

4    opinion; is that correct?

5              MS. SPICER:  Object to the question.

6         It's not an attorney.  Go ahead.

7              THE WITNESS:  I'm not aware of that.

8    BY MR. JOHNSTON:

9         Q.   You're not aware.  Are you --

10   how many times have you served as an expert

11   witness, sir, in federal cases?

12        A.   Oh, I don't know the breakdown for

13   federal cases.

14        Q.   Okay.  How many times overall?

15        A.   About 35.

16        Q.   And you prepared expert reports

17   before; correct?

18        A.   Yes, I have.

19        Q.   And did you understand that one of

20   the things that you were supposed to do in an

21   expert report was to list the materials that

22   you considered?

23             MS. SPICER:  I'm going to object

24        to -- I'm going to object to this line of

25        questioning.  One, it's argumentative; two,

Page 15

1              MARK A. WEISS, M.D.

2          he's already pointed out that he did say in

3          his report that he reviewed oncology

4          records.  That's --

5              MR. JOHNSTON:  Objection to coaching

6          the witness.

7              MS. SPICER:  I'm not coaching the

8          witness.  I'm --

9              MR. JOHNSTON:  You're just -- yes,

10          you are.

11              MS. SPICER:  You're misstating his

12          question.

13              MR. JOHNSTON:  You're absolutely

14          mis -- coaching the witness.

15   BY MR. JOHNSTON:

16          Q.   My question is --

17              MS. SPICER:  You're misstating his

18          testimony.

19   BY MR. JOHNSTON:

20          Q.   -- when you have served as an

21   expert in the past, did you understand that

22   you were supposed to prepare a Materials

23   Considered List to support -- as part of the

24   package of materials that you submitted as an

25   expert witness?

Page 16

1              MARK A. WEISS, M.D.

2              MS. SPICER:  Object to form.

3              THE WITNESS:  I don't remember

4        specifically, but I don't think I've ever

5        put review of medical records in that

6        section of my report.  I always viewed it,

7        I guess, more of a medical-academic report

8        where you cite original literature of

9        experimental methodology --

10  BY MR. JOHNSTON:

11       Q.    All right.

12       A.    -- and so forth, so --

13       Q.    We'll deal with some specific

14  questions where you failed to cite what

15  report -- what records you were looking at in

16  a bit, so --

17              MS. SPICER:  Object to form.  Object

18        to the -- come on, Robert.  It's not a

19        question.  That's a --

20              MR. JOHNSTON:  I object to you

21        objecting.  That's not an objection, so --

22              MS. SPICER:  It's an objection.

23        That's not a --

24  BY MR. JOHNSTON:

25       Q.    Here's what I want to know --

Page 17

1          MARK A. WEISS, M.D.

2          MR. JOHNSTON:  Sorry.

3    BY MR. JOHNSTON:

4          Q.   Here's what I want to know next:

5    When did you first get contacted by

6    Plaintiffs' counsel to prepare a report for

7    the McWilliams case?

8          A.   I believe it was in February of

9    2018.

10         Q.   Was it at the beginning of the

11   month?  Was it on the 19th of the month?  Do

12   you recall?

13         A.   No, I don't.

14         Q.   Okay.  And how much time did you

15   spend working on your initial expert report

16   that's been marked as Exhibit 2 prior to it

17   being served on February 20th, 2018?

18         A.   Well, the time spent on the report

19   is, in my opinion, a two-part question.  The

20   first thing is that the bulk of this report

21   and the opinions contained in the report were

22   developed before I was asked -- ever asked to

23   write a report for McWilliams, and that's why

24   this report is very similar to the report I

25   did for Lauris.  And in making the original

Page 18

1              MARK A. WEISS, M.D.

2    Lauris report, I probably -- I mean, I've put

3    in over a hundred hours total between these

4    two cases, and specifically I would say it

5    might have been five to ten hours in preparing

6    the specific McWilliams report that was built

7    on a basis of the study I did prior to Lauris.

8         Q.   So you billed five to ten hours to

9    change the name and the dates of use and

10   Paragraph 2 on Page 1 of your first report in

11   this case that's been marked as Exhibit 2; is

12   that correct?

13              MS. SPICER:  Object to form.

14              THE WITNESS:  No, that's -- that's

15        not correct.

16   BY MR. JOHNSTON:

17        Q.   Okay.

18        A.   I read the entire report and

19   reviewed the entire report, and that's what I

20   spent most of the time on.  Of course, I made

21   the -- after reviewing the report or while

22   reviewing the report, I made edits that would

23   make it appropriate for this -- this person's

24   issue -- or this person, actually, not so much

25   his issue.

Page 19

                    MARK A. WEISS, M.D.

1        Q.    And your report is 14 pages long;

2   correct?  Your initial report that's been

3   marked as Exhibit 2.

4        A.    Yes, it looks like it ends on

5   Page 14.

6        Q.    So your testimony is that you

7   spent five to ten hours to review 14 pages of

8   text and to make changes in the name of the

9   Plaintiff and the particular dates for which

10  various therapies were used; correct?

11                 MS. SPICER:  Object to form,

12            misstates his testimony.

13                 THE WITNESS:  Well, you have to

14            remember in the review, I also confirmed by

15            re-looking at some of the cases that my

16            memory was imperfect on and some of the

17            papers that I've listed.  So, yes, I -- it

18            was about five hours probably.  I don't

19            remember the exact number of hours.  I

20            mean, I -- I have that number.  I can find

21            it at some point if you really need it.

22  BY MR. JOHNSTON:

23       Q.    And then you -- let's look at

24  Exhibit 3, which is your rebuttal report.

1              MARK A. WEISS, M.D.

2    Tell me how -- have you billed, by the way,

3    Plaintiff's counsel for your work in this case

4    yet?

5         A.   My standard practice is to send

6    out a bill once a month.

7         Q.   And so have you sent them a bill

8    related to the creation of Exhibit 2, your --

9         A.   Yes, I have.

10         Q.   And have you sent them a bill

11    related to the creation of Exhibit 3, which is

12    your supplemental report?

13         A.   Yes, though, again, the -- the

14    bills aren't report specific, they're

15    time-block specific.

16         Q.   I understand.

17         A.   So I sent them a report [sic] in

18    early Feb -- in early March for the work I did

19    in February.  I would have sent them a bill in

20    early April for the work I did in March.

21         Q.   And do you recall how much time

22    you billed in April for the work in March on

23    the supplemental report?

24         A.   Again, I'm uncertain of the exact

25    numbers.  I would estimate that in total it

Page 21

1              MARK A. WEISS, M.D.

2  was about 20 hours between the two reports.

3         Q.   Well, you said you think you spent

4  about five hours on the first report.  Does

5  that mean you spent about 15 hours on the

6  supplemental report?

7         A.   I think something of that time

8  frame.  Again, if you need an exact number, I

9  can refer to the bills that I've sent out.

10         Q.   And your total for both reports

11  was about 20 hours, would that be fair?

12         A.   That's my sense of it, yes.

13         Q.   And you bill -- is it $650.00 an

14  hour for that sort of work?  Is that correct?

15         A.   That is correct.

16         Q.   So you billed about $13,000.00

17  approximately for the work in the McLauris

18  case so far; correct?

19         A.   The McWilliams case I --

20         Q.   McWilliams.  Sorry.

21         A.   -- believe you meant.

22         Q.   Thank you.

23         A.   I -- yeah, that's, I think, the

24  way the math works out.  Again, if you need an

25  exact reckoning, that information is

Page 22

1            MARK A. WEISS, M.D.

2  obtainable.

3            Q.   Since you were -- you remember you

4  were deposed back on July 14th of 2017 in the

5  Lauris case?  Do you recall that?

6            A.   Yes, I do.

7            Q.   Okay.  Since that time, have you

8  been asked to serve as an expert witness in

9  any other cases besides the McWilliams case?

10            MS. SPICER:  Object to form.

11  BY MR. JOHNSTON:

12            Q.   And I mean generally.  I don't

13  mean just for -- for these attorneys.

14            A.   I have several outstanding cases

15  in varying degrees of activity, but I believe

16  I've only been -- well, actually, I haven't

17  even been yet retained, but I have an

18  agreement to -- to work on a case that the

19  retainer is -- is pending still.  I think all

20  of the other cases I actually had before I had

21  the Lauris case, so there's been some activity

22  on at least one of those cases in the

23  interval.

24            Q.   Have you served any expert reports

25  in any of those cases in the interval other

1              MARK A. WEISS, M.D.

2      than this case?

3              A.   Since --

4              Q.   Since --

5              A.   -- July?

6              Q.   -- July of 2017.

7              A.   I don't think so, but my memory is

8      imperfect of the exact dates I filed some of

9      these reports.

10             Q.   Have you testified in any

11     depositions --

12             A.   Yes.

13             Q.   -- between -- between --

14             A.   Sorry.

15             Q.   -- July 14th and the present?

16             A.   Yes, I have.

17             Q.   How many depositions have you

18     given?

19             A.   There -- there's one additional

20     deposition that I've testified in in the

21     interval.

22             Q.   All right.  And can you tell me

23     what that case involves?

24             A.   In that -- in that case there's

25     alleged medical malpractice for a patient who

Page 24

```
1              MARK A. WEISS, M.D.
2  suffered a pulmonary embolus following
3  surgery.
4         Q.   Is that a cancer patient?
5         A.   No, it was not.
6         Q.   Are you a surgeon?
7         A.   No, I am not.
8         Q.   Are you a pulmonologist?
9         A.   No, I am not.
10        Q.   Okay.  Have you testified in court
11 in any cases since July 14th of 2017?
12        A.   No, I have not.
13        Q.   In that case in which you were
14 deposed, are you a expert witness for the
15 plaintiff or for the defense?
16        A.   For the defense.
17        Q.   So are you offering an opinion
18 there that no medical malpractice was
19 committed?
20        A.   I'm embarrassed to say I might be
21 for the plaintiff in that case.
22        Q.   So you're offering --
23        A.   Yes, I am.  I was for the
24 plaintiff.  I'm sorry.  I --
25        Q.   So you're --
```

Page 25

1                 MARK A. WEISS, M.D.

2         A.    -- remembered it incorrectly.

3         Q.    -- you're offering an opinion in

4    that case that there was medical malpractice;

5    correct?

6         A.    I believe there was, yes.

7         Q.    Okay.  Do you know where that case

8    is pending?

9         A.    It's in Utah.

10        Q.    Utah.  Is it Federal State --

11   Federal or State Court, do you know?

12        A.    I want to say it's Federal Court,

13   but that should be in one of my reports where

14   I know I submitted to Ms. Spicer's firm an

15   updated report of my depositions given in the

16   last four years.

17        Q.    Is it the Iker versus Nakken --

18   Nakken case?

19        A.    Yes.

20        Q.    Okay.  So it looks like that's in

21   State Court in Iron County, Utah.  Does that

22   sound right?

23        A.    It sounds right.

24        Q.    Okay.  I want to try to get a

25   couple of definitional terms agreed to just so

1             MARK A. WEISS, M.D.

2    we can be sure we're talking about the same

3    thing.

4             There is something in the context

5    of CML called complete cytogenetic response;

6    correct?

7        A.   Yes.

8        Q.   And that's often written as

9    capital C capital C little y capital R;

10   correct?

11       A.   I've seen it several ways, but

12   that abbreviation has been used.

13       Q.   So if we see that in a paper that

14   we might look at today, your understanding is

15   that would refer to complete cytogenetic

16   response; correct?

17       A.   Probably, but I would look at the

18   footnotes within the paper.  With the first

19   usage of a term, they'll define the term; and

20   some people do use different abbreviations for

21   different terms, and I try to be as thorough

22   and as explicit as I can be.

23       Q.   And the -- what that term

24   "complete cytogenetic response" means is that

25   there is no detectable cells with the

MARK A. WEISS, M.D.

1
2    Philadelphia positive chromosome as measured
3    by cytogenetics; correct?
4         A.    Not completely correct, no.
5         Q.    Okay.  What's wrong with what I
6    said?
7         A.    There are some cases of CML that
8    can be cytogenetically recognized that do not
9    have the Philadelphia chromosome in it.  So in
10   those cases you could still have cytogenetic
11   evidence of CML without having an obvious
12   Philadelphia chromosome.
13        Q.    So you're saying there are cases
14   of CML in which there is no Philadelphia
15   chromosome present?
16        A.    Yes.
17        Q.    At all?
18        A.    Philadelphia chromosome in --
19   refers specifically to a tiny little piece of
20   chromosome that's left over after the disease
21   rearrangement occurs.  So it's something that
22   can be seen only on cytogenetics.  And in
23   cytogenetics there are cases that are CML, and
24   we can prove that by looking at the molecular
25   level, but they do not have this tiny little

Page 28

1            MARK A. WEISS, M.D.

2    chromosome called the Philadelphia chromosome.

3            Q.   Well, isn't it true that the

4    hallmark of CML is the Philadelphia positive

5    chromosome?

6            A.   No, it is not.

7            Q.   Okay.  Cytogenetics are tests that

8    look at bone barrow [sic] biopsies or they

9    also might look at peripheral blood and

10   determine whether there are any cells with the

11   Philadelphia chromosome, and, if so, what

12   percentage; is that correct?

13           A.   I'm sorry?

14           Q.   In this context.

15           A.   Can you restate that?

16           Q.   In this context, in the context of

17   CML that's Philadelphia positive, what happens

18   in a cytogenetic test is that cells are taken

19   from the bone marrow or perhaps the peripheral

20   blood and they are looked at by a pathologist

21   to determine what percentage of those cells

22   have the Philadelphia positive chromosome;

23   correct?

24           MS. SPICER:  Object to form.

25           THE WITNESS:  For very technical

Page 29

1             MARK A. WEISS, M.D.

2        reasons I don't believe that is correct

3        because I don't think a traditional

4        pathologist is the person who interprets

5        this test.  There are specific

6        cytogeneticists that really study the

7        chromosomes and look at it.  They may be

8        signed off by a pathologist because of the

9        M.D. degree and issues about billing, but

10       they don't actually read the -- the

11       chromosomes of the cells.

12  BY MR. JOHNSTON:

13       Q.   Okay.  Let me ask it again making

14  that correction.

15            In the context of Philadelphia

16  positive CML, cytogenetic tests are done where

17  cells are taken from the bone marrow, a bone

18  marrow biopsy or perhaps the peripheral blood,

19  and they are looked at by a geneticist to

20  determine what percentage of those cells have

21  the Philadelphia positive chromosome; is that

22  right?

23       A.   That's correct, though I want to

24  emphasize for cytogenetics specifically, the

25  peripheral blood is usually not a good place

                    MARK A. WEISS, M.D.

1

2  to study it because you need to have dividing

3  cells.

4         Q.   And we'll come back to it, but

5  that's one reason why the quantitative PCR

6  test was developed, was in order to use

7  peripheral blood rather than having to take

8  bone marrow biopsies; correct?

9         A.   The molecular testing, as far as

10  my perception of it, was designed primarily to

11  be a more sensitive test than not just

12  cytogenetics, but in the interval between

13  cytogenetics and molecular testing there was a

14  test called fluorescent in situ hybridization

15  often -- often abbreviated as F-I-S-H and

16  pronounced as FISH, and that can be done on

17  peripheral blood because it does not require

18  dividing cells to identify the molecular

19  abnormality of CML.

20         Q.   So I referred to a quantitative

21  PCR test.  That is a quantitative polymerase

22  chain reaction test; correct?

23         A.   Polymerase chain reaction, yes.

24         Q.   And that is a test in which cells,

25  and usually peripheral blood cells, are taken

1                    MARK A. WEISS, M.D.

2       and they are put through a process where there

3       is a reverse engineering of the DNA and that

4       causes replication.   I don't completely

5       understand it, but the point is that

6       eventually somebody can look at a sheet and

7       see whether or not there are BCR-ABL in this

8       instance cells present; correct?

9                    MS. SPICER:   Object to form.

10                   THE WITNESS:   The test has

11          limitations, so you can have BCR-ABL

12          present and have a negative test, but this

13          test looks at the genetic material within

14          the cells, so it doesn't look at whole

15          cells, though it's whole cells you take out

16          of the body, and in a very -- in a much

17          more sensitive way than cytogenetics or

18          even FISH, can tell what fraction of cells

19          that you've removed have evidence of the

20          rearrangement specific for CML.

21      BY MR. JOHNSTON:

22          Q.    Okay.   And there has been work --

23      well, so in a Philadelphia positive CML case,

24      complete cytogenetic response is considered to

25      be where there is no cells of the group looked

1             MARK A. WEISS, M.D.

2    at that showed the Philadelphia positive

3    chromosome; correct?

4         A.   Correct.

5         Q.   Okay.  And work has been done that

6    shows that that condition equates to a

7    quantitative PCR test score of 1 percent,

8    correct, or 1?

9         A.   No, that's not correct.  It's very

10   hard to compare these tests one to another;

11   and, in fact, in general, I don't think you

12   can.

13        Q.   Have you ever heard of the NCCN?

14        A.   Yes, I have.

15        Q.   What is the NCCN?

16        A.   This is a consortium of several --

17   well, more than several, of multiple cancer

18   centers in the United States that have tried

19   to produce guidelines, but like all other

20   guidelines, they're consensus reports and

21   they're not factual reports.  They're opinion

22   reports.

23             (Exhibit Weiss-4, multipage document

24        entitled NCCN Guidelines For Patients

25        Chronic Myeloid Leukemia 2018, is marked

1           MARK A. WEISS, M.D.

2        for identification.)

3           THE WITNESS:  Thank you.

4    BY MR. JOHNSTON:

5        Q.   We've marked as Exhibit 4 the

6    patient -- "NCCN Guidelines For Patients

7    Chronic Myeloid Leukemia" from 2018.

8           Have you seen this document

9    before?

10       A.   No, I have not.

11       Q.   Have you seen the NCCN guidelines

12   for physicians from 2018 on chronic myeloid

13   leukemia?

14       A.   I don't believe I have.

15       Q.   Okay.  Just on this particular

16   point that I was talking about, let me have

17   you look at Page 29.

18       A.   Uh-huh.

19       Q.   And I'll have you look at the

20   right-hand column, the first arrow says, [as

21   read]: "CCyR (complete cytogenetic response)

22   is the absence of the Philadelphia chromosome

23   as measured by cytogenetics.  A CCyR

24   corresponds with BCR-ABL1 .1 to BCR-ABL1 1

25   percent."

1          MARK A. WEISS, M.D.

2          Do you disagree with that

3    statement?

4          A.   Yes, I do.

5          Q.   So you're saying that the NCCN is

6    wrong; correct?

7          A.   I'm saying this statement which is

8    in a pamphlet meant for a lay public is not a

9    complete description of what CCyR could be,

10   and it could certainly lie outside of this

11   range.

12         Q.   And Figure 9 is also on this page;

13   correct?

14         A.   Yes, it is.

15         Q.   And it shows that a CCyR by 12

16   months is a 1 percent 2-log reduction;

17   correct?

18         A.   That's what it says here.

19         Q.   And you disagree with that as

20   well; correct?

21         A.   It's not completely accurate.

22         Q.   Okay.  So you disagree with it;

23   correct?

24         A.   Yes, that is correct.

25         Q.   Do you know who Jeremy -- who

Page 35

1               MARK A. WEISS, M.D.

2    Jerry Radich is?

3          A.   The name's familiar, but I don't

4    know that person.

5          Q.   You don't know him?  You don't

6    know any of his work?

7               MS. SPICER:  Object to form.

8               THE WITNESS:  I may.  I just can't

9          recall offhand.

10   BY MR. JOHNSTON:

11         Q.   One of the leading researchers on

12   chronic myeloid leukemia.  You don't know any

13   of his work that you can identify?

14               MS. SPICER:  Object to form,

15          argumentative.

16               THE WITNESS:  When you say "one of

17          the leading researchers," I'm unaware that

18          he is.

19   BY MR. JOHNSTON:

20         Q.   Are you aware of a guy named

21   Druker?

22         A.   Yes.

23         Q.   Okay.

24         A.   I know Druker.

25         Q.   Where is he from?

1            MARK A. WEISS, M.D.

2        A.   Most of the work he did using an

3   imatinib for CML was done at Oregon State's

4   Health Sciences, I believe is the name of the

5   place he was at.

6        Q.   Also on this page there is another

7   item I wanted to define.  "Major molecular

8   response," have you -- have you ever heard of

9   that phrase?

10       A.   Yes, I have.

11       Q.   And often that's abbreviated as

12  MMR; correct?

13       A.   That's correct as well.

14       Q.   Do you agree with the statement on

15  this page in Exhibit 4 from the NCCN

16  Guidelines For Patients 2018 that "MMR (major

17  molecular response) is defined as BCR-ABL1

18  less than .1 percent"?

19       A.   Yes, that's a correct statement

20  because it indicates this is "defined as."

21  The problem with the statement of an complete

22  cytogenetic response is they're not using a

23  definition, instead they're saying what it

24  corresponds to, but it's actually impossible

25  for this statement to be true since most

1                MARK A. WEISS, M.D.

2    cytogenetics only looks at 20 cells.  So

3    really if you're below 5 percent, you could

4    have a complete cytogenetic response and you

5    don't -- or you could be less than .1 percent

6    and have a complete cytogenetic response.

7                See, it's -- it's not defined as

8    this.  A complete cytogenetic response is

9    defined --

10               (Reporter clarification.)

11        A.   I'm sorry.

12               (Continuing) -- is defined as

13   the -- as it says here, "The absence of the

14   Philadelphia chromosome as measured by

15   cytogenetics."  That's its definition.  The

16   interpretation, which is the second part of

17   that sentence, is what I object to -- or what

18   I disagree with I should say.

19        Q.   So do most practitioners in your

20   experience consider a BCR-ABL between .1 and 1

21   to roughly equate to cyto -- complete

22   cytogenetic response?

23               MS. SPICER:  Object to form.

24               THE WITNESS:  I don't know.  I think

25        most would look at that as consistent with

1            MARK A. WEISS, M.D.

2        both a complete cytogenetic response and,

3        for that matter, a complete FISH response.

4    BY MR. JOHNSTON:

5        Q.   And then just to complete some

6    definitional terms, there's another sentence

7    right below that, it says, "Although not a

8    milestone, another treatment result is a CMR

9    (complete molecular response).  A CMR is when

10   BCR-ABL1 can't be detected."

11            Do you agree with that statement?

12       A.   There are -- there are problems

13   with the statement as you read it, which are

14   improved somewhat by reading the next

15   sentence, which indicates that a lab has to

16   have a sensitivity of at least a 4.5-log

17   reduction.

18       Q.   So if a log -- if a lab has the

19   ability to detect at least a 4.5-log reduction

20   and there is no detectible BCR-ABL1, then you

21   agree that that would be considered a complete

22   molecular response; is that correct?

23       A.   Not completely.

24       Q.   Okay.  What's wrong with it?

25       A.   For me a complete molecular

1              MARK A. WEISS, M.D.

2     response means that regardless of the type of

3     PCR testing you do, you cannot detect the

4     BCR-ABL rearrangement.  So there are some PCR

5     tests that are more sensitive than 4 1/2 logs

6     that could still be positive.  But in terms of

7     a response, there is this notion that at least

8     a 4.5-log reduction is another point to be

9     reckoned with, but I personally wouldn't label

10    it as complete because on some PCR testings it

11    would still be positive.

12             Excuse me.  Can we go off for one

13    second?

14             MR. JOHNSTON:  Do you want to take a

15        break?

16             THE VIDEOGRAPHER:  Off --

17             THE WITNESS:  No, I just want to

18        check my phone.

19             MR. JOHNSTON:  Okay.

20             THE VIDEOGRAPHER:  Off the video

21        11:05.

22             (Off the record.)

23             THE VIDEOGRAPHER:  Back on 11:05.

24    BY MR. JOHNSTON:

25        Q.   And molecular response 4.5 -- a

Page 40

1              MARK A. WEISS, M.D.

2       4.5-log reduction equates to a BCR-ABL of

3       equal to or less than .1 percent; correct?

4              A.   Yes, but much less than

5       .1 percent.  .1 percent would be --

6              Q.   Right.

7              A.   -- a 3-log reduction.

8              Q.   It equals .0032 percent; right?

9              A.   I think that's correct.

10             Q.   In your report --

11             MS. SPICER:  Go ahead.  Go ahead.

12      BY MR. JOHNSTON:

13             Q.   Your supplemental report,

14      Exhibit 3, Page 1 to 3 you discuss one

15      paragraph of Dr. Giles' report; correct?

16             MS. SPICER:  Object to form.

17             THE WITNESS:  I'm not sure how many

18         paragraphs it was, but it's labeled

19         "Response to Giles' Opinion 1."

20      BY MR. JOHNSTON:

21             Q.   Well, you state -- you have a

22      quote from Dr. Giles's report, correct, in

23      your report under A?

24             A.   Yes, I do have a quote.

25             Q.   And you make bold two separate

```
1                    MARK A. WEISS, M.D.

2    statements in that paragraph; correct?

3           A.   Yes.

4           Q.   Okay.  The first one that's bolded

5    says, "Gleevec, to which this [sic] disease

6    has become resistant."  And the second one

7    says, that's bolded, "I will focus only on the

8    therapies Gleevec, Tasigna and Sprycel."

9                    And you write, [as read]: "I don't

10   agree with two of the above

11   characterizations."

12                    Are the bolded ones the two you

13   don't agree with?

14           A.   I believe so.

15           Q.   Okay.  And the first of those is

16   that you don't -- that "The statement that the

17   patient's disease had become resistant to

18   imatinib (Gleevec) is not supported by the

19   medical oncology records that I reviewed";

20   correct?

21           A.   Correct.

22           Q.   Are you aware that at the time

23   that Mr. McWilliams switched from Gleevec to

24   Tasigna, he had a quantitative PCR of .779 at

25   44 months from diagnosis?
```

Page 42

1          MARK A. WEISS, M.D.

2          MS. SPICER:  Object to form, assumes

3      facts not in evidence.

4          You want to show him something, show

5      him something.

6          MR. JOHNSTON:  He says he looked at

7      the medical records.  I want to know what

8      he looked at.

9          MS. SPICER:  Well, you're --

10 BY MR. JOHNSTON:

11     Q.   Did you look at a record --

12         MS. SPICER:  -- putting a fact into

13     a question that has not been, I'm sorry,

14     so --

15         MR. JOHNSTON:  Well, see, that's

16     kind of the problem here, is he doesn't

17     tell me what records he looked at.

18         MS. SPICER:  Ask him what records he

19     looked at.  Don't put facts --

20 BY MR. JOHNSTON:

21     Q.   Do you remember looking at a

22 record that showed a --

23         (Reporter clarification.)

24         MS. SPICER:  Don't put facts into a

25     question that you haven't asked him about

Page 43

```
 1              MARK A. WEISS, M.D.

 2         yet.

 3              MR. JOHNSTON:  Well, that's kind of

 4         the whole problem with this report,

 5         Counsel.

 6    BY MR. JOHNSTON:

 7         Q.   Do you recall looking at a record

 8    that showed a quantitative PCR of .779 44

 9    months into treatment for Mr. McWilliams?

10              MS. SPICER:  Same objection.

11              THE WITNESS:  I certainly remember

12         seeing a report that indicated a PCR level

13         of .779.  I don't remember acknowledging

14         that it was exactly 44 months into

15         treatment.

16    BY MR. JOHNSTON:

17         Q.   And where in your expert report do

18    you cite that you reviewed that record?

19              MS. SPICER:  Object to form, asked

20         and answered.

21              THE WITNESS:  As we discussed

22         earlier, I write here that I reviewed

23         medical oncology records.

24    BY MR. JOHNSTON:

25         Q.   And you think that's adequate to
```

Page 44

1                MARK A. WEISS, M.D.

2       disclose to me which records you reviewed;

3       correct?

4                MS. SPICER:  Object to form,

5            argumentative.

6                If you want to ask him what records

7            he reviewed, ask him specific records he

8            reviewed.

9                MR. JOHNSTON:  Quit coaching the

10           Witness.

11               MS. SPICER:  I'm not.  I'm talking

12           to you.

13               MR. JOHNSTON:  Yes, you are.  You

14           can say, "objection, form."  That's all you

15           need.

16               MS. SPICER:  I can say what I need

17           to say, and you're --

18               MR. JOHNSTON:  That's not what

19           Mr. Elias says at his depositions.

20               MS. SPICER:  Okay.  Well, I -- we've

21           been in a lot of depositions together.  Go

22           ahead.  Ask an appropriate question.

23      BY MR. JOHNSTON:

24           Q.   Answer the question that I asked.

25               MR. JOHNSTON:  He's going to answer

1          MARK A. WEISS, M.D.

2      whatever question I ask unless you're going

3      to call the Judge.

4          MS. SPICER:  Repeat your question.

5  BY MR. JOHNSTON:

6      Q.  Do you think it's adequate to

7  disclose to me which records you reviewed to

8  write, "based on the medical oncology records

9  that I reviewed"?

10         MS. SPICER:  Same objection,

11      argumentative.

12         THE WITNESS:  Yes, I do, because if

13      it's very important to you, I can retrieve

14      the records and indicate where I saw what I

15      saw.

16  BY MR. JOHNSTON:

17      Q.  Well, that's not the way this

18  process works, Doctor.  You are supposed to

19  tell me now so that I can ask you at this

20  deposition what you reviewed.  And you, by the

21  way, don't say that you reviewed all the

22  medical oncology records.  You say, "The

23  medical oncology records I reviewed."

24          Did you review the entire medical

25  oncology record in this case?

Page 46

```
1              MARK A. WEISS, M.D.
2              MS. SPICER:  Object to form.
3              THE WITNESS:  I have no way of
4        knowing that.
5    BY MR. JOHNSTON:
6         Q.   So you might have only reviewed
7    parts of the medical oncology --
8         A.   It is possible.
9         Q.   -- record?
10             MS. SPICER:  Object -- object to
11       form, argumentative.  Ask him what he
12       reviewed.
13             MR. JOHNSTON:  That's what I did.
14   BY MR. JOHNSTON:
15        Q.   Did you -- do you know whether you
16   reviewed the entire oncology -- medical
17   oncology record for Mr. McWilliams in this
18   case?
19        A.   I have no way of --
20             MS. SPICER:  Object to form.
21             THE WITNESS:  -- knowing this.  I'm
22       sorry.
23             MS. SPICER:  Let me get my
24       objections in.
25             THE WITNESS:  Oh, I'm sorry.
```

Page 47

                    MARK A. WEISS, M.D.

1

2                    MS. SPICER:  Object to form, asked

3          and answered.

4    BY MR. JOHNSTON:

5              Q.   How did you select which records

6    you did review of Mr. McWilliams from the

7    medical oncology files?

8              A.   I didn't do the selection.  There

9    were records sent to me.  I didn't have

10   independent access to his medical records, and

11   so I reviewed the medical records that were

12   sent to me.

13             Q.   And those were sent to you by

14   Plaintiffs' counsel; correct?

15             A.   That is correct.

16             Q.   And Plaintiffs' counsel selected

17   which records to send you; is that correct?

18                  MS. SPICER:  Object to form.

19                  THE WITNESS:  I assume that's how it

20          works.

21   BY MR. JOHNSTON:

22             Q.   And you don't know whether they

23   sent you the entire medical oncology record

24   for Mr. McWilliams or not, do you?

25                  MS. SPICER:  Object.

Page 48

1          MARK A. WEISS, M.D.

2          THE WITNESS:  No, I do not.

3          I'm sorry.  I keep stepping on you.

4          MS. SPICER:  For the record, to

5     clarify the record and make it --

6          MR. JOHNSTON:  You're not -- you're

7     not --

8          MS. SPICER:  -- absolutely clear --

9          MR. JOHNSTON:  -- testifying,

10    counsel.

11         MS. SPICER:  -- the Witness is not

12    here and he has not provided any opinions

13    on specific causation information --

14         MR. JOHNSTON:  That's not true.

15         MS. SPICER:  It is true, and you're

16    entitled to ask him about his opinions in

17    this case.  You're entitled to ask him

18    about what's here, but this whole -- it's

19    unnecessary.

20         MR. JOHNSTON:  He's offered an

21    opinion about the reduction -- and we're

22    going to get to it -- the reduction in

23    cancer burden.

24         MS. SPICER:  Yes.  Then ask --

25         MR. JOHNSTON:  And he can't tell me

Page 49

                    MARK A. WEISS, M.D.

1          which records he looked at for that.

2               MS. SPICER:  You haven't asked him

3          that question.

4               MR. JOHNSTON:  I will.

5               MS. SPICER:  You haven't asked

6          him --

7               MR. JOHNSTON:  And he won't be able

8          to tell me those records either.

9               MS. SPICER:  You haven't ask -- ask

10         him what records he reviewed, Robert.

11              MR. JOHNSTON:  I have.

12    BY MR. JOHNSTON:

13         Q.   What records did you review?

14         A.   I reviewed three different sets of

15    records.  One set was his personal, his

16    private oncologist, who I believe his name was

17    Walia.  I reviewed office records that I

18    received about Walia.

19              I also received a very short file

20    about a visit with the University of Florida

21    Pulmonary Group that I believe was in 2017.

22              And I received a handful of pages

23    from his consultation with Dr. Wingard at the

24    University of Florida for a second oncologic

Page 50

1                MARK A. WEISS, M.D.

2      opinion.

3               Q.   Did you understand that those were

4      all of the records of Dr. Walia that you

5      received from counsel?

6               A.   No, I did not understand that.

7               Q.   Okay.  Did you understand that

8      those were all of the University of Florida

9      records that you received from counsel?

10              A.   No, I did not understand that.

11              Q.   Was it your understanding that you

12      received all of the records for Dr. Wingard

13      related to Mr. McWilliams from Plaintiffs'

14      counsel?

15              A.   No.

16              Q.   So you can't say whether or not

17      you reviewed the entire medical oncologic

18      history of Mr. McWilliams; correct?

19              A.   Correct.

20              Q.   Did you receive test results from

21      Dr. Walia's file?

22              MS. SPICER:  Object to form, vague.

23              THE WITNESS:  Can you restate that,

24          please?

25      BY MR. JOHNSTON:

1        MARK A. WEISS, M.D.

2        Q.   Did you receive FISH tests from

3   Dr. Walia's file?

4        A.   Yes, I saw some FISH results; and

5   I believe most of them were from Dr. Walia's

6   file, but I can't say that some of them may

7   have been included in Dr. Wingard's paperwork.

8        Q.   Did you receive qualitative --

9   quantitative PCR test results from Dr. Walia's

10  file?

11       A.   I did review some quantitative PCR

12  records as well.  I think they were from

13  Dr. Walia, but, again, some of it may have

14  been from Dr. Wingard's records.

15       Q.   Do you have any idea how many

16  quantitative PCR test results you reviewed for

17  Mr. McWilliams?

18       A.   I don't remember specifically.  I

19  would estimate maybe between five and ten

20  different results.

21       Q.   And did those records have on the

22  bottom of the page Bates numbers?

23            Do you know what a Bates number

24  is?

25       A.   I think I know what a Bates number

Page 52

1            MARK A. WEISS, M.D.

2    is; and I think these pages probably did have

3    Bates numbers on them.

4            Q.   But you didn't disclose in your

5    report which Bates numbers of those records

6    you looked at; correct?

7            A.   Correct.  As I stated earlier,

8    that's not been my practice; and up until now,

9    no one has ever told me otherwise.

10           (Pause.)

11           (Exhibit Weiss-5, multipage

12      document, first page entitled Dennis

13      McWilliams' BCR-ABL Scores, is marked for

14      identification.)

15   BY MR. JOHNSTON:

16           Q.   I've handed you what's been marked

17   as Exhibit 5; and what Exhibit 5 is is a chart

18   we created on the top. And we'll get to what

19   that is, but behind that chart are the testing

20   records that support each of the BCR-ABL

21   scores listed on the chart.

22              MS. SPICER:  And for the record,

23      this is the first time this is being

24      provided to Plaintiffs' counsel, this

25      chart?

Page 53

1                    MARK A. WEISS, M.D.

2                    MR. JOHNSTON:  Correct.

3                    MS. SPICER:  Okay.

4                    MR. JOHNSTON:  I have no obligation

5           to provide it to you, counsel.

6                    MS. SPICER:  There was no narrative

7           there.  I asked a question.

8    BY MR. JOHNSTON:

9           Q.    And if you look at the first page,

10   Page 2 of this exhibit, do you see that that

11   page, which is Bates Numbered Dennis --

12   MCWILLIAMS_DENNIS-FL-0034002, I think.

13                   MS. SPICER:  This --

14                   THE WITNESS:  You know, it's hard

15          for me to see the "02" part.

16   BY MR. JOHNSTON:

17          Q.    All right.  Well, you see that

18   it's a record dated 5/27/11 as the date of

19   collection with a "Date Reported" of 6/6/11?

20          A.    Yes, I do.

21          Q.    And you see that there is, as part

22   of this lab report, a BCR-ABL quantitative

23   test that was run?

24          A.    Yes, I do.

25          Q.    And it showed that for the b2a2

Page 54

1              MARK A. WEISS, M.D.

2    transcript a result of .779.  Do you see that?

3         A.    Yes, I do.

4         Q.    Okay.  .779 is not in major

5    molecular response, is it?

6         A.    No, it is not.

7         Q.    Is it your -- and do you know when

8    Mr. McWilliams was diagnosed with CML?

9         A.    My understanding, he was diagnosed

10   in 2007.

11        Q.    Okay.  And do you need me to get

12   out a record so that we can calculate whether

13   or not this test was run 44 months from his

14   diagnosis or not, or are you willing to accept

15   my representation that that's correct?

16        A.    Let's look.

17        Q.    Okay.  Did you review the

18   deposition -- sorry.

19              Did you review the deposition of

20   Dr. Walia in preparing your supplemental

21   report in this case?

22        A.    No, I did not.

23        Q.    Have you reviewed the deposition

24   of Dr. Walia since you prepared your

25   supplemental report?

Page 55

1              MARK A. WEISS, M.D.

2         A.    No, I have not.

3         Q.    Have you reviewed the deposition

4    of Dr. Wingard?

5         A.    No, I have not.

6         Q.    Are you aware that those gentlemen

7    have been deposed?

8         A.    No, I'm -- now I am, I guess.

9         Q.    You don't have to take my word for

10   it.  No one told you that they had been

11   deposed before today; correct?

12        A.    No.

13              Excuse me.  Can I ask for a

14   clarification?

15        Q.    Sure.

16        A.    You asked about Dr. Giles and

17   Dr. Wingard; correct?

18        Q.    No, Dr. Walia and Dr. Wingard.

19        A.    Oh, okay.  Then my answer is

20   correct as stands.

21        Q.    Looking at Exhibit 2, which is

22   your expert report, on Page 10 you write, [as

23   read]: "I have been asked to provide opinions

24   on whether the United States nilotinib label

25   in effect at the time that Mr. McWilliams was

Page 56

1               MARK A. WEISS, M.D.

2     on the drug (which I have been informed span

3     from around June 2011 to around August 2013),

4     close quote, adequately warned oncologists of

5     the risks of developing

6     atherosclerosis-related disease described

7     above."

8               Did I read that correctly?

9          A.   Yes, you did.

10         Q.   So you were informed for this

11    report that Mr. McWilliams received Tasigna

12    from June 2011 to August 2013; correct?

13         A.   I was informed that he was on the

14    drug between those two dates.  I wasn't

15    informed of the stop date.

16         Q.   Have you -- who informed you of

17    that?

18         A.   I believe it was Mr. Elias who

19    informed me of this.

20         Q.   Did you review the medical records

21    to determine whether that was, in fact,

22    correct?

23              MS. SPICER:  Object to form.  His

24         opinion is not relevant to that.  It's not

25         what his opinion stated.

1                MARK A. WEISS, M.D.

2           THE WITNESS:  No, I didn't.

3    BY MR. JOHNSTON:

4        Q.   So you don't know sitting here

5    today the dates on which he was treated with

6    nilotinib; is that correct?

7           MS. SPICER:  Object to form.

8           THE WITNESS:  Subsequently, I have

9         looked at Dr. Walia's records, at least the

10        ones that were supplied to me; and so

11        subsequently, I believe I've seen the

12        dates, but I'd like to look at my report or

13        the records again to state that with

14        certainty.

15   BY MR. JOHNSTON:

16        Q.   You didn't bring the records with

17   you, did you?

18           MS. SPICER:  Object to form,

19        argumentative.

20           THE WITNESS:  No.

21           (Reporter clarification.)

22           MS. SPICER:  I'm sorry.  I said,

23        object to form, argumentative.

24   BY MR. JOHNSTON:

25        Q.   You didn't bring the records with

1              MARK A. WEISS, M.D.

2    you, did you?

3         A.   No, as --

4              MS. SPICER:  Same objection.

5              THE WITNESS:  -- I stated at the

6         beginning, I brought nothing with me.

7    BY MR. JOHNSTON:

8         Q.   So I would -- so in order for you

9    to do that, I would have to suspend this

10   deposition and reschedule for another day, so

11   that you could bring those records or consult

12   them to determine whether you have information

13   in your possession that informs you of that

14   answer; correct?

15             MS. SPICER:  Object to form.  He has

16        no obligation to bring this -- those set of

17        medical records that he reviewed to this

18        deposition.  I'm sure you have them.

19             If you want to ask him about

20        something, ask him about something.

21             MR. JOHNSTON:  No, what he has to

22        do -- what he has an obligation to do is

23        explain to me what the basis for his

24        opinions are, and this report doesn't do

25        that.  And he just said he could look at

```
 1                MARK A. WEISS, M.D.

 2           those records and determine that.

 3                So I'm saying I'm willing to give

 4           him that option.

 5                MS. SPICER:  Object to form.  If --

 6   BY MR. JOHNSTON:

 7           Q.   So --

 8                MS. SPICER:  -- you have the --

 9   BY MR. JOHNSTON:

10           Q.   -- how far away are your records?

11                MS. SPICER:  Stop.  That is not an

12           appropriate -- that is not -- you have the

13           medical records here.  And if you don't,

14           you can ask him whatever you --

15   BY MR. JOHNSTON:

16           Q.   How -- how far away are your --

17                MS. SPICER:  -- want to ask him

18           today.

19   BY MR. JOHNSTON:

20           Q.   How far away are your records?

21                MS. SPICER:  Don't answer that.

22                (Instruction.)

23                MR. JOHNSTON:  Are you instructing

24           him not to answer?

25                MS. SPICER:  How far away --
```

Page 60

1          MARK A. WEISS, M.D.

2          MR. JOHNSTON:  Yes.

3    BY MR. JOHNSTON:

4          Q.    How far --

5          MS. SPICER:  -- are the records?

6          Q.    -- away are your records?

7          MS. SPICER:  We're going to go --

8       we're going to go off the record here.

9          MR. JOHNSTON:  No, we're not.

10   BY MR. JOHNSTON:

11         Q.    How far away are your records,

12      sir?

13         MS. SPICER:  Robert, do you have the

14      records here that you want to ask him

15      about?

16         MR. JOHNSTON:  No, I want to know

17      what he looked at.

18         MS. SPICER:  He already told you.

19         MR. JOHNSTON:  That's what I want to

20      know.  He did not.

21         MS. SPICER:  He already told you

22      what he looked at.

23         MR. JOHNSTON:  Okay.  Stop

24      interrupting.

25   BY MR. JOHNSTON:

Page 61

1                MARK A. WEISS, M.D.

2           Q.    Answer my question.   How far away

3    is the place where your records are stored

4    from this building?

5                MS. SPICER:   Object to form.

6                MR. JOHNSTON:   Okay.   Fine.   You can

7          object.

8                MS. SPICER:   We're talking about

9          medical records that he reviewed.   You have

10         the full set of medical record at your

11         disposal.   There is --

12               MR. JOHNSTON:   Are you instructing

13         the Witness not to answer?

14               MS. SPICER:   I am -- yes, because

15         this is absurd.

16               MR. JOHNSTON:   Okay.   We're going to

17         take a break.   I need the Judge's number.

18               THE VIDEOGRAPHER:   We are now --

19               COURT REPORTER:   Counsel, is it all

20         right to go off the record?

21               MS. SPICER:   Yes.

22               THE VIDEOGRAPHER:   Now going off the

23         video.   The time 11:26.

24               (A recess is held from 11:26 a.m. to

25         11:34 a.m.)

Page 62

1              MARK A. WEISS, M.D.

2              THE VIDEOGRAPHER:  Back on 11:34.

3    BY MR. JOHNSTON:

4         Q.   I didn't ask you at the beginning,

5    do you maintain an office currently?

6         A.   I'm sorry.  Can you be more

7    specific than that?

8         Q.   Do you have a place where you see

9    patients or treat patients?

10        A.   No, I do not.

11        Q.   Okay.  Do you have a location

12   where you keep records of your career and

13   things like that?

14        A.   No, I do not.

15        Q.   All right.  Is there any --

16        A.   Excuse me.  Do you mean patient

17   records?

18        Q.   No.  Any -- anything related to

19   your employment or your historical career.

20        A.   Yes, I still have materials

21   related to my publications and my academic

22   research.

23        Q.   Okay.  And is that somewhere on

24   campus or in your house or --

25        A.   No, it's -- it's at my home.

Page 63

1            MARK A. WEISS, M.D.

2       Q.   Okay.  So you don't have a place

3  where you work other than at the home

4  currently; is that right?

5       A.   That is correct.

6       Q.   And what is -- what is your home

7  address, please?

8       A.   It's 1111 Locust Street, and

9  that's in Philadelphia, PA  19107; and it's

10  Apartment 6F, like Frank.

11       Q.   One second.

12            So that's about a mile from here;

13  right?

14       A.   Sounds about right.

15       Q.   And is that where the documents

16  that Plaintiffs' counsel provided you related

17  to Dr. Walia, Dr. Wingard, and UF are located?

18       A.   That's where the electronic files

19  are that had those documents on them.

20       Q.   Okay.  Let's look at the -- the

21  record again.  And we -- we -- well, what I'm

22  trying to do is -- you don't know when

23  Mr. McWilliams was first diagnosed with CML;

24  is that your testimony?

25            MS. SPICER:  Object to form,

1                MARK A. WEISS, M.D.

2           misstates his testimony.

3                THE WITNESS:  My memory is that he

4           was diagnosed in 2007.

5     BY MR. JOHNSTON:

6           Q.    Does June 2007 help at all?

7           A.    I believe that's the correct date,

8     but I would --

9           Q.    Well --

10          A.    -- have to go back and check to

11    be --

12          Q.    -- I'm going to get a

13    record that --

14          A.    -- absolutely sure.

15                (Reporter clarification.)

16                MR. JOHNSTON:  Sorry.

17                THE WITNESS:  Oh, I'm sorry.

18                MR. JOHNSTON:  It's my fault.

19                THE WITNESS:  (Continuing) -- to be

20          absolutely sure.

21                MR. JOHNSTON:  I'm sorry.

22    BY MR. JOHNSTON:

23          Q.    I'm having a record pulled that

24    will allow us to fix that date precisely --

25          A.    Thank you.

1              MARK A. WEISS, M.D.

2         Q.   -- but I'd like to try to go on.

3              I will represent to you that it

4    was June 7th -- 7 -- June of 20 -- 2007, which

5    is about 44 months before this PCR test.  We

6    can match that up, but I'm going to ask you --

7    I'll let you have a choice.  Either we can

8    assume, and I can keep asking questions, that

9    I'm right that it was 44 months, or we can

10   wait until I get the document and we can go

11   that way.

12        A.   I'm not sure how important it was,

13   but if the date is June 2007, the day of this

14   test was May 2011.  That's not 44 months.

15        Q.   All right.  It's three years --

16   more than three years, would you agree with

17   that?

18        A.   Absolutely.

19        Q.   Okay.  Is it your opinion, to a

20   reasonable degree of medical certainty, that a

21   patient with a .779 quantitative PCR test at

22   three-plus years is demonstrating an optimal

23   result of imatinib therapy?

24              MS. SPICER:  Objection.  Just to be

25        clear, opinion in general, not an opinion

Page 66

1          MARK A. WEISS, M.D.

2      he's offering in this case?

3          THE WITNESS:  Can you restate that,

4      please?

5  BY MR. JOHNSTON:

6      Q.   Is it your opinion that any

7  patient who is on Gleevec therapy for three --

8  more than three years, and had a .779 PCR, is

9  it your opinion that that patient is

10 demonstrating an optimal result from imatinib

11 therapy?

12          MS. SPICER:  Same objection.

13          THE WITNESS:  That patient's

14      experiencing a very good result, but, no,

15      not optimal.

16 BY MR. JOHNSTON:

17      Q.   Okay.  So it's a suboptimal

18 result; correct?

19      A.   My opinion is any detectable

20 disease by any means is less than optimal.

21 "Optimal" implies the very top, the pinnacle.

22      Q.   And isn't the goal of therapy to

23 obtain optimal therapy if possible?

24      A.   No, I don't agree with that.

25          I think every patient decision,

Page 67

MARK A. WEISS, M.D.

1            MARK A. WEISS, M.D.

2 including where you want the patient to be on,

3 let's say molecular testing, at least for a

4 good physician, is always a balance of the

5 potential risks against the potential

6 benefits.  And so for different people that

7 may mean different things.

8      Q.  And you don't know what

9 Dr. Walia's view about what the goal of

10 therapy was when he saw .779 PCR, do you?

11      A.  No, I do not.

12      Q.  Okay.  Is it your opinion that a

13 patient who has a .77 PCR at more than three

14 years after the initiation of Gleevec therapy

15 is not showing resistance to Gleevec?

16            MS. SPICER:  Object to form.

17            THE WITNESS:  Yes, I think the term

18        "resistance to Gleevec" in that setting is

19        not correct.

20 BY MR. JOHNSTON:

21      Q.  Okay.  What do you mean by

22 "resistance"?

23      A.  "Resistance" in cancer therapy,

24 it's fairly well-agreed on, implies that the

25 disease is progressing despite being on active

Page 68

                    MARK A. WEISS, M.D.

1

2    therapy.

3         Q.   And do you have any cites or

4    sources that you can cite for that definition

5    or is that just based on your experience?

6         A.   That's based on my medical

7    training and my experience, and common sense

8    of what the word "resistance" means.

9         Q.   Is it possible that Dr. Giles in

10   using the word "resistance" equated that to a

11   suboptimal result?  Is that possible?

12        A.   I have no idea.  It just doesn't

13   mean resistance in either the normal

14   vocabulary or in the medical vocabulary --

15        Q.   Is it your --

16        A.   -- and that's why I objected to

17   it.

18        Q.   Is it your opinion that a patient

19   with a .779 PCR at three-plus years of

20   therapy, that there is some evidence of a

21   inability of Gleevec to provide an optimal

22   response?

23             MS. SPICER:  Object to form.

24             THE WITNESS:  Can you state that

25        again, because it's --

Page 69

1                    MARK A. WEISS, M.D.

2    BY MR. JOHNSTON:

3            Q.   I'll say it exactly how I said it.

4    Let me scroll back to it.   Actually, I'm not

5    getting anything.

6                 If a patient, any patient, has a

7    .779 PCR after three years on imatinib

8    therapy, is that evidence that that patient is

9    not getting optimal results from Gleevec

10   therapy?

11                MS. SPICER:   Object to form,

12        incomplete hypothetical.

13                THE WITNESS:   I -- I --

14                MS. SPICER:   In -- sorry.

15                THE WITNESS:   I'm sorry.

16                MS. SPICER:   Let me say it louder.

17                Object to form, incomplete

18        hypothetical.

19   BY MR. JOHNSTON:

20           Q.   Go ahead.   You can answer.

21           A.   So I believe I answered this

22   before, that the term "optimal" implies the

23   best you can possibly do.   So having any

24   detectable disease, including .779, would not

25   be optimal.

Page 70

1              MARK A. WEISS, M.D.

2              (Exhibit Weiss-6, handwritten

3         one-page record dated 6-11-2007, bearing

4         Bates Number McWilliams-000204, is marked

5         for identification.)

6              THE WITNESS:  Thank you.

7    BY MR. JOHNSTON:

8         Q.   I've handed you what's been marked

9    as Exhibit 6, which bears the Bates Number

10   McWilliams-000204.  It is a record dated

11   6/11/07.  It is signed at the bottom by

12   Dr. Walia, and it states that he had a blood

13   test suggestive of chronic myelogenous

14   leukemia on that date that -- or at least that

15   was discussed with him on that date?

16              Do you see that?

17              MS. SPICER:  Object.

18              THE WITNESS:  Yes, I do.

19   BY MR. JOHNSTON:

20        Q.   Okay.  Does this help refresh your

21   recollection or inform you, if you never knew,

22   about the time that Mr. McWilliams was

23   diagnosed with chronic myeloid leukemia?

24        A.   Well, of course, this doesn't

25   diagnose him.  But these blood counts, I guess

Page 71

1          MARK A. WEISS, M.D.

2    as you said here, are suggestive of the

3    disease.  I believe it was later that the

4    disease was actually diagnosed.  Not a long

5    time later, but soon later.

6              (Counsel confer.)

7              MR. JOHNSTON:  All right.  Let's

8        mark this as 5 -- 7.

9              (Exhibit Weiss-7, handwritten

10        one-page record dated 6-20-07, bearing

11        Bates Number McWilliams-000203, is marked

12        for identification.)

13   BY MR. JOHNSTON:

14        Q.    Exhibit 7 is Bates Numbered

15   McWilliams-000203.  Again, signed by Dr. Walia

16   dated 6/20/07.

17              You see that the "Interval

18   History" says, "Had BM asp," which I think is

19   bone marrow aspiration, "biopsy and

20   cytogenetics, Philadelphia chromosome positive

21   CML."

22              You see that?

23        A.    Yes, I do.

24        Q.    So will you agree that at least by

25   6/20/2007, Mr. McWilliams was diagnosed with

MARK A. WEISS, M.D.

1

2    chronic myeloid leukemia?

3        A.    Certainly the way it appears here.

4        Q.    Okay.  Had you seen these records

5    before?

6        A.    I believe I have.

7        Q.    And you had not previously formed

8    an opinion as to whether or not he had been

9    diagnosed by 6/20/07 as part of your review of

10   the records?

11           MS. SPICER:  Object to form.  He's

12       not offering an opinion on a CML diagnosis.

13           THE VIDEOGRAPHER:  One moment.  Off

14       video, 11:45.

15           (Off the record.)

16           THE VIDEOGRAPHER:  Back on, 11:46.

17   BY MR. JOHNSTON:

18       Q.    Do you have any reason to think

19   that you ever doubted that by 6/20/2007

20   Mr. McWilliams was diagnosed with chronic

21   myeloid leukemia that was Philadelphia

22   positive?

23           MS. SPICER:  Object to form.

24           THE WITNESS:  I believe he had this

25       disease; but to be honest with you, I

Page 73

1                  MARK A. WEISS, M.D.

2            accepted his diagnosis as stated here, as

3            a -- that is postulated.  I can't remember

4            the right words from my geometry in tenth

5            grade, but I accepted the fact that he had

6            CML and that his PCR value was .779 at the

7            time point we talk about.

8        BY MR. JOHNSTON:

9            Q.   All right.  Just for the record,

10       the time point we talked about where his PCR

11       was .779 was in May of 2011; correct?

12            A.   I believe that's right.  I think

13       it was --

14            Q.   And --

15            A.   -- May 27th, 2011.

16            Q.   And the record that we're looking

17       at now, which is Exhibit 7, you are accepting

18       this record that Dr. Walia prescribe --

19       diagnosed Mr. McWilliams with Philadelphia

20       positive CML on 6/20/2007; correct?

21            A.   On that date or prior to that

22       date --

23            Q.   Right.

24            A.   -- yes.

25            Q.   I'm not asking you to agree with

Page 74

1              MARK A. WEISS, M.D.

2    Dr. Walia.  I'm just asking you that --

3         A.   Yes.

4         Q.   -- that's what Dr. Walia said;

5    correct?

6         A.   Absolutely.

7         Q.   And you don't dispute that?

8         A.   No, I don't.

9         Q.   You state in your supplemental

10   expert report, which is Exhibit 3, on Page 2,

11   "This represented" -- I'm -- it's the --

12   starts on the -- at the end of the first line:

13   "This represented a reduction of more than

14   99 percent of his CML compared to his state

15   prior to starting imatinib (Gleevec)."

16              Do you see you wrote that?

17              MS. SPICER:  Object to form.

18              Can we clarify what "This represent"

19        mean that you haven't addressed the prior

20        sentence.

21              MR. JOHNSTON:  I don't have any idea

22        what you just said.

23   BY MR. JOHNSTON:

24         Q.   But did you write that, what I

25   asked you about?

Page 75

1              MARK A. WEISS, M.D.

2              MS. SPICER:  Is that -- hold on.

3         Objection, this is vague.

4              You're saying -- you're -- you're

5         asking him about a sentence that says,

6         "This represented," but we haven't -- you

7         haven't established what "this" is.

8              MR. JOHNSTON:  All right.  Now I'm

9         only asking him if he wrote it.

10   BY MR. JOHNSTON:

11        Q.   Did you write, "This represented a

12   reduction of more than 99 percent of his CML

13   compared to his state prior to starting

14   imatinib (Gleevec)"?

15        A.   I wrote this report, yes.

16        Q.   And is it your opinion that the

17   quantitative PCR of .779 taken in May of 2011

18   "represented a reduction of more than

19   99 percent of his CML compared to his state

20   prior to starting imatinib"?

21              MS. SPICER:  Object to form.

22              THE WITNESS:  Yeah.

23   BY MR. JOHNSTON:

24        Q.   Okay.  What is the baseline from

25   which you determine that there was a

Page 76

1              MARK A. WEISS, M.D.

2    99 percent reduction in his CML?

3         A.   He was now less than 1 percent

4    CML cells in his peripheral blood; whereas, at

5    the time of diagnosis, essentially everyone's

6    assumed to be 100 percent CML.

7         Q.   So you're assuming he was

8    100 percent?

9         A.   I'm assuming all patients are

10   100 percent.

11        Q.   All right.  But you don't have a

12   record that tells you how many cells, what

13   percentage of cells at that time were

14   Philadelphia positive, do you, at the time of

15   his diagnosis?

16        A.   No, but even if I had such a

17   result, it wouldn't actually tell me the exact

18   percent he was because of the limits of

19   accuracy and precision of these tests,

20   particularly cytogenetics.  When you only look

21   at 20 cells, if you do the statistics on it,

22   20 out of 20 positive may not be 100 percent.

23   It might only be 93 percent actually.

24        Q.   Do you know whether they looked at

25   more than 20 cells in this testing?

Page 77

```
1                    MARK A. WEISS, M.D.
2          A.    I don't remember that.
3          Q.    All right.  Did you look at some
4   document to use as your baseline for this
5   opinion or is -- are you just going on a
6   general assumption?
7          A.    I'm using general knowledge about
8   the disease.
9          Q.    So you did not find a record that
10  you based this differential opinion that
11  you're offering here on; is that correct?
12              MS. SPICER:  Object to form.
13              THE WITNESS:  I don't -- I don't
14       remember seeing a record that stated that.
15  BY MR. JOHNSTON:
16         Q.    Do you remember looking at any
17  biopsies?
18         A.    I was not supplied any biopsies to
19  look at.
20         Q.    So you looked at no bone marrow
21  biopsies; is that correct?
22         A.    No, I have not looked at any bone
23  marrow biopsies.
24         Q.    Did you look at any FISH results?
25              MS. SPICER:  Object to form, asked
```

1            MARK A. WEISS, M.D.

2        and answered.

3            THE WITNESS:  Yes, I looked at FISH

4        results; and, again, not to -- not -- not

5        to correct you, but to be very explicit,

6        while I did not look at any bone marrows, I

7        believe I did see at least one report on a

8        bone marrow, but I'm not 100 percent sure

9        of it.

10  BY MR. JOHNSTON:

11        Q.   Okay.

12        A.   But there's a difference between

13  looking at a bone marrow and looking at a

14  report.  And if I were to take care of a

15  patient or to give a medical opinion, I would

16  look at the bone marrow myself.

17        Q.   All right.  Let me ask those

18  questions all over again with your

19  distinctions.

20            You did not look at any bone

21  marrow, actual bone marrow; correct?

22        A.   Correct.

23        Q.   And you don't recall whether you

24  looked at any bone marrow biopsy reports; is

25  that right?

Page 79

1          MARK A. WEISS, M.D.

2          A.   I -- I can't specifically remember

3    that, yes.

4          Q.   Do you know whether you were

5    provided with any bone marrow biopsy reports

6    by counsel?

7          A.   If I were provided, I would have

8    seen them, yes.

9          Q.   All right.  My question is:  Were

10   you provided with them?

11         A.   Well, given that last statement, I

12   think it follows that I don't remember if I

13   was provided, because if I remembered that, I

14   would remember if I saw them.

15         Q.   Okay.  And how many FISH results

16   do you recall seeing?

17         A.   I believe I saw at least two, but

18   it may be more than that.

19         Q.   Do you remember when the FISH

20   results were from?

21         A.   No, I don't remember the exact

22   dates.

23         Q.   How do you know that only 20 cells

24   would have been looked at in the evaluation of

25   a bone marry biop -- barrow -- bone marrow

Page 80

1             MARK A. WEISS, M.D.

2    biopsy?

3         A.   That -- that's a very standard

4    number that's -- that's reviewed.

5         Q.   Have you --

6         A.   In some cases they can't get

7    20 cells so there's even less, and that makes

8    the report less accurate.  But personally, I

9    don't remember seeing a report where they

10   analyzed more than 20 cells for cytogenetic

11   analysis.  Other types of analysis, they do

12   look at more cells.

13        Q.   How many cells do they look at for

14   a FISH analysis usually?

15        A.   For FISH it's very dependent, but

16   I think the most common number I see used is

17   200 cells.  But there is some variation of

18   that.

19        Q.   Now, you told me earlier that you

20   can't equate the results of cytogenetics to

21   BCR-ABL PCR testing; correct?

22        A.   Not directly, no.

23        Q.   Okay.  So if you are using the

24   opinion of 100 percent based on FISH or other

25   cytogenetic testing, that does not correlate

Page 81

1              MARK A. WEISS, M.D.

2    to a BCR-ABL quantitative PCR score in your

3    opinion; correct?

4         A.    I'm sorry.  Can you repeat that?

5         Q.    Yeah.  BCR-ABL quantitative PCR

6    scoring is not a directly analogous test to

7    the results of a biopsy or a FISH test;

8    correct?

9         A.    Yes, I agree with that.

10         Q.    So how can you say that there's a

11    99 percent reduction in your report if those

12    tests are apples and oranges?

13              MS. SPICER:  Object to form,

14         misstates his testimony.

15              THE WITNESS:  Correct.

16              As -- as I stated before, the

17         assumption is that at the time of

18         diagnosis, patients with CML are

19         100 percent positive for CML.  So that part

20         is, I think, a universally accepted

21         starting point.  And that if you would then

22         be less than 1 percent, the normal

23         suggestion is that you'd be more than

24         2 logs reduced, which would make it

25         a 100-fold decrement.

Page 82

1              MARK A. WEISS, M.D.

2         And the same thing is assumed for

3    the things you were talking about earlier,

4    like major molecular response.  They don't

5    actually compare a starting PCR to a PCR at

6    a later time point to look for a 3-log

7    reduction.  They look for a PCR that's less

8    than .1 percent assuming that they start at

9    100 percent.

10   BY MR. JOHNSTON:

11        Q.   Well, if there were testing that

12   showed less than 100 percent positive nuclei,

13   would you want to know about that in order to

14   formulate that opinion in this case?

15        A.   I think having more knowledge is

16   always better than having less.  But, again,

17   because of problems with the accuracy of

18   tests, I think the presumption, regardless of

19   what initial results were, would be to assume

20   he started at 100 percent and his levels have

21   been reduced accordingly.

22        Q.   Okay.  Well, you can assume that,

23   but you can't demonstrate that unless you have

24   the actual tests that demonstrate it; right?

25        A.   Again, I -- I don't believe you're

Page 83

1              MARK A. WEISS, M.D.

2    characterizing this properly.

3              The standard in CML is to look at

4    what a result is and, yes, compare it to other

5    results.  But if you don't have the original

6    result or even if you do, you assume people

7    start at 100 percent.

8         Q.   So this is based on an assumption,

9    not on any test results; correct?

10        A.   This is, I believe, standard of

11   practice.

12        Q.   Okay.  It's based on an

13   assumption, not any particular test result;

14   correct?

15             MS. SPICER:  Object to form, asked

16        and answered.

17   BY MR. JOHNSTON:

18        Q.   Let me ask it a different way.

19             It's based on a standard of

20   practice assumption, not based on any

21   particular test results of Mr. McWilliams;

22   correct?

23        A.   Correct.

24        Q.   You state in the -- on this page

25   two sentence later -- sentences later, [as

Page 84

MARK A. WEISS, M.D.

1        read]: "The medical oncology records that I

2        reviewed further reflect that this was the

3        first time quantitative PCR was used in this

4        patient and that in that setting it is not

5        possible to even know if his CML was getting

6        better, worse, or remained consistent [sic]."

7                    Do you see that?

8                    MS. SPICER:  Object to form.  It's

9              "constant" not "consistent."

10                   MR. JOHNSTON:  "Constant."

11                   THE WITNESS:  Yes, I see that.

12       BY MR. JOHNSTON:

13              Q.    Okay.  Is it your testimony that

14       there would be no way to know, other than the

15       use of quantitative PCR testing, whether or

16       not his CML was getting better, worse, or

17       remaining constant?

18              A.    There, I guess, could be other

19       ways to know.  If at the previous time point

20       he had a cytogenetic or a FISH analysis that

21       showed that 50 percent of the cells were

22       CML positive, I think those results are

23       disparate enough that it would be a very

24       strong indication this his CML was getting

Page 85

1              MARK A. WEISS, M.D.

2    better.

3         Q.   You don't recall looking at any

4    FISH results prior to this PCR to determine

5    what the status of his cancer was prior to

6    May of 2011, do you?

7         A.   I --

8              MS. SPICER:  Object to form.

9              THE WITNESS:  I looked at FISH

10        results prior to -- between June 2007 and

11        May 2011, and I clearly remember seeing

12        FISH results that showed no evidence of

13        CML.

14   BY MR. JOHNSTON:

15        Q.   Where did you talk about those in

16   your report in support of your opinion that

17   there was -- it was not possible to know

18   whether the CML was getting better, worse, or

19   remained constant?

20        A.   I'm sorry.  Can you say that

21   again?

22        Q.   Well, I'll ask a different

23   question.

24             In order to understand this

25   question -- the answer -- sorry.

Page 86

1           MARK A. WEISS, M.D.

2               In order to understand what you

3     wrote -- what you wrote is "it's not possible

4     to even know if his CML was getting better,

5     worse, or remained constant."

6               My question is:  Did you look at

7     FISH results to see whether they demonstrated

8     whether his CML was getting better, worse, or

9     remaining constant --

10              MS. SPICER:  Object to form.

11    BY MR. JOHNSTON:

12        Q.    -- prior to this first PCR test?

13              MS. SPICER:  Object to form.

14              THE WITNESS:  I looked at some FISH

15        results.  I remember seeing one, and I

16        believe two results, that showed no

17        evidence of CML.

18    BY MR. JOHNSTON:

19        Q.   What were the dates of those

20    results?

21              MS. SPICER:  Let him finish his

22        answer.

23              THE WITNESS:  And this -- from my

24        review of the records I had, this was the

25        first PCR test that I saw the results of.

Page 87

1           MARK A. WEISS, M.D.

2      And in that context of not having prior PCR

3      results, it's not possible to know whether

4      he was getting better, worse, or remained

5      the same.

6           Though, obviously, he was better

7      than before he started treatment, much

8      better, because when you start treatment,

9      we assume everyone to be 100 percent.

10   BY MR. JOHNSTON:

11      Q.   So all you're saying in this

12   sentence is that based on PCR, you can't tell

13   whether he was getting better, worse, or

14   remained constant; correct?

15      A.   I'm not sure I understand your

16   statement.

17      Q.   Did you chart his FISH results

18   prior to this date --

19           (Reporter clarification.)

20      Q.   Did you chart the FISH results

21   that were in the records you reviewed prior to

22   May of 2011?

23      A.   No.  I reviewed the results, but I

24   didn't chart them.

25      Q.   Do you know whether or not, even

Page 88

1                MARK A. WEISS, M.D.

2    though you know -- you remember, I understand,

3    that there were some FISH results that were

4    non-detect.

5                Do you remember what the trend in

6    FISH results was prior to May 2011?

7         A.    The FISH results most proximate to

8    the May 27th, 2011 testing were negative.

9         Q.    Where do you say that in your

10   report?

11        A.    I don't think I do say that in my

12   report.

13        Q.    Where do you say you ever looked

14   at any FISH results in your report?

15        A.    I don't think I said that.

16             MS. SPICER:  Object to form.

17             THE WITNESS:  I'm sorry.

18   BY MR. JOHNSTON:

19        Q.    Where do you say in your

20   "Materials Considered" list that you reviewed

21   Dr. Walia's test results based on the FISH

22   analysis?

23             MS. SPICER:  Object to form, asked

24        and answered.

25             THE WITNESS:  Again, in my report,

Page 89

1                 MARK A. WEISS, M.D.

2          as we said, I do state I reviewed the

3          oncology records.

4    BY MR. JOHNSTON:

5          Q.    You don't tell me which ones, do

6    you?

7          A.    (No reply.)

8                MS. SPICER:    Object to form, asked

9          and answered.

10   BY MR. JOHNSTON:

11         Q.    And you've told me today that you

12   don't know whether you reviewed all of them or

13   not; correct?

14         A.    That is correct.

15         Q.    Okay.  If you were trying to

16   evaluate whether or not he was getting better,

17   worse, or remaining constant at the time of

18   his first PCR test in May of 2011, you had

19   materials available to you to make that

20   evaluation in the records, didn't you,

21   i.e. the FISH result that you're just talking

22   about?

23         A.    I'm sorry.  Say that again.

24         Q.    If you were trying to determine --

25   you say that you can't know whether he was

Page 90

1                MARK A. WEISS, M.D.

2    getting better, worse, or remaining constant.

3                But you could know, because you

4    could have looked at the FISH results and the

5    cytogenetic testing that preceded May of 2011

6    and evaluated what those results said,

7    couldn't you?

8                MS. SPICER:  Object to form,

9          argumentative, misstates his prior

10         testimony.

11               You can answer.

12               THE WITNESS:  I -- I'm not sure I

13         understand exactly what you're asking me

14         for.

15               But, I mean, in my report it states

16         that based on having one single data point,

17         which shows a very good response in his

18         CML, and that he's much improved compared

19         to his baseline, you can't possibly know

20         what his kinetic course was at that time in

21         terms of getting better, worse, or

22         remaining the same.

23   BY MR. JOHNSTON:

24         Q.   But you had available to you other

25   data points, didn't you, like the FISH

Page 91

1          MARK A. WEISS, M.D.

2   results?

3              MS. SPICER:  Object to form, asked

4       and answered.

5              THE WITNESS:  I had FISH results,

6       yes.

7   BY MR. JOHNSTON:

8       Q.   And you didn't evaluate, for

9   purposes of your report, those results to

10  determine what his kinetic trajectory was at

11  the time of this PCR, did you?

12             MS. SPICER:  Object to form,

13      misstates his testimony, misstates his

14      report.

15             THE WITNESS:  I'm sorry.  Say that

16      again.

17  BY MR. JOHNSTON:

18      Q.   You did not evaluate the FISH

19  results that preceded this date to determine

20  the kinetic trajectory of his disease, did

21  you --

22             MS. SPICER:  Object to form --

23  BY MR. JOHNSTON:

24      Q.   -- in forming -- formulating this

25  opinion?

Page 92

1                MARK A. WEISS, M.D.

2                MS. SPICER:  Object to form,

3         misstates his prior testimony.

4                THE WITNESS:  I think I reviewed the

5         FISH results, but I don't think my opinion

6         is based on the FISH results.

7    BY MR. JOHNSTON:

8         Q.   You didn't take them into account

9    in reaching this opinion, did you?

10        A.   I think what I took into account

11   to reach this opinion was that this was the

12   first time to my review -- now, there may have

13   been records that I didn't see that did have

14   prior quantitative PCR, but to my review, this

15   was the first time that quantitative PCR was

16   used.

17                At this level of less than

18   1 percent cells being BCR-ABL positive, I

19   don't really think there's any FISH results or

20   cytogenetic or blood test results that

21   would -- that would alter this.  He had a very

22   good response.  He's now at a level of

23   sensitivity where only a PCR reaction will

24   give you informative information.

25        Q.   I didn't ask that question,

Page 93

1                    MARK A. WEISS, M.D.

2    Doctor.

3                    I asked you whether you evaluated

4    the FISH results that preceded this PCR test

5    to determine the trajectory of his disease as

6    part of formulating this opinion that you

7    can't tell whether his CML was getting better,

8    worse, or remaining constant?

9                    That's my only question.

10                   MS. SPICER:  Object to form, asked

11              and answered.

12                   THE WITNESS:  I believe I looked at

13              the FISH results before I did this, but I

14              believe this opinion was formulated based

15              on the fact that there were no prior

16              quantitative PCR results to use as a

17              comparator.

18    BY MR. JOHNSTON:

19         Q.   So you ignored the prior course of

20    his disease in reaching this opinion; correct?

21                   MS. SPICER:  Object to form,

22              completely misstates --

23                   THE WITNESS:  No, that --

24                   MS. SPICER:  -- the prior testimony.

25                   THE WITNESS:  -- that's not --

Page 94

1              MARK A. WEISS, M.D.

2         that's not correct, and --

3              MR. JOHNSTON:  Well, then --

4              THE WITNESS:  -- I'm not sure why

5         you would say that.

6    BY MR. JOHNSTON:

7         Q.   You must have known then whether

8    it was getting better, worse, or remaining

9    constant at the time of this PCR?

10        A.   How could I possibly know that

11   without having another PCR to compare it to?

12        Q.   What if he had a zero FISH?  What

13   if he had a non-detect FISH result?  That's

14   what you just said you expected that he had.

15        A.   No.

16        Q.   If you'd had that, that would

17   determine -- help you understand the course of

18   his disease, wouldn't it?

19        A.   No, it would not.

20        Q.   It wouldn't; that's your

21   testimony?

22        A.   His disease could still be getting

23   better, worse or not, because once you're

24   below the level of sensitivity of a test, you

25   have no idea how far below you are.

Page 95

1            MARK A. WEISS, M.D.

2            So a FISH result of non-detectable

3    might mean that his disease was .779 during

4    that period of time, it could mean his disease

5    was 1.3 percent at that period of time, it

6    could mean his disease was .005 percent at

7    that time.  We have no way of distinguishing

8    those three results.  So it could have been

9    getting better, worse, or unchanged.

10           Q.   And the difference between the

11   results you just mentioned can alter the

12   outcome for the patient, can't it?

13                MS. SPICER:  Object to form.

14                THE WITNESS:  The outcome for the

15       patient is the outcome for the patient.

16   BY MR. JOHNSTON:

17           Q.   That's not the question I asked

18   you, Doctor.

19           A.   I'm sorry.

20           Q.   Whether or not you're a 1.3 --

21           A.   Then say it again.

22           Q.   Whether or not you're a 1.3 or

23   a .1 has an effect on what your prospective

24   outcomes likely are, doesn't it?

25                MS. SPICER:  Object to form.

Page 96

1              MARK A. WEISS, M.D.

2              THE WITNESS:  I don't believe you're

3        saying that correctly.

4              Your level of BCR-ABL in your blood

5        and bone marrow, contingent on people

6        taking their pills appropriately and having

7        proper absorption of their medication, the

8        level of BCR-ABL has predictive value, but

9        it does not determine what's happened to

10       an --

11             MR. JOHNSTON:  I understand.

12             THE WITNESS:  -- individual patient.

13    BY MR. JOHNSTON:

14       Q.   But it has --

15       A.   I'm sorry.  The way I --

16             MS. SPICER:  Let him finish his

17       answer, please.

18             THE WITNESS:  I'm sorry.  The way

19       you -- you asked the question, I

20       interpreted that you were saying that this

21       had implication for the patient.

22             These are predictive models that are

23       generated for many patients.  It doesn't

24       tell you what happens to a specific patient

25       however.

Page 97

1            MARK A. WEISS, M.D.

2   BY MR. JOHNSTON:

3        Q.   And in those predictive models,

4   there can be better outcomes associated with

5   lower levels of molecular response below 1 and

6   less favorable outcomes with higher levels

7   below 1, correct, predict -- on a predictive

8   basis?

9            MS. SPICER:  Object to form.

10           THE WITNESS:  I believe that, as I

11       stated before, the lowest -- the lower the

12       level of BCR-ABL in a patient with CML, the

13       better the prognosis is and I stand by that

14       statement.

15  BY MR. JOHNSTON:

16       Q.   And not being in major moletic --

17  molecular response -- major molecular response

18  is something that could affect the predictive

19  outcomes that that patient might see in the

20  future; correct?

21           MS. SPICER:  Object to form.

22           THE WITNESS:  Not having a major

23       molecular response is predictive of the

24       possibility of a less favorable outcome

25       than having achieved a major molecular

Page 98

1              MARK A. WEISS, M.D.

2         response, but I want to point out that

3         the -- these are not bright lines.

4              And I think the better way to say it

5         is the way I've been expressing it, which

6         is the less CML you have in your body

7         overall, the better your prognosis will be.

8    BY MR. JOHNSTON:

9         Q.   Do you agree that never having a

10   major molecular response increases the

11   predictive risk of relapse out of Q -- out of

12   CCyR?

13        A.   So by relapse, you mean that the

14   person's in remission at this point?

15        Q.   And is no longer in remission and

16   CCyR if they've never -- sorry.  Let me just

17   rephrase the question.

18             If you've never achieved MMR in a

19   patient, isn't it more likely that they will

20   lose CCyR in the future?

21        A.   Yes, I believe that's true.

22        Q.   And that's a worse outcome than

23   someone who obtains MMR prognostically;

24   correct?

25        A.   It's a surrogate endpoint.  Again,

1              MARK A. WEISS, M.D.

2      we sometimes get confused between what

3      actually happens to the patient and numbers

4      that we see on a piece of paper.

5              In general, the presumption is the

6      more CML you have in the body at a given time

7      point, the worse the prognosis is, if we

8      compare it to other people who have less CML

9      in their body.

10             MS. SPICER:  Is now a good time to

11         take a quick break, Robert?  I have to

12         use --

13             MR. JOHNSTON:  Sure.

14             MS. SPICER:  -- the restroom, if

15         that's okay.

16             MR. JOHNSTON:  Yeah, we can take a

17         break.

18             THE VIDEOGRAPHER:  We are now going

19         off the video record.  That concludes DVD

20         Number 1.  The time is 12:11.

21             (A recess is held from 12:11 p.m.

22         to 12:23 p.m.)

23             (Exhibit Weiss-8, article entitled

24         Deep Molecular Response in Chronic Myeloid

25         Leukemia:  The New Goal of Therapy? by

1            MARK A. WEISS, M.D.

2        Francois-Xavier Mahon and Gabriel Etienne,

3        is marked for identification.)

4            THE VIDEOGRAPHER:  We are now back

5        on the video record.  This commences DVD

6        Number 2, April 24th, 2018.  The time

7        12:23.

8   BY MR. JOHNSTON:

9        Q.   Exhibit 9 -- sorry, 8, my

10  mistake --

11       A.   Thank you.

12       Q.   -- is the next exhibit.  We're

13  going to try to move through some of these.

14            This is a article by Dr. Mahon,

15  M-A-H-O-N, titled "Deep Molecular Response in

16  Chronic Myeloid Leukemia:  The New Goal of

17  Therapy?"  It is dated in January 2014.

18            Have you ever seen this document

19  before?

20       A.   No, I don't believe I have.

21       Q.   And it's published in the Clinical

22  Cancer Research journal; correct?

23       A.    Correct.

24       Q.   And that is the journal of the

25  American Association for Cancer Research?

1          MARK A. WEISS, M.D.

2          A.   I believe it's one of the

3     journals --

4          Q.   Okay.

5          A.   -- of that organization.

6          Q.   Is it a reputable journal?

7          A.   It's certainly not one of the

8     top-tier journals.

9          Q.   Okay.  But it's a reputable

10    journal; right?

11               MS. SPICER:  Object to form.

12    BY MR. JOHNSTON:

13         Q.   Are you saying it's not a

14    reputable journal?

15         A.   I don't -- I don't know that I use

16    that language when I think of these journals.

17         Q.   Is it peer --

18         A.   This is I would consider a

19    secondary or a tertiary-tiered journal.  I --

20    I don't think of reputation as part of the

21    mix.

22         Q.   Is it peer-reviewed?

23         A.   Certain things are.  I suspect

24    this probably was not really peer-reviewed

25    because it looks like it's an opinion piece,

Page 102

1                MARK A. WEISS, M.D.

2    not a factual study.

3         Q.   Well, it's listed as a review

4    article; correct?

5         A.   Yes.  So not all review art --

6    review articles are often invited and not

7    peer-reviewed though.  Sometimes they are

8    peer-reviewed.  It depends on the journal and

9    the particulars of whether or not this was a

10   solicited review or a follow -- you know, or

11   it's just a submitted, let's hope they'll

12   publish it review.

13        Q.   You don't know one way or the

14   other what the story with this review is, do

15   you?

16        A.   No, I haven't seen this report

17   before.

18        Q.   So it could have been

19   peer-reviewed?

20        A.   It could have been.

21        Q.   Okay.  If you look in the

22   "Abstract," six lines down there's a sentence

23   that starts in the middle of the page that

24   says, "Recent evidence suggests."

25             You see where I'm reading?

1            MARK A. WEISS, M.D.

2       A.   Yes.

3       Q.   Okay.  "Recent evidence suggests

4  that deeper molecular responses (greater than

5  4-log reductions in BCR-ABL1 transcript

6  levels), particularly when attained early

7  during treatment, may have even better

8  correlation with long-term outcomes, including

9  survival and disease progression."

10           Do you see that?

11      A.   Yes, I do.

12      Q.   Do you have any basis to disagree

13  with that statement?

14           MS. SPICER:  Object to form.

15           Feel free to review the -- as much

16       as you need to for the context of this.

17           THE WITNESS:  In regards to that

18       sentence, I believe it's completely

19       consistent with the way I usually describe

20       it, and how I have described it to you,

21       which is in CML, the lesser amount of

22       disease you had in general predicts for

23       more favorable outcomes compared to people

24       who have greater levels of disease.

25  BY MR. JOHNSTON:

1          MARK A. WEISS, M.D.

2      Q.   So you don't disagree with that

3  sentence; correct?

4          MS. SPICER:  Object to form, asked

5      and answered.

6          THE WITNESS:  My answer is that I

7      believe in CML having less disease in your

8      body is a better prognosticator for a group

9      of patients compared to a group of patients

10     with more disease; and I believe that

11     includes many different circumstances.  I

12     think I've said that very clearly.

13         MR. JOHNSTON:  I move to strike the

14     answer as non-responsive.

15 BY MR. JOHNSTON:

16     Q.   All I'm asking you is whether you

17 agree or disagree with the sentence that we

18 read, which says, "Recent evidence suggests

19 that deeper molecular responses (greater than

20 4-log reductions in BCR-ABL1 transcript

21 levels), particularly when attained early

22 during treatment, may have even better

23 correlation with long-term outcomes, including

24 survival and disease progression."

25         MS. SPICER:  Object to form, asked

1           MARK A. WEISS, M.D.

2       and answered.

3           THE WITNESS:  Well, I'd have to see

4       what they're talking about "Recent

5       evidence," 'cause the evidence for greater

6       reduction of CML as a predictor is, in my

7       mind, fairly old, goes back to the early

8       imatinib era, so maybe it's 10, 15 years

9       old at this point.  So I wouldn't call that

10      recent.

11  BY MR. JOHNSTON:

12      Q.   Well, this paper is 2014, sir;

13  correct?

14      A.   But even at 2014 I would say -- so

15  it was still five or ten years before.  I

16  wouldn't call that recent since imatinib was

17  only commercially available, I believe, in the

18  year 2000 --

19      Q.   Right.  If you take out --

20      A.   -- and then a secondary -- I'm

21  sorry.  Go ahead.

22          MS. SPICER:  No.  No.  You finish --

23  BY MR. JOHNSTON:

24      Q.   Go ahead.

25          MS. SPICER:  -- your answer.

1          MARK A. WEISS, M.D.

2          THE WITNESS:  And then a secondary

3      point is that it says that, [as read]:

4      "Recent evidence suggests that deeper

5      molecular responses (greater than a 4-log

6      reduction in BCR-ABL transcript levels),

7      particularly when attained early during

8      treatment, may have even better correlation

9      with long-term outcomes."

10          It doesn't explicitly state compared

11      to what.

12  BY MR. JOHNSTON:

13      Q.   If you look on the bottom of

14  Page 310, it starts "MMR," and it continues

15  over to the next page.  It says, "MMR has been

16  found to be associated with improved

17  progression-free survival."

18          Do you see that?

19      A.   I'm sorry.  Say that again.

20      Q.   "MMR has been found to be

21  associated with improved progression-free

22  survival."

23          MS. SPICER:  Object to form.

24  BY MR. JOHNSTON:

25      Q.   Do you see that?

Page 107

1              MARK A. WEISS, M.D.

2         A.    I'm sorry.  What page are we on?

3         Q.    310.

4              MS. SPICER:  The bottom of the first

5     page is --

6  BY MR. JOHNSTON:

7         Q.    First page.

8         A.    First page.

9              MS. SPICER:  -- 310 of the article.

10  BY MR. JOHNSTON:

11        Q.    Last word on the first page,

12  "MMR."  Turn the page.

13        A.    All right.

14        Q.    "MMR has been found to be

15  associated with improved progression-free

16  survival."

17              MS. SPICER:  Object to form.

18  BY MR. JOHNSTON:

19        Q.    Is that what it says?

20              MS. SPICER:  It's not the complete

21     sentence.

22              THE WITNESS:  I'm sorry.  I haven't

23     quite gotten there yet.

24              To be completely precise, I think

25     there are some errors in this area of the

MARK A. WEISS, M.D.

1

2       paragraph.

3   BY MR. JOHNSTON:

4       Q.   What errors?  Wait a minute.  I

5   didn't ask you about the paragraph.  I asked

6   you about that sentence.

7               All I want to know is:  Do you

8   agree that MMR is associated with improved

9   progression-free survival?

10              MS. SPICER:  Okay.  That's a

11          different question than you asked before.

12          You were just asking if it stated that,

13          so...

14  BY MR. JOHNSTON:

15      Q.   As noted by this paper?

16      A.   Again, it doesn't say in

17  comparison to what.  So, no, I don't think, to

18  be precise, that that's answerable.

19      Q.   So it's your testimony that you

20  don't know whether achieving MMR is associated

21  with improved progression-free survival;

22  correct?

23              MS. SPICER:  Object to form,

24          misstates his testimony.

25              THE WITNESS:  No, I actually believe

1          MARK A. WEISS, M.D.

2      I've said several times that having less

3      CML in your body is better compared to

4      people who have more CML in their body.

5           And a major molecular response as

6      defined by a 3-log reduction is a pretty

7      substantial reduction, but that person's

8      prognosis is worse than somebody who has no

9      detectable disease.

10          MR. JOHNSTON:  As --

11          THE WITNESS:  So it depends on what

12      your comparison's to.

13  BY MR. JOHNSTON:

14      Q.   Well, what do you think the

15  comparison is to in this par -- in this

16  sentence?

17          Isn't it to people who haven't

18  achieved MMR?

19      A.   I'm sure that --

20          MS. SPICER:  Object to form --

21          THE WITNESS:  -- they're trying

22      to --

23          MS. SPICER:  Object to form --

24          THE WITNESS:  Sorry.

25          MS. SPICER:  -- lack of foundation.

1           MARK A. WEISS, M.D.

2               THE WITNESS:  You see, even this

3       immediately preceding sentence is

4       incorrect.

5   BY MR. JOHNSTON:

6           Q.   I didn't ask you about the --

7           A.   The --

8           Q.   -- immediately preceding sentence.

9           A.   No, but I think --

10          Q.   All I want to know is if you

11  think achieving MMR --

12          A.   This sentence has --

13              MS. SPICER:  Hey, hey, hey.

14              MR. JOHNSTON:  Sorry.

15              MS. SPICER:  Don't talk.  Let him

16      say what he was going to say --

17              MR. JOHNSTON:  I'm going to say what

18      I'm going to say.

19              MS. SPICER:  -- you've asked him a

20      question.

21  BY MR. JOHNSTON:

22          Q.   All I want to know is if you --

23              MS. SPICER:  He's the Witness.

24              MR. JOHNSTON:  I'm talking now, not

25      you.

1          MARK A. WEISS, M.D.

2    BY MR. JOHNSTON:

3          Q.   I want to know if you believe that

4    achieving MMR is associated with improved

5    progression-free survival --

6               MS. SPICER:  Object to form.

7    BY MR. JOHNSTON:

8          Q.   -- as opposed to not achieving

9    MMR?

10              MS. SPICER:  Object to form, asked

11         and answered.

12              THE WITNESS:  As compared to not

13         achieving MMR patients who achieve MMR

14         have, overall, a better prognosis than

15         patients who haven't achieved MMR.

16   BY MR. JOHNSTON:

17         Q.   I want to know about

18   progression-free survival.

19              Do you agree that patients who

20   achieve MMR have improved progression-free

21   survival compared to patients who don't

22   achieve MMR?

23         A.   You're going to have to define

24   "progression-free survival."

25         Q.   Okay.  Well, what does it mean to

1                MARK A. WEISS, M.D.

2     you?

3            A.    Progression-free survival is often

4     a surrogate endpoint that's used and the

5     clinical relevance isn't always fully known.

6                 So for me, for people with CML,

7     the real progression that you worry about is

8     people who progress to accelerated or blast

9     crisis.  So for me, that would be a clinically

10    relevant time point of progression-free

11    survival.

12                The surrogate endpoints are done

13    to evaluate clinical trials and to have some

14    kind of baseline, but they are not in and of

15    themselves relevant to the patient in terms of

16    what the patient feels or does or is.

17           Q.    But it is relevant to their

18    potential future outcomes, isn't it?

19                So let's assume your definition of

20    "progression-free survival."  If a -- if a

21    patient has a better chance of not going into

22    blast crisis if a certain thing happens,

23    that's a benefit for the patient, isn't it?

24                MS. SPICER:  Object to form.

25                THE WITNESS:  The way I'm

1          MARK A. WEISS, M.D.

2      understanding you, I believe you're talking

3      about specific patients rather than what is

4      the prognostic implication --

5          MR. JOHNSTON:  No.

6          THE WITNESS:  -- of these findings.

7  BY MR. JOHNSTON:

8      Q.   You misunderstand me then.

9      A.   Yes, I do.

10     Q.   You have 10 patients --

11     A.   Okay.

12     Q.   -- and you have a rate that says,

13  if you achieve MMR, 70 percent of them will

14  not progress, but 3 will; but if you don't,

15  you have 5 that will progress and 5 that

16  won't.  To that group of patients, there is an

17  advantage to obtaining MMR, isn't there?

18          And I'm talking hypothetically.

19  I'm not asking you to validate those numbers.

20  I'm talking about the -- the -- there being a

21  benefit to the patients as a population to

22  obtaining MMR.

23          MS. SPICER:  Object to form.

24          THE WITNESS:  So in the example you

25      just gave, the patients who achieved an MMR

Page 114

1          MARK A. WEISS, M.D.

2       will ultimately have a better outcome,

3       because you've stipulated that, than the

4       patients who don't achieve the MMR.

5            So, yes, on your example, I agree

6       with that.

7   BY MR. JOHNSTON:

8       Q.   And so let's just look at the data

9   here.

10           By the way, on Page 311 there's a

11  chart, which is a pyramid that has BCR

12  equivalents to MMR and CCyR.  I assume you

13  don't agree with that chart, other than for

14  MMR and below?

15           MS. SPICER:  Object to form.

16           Again, you could take as much time

17      as you need to review the article that he's

18      asking questions about.

19           THE WITNESS:  (Reviewing document.)

20           So in terms of looking at this

21      figure --

22  BY MR. JOHNSTON:

23      Q.   For the record, this is Figure 1

24  in the article?

25      A.   Yeah.  If you don't mind, I know

1          MARK A. WEISS, M.D.

2     what you mean by "chart," but if we could

3     refer to this as a "figure," I would...

4          Q.    You call it whatever you want,

5     Doctor.

6          A.    Thank you.

7                So in Figure 1, no, I think this

8     is largely consistent with what I've been

9     saying for most of the morning.

10         Q.    So the key is that it uses the

11    words "approximates" not "correlates to"

12    because when we saw the word "correlates to"

13    CCyR," you disagreed with that?

14         A.    Correct.

15         Q.    So "approximates" you're okay

16    with, but "correlates" you have a problem

17    with; correct?

18         A.    I'd have to look up the exact

19    language in the other paper, but I objected to

20    the fact that it thought that you could make

21    an equivalency between a PCR result and a FISH

22    result and a cytogenetic result.

23         Q.    All right.  We'll pull up -- I

24    think this was Exhibit 4, the CCy -- NCCN

25    Guidelines, Page 29.

1                 MARK A. WEISS, M.D.

2          A.   And, again, for precision, these

3    are Guidelines for Patients.  This isn't what

4    we usually refer to as the NCCN --

5          Q.   Don't worry.  I'm --

6          A.   -- Guidelines.

7          Q.   -- I'm going to mark the other

8    ones, too.

9               MS. SPICER:  Let him finish his

10        answer, please.

11              THE WITNESS:  And you'll notice that

12        in this Figure 1, as I said, they label

13        "Baseline" as "100" percent, I think

14        reinforcing my point that that's a well

15        accepted standard.

16              MR. JOHNSTON:  Objection, move to

17        strike.  There was no question pending.

18   BY MR. JOHNSTON:

19        Q.   So in Exhibit 4, Page 29, it says

20   CCyR, [as read]: "A CCyR corresponds with

21   BCR-ABL 1 percent to BCR-ABL -- .1 percent to

22   BCR-ABL 1 percent."

23        A.   That is incorrect.

24        Q.   You disagree with that?

25        A.   Yes.

1          MARK A. WEISS, M.D.

2          Q.   But you are okay with approximates

3    1 in 100 log reduction to BCR-ABL1.  You're

4    okay with that in this chart that's in

5    Exhibit 8 in this figure?

6          A.   I'm okay with the term

7    "approximates" because that recognizes that

8    there are error bars on this.  But the term --

9    where were we again?

10         Q.   29.

11         A.   Oh, 29.  I'm on the wrong page.

12         Q.   Top of the page.  It's -- the word

13   you're looking for is "corresponds."

14         A.   Yes.  So I disagree with this

15   because this says it corresponds to something

16   between two levels, and that is incorrect.

17   That's a -- that's an oversimplification of

18   what it is.

19             Approximately doesn't -- it's not

20   saying .1 percent to 1 -- to 1 percent, that

21   it falls within that exact range.  It,

22   instead, says that a 2-log reduction or a

23   1 percent BCR-ABL is approximately the level

24   you can see with CCyR.

25         Q.   All right.  So I just need to make

1          MARK A. WEISS, M.D.

2    sure I use the word "approximates" not

3    "corresponds" when we talk about this and

4    you'll be happy with it, correct, Doctor?

5              MS. SPICER:  Object to form.

6              THE WITNESS:  I don't know if my

7         happiness has anything to do --

8              MR. JOHNSTON:  Well --

9              THE WITNESS:  -- with this

10        deposition --

11             MR. JOHNSTON:  -- I'd like

12        to think --

13             THE WITNESS:  -- to be honest with

14        you.

15             MR. JOHNSTON:  -- it would move the

16        deposition forward.

17             (Reporter clarification.)

18   BY MR. JOHNSTON:

19        Q.   I'd like to think it would move

20   the deposition forward faster if we can agree

21   at least on common nomenclature that you agree

22   with.

23        A.   I think -- you know, I need to

24   hear the question, and I will answer it as

25   precisely as I can.  And if I think that there

1          MARK A. WEISS, M.D.

2    may be misunderstanding of terms, as I have in

3    the past, I will try to clarify my response.

4          Q.    Let's go back to Exhibit 8,

5    Table 2.

6          A.    Exhibit 8.

7          Q.    It's the Mahon article right there

8    in front of you.  It's on Page 315 of the

9    article.

10         A.    Okey-dokey.

11              MS. SPICER:  Wait.  I'm sorry.  Are

12        we on --

13              MR. JOHNSTON:  That one.

14              MS. SPICER:  Oh, we're moving to

15        3 -- we're moving to a new --

16              MR. JOHNSTON:  New page, 315.

17              MS. SPICER:  Gotcha.  315.

18              MR. JOHNSTON:  Table 2.

19              MS. SPICER:  This is it.  Yeah.

20              THE WITNESS:  Okay.

21   BY MR. JOHNSTON:

22         Q.    So this is a table of studies that

23   they are summarizing in their review.  And if

24   you see the Etienne study, the comparators are

25   CCyR plus MR [sic] plus CMR, CCR [sic] plus MR

1                    MARK A. WEISS, M.D.

2    [sic] minus CMR, and CCR [sic] minus MMR.

3                    So that last category would be

4    patients that achieved complete cytogenic

5    response, but did not achieve major molecular

6    response; correct?

7              A.    I'm sorry.  Say that again.

8                    MS. SPICER:  I'm just going to --

9          can we -- can you restate that?  Because I

10         think you were saying "MR" instead of "MMR"

11         when you were -- I -- are we looking there

12         at the top of the --

13                   MR. JOHNSTON:  The top of the chart.

14                   MS. SPICER:  Yeah, you were saying

15         "MR" --

16                   MR. JOHNSTON:  The "Trial

17         Description" -- the "Trial Description,"

18         "Etienne."

19                   THE WITNESS:  Uh-huh.

20                   MS. SPICER:  Yes.

21   BY MR. JOHNSTON:

22              Q.   There are three "Comparator"

23   categories.

24                   The first one is complete

25   cytogenic [sic] response plus MMR plus CMR,

1                MARK A. WEISS, M.D.

2    being a complete molecular response.

3                The second category is CCyR plus

4    MMR minus CMR.

5                And the third category is CCyR

6    minus MMR.  So that's complete cytogenetic

7    remission -- response without major molecular

8    response.

9          A.    Okay.

10         Q.    Do you see that the EFS rate for

11   the first -- for the -- for the category

12   CCyR minus MMR is 28?

13         A.    I do see that number there.

14         Q.    And for people who have achieved

15   complete cytogenic response and major

16   molecular response, the EF rate is 65 percent.

17               Do you see that?

18         A.    I see that number as well.

19         Q.    So according to this chart and

20   this article, event-free survival, 65 percent

21   of the people who achieve major molecular

22   remission do not experience an event that --

23   that is an -- that is calculated in the

24   event-free survival rate compared to

25   28 percent for complete cytogenetic response

1           MARK A. WEISS, M.D.

2    that did not achieve MMR; correct?

3               MS. SPICER:  Object to form.

4               THE WITNESS:  That's what this table

5          shows -- says.

6    BY MR. JOHNSTON:

7          Q.   And for --

8          A.   I didn't review the original

9    article.

10         Q.   And for PFS rate it shows that

11   82 percent of the people who achieve MMR but

12   not CMR, have -- have outcome of no

13   progression compared to 56 percent for people

14   who achieve complete cytogenic response, but

15   don't achieve MMR; correct?

16         A.   Yes, I see that.

17         Q.   So this chart indicates that in

18   the aggregate, people who achieve MMR while in

19   cytogenetic response have better outcomes for

20   EFS and PFS than those that did not achieve

21   MMR; correct?

22              MS. SPICER:  Object to form.  We're

23         talking about one piece in this chart.

24              THE WITNESS:  No.  Again, the

25         problem is that EFS and PFS are the -- are

1              MARK A. WEISS, M.D.

2         defined differently by different groups in

3         different publications.  So I don't know

4         their definitions because this isn't the

5         original article.

6              But I will say it reinforces

7         something that I was saying before, that

8         EFS and PFS do not always correlate with

9         clinically important outcomes, because if

10        you look at the third column, it even

11        states that overall survival is not

12        different among the three groups.

13   BY MR. JOHNSTON:

14        Q.   So it's your testimony that only

15   overall survival, which is the length of time

16   you live, is the only clinically relevant

17   outcome?

18              MS. SPICER:  Object to form,

19        misstates his testimony.

20              THE WITNESS:  I did not say that at

21        all.

22   BY MR. JOHNSTON:

23        Q.   Okay.  So if I go into -- if a

24   patient goes into blast crisis, is that a

25   clinically important outcome?

                    MARK A. WEISS, M.D.

1

2        A.    Yes, it is.

3        Q.    Okay.  So that would be something

4    reflected in the progression-free survival

5    rate; right?

6        A.    It would depend on the exact

7    definitions used for a particular study.

8        Q.    Generally speaking, as --

9              (Reporter clarification.)

10             MR. JOHNSTON:  Sorry.

11   BY MR. JOHNSTON:

12        Q.    Generally speaking, blast crisis

13   would almost always be considered part of

14   progression-free survival; correct?

15        A.    It would, but I will again remind

16   you that blast crisis almost always ends with

17   fatality.  So that would affect the overall

18   survival rate.

19        Q.    Didn't in Mr. Lauris's case, did

20   it?

21             MS. SPICER:  Object to form.  We're

22        not talking about the Lauris case now.

23   BY MR. JOHNSTON:

24        Q.    Are you aware of -- are you aware

25   of any cases where blast crisis did not result

1          MARK A. WEISS, M.D.

2    in fatality?

3          A.    Yes, there are some cases.

4          Q.    Okay.  So that's a little bit of

5    an overstatement to say that they all should

6    be reflected in the OS --

7          A.    No, I said --

8               MS. SPICER:  Hold on.  Hold on.

9               THE WITNESS:  I'm sorry.  I'm

10        apologize.

11               (Reporter clarification.)

12               MS. SPICER:  Object to form,

13        argumentative.

14               THE WITNESS:  If I said they all are

15        reflected in overall survival, that would

16        be a misstatement.  I believe I said that

17        it -- something to the effect like it

18        usually leads to death.

19               And you're right, if I stated

20        always -- I think in my last deposition of

21        July last year, I -- I frequently stated

22        that in medicine you almost should never

23        say "always" or "never" because there are

24        almost always exceptions to everything.

25               So, no, not every person in blast

Page 126

1              MARK A. WEISS, M.D.

2         crisis dies, but the vast majority do.

3    BY MR. JOHNSTON:

4         Q.   You agree that blast crisis would

5    be a clinically significant event; correct?

6         A.   Yes, I do.

7         Q.   And blast crisis and accelerated

8    phase are essentially the same thing in your

9    view; correct?

10             MS. SPICER:  Object to form.

11   BY MR. JOHNSTON:

12        Q.   Sorry.  Not accelerated phrase --

13   yeah, accelerated phase.

14        A.   So accelerated phase and blast

15   crisis aren't the same thing, but -- but

16   they're both clinically relevant events in my

17   mind.

18        Q.   And having an increase in white

19   blood cell counts that makes you have to go to

20   the hospital and have a bunch of tests run,

21   that may not be clinically significant, but it

22   certainly is impactful in the patient who has

23   to go through those tests, isn't it?

24        A.   I don't understand the scenario

25   where you're saying a patient has an elevated

1                MARK A. WEISS, M.D.

2    blood test, so you have to go to the hospital,

3    since the blood's usually taken in the --

4         Q.   All right.

5         A.   -- doctor's office.

6         Q.   Let's say the blood is taken in

7    the doctor's office.  You come in to -- I come

8    in to see you as an oncologist or a

9    hematologist, and you say," Ah, you know,

10   you've got CML and your white blood cell count

11   is through the roof.  I need to draw that and

12   figure out what's going on."  And it takes you

13   48 hours to figure out what's the scoop on

14   that.

15                Are you telling me that that is

16   not significant in a patient's life, to have

17   to go through that 40 hours wondering what

18   that elevated white blood cell count means?

19                MS. SPICER:  Object to form.

20                THE WITNESS:  I -- I would need to

21         know the exact specifics of the case, but

22         it sounds to me like the doctor's

23         characterization may have been overly

24         dramatic, which in general, I think doctors

25         need to tell patients the truth, but not to

1          MARK A. WEISS, M.D.

2      oversell or undersell the truth.

3  BY MR. JOHNSTON:

4      Q.   If you look down on Table 2 at

5  "Verma," the article listed there, which is

6  stated to be a retrospective analysis for

7  first-line IM, just want to get the rates in

8  the record.

9           It has CCyR plus MMR plus CMR at

10 two years has 100 percent event-free survival

11 rate according to the chart; right?

12          MS. SPICER:  At five --

13          THE WITNESS:  That's what -- I'm

14      sorry.  You're -- yes, that's --

15          MS. SPICER:  At five years.

16 BY MR. JOHNSTON:

17      Q.   At five years.

18      A.   That's what it says here,

19 parentheses five years.

20      Q.   And then it has a CCyR plus MMR

21 minus CMR at two years, 96 percent at five

22 years; correct?

23      A.   I see that number as well.

24      Q.   And it has CCyR minus MMR minus

25 CMR at two years has an 86 percent rate at

1            MARK A. WEISS, M.D.

2    five years; correct?

3         A.   Yes, I see that as well.

4         Q.   And way beyond two years

5    Mr. McWilliams might have been in CCR [sic],

6    but at -- in May of 2011 was not in MMR;

7    correct?

8              MS. SPICER:   Object to form.

9              THE WITNESS:   In May of 2011, the

10        test result that I saw indicates that he

11        had not achieved what's normally defined as

12        a major molecular response.

13             (Exhibit Weiss-9, multipage document

14        entitled National Comprehensive Cancer

15        Network, NCCN Clinical Practice Guidelines

16        in Oncology (NCCN Guidelines) Chronic

17        Myeloid Leukemia Version 4.2108 - January

18        24, 2018, is marked for identification.)

19    BY MR. JOHNSTON:

20        Q.   We have marked as Exhibit 9 the

21    NCCN Clinical Guidelines.

22             Have you ever seen those before?

23        A.   I don't think I've seen this

24    version of it.

25        Q.   You haven't seen the 2018 version?

1            MARK A. WEISS, M.D.

2        A.   I don't believe so.

3        Q.   If you look at the first page --

4            MR. JOHNSTON:   Thank you.

5   BY MR. JOHNSTON:

6        Q.   -- see the Chair of the NCCN

7   Guidelines Panel was Jerald Radich?

8        A.   Okay.

9        Q.   He's the guy who you said you'd

10  never heard of before; right?

11       A.   Not familiar with, no.

12       Q.   So he's at Fred Hutchinson's

13  Cancer Research Center.  Do you know what that

14  is?

15       A.   Yes, I do.

16       Q.   Have you had any work -- ever done

17  any work with Fred Hutchinson?

18       A.   I've given a lecture there.

19       Q.   Okay.  Was that a lecture on CML?

20       A.   No, it was not.

21       Q.   Okay.  And you've never met Jerry

22  Radich?

23       A.   I don't believe I have.

24       Q.   Michael Deininger, do you know who

25  that is?

Page 131

1          MARK A. WEISS, M.D.

2     A.   No, I don't.

3     Q.   He's listed as the Vice-Chair;

4  correct?

5     A.   That's what it says here.

6     Q.   And he's at Huntsman Cancer

7  Institute; right?

8     A.   That's what it says, yes.

9     Q.   Do you know Camille Abboud from

10 Siteman Cancer Center?

11    A.   I do not know her.

12    Q.   Do you know Jessica Altman from

13 Robert Lurie Comprehensive Cancer Center at

14 Northwestern?

15    A.   I do know Jessica.

16    Q.   How do you know Jessica?

17    A.   You know, we've traveled in the

18 same circles, and she's been at meetings that

19 I've been to, including small group meetings.

20    Q.   By the way, do you go to ASCO

21 meetings or did you go to ASCO meetings when

22 you were practicing?

23    A.   Sometimes.

24    Q.   Not every year?

25    A.   Not every year.

1              MARK A. WEISS, M.D.

2         Q.   By the way, have you prescribed

3    any TKI since you -- since we had your last

4    deposition in --

5         A.   No, I have not.

6         Q.   -- July?

7              Have you prescribed any medicines

8    since then?

9         A.   Yes, I have prescribed some

10   medicines since then.

11        Q.   Any cancer medicines?

12        A.   No, no cancer medicines.

13        Q.   Okay.  Do you know Ellin Berman?

14        A.   She was my partner for 20 years.

15        Q.   Your partner in a medical

16   practice?

17        A.   In an academic medical practice,

18   yeah.

19        Q.   And was that at Memorial Sloan

20   Kettering?

21        A.   Yes, that's correct.

22        Q.   Okay.  And did you share an

23   office?  I mean, what does it mean to be a

24   "partner"?

25        A.   She was in --

1          MARK A. WEISS, M.D.

2      Q.   Did you see her every day?

3           Go ahead.

4      A.   I would see her frequently and

5  talk to her frequently, I would say several

6  times a week probably, maybe a little less

7  than that.  Her office was maybe 200 feet from

8  my office while I was at Sloan Kettering.

9           And we practiced in the same

10  inpatient rounding group; and we worked

11  together collaboratively on a variety of

12  different academic and research projects.

13      Q.   Did you publish any papers with

14  her?

15      A.   I believe I have some publications

16  where she's the co-author, yes.

17      Q.   Do you know Ravi Bhatia from

18  Alabama?

19      A.   That name's familiar, but I really

20  can't place him for sure.

21      Q.   How about Bhavana Bhatnagar from

22  Ohio State?

23      A.   No, I don't know him.

24      Q.   How about Peter Curren [sic] from

25  San Diego Moores Cancer Center?

1          MARK A. WEISS, M.D.

2     A.    Peter Curtin?

3     Q.    Curtin.  Sorry.

4     A.    I do not know him, either.

5     Q.    How about Daniel DeAngelo from

6  Dana -- Dana-Farber?

7     A.    I know Dan DeAngelo.

8     Q.    How do you know Dan DeAngelo?

9     A.    Again, through meetings we've

10 attended together.  And I once gave a lecture

11 at Dana-Farber where he was, and he once gave

12 a lecture at Sloan Kettering when I was there.

13    Q.    Do you know Jason Gotlib from

14 Stanford?

15    A.    No, I don't.

16    Q.    Do you know Gabriela Hobbs from

17 Mass General?

18    A.    No, I don't.

19    Q.    Do you know Madan Jagasia from

20 Vanderbilt-Ingram?

21    A.    I don't think so.

22    Q.    Do you know Hagop Kartarjian [sic]

23 -- Kantarjian?  I'm sure you do know --

24    A.    Kantarjian.

25    Q.    I'm sure you know him; right?

Page 135

1               MARK A. WEISS, M.D.

2       A.    Yes, I know him very well.

3       Q.    Lori Maness, do you know her?

4       A.    No, I've never even heard of the

5  Fred and Pamela Buffett Cancer Center.

6       Q.    Leland Metheny from Case

7  Comprehensive, do you know him?

8       A.    No, I don't.

9       Q.    Do you know Joseph Moore from

10 Duke?

11      A.    Yes, I do.

12      Q.    How do you know Joseph Moore?

13      A.    He collaborated with me on at

14 least one clinical trial that I ran while I

15 was at Sloan Kettering, and he invited me to

16 Duke on several occasions to give lectures.

17      Q.    Do you know Arnel Pallera from

18 St. Jude?

19      A.    No, I don't.

20      Q.    Do you know Philip Pancari from

21 Fox Chase Center?

22      A.    No, I don't.

23      Q.    Do you know Michal Rose from Yale?

24      A.    No, I don't.

25      Q.    Do you know Neil Shah from UCSF?

1           MARK A. WEISS, M.D.

2           A.    That name is familiar, but I can't

3    specifically attach a face to it.

4           Q.    Do you know Doug Smith from the

5    Sidney Krimmel [sic] Comprehensive Cancer

6    Center at Johns Hopkins?

7           A.    I don't believe I know him.

8           Q.    Do you know David Snyder from City

9    of Hope?

10          A.    I don't know David Snyder.

11          Q.    Do you know Kendra Sweet from

12   Moffitt Cancer Center?

13          A.    No, I don't.

14          Q.    Do you know Moshe Talpaz from

15   University of Michigan?

16          A.    Yes, I know Moshe.

17          Q.    How do you know him?

18          A.    He was at MD Anderson for many

19   years, and I had a very close relationship

20   with the physicians at MD Anderson, and we

21   often gave lectures at each other's centers.

22   And we would have a group meeting for several

23   years that I organized at the ASH Conference.

24              And Moshe Talpaz was instrumental

25   in the demonstration that Interferon was good

1              MARK A. WEISS, M.D.

2   therapy for CML, but then that really

3   completely fell out of favor when imatinib was

4   introduced.

5          Q.   Do you know James Thompson at

6   Roswell Park Cancer Institute?

7          A.   The name is somewhat familiar,

8   but, again, I can't attach a face to that.

9          Q.   Do you know Raoul Tibes from Mayo

10  Clinic?

11         A.   No, I don't.

12         Q.   Do you know David Yang from

13  University of Wisconsin?

14         A.   No, I don't.

15         Q.   All right.

16              MS. SPICER:   You can put that one

17        aside.

18              MR. JOHNSTON:   Sorry.   This is 10.

19              (Exhibit Weiss-10, article entitled

20        Molecular Monitoring of Imatinib in Chronic

21        Myeloid Leukemia Patients in Complete

22        Cytogenetic Remission:   Does Achievement of

23        a Stable Major Molecular Response at any

24        Time Point Identify a Privileged Group of

25        Patients?   A Multicenter Experience in

1                MARK A. WEISS, M.D.

2            Argentina and Uruguay, is marked for

3            identification.)

4       BY MR. JOHNSTON:

5            Q.    Handed you Number 10 --

6       Exhibit Number 10, which is an article called

7       an "Original Study" from the Clinical

8       Lymphoma, Myeloma & Leukemia journal from June

9       2011, by Carolina Pavlovsky and others, titled

10      "Molecular Monitoring of Imatinib in Chronic

11      Myeloid Leukemia Patients in Complete

12      Cytogenetic Remission:  Does Achievement of a

13      Stable Major Molecular Response at any

14      Time Point Identify a Privileged Group of

15      Patients?  A Multicenter Experience in

16      Argentina and Uruguay."

17                Do you see that?

18           A.    I see the title, yes.

19           Q.    Have you ever seen this document

20      before?

21           A.    No, I have not.

22           Q.    And have you ever read any

23      articles in Clinical Lymphoma, Myeloma &

24      Leukemia?

25           A.    I may have, but this is a

1              MARK A. WEISS, M.D.

2    relatively lower-tier journal, so it's

3    certainly not on my regular reading list; and

4    I can't remember specifically reading an

5    article in it, but sometimes my search through

6    literature leads me to journals that I don't

7    always remember.

8          Q.   And do you know whether this

9    article was peer-reviewed or not?

10         A.   I don't think it states that, but

11   I haven't looked through the entire article.

12   So the answer would be, no, I don't know if

13   it's been peer-reviewed or not.

14         Q.   Okay.  You don't know that it

15   hasn't been peer-reviewed; correct?

16         A.   Correct.

17         Q.   Okay.  In the "Abstract" four

18   lines up, do you see where it says, "Not

19   achieving a stable MMR"?

20              Do you see where I'm reading?

21         A.   "Not achieve" -- yes, I do.

22         Q.   Okay.  "Not achieving a stable MMR

23   determined a higher risk of cytogenetic

24   relapse (9 percent of MMR patients not

25   achieving an MMR vs. 1 percent of patients who

1              MARK A. WEISS, M.D.

2     achieved MMR).  Patients with sustained MMR

3     had a significantly better cytogenetic

4     relapse-free survival at 48 months...but

5     showed no differences in overall survival."

6              Do you see that?

7        A.   Yes, I do.

8        Q.   Would a cytogenetic relapse

9     constitute a clinically significant event in

10    your opinion?

11       A.   No, it would not.

12       Q.   And if you turn to Page 284.

13       A.   (The witness complies with the

14    request of counsel.)

15       Q.   The second paragraph starts, "The

16    ELN recommendations."

17              Do you know what "ELN" is?

18       A.   No, I do not.

19       Q.   You don't know that it's a

20    European cancer group?

21       A.   I'm not familiar with the ELN, no.

22       Q.   Okay.  It says, "The ELN

23    recommendations consider achieving less than

24    an MMR at 18 months to be a suboptimal

25    response, which meant that the patient may

1          MARK A. WEISS, M.D.

2    still have a substantial benefit from

3    continuing imatinib but that the long-term

4    outcome is not likely to be optimal, so the

5    patient becomes eligible for other

6    treatments."

7               Do you see that?

8         A.   I see where they state it, yeah.

9         Q.   Okay.  Do you agree that achieving

10   less than MMR at 18 months is a suboptimal

11   response?

12        A.   Okay.  I think we've discussed

13   this several times, haven't we?

14        Q.   Well, you can answer it again.

15        A.   Okay.  So --

16             MS. SPICER:  Objection, asked and

17        answered.

18             THE WITNESS:  "Optimal" means the

19        best you can possibly be.  So having any

20        evidence of CML is not the best you can

21        possibly be, so it would not be optimal.

22   BY MR. JOHNSTON:

23        Q.   So it's suboptimal?

24        A.   It's less than optimal, yes.

25        Q.   Well, you don't like the word

Page 142

1            MARK A. WEISS, M.D.

2    "suboptimal"?

3                MS. SPICER:  Object to form.

4                THE WITNESS:  I'm not sure it

5        matters.

6                But I would describe this as this is

7        not optimal because optimal is the

8        pinnacle, and this is not the pinnacle.

9    BY MR. JOHNSTON:

10       Q.   You're aware a lot of researchers

11   use the word "suboptimal"; correct?

12               MS. SPICER:  Object to form.

13               THE WITNESS:  I -- I never noticed.

14   BY MR. JOHNSTON:

15       Q.   Really?

16       A.   Yeah, really.

17               MS. SPICER:  Object to form.

18   BY MR. JOHNSTON:

19       Q.   You're being very careful about

20   what words you're choosing.  Don't you think

21   they're careful about the words they choose?

22               MS. SPICER:  Object to form.

23               THE WITNESS:  I -- I believe I am a

24       more careful physician and investigator

25       than many other of my peers.

1                MARK A. WEISS, M.D.

2    BY MR. JOHNSTON:

3         Q.   So do you agree that "suboptimal"

4    as used in many papers, because we're going to

5    see it a lot as we go through these, is

6    equivalent to "less than optimal," from your

7    perspective?

8         A.   That's what I would believe it

9    means.

10        Q.   Okay.  And this patient [sic]

11   concedes that a patient who's got a suboptimal

12   response may still have a benefit from

13   continuing imatinib, but becomes eligible for

14   other treatments at that point.

15             Does that seem consistent with

16   what you understand to be practice in that

17   regard?

18             MS. SPICER:  Object to form.

19             THE WITNESS:  Again, this whole

20        thing is -- is opinion driven, because what

21        we know is that if you take a group of

22        patients and you treat them with imatinib,

23        those who go into remission faster and have

24        a lower level of disease faster do better

25        than those that take longer and don't have

Page 144

1          MARK A. WEISS, M.D.

2      a lower level of disease.

3          But it doesn't tell you if changing

4      their therapy and getting them lower will

5      actually make them better.  Because it may

6      just be that people who achieve these time

7      points they have here have easier to treat

8      disease and, innately, a better prognosis.

9          So, yeah, you could say it makes

10     them eligible for alternative treatments,

11     but there's no data to prove that that

12     offers any additional benefit.

13 BY MR. JOHNSTON:

14     Q.   Well, you're saying there's no

15 data that shows that there are improved

16 outcomes when you use second-line therapies

17 that are more potent?

18          I think that's inconsistent with

19 what you said at your last deposition.

20          MS. SPICER:  Object to form.

21          THE WITNESS:  I'm sorry.  Can you

22     repeat that?

23 BY MR. JOHNSTON:

24     Q.   Yeah.  Are you saying that there

25 is no data that demonstrates the higher level

Page 145

1          MARK A. WEISS, M.D.

2     of responses associated with second-line TKI

3     therapies has no benefit?

4               MS. SPICER:  Object to form,

5          misstates the testimony.

6     BY MR. JOHNSTON:

7          Q.    I mean, you're basically saying,

8     we don't know what to do, we're guessing

9     what to do --

10          A.    I don't think I said --

11          Q.    -- and I have no evidence --

12               MS. SPICER:  Hold on.

13               THE WITNESS:  I'm sorry.

14               MS. SPICER:  Yeah, let him finish.

15     BY MR. JOHNSTON:

16          Q.    -- and I have no evidence --

17               (Reporter clarification.)

18          Q.    You're guessing what to do, and I

19     have no evidence that tells me what to do with

20     a patient who comes in not in MMR at three

21     years.

22               MS. SPICER:  Object to form.

23     BY MR. JOHNSTON:

24          Q.    Is that your testimony?

25               MS. SPICER:  Object to form.

1              MARK A. WEISS, M.D.

2              THE WITNESS:  I certainly didn't say

3         that.

4    BY MR. JOHNSTON:

5         Q.   Okay.

6         A.   Yeah, I -- I think that you'd have

7    to know the specifics of the patient's case to

8    know what you want to do at any time point.

9         Q.   Now, if we look at this article on

10   284, in that -- at the end of that paragraph

11   describing their research, they say, [as

12   read]:  "We found that patients not achieving

13   a sustained MMR had a higher risk of

14   cytogenetic relapse than if they achieved a

15   sustain -- a sustained MMR."

16              Do you see that?

17              MS. SPICER:  Okay.  Wait.  I don't

18        see it.  Where are we?

19              MR. JOHNSTON:  End of that first

20        paragraph that we were -- the second

21        paragraph on the -- the first paragraph on

22        the page where we were looking before.

23              MS. SPICER:  And what's -- how --

24        where -- where does it start?

25              MR. JOHNSTON:  Well, it starts with,

1          MARK A. WEISS, M.D.

2      "The ELN recommendations," but I'm looking

3      at the last sentence of that paragraph.

4          MS. SPICER:  Say it again.

5      "Although our study"?

6          MR. JOHNSTON:  "Although" --

7          MS. SPICER:  That's fine. I'm just

8      trying to make sure I'm at the right place.

9          MR. JOHNSTON: "Although our study

10      size was limited" --

11          MS. SPICER:  Okay.  There we go.

12      All right.

13          MR. JOHNSTON: -- "we found that

14      patients not achieving a sustained MMR had

15      a higher risk of cytogenetic relapse than

16      if they achain -- achieved a sustained

17      MMR."

18  BY MR. JOHNSTON:

19      Q.   You see that?

20      A.   Yes, I see that.

21      Q.   And they give data for that;

22  right?

23      A.   They certainly have some

24  numbers --

25      Q.   And --

MARK A. WEISS, M.D.

1

2      A.     -- in this paper, yes.

3      Q.    And they, in fact, contend that

4 it's statistically significant difference,

5 don't they?

6      A.    Yeah, so that's, of course, a

7 loose interpretation of how to apply a

8 statistical test.

9      Q.    They write, "P equals .008."

10          That indicates a statistically

11 significant result, doesn't it?

12          MS. SPICER:  Object to form.

13          THE WITNESS:  Again, P equals 008 is

14       a significant event, but when you apply it

15       retrospectively, that's not what the

16       statistic was designed to test.  These

17       statistics, and -- and the use of .05 as a

18       bright line for statistical significance,

19       are really driven from prospective studies

20       with pre-identified endpoints.

21          Once you do a post hoc analysis the

22       problem is, for all I know, these guys

23       could have looked at 100 different results

24       and they only reported the one that gave

25       them the P value of this.  So unless we

1            MARK A. WEISS, M.D.

2       know all of the things that happened, we --

3       this would usually be viewed as not the

4       right way to do it.

5  BY MR. JOHNSTON:

6       Q.   Well, this is supposedly an

7  "Original Study," isn't it?

8            MS. SPICER:  Object to form, lacks

9       foundation.

10 BY MR. JOHNSTON:

11      Q.   According to the cover page here;

12 right?

13           A.   Yes, though I --

14      Q.   This is not a review article, this

15 is somebody who actually did the research;

16 right?

17           MS. SPICER:  Object to form, lacks

18      foundation.

19 BY MR. JOHNSTON:

20      Q.   These are patients that they saw

21 at several institutions, if you look at 281

22 under "Patients and Methods," seen between

23 November '05, and January 2 -- 2010, with

24 their transcript levels measured once CCR --

25 CCyR was achieved, and at six-month intervals.

Page 150

1          MARK A. WEISS, M.D.

2               So this was a prospective -- or at

3     least it was a study of patients they actually

4     had in their clinics, correct, and that they

5     followed prospectively?

6               MS. SPICER:  Object to form.

7               THE WITNESS:  The identification of

8          who achieved an MMR or didn't achieve it

9          is, by its nature, a retrospective

10          analysis.  The study may have followed

11          patients prospectively, but the analysis is

12          still retrospective.

13     BY MR. JOHNSTON:

14          Q.  And the analysis indicated that if

15     you achieve MMR, you have a better outcome;

16     correct?

17               And you agree with that, don't

18     you?

19          A.  Yes, that patients -- I'm sorry.

20     I don't think you're really explicitly stating

21     it the way I say it, and I think it does

22     change the meaning --

23          Q.  You're right, I'm not, 'cause I

24     don't like --

25               (Reporter clarification.)

1          MARK A. WEISS, M.D.

2          A.   -- the meaning of -- of what I'm

3     actually saying.  So I do find that

4     problematic.  I believe that achieving a

5     better quality response to therapy X for

6     treatment of CML portends a better prognosis

7     for the group than achieving a less response.

8               And, again, this is summarized by

9     what I've said multiple times, the less

10    disease you have in your body with CML

11    overall, the better your prognosis will be;

12    and that's at every level, not just a major

13    molecular response of .1 percent.

14               In general, my paradigm is that if

15    you have .02 percent, that's better than

16    having .1 percent, even though they're both

17    major molecular responses.

18          Q.   Well, all I'm trying to do is read

19    to you what other scientists have said.

20               And you apparently don't like the

21    way any other scientists phrase this issue,

22    either, because you've disagreed so far with

23    everything we've read in every article --

24               MS. SPICER:  Object to form.

25    BY MR. JOHNSTON:

Page 152

MARK A. WEISS, M.D.

1

2      Q.    -- correct?

3            MS. SPICER:  That's completely

4      argumentative and inappropriate, misstates

5      the testimony, and a million

6      other object --

7  BY MR. JOHNSTON:

8      Q.   I mean, I'm not giving you -- I'm

9  not --

10           (Reporter clarification.)

11           MS. SPICER:  -- and a million other

12      objections.

13  BY MR. JOHNSTON:

14      Q.   I'm not positing things.

15           I'm reading to stuff from you from

16  peer-reviewed literature, and you're

17  disagreeing with the way they phrase it;

18  correct?

19           MS. SPICER:  Object to --

20           THE WITNESS:  I'm sorry.

21           MS. SPICER:  I'll object --

22           THE WITNESS:  I'm sorry.

23           MS. SPICER:  -- to form, assumes

24      facts not in evidence, lacks foundation,

25      misstates the testimony, misstates the

Page 153

1          MARK A. WEISS, M.D.

2      article.

3              MR. JOHNSTON:  It's all in evidence.

4              MS. SPICER:  Misstates your

5      question.

6              MR. JOHNSTON:  It's all in evidence

7      'cause I've asked him about it, and he's

8      disagreed with every single statement I've

9      read out of peer-reviewed literature so

10     far.

11             MS. SPICER:  Same --

12 BY MR. JOHNSTON:

13      Q.    Correct?

14             MS. SPICER:  Same objections.

15             THE WITNESS:  Again, I don't know

16     that this is peer-reviewed.  So for you to

17     say that I've disagreed with every

18     statement you've made from peer-reviewed

19     literature is a non sequitur in my opinion.

20 BY MR. JOHNSTON:

21      Q.    Okay.  Well, let me ask it this

22 way:  You've disagreed with every sentence

23 I've read from every article we've looked at

24 so far; isn't that correct?

25             MS. SPICER:  Object to form,

1              MARK A. WEISS, M.D.

2         argumentative, misstates the testimony.

3    BY MR. JOHNSTON:

4         Q.   Isn't that correct?

5         A.   I don't think I've disagreed with

6    every statement you've made.  There are some

7    that I've clarified because of precision of

8    language issues, but --

9         Q.   Well, these aren't my -- these

10   aren't my statements.  These are statements

11   I'm reading from published literature.

12              You've -- every sentence I've read

13   out of an article you have disagreed with in

14   some way so far; isn't that true?

15              MS. SPICER:  Object to form,

16         misstates his testimony.

17              THE WITNESS:  I can't remember if

18         that's true or not.

19   BY MR. JOHNSTON:

20         Q.   Well, the record will show.

21         A.   Yes, it will.

22         Q.   Cytogenetic relapse, you're saying

23   that's not clinically significant?

24         A.   No, I believe clinically

25   significant events are events that, as the

1          MARK A. WEISS, M.D.

2    name implies, have clinical implications.

3    It's something that is recognizable by the

4    patient and/or the physician, based on routine

5    clinical monitoring.

6          Q.   If you use -- lose -- if you lose

7    CCyR, don't you have a very much increased

8    risk of going into blast crisis compared to

9    not losing CCyR?

10              MS. SPICER:  Object to form, vague.

11              THE WITNESS:  The power of these

12         responses is as a surrogate endpoint, and

13         what you've described is a surrogate

14         endpoint for a clinically relevant problem,

15         which is blast crisis.  And, I mean, we --

16         we talked about this before.

17   BY MR. JOHNSTON:

18         Q.   Okay.  So you agree that losing

19   CCyR increases your risk of going into blast

20   crisis which is a clinically significant

21   event; correct?

22         A.   Compared to patients who don't

23   lose it.  In a group of patients who have lost

24   it, they have a higher chance of having

25   accelerated or blast crisis disease, yes.

1          MARK A. WEISS, M.D.

2          MR. JOHNSTON:  We'll do this last

3      paper and then we'll figure something out

4      for lunch.

5          This is 11.

6          (Exhibit Weiss-11, multipage article

7      entitled Long-term prognostic significance

8      of early molecular response to imatinib in

9      newly diagnosed chronic myeloid leukemia:

10     an analysis from the International

11     Randomized Study of Interferon and STI571

12     (IRIS), is marked for identification.)

13 BY MR. JOHNSTON:

14     Q.   Handed you a article we've marked

15 as Exhibit 11 published in Blood.

16          Do you know what Blood is?

17     A.   Yes, I do.

18     Q.   It's the journal of the American

19 Hematological -- of ASH, American

20 Hematological Society; correct?

21     A.   The American Society of

22 Hematology, yes.

23     Q.   Thank you.

24          And this is a paper by Timothy

25 Hughes and others.  Have you ever heard of

1                MARK A. WEISS, M.D.

2    Timothy Hughes?

3         A.    No, I haven't.

4         Q.    Have you ever heard of Andreas

5    Hochhaus?

6         A.    Yes, I have.

7         Q.    Have you ever heard of Brian

8    Druker?

9         A.    Yes, I have.

10        Q.    We got Jerry Radich again.  You

11   haven't ever heard of him though; right?

12             MS. SPICER:  Object to form, asked

13        and answered.

14             THE WITNESS:  I -- I don't remember

15        his name.

16   BY MR. JOHNSTON:

17        Q.    Okay.  And this is titled

18   "Long-term prognostic significance of early

19   molecular response to imatinib in newly

20   diagnosed chronic myeloid leukemia:  an

21   analysis from the International Randomized

22   Study of Interferon and ST1571 [sic]" which is

23   the IRIS study; correct?

24        A.    Correct.

25        Q.    And this was published in 2010;

                    MARK A. WEISS, M.D.

1   right?

2           A.    Yes.

3           Q.    And STI571 is imatinib, isn't it?

4           A.    That is correct.

5           Q.    If you look in the "Abstract"

6   middle column, it says -- there's a word,

7   "Conversely," about halfway down.

8               Do you see that?

9           A.    Yes, I do.

10          Q.    It says, "Conversely, patients who

11  achieved major molecular response...by 18

12  months enjoyed remarkably durable -- durable

13  responses, with no progression to AP/BC and 95

14  percent EFS at 7 years."

15              Do you see that?

16          A.    Yes, I do.

17          Q.    Goes on to say, "The probability

18  of loss of complete cytogenetic response by 7

19  years was only 3 percent for patients in MMR

20  at 18 months versus 26 percent for patients

21  with complete cytogenetic response but not

22  MMR."

23              You see that?

24          A.    Yes, I do.

1          MARK A. WEISS, M.D.

2          Q.   "This study shows a strong

3    association between the degree to which

4    BCR-ABL transcript numbers are reduced by

5    therapy and long-term clinical outcome,

6    supporting the use of time-dependent molecular

7    measures to determine optimal response to

8    therapy."

9               Do you see that?

10         A.   Yes, I do see where they say that.

11         Q.   Do you agree or disagree with

12   those statements?

13              MS. SPICER:  Object to form, lacks

14         foundation.

15              THE WITNESS:  The problem with the

16         last -- well, the next to last sentence

17         where it says "time-dependent molecular

18         measures" is that not every study has

19         confirmed this observation.

20              And the most notable one was a study

21         that was a multinational study organized by

22         the group at MD Anderson, but it was

23         international, where patients were

24         randomized to get either 400 milligrams

25         daily of imatinib or 800 milligrams daily.

1          MARK A. WEISS, M.D.

2               And, again, I do not have that paper

3          in front of me.  I view this as my sort of

4          general knowledge about CML.  But in that

5          study they found that the patients in the

6          800 milligram group achieved these

7          endpoints faster than the patients in the

8          400 milligram endpoint.

9               But when they waited to see

10         clinically relevant events, they found no

11         difference between the two groups.  They

12         did find a difference if you achieved MMR

13         or not, but not between the two groups.

14         Because if you get there later, you were

15         just as well as when you get there sooner.

16              So I believe this statement of

17         time-dependent should -- needs to have an

18         asterisk next to it.

19    BY MR. JOHNSTON:

20         Q.   Turn to Page 3761, please.  You

21    see that there's a section called "EFS by

22    molecular response at 6, 12, and 18 months."

23              Do you see that on the right

24    column?

25         A.   All right.  We're on Page 3761.

1          MARK A. WEISS, M.D.

2      Q.    Right.

3      A.    Are we talking --

4      Q.    Right column.

5      A.    -- about Table 3?

6      Q.    Nope.

7          MS. SPICER:  Of that --

8  BY MR. JOHNSTON:

9      Q.    The heading in text, "EFS by

10  molecular response" --

11      A.    Oh.

12          (Reporter clarification.)

13  BY MR. JOHNSTON:

14      Q.    -- "EFS by molecular response at

15  6, 12, and 18 months," bolded heading and text

16  on the right column.

17          Do you see that?

18      A.    Yes, I see that.

19      Q.    All right.  And then you see in

20  that paragraph where it refers to Table 3 and

21  Figure 2A?

22      A.    Table 3 and Figure 2A --

23      Q.    Okay.

24      A.    -- I see that.

25      Q.    I want to look at the next

Page 162

1                   MARK A. WEISS, M.D.

2       sentence.

3                   (Reporter clarification.)

4                   MR. JOHNSTON:  Sorry.

5                   THE WITNESS:  I'm sorry.

6                   MR. JOHNSTON:  Sorry.

7       BY MR. JOHNSTON:

8            Q.   I want to look at the next

9       sentence, "At 12 months, the achievement of

10      M -- an MMR appeared to be a clinically

11      significant event.  The EFS in patients with

12      an MMR at 12 months was 91 percent, compared

13      with 90 -- with 79 percent in cases who had

14      not achieved an MMR."

15                  Do you see that?

16           A.   Yes, I do see that.

17           Q.   And that's what their data showed;

18      right?

19                  MS. SPICER:  Object to form, lacks

20           foundation.

21      BY MR. JOHNSTON:

22           Q.   According to this paper?

23           A.   Yes, it --

24                  MS. SPICER:  Object to form.  He

25           hasn't reviewed the paper.

Page 163

1          MARK A. WEISS, M.D.

2          THE WITNESS:  Yes.

3   BY MR. JOHNSTON:

4          Q.   You didn't consider this paper in

5   reaching your opinions in this case, did you?

6          A.   I did not consider this specific

7   paper.

8          Q.   You didn't consider the Mahon

9   paper that we marked as Exhibit 8, did you?

10         A.   No.  I think we could probably

11  find a long list of papers that I haven't

12  considered --

13         Q.   Well --

14         A.   -- given the extensive medical

15  literature on this topic.

16         Q.   You can just answer my question,

17  Doctor.

18              You didn't consider --

19              MS. SPICER:  Object.  Object to

20      form.

21  BY MR. JOHNSTON:

22         Q.   You can -- you didn't consider

23  Exhibit 9 [sic], the Pavlovsky article, in

24  formulating your opinions in this case, did

25  you?

1             MARK A. WEISS, M.D.

2             MS. SPICER:  Object to form, asked

3        and answered.

4             THE WITNESS:  I believe I've already

5        said I haven't.

6    BY MR. JOHNSTON:

7        Q.   Not the Pavlovsky, that's --

8        A.   I don't --

9        Q.   -- a different article,

10   Exhibit 10.

11       A.   Then I'm sorry.  I don't remember

12   Pavlovsky.

13       Q.   Okay.  That was the one from

14   Argentina.

15       A.   Ah.  No, I haven't looked at that

16   before.

17       Q.   Look on Page 3762.

18       A.   Yes.

19       Q.   Under the heading "Progression to

20   AP/BC by molecular response at 6, 12, and 18

21   months."

22       A.   Yes.

23       Q.   That's -- "AP" is advanced phase;

24   correct?

25       A.   Accelerated phase.

Page 165

1        MARK A. WEISS, M.D.

2        Q.    Accelerated phrase [sic].  Thank

3    you.

4             "BP" is blast crisis; correct?

5        A.    Yes.

6        Q.    The first sentence says,

7    "Achievement of MMR at 12 months was

8    associated with decreased rate of progression

9    to AP/BC, 99 percent progression-free survival

10   for patients with an -- with an MMR vs 90

11   percent for patients without an MMR"; correct?

12       A.    Yes.

13       Q.    And that was statistically

14   significant; right?

15            MS. SPICER:  Object to form.

16   BY MR. JOHNSTON:

17       Q.    According to this paper --

18       A.    According to this --

19            (Reporter clarification.)

20            THE WITNESS:  I'm sorry.

21   BY MR. JOHNSTON:

22       Q.    That was statistically

23   significant, according to this paper; correct?

24       A.    That is correct.

25       Q.    "In addition, patients who

1                MARK A. WEISS, M.D.

2    achieved an MMR had lower progression rates

3    than those who had achieved a response at the

4    next lowest category of response, that of

5    BCR-ABL (IS) greater than .1 percent to less

6    than 1 percent (99 percent versus 96 percent,

7    P equals .048; Table 3 and Figure 4C."

8                That's statistically significant

9    as well; correct?

10                MS. SPICER:  Object to form.

11    BY MR. JOHNSTON:

12          Q.   According to the paper?

13          A.   Yes, I believe all of these things

14    you're saying is consistent with the mantra I

15    seem to have been repeating throughout this

16    morning, that less disease, in general,

17    portends for a better prognosis than more

18    disease.

19          Q.   And at Mr. McWilliams' first PCR

20    test he was in that low -- next lowest

21    category, between .1 percent -- greater than

22    .1 percent and less than 1 percent; correct?

23          A.   Correct.

24          Q.   So he was not in MMR, and he would

25    have, therefore, suffered with having a higher

1              MARK A. WEISS, M.D.

2   progression rate than someone who had attained

3   MMR or faced the -- the statistical likelihood

4   of a higher progression rate; correct?

5              MS. SPICER:  Object to form.

6              THE WITNESS:  For patients who do

7         not achieve this, this is the overall

8         result they have.  But it doesn't say that

9         these patients remained on therapy X or

10        were changed to therapy Y.  We don't have

11        that data, so...

12  BY MR. JOHNSTON:

13        Q.   Look on Page 3763, please.  This

14  is heading "Overall survival by molecular

15  response at 6, 12, and 18 months"; correct?

16        A.   Yes.

17        Q.   And I want you to look at the

18  "18-month landmark" sentence, which is the

19  last sentence in that paragraph.

20              [As read]:  "At the 18-month

21  landmark, there was a trend for improved OS in

22  patients who obtained a molecular response of

23  less -- IS less than 1 percent, with OS of

24  approximately 95 percent compared with 84

25  percent in cases with an IS of between .1 and

1          MARK A. WEISS, M.D.

2    10 percent"; correct?

3          A.    That's what it says.

4          Q.    And Mr. McWilliams would have been

5    in that second category, which according to

6    their data, would have an 84 percent overall

7    survival rate; correct?

8          A.    His PCR at that time was between

9    .1 and 1 percent, which means that his

10   prognosis at that point would have been that

11   in a group of 100 patients, he would have an

12   84 percent chance of surviving, you know, plus

13   or minus the margin of error.

14         Q.    And about nine more patients -- he

15   would have had a 9 percent greater chance of

16   surviving if he'd actually achieved an MMR,

17   approximately; correct?

18         A.    Yes, but he -- he didn't.  So

19   that's his prognosis.

20               It doesn't change, as far as we

21   know, with what happens next.  We think it

22   changes.  But there's never, in my opinion or

23   that I know of, been a randomized trial that

24   took people who had this level of PCR result

25   and randomly assigned them to neratinib or a

1          MARK A. WEISS, M.D.

2    higher dose of imatinib.  That would be the

3    test you would need to know to know if that

4    information is really actionable.

5              We assume it is.  And as I said, I

6    assume it is, because I believe that if you

7    have more disease in your body compared to

8    less, that's important to know.

9          Q.   So --

10         A.   But in general, for people who

11   have very high quality responses, which is

12   what I believe .779 percent represents, I

13   think then the secondary question once you

14   have a very good response is -- I think a

15   famous jurist once said this, is "Less where

16   we are than in what direction we are going."

17             And I think we would need to know

18   what his disease was doing from .779.  If at

19   the next visit he was 5.0, let's say, I would

20   find that very worrisome that his disease is

21   progressing.  We don't have that data.

22         Q.   So there are basically three

23   options from that .779.

24             One is that it goes up above 1,

25   for example?  But it goes up above .779,

1          MARK A. WEISS, M.D.

2    correct?  That's one possibility?

3          A.   Well, go -- it needs to go up high

4    enough that it's a convincing change.

5          Q.   My point is that either it's going

6    to go up?

7          A.   Uh-huh.

8          Q.   It's going to stay the same,

9    whether that's .779 or within a range of --

10         A.   Exactly.

11         Q.   -- values that you say are roughly

12   equivalent to .779?

13         A.   Uh-huh.

14         Q.   Or it's going to go down?

15         A.   Correct.

16         Q.   If it goes up, what should a

17   doctor do?

18              MS. SPICER:  Object to form.

19   BY MR. JOHNSTON:

20         Q.   In your opinion?

21         A.   Again, the answer is always

22   patient-specific, because different patients

23   have different issues.

24              But if people are starting to have

25   higher disease levels, I think intervening

1          MARK A. WEISS, M.D.

2   before they are clinically affected, affected

3   how they feel, affected by their blood counts,

4   is appropriate to try to prevent this.

5               And the question is --

6       Q.    Which intervention?

7       A.    -- what intervention?

8       Q.    Right.  Okay.

9       A.    But in this case, we didn't even

10  have information that he was progressing.

11      Q.    Okay.  I'm just --

12      A.    At least I didn't see it in the

13  records I reviewed.

14      Q.    I'm just trying to figure out

15  where we go from here.

16              So what if he stayed --

17      A.    Yeah.

18      Q.    -- the same, being within that

19  band of -- of values that you would consider

20  to be roughly the same as the .779, what would

21  the options at that point be?

22              MS. SPICER:  Object to form.

23              Are we talking about a hypothetical

24      patient?  What are we talking about?

25  BY MR. JOHNSTON:

1                MARK A. WEISS, M.D.

2        Q.    I'm talking about a patient who

3    three years into therapy has a .779 PCR.

4                MS. SPICER:  Object to form,

5           incomplete hypo --

6    BY MR. JOHNSTON:

7        Q.    And if he has another one of the

8    same rough value, what would the correct

9    options be at that point?

10               MS. SPICER:  Object to form,

11          incomplete hypothetical.

12               THE WITNESS:  I think you would have

13          to know the specifics of the patient, but

14          patients --

15   BY MR. JOHNSTON:

16       Q.    What are the ranges --

17               (Reporter clarification.)

18   BY MR. JOHNSTON:

19       Q.    Okay.  Go ahead.

20       A.    (Continuing) -- but patients who

21   have stable or improving disease, who are --

22   you know, who are not symptomatic from their

23   disease, they're not having -- or they're not

24   having toxicity side effects from their

25   medication, if they have stable or improving

1          MARK A. WEISS, M.D.

2    disease, I usually monitor them.  And that's

3    what I think makes the most sense.

4          Q.   So you would monitor a patient who

5    had a result not in major molecular remission,

6    you would continue to monitor that patient

7    with no change in therapy; is that your

8    testimony?

9               MS. SPICER:  Object to form.

10   BY MR. JOHNSTON:

11         Q.   As a general matter?

12         A.   Yes, because our testing is so

13   sensitive now, we can detect at very early

14   stages when patients are showing evidence of

15   progression; and so there's no harm to the

16   patient to careful monitoring in this setting.

17         Q.   How often do you monitor, Doctor?

18              MS. SPICER:  Object to form, vague.

19              THE WITNESS:  I typically test my

20         CML patients every three months.

21   BY MR. JOHNSTON:

22         Q.   Okay.  And is it not possible that

23   things could change substantially within three

24   months between tests?

25              MS. SPICER:  Object to form.

Page 174

1            MARK A. WEISS, M.D.

2    BY MR. JOHNSTON:

3        Q.   Could you lose -- let me ask it

4    again.

5            Could someone lose -- go from a

6    .779 PCR and lose cytogenetic response within

7    three months?  Is that possible?

8        A.   I mean, anything's possible, of

9    course.

10       Q.   So it is possible?

11       A.   It's not common.

12       Q.   But it happens?

13       A.   People go into blast crisis and

14   die within three months too.  I -- we're

15   unable to -- none of these prognosticators are

16   completely predictive for every patient.  I

17   mean, that's why they give you percentages.

18           MR. JOHNSTON:  Let's -- let's go off

19       the record and talk about lunch for a

20       moment.

21           THE VIDEOGRAPHER:  Now going off the

22       video record.  The time, 13:26.  That

23       concludes DVD Number 2.

24           (A recess is held from 1:26 p.m. to

25       2:09 p.m.)

1           MARK A. WEISS, M.D.

2           THE VIDEOGRAPHER:  We are now back

3      on the video record.  This commences

4      DVD Number 3, April 24th, 2018.  The time

5      14:10.

6           (Exhibit Weiss-12, Product Label for

7      Tasigna Revised: 2/2017, is marked for

8      identification.)

9  BY MR. JOHNSTON:

10     Q.   During the break we marked

11  Exhibit 12, which is the 2/2017 label for

12  Tasigna.  I'm going to ask you some questions

13  that deal with that in a minute.

14          Have you heard of the phrase

15  "treatment-free remission"?

16     A.   Yes.

17     Q.   What is that?

18     A.   It's a general term for cancer

19  patients, though I presume it to be used for

20  other patients as well, for patients who stay

21  in remission but not on active therapy.

22     Q.   And in the context of chronic

23  myeloid leukemia there is a current approval

24  for Tasigna to allow patients who have

25  maintained a remission event to go off therapy

1            MARK A. WEISS, M.D.

2   according to the FDA; correct?

3        A.   That's my understanding, yes.

4        Q.   All right.  And I just want to --

5   let's look at Section 2.2 of Exhibit 12, which

6   is -- let me get -- make sure I -- wait a

7   minute.  That's not the right one.

8            MR. JOHNSTON:  Give me one second

9        here.  I think I got it.

10           (Pause from the record.)

11  BY MR. JOHNSTON:

12       Q.   All right.  I have the wrong

13  label, but you are aware that the FDA has

14  approved Tasigna -- patients taking Tasigna

15  who obtain a MR 4.5 for some period of time --

16  for a -- for a year, I believe, to go off --

17  sorry -- M -- MR 4.0 for a year, to go off

18  Tasigna if their last reading was an MR 4.5.

19           Does that sound right to you?

20           MS. SPICER:  Object to form.

21           THE WITNESS:  I don't remember the

22       exact specifics of the FDA label, but I'm

23       aware that the label was amended.

24           And the general thinking is that for

25       patients who achieve very high quality

MARK A. WEISS, M.D.

1

2       responses with CML, that they can go off

3       drug.  And at least so far, the data

4       suggested that some of those patients, but

5       not all, will not have recurrence of

6       disease.

7   BY MR. JOHNSTON:

8       Q.   And even if you only go off drug

9   for a few months, there's a benefit to that,

10  isn't there?

11      A.   Well, the thing that's wound into

12  this is actually something that we were

13  talking about earlier, and that's the fact

14  that patients who go off this drug need to be

15  carefully monitored, because when you have

16  very low levels of disease, the typical

17  progress is that the disease slowly increases.

18  And you can catch it, even though it's more

19  than it was, and have no adverse repercussions

20  to the patient clinically.

21          So, yes.  So stopping the drug is

22  doable, but it's with the caveat that patients

23  are followed closely, looking for progression

24  of their molecular burden.

25      Q.   But not taking a TKI is beneficial

1              MARK A. WEISS, M.D.

2    to the patient because it avoids the potential

3    side effects or adverse reactions associated

4    with taking a TKI; correct?

5         A.   If you're not taking a medicine,

6    most of the reversible side effects you will

7    no longer experience.

8         Q.   So there is a benefit to patients

9    if they are able to enter treatment-free

10   remission?

11            MS. SPICER:  Object to form.

12   BY MR. JOHNSTON:

13        Q.   Correct?

14        A.   The -- there is some benefit.

15        Q.   And somebody with a .779 PCR would

16   not be eligible for treatment-free remission;

17   correct?

18        A.   This would not be a person that I,

19   or I think most other leukemia experts, would

20   remove from TKI therapy.

21        Q.   Okay.  Let's look back at

22   Exhibit 4.  And I'll have you look at Page 31,

23   please.

24            And you'll see that on the top of

25   this page is the heading "Second-Line

1            MARK A. WEISS, M.D.

2    Treatment"; correct?

3            "Chronic Phase -- "4 Chronic Phase

4    Second-Line Treatment" is in the bar at the

5    top of -- top of this page in Exhibit 4;

6    correct?

7        A.   Yes.

8        Q.   And on the right column is a

9    heading "Second-Line Treatment"; correct?

10        A.   Correct.

11        Q.   And there's a "Guide 5" on this

12   page at the -- kind of the bottom half of the

13   page; correct?

14        A.   Yes.

15        Q.   So in May of 2011, when

16   Mr. McWilliams had his first quantitative PCR

17   test with the result of .779, which of these

18   boxes would he have fallen in?

19        A.   At .1 percent to 1.0 percent,

20   which is where his result had put him, he

21   would fall -- and because this was beyond

22   12 months, he would fall into the box on the

23   lower right-hand corner.

24        Q.   And in that box it says that the

25   second-line treatments for that box would be

Page 180

1                MARK A. WEISS, M.D.

2    to switch to a new TKI; correct?

3         A.    Yes.

4         Q.    To have the same dose of

5    nilotinib or dasatinib; correct?

6         A.    Correct.

7         Q.    To raise the imatinib dose;

8    correct?

9         A.    Yes.

10        Q.    "Discuss HCT."  What is HCT?

11        A.    That usually is an abbreviation

12   for hematopoietic cell transplant.

13        Q.    Okay.  So a patient like

14   Mr. McWilliams, his doctor, Dr. Walia, had

15   these four options in May of 2011, according

16   to these guidelines; correct?

17        A.    Were these the same guidelines in

18   effect seven years earlier?

19        Q.    No.  But -- but with the current

20   guidelines, that would have been the category

21   that he would have fallen into, and those

22   would have been the options; correct?

23             MS. SPICER:  Object to form.

24             THE WITNESS:  Well, of course, these

25        are guidelines, which mean that they're not

1              MARK A. WEISS, M.D.

2         specific to every patient; and one of the

3         things that I think isn't taken into

4         account here is the fact that we don't know

5         which way the guy's disease was going at

6         that point in time.

7              So in a pro forma way, yes, it falls

8         into the box.  But I don't think, actually,

9         we can put that person in this box; and

10        even if we could, you know, this is the

11        opinion -- a compiled opinion of several

12        different people reaching compromises based

13        on opinion.  These are not, by any means,

14        all proven to be the right thing to do.

15   BY MR. JOHNSTON:

16        Q.   Is it generally considered that if

17   you follow the NCCN treatment guidelines that

18   you will be acting within the standard of

19   care?

20             MS. SPICER:  Object to form.

21             THE WITNESS:  Some people believe

22        that to be true.

23   BY MR. JOHNSTON:

24        Q.   Okay.  And within these

25   guidelines, one option available according to

1           MARK A. WEISS, M.D.

2     the guidelines to Dr. Walia was to switch

3     Mr. McWilliams to a new TKI; correct?

4           A.    Yes.

5           Q.    Is it your opinion that it was

6     malpractice for Dr. Walia to switch

7     Mr. McWilliams to a new TKI in May of 2011?

8                 MS. SPICER:  Object to form.

9                 THE WITNESS:  You know, I did not

10          create an opinion, nor was I asked to

11          create an opinion, as to what Dr. Walia did

12          in regards to this patient's care.

13    BY MR. JOHNSTON:

14          Q.    Well, you do offer the opinion

15    that he should have been kept on imatinib,

16    don't you?

17                MS. SPICER:  Object --

18                THE WITNESS:  I guess I should look

19          at what I actually said in my report.  I

20          believe I said that would be one option for

21          a patient in this setting.

22    BY MR. JOHNSTON:

23          Q.    Another option for a patient in

24    this setting would be to switch to a new TKI;

25    correct?

1         MARK A. WEISS, M.D.

2         MS. SPICER:  Can you give him a

3     second to find what he's looking for?

4         And look at your -- Exhibit 3 is

5     your supplemental report.

6         THE WITNESS:  Oh, the supplemental

7     report.  I'm sorry.

8         What I said in my report is, [as

9     read]: "The patient had options other than

10    nilotinib.  He could have stayed on

11    imatinib at the same dose or an increased

12    dose, or he could have switched to

13    dasatinib or, later, bosutinib."  So I

14    offered that there were options.

15        I didn't comment specifically

16    whether I thought any one of these were

17    right or not.  I wasn't asked to give that

18    opinion for this particular patient, nor do

19    I think I had enough information on his

20    medical history to -- to make such a

21    judgment.

22  BY MR. JOHNSTON:

23    Q.  So it's possible that prescript --

24  prescribing nilotinib at that point was a

25  viable and a option within the standard of

Page 184

1          MARK A. WEISS, M.D.

2    care; correct?

3              MS. SPICER:  Object, form, misstates

4         his testimony, misstates the opinion,

5         misstates the report he just cited.

6    BY MR. JOHNSTON:

7         Q.   Trying to figure out what your

8    report says, Doctor.  Are --

9              MS. SPICER:  Object to form.

10   BY MR. JOHNSTON:

11        Q.   Are you of the opinion that

12   nilotinib was -- prescribing nilotinib in

13   May 2011 was also a viable alternative choice

14   for Dr. Walia?

15        A.   I think I say it very clearly

16   here, "The patient had options other than

17   nilotinib."

18        Q.   Well, your implication is

19   that nilotinib wasn't --

20              (Reporter clarification.)

21              MR. JOHNSTON:  Other than nilotinib.

22   BY MR. JOHNSTON:

23        Q.   The implication of that is that

24   nilotinib was not a correct choice.  I want to

25   make sure you are not offering an opinion in

Page 185

1            MARK A. WEISS, M.D.

2    this case that nilotinib was not a correct

3    choice that Dr. Walia could make.  Let me

4    rephrase that.

5            I want to make sure you're not

6    offering the opinion that prescribing

7    nilotinib was not an appropriately available

8    option to Dr. Walia.

9        A.   I'm not making an opinion on any

10   prescription that Dr. Walia made --

11       Q.   So --

12       A.   -- to this patient.

13       Q.   So if Dr. Walia prescribed

14   nilotinib, you would have no quibble or

15   complaint about that; correct?

16            MS. SPICER:  Object, misstates his

17        testimony, misstates what he was asked to

18        do here.  He's been clear on that.

19            THE WITNESS:  Yeah, I wasn't asked

20        to assess the particular treatment by

21        Dr. Walia of Mr. McWilliams.  And because I

22        didn't have a complete medical record, even

23        if I wanted to, I would be unable to offer

24        an opinion.

25   BY MR. JOHNSTON:

1          MARK A. WEISS, M.D.

2       Q.   You agree that on Exhibit 4,

3   Page 31, Guide 5, the table Beyond 12 Months,

4   1 percent to 1 -- .1 percent to 1 percent, the

5   box there says the options were to switch to a

6   new TKI, the same dose of nilotinib or

7   dasatinib, raise imatinib dose or discuss HCT.

8   We discussed that.

9            In your report, you said he could

10  have stayed on imatinib at the same dose.

11           Do you see that?

12      A.   Yes, I do.

13      Q.   That's not consistent with the

14  NCCN recommendations portrayed here, is it?

15           MS. SPICER:  Object to form.  You're

16       talking about a 2018 document.

17           THE WITNESS:  Well, you know, first

18       of all, this is the guideline for patients.

19       So I don't know what it says in the

20       clinician's guideline.

21           Second of all, you know, this is a

22       consortium opinion.  It's not fact.

23           And my opinion, which I think we

24       discussed already, is that at this very low

25       level of disease in a patient who had

1                MARK A. WEISS, M.D.

2          normal blood counts and was asymptomatic,

3          and had less than 1 percent of the cells in

4          his blood showing the CML abnormality, that

5          another option would have been to -- yes,

6          to stay on the same dose of imatinib and

7          try to understand where his disease was

8          going.

9     BY MR. JOHNSTON:

10          Q.   And is it your opinion that by not

11    doing that Dr. Walia made the wrong decision?

12              MS. SPICER:   Object to form.   He's

13          not been asked -- he's already testified

14          he's not been asked to give any opinion on

15          the prescribing decision.

16              MR. JOHNSTON:   Yeah, I don't agree

17          with you.   I think his report clearly

18          states that he's giving an opinion on the

19          prescribing decision, so I want to

20          understand what his opinion is.   And if he

21          wants to tell me that, that's fine.

22    BY MR. JOHNSTON:

23          Q.   You have no -- is it correct that

24    you have no opinion about whether Dr. Walia's

25    decision not to maintain imatinib and continue

Page 188

                    MARK A. WEISS, M.D.

    to test was right or wrong?

                    MS. SPICER:  Object to form.  Same

            opinion.  This is a rebuttal opinion to

            Dr. Giles.  It's very clearly stated what

            his opinions are, as he's just repeated to

            you.

                    THE WITNESS:  I don't have enough

            information to formulate an opinion on that

            question.

11  BY MR. JOHNSTON:

            Q.   So it is possible that Dr. Walia

    did something that is within the realm of --

    of permissible options, in your opinion, when

    he prescribed nilotinib in May 2011?

            A.   Yes, I think I would rather phrase

    it that it's possible that for a generic

    patient who has one, there are several options

    and -- but there are options other than

    nilotinib.  I say it right --

            Q.   Yeah.

            A.   -- there.

            Q.   And nilotinib is also an accepted

    option; correct?

                    MS. SPICER:  Object to form.

Page 189

1              MARK A. WEISS, M.D.

2              THE WITNESS:  Are you asking this

3          specific patient or in general patients?

4     BY MR. JOHNSTON:

5              Q.   Well, you already told me that you

6     don't know enough about this specific patient

7     to offer an opinion; right?

8              A.   Correct.

9              MS. SPICER:  Object.

10    BY MR. JOHNSTON:

11             Q.   So I'm asking you --

12             MS. SPICER:  Hold on.  Object --

13         object to form.  I want to be very clear

14         about what we're talking about here.

15             He's already recited his opinion

16         in -- that's stated in his report, and

17         let's stick to that because it's

18         obviously --

19             MR. JOHNSTON:  I have to employ --

20         never mind.  I'm not even going to talk to

21         you about this.

22    BY MR. JOHNSTON:

23             Q.   And you agree with me that in the

24    NCCN Guidelines from 2018, the .1 to 1 percent

25    category, nilotinib is considered to be a --

1          MARK A. WEISS, M.D.

2    an appropriate option for patients beyond

3    12 months not in MMR; correct?

4              MS. SPICER:  Object to form.

5              THE WITNESS:  That's what it says

6         here.

7              I will point out that by its nature,

8         this comment, same dose of nilotinib or

9         dasatinib in people who are .1 percent to

10        1.0 percent, is an acknowledgement that

11        sometimes you accept people who aren't in

12        major molecular response, and you don't

13        make a change --

14             MR. JOHNSTON:  I'm not argue --

15             THE WITNESS:  -- even though you

16        could make a change.

17   BY MR. JOHNSTON:

18        Q.   I'm not arguing with you about

19   that.  I think that's --

20        A.   Well --

21        Q.   -- an appropriate response,

22   Doctor, but I also think prescribing nilotinib

23   is an appropriate response; and I'm just

24   trying to make sure that you don't hold a

25   contrary opinion.

Page 191

1           MARK A. WEISS, M.D.

2           MS. SPICER:  Object to form.  His --

3    BY MR. JOHNSTON:

4        Q.   Do you --

5           MS. SPICER:  -- opinions speak --

6       state for the -- speak for themselves.

7    BY MR. JOHNSTON:

8        Q.   Do you hold an opinion that you

9    intend to offer at trial that Dr. Walia made a

10   mistake in prescribing nilotinib to

11   Mr. McWilliams?

12       A.   I don't have an opinion on that

13   topic.

14       Q.   Okay.  Let me have you look at

15   Exhibit 9, which is the physician

16   guidelines -- or the actual guidelines, not

17   the patient version.

18       A.   Okay.

19       Q.   And I will have you look at CML --

20   Page CML-3, which has a very similar colored

21   chart.  The one in this one that I gave you

22   before is colored, but it's not colored in the

23   one I gave you, but...

24           CML-3.

25       A.   All right.

Page 192

1          MARK A. WEISS, M.D.

2          Q.   Let me see if I can tell you how

3   many pages in it is.  One, two, three...

4          A.   Ooh, I think I'm hot on it now.

5          Q.   Eight pages.  It's got yellow,

6   red, and green --

7          A.   Yeah.

8          Q.   -- colors on it.

9          A.   I got it.

10          Q.   Okay.  Now, this chart also

11   addresses the Response Milestones based on

12   time since diagnosis and BCR-ABL1 PCR test

13   result; correct?

14          A.   I'm sorry.  Can you please say

15   that again?

16          Q.   Yes.  This chart or figure or

17   whatever you want to call it that appears on

18   CML-3 of the -- this Exhibit Number 9,

19   presents BCR-ABL1 (IS) percentages on the

20   left -- on the Y axis; correct?

21          A.   Uh-huh.

22          Q.   And it presents duration from

23   diagnosis on the X axis; correct?

24          A.   To be very particular, it's

25   Response Milestones.  So it wouldn't be from

Page 193

MARK A. WEISS, M.D.

1  diagnosis, it would be from treatment

3  initiation.

4          Q.   From initiation of therapy.  Okay.

5  So three months from initiation of therapy,

6  six months, et cetera?

7          A.   Yes.

8          Q.   And if you look back at Exhibit 4,

9  those boxes, you can't see it in color, but

10  they -- I can tell you that the dark ones are

11  red, and the light ones are yellow, and the

12  middle ones are green.

13              There's a similar pattern of

14  shades to this colored chart in the patient

15  guidelines; correct?

16              MS. SPICER:  Object to form.

17              THE WITNESS:  I'm sorry.  Can you

18        remind me what page in Exhibit 4?

19  BY MR. JOHNSTON:

20          Q.   It's 31 in Exhibit 4.

21          A.   Thank you.

22              Now, the formatting of the charts

23  are similar.

24          Q.   Okay.  And just -- so in box

25  one -- well, never mind.

Page 194

1                MARK A. WEISS, M.D.

2                You'll see that the yellow has a

3    key here; correct?

4           A.    Yes.

5           Q.    And the yellow key says -- the

6    "Clinical Considerations" are to "Evaluate

7    patient compliance and drug interactions," and

8    do a "Mutational analysis"; correct?

9           A.    Those are considerations, yes.

10          Q.    Mutational analysis was not done

11   in Mr. McWilliams' case; correct?

12          A.    I didn't see a test for it, no.

13          Q.    Okay.  And then the "Second-Line

14   and Subsequent Treatment Options" were to

15   Switch to an altern -- alternate TKI, continue

16   same TKI, dose escalation of imatinib (to a

17   max of 800 mg) and evaluate for HCT.

18                Do you see that?

19          A.    Yes, I do.

20          Q.    So they're basically the same

21   rec -- options that are presented in the

22   patient guide; correct?

23                MS. SPICER:   Object to form.

24                THE WITNESS:   They're similar.

25          There's -- I mean, unless it's stated

1          MARK A. WEISS, M.D.

2          somewhere in the footnotes, in this box

3          they don't -- they say, "Continue same

4          TKI," and they don't necessarily restrict

5          that to dasatinib or nilotinib; and for

6          that matter, it's incomplete because it

7          doesn't include bosutinib, which is

8          approved for front-line therapy.

9    BY MR. JOHNSTON:

10         Q.   We're going to talk about that in

11   a minute.

12         A.   Okay.  I'm just pointing out, this

13   isn't the complete --

14         Q.   That's fine.

15         A.   This is opinion -- I'm sorry.

16   This is opinion work.  And, obviously, it's

17   not meant, nor can it be, applied to every

18   patient.

19         Q.   And the recommended second-line

20   treatment options includes switching to an

21   alternate TKI; correct?

22         A.   Uh-huh.

23         Q.   And if you see, they refer to

24   CML-5, on which they list alternate --

25   alternate TKIs, dasatinib, nilotinib,

1             MARK A. WEISS, M.D.

2     bosutinib, ponatinib on this --

3             A.    Those are all the TKIs.   These

4     other ones are not TKIs.

5             Q.    The Omacetaxine is not?

6             A.    Omacetaxine --

7             Q.    Taxine, yeah.

8             A.    -- is not, nor is --

9             Q.    Allogeneic HC --

10            (Reporter clarification.)

11            MR. JOHNSTON:   Sorry.

12    BY MR. JOHNSTON:

13            Q.    Allogeneic HCT is not a TKI.

14            So they have identified bosutinib

15    in the clinical -- in the -- in the

16    physician's version of this as a possible TKI

17    to prescribe; correct?

18            A.    Yes, they have.

19            Q.    Okay.  But they include nilotinib

20    at 12 months when you're not in MMR as an

21    option; correct?

22            A.    According to these guidelines,

23    yes.

24            Q.    Okay.  I'll have you look back at

25    the patient's guide on Page 32, which is

1             MARK A. WEISS, M.D.

2      Exhibit 4 by the way.

3             Do you see --

4      A.    Okay.

5      Q.    -- under the heading "Scores of

6      Concern" --

7      A.    Yes.

8      Q.    -- it says, "The following scores

9      are of concern:  Greater than 10 percent at 3

10     months, greater than 1 percent to 10 percent

11     at 12 months, and .1 percent to 1 percent past

12     12 months."

13            Correct, that's what it says?

14     A.    Correct.

15     Q.    Do you agree that those scores are

16     of concern at those time frames, based on your

17     experience?

18            MS. SPICER:  Object to form.

19     BY MR. JOHNSTON:

20     Q.    As a general matter?

21     A.    They're of concern, yes.

22     Q.    Okay.  And it says, "You may have

23     four options.

24            "One option is to switch to

25     another TKI.  Dasatinib, nilotinib, and

1              MARK A. WEISS, M.D.

2    bosutinib may work when imatinib does not."

3              So, in fact, the -- do you see

4    that?

5         A.   Yes, I do.

6         Q.   So, in fact, the patient

7    guidelines actually refer in text to bosutinib

8    as well; correct?

9         A.   Yes.

10        Q.   "Bosutinib may work when dasatinib

11   and nilotinib do not.  Ponatinib make work

12   when a T315I mutation is present.  It may also

13   work when other TKIs do not."

14             Did I read that correctly?

15        A.   You read that correctly.

16        Q.   It says, "Another option may be to

17   stay on the same dose of nilotinib or

18   dasatinib.  Your scores may reach milestones

19   when tested next."

20             You agree with that, don't you?

21        A.   Yes.

22        Q.   "A third option may be to increase

23   the dose of [sic] imatinib.  Of importance,

24   side effects can worsen with higher doses.  A

25   higher dose is not likely to be helpful if the

Page 199

1            MARK A. WEISS, M.D.

2    standard dose didn't help."

3            Do you see that?

4        A.   I do see that.

5        Q.   Are you -- do you agree with that

6    statement?

7            MS. SPICER:  Object to form.  Are we

8        talking generally or are we talking 2018?

9        Are we talking 2011?  What -- what are

10       we --

11           MR. JOHNSTON:  Your objection is

12       noted.

13   BY MR. JOHNSTON:

14       Q.   Do you agree with that statement?

15           MS. SPICER:  Same objection.

16           THE WITNESS:  This needs to be read

17       in the context that it is, and that all of

18       your treatment decisions need to be

19       balanced against what are the options

20       available to you.

21           So in the pre-nilotinib and

22       dasatinib era they would say the exact

23       opposite of this, because there are some

24       patients who respond to higher doses of

25       imatinib that didn't.

Page 200

1              MARK A. WEISS, M.D.

2          I don't know if I said that last

3      part right.

4  BY MR. JOHNSTON:

5          Q.    I understand what you're saying.

6  But we're, in this case, not in the

7  pre-nilotinib and dasatinib era, are we?

8          A.    I'm using that as an example that

9  it's not black and white, the way it seems to

10  be stated here for patient consumption.

11          Q.    You don't agree that a higher dose

12  is not likely to be helpful -- higher dose of

13  imatinib is not likely to be helpful if the

14  standard dose didn't help?

15              You don't agree with that

16  statement?

17              MS. SPICER:   Object to form.

18      What are -- who are we talking about?

19              THE WITNESS:   A higher dose may be

20      helpful, but, again, the treatment choice

21      for any particular patient depends on a

22      risk-benefit analysis; and you have to

23      balance the toxicity risks with any of

24      these medicines against the efficacy of any

25      of these medicines.

1        MARK A. WEISS, M.D.

2            And -- and then when you can

3        properly weigh the risks and the benefits,

4        you make a specific recommendation to a

5        patient.

6    BY MR. JOHNSTON:

7        Q.    In your report on Page 2, at the

8    bottom you say that -- well, it's actually in

9    the last sentence of the second paragraph.

10   You say, [as read]: "The omission of bosutinib

11   limits the analysis of potential TKIs";

12   correct?

13       A.    This is in my --

14            MS. SPICER:  The supplemental

15       report?

16            THE WITNESS:  -- supplemental

17       report?

18   BY MR. JOHNSTON:

19       Q.    Supplemental report, Exhibit 3.

20       A.    Yes, I do see that.

21       Q.    Tasigna was prescribed in

22   June 2011 to Mr. McWilliams; correct?

23       A.    Yes, I believe that's correct.

24       Q.    Isn't it true that bosutinib was

25   not approved for any use in the United States

Page 202

1          MARK A. WEISS, M.D.

2    until September of 2012?

3               MS. SPICER:  I'm sorry.  Are we

4         talking about dasatinib --

5               THE WITNESS:  You mean bos --

6               MS. SPICER:  -- or are we talk --

7         I'm sorry.  Hold on.

8               Are we talk -- are we talking about

9         bosutinib or are we talking about

10        dasatinib?

11              MR. JOHNSTON:  Well, I thought I was

12        clear that I was talking about bosutinib.

13              MS. SPICER:  Are you saying -- I

14        can't -- I can't hear what you're saying.

15        I don't think she can, either.

16              THE WITNESS:  I don't know what that

17        drug is.

18              MR. JOHNSTON:  Bosut -- huh?

19              THE WITNESS:  I don't know what that

20        drug is.

21              MR. JOHNSTON:  Bosutinib?

22              MS. SPICER:  Are we talking about

23        dasatinib or bosutinib?

24              MR. JOHNSTON:  Bosutinib.

25              MS. SPICER:  B or D?

1            MARK A. WEISS, M.D.

2            MR. JOHNSTON:  B.

3            MS. SPICER:  B as in boy?

4            MR. JOHNSTON:  B-O --

5            THE WITNESS:  Okay.

6            MS. SPICER:  B --

7            MR. JOHNSTON:  -- S-U-T-I-N-I-B.

8            MS. SPICER:  Okay.

9            MR. JOHNSTON:  Bosutinib.

10            MS. SPICER:  Now, if you could

11       repeat the question now we know -- we're

12       clear on which drug you're talking about.

13  BY MR. JOHNSTON:

14       Q.   Are you aware that bosutinib --

15  bosutin -- bosutinib was not available in the

16  United States in June of 2011 when Dr. Walia

17  prescribed Tasigna to Mr. McWilliams?

18       A.   First of all, that's not

19  completely accurate.  It was available, but at

20  that point it would be on investigational

21  study.  It was not commercially available at

22  that time.

23            But in context, if you look at

24  what I wrote in context, this is isn't the

25  response that Dr. Giles mentioned ponatinib,

1                MARK A. WEISS, M.D.

2    which was approved even later than bosutinib

3    but for some reason didn't include bosutinib.

4    It -- it was striking in its absence that one

5    of the five FDA-approved TKIs for the

6    treatment of CML was omitted.

7         Q.   You omitted bosutinib from your

8    report in the Lauris case, too, didn't you?

9              MS. SPICER:  Object to form.

10             THE WITNESS:  I'd have -- I'd have

11        to look at that.

12   BY MR. JOHNSTON:

13        Q.   Okay.  You agree that it was not

14   commercially available and had not been

15   approved by the U.S. FDA for patients outside

16   the scope of clinical trials in June of 2011

17   when Dr. Walia prescribed Mr. McWilliams

18   Tasigna; correct?

19        A.   I'm sorry.  Can you say that

20   again?

21        Q.   You agree that bosutinib was not

22   commercially available outside the context of

23   clinical trials and had not been approved by

24   the U.S. FDA in June of 2011 when Dr. Walia

25   prescribed Mr. McWilliams Tasigna; correct?

Page 205

1              MARK A. WEISS, M.D.

2         A.    Correct.  It says right in my

3    report here, "bosutinib approved 9/4/12."

4    Again, this --

5         Q.    So it wasn't -- it wasn't an

6    option in May of 2011 unless Dr. Walia had

7    attempted to get him enrolled in a clinical

8    trial?

9         A.    Yes, but you're taking this out of

10   context and --

11        Q.    You have to let me finish my

12   question, sir.

13        A.    I'm sorry.

14        Q.    It was not an option for Dr. Walia

15   in May of 2011, bosutinib, unless Dr. Walia

16   had gotten Mr. McWilliams into a clinical

17   trial; correct?

18             MS. SPICER:  Object to form, asked

19        and answered.

20             THE WITNESS:  It was not

21        commercially available at that time.

22   BY MR. JOHNSTON:

23        Q.    And the only way he could have

24   gotten it was if Dr. Walia got Mr. McWilliams

25   into a clinical trial; correct?

Page 206

```
 1              MARK A. WEISS, M.D.

 2              MS. SPICER:  Object to form.

 3              THE WITNESS:  I believe so.

 4    BY MR. JOHNSTON:

 5         Q.   Are you suggesting that having

 6    prescribed Tasigna to Mr. McWilliams in June

 7    of 2011, that at some point between then and

 8    when he prescribed Sprycel in September of

 9    2013, Dr. Walia should have switched

10    Mr. McWilliams to bosutinib?

11              MS. SPICER:  Object to form, asked

12         and answered.

13              He's already testified repeatedly

14         he's not giving an opinion on the specific

15         prescribing decision in this case.

16    BY MR. JOHNSTON:

17         Q.   You can answer the question.

18         A.   Yeah, again, because I don't have

19    the patient's complete medical record, I

20    cannot offer an opinion on the specific

21    prescribing decisions made by Dr. Walia or

22    others.

23         Q.   If you look at the -- Exhibit 5 I

24    gave you, which has a chart of his --

25    Mr. McWilliams' BCR-ABL scores.
```

1          MARK A. WEISS, M.D.

2          MS. SPICER:  Object to form.

3          And for the record, this is a chart

4     created by Novartis; correct?

5          MR. JOHNSTON:  No, it's created by

6     Hollingsworth.

7          MS. SPICER:  Hollingsworth's

8     attorney.

9  BY MR. JOHNSTON:

10     Q.   And --

11          MS. SPICER:  This is Novartis'

12     attorney, Alan.

13  BY MR. JOHNSTON:

14     Q.   And attached to the chart are --

15          MS. SPICER:  Hold on.

16  BY MR. JOHNSTON:

17     Q.   -- all the records that

18  substantiate the readings in the chart.

19          And so you're free to look at any

20  of the test results that you would like that

21  are attached hereto.

22          MS. SPICER:  Again, for the record,

23     this is a composite exhibit prepared by

24     Hollingsworth including the chart.

25  BY MR. JOHNSTON:

1                   MARK A. WEISS, M.D.

2          Q.    Is it your testimony that you have

3    no ability to determine whether or not this is

4    an accurate chart because you didn't review

5    all of these BCR-ABL tests --

6                   MS. SPICER:  Object to form.

7    BY MR. JOHNSTON:

8          Q.    -- in preparation of your -- of

9    your opinions in this case?

10                  MS. SPICER:  Object to form, lack of

11             foundation.  He's seeing this chart for the

12             first time today.

13                  THE WITNESS:  I -- I certainly

14             haven't done a complete analysis, but it's

15             quite clear to me by looking at the first

16             two purple lines that this is not an

17             accurate representation of the data.

18   BY MR. JOHNSTON:

19         Q.    Why is that?

20         A.    Because -- oh, maybe -- maybe I

21   spoke too soon.

22         Q.    The left -- the Y axis is BCR-ABL.

23         A.    So the purple testing is what kind

24   of test?

25         Q.    It's just denoting the

1                    MARK A. WEISS, M.D.

2    prescription of Tasigna.

3         A.    Oh, I'm -- I see.  It's not --

4         Q.    It's simply --

5               (Reporter clarification.)

6         A.    -- relevant to the left -- to the

7    Y axis?

8         Q.    Yes.

9         A.    I'm sorry.  I missed that.  Okay.

10              So I see, as is the case with most

11   patients, there are fluctuations in the

12   results of quantitative PCR.

13        Q.    In September of 2012, and you can

14   check the record, and we can find it if you

15   want to, Mr. McWilliams achieved a

16   non-detectable BCR-ABL I under the

17   quantitative PCR methodology.

18              Would you have advocated at that

19   point switching to bosutinib, which is when

20   bosutinib became -- became available?  Would

21   you have advocated switching to that drug for

22   a patient who was in non-detect on BCR-ABL,

23   and had not experienced any adverse reactions

24   to the drug --

25              MS. SPICER:  Object to form.

Page 210

1            MARK A. WEISS, M.D.

2    BY MR. JOHNSTON:

3         Q.   -- nilotinib?

4            MS. SPICER:  Object to form.

5            Let's talk about the opinions he's

6       given in this case, not hypothetical

7       opinions.

8            THE WITNESS:  It's hard to know what

9       one single non-detectable level means,

10      so -- and, again, without really having the

11      patient's history and what their risk

12      profile is, I can't make an adequate

13      risk-benefit analysis.

14          In the days when we only had

15      imatinib, there weren't any other choices.

16      So the analysis was simple.

17   BY MR. JOHNSTON:

18       Q.   And you agree that this chart and

19   the tests that are attached reflect that on

20   Tasigna Mr. McWilliams dropped from .779 in

21   May of 2011 down to 336 -- .336 in

22   November 2011 which is the third page of this

23   exhibit --

24       A.   Yes, I see that.

25       Q.   -- down to non-detect on Tasigna

1          MARK A. WEISS, M.D.

2    in September of 2012?

3               So the trend on Tasigna at that

4    point in time, when bosutinib became

5    available, was improvement in molecular

6    response; correct?

7          A.   He had two data points in a row

8    that reflected lower numbers than the .779.

9    The clinical importance of that at these

10   levels is hard to know because you will notice

11   the very next test he's at .298, and then

12   .303.  And I'll point out that both of those

13   values are within the same range of .1 percent

14   to 1 percent that he was on with imatinib.

15         Q.   You skipped the .016 in the middle

16   there, didn't you?

17         A.   Yes, because the test results

18   fluctuate.  I think that's really the point

19   I'm trying to make.

20              We don't have enough data from

21   imatinib.  You have much more data on

22   nilotinib.  So you're comparing something,

23   which isn't fair, because we don't have one,

24   two, three, four, five, six, seven data points

25   on imatinib.  We have one.

1                MARK A. WEISS, M.D.

2        Q.    You have no --

3        A.    So I don't think we can know what

4   would have happened.

5        Q.    You have no basis to -- well,

6   strike that.

7                You are not offering the opinion

8   that bosutinib should have been prescribed to

9   Mr. McWilliams at any point prior to his

10  stroke in 2013; is that correct?

11       A.    I've answered --

12             MS. SPICER:  Object to form.

13             THE WITNESS:  Oh, I'm sorry.

14             MS. SPICER:  Yeah.  Object to form,

15        asked and answered.

16             THE WITNESS:  I've answered many

17        times that I am not giving, nor can I give,

18        a specific opinion in regards to the

19        prescriptions given to this patient.

20  BY MR. JOHNSTON:

21       Q.    You realize that even as of today,

22  there are only 12 months of data for bosutinib

23  in first-line trials; correct?

24       A.    Yes.

25       Q.    And that was published last year

1                MARK A. WEISS, M.D.

2      in December, wasn't it?

3           A.   I think so.

4           Q.   Was there any indicate -- and you

5      offer the opinion -- well, do you believe

6      that -- well, hold on a second.  Let me see

7      what you say.

8                You say that bosutinib doesn't

9      appear to carry the same risk of accelerated

10     atherosclerosis that nilotinib does in your

11     report.

12          A.   Now, you're -- you're saying

13     bosutinib there; right?  I mean --

14          Q.   Yes.  Sorry.  Bosutinib --

15          A.   -- sometimes when I --

16               (Reporter clarification.)

17          A.   I'm sorry.  When you say that

18     word, sometimes it sounds a little like --

19          Q.   All right.

20          A.   -- dasatinib to me.

21          Q.   Bosulif.

22          A.   I'm happy with bosutinib.

23          Q.   Okay.  "Bosutinib," you write,

24     "doesn't appear to carry the same degree of --

25     degree of increased risk of accelerated

1                MARK A. WEISS, M.D.

2    atherosclerosis that nilotinib does"; correct?

3         A.   As of today, I think that's the

4    paradigm that most of us act under.

5         Q.   And was there evidence within the

6    first year of the clinical trial, first 12

7    months of data on nilotinib, of an increased

8    risk of atherosclerosis?

9         A.   No, there wasn't.

10        Q.   Okay.  So it's possible that we're

11   going to find out in five years that bosutinib

12   has exactly the same or worse risk than

13   nilotinib; correct?

14        A.   All things are possible.  As I

15   said in my report, it's a potential option

16   along with others; and none of this is

17   prescriptive for this patient.

18        Q.   And they actually -- the sponsor

19   of bosutinib actually tried to get approval or

20   did a clinical trial to try to get first-line

21   use way back in 20 -- 2012; correct?

22             MS. SPICER:  Object to form.

23             THE WITNESS:  I'm unaware of the

24        specific dates and corporate strategy that

25        were used then.

1                MARK A. WEISS, M.D.

2    BY MR. JOHNSTON:

3         Q.   Well, you're aware of the BELA

4    study; right?

5         A.   It sounds familiar, but I'd have

6    to actually look at the paper to know.

7                MR. JOHNSTON:  13.

8                MS. SPICER:  Got two copies here.

9                MR. JOHNSTON:  Okay.  That's all

10        right.

11             (Exhibit Weiss-13, article entitled

12        Bosutinib Versus Imatinib for Newly

13        Diagnosed Chronic Myeloid Leukemia:

14        Results From the Randomized BFORE Trial, is

15        marked for identification.)

16   BY MR. JOHNSTON:

17        Q.   This is a paper -- Exhibit 13 is a

18   paper written by Jorge Cortes and a number of

19   other authors, including people like Philipp

20   le Coutre.

21        A.   I know Jorge quite well.

22        Q.   "Bosutinib Versus Imatinib for

23   Newly Diagnosed" --

24             (Reporter clarification.)

25             MR. JOHNSTON:  Sorry.

1                MARK A. WEISS, M.D.

2    BY MR. JOHNSTON:

3         Q.    "Bosutinib Versus Imatinib for

4    Newly Diagnosed Chronic Myeloid Leukemia:

5    Results From the Randomized BFORE," B-F-O-R-E,

6    "Trial" published January 2018 in the Journal

7    of Clinical Oncology.

8               Have you read this paper before?

9         A.    I don't believe I've ever read the

10   complete paper, but I've -- have a vague

11   recollection of skimming this paper.

12        Q.    And this paper and the study, the

13   BFORE study, established that bosutinib was

14   superior to imatinib with various treatment

15   efficacy endpoints; correct?

16              MS. SPICER:  Object to form.

17              THE WITNESS:  I would really have to

18        read the whole thing to know exactly what

19        the paper says.

20              I can see in the "Results" section

21        of the "Abstract" that the major molecular

22        response rate at 12 months, which was the

23        primary endpoint of the study and,

24        therefore, the one that the statistic was

25        designed to test, even though they give

1          MARK A. WEISS, M.D.

2          P values for lots of things, this is the

3          only one that's truly legitimate; and that

4          the primary endpoint was significantly high

5          with bosutinib versus imatinib.

6              I haven't looked at the data in the

7          rest of the paper.  I'm just reading that

8          sentence from the Abstract.

9    BY MR. JOHNSTON:

10         Q.   How do you know that the rest of

11   the data wouldn't be truly legitimate, as you

12   put it?

13         A.   I suspect it probably is, but I

14   haven't reviewed it to ascertain with

15   certainty.

16         Q.   All right.  So you're not saying

17   that the other endpoints are not legitimate

18   statistical outcomes?

19         A.   Oh, there's a phenomenon in

20   "statistic" that talks about multiple

21   endpoints and multiple looks at the data.  And

22   that's why, as I said earlier, it's very

23   important in a randomized trial to identify

24   before the trial gets underway what you're

25   evaluating; and that's the only endpoint for

1            MARK A. WEISS, M.D.

2    which the statistics are really valid.

3            So people can create these

4    numbers.  If the study wasn't designed to test

5    it, the P values don't have the actual meaning

6    that they appear to have, because, again, you

7    know, for a P value to be statistically

8    significant, we say it has to be less than

9    .05 percent.  Well, if it's .049 percent,

10   which is about 5 percent of the time, if you

11   threw 100 things against the wall, five of

12   them would be statistically significant even

13   though they're really not.  So it has to do

14   with trial design and not misrepresenting the

15   statistic.

16            And I will tell you, though

17   perhaps I should wait for you to ask, it seems

18   to me that many physicians and many

19   oncologists, including some people who I would

20   view even as experts in certain diseases, do

21   not understand this concept about statistics.

22   But this is the way I understand it based on

23   discussions I've had with, you know,

24   biostatisticians at Sloan Kettering.

25            Q.   All right.  There can be --

1                MARK A. WEISS, M.D.

2    there's a one in -- there's one primary

3    endpoint for every clinical trial; correct?

4            A.    There should be.

5            Q.    At -- but there can be multiple

6    pre-specified secondary endpoints; correct?

7            A.    Yes.

8            Q.    So just because somebody --

9    something is not the primary endpoint doesn't

10   mean the trial was not designed to obtain

11   information on those things, does it?

12           A.    What I'm saying is once you have

13   multiple endpoints, you impugn the quality of

14   the P value that's generated.  And --

15           Q.    Only -- sorry.  Go ahead.

16           A.    -- and -- and because of that,

17   it's hard to know when you do multiple

18   endpoints is this something that we know for

19   sure is related.  Maybe it's related, maybe

20   it's not related.  I'm certainly not

21   stipulating that these things aren't related.

22   I'm talking about the purity of the statistic

23   and rigorous scientific method.

24           Q.    Well, doesn't it all depend upon

25   whether the sample size is adequate for those

1          MARK A. WEISS, M.D.

2    endpoints?

3          A.    If you have a large enough sample

4    size, you are able to explore multiple

5    endpoints.

6          Q.    And do you have an opinion about

7    whether the sample size in this trial was

8    inadequate to explore multiple endpoints or

9    not?

10         A.    I don't have an opinion on that.

11         Q.    All right.

12         A.    I -- I would need to have

13    somebody --

14         Q.    So --

15         A.    -- more expert in biostatistics

16    than me.

17         Q.    So you don't know whether the

18    secondary endpoints described in this paper

19    are valid or not based upon your review of

20    the --

21         A.    Correct.

22         Q.    -- paper; correct?

23         A.    But just the fact that they state

24    them does not, by itself, prove that they did

25    an adequate statistical analysis.

Page 221

                    MARK A. WEISS, M.D.

1          Q.   If you look on Page 232, top of

2    the page, after Footnote 14 -- well, let's

3    see.  After Footnote 8, "Bosutinib

4    500 milligrams daily."

5          A.   I'm sorry.  I --

6          Q.   After Footnote 8 in the text.  I'm

7    look -- talking about the footnote reference.

8    Sorry.  Left column, 232.

9                MS. SPICER:  The top left column

10         there?

11               MR. JOHNSTON:  Yes.

12               THE WITNESS:  Ah.  Right after --

13               MR. JOHNSTON:  All right?

14               THE WITNESS:  -- "V299L"?

15   BY MR. JOHNSTON:

16         Q.   Correct.

17         A.   Okay.

18         Q.   So it says, "Bosutinib

19   500 milligrams daily is approved for use in

20   CML as second- or subsequent-line therapy."

21               That's what occurred back in 2012;

22   correct?

23         A.   Prior to, yes, this September 4th,

24   2012.

1          MARK A. WEISS, M.D.

2          Q.    "In a phase I/II study,

3    significant clinical activity was reported

4    with bosutinib in patients with CML resistant

5    and/or intolerant to prior TKIs and in

6    patients with advanced disease.  This led to a

7    randomized trial of bosutinib versus imatinib

8    as initial therapy for patients with

9    Philadelphia chromosome (Ph)-positive chronic

10   phase CML" in the "Bosutinib Efficacy and

11   Safety in Newly Diagnosed Chronic Myeloid

12   Leukemia" trial shortened as "BELA"; correct?

13          A.    I see that there.

14          Q.    That's what it says?

15               But it says, "Despite an

16   improvement in MMR rate at 12 months, shorter

17   time to response, and a lower rate of

18   transformation to accelerated phase (AP) or

19   blast phase (BP) with bosutinib, the study's

20   primary objective (superior rate of CCyR at

21   12 months) was not met."

22               Do you see that?

23          A.    Yes, I do.

24          Q.    So what that indicates is back in

25   2012 the manufacturer and the sponsor of

1          MARK A. WEISS, M.D.

2    bosutinib had failed to obtain a first-line

3    indication from FDA for the drug; correct?

4          MS. SPICER:  Object to form, lacks

5       foundation.

6          THE WITNESS:  I think this affirms

7       or reaffirms what I've been saying about

8       multiple endpoints.  They picked an

9       endpoint, which interestingly enough no

10      one's been talking today or in most of

11      these papers about complete cytogenetic

12      response.

13          Most people talk about major

14      molecular response, which did improve.  But

15      they picked an endpoint that is not

16      standard, and was not met.  And I'm sure

17      the FDA said, yeah, but these secondary

18      endpoints of MMR are not valid because

19      you're trying to do multiple things with

20      the statistic.

21          So I think this confirms what I

22      said.  It's, you know, be careful what you

23      wish for kind of a thing.  But, you know,

24      it's only the primary endpoint that most

25      studies are powered to discern.

1                 MARK A. WEISS, M.D.

2    BY MR. JOHNSTON:

3         Q.   And so a doctor like Dr. Walia

4    back in 2012 would have seen that they had

5    failed to demonstrate efficacy in the BELA

6    trial; correct?

7                 MS. SPICER:  Object to form --

8                 THE WITNESS:  No, that's not

9         correct.

10                MS. SPICER:  -- lacks foundation.

11                THE WITNESS:  I'm sorry.

12                There's a difference between lack of

13        efficacy and failing to meet the objective

14        of rate of CC -- CCyR at 12 months.

15   BY MR. JOHNSTON:

16        Q.   What's the difference?

17                If the endpoint is CCyR and you

18   don't prove it, then you failed to demonstrate

19   that your drug is effective for the FDA's

20   purposes, haven't you?

21        A.   Are we talking about whether the

22   drug is effective or what the FDA purposes

23   are?

24        Q.   Talking about what a doctor

25   looking at this would have thought back in

1          MARK A. WEISS, M.D.

2    2012 about bosutinib.

3          A.    I think a doctor looking at this

4    in 2012 would see that this is a highly active

5    drug because the rates of MMR improved.  I

6    think they would look at it and think like,

7    well, it's silly, it's one little endpoint

8    that didn't hit their marks and they didn't

9    give an approvement based on that.

10              Now, I actually approve of that

11   because that's the proper use of statistical

12   analysis, but I don't think the average doctor

13   recognizes that.  I mean, may -- maybe that's

14   not a nice thing to say about the average

15   doctor, but that's my opinion.

16         Q.    Let's look on Page 236.  You see

17   at the bottom -- sorry, at the bottom of 235

18   the sentence that's going to carry over

19   starts, "Cardiovascular events."  Actually,

20   that's -- let's see.  One second.

21              Let me go back to the -- the one

22   before.  Page 235, the paragraph beginning

23   "Peripheral vascular events."

24         A.    Yes.

25         Q.    Okay.  "Peripheral vascular events

1              MARK A. WEISS, M.D.

2    occurred in 1.5 percent of patients receiving

3    bosutinib and 1.1 percent of patients

4    receiving imatinib."

5         A.   I see where it says that.

6         Q.   So you see that bosutinib cause --

7    is associated with a higher rate of peripheral

8    vascular events than imatinib; correct?

9              MS. SPICER:  Object to form.

10             THE WITNESS:  So this was a study

11        that had 268 patients in each arm; and

12        1.1 percent probably means two patients

13        or -- or maybe three, I'd have to do the

14        math, had the event; whereas, three

15        patients or four had the event in -- in the

16        bosutinib arm.  So I think the difference

17        of one patient out of 268, it's hard to

18        make a definitive statement on.

19             And I think if -- if they had run a

20        P test on this, which, again, I don't think

21        is really a valid thing to do, but if they

22        had, it probably would not reach

23        statistical significance because these

24        numbers are quite similar.

25    BY MR. JOHNSTON:

1          MARK A. WEISS, M.D.

2     Q.   And you see in the next sentence

3  it says, "One patient receive -- who received

4  imatinib experienced a cerebrovascular event

5  (cerebrovascular accident resulting in

6  death)."

7          Do you see that?

8     A.   Yes, I do.

9     Q.   So imatinib actually had a

10 cerebrovascular event and bosutinib didn't;

11 correct?

12

13          MS. SPICER:  Object to form.

14 BY MR. JOHNSTON:

15     Q.   According to this paper?

16          MS. SPICER:  In 2018?

17 BY MR. JOHNSTON:

18     Q.   According to this paper when it

19 was published in 2018; correct?

20     A.   Well, I still -- I -- I haven't

21 really read enough of this yet, but I see it

22 says that, "One patient who received imatinib

23 experienced a cerebrovascular event."

24          It doesn't explicitly state what

25 happened in the bosutinib arm in regards to

Page 228

1              MARK A. WEISS, M.D.

2    cerebrovascular events.

3         Q.   Okay.  Well, the sentence --

4         A.   At least I don't see it here.

5         Q.   The sentence before provided the

6    rate for both categories; correct?

7              MS. SPICER:  Object to form.

8         That's --

9              THE WITNESS:  No, they're --

10        they're -- they're different things they're

11        talking about.  One is peripheral vascular

12        events --

13   BY MR. JOHNSTON:

14        Q.   Right.

15        A.   -- and the other is

16   cerebrovascular events.

17        Q.   So let's go to the next one.

18             "Cardiovascular events occurred in

19   3 percent of patients receiving bosutinib

20   and.4 percent of patients receiving imatinib,

21   2.2 percent and .4 percent, respectively,

22   during the first year."

23             You see that?

24        A.   Yes, I do.

25        Q.   So cardiovascular events occurred

1          MARK A. WEISS, M.D.

2    at a higher rate in ponatinib -- in bosutinib

3    patients, bosutinib patients as opposed to

4    imatinib patients; correct?

5          A.    Numerically these numbers are

6    higher in the bosutinib arm than in the

7    imatinib arm.

8          Q.    Well -- and they're higher as a

9    percentage of the population, too, aren't

10   they?

11         A.    Yes, they're -- the -- the

12   number -- the percent number is higher for

13   bosutinib than it is for imatinib.

14         Q.    And given the structure of those

15   three sentences, the peripheral vascular

16   events talks about the percent in bosutinib

17   and the percent in imatinib, the

18   cardiovascular events talks about the percent

19   in bosutinib and the percent in imatinib, and

20   for cerebrovascular events it only talks about

21   imatinib; correct?

22         A.    That's correct.

23         Q.    Doesn't that imply that there were

24   zero events in the bosutinib population?

25               MS. SPICER:  Object to form, asked

Page 230

1              MARK A. WEISS, M.D.

2          and answered.

3              THE WITNESS:  I mean, what it

4          implies, it can imply many things and --

5          I'm just saying it doesn't say anything

6          about the bosutinib arm.

7   BY MR. JOHNSTON:

8      Q.   Think that would be a strong point

9   to put in a paper, that there was an event in

10  imatinib and not to mention if there were

11  events in bosutinib?

12             MS. SPICER:  Object to form.

13             THE WITNESS:  You know, I've

14         peer-reviewed a lot of these papers and I

15         find a lot of omissions that happen for

16         real reasons or not.

17             I'm not saying there was an event in

18         the bosutinib arm.  I'm just saying the

19         paper is silent about it.

20  BY MR. JOHNSTON:

21     Q.   In the ENESTnd trial there were no

22  cerebrovascular events reported in the

23  imatinib arm; correct?

24     A.   What -- what -- what am I looking

25  at?

1                 MARK A. WEISS, M.D.

2        Q.    I'm just asking you.   You're

3    supposed to be an expert who cites the ENESTnd

4    study in your report.

5                 I'm asking you if you know how

6    many --

7        A.    Yes, but --

8        Q.    -- cerebrovascular events there

9    were in imatinib in the ENESTnd trial.

10               MS. SPICER:   Object to form,

11          argumentative.   This isn't a memory test.

12               THE WITNESS:   When I wrote this

13          report I had access to that paper, and I

14          would have reviewed it in realtime that I

15          was writing the report.   No, I haven't

16          memorized the entire paper.

17               MS. SPICER:   Now a time to take a

18          good, quick break?

19               MR. JOHNSTON:   Sure, we can take a

20          break.

21               MS. SPICER:   Just -- yeah, I got to

22          return a call.

23               THE VIDEOGRAPHER:   Off video 15:05.

24               (A recess is held from 3:05 p.m. to

25          3:13 p.m.)

1                MARK A. WEISS, M.D.

2            THE VIDEOGRAPHER:  Back on 15:13.

3            (Exhibit Weiss-14, Label for Bosulif

4        Revised: 12/2017, is marked for

5        identification.)

6    BY MR. JOHNSTON:

7        Q.   Dr. Weiss, you've been handed

8    Exhibit 14, which is the label from 12/2017

9    for bosutinib, which has also the word

10   "Bosulif," which is the trade name for the

11   drug.  This should be pretty quick.

12            I just want to call your attention

13   in the highlighting -- "Highlights" section,

14   which is on the first page.

15            Under "Warnings and Precautions,"

16   you see that there's a warnings and precaution

17   for "Fluid Retention: Monitor patients and

18   manage using standard of care treatment.

19   Withhold, dose reduce, or discontinue

20   Bosulif."

21            Do you see that?

22       A.   Yes.

23       Q.   Okay.  And then I'll just have you

24   turn to Section 5.4.  And this is in the

25   "Warnings and Precautions" section of the

Page 233

1                    MARK A. WEISS, M.D.

2    label; correct?

3          A.    Yes.

4          Q.    And it's 5.4, "Fluid Retention" is

5    the heading; correct?

6          A.    Correct.

7          Q.    It says, "Fluid retention occurs

8    with Bosulif and may manifest as pericardial

9    effusion, pleural effusion, pulmonary edema,

10   and/or peripheral edema"; correct?

11         A.    That's what it says.

12         Q.    And if you look in the next

13   paragraph, it states that 12 patients in the

14   trial -- hold on one second.

15              MS. SPICER:  I'm sorry.  What's the

16         exhibit number on this again?

17              MR. JOHNSTON:  This is 14.

18              MS. SPICER:  14.

19              MR. JOHNSTON:  I'll withdraw the

20         question.

21   BY MR. JOHNSTON:

22         Q.    It -- in the last sentence of that

23   paragraph it says, "Specifically."

24              You see where I am?

25         A.    Yes, I think so.

1          MARK A. WEISS, M.D.

2          Q.   "Specifically, 21 patients

3    experienced Grade 3 or 4 pleural effusions,

4    seven patients experienced Grade 3 or 4

5    pericardial effusions, and six patients

6    experienced Grade 3 edema"; correct?

7          A.   And these numbers are referring

8    to the sentence above that says, "Among 546

9    patients in a single-arm study"?

10         Q.   Correct.

11         A.   Okay.  Yes, I see those words.

12         Q.   Okay.  So 21 patients in that

13   study had pleural effusions, correct,

14   according to this label approved by the FDA?

15         A.   Yes.

16         Q.   You know that Dr. Walia -- maybe

17   you don't.

18              Do you -- are you aware that

19   Dr. Walia prescribed Sprycel to Mr. McWilliams

20   at some point?

21         A.   I did see that in my review of his

22   oncology records.

23         Q.   Okay.  And there is no -- there's

24   no evidence that Sprycel has a overall

25   survival advantage over imatinib, is there?

1           MARK A. WEISS, M.D.

2      A.   I don't remember seeing that, no.

3      Q.   Okay.  And are you aware that

4  there is a "Warnings and Precautions" in the

5  Sprycel label for "Fluid Retention"?

6      A.   Yes, I am.

7      Q.   And that includes pericardial

8  effusions, pleural effusions, things like

9  that; correct?

10     A.   Yes.

11     Q.   Many of the same things in the

12 bosutinib label?

13          MS. SPICER:  Object to form.

14 BY MR. JOHNSTON:

15     Q.   Correct?  In the "Fluid

16 Retention" --

17     A.   There's -- there's --

18     Q.   -- section.

19     A.   There's a warning -- oh, I'm

20 sorry.

21     Q.   Go ahead.

22     A.   There's a warning for dasatinib,

23 and it's a well-recognized side effect that

24 patients on dasatinib can have fluid retention

25 with pleural effusion, I would say, being the

1                MARK A. WEISS, M.D.

2    biggest bugaboo, if you will.

3         Q.   And there is not a warning and

4    precaution in the nilotinib label for fluid

5    retention, is there?

6         A.   I don't remember seeing one.  I'd

7    have to look at the label to confirm that.

8         Q.   You're not aware of fluid

9    retention being a significant adverse reaction

10   for nilotinib; correct?

11        A.   It's not in the paradigm the way I

12   think of the drug.

13        Q.   Okay.  And if you'll remember, at

14   your last -- well, are you aware that after

15   the stroke that occurred in Mr. McWilliams'

16   case in 2013, that Dr. Walia indicated that he

17   was going to restart nilotinib in December of

18   2013?

19             Are you aware of that?

20        A.   I probably saw it.  I -- I --

21   offhand, I can't remember it specifically.

22        Q.   And that Mr. McWilliams went to

23   see Dr. Wingard at Shands, and they decided to

24   go back -- to go to Sprycel at that point

25   rather than continuing nilotinib; correct?

1                 MARK A. WEISS, M.D.

2        A.    That sounds correct.

3        Q.    But Dr. Walia in 2013 initially

4    intended to continue nilotinib?

5                 MS. SPICER:   Object to form,

6          lacks --

7    BY MR. JOHNSTON:

8        Q.    To your understanding; correct?

9                 MS. SPICER:   -- lacks foundation.

10                THE WITNESS:   I -- I don't have a

11         specific memory of that.   I'm sorry.

12   BY MR. JOHNSTON:

13       Q.    Do you recall at your last

14   deposition last year that you talked about how

15   severe pleural effusions can be?

16       A.    Yes, pleural effusions can be

17   quite severe.

18       Q.    And you even described a patient

19   that you had in your clinical trials service,

20   or at least under your care, who had severe

21   pleural effusions that required a chest tube.

22                Do you recall --

23       A.    Yes.

24       Q.    -- discussing that?

25       A.    I do.

1          MARK A. WEISS, M.D.

2      Q.   And do you recall at the time that

3  you said that --

4          MS. SPICER:  Hold on.  I'm going

5      to -- this is the definition of

6      "redundant."  You're asking the exact same

7      questions that were asked at his prior

8      depo.

9          MR. JOHNSTON:  Thank you.

10  BY MR. JOHNSTON:

11      Q.   Do you recall that you said at the

12  time that those procedures carry -- the chest

13  tube procedure carries a risk of more serious

14  complications in the form of bleeding and

15  infection?

16          MS. SPICER:  Same objection.  What

17      are -- what -- what's happening here?

18  BY MR. JOHNSTON:

19      Q.   You can answer the question.

20          MS. SPICER:  No.  Hold on.

21          MR. JOHNSTON:  Are you going to

22      instruct him not to answer?

23          MS. SPICER:  Well, I'm going to if

24      you're going to ask him the exact same

25      questions that the Judge --

Page 239

1          MARK A. WEISS, M.D.

2          MR. JOHNSTON:  Do it, and let's call

3     the Judge right now.

4          MS. SPICER:  Robert, you're --

5          MR. JOHNSTON:  This is a fine

6     question.

7          MS. SPICER:  There's a Court --

8  BY MR. JOHNSTON:

9      Q.   Answer the question.

10          MS. SPICER:  There's a Court Order

11     to specifically avoid redundant

12     questioning --

13          MR. JOHNSTON:  That Order does not

14     apply to this deposition --

15          MS. SPICER:  Yes, it does.

16          MR. JOHNSTON:  -- number one.

17          Number two, I am not redundant

18     questioning him.

19          MS. SPICER:  Yes, it --

20          MR. JOHNSTON:  I'm about to bring it

21     home to this case.  You -- now, so --

22          MS. SPICER:  Okay.  Well, let's ask

23     about this case.

24          MR. JOHNSTON:  -- if you stop

25     interrupting me --

1             MARK A. WEISS, M.D.

2             MS. SPICER:  I'm not interrupting

3       you.

4             MR. JOHNSTON:  You are interrupting

5       me.

6             MS. SPICER:  I'm raising an

7       objection that is based on a Court --

8             MR. JOHNSTON:  Okay.  You have

9       raised -- you've made your objection.

10            MS. SPICER:  -- Order --

11            MR. JOHNSTON:  Either call the Judge

12      or be quiet.

13            MS. SPICER:  Well, if you don't get

14      to this case, if you keep asking him

15      questions --

16            MR. JOHNSTON:  Call the Judge --

17            MS. SPICER:  -- on this subject,

18      then I will.

19            MR. JOHNSTON:  -- or be quiet.

20            Call the Judge or be quiet.

21  BY MR. JOHNSTON:

22       Q.   Sir --

23            MS. SPICER:  I will if you keep

24      asking him questions that were already --

25  BY MR. JOHNSTON:

1              MARK A. WEISS, M.D.

2       Q.    -- do you recall that you --

3             (Reporter clarification.)

4       Q.    Do you recall that at your

5  deposition in June you said that the chest

6  tube procedure carries a risk of bleeding and

7  infection as forms of more serious

8  complications?

9             MS. SPICER:  Same objection.  These

10       are questions that were already asked at

11       his prior depo.  Let's get to this case.

12  BY MR. JOHNSTON:

13       Q.   Are you aware of that?  Do you

14  remember that?

15            She's not instructing you not to

16  answer.  You can answer the question.  She's

17  not calling the Judge.  You can answer the

18  question.

19       A.   I recall saying that, yes.

20       Q.   Are you aware that Mr. McWilliams

21  experienced pleural effusions while on

22  Sprycel?

23       A.   Yes.

24       Q.   Are you aware that Mr. McWilliams

25  had a thoracentesis while taking Sprycel to

Page 242

1              MARK A. WEISS, M.D.

2    remove the fluid from his -- from his lungs?

3         A.   I don't remember that --

4         Q.   Okay.

5         A.   -- explicitly.

6         Q.   Let's smart correct it then.

7         A.   I do remember that he needed to

8    have pleural fluid removed both during the

9    time he was on dasatinib, and I believe also

10   later when he wasn't on dasatinib as well.

11              (Exhibit Weiss-15, two-page record

12         of Dr. Matthew David Barnes, Shands At the

13         University of Florida, bearing Bates

14         Numbers MCWILLIAMS_DENNIS-FL-0054-00010

15         through MCWILLIAMS_DENNIS-FL-0054-00013, is

16         marked for identification.)

17   BY MR. JOHNSTON:

18        Q.   The reporter has handed you what's

19   been marked as Exhibit 15, which is a record

20   from Shands At The University Of Florida.

21   It's Bate -- it's Bates Numbered

22   MCWILLIAMS_DENNIS-FL-0054-00010 and continues

23   to 00013.  It is a record of a -- appears to

24   be a pulmonary appointment with Matthew David

25   Barnes.

1            MARK A. WEISS, M.D.

2            Have you seen this record before,

3      sir?

4            A.    I may have.

5            Q.    What is a thoracentesis?

6            A.    A thoracentesis is a procedure

7      whereby a needle is pushed through the chest

8      wall and into the space between the lining

9      that surrounds the lung and the lining that

10     surrounds the chest cavity and removes fluid

11     for either sampling and diagnosis or for

12     treatment of pleural effusions.

13           Q.    Is a -- is a thoracentesis the

14     sort of procedure you described as having a

15     chest tube put in?

16           A.    No, it's a distinct procedure.

17           Q.    And is a thoracentesis painful?

18           A.    It -- it can be.

19           Q.    Okay.  So you see that

20     Mr. McWilliams underwent a thoracentesis to

21     remove pleural fluid on October 18th, 2017;

22     correct?

23           A.    Yes.  That's the date on this

24     report.

25           Q.    Okay.

1          MARK A. WEISS, M.D.

2            (Exhibit Weiss-16, one-page IP

3      Encounter Report OP Note by Jantz, Michael

4      A. MD at 11/14/17 1603 (continued) bearing

5      Bates Numbers

6      MCWILLIAMS_DENNIS-FL-0054-000555 through

7      MCWILLIAMS_DENNIS-FL-0054-000556, is marked

8      for identification.)

9   BY MR. JOHNSTON:

10        Q.   Hand you a document that's been

11   marked as Exhibit 16, a record from

12   November 14th of 2017 from Michael Jantz for

13   pulmonary service, you see that, at Shands?

14        A.   Yes, I do.

15        Q.   And this one has a procedure

16   medical thoracos -- thoracoscopy --

17   thoracoscopy with pleural biopsies.  What

18   procedure is that?

19        A.   I believe that in this procedure a

20   thin, flexible lighted tube is placed in the

21   space between the lining around the lung and

22   the lining -- the internal lining of the chest

23   cavity, and then under visualization from that

24   thin fiberoptic tube various things can be

25   done.

1                MARK A. WEISS, M.D.

2        Q.    Is that a chest tube procedure?

3        A.    A chest tube can be placed during

4   or following this procedure, but the procedure

5   itself is actually distinct from placement of

6   a chest tube.

7        Q.    You see at the bottom of the

8   Page 48 it says, [as read]: "Two 28 French

9   chest tube were then inserted and sutured to

10  the skin using Z prolene sutures."

11            Does that indicate that a chest

12  tube was put in on this date?

13       A.    Yes, it does.

14       Q.    That's the sort of severe pleural

15  effusion that you described as being

16  associated with use of Sprycel, correct, at

17  your last deposition?

18            MS. SPICER:  Object to form.

19            THE WITNESS:  It certainly can be

20       associated with dasatinib.

21  BY MR. JOHNSTON:

22       Q.    Now, are you aware that -- well,

23  let me mark this one.

24       A.    Can I ask if this patient that

25  you've been talking about was actually on

```
 1              MARK A. WEISS, M.D.
 2    dasatinib at the time this happened?
 3         Q.   No, you can't.
 4         A.   Okay.  I guess I can ask.  You
 5    won't answer it.
 6         Q.   You don't ask questions.  I ask
 7    questions.
 8         A.   Yes, sir.
 9              (Exhibit Weiss-17, multipage
10         document entitled St. Lucie Medical Center
11         (COCXG) History & Physical, is marked for
12         identification.)
13    BY MR. JOHNSTON:
14         Q.   Exhibit 17 is a medical record
15    dated July 12th, 2015 for Dr. Shaikh.
16              Have you ever heard of Dr. Shaikh?
17         A.   I don't believe I have.
18         Q.   You don't know that Dr. Shaikh is
19    Mr. McWilliams' or at least was at some point
20    one of his primary treating care physicians?
21              MS. SPICER:  Object to form.
22              THE WITNESS:  I don't remember that,
23         no.
24    BY MR. JOHNSTON:
25         Q.   And you see this record down under
```

Page 247

1                    MARK A. WEISS, M.D.

2     "HPI" --

3         A.   Yes.

4         Q.   -- four lines up says, "He does

5     have mild to moderate sized bilateral pleural

6     effusions as well as a pericardial effusion.

7     He has been told he has -- had effusions in

8     the past and was subsequently placed on Lasix

9     intermittently.  He was told this is a side

10    effect of his Sprycel.  He's been admitted for

11    further workup and management.  He denies any

12    chest pain or abdominal pain currently."

13                You see that?

14        A.   Yes, I do.

15        Q.   All right.  So does this record

16    indicate that he had both pleural effusions

17    and a pericardial effusion as of July of 2015

18    and that he had been told that they were a

19    side effect of his Sprycel?

20        A.   That's what it states here.

21        Q.   Do you have any reason to think

22    that they weren't related to his use of

23    Sprycel, those pericardial and pleural

24    effusions?

25                MS. SPICER:  Object to form.  This

1            MARK A. WEISS, M.D.

2       is way outside the scope of his opinions

3       being offered in this case.

4            THE WITNESS:  I certainly believe

5       Sprycel can cause pleural effusions and

6       pericardial effusions.  I would have to

7       look again in detail at his complete

8       medical record to know whether or not I

9       thought the Sprycel was the likely culprit,

10      a contributing culprit, or unrelated.

11 BY MR. JOHNSTON:

12      Q.   And you haven't done that, have

13 you --

14      A.   No, I --

15      Q.   -- looked at his complete medical

16 record?

17      A.   I have not looked at his complete

18 medical record.

19      Q.   All right.  And Bosulif has a risk

20 of fluid -- Bos -- bosutinib, sorry.

21           Bosutinib has a risk of pleural

22 effusions and other fluid retentions as well;

23 correct?

24      A.   If the questions is:  Does it have

25 a risk, the answer is yes.  I think it's

1          MARK A. WEISS, M.D.

2   always a question, though, of do -- how do we

3   perceive the prominence of the effect.

4                I think a perfect example to

5   illustrate this point is that most of us

6   believe that both ponatinib and nilotinib can

7   promote atherosclerotic disease, but it's much

8   more likely with ponatinib than it is with

9   nilotinib.  So it's really a question of

10  relative frequency/intensity, not a

11  all-or-none kind of question.

12        Q.   We only have one year of

13  efficacy -- of safety data on bosutinib at

14  this point; correct?

15               MS. SPICER:  What point?

16               THE WITNESS:  No.  No, I don't

17       think --

18               MS. SPICER:  Vague.

19  BY MR. JOHNSTON:

20        Q.   Now.

21        A.   -- that's true.

22        Q.   Today.

23               Well, the study only has one

24  year -- only has results through 12 months;

25  correct?

1            MARK A. WEISS, M.D.

2       A.    But bosutinib was used long before

3  these randomized trials were used, and so we

4  have safety data from those studies.

5       Q.    And are those in clinical trials?

6       A.    Those were performed on clinical

7  trials at the time.  They preceded these

8  studies.

9       Q.    Well, FDA has looked at that

10  history and has elected to put pleural

11  effusions on the label; correct --

12            MS. SPICER:  Object to form.

13  BY MR. JOHNSTON:

14       Q.    -- for -- for --

15       A.    Yes.

16       Q.    -- bosutinib?

17       A.    That is true.

18       Q.    So it carries a similar risk to

19  Sprycel for pleural effusions and fluid

20  retention?

21            MS. SPICER:  Object to form.

22            THE WITNESS:  No, I don't believe I

23       said that and I don't believe the risk is

24       similar.

25  BY MR. JOHNSTON:

Page 251

1              MARK A. WEISS, M.D.

2         Q.   But we only have one year of data

3    under the current trial; correct?

4              MS. SPICER:  Object to form, asked

5         and answered.

6              THE WITNESS:  We have more than one

7         year of data on --

8    BY MR. JOHNSTON:

9         Q.   How many years do we have?

10             MS. SPICER:  Finish your -- finish

11        your answer.

12             THE WITNESS:  Well, we -- we have at

13        least six years of data when it was

14        commercially available because it was

15        approved -- well, I guess a little less

16        than six years.  It was approved in

17        September 2012, but prior to that there

18        were clinical trials that used it.  So

19        probably if you go back far enough, we're

20        talking there are probably some eight or

21        even ten-year follow-up data.  I do not

22        know that for sure though, but it's

23        probably achievable.  But the drug's been

24        available for almost six years already, so

25        to characterize it as only one year of

Page 252

1          MARK A. WEISS, M.D.

2        follow-up, I don't think that's accurate.

3    BY MR. JOHNSTON:

4        Q.   You haven't looked at the safety

5    data for bosutinib that was accumulated during

6    that six-year period as part of preparing your

7    expert report in this case, have you?

8        A.   I looked at the report that I

9    cited in the text of my article, which did

10   include those studies.

11       Q.   Where did you cite something about

12   bosutinib in your report?  Are you talking

13   about in your supplemental report or your

14   original report?

15       A.   No, it would be in my supplemental

16   report.

17       Q.   Okay.  Where did you cite

18   something about that?

19       A.   If you give me a second, I'll look

20   for it.  Well, I'll -- I'll start with the

21   bibliography 'cause it's easier for me to find

22   it there, but it's this report, Cortes, et

23   al., 2016 American Journal of Hematology.

24       Q.   Same author who wrote this 2018

25   paper that we just looked at; correct?

1                    MARK A. WEISS, M.D.

2          A.   Yes, though, of course, there are

3     multiple authors on both of these papers, but

4     Jorge was the first author on this as well.

5          Q.   Where is it cited?  Where do you

6     actually put a citation for it?

7          A.   I'm -- I'm looking for that.

8               MS. SPICER:  I can help.  It's on

9          Page 2.

10              MR. JOHNSTON:   Okay.

11              MS. SPICER:  End of the first full

12         paragraph on Page 2.

13    BY MR. JOHNSTON:

14         Q.   So looking at that sentence on

15    Page 2, it says that "bosutinib does not have

16    a substantially increased risk of thrombosis";

17    correct?

18         A.   Yes.

19         Q.   But bosutinib does have a

20    substantially increased risk of fluid

21    retention, doesn't it?

22         A.   I would have to look over the

23    available data for --

24         Q.   You don't --

25         A.   -- fluid retention.

Page 254

1              MARK A. WEISS, M.D.

2          Q.   You don't know even though it's on

3    the FDA-approved label, whether or not there's

4    a risk of fluid re -- substantial risk of

5    fluid retention and associated adverse

6    reactions with bosutinib; is that your

7    testimony?

8              MS. SPICER:   Object to form.

9              THE WITNESS:   I don't believe the

10        label says that, "a substantial risk."

11        Does it say "substantial risk" here?

12   BY MR. JOHNSTON:

13        Q.   Well, you --

14        A.   Am I missing that?

15        Q.   You're the one who used the word

16   "substantial risk."   I don't know what your

17   basis for that is.

18        A.   But not --

19             MS. SPICER:   Object --

20             THE WITNESS:   Oh, I'm sorry.

21             MS. SPICER:   Hold on.   Object to

22        form.

23             THE WITNESS:   I'm confused.

24             MS. SPICER:   That misstates his

25        testimony.   Let's start over.   Yeah.

Page 255

```
 1             MARK A. WEISS, M.D.

 2             MR. JOHNSTON:  We're not starting

 3        over.

 4             MS. SPICER:  Well, you're --

 5             MR. JOHNSTON:  We're going to keep

 6        going from right here.

 7             MS. SPICER:  You're misstating his

 8        testimony.

 9             MR. JOHNSTON:  I'm not.  He said a

10        substantial --

11             (Reporter clarification.)

12             MR. JOHNSTON:  He says a

13        substantially increased risk of thrombosis

14        for nilotinib.

15   BY MR. JOHNSTON:

16        Q.   I'm asking you is there a

17   substantially increased risk of pleural

18   effusions with Sprycel.

19        A.   I'd have to see the data --

20        Q.   You don't know --

21        A.   -- to --

22        Q.   -- that data?

23             (Reporter clarification.)

24        A.   -- to affirm that.

25        Q.   You don't know.
```

1          MARK A. WEISS, M.D.

2     A.    Not as I sit here today, I don't

3  remember.

4     Q.    And you don't know whether or not

5  there's a substantially increased risk of

6  fluid retention with Bosulif as you sit here

7  today also; correct?

8     A.    Correct.

9          MS. SPICER:   Object.

10 BY MR. JOHNSTON:

11    Q.    But the FDA has required both of

12 those products to put that in the "Warnings

13 and Precaution" section of their labels; isn't

14 that true?

15    A.    It sure looks like it.

16    Q.    Okay.  By the way, you're aware

17 that after Mr. McWilliams experienced pleural

18 effusions, a thoracentesis and a thoracoscopy

19 while on -- involved with Sprycel, that his

20 doctor switched him back to Gleevec; correct?

21    A.    I am aware of that.

22    Q.    And that occurred in 2017; right?

23    A.    Yes.

24    Q.    Okay.  Is there any paper anywhere

25 that establishes that Gleevec is an effective

1            MARK A. WEISS, M.D.

2    treatment after being treated with second-line

3    TKI therapy?

4            MS. SPICER:  Object to form.

5            THE WITNESS:  Off the top of my

6        head, I'm not familiar with a paper, but I

7        think we know with a very high degree of

8        certainty that since some people go to

9        second-line therapy because of tolerability

10       issues and some of those patients then go

11       back onto imatinib, we know that there's

12       activity of it there; and this patient's a

13       perfect example to it.  His tests results

14       looked quite good on imatinib, which, if

15       anything, I think you could say supports

16       the concept that imatinib wasn't a bad

17       choice for him and it was a viable option.

18   BY MR. JOHNSTON:

19       Q.   You believe MM -- not being in MMR

20   is quite good; correct?

21       A.    I believe being asymptomatic,

22   having normal blood counts, likely having a

23   normal-looking bone marrow exam, having a

24   negative FISH analysis is an excellent

25   response.

Page 258

MARK A. WEISS, M.D.

1

2          Q.   All right.  Let me ask it again.

3          A.    In any cancer that we have, if you

4    have a reduction of 99 percent of that tumor,

5    we're typically ecstatic.  Now, can we do

6    better?  Perhaps.

7          Q.   So it's your --

8          A.    But it is an excellent response.

9               MS. SPICER:  Let him finish his

10       answer.

11   BY MR. JOHNSTON:

12         Q.    It's your view that having --

13   being asymptomatic, having normal blood

14   counts, having likely speculatively

15   normal-looking bone marrow, a negative FISH

16   analysis but not in MMR, your testimony is

17   that's a good response; correct?

18         A.    Yes, it's --

19               MS. SPICER:  Object --

20               THE WITNESS:  -- actually a very

21       good re --

22               MS. SPICER:  Hold --

23               THE WITNESS:  I'm sorry.

24               MS. SPICER:  Yeah, object to form,

25       argumentative.  Go ahead.

Page 259

1          MARK A. WEISS, M.D.

2               MR. JOHNSTON:  He already answered

3     it.

4               THE WITNESS:  It's a very good

5     response, but as you discussed earlier,

6     it's not an optimal response because

7     optimal means the very best.

8               There are different flavors of good.

9  BY MR. JOHNSTON:

10          Q.   Is it possible -- you realize that

11  CML is clonal; correct?

12          A.   CML is a clonal disorder.

13          Q.   And there are often mutations that

14  occur in CML clones; correct?

15          A.   I'm not sure I understand what

16  you're saying.

17          Q.   Well, one of the reasons imatinib

18  often stops working for people is because

19  there is a CML clone that has a different

20  mutation that imatinib doesn't address;

21  correct?

22          A.   That sometimes happens with any of

23  the TKIs that are used.

24          Q.   Right.  I mean, that's a common

25  feature for CML, is that you could develop a

Page 260

1          MARK A. WEISS, M.D.

2  clone with a different mutation which would

3  render the TKI therapy you're receiving not

4  optimal or fail entirely.

5          A.   I think your characterization of

6  that as "common" is flawed.  In the majority

7  of patients, actually a large majority of

8  patients that doesn't happen, but in some

9  patients it does.

10         Q.   Well, in Mr. McWilliams' case, he

11 did not exhibit any intolerability to

12 imatinib, did he?

13         A.   I don't think so.  I don't

14 think -- I thought he tolerated the imatinib

15 well.

16         Q.   So --

17         A.   And I thought it had efficacy

18 despite the fact that his PCR test was

19 almost -- well, on one occasion was between

20 .1 percent and 1 percent and he was between

21 .1 percent and 1 percent on multiple occasions

22 on nilotinib.

23         Q.   So --

24         A.   This is who he was and what his

25 disease response was.

1          MARK A. WEISS, M.D.

2      Q.   So Dr. Walia did not change him

3  off of imatinib due to tolerability issues;

4  correct?

5          MS. SPICER:  Object to form, lack of

6      foundation.

7  BY MR. JOHNSTON:

8      Q.   As far as you can tell.

9      A.   From my review of the medical

10 record, I got the sense that he did it because

11 he feared he had an inadequate leukemic

12 response, but --

13     Q.   And it is possible that if that

14 were true, hypothetically, that -- that

15 imatinib was not providing a leukemic response

16 adequately because of a mutation, that

17 subsequent treatment with Tasigna and Sprycel

18 could eliminate or reduce that clonal mutation

19 such that going back to Gleevec would allow

20 him to have effectiveness with Gleevec again;

21 correct?

22          MS. SPICER:  Object to form.

23          THE WITNESS:  Can you, please,

24      restate that?

25 BY MR. JOHNSTON:

Page 262

1            MARK A. WEISS, M.D.

2        Q.    Yeah.

3        A.    I got a little lost in the --

4        Q.    So let's assume that there's a

5    mutation that make -- that renders imatinib

6    ineffective and you go to -- to nilotinib and

7    then to Sprycel.  It's possible that those two

8    drugs could knock out the mutation that is

9    imatinib-resistant such that when you went

10   back to Gleevec, you would have a period of

11   time in which Gleevec could be effective when

12   it previously wasn't; correct?

13               MS. SPICER:  Object to form and --

14               THE WITNESS:  I'm sure that's

15        poss --

16               MS. SPICER:  Let me finish my

17        objection.

18               THE WITNESS:  I'm sorry.  I'm sorry.

19               MS. SPICER:  That's okay.

20               Incomplete hypothetical, calls for

21        speculation, lack of foundation.  You can

22        answer if you understand the question.

23               THE WITNESS:  I believe that that is

24        possible.  The frequency at which it

25        recurs, I don't think we have any data.

1           MARK A. WEISS, M.D.

2           And as a point of clarification, I think

3           it's important to know that about half of

4           the patients who are resistant to imatinib

5           do not have any evidence of mutations that

6           our analysis can detect.

7    BY MR. JOHNSTON:

8           Q.   And you said earlier there was no

9    mutation analysis done for Mr. McWilliams, so

10   we don't know the answer to that question for

11   him; correct?

12          A.   I don't know the answer to that

13   question for sure.

14          Q.   Is it your opinion that chronic

15   myeloid leukemia is not atherogenic?

16          A.   I don't believe that patients with

17   CML appear to have an increased risk of

18   atherosclerosis relative to patients with

19   other diseases; and that's in distinction to

20   some other hemalogic malignancies, one of

21   which is a different myeloproliferative

22   disease called polycythemia vera and its

23   cousin essential thrombocythemia where there

24   is -- I'm sorry.  These are hard words.

25               (Reporter clarification.)

1            MARK A. WEISS, M.D.

2        Q.    Its cousin.

3        A.    Its cousin essential thrombocy --

4   cythemia -- sorry -- which are associated with

5   a clear-cut increased risk of complications

6   from atherosclerosis.

7            But, no, I don't believe -- it

8   hasn't, in my mind, been rigorously studied,

9   but to basic appearance, no, it doesn't seem

10  that CML has an increased risk.

11       Q.    Okay.  I didn't ask about

12  increased risk.  I asked you whether it's

13  atherogenic.  Is CML an atherogenic disease?

14            MS. SPICER:  Let's for the record

15       clarify.  Are we talking about his opinions

16       in this case or are you just talking in

17       general because he's very clear in his

18       supplemental report that he's responding to

19       a specific statement by Dr. Giles.

20            MR. JOHNSTON:  And he's offering an

21       opinion.

22            (Reporter clarification.)

23            MR. JOHNSTON:  Yes, and I'm

24       exploring his opinion offered in response

25       to Dr. Giles, which I'm not sure what he's

1            MARK A. WEISS, M.D.

2        saying.

3    BY MR. JOHNSTON:

4        Q.   So I'm trying to find out whether

5    you're saying "I don't think there's evidence

6    that allows me to conclude that it's

7    atherogenic" or are you saying your opinion is

8    that it is not atherogenic?

9            MS. SPICER:  Again, I object to

10        form.  I think his report speaks for

11        itself, and you can ask him about his

12        opinion.

13           MR. JOHNSTON:  Well, if it did,

14        that's why -- then I wouldn't need a

15        deposition, which is why we get to take

16        depositions, Counsel.

17           MS. SPICER:  You're asking a

18        question in the abstract.  I'm asking you

19        to specify what we're talking about here.

20   BY MR. JOHNSTON:

21       Q.   Is your -- so I'll say it again.

22       A.   I'm sorry.  I need a little --

23       Q.   Okay.  Go ahead.

24       A.   -- time here.

25           I think when I responded

1                MARK A. WEISS, M.D.

2    previously, I paraphrased what I actually said

3    in the report, which is I agreed with

4    something Dr. Giles had said, where he states,

5    "cardiovascular events that are characteristic

6    of pH negative chronic myeloproliferative

7    neoplasms," and those would be the essential

8    thrombocythemia and polycythemia vera that I

9    discussed previously, that those

10   characteristics have not been described more

11   frequently in CML patients.  I actually think

12   that's a very good way to describe the

13   paradigm I used to understand CML and

14   atherosclerosis.

15        Q.   Okay.  That doesn't answer my

16   question either.  My question is --

17        A.   I may not be able to answer your

18   question.

19        Q.   My question is -- well, it's

20   simple.  If you -- if your answer is, "I don't

21   have data that allows me to draw that

22   conclusion," I'm okay with that.  That's a

23   fine answer.

24             But I want to know whether your

25   opinion is that it's not to a reasonable

Page 267

1                   MARK A. WEISS, M.D.

2     degree of medical certainty atherogenic or are

3     you simply saying, "I don't have data that

4     allows me to draw that conclusion"?

5                   MS. SPICER:  Object to form.

6                   THE WITNESS:  You know, I -- I

7           answered your question in that -- I mean,

8           I -- I said it before.  There hasn't

9           been -- or I'm not aware of an actual trial

10          that's looked at this question in depth to

11          answer it.

12                So based on the best available data

13          we have, I agree with Dr. Giles' assertion

14          that it's distinct from the other closely

15          or not closely related myeloproliferative

16          conditions that do have an increased risk

17          of atherosclerotic disease, and that that

18          doesn't appear to be apparent in CML

19          patients.

20    BY MR. JOHNSTON:

21          Q.   So you're offering the opinion

22    that CML is not atherogenic; correct?

23                MS. SPICER:  Object to form,

24          misstates his testimony.

25                THE WITNESS:  That's not what I

Page 268

1          MARK A. WEISS, M.D.

2      said, no.

3          MS. SPICER:  He -- this is a

4      rebuttal opinion to Dr. Giles on a specific

5      point.  You're -- he's not giving an

6      original opinion --

7          MR. JOHNSTON:  That's the point.

8          MS. SPICER:  -- on that.

9  BY MR. JOHNSTON:

10     Q.   Is it your opinion that CML is not

11 atherogenic?

12     A.   As I said, the exact trials to

13 determine this, to my knowledge, have not been

14 done, but based on the information we have, it

15 doesn't appear to share the characteristic

16 that these other myeloproliferative diseases

17 had.  So it doesn't seem to be an increased

18 risk of complications from atherosclerosis in

19 CML patients.  I recognize that that excludes

20 the possibility that with, you know, very

21 careful monitoring they may show a slight

22 uptake -- uptick in it, but that's never been

23 shown and it's not part of the paradigm that

24 myself and I believe most oncologists, I mean

25 certainly Dr. Giles expressed the same

1                MARK A. WEISS, M.D.

2    opinion, believed about CML.  It's not viewed

3    as an atherogenic state.

4         Q.   Well, in fact, Dr. Giles has

5    expressly -- expressed the other opinion,

6    hasn't he, in his expert report in this case?

7         A.   I'm not sure what the basis for

8    him changing his opinion is.  I looked at that

9    reference and it seemed to be completely

10   unrelated to his statement.

11        Q.   Well, we're going to look at it

12   again right now.

13        A.   Fair enough.

14             (Exhibit Weiss-18, Article by

15        Siddhartha Jaiswal published in the New

16        England Journal of Medicine July 13, 2017,

17        titled Clonal Hematopoiesis and Risk of

18        Atherosclerotic Cardiovascular Disease, is

19        marked for identification.)

20   BY MR. JOHNSTON:

21        Q.   Handed you Exhibit 18, which is an

22   article by Jaiswal, G-A-I-S-W-A-L [sic], and

23   others published in the New England Journal of

24   Medicine, July 13th, 2017, titled "Clonal

25   Hematopoiesis and Risk of Atherosclerotic

Page 270

1           MARK A. WEISS, M.D.

2   Cardiovascular Disease."

3               Is that the article you were just

4   referring to that Dr. Giles pointed to?

5           A.   Yes, but I have some concerns that

6   this isn't the complete article.

7           Q.   Why is it not the complete

8   article?

9           A.   I believe that there was a -- a

10  fairly long supplement to this that was online

11  and that I referred to in my report.

12              Do you -- by any chance, do you

13  have that supplement?

14          Q.   No.

15          A.   Okay.

16          Q.   You didn't cite that you needed

17  the supplement in your report anywhere, did

18  you?

19          A.   I think I did cite that I viewed

20  the supplement and found this relevant fact in

21  it, yes.

22          Q.   What's the relevant fact that you

23  found?

24              MS. SPICER:  It's on Page 3.

25              MR. JOHNSTON:  Yes, the fact there

1           MARK A. WEISS, M.D.

2       are -- they didn't look at the BCR-ABL

3       gene?

4           MS. SPICER:  Excuse me.  He's

5       find -- he's finding it and he'll tell you.

6   BY MR. JOHNSTON:

7       Q.   I found it.  I can read it to.

8           You say, "In reviewing Table S3 in

9   the supplement" --

10          (Reporter clarification.)

11      Q.   "In reviewing Table S3 in the

12  supplementary appendix, I find that in

13  screening people for this condition, the

14  authors looked for evidence of mutations in a

15  total of 74 genes and not one of them is the

16  BCR-ABL gene of CML."

17      A.   Yes, that's the sentence I'm

18  referring to.

19      Q.   All right.  Well -- so you said

20  that.  I'm not going to dispute that fact.

21      A.   Okay.

22      Q.   That was on Page 3 of his report,

23  by the way.

24          All right.  I want you to look on

25  Page 111.

1           MARK A. WEISS, M.D.

2      A.   Okay.

3      Q.   And under "Conclusions" it says,

4  "The presence of C-H-I-P" -- I'll call it CHIP

5  from now on -- "in peripheral blood cells was

6  associated with a nearly -- with nearly a

7  doubling in the risk of coronary heart disease

8  in humans and with accelerated atherosclerosis

9  in mice."

10           Did I read that correctly?

11      A.   Yes, you did.

12      Q.   Okay.  On the next page under

13  the -- in the first paragraph seven lines up,

14  it's the sentence that starts, "Carriers."  Do

15  you see that?  "Carriers of these mutations."

16      A.   We're on Page 112?

17           MS. SPICER:  Yeah.

18           MR. JOHNSTON:  Yes.

19           MS. SPICER:  Oh, here it is.  The

20      first paragraph --

21           MR. JOHNSTON:  First paragraph.

22           MS. SPICER:  -- near the bottom of

23      the first paragraph?

24           MR. JOHNSTON:  Yep.

25           THE WITNESS:  Oh, the bottom of the

1          MARK A. WEISS, M.D.

2          first paragraph where it says, "Carriers of

3          these mutations"?

4   BY MR. JOHNSTON:

5          Q.   Yep.  It says, "Carriers of these

6   mutations have ten times the risk of a

7   hematologic cancer as those without such

8   mutations."

9               Do you see that?

10         A.   Yes.

11         Q.   Do you agree or disagree with that

12  statement?

13         A.   I believe the statement's probably

14  correct, but I believe the statement has no

15  reference to CML as they did not look for this

16  gene in their screening for this group of

17  patients.  This is a benign condition that's

18  been noted in -- as people age, so it's not,

19  in and of itself, a disease.

20         Q.   I didn't --

21         A.   Now, there is association with

22  certain types of leukemia and other hemalogic

23  malignancies that have the driver mutations

24  that they looked for in supplement S3, but CML

25  was not one of them.

1          MARK A. WEISS, M.D.

2          MR. JOHNSTON:  You've already made

3     that point, Doctor.  We're trying to move

4     forward here.  And I'm going to strike all

5     that answer as non-responsive other than

6     the first sentence because you answered my

7     question and then you gave a speech; and

8     that's not allowed, Doctor.

9  BY MR. JOHNSTON:

10     Q.   It goes on to say, "On the basis

11  of these findings" --

12          (Reporter clarification.)

13     Q.   "On the basis of these findings,

14  we provisionally define persons carrying such

15  mutations in the absence of any other

16  hematologic abnormalities as having clonal

17  hemio -- hematopoiesis of indeterminate

18  potential (CHIP)."

19          It says that; right?

20     A.   I'm sorry.  Say that again.

21     Q.   "On the basis of these findings,

22  we provisionally define persons carrying such

23  mutations in the absence of any other

24  hematologic abnormalities as having clonal

25  hematopoiesis of indeterminate potential."

1          MARK A. WEISS, M.D.

2     A.    That's what it says here.

3     Q.    Okay.  In the next paragraph right

4  after Type 2 diabetes you see where --

5          (Reporter clarification.)

6     Q.    -- Type 2 diabetes there's a

7  clause that starts, "Many persons with

8  atherosclerosis."

9          Do you see that, Doctor?

10    A.    Yes, I see that.

11    Q.    "Many persons with atherosclerosis

12  or coronary heart disease do not have

13  established risk factors, which suggests that

14  unknown factors may also contribute to

15  atherosclerosis and its complications."

16         Did I read that correctly?

17    A.    Yes, you did.

18    Q.    Do you agree with that statement?

19    A.    Yes, I do.

20    Q.    You note that they were looking at

21  patients -- over on the right column they were

22  evaluating patients with early-onset less than

23  50 years myocardial infarction as part of

24  understanding this CHIP process; correct?

25         MS. SPICER:  Where are we looking?

1          MARK A. WEISS, M.D.

2          MR. JOHNSTON:  Middle paragraph on

3     the right column Page 112, the ATVB and the

4     PROMIS trials.

5          MS. SPICER:  And what's the

6     question?

7          MR. JOHNSTON:  Whether or not they

8     were looking at patients with early onset

9     age less than 50 years myocardial

10    infarctions.

11  BY MR. JOHNSTON:

12       Q.   Correct?

13       A.   They obtained DNA from two groups,

14  one was an Italian group and one was a

15  Pakistan group, and they did a procedure known

16  as whole exome sequencing on the DNA from

17  these patients; and it says they did this to

18  evaluate participants with early-onset age

19  less than 50 years myocardial infarction.

20       Q.   And if you look on 113 under

21  "Association Between CHIP and Early-Onset

22  Myocardial Infarction," it states, "In both

23  ATVB and P-R-O-M-I-S" -- PROMIS --

24  "participants with early-onset myocardial

25  infarction have" --

Page 277

1                MARK A. WEISS, M.D.

2        A.    I'm sorry.  Where do you see that?

3        Q.    Under the heading "Association

4    Between CHIP and Early Onset Myocardial

5    Infarction."

6        A.    Okay.

7        Q.    "In both ATVB and PROMIS,

8    participants with early-onset myocardial

9    infarction had marked enrichment of CHIP, as

10   compared with controls."

11              Do you see that?

12       A.    Yes, I do see that.

13       Q.    And in the last sentence it

14   says -- of that paragraph, says, [as read]: "A

15   combined fix effects meta-analysis of these

16   two cohorts showed that CHIP was associated

17   with an odds ratio of 4 for early-onset

18   myocardial infarction."

19              Do you see that?

20       A.    I do see that.

21       Q.    Let's turn to Page 114, the last

22   sentence that carries over.  They write,

23   "Among those without incident coronary heart

24   disease, CHIP carriers had a median score for

25   coronary" -- and it goes over to 116 --

MARK A. WEISS, M.D.

1           MARK A. WEISS, M.D.

2   "coronary calcif -- artery calcification that

3   was 3.3 times as high as that in non-carriers

4   (306 versus 92 Agatston units)."

5   A-G-T-S-T-O-N [sic].

6         Did I read that correctly?

7      A.   I'm sorry.  I can't find exactly

8   where you're reading from.

9      Q.   It's bottom of 16 under Figure 3.

10     A.   So the left-hand column?

11     Q.   Yes.  So it goes from 1 -- 114 to

12   116.

13     A.   Okay.  "Among those without

14   incident coronary heart disease, CHIP carriers

15   had a median score for coronary-artery

16   calcification that was 3.3 times as" --

17        (Reporter clarification.)

18     A.   I'm sorry.

19        -- "3.3 times as high as that in

20   non-carriers."

21        Yes, I --

22     Q.   And then it goes --

23     A.   -- see that.

24     Q.   -- on to say, "In those with

25   incident coronary heart disease, the score was

1              MARK A. WEISS, M.D.

2    1.8 times as high in CHIP carriers as

3    non-carriers"; correct?

4         A.   That's what it says.

5         Q.   It says, "A coronary-artery

6    calcification score" -- I'm going to skip

7    that.

8              On Page 119 under "Discussion,"

9    second paragraph, second sentence starts

10   "First."

11             You see that?

12        A.   I'm sorry.  The second paragraph?

13        Q.   Second paragraph under

14   "Discussion" second sentence starts, "First

15   comma."

16        A.   Yes, I see that.

17        Q.   "First, the relationship between

18   CHIP and coronary heart disease appears to be

19   a causal one."

20             You see that?

21        A.   I do see that.

22        Q.   Do you agree or disagree with that

23   statement?

24        A.   There's clearly an association.  I

25   suspect some of it's causal.  I'm concerned

1             MARK A. WEISS, M.D.

2    because I didn't see a breakdown that much, if

3    not all, of this increase was seen in patients

4    who have those other myeloproliferative

5    diseases that I spoke about that have a known

6    increased incidence.  In fact, I think they

7    give an odds ratio for people who have JAK2

8    abnormalities, which can be very common in

9    polycythemia vera and essential

10   thrombocythemia and they have a very high risk

11   of it.  So this group that they're looking at

12   is enriched for patients who have mutations in

13   genes associated with cancers that are known

14   to be atherogenic, but this entity of CHIP is

15   not associated with CML, so I don't see the

16   relevance of it.

17             (Exhibit Weiss-19, document titled

18        Risk Factors and Mechanisms Contributing to

19        TKI-Induced Vascular Events in Patients

20        With CML, is marked for identification.)

21   BY MR. JOHNSTON:

22        Q.   Handed you a document titled,

23   "Risk Factors and Mechanisms Contributing to

24   TKI-Induced Vascular Events in Patients With

25   CML."  It's been marked as Exhibit 19.  It's

1                MARK A. WEISS, M.D.

2     from the journal Leukemia Research.  The first

3     author is Peter Valent.

4                Have you ever heard of Peter

5     Valent?

6          A.    Yes, I have.

7          Q.    Who's Peter Valent?

8          A.    Peter Valent is a clinician and

9     clinician researcher who was one of the first,

10    if not the first person to report on the

11    finding that nilotinib appeared to be

12    associated with in some cases severe

13    particularly peripheral artery occlusive

14    disease, but also some other

15    atherosclerotic-complicated events.

16         Q.    Do you consider him to be a

17    well-credentialed doctor?

18                MS. SPICER:  Object to form.

19                THE WITNESS:  I don't know his

20         clinical skills directly or personally, but

21         he strikes me as a good guy.

22    BY MR. JOHNSTON:

23         Q.    This paper was published in 2017,

24    wasn't it?

25         A.    Yes.

1          MARK A. WEISS, M.D.

2          Q.    Have you reviewed this paper

3     before?

4          A.    I've seen this paper and I've

5     skimmed it, but I don't believe I made a

6     thorough reading of it and I certainly don't

7     remember the details of it sitting here today.

8          Q.    Let me have you look at Page 49.

9               Left-hand column carry-over

10    paragraph Dr. Valent writes, "Recent data

11    suggests that clonal hematopoiesis (CH)

12    increases with age and that in these patients

13    the risk for development of both, hematologic

14    neoplasms and severe cardiovascular disorders,

15    increases."

16              That's what he wrote; right?

17         A.    Yes, that's what he wrote.

18         Q.    And CH is the same thing as CHIP

19    that we were talking about from the other

20    paper; correct?

21         A.    I believe so.

22         Q.    Okay.  Next sentence, "Indeed,

23    distinct CH type-mutations may predispose not

24    only for clonal expansion once BCR-ABL1 has

25    been acquired by neoplastic stem cells, but

```
1              MARK A. WEISS, M.D.

2   also for the development of cardiovascular

3   disorders.  It is also important to understand

4   that early, BCR-ABL1-negative, CH persists

5   (and expands over time) even after an overt

6   CML has developed and that TKI therapy is

7   unable to eradicate (all of) this

8   BCR-ABL1-negative-CH portion of the disease or

9   (all) other new CH clones."

10             Did I read that correctly?

11      A.    You read that correctly.

12      Q.    Doesn't this say that Dr. Valent

13  believes that there is a role for CH in CML?

14             MS. SPICER:  Object to form.

15             THE WITNESS:  There's no data from

16        the paper I read that supports this

17        statement.  He says it's possible.  Many

18        things are possible, and perhaps this is

19        possible, too, but the data from that

20        paper, which I suspect is the one he's

21        referring to here, doesn't show that.

22  BY MR. JOHNSTON:

23      Q.    Well, let --

24      A.    I mean, he can hypothesize

25  whatever he wants, but it doesn't mean that
```

1                    MARK A. WEISS, M.D.

2    it's true or proven.

3         Q.   Well, let's go on and see what he

4    says about what that data is.

5              Next sentence, "Whether the

6    CH-mediated risk of occurrence of

7    cardiovascular events also contributes to VAE

8    development in TKI-treated patients with CML

9    is currently under investigation."

10             Are you aware of any

11   investigations into the role of CH and VAEs in

12   CML patients?

13        A.   No, I wasn't aware of that.

14        Q.   Okay.  So it appears Dr. Valent

15   thinks there's some investigation going on of

16   the role of CH in CML patients; right?

17        A.   He postulates that "whether the

18   CH-mediated risk of occurrence of

19   cardiovascular events also contributes to VAE

20   development in TKI-treated patients with CML

21   is currently under investigation."  So, no,

22   he's not stating that it's associated.  He's

23   hypothesizing it might be and they're testing

24   the hypothesis now.

25        Q.   I didn't ask you that question.  I

1              MARK A. WEISS, M.D.

2   asked you whether Dr. Valent appears to be

3   aware that it is under investigation as to

4   whether CH has a role in CML patients.

5         A.   I mean --

6              MS. SPICER:  Object to form.

7              THE WITNESS:  I'm sorry.  You -- you

8        read that and I read that it's under

9        investigation.

10  BY MR. JOHNSTON:

11        Q.   Okay.  Next sentence.

12  "Preliminary data suggests that CH-related

13  mutations indeed cluster in those patients who

14  developed VAE during therapy with nilotinib

15  (P.V,  E.H., G.H., unpublished observation)."

16             So that suggests that Dr. Valent

17  and his colleagues actually have done some

18  research that support the idea that CH-related

19  mutations cluster in CML patients treated with

20  nilotinib therapy; right?

21             MS. SPICER:  Object to form.

22             THE WITNESS:  This does not say that

23        patients -- that patients with CML develop

24        CHIP.  He's looking at a bunch of mutations

25        that happen to be, presumably, from that

1           MARK A. WEISS, M.D.

2         same list that I talked about, Table S3 in

3         the supplemental report.  Those mutations

4         are found in lots of different places for

5         lots of different things.

6               So he's saying that those mutations

7         may cluster.  The -- it's unpublished data,

8         so it's not been subject to peer review.

9         And I'm not saying that it doesn't cluster.

10        I'm just saying we don't have the data that

11        this is true.  And this is not CHIP.  I

12        think it's really important.  You seem, at

13        least to me, the way I'm hearing you, you

14        seem to be blurring the lines here and

15        these are specific mutations that they've

16        looked for.

17   BY MR. JOHNSTON:

18        Q.   I'm sorry.  I thought earlier you

19   agreed that this was CHIP, that CH was related

20   to CHIP and -- and I don't know how you're

21   distinguishing that.  So how is this not CHIP?

22        A.   Oh, I'm sorry.  Because in this

23   sentence it says, "Preliminary data

24   suggest" --

25               (Reporter clarification.)

1          MARK A. WEISS, M.D.

2          THE WITNESS:  I guess the New Yorker

3     in me was coming for out for a second.

4          A.   "Preliminary data suggests that

5     CH-related mutations."  They're talking about

6     the mutations not to the clonal hematopoiesis.

7          Q.   Yes, they're investigating that.

8     That's what it says in the prior sentence;

9     correct?

10          That whether CH-mediated risk of

11     cardiovascular events also contributes to VAE

12     development in TKI-treated patients with CML

13     is currently under investigation, that's

14     exactly what it says; isn't it?

15          A.   The next line is, "So far it

16     remains unknown how CH can predispose for VAE

17     in patients with CML."

18          Q.   I was going to read that one next.

19     But Dr. Valent thinks there's something worth

20     studying here, doesn't he?

21          A.    I don't want to stipulate that I

22     know what Dr. Valent is thinking.  Clearly

23     they believe that investigating the mutations

24     that are related to the clonal hematopoiesis

25     patients may have some bearing on

1            MARK A. WEISS, M.D.

2    understanding the proatherogenic effects seen

3    in patients treated with TKIs.  I find the

4    whole thing a little confusing because,

5    obviously, patients with -- treated with TKIs

6    have suppression of their CML, but we don't

7    know what happens to these mutations.  There's

8    no indication these mutations are actually in

9    the CML cells.  Older patients can have these

10   mutations and older patients can have CML; and

11   I don't think we have enough information to --

12   to fully adjudicate that.

13        Q.   Well, your position is that C --

14   CHIP has nothing to do with CML.  I would say

15   that Dr. Valent seems to think otherwise;

16   correct?

17            MS. SPICER:  Object to form,

18        misstates his testimony.

19            THE WITNESS:  I -- I don't know what

20        Dr. Valent has to say about this.  I can

21        only tell you what my opinion was from the

22        review of the article cited by Dr. Giles in

23        his report, which I do not believe supports

24        the statement that he made, and I explained

25        my reasons for it in my report.  I can read

1            MARK A. WEISS, M.D.

2        them to you again if you want.

3    BY MR. JOHNSTON:

4        Q.   No, I don't want you to do that.

5    I want you to deal with the fact that

6    Dr. Valent thinks that CHIP has something to

7    do with CML.

8        A.   That's not a fact.  I -- I

9    really --

10       Q.   That's not a fact.  I agree with

11   you.

12            (Reporter clarification.)

13       Q.   It's a hypothesis.  It's a

14   hypothesis.  I agree with you.  It's a

15   hypothesis.

16            But Dr. Valent has a hypothesis

17   that CH somehow is involved in CML, doesn't

18   he?

19       A.   (No reply.)

20            MS. SPICER:  Object to form,

21       argumentative, misstates the testimony.

22            THE VIDEOGRAPHER:  We are now going

23       off the video record.  That concludes DVD

24       Number 3.  The time is 16:08.

25            (A recess is held from 4:08 p.m. to

Page 290

1          MARK A. WEISS, M.D.

2       4:15 p.m.)

3           (Exhibit Weiss-20, article entitled

4       Long-term benefits and risks of frontline

5       nilotinib vs imatinib for chronic myeloid

6       leukemia in chronic phase: 5-year update of

7       the randomized ENESTnd trial, is marked for

8       identification.)

9           THE VIDEOGRAPHER:  We are now back

10      on the video record.  This commences

11      DVD Number 4, April 24th, 2018.  The time

12      16:15.

13  BY MR. JOHNSTON:

14       Q.   Hand you what's been marked as

15  Exhibit 20, which is the Hochhaus paper from

16  2016 on the ENESTnd five-year update.

17          You cited this paper in your

18  expert report; correct?

19       A.   That is --

20          MS. SPICER:  Sorry.  Do you have

21      a -- do you have a copy for me?

22          MR. JOHNSTON:  I thought I gave you

23      one, but I do.

24          MS. SPICER:  I don't think so.

25      There we go.  Thank you.

1                    MARK A. WEISS, M.D.

2      BY MR. JOHNSTON:

3           Q.    I'm only going to ask a few

4      questions on this.   Look at Table 1, please.

5           A.    I got it.

6           Q.    The first thing in Table 1 is

7      "Progression to AP/BC"; correct?

8           A.    Yes.

9           Q.    And both nilotinib 300 milligrams

10     and nilotinib 400 milligrams were

11     statistically significantly better than

12     imatinib 400 milligrams with respect to the

13     statistic progression to AP/BC; correct?

14          A.    They generated P values.   Again,

15     this was not -- I don't believe this was the

16     primary endpoint of the study.   I think the

17     primary endpoint was major molecular response.

18     So they did generate P values and the P values

19     would fall below what we consider the usual

20     level of significance, which is .05.

21          Q.    Which means they were

22     statistically significantly better, correct,

23     on this dataset?

24          A.    I'm sorry.   Again, the question of

25     whether something's statistically significant

Page 292

1              MARK A. WEISS, M.D.

2   when it's not the primary endpoint of a

3   randomized trial is more complicated --

4          Q.   Well --

5          A.   -- and --

6          Q.   -- you don't know what the power

7   of this trial was, do you?

8          A.   No, I don't.

9          Q.   So you don't know whether there

10  was adequate power for these statistics in

11  Table 1 or not, do you?

12         A.   I do not know.

13         Q.   All right.  But you agree with me

14  that as presented in this table, that

15  nilotinib 300 milligrams twice daily and

16  nilotinib 400 milligrams twice daily were

17  statistically significantly better with

18  respect to progression to AP/BC than

19  imatinib 400 milligrams once daily; correct?

20         A.   No, that's not correct.

21         Q.   That's not what --

22         A.   You keep repeating the same thing,

23  but I -- I thought I clarified it before.

24         Q.   No, you didn't.

25         A.   I'm sorry.  I'll try again.

1          MARK A. WEISS, M.D.

2          That -- why don't you give me a

3    minute and I'll read the statistic section of

4    this paper and see if it gives me an answer to

5    this.

6          Q.   No, I don't -- I'm sorry.

7          I want to know does this paper,

8    Table 1, reflect a statistically significant

9    result under nilotinib 300 milligrams 99.3

10   with a range of 98.2 to 100, that that is a

11   statistically significantly superior outcome

12   to imatinib 400, 95.2 ranging from 92.6 to

13   97.9.  Is that what this table says?

14          MS. SPICER:  Object to form, asked

15       and answered, argumentative, badgering the

16       witness, raising your tone at the witness.

17       Let's calm down and let him -- you already

18       asked him.  Asked and answered.

19   BY MR. JOHNSTON:

20          Q.   Is that what this table says?

21          MS. SPICER:  Same objections.

22   BY MR. JOHNSTON:

23          Q.   Does the table say it's

24   statistically significant?

25          MS. SPICER:  Same objections.

Page 294

1              MARK A. WEISS, M.D.

2    BY MR. JOHNSTON:

3         Q.    Let's start there, then you can go

4    look at whatever you want.

5              But do you agree that the table

6    says it's statistically significantly better?

7              MS. SPICER:  Objection, asked and

8         answered.

9              THE WITNESS:  I stated what the

10        table says.  There is not a statement here

11        on the table that says it's statistically

12        sig -- it's significantly better.

13             Clearly, they generated P values,

14        which are below the level of what's usually

15        viewed as statistical significance, but

16        whether or not these results, though they

17        certainly look better than imatinib,

18        I'll -- I don't have any question about

19        that.  But whether or not in a very

20        rigorous and technical sense they are

21        statistically significant cannot be

22        discerned just by looking at these --

23   BY MR. JOHNSTON:

24        Q.    They report a --

25        A.    -- this line.

Page 295

1          MARK A. WEISS, M.D.

2               MS. SPICER:  Let him finish his

3          answer.

4     BY MR. JOHNSTON:

5          Q.    They report a statistically

6     significant P value according to the table for

7     each of those numbers; correct?

8               MS. SPICER:  Object to form, asked

9          and answered.

10              THE WITNESS:  I -- I already

11         answered this question.

12    BY MR. JOHNSTON:

13         Q.    No, you didn't.

14         A.    Yes, I did.

15         Q.    You dissembled.  The table says --

16         A.    I said what --

17         Q.    -- ".0059" --

18              (Reporter clarification.)

19         Q.    The table nilotinib 300, P versus

20    imatinib .0059.

21              (Reporter clarification.)

22         Q.    Nilotinib 300 progression to

23    AP/BC, the figure for p versus imatinib is

24    .0059; correct?

25         A.    Yes.

1          MARK A. WEISS, M.D.

2          Q.    That is considered to be a

3    statistically significant result,

4    statistically significant result; correct?

5               MS. SPICER:   Object.

6               THE WITNESS:   It depends on the

7         context.

8    BY MR. JOHNSTON:

9          Q.    So every paper that is addressing

10   anything other than the primary endpoint is

11   meaningless in your opinion; correct?

12         A.    No, that misrepresents what I

13   said.  I did not say "meaningless."  I said

14   that for the statistic to be accurate and for

15   it to display what it's said to display, it

16   has to follow certain ground rules.  I mean,

17   you can look right here that they assessed,

18   what, you know, one, two, three, four, five,

19   six -- seven things.  The more things you

20   evaluate, the more likely you can generate a

21   P value that's considered statistically

22   significant, but it's by random chance because

23   you're sampling the data and not adjusting for

24   it.  And you're right, most papers don't take

25   that into account and it's a big flaw in how a

1                MARK A. WEISS, M.D.

2      lot of research is interpreted.

3           Q.   I'm guessing your papers don't

4      always take that into account either?

5           A.   They probably don't.

6           Q.   So you're basically saying this

7      table means nothing; correct?

8                MS. SPICER:  Object to form,

9           misstates his testimony, argumentative.

10               THE WITNESS:  Again, I --

11     BY MR. JOHNSTON:

12          Q.   All I want to know, all I want to

13     know, the only question I'm asking you is

14     whether or not what's written on the page

15     purports to say that it's a statistically

16     significant result.

17               You can caveat that right now

18     globally, "I don't know the design.  I don't

19     know the power."  But what I'm asking you is

20     the authors have portrayed that there is

21     statistically significantly better progression

22     to AP value for nilotinib 300 over

23     imatinib 400; correct?

24          A.   That I can agree with.

25          Q.   Okay.  And the --

Page 298

1           MARK A. WEISS, M.D.

2           A.   That's what the authors portrayed

3      here.

4           Q.   And the authors portray that for

5      nilotinib 400 milligrams twice daily, that

6      there is a statistically significantly better

7      result on nilotinib 400 versus imatinib 400,

8      correct, that's what the authors portray?

9           A.   I'm sorry.  Say that again.

10          Q.   The authors portray that there is

11     a statistically significantly better result

12     for progression to AP/BC for nilotinib

13     400 milligrams compared to imatinib

14     400 milligrams; correct?

15              MS. SPICER:  Object to form.

16              THE WITNESS:  Yes, that's the way

17         the authors have portrayed it.

18     BY MR. JOHNSTON:

19          Q.   All right.  Next line "Progression

20     to AP" -- "Progression to AP/BC on study, n."

21     The authors portray that both nilotinib

22     300 milligrams twice daily and nilotinib

23     400 milligrams twice daily are statistically

24     significantly superior to imatinib

25     400 milligrams once daily; correct?

1          MARK A. WEISS, M.D.

2      A.   That's what they portray, yes.

3      Q.   Okay.  EFS, the authors portray

4  that both nilotinib 300 milligrams twice daily

5  and nilotinib 400 milligrams twice daily are

6  statistically significantly better than

7  imatinib 400 milligrams; correct?

8      A.   I'm sorry.  Can you repeat that?

9      Q.   EFS --

10     A.   Yes.

11     Q.   -- the authors portray that

12  nilotinib 300 milligrams and nilotinib

13  400 milligrams are both statistically

14  significantly better than imatinib 400

15  milligrams once a day.

16     A.   No, that's not what this says.

17     Q.   Okay.

18     A.   The authors have not portrayed it

19  that way for this finding.

20     Q.   All right.  So the one they don't

21  portray it that way for is nilotinib

22  300 milligrams; correct?

23     A.   Correct.

24     Q.   But they do portray that nilotinib

25  400 millions is statistically significantly

1              MARK A. WEISS, M.D.

2    better than imatinib 400 milligrams for EFS;

3    correct?

4         A.    Yes, I agree with that statement.

5         Q.    The authors also portray for PFS

6    that nilotinib 400 milligrams twice daily is

7    statistically significantly better than

8    imatinib 400 milligrams; correct?

9         A.    Yes.

10        Q.    For PFS events on study, n, the

11   authors portray in this table that nilotinib

12   400 milligrams twice daily is statistically

13   significantly better than imatinib

14   400 milligrams once a day; correct?

15        A.    Correct.

16        Q.    And for overall survival, the

17   authors portray that nilotinib 400 milligrams

18   twice daily is statistically significantly

19   better than imatinib 400 milligrams once

20   daily; correct?

21        A.    Yes.

22        Q.    And --

23        A.    These results were always of

24   concern to me because I think, as you've very

25   eloquently pointed out, that for most of these

1               MARK A. WEISS, M.D.

2    endpoints the P value that's generated only is

3    less than .05 for the nilotinib 400 milligram

4    group and yet the recommendation is to take

5    the nilotinib at 300 milligrams twice daily,

6    which doesn't have a favorable P statistic for

7    most of these things, and that's the dose that

8    the FDA recommends and the dose that's

9    approved.  So I've always found that unusual.

10               MR. JOHNSTON:  I move to strike

11          everything as non-responsive other than the

12          agreement that there's a statistically

13          significant OS for nilotinib 400.  There

14          was no question pending that called for

15          that, and we'll ask the Judge to exclude

16          that testimony at trial.

17    BY MR. JOHNSTON:

18          Q.   Now, turning to Table 5 or

19    Figure 5, and I actually have a blow-up

20    somewhere of Figure 5.

21               (Exhibit Weiss-21, one-page blow-up

22          of Figure 5, is marked for identification.)

23    BY MR. JOHNSTON:

24          Q.   I've handed you --

25               MS. SPICER:  Are you going to

Page 302

1              MARK A. WEISS, M.D.

2         mark this as a new exhibit then --

3              MR. JOHNSTON:  Yes.

4              MS. SPICER:  -- or --

5              Okay.  What number are we on?

6              THE WITNESS:  I've got 21 on mine.

7              MS. SPICER:  21.

8              MR. JOHNSTON:  Exhibit 21.

9   BY MR. JOHNSTON:

10       Q.   This is a blow-up, Figure 5 in the

11  PDF for the study is a vector file, so this is

12  actually a blow-up of Figure 5, not a

13  recreation of Figure 5, so it is actually the

14  same graphic, just made larger.

15       A.   Okay.

16              MS. SPICER:  I'm going to object.  I

17         mean, this is not anything unique to this

18         particular case.  He was asked about this

19         very same article in his prior deposition.

20              MR. JOHNSTON:  Don't worry.  I'll

21         ask some questions about this case about

22         this.

23              MS. SPICER:  Well...

24  BY MR. JOHNSTON:

25       Q.   Are there any cerebro -- which --

1            MARK A. WEISS, M.D.

2   which of these on this chart are

3   cerebrovascular events?

4        A.   I'm not sure they're separated out

5   like that.

6        Q.   So this chart doesn't show

7   anything about the narrow question of

8   cerebrovascular events; correct?

9        A.   It appears to me that they lump

10  all these events together as cardiovascular

11  events, CVE.

12       Q.   This table's not drawn to scale,

13  is it?

14            MS. SPICER:   Object to form.

15  BY MR. JOHNSTON:

16       Q.   The -- the Y axis is a percentage.

17  The top of the percentage is 30 percent.

18  Isn't the top of the percentage actually

19  100 percent?

20       A.   Yes, but this scale within what

21  they show -- I mean, in other words, from

22  0 to 10, 10 to 20, and 20 to 30, it looks

23  symmetric, so...

24       Q.   Right.  So if you extended this up

25  to 100 and then squashed it down to fit in the

Page 304

1          MARK A. WEISS, M.D.

2    space they had, these lines would all be on

3    top of each other, wouldn't they?

4          A.   They -- they would appear closer

5    together, but the lines would be the lines.

6          Q.   And by doing it this way, it

7    emphasizes the difference between these lines,

8    doesn't it?

9          A.   Yes, it does.

10         Q.   There's no basis based on this

11   chart to say these lines show a statistically

12   significant difference between the three arms

13   of the study, is there?

14         MS. SPICER:  I'm going to object to

15       this whole line of questioning, Robert.  He

16       was asked about the same -- the exact same

17       document at his prior deposition.  You've

18       been instructed not to ask --

19         MR. JOHNSTON:  That's not true.

20         MS. SPICER:  -- redundant questions

21       or -- and you're supposed to only be -- ask

22       questions unique to this case.

23         MR. JOHNSTON:  That's not true.

24         MS. SPICER:  This -- yes --

25         MR. JOHNSTON:  That's not true.

1        MARK A. WEISS, M.D.

2        MS. SPICER:  -- it is true.

3        MR. JOHNSTON:  I was not in --

4        (Reporter clarification.)

5        MR. JOHNSTON:  I was not instructed

6   to do --

7        MS. SPICER:  Stop inter --

8        MR. JOHNSTON:  -- anything.  I was

9   not instructed to do anything, Counsel.

10  The Order just says --

11        MS. SPICER:  The Order reads --

12        MR. JOHNSTON:  -- that she expects

13  that I will do it correctly, and I am doing

14  it correctly, Counsel.

15        MS. SPICER:  I'll -- I'll read the

16  Order.

17        MR. JOHNSTON:  You can call the

18  Judge or not.

19        MS. SPICER:  I'll read --

20        MR. JOHNSTON:  Let's answer my

21  question.

22        MS. SPICER:  Excuse me.  I'm going

23  to read the Order for the record.

24        MR. JOHNSTON:  Okay.  You're not

25  making your flight.

Page 306

1      MARK A. WEISS, M.D.

2        MS. SPICER:  Well, I'm going to make

3    my flight --

4        MR. JOHNSTON:  No, you're not.

5        MS. SPICER:  -- because right now

6    you're violating -- you've had -- you've

7    been asking this witness questions --

8        MR. JOHNSTON:  That's just not true.

9    That's not true.

10        MS. SPICER:  -- for -- for several

11    hours.

12        MR. JOHNSTON:  That's just not true.

13    You're -- it's just not true.

14        MS. SPICER:  There's an Order.

15    "Defendants have an obligation to spare the

16    Plaintiffs and the expert witnesses the

17    expense and burden of using the depositions

18    for redundant purposes.  This means

19    Defendants have an obligation to limit the

20    depositions to what is needed for this case

21    to areas of inquiry unique to this case."

22        You're asking about an exhibit that

23    was already asked about in his prior

24    deposition.  There's not -- nothing unique

25    to his opinions offered in this case.

1          MARK A. WEISS, M.D.

2          I have a flight to catch.  You

3     wanted to start this deposition at 10:30,

4     you said you'd be done three hours ago, and

5     now you're asking questions about something

6     that is not unique to this case and is not

7     unique to his opinions specific to this

8     case.

9          MR. JOHNSTON:  I -- I -- it is --

10         MS. SPICER:  So stop wasting the

11    time -- the witness's time, my time, and

12    let me catch my flight.

13         MR. JOHNSTON:  Okay.  Call the Judge

14    or be quiet.

15         MS. SPICER:  I will if you don't

16    stop asking questions about this.

17         MR. JOHNSTON:  I'm going to keep

18    asking questions about this exhibit.  So

19    you can call the Judge.

20    BY MR. JOHNSTON:

21         Q.   Sir, these lines are not

22    statistically powered for statistical

23    significance between the three arms, are they?

24         A.   I really don't know.

25         Q.   You have no reason to think they

1          MARK A. WEISS, M.D.

2    are based on the article, do you, which is

3    also there in front of you?

4          A.   Right, but there's a more

5    fundamental problem with this, is that the

6    study was not designed to look for

7    cardiovascular events.  So commenting on them,

8    I'm not fully sure I -- I know exactly what it

9    means.

10         Q.   Have you ever used a Kaplan-Meier

11   to show -- chart to show time-to-event

12   analysis in a study you've done before for --

13         A.   I have used Kaplan-Meier

14   analysis --

15         Q.   -- for adverse reactions?

16              (Reporter clarification.)

17         Q.   Have you ever used a Kaplan-Meier

18   graph to show time-to-event for adverse

19   reactions in a study?

20         A.   I honestly don't remember if I've

21   ever used it or not.

22         Q.   The title for Figure 5 is

23   "Kaplan-Meier Estimated Time to First

24   Cardiovascular Event on Study."

25              Does that show the time to event

1              MARK A. WEISS, M.D.

2    for cardio -- first cardiovascular events in

3    this Kaplan-Meier chart?

4              MS. SPICER:  Object to form.

5         Explain for the record and the Court since

6         it's after hours anyway, how this is unique

7         to his opinions in this case.

8              MR. JOHNSTON:  I don't have to

9         explain anything to you, Counsel.

10             MS. SPICER:  Yes, you -- you're

11        going to have to explain it to the Judge,

12        so --

13             MR. JOHNSTON:  I'll explain it to

14        the Judge.  I'm not explaining anything to

15        you because you're wasting time now.  This

16        is going to go longer and longer --

17             MS. SPICER:  I'm not wasting --

18             MR. JOHNSTON:  -- and you're going

19        to miss your flight.

20             MS. SPICER:  You're asking --

21   BY MR. JOHNSTON:

22        Q.   What do the dashes on this

23   chart --

24             MS. SPICER:  How is this --

25   BY MR. JOHNSTON:

```
 1              MARK A. WEISS, M.D.

 2         Q.    -- represent?

 3              MS. SPICER:  -- unique to his

 4         opinions in this case?

 5    BY MR. JOHNSTON:

 6         Q.    How are -- how are the --

 7              MS. SPICER:  No, don't answer it.

 8              (Instruction.)

 9              MR. JOHNSTON:  Are you instructing

10         him not to answer?

11              MS. SPICER:  I'm asking you a

12         question.  How is this --

13              MR. JOHNSTON:  I'm not answering

14         your question.  I'm not here to answer

15         questions for you.

16              MS. SPICER:  You're here to abide by

17         the Court's Order.

18              MR. JOHNSTON:  I am abiding by the

19         Court's Order.

20    BY MR. JOHNSTON:

21         Q.    What are the dashes on this chart?

22              MS. SPICER:  Okay.  We're going to

23         go --

24              (Reporter clarification.)

25              MS. SPICER:  We're going to go off
```

1          MARK A. WEISS, M.D.

2     the record for a second.

3          MR. JOHNSTON:  Are you leaving?  Are

4     you instructing the witness --

5          MS. SPICER:  I'm leaving for a

6     second.

7          Can we go off the record?

8          MR. JOHNSTON:  Where are you going?

9     You're taking a break or are we leaving --

10    is he leaving now?

11         MS. SPICER:  I'm going -- I mean,

12    I'm going to figure out if we can get ahold

13    of the Court because this is -- this is --

14    you are wasting all of our time.

15         MR. JOHNSTON:  No, you -- you have

16    wasted all my time today.

17         So I've asked him already about

18    where cardiovascular events on this chart,

19    so I've already brought it home to this

20    case.

21         MS. SPICER:  That's -- that's

22    nothing unique to this case, Rob.

23         MR. JOHNSTON:  It is unique to this

24    case.

25         MS. SPICER:  No, it isn't.

1        MARK A. WEISS, M.D.

2        MR. JOHNSTON:  This is a stroke

3   case.

4        MS. SPICER:  And so was --

5        MR. JOHNSTON:  No, the other one's

6   not.  The other one's not a stroke case.

7        MS. SPICER:  So was Lauris.

8        MR. JOHNSTON:  Nope.  Lauris is a

9   PAOD case.

10        MS. SPICER:  He was a stroke case

11   and he was --

12        MR. JOHNSTON:  He was not.  He was a

13   stroke only after the surgeon caused the

14   stroke.

15        MS. SPICER:  He specifically --

16        (Reporter clarification.)

17        THE WITNESS:  We're not on the

18   record.

19        MS. SPICER:  We're not on the

20   record.

21        MR. JOHNSTON:  She is on the record.

22   No one told her to go off.

23        COURT REPORTER:  Excuse me.  This is

24   the court reporter.  We haven't gone off

25   the record and I cannot hear what everyone

Page 313

1              MARK A. WEISS, M.D.

2         is saying.

3                   THE WITNESS:  Oh, excuse me.

4                   MS. SPICER:  I'm sorry.  I -- we

5         said to go off the record.

6                   COURT REPORTER:  Everyone has --

7                   MR. JOHNSTON:  No one did.

8                   COURT REPORTER:  All counsel in the

9         room have to agree to go off the record

10        before I can go off the record.

11                  MR. JOHNSTON:  I'm fine going off

12        the record.

13                  MS. SPICER:  Thank you.

14                  THE VIDEOGRAPHER:  Off the record.

15        The time is 16:32.

16                  (Recess taken from 4:32 p.m. to

17        4:37 p.m.)

18                  THE VIDEOGRAPHER:  Back on 16:37.

19   BY MR. JOHNSTON:

20        Q.   One question on this and then I'll

21   move on.

22             Do you have any idea what the

23   lines are, the vertical lines?

24        A.   Well, yes, they're labeled right

25   here.  In fact, that these are censored

1                MARK A. WEISS, M.D.

2    observations.  And my understanding of a

3    censored observation is that that's an

4    indication of the time that an event occurred.

5            Q.   Is it when an event occurred or

6    when somebody fell out of the study either

7    because they had their first event or because

8    they were lost to follow-up or because they

9    quit or something like that?

10               Do you know?

11               MS. SPICER:  Object to form.

12               THE WITNESS:  I think -- I think in

13        this case, this -- I don't -- yes, this --

14        this may represent when patients came off

15        study in these different arms.

16               (Pause.)

17               MR. JOHNSTON:  So mark the next one.

18               We're done with that now.  Thank

19        you.

20               (Exhibit Weiss-22, article entitled

21        Nilotinib (formerly AMN1070), a highly

22        selective BCR-ABL tyrosine kinase

23        inhibitor, is effective in patients with

24        Philadelphia chromosome-positive chronic

25        myelogenous leukemia in chronic phase

1           MARK A. WEISS, M.D.

2      following imatinib resistance and

3      intolerance, is marked for identification.)

4           (Pause.)

5           MS. SPICER:  Do you have a copy for

6      me?

7           MR. JOHNSTON:  I do.

8           MS. SPICER:  Thank you.

9           MR. JOHNSTON:  Okay.  That's

10     Exhibit 20, 21?

11          MS. SPICER:  22.

12          MR. JOHNSTON:  22.

13          MS. SPICER:  I believe.  Is that

14     right?

15  BY MR. JOHNSTON:

16      Q.   I'm trying to -- I'm going to try

17  to go through a number of articles very

18  quickly.  I only have a couple of questions

19  about each one, and they're not going to

20  require a lot of reading.

21          This is a article from

22  Dr. Kantarjian in 2007.  Do you know if you've

23  ever looked at this article before?

24      A.   Yes, I'm fairly confident that

25  I've looked at this before.

Page 316

1           MARK A. WEISS, M.D.

2       Q.   All right.  So this was published

3   in 2007.  If you look on Page 3544, you see it

4   says, "A total of four deaths occurred in the

5   study, or within 28 days of discontinuing

6   nilotinib; one patient had a myocardial

7   infarction, another died of coronary artery

8   disease, and two patients died of sepsis."

9       A.   I see that.

10      Q.   So as of 2007 there was

11  information that patients on this study had

12  had myocardial infarctions and coronary artery

13  disease in the public literature; correct?

14      A.   You're right.  And best of my

15  recollection, I did not remark on -- on this

16  in -- in this context, but you're right, it's

17  there.

18           (Exhibit Weiss-23, article entitled

19       Cardiac Safety Profile of Imatinib and

20       Nilotinib In Patients (pts) with Newly

21       Diagnosed Chronic Myeloid Leukemia In

22       Chronic Phase (CML-CP): Results From

23       ENESTnd, is marked for identification.)

24           THE WITNESS:  Thank you.

25  BY MR. JOHNSTON:

1           MARK A. WEISS, M.D.

2      Q.   This is a -- 23, abstract from

3  ASH; correct?

4      A.   Abstract 2291.

5      Q.   Presented in ASH in 2010 by

6  Richard Larson; correct?

7      A.   Yes.

8      Q.   And it's "Cardiac Safety Profile

9  of Imatinib and Nilotinib in Patients With

10  Newly Diagnosed Chronic Myeloid Leukemia in

11  Chronic Phase"; correct?

12      A.   That's what it says.

13      Q.   And if you turn to the second page

14  of this print under "Results," you'll see

15  there's a bolded table about halfway down the

16  page on the left towards the left margin, any

17  arm table?

18      A.   I'm not -- I'm not on this --

19      Q.   Oh, you have a different copy.

20      MS. SPICER:  Yeah, we're --

21      THE WITNESS:  I think I'm paginated

22    differently than you are.

23      MS. SPICER:  We don't have a table

24    in this.

25  BY MR. JOHNSTON:

Page 318

MARK A. WEISS, M.D.

1

2     Q.   I don't think I have a table in

3   my -- oh, I do have a table in mine.  All

4   right.

5          Well, there's a LVEF change with a

6   greater than 15 percent.

7          MS. SPICER:  How far are you in

8      that?

9          MR. JOHNSTON:  Let me see yours --

10          MS. SPICER:  Yeah.  Here.

11          MR. JOHNSTON:  -- if you don't mind.

12          So on what's the third page in the

13      one you're looking at, and as soon as I

14      figure out where it is, I'll hand it back

15      to you.

16          MS. SPICER:  Uh-huh.

17   BY MR. JOHNSTON:

18      Q.   You see there's about -- exactly

19   halfway down the page, there's a sentence that

20   says, "Prolongation or LVEF change," and then

21   it says, "An analysis"?

22      A.   Uh-huh.

23      Q.   Okay.  [As read]: "An analysis of

24   grouped adverse event terms was performed to

25   identify cases consistent with ischemic heart

1          MARK A. WEISS, M.D.

2    disease or left ventricular dysfunction.  A

3    total of 11 patients in all treatment arms

4    experienced IHD events after median treatment

5    duration of 18 months:  Three on the

6    nilotinib 300, six on nilotinib 400, two on

7    imatinib."

8              You see that?

9        A.   Yes, I do see that.

10        Q.   So in an ASH abstract presented in

11    2010, there were reports of ischemic heart

12    disease cases in the ENESTnd trial, correct,

13    according to this document?

14        A.   There were reports, but the

15    numbers are so small that it's hard -- it's

16    hard to know if -- I mean, I don't think you

17    can draw conclusions from this, particularly

18    presented as an abstract.

19              But, yes, as I'm -- as you're

20    showing me these things, I find that there

21    were slivers of information that were not

22    well-publicized that was linking nilotinib to

23    ardio -- arteriosclerotic occlusive disease.

24        Q.   Well, ASH is the American Society

25    of Hematologists; correct?

1                MARK A. WEISS, M.D.

2        A.    Yes.

3        Q.    And these abstracts were presented

4   at the annual meeting of the American Society

5   of Hematology; correct?

6        A.    Yes, and --

7        Q.    This one was.

8        A.    -- this abstract indicates there's

9   at least 2,291 such abstracts, so I defy

10  anybody to have seen all of them.

11       Q.    Okay.

12            MR. JOHNSTON:  Let's mark this one

13       24.

14            Did I give you a copy?

15            MS. SPICER:  Yes.  Thanks.

16            (Exhibit Weiss-24, American Society

17       of Hematology Abstract 3430 Efficacy and

18       Safety of Nilotinib In Chronic Phase (CP)

19       Chronic Myeloid Leukemia (CML) Patients

20       (Pts) with Type 2 Diabetes In the ENESTnd

21       Trial, is marked for identification.)

22  BY MR. JOHNSTON:

23       Q.    This is Abstract 3430 from

24  December 6, 2010 from the 53rd ASH meeting;

25  correct?

```
                    MARK A. WEISS, M.D.
1
2         A.    2010, 53rd ASH meeting, yes.
3         Q.    Okay.  And this is a abstract by
4    Guiseppe Saglio.  Do you know him?
5         A.    No, I don't.
6         Q.    Okay.  If you look at -- in the
7    list of authors, you see a name Neil
8    Gallagher?  Next to the --
9         A.    I see it.
10        Q.    -- mark for Foot -- so if you look
11   at Footnote 11, it says, "Novartis Pharma AG
12   Basel, Switzerland."
13             Do you see that?
14        A.    Yes, I do.
15        Q.    And then for Marcia Kayla --
16   Kayath, the next one on the list, you see
17   that?
18        A.    Kayath, yes.
19        Q.    Number 12 says, "Novartis
20   Pharmaceuticals Corporation, East Hanover, New
21   Jersey"?
22        A.    I do see that.
23        Q.    And that's actually related to
24   Ming Zheng.  I'm sorry.  I misspoke.
25             MS. SPICER:  No, it's both.
```

1    MARK A. WEISS, M.D.

2    MR. JOHNSTON:  Oh, both of them.

3  Thank you.

4 BY MR. JOHNSTON:

5    Q.   So this was co-authored by

6 employees of Novartis; correct?

7    A.   Yes, it was.

8    Q.   Okay.  And if you look on the back

9 of the second page of this document, it's --

10 the first sentence that starts on that page

11 starts, "One diabetic patient."

12    Do you see that?

13    A.   Um...

14    Q.   Very top of the page.

15    A.   Yes, I do see it.

16    Q.   "One diabetic patient in each of

17 the nilotinib arms experienced an ischemic

18 heart disease event (Grade 1 or 2).  Two

19 diabetic patients died, one due to intestinal

20 obstruction and one due to suicide, both in

21 the nilotinib 300 milligram arm.

22    "Conclusions.  Hyperglycemia

23 occurring during nilotinib treatment was

24 usually mild, transient, manageable and did

25 not lead to treatment discontinuation in

1          MARK A. WEISS, M.D.

2   patients with or without pre-existing Type 2

3   diabetes."

4          So these -- this report talked

5   about diabetes occurring in patients on the

6   nilotinib trial; correct?

7          A.   From the limited amount that I've

8   seen, yeah, it speaks to glucose levels in

9   patients.  Excuse me.  I'm sorry.

10          Q.   And that was presented at the ASH

11   meeting in 2010; correct?

12              MS. SPICER:  Object to form.

13              THE WITNESS:  Yes, it was.

14              (Exhibit Weiss-25, article entitled

15          Nilotinib Versus Imatinib for Newly

16          Diagnosed Chronic Myeloid Leukemia, is

17          marked for identification.)

18   BY MR. JOHNSTON:

19          Q.   You've been handed the exhibit

20   marked as Exhibit 25, a article from June

21   17th, 2010 edition of the New England Journal

22   of Medicine by, again, Dr. Saglio, titled

23   "Nilotinib Versus Imatinib for Newly Diagnosed

24   Chronic Myeloid Leukemia"; correct?

25          A.   Correct.

MARK A. WEISS, M.D.

1

2    Q.   If you look on Page 2256, sentence

3  just above the "Discussion" header, it says,

4  "A total of 11 patients in all three study

5  groups combined had an ischemic heart disease

6  event, with only one event resulting in

7  treatment discontinuation."

8        Do you see that?

9    A.   I do.

10    Q.   So in the New England Journal of

11  Medicine in June of 2010, Novartis reported

12  that 11 patients had ischemic heart disease

13  events in the ENESTnd trial; correct?

14    A.   That's what it says here.

15    Q.   None of these articles we've

16  looked at so far, starting with the article in

17  2007, have addressed any cerebrovascular

18  events, have they?

19        MS. SPICER:  Object to form.

20        THE WITNESS:  I would have to make a

21     more thorough review of these papers.  You,

22     obviously, pointed me to specific sections.

23  BY MR. JOHNSTON:

24    Q.   All right.  Well --

25    A.   And I agree with what you read out

1            MARK A. WEISS, M.D.

2    of those sections, but I would actually have

3    to look.  As they say, the devil's in the

4    detail.

5            Q.   Well, we're going to have to do

6    that then, so we'll go back to those after we

7    finish these.

8            MR. JOHNSTON:  This is 26.

9            (Exhibit Weiss-26, article entitled

10         Progressive peripheral arterial occlusive

11         disease and other vascular events during

12         nilotinib therapy in CML by Karl

13         Aichberger, is marked for identification.)

14            THE WITNESS:  Thank you.

15    BY MR. JOHNSTON:

16            Q.   This is an article published 2011,

17    author Karl Aichberger.  You've seen this

18    document before, haven't you?

19            A.   Yes, I have.

20            Q.   And this is one you cite in your

21    expert report.

22            A.   Yes, it is.

23            Q.   And are there any -- and this is

24    the article that I believe you referred to

25    as -- earlier as sort of the first reports

1              MARK A. WEISS, M.D.

2    of -- of atherosclerotic events in

3    nilotinib-treated patients; correct?

4         A.   That's my view of it, yes.

5         Q.   Okay.

6         A.   I mean, you've pointed out that

7    there are reports earlier, but this -- this

8    one could focus attention on it in a way I

9    think the other ones couldn't.

10        Q.   Are there any cerebrovascular

11   events addressed in the Aichberger

12   publication?

13        A.   My memory is that there were three

14   cases of aggressive peripheral arterial

15   occlusive disease and one case of a spinal

16   cord infarct in this paper.

17        Q.   So there were no cases that you're

18   aware of of cerebrovascular disease addressed

19   in this paper, correct, that's been marked --

20        A.   I don't remember them.  I'd have

21   to reread each of the four case reports to say

22   that with absolute certainty.

23        Q.   Take your time.

24        A.   All right.

25             MS. SPICER:  Can we just stipulate

1        MARK A. WEISS, M.D.

2    that the articles speak for themselves?  I

3    mean, this is --

4        MR. JOHNSTON:  No.

5        MS. SPICER:  We don't need to --

6    you're really going to have him sit here

7    and read all these articles to confirm that

8    one point that --

9        MR. JOHNSTON:  Correct.

10        MS. SPICER:  That's a complete waste

11    of time and I'm going to --

12        MR. JOHNSTON:  Not a waste of my

13    time.

14        MS. SPICER:  We're going to --

15        MR. JOHNSTON:  It's very important

16    for this case, which is a case about

17    strokes.

18        MS. SPICER:  Okay.  But the articles

19    say what they say.  It's not --

20        MR. JOHNSTON:  All right.  Will you

21    stipulate that none of the articles, and

22    I'll go through the whole stack, mention a

23    cerebrovascular event?

24        MS. SPICER:  No, we'll stipulate

25    that the articles say what they say --

MARK A. WEISS, M.D.

1

2      MR. JOHNSTON:  No, I'm not going to

3  stipulate that.

4      MS. SPICER:  -- because I'm not --

5      MR. JOHNSTON:  No, I need testimony

6  on this.  I need to be able to deal with

7  this.  You don't know how I --

8      MS. SPICER:  Because the article --

9      MR. JOHNSTON:  -- you don't know how

10  I do this at trial, so --

11      MS. SPICER:  Okay.

12      MR. JOHNSTON:  -- I need testimony

13  on this.

14      MS. SPICER:  I -- you apparently

15  don't know how I'm going to do a depo

16  because we're going to leave if you're

17  going to sit here and expect him to read --

18      MR. JOHNSTON:  Well, you can

19  leave --

20      MS. SPICER:  You're going to --

21  you're -- I mean, if you're going to sit

22  here and expect him to read all of these

23  articles to confirm that point for you is a

24  complete waste of this witness's time, it's

25  a waste of my time, it's a waste of

Page 329

MARK A. WEISS, M.D.

1    everybody's time.

2         MR. JOHNSTON:  Well, that's what we

3    do in depositions.

4         MS. SPICER:  And it's not going

5    to -- that's not going to happen --

6         MR. JOHNSTON:  That's what we do in

7    depositions.

8         MS. SPICER:  -- for documents that

9    speak for themselves.

10        MR. JOHNSTON:  You can leave or you

11   can stay.

12        MS. SPICER:  Well, we will if you're

13   going to have him -- I'll let him finish

14   the --

15        MR. JOHNSTON:  We're going to go

16   through this stack right here and we'll be

17   done.

18        MS. SPICER:  It's -- I'm -- I have

19   to leave for the airport in five minutes --

20        MR. JOHNSTON:  It's not my fault.

21        MS. SPICER:  -- Robert.

22        MR. JOHNSTON:  It's not my problem.

23        MS. SPICER:  Yeah, it's your problem

24   because you wanted to start this at 10:30,

1            MARK A. WEISS, M.D.

2       and you're asking questions about a stack

3       of articles that you do -- shouldn't --

4       is -- we --

5            MR. JOHNSTON:  You know what, if

6       you'll stop talking, we can get done.

7            MS. SPICER:  It's completely abusive

8       to this witness --

9            MR. JOHNSTON:  All right.

10           MS. SPICER:  -- to sit here and ask

11      him to read all of these articles when you

12      said we would be done by 5:00.

13           MR. JOHNSTON:  No -- okay.  I'll

14      tell you that none of these mention a

15      cerebrovascular event.  Maybe that will

16      help you.

17           MS. SPICER:  We'll stipulate that

18      the articles say what they say.

19           THE WITNESS:  As I said, I don't

20      remember seeing that when I looked at this,

21      but for me to say with absolute certainty,

22      I don't have the article memorized, I would

23      need to look through it.

24  BY MR. JOHNSTON:

25      Q.   How many -- how many reports in

1              MARK A. WEISS, M.D.

2    the public literature were there of

3    cerebrovascular events by the time that

4    Dr. Walia prescribed Tasigna to Mr. McWilliams

5    in 2011?

6              MS. SPICER:  Object to form.

7              THE WITNESS:  I don't know that I

8         can enumerate them.

9    BY MR. JOHNSTON:

10         Q.   Do you know if there were any?

11         A.   I believe there were, but I -- I

12   can't point to the data right now.

13         Q.   Well, so that's now the problem

14   because I have the documents that we can prove

15   that with, but your counsel is objecting to me

16   asking you questions about them.

17             MS. SPICER:  I'm not objecting to

18        you asking about them.  I'm objecting to

19        you holding up a three-inch stick -- stack

20        of articles and suggesting that he's

21        supposed to read all of them now when it's

22        5:00 in the evening.

23             MR. JOHNSTON:  We haven't gone seven

24        hours yet.

25             MS. SPICER:  Well, he -- you're not

1       MARK A. WEISS, M.D.

2   entitled to those seven hours --

3       MR. JOHNSTON:  Yes, I am.

4       MS. SPICER:  -- with a guy who has

5   already been deposed for seven hours about

6   these issues.

7       MR. JOHNSTON:  First of all, I want

8   to make a record that the Order in this

9   case does not apply to this deposition.

10      MS. SPICER:  It does.  It applies --

11      MR. JOHNSTON:  It does not.

12      MS. SPICER:  -- to expert witnesses.

13      MR. JOHNSTON:  It does not.

14      It applies to two depositions that

15  you raised by motion; and this was not one

16  of the depositions you raised, and that

17  Order does not apply to this deposition.

18      MS. SPICER:  And if you would like

19  to make that argument to the Court --

20      MR. JOHNSTON:  I'll be happy to.

21      MS. SPICER:  -- by all means --

22      MR. JOHNSTON:  I'll be happy to.

23      MS. SPICER:  -- but we're going to

24  leave here so I can catch my flight because

25  this is a waste of time to have him read a

1              MARK A. WEISS, M.D.

2         three-inch stack of articles --

3              MR. JOHNSTON:  Okay.  Look --

4              MS. SPICER:  -- at his deposition.

5              MR. JOHNSTON:  Would you -- I'm

6         going through the stack.  You can either

7         let me go through the stack and maybe make

8         your flight or you can keep talking and not

9         make your flight.  But all of this time

10        that we're now arguing on the record is you

11        obstructing my ability to get testimony

12        from this witness.

13             MS. SPICER:  I --

14   BY MR. JOHNSTON:

15        Q.   Are any of those four a

16   cerebrovascular event, sir?

17             MS. SPICER:  Asked and answered.

18             THE WITNESS:  I have given you my

19        best answer.

20   BY MR. JOHNSTON:

21        Q.   Which is what?

22        A.   Which is I don't remember any of

23   them being cerebrovascular events, but I can't

24   state it with absolute --

25        Q.   No, I'm talking --

Page 334

1              MARK A. WEISS, M.D.

2        A.   -- certainty --

3        Q.   -- those four.

4        A.   -- without reading the case

5   reports.

6        Q.   Well, I just sat here while you

7   read the case reports.

8        A.   I didn't read all four.  I was

9   interrupted.  And I find it difficult to read

10  when people are arguing --

11       Q.   I understand.

12       A.   -- around me.

13       Q.   I understand.

14            (Reporter clarification.)

15       Q.   I didn't interrupt you.  Your

16  coun -- Ms. -- Plaintiffs' counsel interrupted

17  you.

18       A.   I'm not pointing fingers.  I'm

19  just --

20       Q.   So go ahead and finish.

21       A.   -- stating what my issues are.

22            (Reviewing document.)

23            MS. SPICER:  If you would like to go

24       ahead and mark all those for -- as

25       exhibits?

1        MARK A. WEISS, M.D.

2        MR. JOHNSTON:  I -- it seems like

3   I'm going to have plenty of time to do it.

4        MS. SPICER:  I'm sorry?

5        MR. JOHNSTON:  Seems like he's going

6   to have to read them all, so I'm going to

7   have plenty of time to do it.

8        MS. SPICER:  He's not going to read

9   them all.  We're going to leave.  So I'm

10  saying if -- I -- we -- I --

11       MR. JOHNSTON:  Leave.  Then leave.

12       MS. SPICER:  I'm willing to

13  stipulate that they say what they say.

14       MR. JOHNSTON:  No.

15       MS. SPICER:  So is he.  He's -- this

16  isn't a memory test.  This isn't a reading

17  test.  You don't sit and give somebody --

18       MR. JOHNSTON:  This is not a reading

19  test.

20       MS. SPICER:  -- hours worth of

21  materials --

22       MR. JOHNSTON:  This is

23  impeachment --

24       MS. SPICER:  -- to read.

25       MR. JOHNSTON:  -- and I'm

1        MARK A. WEISS, M.D.

2    challenging the validity of his opinions,

3    and I need this for Daubert.

4        (Reporter clarification.)

5        MR. JOHNSTON:  This is impeachment,

6    I'm challenging the credibility, and I need

7    this for Daubert.

8        MS. SPICER:  Okay.  You can mark

9    those as exhibits, and they say what they

10    say.

11        MR. JOHNSTON:  I --

12        MS. SPICER:  We're stipulating to

13    that, but I'm not going to have him sit

14    here for three hours and read all those

15    articles to -- to --

16        MR. JOHNSTON:  Then leave 'cause I'm

17    going to show him all the articles.  So get

18    up and leave right now if that's what

19    you're going to do.

20        MS. SPICER:  Mark the -- the

21    documents as exhibits if you're going to do

22    that and then we will because I'm not going

23    to have him sit here and read every single

24    one of those.  If you would like them

25    marked as exhibits, by all means, go for

Page 337

1          MARK A. WEISS, M.D.

2     it.

3          MR. JOHNSTON:  28.

4          MS. SPICER:  Object.

5          MR. JOHNSTON:  I don't really

6     need --

7          COURT REPORTER:  I'm not on -- I'm

8     not on the -- I'm marking and I can't do

9     both.

10          (Exhibit Weiss-27, article entitled

11     Severe Peripheral Arterial Disease During

12     Nilotinib Therapy, is marked for

13     identification.)

14          (Exhibit Weiss-28, Nilotinib

15     treatment-associated peripheral artery

16     disease and sudden death:  Yet another

17     reason to stick to imatinib as front-line

18     therapy for chronic myelogenous leukemia,

19     is marked for identification.)

20          MR. JOHNSTON:  I don't need them

21     marked as exhibits if you're going to leave

22     once I do it.

23          MS. SPICER:  Okay.  We are not going

24     to sit here and have him read a three-inch

25     stack of articles, Robert.  That --

Page 338

1           MARK A. WEISS, M.D.

2           MR. JOHNSTON:  Yeah, you are.

3           MS. SPICER:  That's -- no, we're

4    not.

5           MR. JOHNSTON:  You are, unless you

6    get up and leave right now.

7           MS. SPICER:  Then you can move the

8    Court to have him come back and read

9    articles.

10          MR. JOHNSTON:  Then stand up and

11   leave right now.

12          MS. SPICER:  I mean, we will then.

13          MR. JOHNSTON:  Okay.

14          MS. SPICER:  I mean, if that's

15   what -- do you want --

16          MR. JOHNSTON:  Stand up and leave.

17   Terminate the deposition.

18          MS. SPICER:  Do you -- you're asking

19   the witness -- to be clear, you're asking

20   the witness to read a three-inch -- it's

21   5:00 in the evening.  You're asking the --

22   the witness to read a three --

23          MR. JOHNSTON:  I haven't been here

24   seven hours --

25          MS. SPICER:  -- to read a three-inch

Page 339

```
 1              MARK A. WEISS, M.D.

 2       stack of articles right now?

 3              MR. JOHNSTON:  Yes.

 4              MS. SPICER:  And confirm what's not

 5       in them?

 6              MR. JOHNSTON:  Correct.

 7              MS. SPICER:  Okay.  That's not --

 8              MR. JOHNSTON:  And -- and I haven't

 9       gotten to seven hours yet and I am trying

10       to be very careful about the use of time

11       here, but between your interruptions and

12       the witness's long answers, it's taking me

13       longer than I wanted it to take.

14              MS. SPICER:  Okay.

15              MR. JOHNSTON:  So I'm sorry about

16       that, and I've apologized to you.  I'm

17       trying to get you out of here.

18  BY MR. JOHNSTON:

19       Q.   But what I have to confirm is that

20  you just told me you think there's some

21  cerebrovascular events in these articles, or

22  you said you -- there might be.  There aren't.

23       A.   I -- I don't --

24       Q.   And so I need to go through them

25  and confirm with you that you don't think
```

1            MARK A. WEISS, M.D.

2    these have any cerebrovascular events in them.

3         A.   Excuse me.  I -- I think you've

4    misrepresented what I said.

5            I don't know what articles are

6    there so I don't know whether there are or

7    there are not.  I'm saying from articles I

8    reviewed, I do believe I saw --

9         Q.   All the -- all the articles you --

10           (Reporter clarification.)

11           MR. JOHNSTON:  He -- he -- he --

12    okay.

13    BY MR. JOHNSTON:

14        Q.   What do you believe you saw, so

15    she can finish the --

16        A.   I believe I saw some evidence of

17    cerebrovascular events.

18        Q.   This concludes all the articles

19    cited in your expert report, this pile.

20           So tell me which articles from

21    your expert report you think involved a

22    cerebrovascular event, and I'll pull that one

23    out and we can establish whether or not that

24    one, in fact, does.

25        A.   I don't have a specific memory of

1          MARK A. WEISS, M.D.

2     which of the many articles that I read or that

3     I've been shown said it.  I'm giving you a

4     gestalt of what I had.

5          Q.   Well, a gestalt doesn't support a

6     opinion about whether or not there should have

7     been a warning on a label, which you offered

8     in your rebuttal report as of 2011.

9               So I need to understand the basis

10     for your opinion that there should have been a

11     warning about cerebrovascular events on the

12     Tasigna label at the time it was prescribed to

13     Mr. McWilliams in 2011.

14          A.   Is that in my report?

15          Q.   Yes, it sure is.

16          A.   Let me read it.  I'm getting

17     distracted.  My ADD must be kicking in.

18          Q.   Response to Giles Opinion 4,

19     Page 5 and 6.

20          A.   Yes, you see this -- I'm not

21     talking about cerebrovascular events here.

22     You can see the -- I'm quoting Dr. Giles now.

23               "It is my opinion that a

24     reasonable oncologist or hematologist treating

25     a patient with pH+ CML should have been aware

1          MARK A. WEISS, M.D.

2     of the possible risk of

3     atherosclerotic-related disease" -- that is

4     not CVE, it's -- that is CVE, it's not CVA,

5     it's not cerebrovascular accidents -- "based

6     on the product label and the available

7     scientific literature."

8               And that's what I'm saying I don't

9     agree with because there was scientific

10    literature indicating atherosclerotic

11    occlusive disease.

12          Q.   I understand that.

13               My question is:   Was there any

14    scientific literature indicating

15    cerebrovascular disease?

16          A.   Again, I have a gestalt that I did

17    see some data.   I cannot regurgitate it for

18    you at this time.

19          Q.   And in the last sentence of your

20    report you write, "I agree that if Novartis

21    had made adequate efforts to warn prescribers

22    in the United States (which I do not believe

23    it did), then a reasonable physician could

24    make an appropriate risk-benefit analysis

25    prior to making the decision on whether to

Page 343

1                MARK A. WEISS, M.D.

2     prescribe nilotinib or an alternative."

3                Sounds to me like that's an

4     opinion that Novartis failed to warn by the

5     time that Dr. Walia prescribed Tasigna to

6     Mr. McWilliams.  Are you telling me that's not

7     what that is?

8                MS. SPICER:  Object to form,

9          argumentative.  You're abusing the witness.

10          It misstates all of his opinions in this

11          case, but...

12                THE WITNESS:  On my review of the

13          labels, I do not believe that Novartis

14          adequately warned prescribers in the

15          United States about the risk of

16          cardiovascular events.

17     BY MR. JOHNSTON:

18          Q.   By when?  When should they have

19     given that warning?

20          A.   I think -- there -- there's an

21     obligation to supply the physician with

22     adequate information to be able to weigh the

23     risks and benefits; and there's an obligation,

24     both from the physician and from, in my mind,

25     the pharmaceutical company, to warn people

1                  MARK A. WEISS, M.D.

2    about common things or even uncommon and rare

3    things if they're extremely dangerous.

4                  So it's hard for me to say the

5    exact time in part because I don't know the

6    timeline that these events were reported to

7    Novartis.  I know when they were reported

8    publicly, but obviously the events happened

9    earlier than the publication date, and I

10   presume many of the patients were on clinical

11   trials.  So those on clinical trials would for

12   sure have been reported to Novartis, at least

13   that would be standard of care for clinical

14   trials work.

15                  And my opinion is -- is once there

16   was a significant concern that this was a

17   possible outcome, a warning should have been

18   given.  Now, that doesn't mean you shouldn't

19   use nilotinib.  It's a warning so that the

20   doctor could do an adequate job of framing the

21   risk-benefit analysis.

22                  If the doctor knows there might be

23   a risk of heart attack or stroke, and, let's

24   say, somebody he knows already has a

25   99 percent occlusion of one of theirs, it may

Page 345

1              MARK A. WEISS, M.D.

2    give him pause.  It doesn't mean he knows for

3    sure at that time, but he can integrate it

4    into a total picture of how you take care of a

5    human being.

6         Q.   When, in your opinion, should

7    Novartis have warned prescribing physicians

8    about the risk of cerebrovascular events

9    associated with the use of nilotinib?

10             MS. SPICER:  Object, asked and

11        answered.

12             THE WITNESS:  I don't believe I have

13        all the information I need to make that

14        determination.

15   BY MR. JOHNSTON:

16        Q.   So you don't have an opinion on

17   when that warning should have been given;

18   correct?

19             MS. SPICER:  Object, form, misstates

20        his answer, misstates his opinions that are

21        clearly laid out in his report.

22             THE WITNESS:  I would need

23        information on when Novartis became aware

24        of some of these events.

25   BY MR. JOHNSTON:

Page 346

1          MARK A. WEISS, M.D.

2          Q.   And you don't have that

3    information, do you?

4          A.   I do not have that information.

5          Q.   Therefore, is it -- you do not

6    intend to offer at trial an opinion regarding

7    when Novartis should have warned prescribers

8    about cerebrovascular events; is that a

9    correct statement?

10             MS. SPICER:  Object to form.  That

11        completely misstates his opinion.

12             MR. JOHNSTON:  I'll re -- I'll

13        rephrase.

14   BY MR. JOHNSTON:

15         Q.   Do you intend to offer at trial an

16   opinion regarding when Novartis needed to have

17   warned physicians about cerebrovascular events

18   associated with nilotinib?

19             MS. SPICER:  He -- same --

20             THE WITNESS:  I don't know -- oh,

21        I'm sorry.

22             MS. SPICER:  Same objections.

23        I'm --

24             THE WITNESS:  I don't know that I

25        can give you a specific date, but I would

1          MARK A. WEISS, M.D.

2          certainly say that as these reports were

3          developing in 2011, sometime in the -- in

4          mid-2011 to 2012 time frame would be

5          appropriate.

6    BY MR. JOHNSTON:

7          Q.   Well, none of these articles from

8    2011 contain reports of cerebrovascular

9    events, so I need to know from you what data

10   are you aware of that establishes that there

11   were reports of cerebrovascular events in

12   2011, in 2012, in 2013, any year.

13          MS. SPICER:  First of all, let's ask

14          him about his opinions in this case and his

15          opinions --

16          MR. JOHNSTON:  I already have.

17          MS. SPICER:  -- are very clear that

18          he is offering an opinion.  If you look on

19          Page 1 of his actual report, it's talk --

20          it's talking about the "product label in

21          effect during the time of Mr. McWilliams'

22          Tasigna treatment did not appropriately

23          warn of the severe atherosclerosis-related

24          risks associated with the drug."

25               You're asking him -- you're picking

1              MARK A. WEISS, M.D.

2        and choosing what you want to ask him,

3        but --

4              MR. JOHNSTON:  That's right, I am.

5              MS. SPICER:  Okay.  Well --

6              MR. JOHNSTON:  That's what I do.

7        That's what lawyers do.

8   BY MR. JOHNSTON:

9        Q.   I don't think this case is about

10  atherosclerosis.  It's about cerebrovascular

11  events.

12             And I want to know what data you

13  were aware of in 2011 that there were any

14  cerebrovascular events associated with the use

15  of nilotinib.  That's all I want to know.

16             MS. SPICER:  Stop yelling at the

17        witness.

18             Object to form.

19             And he's here to testify about his

20        opinions, not the opinions --

21             MR. JOHNSTON:  Right.

22             MS. SPICER:  -- of Novartis or

23        Novartis's experts --

24             MR. JOHNSTON:  I'm closing him out.

25             MS. SPICER:  -- except for the --

1             MARK A. WEISS, M.D.

2    BY MR. JOHNSTON:

3         Q.   Do you have any opinions about

4    cerebrovascular events and whether they should

5    have been on the warnings label or not?

6         A.   I believe that atherosclerosis is

7    a systemic disease, and that includes more

8    than just cerebrovascular events, peripheral

9    arterial occlusive disease, and coronary

10   artery disease.

11             There are blood vessels that go to

12   every tissue in your body; and if these become

13   obstructed or blocked, you can have tissue

14   necrosis and loss of tissue.  I think it's

15   hard to parse out specific things.

16             There are certain suggestions,

17   like one of the suggestions that I got when I

18   reviewed the literature, is that there were

19   some patients with peripheral arterial

20   occlusive disease that seemed to have a very

21   aggressive, accelerated course.  That seemed

22   unusual to me, but I don't hold myself out to

23   be a vascular expert.  And I think if you

24   asked most physicians and actually if you

25   asked probably most lay people even, "Is

1             MARK A. WEISS, M.D.

2   stroke one of the manifestations of

3   atherosclerosis," I think the answer is "Yes."

4             So I guess I view this a little

5   differently than you do.  I view

6   atherosclerosis as a systemic disease, not a

7   site-specific disease.

8        Q.   I understand that, but that's not

9   necessarily what the law is going to decide in

10  this case.

11            And so --

12       A.   Okay.

13       Q.   -- what I need to know is whether

14  you have any data to support the view that

15  there was adequate data for a warning and

16  precaution by 2012 for cerebrovascular events

17  on the nilotinib label; and if so, what is the

18  basis?

19       A.   Okay.

20            MS. SPICER:  Same objections.  Let's

21       ask him about his actual --

22            THE WITNESS:  So --

23            MS. SPICER:  -- opinions that he's

24       offering in this case.

25            THE WITNESS:  I'm sorry.

Page 351

```
 1              MARK A. WEISS, M.D.

 2              So since I -- I didn't offer a

 3         specific opinion about it, I really can't

 4         comment on it at this time.

 5    BY MR. JOHNSTON:

 6         Q.   So right now you don't have an

 7    opinion about the question -- specific

 8    question of cerebrovascular risk as of 2011;

 9    correct?

10              MS. SPICER:   Object, misstates the

11         testimony.

12              THE WITNESS:   My opinion is more

13         aimed at the general risk of

14         atherosclerosis in human beings.

15    BY MR. JOHNSTON:

16         Q.   You're aware and you cite to the

17    addition of warnings in the Canadian label in

18    August 2013 in your report; correct?

19              MS. SPICER:   In his supplemental

20         report?

21              MR. JOHNSTON:   I believe so, but he

22         does it in his main report, too.  But in

23         his supplemental report on Page 6 -- I can

24         ask about the main report.

25              MS. SPICER:   No, I was just -- I
```

1        MARK A. WEISS, M.D.

2        just wanted to clarify where we were when

3        you were --

4   BY MR. JOHNSTON:

5        Q.    In Canada Novartis warned

6   healthcare providers and the public by sending

7   out notices specifically warning of the

8   relationship between nilotinib and

9   atherosclerosis.  That occurred in August

10  2012.

11        Do you have an opinion that that

12  should have occurred earlier than August 2012?

13        MS. SPICER:  Wait.  Object.  Sorry.

14        I think that misstates the facts in this

15        case.

16  BY MR. JOHNSTON:

17        Q.    The Canadian label was changed to

18  add a discussion of atherosclerosis in

19  August of 2012.  Are you aware of that?

20        A.    Yes, I am.

21        Q.    Do you have an opinion or are you

22  offering an opinion in this case that the

23  label should have been changed prior to

24  August 2012 in the United States for

25  atherosclerosis?

Page 353

1                MARK A. WEISS, M.D.

2                MS. SPICER:  Again --

3                THE WITNESS:  I would have to see

4        the timeline of when Novartis became aware

5        of these events.

6   BY MR. JOHNSTON:

7        Q.    You -- you have not so far offered

8   that opinion in your expert reports in this

9   case; is that correct?

10               MS. SPICER:  Object to form.  That

11       misstates his opinions in his report, which

12       we -- I just read --

13               MR. JOHNSTON:  You can't have it

14       both ways.

15               MS. SPICER:  -- verbatim into the

16       record, so, I mean, you...

17               THE WITNESS:  I mean, I've read my

18       report to you.  You've read your -- my

19       report to you.  I think it states what I'm

20       trying to say.

21   BY MR. JOHNSTON:

22       Q.    Yeah, I don't think it does, so

23   I'm asking you questions, so I can clarify

24   what it says.

25               Do you believe that prior to the

1          MARK A. WEISS, M.D.

2    Canadian label change there was adequate

3    information to require warning and precaution

4    in the United States for atherosclerotic

5    events?  And if so, what's your basis for that

6    belief?

7               MS. SPICER:  Object to form.  This

8          is the exact same opinion that he gave in

9          the first case.  He's already spent seven

10         hours answering questions about how the

11         label was not adequately warning during the

12         time of treatment, so this is redundant.

13         It's duplicative.  It's -- you're trying to

14         twist him up after asking him questions for

15         seven hours and it's ridiculous.

16              MR. JOHNSTON:  It hasn't been seven

17         hours yet.

18              MS. SPICER:  We've been sitting here

19         for seven hours.

20              MR. JOHNSTON:  I have not asked

21         questions for seven hours.  We have not

22         been on the record for seven hours,

23         Counsel.

24              THE WITNESS:  I'm sorry.  Can -- can

25         you restate that, please?

1              MARK A. WEISS, M.D.

2    BY MR. JOHNSTON:

3         Q.    Yeah.   I'm sorry that your -- that

4    Plaintiffs' counsel keeps interrupting in a

5    way that causes you not to be able to remember

6    the question.

7              MS. SPICER:   Okay.

8    BY MR. JOHNSTON:

9         Q.    The question was:   Do you have an

10   opinion -- I'll strike it.

11             I'll ask it this way:   Are you

12   intending to offer an opinion at trial in this

13   case that the U.S. label for nilotinib should

14   have been changed to have a warning and

15   precaution for atherosclerosis prior to the

16   Canadian label change in August 2012?

17             MS. SPICER:   Asked and answered.

18        And his opinions that have -- are the same

19        as they were in the last case have already

20        made clear that he is intending to offer

21        that the label did not appropriately warn

22        during the time of treatment.

23             MR. JOHNSTON:   Counsel, you just

24        coached the witness.

25             MS. SPICER:   I don't -- I'm not --

1          MARK A. WEISS, M.D.

2          MR. JOHNSTON:  You just coached the

3     witness.

4          MS. SPICER:  I'm repeating verbatim

5     what we've already been talking about for

6     the last 30 minutes.

7          MR. JOHNSTON:  You're not here to

8     testify.  You're here to object.

9          MS. SPICER:  I'm not testifying.

10          MR. JOHNSTON:  You are.

11          MS. SPICER:  I'm not testifying.

12     You're here to --

13          MR. JOHNSTON:  I'm going to ask the

14     question again.

15          MS. SPICER:  You're here to ask

16     about his opinions in this case.

17          MR. JOHNSTON:  You can say

18     "objection."  You've already said your

19     objection three times.  You can say the

20     word "objection," and I will give you a

21     stipulation that all of your prior

22     objections are made again.

23          MS. SPICER:  Okay.

24  BY MR. JOHNSTON:

25     Q.   Sir --

1          MARK A. WEISS, M.D.

2          MS. SPICER:  Well, his opinions are

3    clearly laid out.

4          MR. JOHNSTON:  I don't agree with

5    you, and I don't think the Judge will agree

6    with you.

7          MS. SPICER:  And they're clearly

8    laid -- they're clearly identical to what

9    his opinions were in the first case, so --

10         MR. JOHNSTON:  That doesn't matter.

11         MS. SPICER:  -- you are not only

12   wasting my time and causing and wasting the

13   witness's time --

14         MR. JOHNSTON:  This is like

15   filibusters, I mean --

16         MS. SPICER:  I'm not filibustering.

17         MR. JOHNSTON:  You are

18   filibustering.

19         MS. SPICER:  You're asking questions

20   that have -- were already -- he was asked

21   about for several hours.

22         MR. JOHNSTON:  No, he wasn't.

23         MS. SPICER:  Please look at your

24   report and tell him what your opinions are.

25         MR. JOHNSTON:  Counsel, quit

Page 358

1      MARK A. WEISS, M.D.

2  coaching the witness.

3          MS. SPICER:  I'm not.

4          MR. JOHNSTON:  You are.

5          MS. SPICER:  You're asking what his

6  opinions are and I'm --

7          MR. JOHNSTON:  You know --

8          MS. SPICER:  -- and that's what he's

9  here to talk about.

10          MR. JOHNSTON:  -- Mr. Elias has

11  started to rub off on you in not --

12          MS. SPICER:  Oh, please.

13          MR. JOHNSTON:  -- a good way.

14          MS. SPICER:  Please.

15      I do need to leave.  And, again --

16          MR. JOHNSTON:  I'm sorry.  Then you

17  can leave.

18          MS. SPICER:  Okay.  Well, we will

19  because this -- you know, if I had known

20  you were going to take this time, we would

21  have started the depo at 9:00.

22          MR. JOHNSTON:  I didn't intend to

23  take this time.

24          MS. SPICER:  I agreed to start 10:30

25  because I assumed that's what you needed.

Page 359

1        MARK A. WEISS, M.D.

2        MR. JOHNSTON:  I didn't intend to

3    take this time.

4        MS. SPICER:  Okay.  Well, I mean,

5    now you're not being -- extending me that

6    same courtesy.  You're not extending the

7    witness the same courtesy.  You're asking

8    the exact --

9        MR. JOHNSTON:  You know what, if I

10    can get an answer, I might be done.

11        MS. SPICER:  You're asking the exact

12    same questions that he was already asked

13    about at his prior depo.

14        MR. JOHNSTON:  That's not true.

15        MS. SPICER:  It is.

16        MR. JOHNSTON:  It's not true.

17        MS. SPICER:  It's the exact same

18    opinion that he gave at his prior depo.

19        MR. JOHNSTON:  And the opinion

20    remains ambiguous.

21        MS. SPICER:  Ambiguous?

22        MR. JOHNSTON:  Yes.  What time --

23    what is the day that --

24        MS. SPICER:  What is ambiguous?

25        MR. JOHNSTON:  What date?

1        MARK A. WEISS, M.D.

2        (Reporter clarification.)

3        MS. SPICER:  What is ambiguous about

the nilotinib U.S. product label in effect

during the time of Mr. McWilliams' Tasigna

treatment did not appropriately warn of the

severe atherosclerosis-related risk

associated with the drug?  What's am --

9        MR. JOHNSTON:  What's ambiguous

about that is I don't know what his basis

is and I'm asking --

12        MS. SPICER:  He --

13        MR. JOHNSTON:  -- him what his basis

is.

15        MS. SPICER:  First of all, he has

the same exact opinion in his same exact

report in the prior case and he provided

that.

19        MR. JOHNSTON:  I don't really --

20        MS. SPICER:  So you're asking the

same questions that he already had the

opportunity to answer --

23        MR. JOHNSTON:  We're going to --

24        MS. SPICER:  -- that your co-counsel

already asked and --

1        MARK A. WEISS, M.D.

2        MR. JOHNSTON:  We're going to take a

3   break.

4        MS. SPICER:  -- now you're try --

5   we're going to leave.

6        MR. JOHNSTON:  No, we're taking a

7   break.

8        MS. SPICER:  Okay.

9        MR. JOHNSTON:  Because I'm coming

10  back 'cause you've now filibustered for the

11  last 40 minutes.

12       MS. SPICER:  I'm not filibustering.

13       MR. JOHNSTON:  You absolutely are

14  filibustering, Counsel.  And you've done it

15  for 40 minutes and --

16       MS. SPICER:  Okay.  We're --

17       MR. JOHNSTON:  -- we will find out

18  on the record --

19       MS. SPICER:  We're going to --

20       MR. JOHNSTON:  -- exactly how long

21  you filibustered in this case.  And it's

22  completely inappropriate, Counsel.  I had a

23  couple of questions left.  I was going to

24  not put this whole stack in, but you

25  effectively prevented me from asking a

1          MARK A. WEISS, M.D.

2      question for the last 40 minutes.

3          MS. SPICER:  That is quite an

4      exaggeration.  I'm confident the record

5      will reflect that.

6  BY MR. JOHNSTON:

7      Q.   So I will ask you again, what --

8  how many CV -- cerebrovascular events were

9  present at the time of the -- your opinion

10 that the label was inadequate as to events

11 like Mr. McWilliams' in 2011?  How many were

12 there?

13          MS. SPICER:  Object to form, asked

14      and answered.

15 BY MR. JOHNSTON:

16     Q.   You don't know, do you?

17          MS. SPICER:  Okay.  This is not a

18      memory test.  This is not --

19          THE WITNESS:  I think you can read

20      my opinion where I talk about

21      cerebrovascular events, which is the

22      agglomeration of several things.

23 BY MR. JOHNSTON:

24     Q.   I want to know about

25 cerebrovascular events specifically.  Where do

1          MARK A. WEISS, M.D.

2    you mention them in your report with a number

3    of how many there were in 2011?

4          MS. SPICER:  Object to form, asked

5        and answered.

6    BY MR. JOHNSTON:

7        Q.   Just tell me they're not there,

8    that's fine.

9        A.   I don't believe they are there.

10       Q.   Okay.  That's fine.  That's all

11   I'm trying to get.  They're not in your

12   report; right?

13         MS. SPICER:  Object to form.  That's

14       not what he said.

15   BY MR. JOHNSTON:

16       Q.   Do you believe that Mr. McWilliams

17   suffered a thrombotic stroke?

18         MS. SPICER:  Object to form.  Now,

19       we are definitely not going to do this

20       because this is not -- he is not here to

21       testify about any specific --

22         MR. JOHNSTON:  He wrote in his

23       report on Page 6 that these clauses warned

24       of the risk of thrombotic stroke.  None of

25       these clauses --

1          MARK A. WEISS, M.D.

2          MS. SPICER:  You're asking him a

3      specific question --

4          (Reporter clarification.)

5          MS. SPICER:  You're asking him a

6      specific question about Mr. McWilliams'

7      stroke.  He's not here to testify about

8      Mr. McWilliams' medical stroke and things

9      of that nature.  He's here to give the

10     opinions that are clearly in his report,

11     his expert report.  I've said over and over

12     again he's not testifying.  He didn't

13     review all those medical records.  We're

14     definitely not doing that at this point in

15     time.

16          MR. JOHNSTON:  He wrote in his

17     report, quote, None of these clauses warned

18     of the risk of thrombotic stroke, closed

19     quote.

20          MS. SPICER:  Yes, and that was

21     not --

22 BY MR. JOHNSTON:

23     Q.   My question is:  A thrombotic

24 stroke is different than an ischemic stroke;

25 right?

```
 1                MARK A. WEISS, M.D.
 2          A.   That's not entirely true.  Most
 3   strokes were, in general, again,
 4   cardiovascular events.  The arteries are
 5   narrowed by the athero, or sometimes called
 6   arteriosclerotic process, and the narrowed
 7   arteries are then very much predisposed to
 8   getting clot in them, and that's the final
 9   event.  But it's not -- it's not really right
10   to think of as the thrombosis as the problem
11   because it's the severe narrowing of the
12   artery that's the problem; and usually it's an
13   abrupt cessation when a clot forms.
14               If it's slow enough and there --
15   and a clot never forms and it's just a very
16   slow, gradual occlusion, most people don't
17   have any clinical manifestations of that
18   because there are escape mechanisms such as
19   collaterals and opening up other vascular
20   channels.
21               And, actually, that's one of the
22   concerns about nilotinib, is it may impair
23   those mechanisms that prevent it.  So just
24   having a vessel occluded doesn't always lead
25   to tissue damage.  And most cases, at least
```

1              MARK A. WEISS, M.D.

2    the way I think about a tissue damage happened

3    because the final event is it's a narrowed

4    vessel, it's very sensitive to the size of the

5    lumen that's still open and if you get a small

6    clot there, it can be catastrophic whereas if

7    the vessel's of normal caliber and you get a

8    small clot, there's still plenty of room for

9    the blood to go around.

10         Q.   You don't have any evidence in

11   either the Lauris case or the McWilliams case

12   that there was a clot involved in what

13   happened, do you?

14              MS. SPICER:  Object to form.  He's

15        not here to give any opinions in the Lauris

16        case.

17              MR. JOHNSTON:  I'm just making sure.

18   BY MR. JOHNSTON:

19         Q.   Correct?

20              MS. SPICER:  Object to form.

21              THE WITNESS:  I --

22              MS. SPICER:  You can talk -- you can

23        answer with respect to the McWilliams case.

24   BY MR. JOHNSTON:

25         Q.   And Lor -- and the Lauris case.

1     MARK A. WEISS, M.D.

2         MS. SPICER:  You can answer with

3     respect to the McWilliams case.

4         MR. JOHNSTON:  Are you instructing

5     him not to answer, Counsel?

6         MS. SPICER:  Yes, because he's not

7     here in the Lauris case.  That's a

8     completely different case and completely

9     different patient, completely different

10    medical records.

11        (Instruction.)

12        MR. JOHNSTON:  Let's mark the record

13    that the counsel instructed the witness not

14    to answer.

15        MS. SPICER:  You're here to ask him

16    questions about this case.

17        THE WITNESS:  So --

18        MR. JOHNSTON:  You know, it's the

19    same report, but I can't ask him questions

20    about his report because it's the same

21    report.  It's just completely illogical,

22    Counsel.

23        MS. SPICER:  Restate your question

24    with --

25        MR. JOHNSTON:  Answer the question

Page 368

```
 1              MARK A. WEISS, M.D.

 2         is --

 3              MS. SPICER:  -- respect to this

 4         case.

 5              MR. JOHNSTON:  I'm going to ask it

 6         however I want to ask it.

 7    BY MR. JOHNSTON:

 8         Q.   Do you have any reason to believe

 9    that there was a thrombotic event in any case

10    involving nilotinib that you've evaluated?

11              MS. SPICER:  Object to form.

12              THE WITNESS:  That I evaluated in

13         terms of medical literature reports?

14    BY MR. JOHNSTON:

15         Q.   No, in terms of for a case.

16              MS. SPICER:  He's testified

17         repeatedly he's not here to --

18              THE WITNESS:  I -- I've -- I've

19         not --

20              MS. SPICER:  -- testify to medical

21         record.

22              (Reporter clarification.)

23              THE WITNESS:  I'm sorry.

24              MR. JOHNSTON:  Yeah, I mean...

25              THE WITNESS:  Is it my turn to talk?
```

1            MARK A. WEISS, M.D.

2            THE VIDEOGRAPHER:  Could you leave

3       your mic on?  You can't hold it in your

4       hand.

5            THE WITNESS:  As long as he doesn't

6       throw it at me, I'm okay.  Sorry.  That was

7       uncalled for.

8  BY MR. JOHNSTON:

9       Q.   Don't worry.  It won't be coming

10  your way.

11       A.   That's...

12            I do not have an opinion to offer

13  as to whether or not there was thrombosis

14  associated with the stroke of this patient.  I

15  didn't have enough of the medical record to

16  review to comment on that.

17       Q.   Why did you write thrombotic

18  stroke on Page 6 of your supplemental expert

19  report then instead of ischemic stroke?

20       A.   (Reviewing document.)

21            Here I just make the statement

22  that none of these clauses warned of the risk

23  of thrombotic stroke.

24       Q.   Well, if --

25       A.   I'm not giving a specific opinion

1          MARK A. WEISS, M.D.

2    to what happened to Mr. McWilliams during his

3    stroke event.

4          Q.   But everything else you talk about

5    is ischemic.  Why did you choose thrombotic

6    instead of ischemic on this page?

7          A.   As I said before, these two have

8    an intersection.

9          Q.   Maybe.  Sometimes they do, not

10   always; correct?  Not every ischemic stroke is

11   as a result of thrombotic event; correct?

12         A.   Probably not.  But, again,

13   certainly without a rapidly forming clot, the

14   very slow occlusion of atherosclerosis rarely

15   causes clinical problems because people can

16   get expansion of other vascular pathways to

17   circumvent the vessel that's occluded.

18              So in large part, most -- most

19   strokes associated with arteriosclerosis have

20   clot in them.  This was a landmark study for

21   coronary vessel disease going back to the

22   1970s published in the New England Journal.

23         Q.   What's the name of the author?

24         A.   I can find it for you if you'd

25   like.

1               MARK A. WEISS, M.D.

2          Q.    I would.

3          A.    I read this paper 40 years ago.

4          Q.    I would.  I'd like the paper and

5     I'd also like your bills and I would like a

6     copy of everything Plaintiffs' counsel has

7     given you from the medical records.  And if

8     they give you something else after today, I'd

9     like you to segregate between those two piles

10    which things you had and which things they

11    gave you after today, please.

12               (Request.)

13          MS. SPICER:  You can direct any

14       discovery requests to us.

15          MR. JOHNSTON:  Well, I'll direct

16       them to you too.

17          MS. SPICER:  Great.  And you can --

18          MR. JOHNSTON:  I just made them.

19          MS. SPICER:  -- provide all the same

20       for your experts then.  I mean, that's not

21       what we're doing here, but --

22          MR. JOHNSTON:  I've --

23          MS. SPICER:  --  go ahead.

24          MR. JOHNSTON:  -- basically given

25       you all the records my experts reviewed.

1        MARK A. WEISS, M.D.

2        MS. SPICER:  Yeah, okay.  All right.

3   You -- again, we can -- you can direct them

4   to us.  That's fine.

5        MR. JOHNSTON:  I mean, the problem

6   here is that he doesn't know what he got or

7   he doesn't know whether it's complete.

8        MS. SPICER:  That's not the problem.

9        MR. JOHNSTON:  Yeah, that is the

10  problem.

11       MS. SPICER:  Are we done?

12       MR. JOHNSTON:  I don't know yet.

13  Let me think a minute.

14       I have plenty more questions for you

15  and I'm sure --

16       (Reporter clarification.)

17       (Transcript continued on next page

18  to allow for Jurat.)

19

20

21

22

23

24

25

1       MARK A. WEISS, M.D.

2        MR. JOHNSTON:  I have plenty more

3   questions for you.  I have a feeling I'll

4   be seeing you in another case at this rate,

5   so maybe I'll save them for next time.  I

6   appreciate your time today.  Thank you very

7   much.

8           THE WITNESS:  Thank you.

9           MS. SPICER:  I have no questions.

10          THE VIDEOGRAPHER:  That concludes

11  this deposition and DVD Number 4.  The time

12  is 17:22.

13          (Time noted:  5:22 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 374

```
 1
 2                    I N D E X
 3   WITNESS                          PAGE
 4   Mark A. Weiss, M.D.
 5   BY MR. JOHNSTON                      5
 6                E X H I B I T S
 7   NUMBER         DESCRIPTION          PAGE
 8   Exhibit Weiss-1, Amended Notice Of     4
     Deposition of Dr. Mark A. Weiss
 9
     Exhibit Weiss-2, Expert Report of Mark  4
10   Weiss, M.D.
11   Exhibit Weiss-3, Supplemental Expert    4
     Report of Mark Weiss, M.D.
12
     Exhibit Weiss-4, multipage document    32
13   entitled NCCN Guidelines For Patients
     Chronic Myeloid Leukemia 2018
14
     Exhibit Weiss-5, multipage document,   52
15   first page entitled Dennis McWilliams'
     BCR-ABL Scores
16
     Exhibit Weiss-6, handwritten one-page   70
17   record dated 6-11-2007, bearing Bates
     Number McWilliams-000204
18
     Exhibit Weiss-7, handwritten one-page   71
19   record dated 6-20-07, bearing Bates
     Number McWilliams-000203
20
     Exhibit Weiss-8, article entitled Deep  99
21   Molecular Response in Chronic Myeloid
     Leukemia:  The New Goal of Therapy? by
22   Francois-Xavier Mahon and Gabriel Etienne
23
24
25
```

INDEX CONTINUED

1

2 Exhibit Weiss-9, multipage document            129
   entitled National Comprehensive Cancer
3 Network, NCCN Clinical Practice
   Guidelines in Oncology (NCCN Guidelines)
4 Chronic Myeloid Leukemia Version 4.2108 -
   January 24, 2018
5
   Exhibit Weiss-10, article entitled           137
6 Molecular Monitoring of Imatinib in
   Chronic Myeloid Leukemia Patients in
7 Complete Cytogenetic Remission:  Does
   Achievement of a Stable Major Molecular
8 Response at any Time Point Identify a
   Privileged Group of Patients?  A
9 Multicenter Experience in Argentina and
   Uruguay
10
   Exhibit  Weiss-11, multipage article        156
11 entitled Long-term prognostic
   significance of early molecular response
12 to imatinib in newly diagnosed chronic
   myeloid leukemia:  an analysis from the
13 International Randomized Study of
   Interferon and STI571 (IRIS)
14
   Exhibit Weiss-12, Product Label for          175
15 Tasigna Revised: 2/2017,
16 Exhibit Weiss-13, article entitled           215
   Bosutinib Versus Imatinib for Newly
17 Diagnosed Chronic Myeloid Leukemia:
   Results From the Randomized BFORE Trial
18
   Exhibit Weiss-14, Label for Bosulif          232
19 Revised: 12/2017
20 Exhibit Weiss-15, two-page record of         242
   Dr. Matthew David Barnes, Shands At the
21 University of Florida, bearing Bates
   Numbers MCWILLIAMS_DENNIS-FL-0054-00010
22 through MCWILLIAMS_DENNIS-FL-0054-00013
23 Exhibit Weiss-16, one-page IP Encounter      244
   Report OP Note by Jantz, Michael A. MD at
24 11/14/17 1603 (continued) bearing Bates
   Numbers MCWILLIAMS_DENNIS-FL-0054-000555
25 through MCWILLIAMS_DENNIS-FL-0054-000556

INDEX CONTINUED

1
2  Exhibit Weiss-17, multipage document          246
   entitled St. Lucie Medical Center (COCXG)
3  History & Physical
4  Exhibit Weiss-17, multipage document          246
   entitled St. Lucie Medical Center (COCXG)
5  History & Physical
6  Exhibit Weiss-18, Article by Siddhartha       269
   Jaiswal published in the New England
7  Journal of Medicine July 13, 2017, titled
   Clonal Hematopoiesis and Risk of
8  Atherosclerotic Cardiovascular Disease
9  Exhibit Weiss-19, document titled Risk        280
   Factors and Mechanisms Contributing to
10 TKI-Induced Vascular Events in Patients
   With CML
11
   Exhibit Weiss-20, article entitled           290
12 Long-term benefits and risks of frontline
   nilotinib vs imatinib for chronic myeloid
13 leukemia in chronic phase: 5-year update
   of the randomized ENESTnd trial
14
   Exhibit Weiss-21, one-page blow-up of        301
15 Figure 5
16 Exhibit Weiss-22, article entitled           314
   Nilotinib (formerly AMN1070), a highly
17 selective BCR-ABL tyrosine kinase
   inhibitor, is effective in patients with
18 Philadelphia chromosome-positive chronic
   myelogenous leukemia in chronic phase
19 following imatinib resistance and
   intolerance
20
   Exhibit Weiss-23, article entitled           316
21 Cardiac Safety Profile of Imatinib and
   Nilotinib In Patients (pts) with Newly
22 Diagnosed Chronic Myeloid Leukemia In
   Chronic Phase (CML-CP): Results From
23 ENESTnd,
24
25

1                    INDEX CONTINUED
2    Exhibit Weiss-24, American Society of          320
     Hematology Abstract 3430 Efficacy and
3    Safety of Nilotinib In Chronic Phase (CP)
     Chronic Myeloid Leukemia (CML) Patients
4    (Pts) with Type 2 Diabetes In the ENESTnd
     Trial
5
     Exhibit Weiss-25, article entitled            323
6    Nilotinib Versus Imatinib for Newly
     Diagnosed Chronic Myeloid Leukemia
7
     Exhibit Weiss-26, article entitled            325
8    Progressive peripheral arterial occlusive
     disease and other vascular events during
9    nilotinib therapy in CML by Karl
     Aichberger
10
     Exhibit Weiss-27, article entitled Severe     337
11   Peripheral Arterial Disease During
     Nilotinib Therapy
12
     Exhibit Weiss-28, Nilotinib                   337
13   treatment-associated peripheral artery
     disease and sudden death:  Yet another
14   reason to stick to imatinib as front-line
     therapy for chronic myelogenous leukemia
15
     REQUEST FOR PRODUCTION                         PAGE
16
     Request                                        371
17
18   INSTRUCTION                                    PAGE
19   Instruction                                     59
20   Instruction                                    310
21   Instruction                                    367
22
23
24
25

Page 378

```
 1                    CERTIFICATE
 2  COMMONWEALTH OF PENNSYLVANIA     )
 3                           ) ss:
 4  COUNTY OF PHILADELPHIA           )
 5            I, Debra Sapio Lyons, a Registered
    Diplomat Reporter, a Certified Realtime Reporter,
 6  a Certified Realtime Captioner, an Approved
    Reporter of the United States District Court for
 7  the Eastern District of Pennsylvania, a Certified
    Court Reporter for the State of New Jersey; and
 8  Notary Public within and for the States of New
    Jersey, New York and the Commonwealth of
 9  Pennsylvania do hereby certify:
10            That Mark A. Weiss, M.D., the witness
    whose deposition is hereinbefore set forth, was
11  duly sworn by me and that such deposition is a
    true record of the testimony given by such
12  witness, to the best of my ability and thereafter
    reduced to typewriting under my direction.
13
              I further certify that I am not related
14  to any of the parties to this action by blood or
    marriage and that I am in no way interested in
15  the outcome of the matter.
16            In witness whereof, I have hereunto set
    my hand this 4th day of May, 2018.
17
18
19            _____
              DEBRA SAPIO LYONS
20            CRR, RDR, CRC, CCR, CPE
21
22
23
24
25
```

```
1                      ERRATA SHEET

2    Case Name:

3    Deposition Date:

4    Deponent:

5    Pg.  No. Now Reads      Should Read  Reason

6    ____ ____ _____   _____  _____

7    ____ ____ _____   _____  _____

8    ____ ____ _____   _____  _____

9    ____ ____ _____   _____  _____

10   ____ ____ _____   _____  _____

11   ____ ____ _____   _____  _____

12   ____ ____ _____   _____  _____

13   ____ ____ _____   _____  _____

14   ____ ____ _____   _____  _____

15   ____ ____ _____   _____  _____

16   ____ ____ _____   _____  _____

17   ____ ____ _____   _____  _____

18   ____ ____ _____   _____  _____

19   ____ ____ _____   _____  _____

20

                                _____

21
                                Signature of Deponent

22

     SUBSCRIBED AND SWORN BEFORE ME

23   THIS _____ DAY OF _____, 2018.

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____
```