**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION**

Case No.: 2:17-cv-14302-ROSENBERG/MAYNARD

Dennis McWilliams and
Lori McWilliams,

        Plaintiffs,

vs.

Novartis AG, a Global Healthcare
Company; Novartis Pharmaceuticals
Corporation, a Delaware Corporation,

        Defendants.
_____/

**DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATION'S
MOTION TO EXCLUDE TESTIMONY OF DR. ROBERT WAGMEISTER
<u>WITH SUPPORTING MEMORANDUM OF LAW</u>**

**TABLE OF CONTENTS**

REQUEST FOR HEARING ......................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

ADMISSIBILITY STANDARDS UNDER DAUBERT AND RULE 702 ................................... 1

ARGUMENT .................................................................................................................................. 2

    I.    Dr. Wagmeister's Litigation-Derived Opinions About Tasigna Are Not Related To His Expertise As A Vascular Surgeon Who Specializes In Vascular Aspects of Spinal Surgery. ............................................................................................................................. 2

    II.    Dr. Wagmeister's Reliance On His Belief That Mr. McWilliams' Atherosclerosis Was "Rapidly Progressing" To Exclude Mr. McWilliams' Other Well Known Risk Factors For Atherosclerosis Is Unreliable And *Ipse Dixit*. ............................................................. 6

CONCLUSION ............................................................................................................................. 11

LOCAL RULE 7.1(a)(3) CERTIFICATION ............................................................................... 11

## **REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), NPC hereby requests oral argument on NPC's Motion to Exclude Testimony of Dr. Robert Wagmeister and a *Daubert* evidentiary hearing, where the Court can see Dr. Wagmeister testify and even ask him questions directly. Oral argument will streamline the Court's consideration of NPC's Motion and allow for a more efficient resolution of the issues raised therein. An evidentiary hearing would assist the Court in discharging its obligation as a *Daubert* gatekeeper. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) ("[D]istrict courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant."). Evidentiary hearings are particularly important in "less usual or more complex cases," such as this, "where cause for questioning the expert's reliability arises." *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also City of Tuscaloosa v. Harcras Chem. Inc.*, 158 F.3d 548, 564-65 n.21 (11th Cir. 1998) (*Daubert* hearings "are almost always fruitful uses of the court's time and resources in complicated cases involving multiple expert witnesses, such as the instant case.").

NPC proposes a full day hearing for oral argument and evidentiary hearings on this and NPC's concurrently filed pre-trial motions.

**INTRODUCTION**

Plaintiffs have designated Dr. Robert Wagmeister, a vascular surgeon whose practice since 2008 specializes in assisting surgeons with obtaining access to the spine by accessing and moving blood vessels, as a retained expert to offer testimony on specific causation – i.e., that "Tasigna-induced atherosclerotic disease caused [Mr. McWilliams'] stroke." Expert Report of Robert Wagmeister, Feb. 19, 2018 ("Wagmeister Report") at 1 (Ex. 1) ("Tasigna (generic name nilotinib) caused the atherosclerotic-related disease observed in Mr. McWilliams' [sic] severe, nearly occluded right internal carotid artery, which was unusual by its rapid onset and accelerated progression, and not expected in a person of Mr. McWilliams' age and health profile.").[1]

Dr. Wagmeister failed to apply reliable methodologies to reach his specific causation opinion. His opinion that Tasigna causes atherosclerosis, and did so in Mr. McWilliams' case, is grounded in a subjective application of the term "rapidly progressing," which he relies on to exclude multiple other explanations for Mr. McWilliams' atherosclerosis, including, among others, hypertension, obesity, and family history. As set forth more fully below, the Court should preclude Dr. Wagmeister from opining that Tasigna® caused Mr. McWilliams' stroke. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993); Fed. R. of Evid. 702.

In light of the complex medical and scientific issues involved, NPC requests a live evidentiary hearing to address these *Daubert* concerns. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564 n.21 (11th Cir. 1998).

**ADMISSIBILITY STANDARDS UNDER DAUBERT AND RULE 702**

In *Daubert*, the Supreme Court addressed the admissibility of expert testimony and established "the exacting standards of reliability such evidence must meet." *See Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000). Under Federal Rule of Evidence 702 and *Daubert*, the court must determine whether "(1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is 'sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*'; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble*

---

[1] Dr. Wagmeister also provided a 12-page rebuttal report that is longer than his original report, in which he outlined areas where he disagreed with NPC's experts' conclusions. Rebuttal Expert Report of Robert Wagmeister, Mar. 20, 2018 ("Rebuttal Report") (Ex. 2).

1

*Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (quoting *United States v. Frazier*, 387 F. 3d 1244, 1260 (11th Cir. 2004)). "[D]istrict courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Frazier*, 387 F. 3d at 1260 (internal quotation marks and citation omitted).

In particular, plaintiffs must establish that the expert witness has the necessary expertise, in the form of "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, to render an opinion on the specific issue addressed by his proposed testimony. Second, plaintiffs must establish that the expert's testimony is "reliable" – *i.e.*, that the testimony is "ground[ed] in the methods and procedures of science[,]" as opposed to the expert's "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590 (quotation marks omitted). Third, plaintiffs must establish that the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue," Rule 702, which means that the testimony must have "a valid scientific connection" to – *i.e.*, must "fit" – the pertinent inquiry in the lawsuit. *Daubert*, 509 U.S. at 591-92. "Because of the powerful and potentially misleading effect of expert evidence," even opinions that "otherwise meet the admissibility requirements may still be excluded [under] Rule 403." *Frazier*, 387 F. 3d at 1263.

## ARGUMENT

**I.    DR. WAGMEISTER'S LITIGATION-DERIVED OPINIONS ABOUT TASIGNA ARE NOT RELATED TO HIS EXPERTISE AS A VASCULAR SURGEON WHO SPECIALIZES IN VASCULAR ASPECTS OF SPINAL SURGERY.**

Since 2008, Dr. Wagmeister has specialized in vascular surgery conducted along-side a spine surgeon. Wagmeister Dep. 19:18-20:20, July 6, 2017, (Ex. 3) ("7/6/17 Wagmeister Dep.") (noting that he mobilizes blood vessels that sit on vertebral column to uncover discs before spine surgeon goes ahead)[2]; Wagmeister Dep. 41:13-18, Apr. 19, 2018, (Ex. 4) ("4/19/18 Wagmeister Dep.") (specializes in vascular access in spinal surgeries). He has not performed a carotid artery endarterectomy (the surgical procedure that Mr. McWilliams underwent following his September 2013 stroke) or diagnosed carotid artery stenosis (the location of Mr. McWilliams'

---

[2] Dr. Wagmeister was deposed in another Tasigna product liability matter, *Lauris v. Novartis AG*, No. 3:16-cv-00393-SEH (C.D. Cal.). His testimony in that case is largely applicable here, as he offers an opinion in both that case and this one that he believes Tasigna caused the patient to experience a stroke.

atherosclerosis) in approximately a decade.  4/19/18 Wagmeister Dep. 42:1-10 (Ex. 4).  Multiple online catalogs list Dr. Wagmeister's services as being available for litigation purposes.  *See* Expert Witness Listings for Robert Wagmeister on SEAK Expert Witness Directory (noting 30 times deposed/testified in last 4 years), The National Directory of Expert Witnesses, and LexVixio (Ex. 5).  Dr. Wagmeister testified that he reviews about 8-10 cases per year at the request of attorneys, and receives an additional dozen calls from attorneys where he does not conduct a full review.  7/6/17 Wagmeister Dep. 27:9-21 (Ex. 3).  Most of his expert work has been in medical malpractice cases.  *Id.* at 29:5-11.

     Dr. Wagmeister lacks the relevant experience in evaluating the etiology, or underlying cause, of a patient's atherosclerosis.  "Experience in a particular field is not enough to qualify an expert; the expert must have experience with the issue before the court."  *Harvey v. Novartis Pharm. Corp.*, 895 F. Supp. 2d 1206, 1209 (N.D. Ala. 2012) (citing *Hendrix ex rel G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010)).  Specifically, he has never in his clinical practice formed an opinion that a medication caused a patient to develop atherosclerosis.  4/19/18 Wagmeister Dep. 42:17-21 (Ex. 4).  And despite his extensive experience as a paid expert in litigation, prior to his litigation work involving Tasigna, he has never served as an expert in a pharmaceutical-product-liability case.  7/6/17 Wagmeister Dep. 33:9-11 (Ex. 3).  Dr. Wagmeister's knowledge of Tasigna and its possible association with atherosclerosis is entirely litigation-derived.  He has never published any scientific literature – peer-reviewed or not – on Tasigna or CML.  *Id.* at 43:17-20.  In fact, he has not written an article published in the medical literature since 1980.  *Id.* at 44:6.  He does not treat CML and does not recall being aware that any of his patients had CML or were being treated with Tasigna.  *Id.* at 43:5-12.  As he testified:

> Q.  Before you were approached to work as an expert in this case, had you conducted any research about TASIGNA and atherosclerosis related to it?
>
> A.  No.
>
> . . .
>
> Q.  All right.  When did you learn about a potential association between TASIGNA and atherosclerosis?
>
> A.  When I received, I think, a call or an E-mail from [plaintiffs' counsel] Mr. Elias.

3

*Id.* at 43:13-16, 44:7-10.  At his initial deposition he brought a binder with literature that had been provided to him by plaintiffs' counsel.  *Id.* at 5:25-7:21.  The fact that Dr. Wagmeister formed his opinions about Tasigna and atherosclerosis only after being approached by plaintiffs' counsel and prior to conducting the necessary research to support it shows that Dr. Wagmeister is "lacking the objectivity that is the hallmark of the scientific method." *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 503 (9th Cir. 1994); *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1321 (11th Cir. 1999) (affirming expert exclusion where expert's "opinion was developed in preparation for litigation").  Reaching a conclusion and then applying a methodology to justify it is scientifically unreliable and warrants exclusion of proposed testimony. *McClellan v. I-Flow Corp.,* 710 F. Supp. 2d 1092, 1121 (D. Or. 2010) (finding litigation bias where expert agreed to assert a causation opinion prior to the conclusion of expert's own study that purportedly formed the basis of his opinion); *Caraker v. Sandoz Pharms. Corp.*, 172 F. Supp. 2d 1046, 1049 n.5 (S.D. Ill. 2001) ("Justifying a conclusion after the fact by applying a methodology does not generally lead to reliable scientific knowledge."); *Muzzey v. Kerr-McGee Chem. Corp.*, 921 F. Supp. 511, 520 (N.D. Ill. 1996) ("By searching for support for his opinion after he has formed it, the expert shows that he has not used the scientific method to derive his opinion.").  A court should consider in its *Daubert* analysis "[w]hether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Hoffman v. Monsanto Co.*, No. 2:05–CV–00418, 2007 WL 2984692, at *3 (S.D.W. Va. Oct. 11, 2007) (quoting Fed. R. Evid. 702 advisory committee's note); *see also Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422 (9th Cir. 1998) ("One very significant fact" is that the expert "developed [his] opinions expressly for the purpose of testifying").

Dr. Wagmeister, who is not an epidemiologist, reviewed the expert reports of two of plaintiffs' other experts (epidemiologist Dr. Singh and oncologist Dr. Weiss) sometime in the month or two before his initial deposition, 7/6/17 Wagmeister Dep. 12:21-13:7 (Ex. 3), with the purpose to see their thoughts regarding background of treatment, the oncologist's thoughts in relation to its side effects, and how the epidemiologist "correlates all the literature in a statistical nature, providing that Tasigna was the cause of accelerating atherosclerosis," *id.* at 13:20-14:6. When asked questions about one of the articles discussed in his report, a case series by Karl J. Aichberger, he said he would defer to Dr. Singh.  *Id.* at 53:16-20.  When asked about whether a

4

numerical difference in the rates of events in a study equates to a causal relationship, he again said he "would defer to the epidemiologist …." *Id.* at 63:15-17; *see also id.* at 82:16-18 ("You'll have to explain P values [regarding statistical significance] to me" because they "don't mean anything to me."); 4/19/18 Wagmeister Dep. 79:14 – 80:13 (Ex. 4) (relies on others to determine if results are statistically significant). Dr. Wagmeister should not be permitted to bootstrap what he learned from reviewing other experts' reports into admissible expert testimony on general causation. *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) (expert testimony that "merely parrots" another expert's opinion does not assist the trier of fact) (citing *Robinson v. Ford Motor Co.*, 967 F. Supp. 482, 487 n.2 (M.D. Ala. 1997)); *see also Parenti v. Cty. of Monterey*, No. 14-CV-05481-BLF, 2017 WL 1709349, at *6 (N.D. Cal. May 3, 2017) (excluding expert's testimony to the extent it was based on another witness's testimony) (citing *Dep't of Toxic Substances Control v. Technichem, Inc.*, No. 12-CV-05845-VC, 2016 WL 1029463, at *1 (N.D. Cal. Mar. 15, 2016) (excluding expert opinion in part because expert "often does no more than regurgitate information given to him by other sources"); *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *24 (N.D. Ill. Mar. 31, 2017) ("This kind of impermissible bolstering is neither helpful to the trier of fact nor is it based on sufficient facts or data.").[3]

Dr. Wagmeister's report also fails to include any discussion of data regarding stroke in patients receiving Tasigna, which is the event at issue in this case. *See* Report 7-10. Instead, Dr. Wagmeister discusses literature reports of atherosclerosis generally, and of peripheral arterial occlusive disease. *Id.* These data do not address the issue of medical causation for the event at issue here, stroke. Accordingly, Dr. Wagmeister's failure to distinguish between strokes and other injuries renders his general causation opinion a poor "fit" for this case, which is about a

---

[3] Even if Dr. Wagmeister had an opinion on general causation that he was qualified to offer and that was not simply a restatement of the opinions of plaintiffs' other experts, his opinions still are unreliable under *Daubert* for many of the same reasons as Dr. Singh's. For example, Dr. Wagmeister failed to consider and rule out the possible cardioprotective effect of Gleevec as an explanation for why more cardiovascular events were seen in the Tasigna than the Gleevec study arms. *See* NPC's Mot. to Exclude Dr. Singh, § I.B.2 (addressing Dr. Singh's failure to adjust for such an effect). When he was asked about the fact that zero cases of PAOD were observed in patients receiving Gleevec in ENESTnd, Dr. Wagmeister said "I'm not the scientist" and that he had not conducted his own research on the hypothesis that Gleevec is cardioprotective. 7/6/17 Wagmeister Dep. 64:1-65:16 (Ex. 3) (stating that "[b]ecause I don't take care of CML patients[ ] I only report what Novartis articles, what their authors, essentially, reported.")).

5

stroke. *See Daubert*, 509 U.S. at 591-92; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (finding expert testimony unreliable based on "analytical gap" between data and conclusions).

Dr. Wagmeister simply lacks the qualifications, by experience or training, to offer opinions in this case regarding the issues of general or specific causation in this case.

II. **DR. WAGMEISTER'S RELIANCE ON HIS BELIEF THAT MR. MCWILLIAMS' ATHEROSCLEROSIS WAS "RAPIDLY PROGRESSING" TO EXCLUDE MR. MCWILLIAMS' OTHER WELL KNOWN RISK FACTORS FOR ATHEROSCLEROSIS IS UNRELIABLE AND *IPSE DIXIT*.**

An expert witness' opinion must be based on a chain of sound scientific reasoning and not just his own belief in its accuracy. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"). Merely assuming a causal relationship because of a temporal relationship is unreliable under *Daubert*. *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1254 (11th Cir. 2010) (excluding opinion that medication caused diabetes based on a differential diagnosis where the expert relied on the temporal proximity of the use of drug and diagnosis of diabetes). As another appellate court noted in rejecting such testimony:

> Essentially, this is a bit like saying that if a person has a scratchy throat, runny nose, and a nasty cough, that person has a cold; if, on the other hand, that person has a scratchy throat, runny nose, nasty cough, and wears a watch, they have a watch-induced cold.

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 673 (6th Cir. 2010) (quoting *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 882 (W.D. Tex. 1997)). "Such reasoning is extremely suspect, which has prompted other courts to reject it as unscientific in the absence of convincing epidemiology evidence." *Kelley*, 957 F. Supp. at 882.

To satisfy the reliability requirement of *Daubert* and Rule 702, Dr. Wagmeister was required to consider and rule out the potential alternate causes of Mr. McWilliams' atherosclerosis in a scientific manner, which he failed to do. When properly conducted,

6

differential diagnosis[4] can be a reliable methodology for the determination of specific medical causation. *Guinn*, 602 F.3d at 1253. When performing a differential diagnosis, the physician considers all relevant potential causes of the symptoms and then eliminates alternative causes. *Id.* However, the reliability of an expert's techniques cannot be established merely by a claim that the expert performed a differential diagnosis. *Guinn*, 602 F.3d at 1253; *McClain v. Metabolife Intl., Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005); *Tamraz*, 620 F.3d at 674 ("[s]imply claiming that an expert used the 'differential diagnosis' method is not some incantation that opens the *Daubert* gate").

An expert "must provide a reasonable explanation as to why 'he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause' of the plaintiff's injury." *Guinn*, 602 F.3d at 1253 (alterations in original) (citing *Best v. Lowe's Home Ctrs. Inc.*, 563 F.3d 171, 179 (6th Cir. 2009)); *Clausen v. M/V/ New Carissa,* 339 F.3d 1049, 1058 (9th Cir. 2003) (rejection of alternative hypotheses must use scientific methods and procedures and "be founded on more than 'subjective beliefs or unsupported speculation'"); *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 694 (8th Cir. 2001) (stating an expert must "be able to explain why other conceivable causes are excludable"); *Westburry v. Gislaved Gummi AB*, 178 F.3d 257, 265-66 (4th Cir. 1999) (holding an expert must provide some explanation of why other potential causes were not the sole cause). If the doctor uses very few standard diagnostic techniques to "rule out" alternative causes, a good explanation must be offered as to why an alternative cause suggested by the defense was not the sole cause. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 760 n.31 (3d Cir. 1994). The failure to rule out alternative causes is fatal to the reliability prong because "it means that these alternative causes may have been the sole causes of plaintiffs' injuries." *Id.* at 761 n.31; *Clausen,* 339 F.3d at 1058 (district court may exclude expert that fails to explain why proffered alternative cause was ruled out during differential analysis); *Whisnant v. U.S.*, No. C03-5121, 2006 WL 2861112, at *4 (W.D. Wash. Oct. 5, 2006) (excluding expert that failed to rule out other potential causes of plaintiff's symptoms); *Conde v. Velsicol Chem. Corp.*, 24 F.3d

---

[4] This is more precisely called a differential *etiology*. It is different from a differential diagnosis that doctors routinely perform in their clinical practices. "[D]ifferential diagnosis refers to a method of determining which of two diseases a patient suffers from, whereas differential etiology is a term used to describe the process by which the cause of an injury is determined." *Guinn*, 602 F.3d at 1257 n.6.

7

Case 2:17-cv-14302-RLR   Document 60   Entered on FLSD Docket 05/21/2018   Page 11 of 15

809, 814 (6th Cir. 1994) (excluding causation opinions because experts were unable to rule out other potential causes for the plaintiffs' symptoms).

Dr. Wagmeister failed to meaningfully consider and rule out alternative causes of Mr. McWilliams' atherosclerosis because he bases his opinion on what he identifies in the literature as "an association between Tasigna and the *rare* form of severe, accelerated atherosclerosis observed in this case." *See* Wagmeister Report at 7 (Ex. 1) (emphasis in original). However, when asked to objectively define what that means (without reference to Tasigna), it became apparent that Dr. Wagmeister could not:

> Q. In your opinion, what constitutes rapidly developing?
>
> A. Well, reading his abstract, it says, "Three of the 24 CML patients developed a rapidly progressing Peripheral Arterial Occlusive Disease during treatment with nilotinib."
>
> Q. I understand those are the words on the page, but what I'm trying to understand is what that term means to you, in your opinions in this case?
>
> A. Someone who developed peripheral vascular disease that required surgical intervention in a brief duration of time –
>
> Q. Is there –
>
> A. – who did not have such peripheral disease known prior to that time element.
>
> Q. Uh-huh
>
> A. As he says, "No peripheral atherosclerosis disease was known before nilotinib therapy in these patients."
>
> Q. Would you agree that – let's – I want to focus on what – you use the word "brief" now. The atherosclerosis developed over a "brief" period of time?
>
> A. I think I said the symptoms of the progressed disease developed where it was not known prior to nilotinib treatment, the patient now had symptomatic peripheral vascular disease requiring surgical intervention.
>
> Q. And what constitutes a development of symptoms over a brief period of time? Is that three months? Six months? A year? Two years?
>
> MR. ELIAS: Object to form.

8

> THE WITNESS: **Whenever it occurred. In fact, that it wasn't present prior to a certain treatment and now was overtly present during the treatment.**

7/6/17 Wagmeister Dep. 55:12-56:20 (Ex. 3) (emphasis added).[5] Under this definition, any patient who does not have clinical symptoms of atherosclerosis prior to starting Tasigna, who then develops symptoms during treatment, has atherosclerosis that is caused by Tasigna. This opinion is simply the recognition of a temporal association, and a temporal association alone is not adequate to establish causation. *See Guinn*, 602 F.3d at 1254; *Brumbaugh v. Sandoz Pharm. Corp.*, 77 F. Supp. 2d 1153, 1156 (D. Mont. 1999) (excluding expert testimony relying on temporal association between medication and occurrence of adverse events). Even plaintiffs' epidemiologist Dr. Singh had to admit that there is no statistically significant evidence that treatment with Tasigna is associated with a rare, rapidly progressing form of atherosclerosis. NPC's Mot. to Exclude Dr. Singh § II.B (citing, *e.g.*, Sonal Singh Dep. 35:18-36:2, July 20, 2017 (Ex. 6) ("7/20/17 Singh Dep.") ("Q. Okay. What evidence do you have in your report that shows that there is a statistically significant association between the use of nilotinib and a uniquely rapidly developing and aggressive form of atherosclerotic events? A. So -- so to that particular question, these case reports do not provide statistical significant evidence. They just describe, you know, the occurrence of these rapidly progressive events.").

This rapid progression hypothesis is Dr. Wagmeister's sole basis to exclude any of the more likely and recognized causes of Mr. McWilliams' atherosclerotic disease, including smoking history, hypertension, family history, obesity, and hyperlipidemia simply because Mr. McWilliams had taken Tasigna.[6] *See* Wagmeister Report at 5-6 (Ex. 1). Dr. Wagmeister must rely on this undefined "rapid progression" because he admits that he sees in clinical practice

---

[5] Not only is there not a maximum length of time between Tasigna therapy beginning and the development of atherosclerosis that Dr. Wagmeister could provide to say when a patient's condition may not have been caused by Tasigna, he also could not provide a minimum amount of time that in his opinion it would take Tasigna to cause atherosclerosis. *Id.* at 57:11-13 ("The fact that it occurs in and of itself is disturbing.").

[6] Dr. Wagmeister admits that known risk factors for atherosclerosis include diabetes, hypertension, family history, age itself, obesity, lack of physical activity, smoking, and hyperlipidemia. 7/6/17 Wagmeister Dep. 66:12-67:18 (Ex. 3) (noting that diabetes is one of the "higher risk factors"); *see also id.* at 74:9-17 (agreeing diabetes can cause peripheral vascular disease, cerebral vascular disease, and coronary artery disease)).

9

patients who develop severe atherosclerotic disease not treated with Tasigna. 7/6/17 Wagmeister Dep. 45:10-17 (Ex. 3); *see also id.* at 33:12-15.

Similarly, Dr. Wagmeister rules out Mr. McWilliams' acknowledged risk factors for atherosclerosis – including his "smoking history," "hypertension," "family history," "weight," and "hyperlipidemia" – as the cause of his atherosclerosis because he was 48 years old "during the period of accelerated atherosclerosis." Wagmeister Report at 5-6 (Ex. 1). Dr. Wagmeister reaches this conclusion because he does not recall ever having had a patient with a critical stenosis – i.e., at least 90 percent occlusion of the carotid artery – before the age of 50. 4/19/18 Wagmeister Dep. 75:6-10 (Ex. 4); Wagmeister Report at 6, 9 (Ex. 1).[7] But Dr. Wagmeister has never seen a CML patient, 7/6/17 Wagmeister Dep. 43:5-12 (Ex. 3), let alone a CML patient who also the additional acknowledged risk factors for stroke that Mr. McWilliams has. Moreover, Dr. Wagmeister does admit that atherosclerosis can occur in individuals in their 30s; that it can develop more quickly in some patients, and more slowly in others; and that atherosclerosis can go for years or decades without it being detected. *Id.* at 49:6-19, 48:8-14, 51:19-22.

Dr. Wagmeister has not reliably considered and ruled out Mr. McWilliams' accepted risk factors for atherosclerosis, contrary to the requirement that an expert "take serious account of other potential causes." *Guinn*, 602 F.3d at 1253. Dr. Wagmeister rules out hypertension, for example, based on the fact that Dr. Wagmeister believes he received no medication for it prior to January 2012. Wagmeister Report at 5 (Ex. 1). Dr. Wagmeister provides no citation to any medical record or scientific literature in the section of his report where he dismisses hypertension as a cause for Mr. McWilliams' stroke. *Id.* Moreover, in his rebuttal report, he states that Mr. McWilliams "more often registered normal readings" than high blood pressure. Rebuttal Report at 6 ") (Ex. 2) (providing a list of "normal readings"). Dr. Wagmeister, however, did not keep any tally comparing the number of high versus normal blood pressures to support that statement. 4/19/18 Wagmeister Dep. 118:15-17 (Ex. 4). This *ipse dixit* say-so, without connection to

---

[7] Dr. Wagmeister's claims regarding his 37-years of clinical experience are at odds with reported cases of 26 patients under the age of 50 who were treated at one university hospital who required the same surgical intervention for carotid artery stenosis that Mr. McWilliams did. Martin GH, et al. *Carotid artery endarterectomy in patients Less than 50 years old.* J Vasc Surgery 26(3):447 (1997) (Ex. 7); 4/19/18 Wagmeister Dep. 88:11-90:17 (Ex. 4) (noting that article reports that "some investigators have proposed that the atherosclerotic process seen in these younger patients is more virulent and diffuse than that seen in older populations with earlier onset accelerated progression").

10

underlying data, renders Dr. Wagmeister's differential diagnosis inadmissible. *Guinn,* 602 F.3d at 1252 (noting trial court's finding that causation opinion "amounts to nothing more than inadmissible *ipse dixit*, as 'the only connection between the conclusion and the existing data is the expert's own assertions.' (quoting *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004))).

## CONCLUSION

For the foregoing reasons, the Court should grant this motion and exclude Dr. Wagmeister's expert testimony on the topics enumerated in his reports.

## LOCAL RULE 7.1(a)(3) CERTIFICATION

Counsel for NPC has conferred with counsel for plaintiffs regarding the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so.

Dated:  May 21, 2018                                    Respectfully submitted,

s/ Michael J. Thomas
Michael J. Thomas
PENNINGTON, P.A.
215 South Monroe Street, 2nd Floor
Tallahassee, FL 32301
Phone: 850-222-3533
Fax: 850-222-2126
mike@penningtonlaw.com

Robert E. Johnston (admitted *pro hac vice*)
(rjohnston@hollingsworthllp.com)
Andrew L. Reissaus (admitted *pro hac vice*)
(areissaus@hollingsworthllp.com)
HOLLINGSWORTH LLP
1350 I Street, NW
Washington, DC 20005
Phone: (202) 898-5800
Fax: (202) 682-1639

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2018, the foregoing was filed with the Clerk of the Court and served in accordance with the Southern District of Florida's Rules on Electronic Service upon the following parties and participants:

>Bryan F. Aylstock, Esq.
>AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
>17 E. Main Street, Suite 200
>Pensacola, Florida 32502
>Miami, FL  33130
>
>Richard M. Elias, Esq.
>Greg G. Gutzler
>Tamara M. Spicer
>ELIAS GUTZLER SPICER LLC
>130 South Bemiston Avenue, Suite 302
>St. Louis, MO  63105
>
>James G. Onder
>Evan Murphy
>ONDER LAW
>110 East Lockwood
>St. Louis, MO

s/ Michael J. Thomas
Michael J. Thomas
