# Exhibit 2

**Rebuttal Report of Robert Wagmeister, M.D.**

I.  **Introduction**

I have reviewed and been asked to comment on aspects of the reports of Frank Giles, M.D., Chitra Venkatasubramanian, and Javid Moslehi, M.D. submitted by Novartis. I address each of these reports below.

II.  **Frank Giles, M.D.**

Dr. Giles offers five opinions, three of which I have been asked to address: (1) Opinion 2, where he opines that there is insufficient data to establish a causal relationship between Tasigna and atherosclerosis-related diseases in general, (2) Opinion 3, where he claims that the cause and progression of Mr. McWilliams' conditions are adequately explained by his other risk factors, and (3) Opinion 5, where he claims that Mr. McWilliams has "minimal, if any, residual impairment from his cerebrovascular event in August 2013." As addressed below, I disagree with these assertions.

A.  Response to Giles Opinion 2

Ignoring the weight of the scientific literature establishing an association between nilotinib and accelerated atherosclerosis-related events, Dr. Giles asserts that there is insufficient data to establish a causal relationship. I disagree.

Dr. Giles does not dispute the multiple studies and trials that show a marked increase in vascular events in Tasigna as compared to other tyrosine kinase inhibitors (TKIs), including Gleevec. Instead, Dr. Giles claims that the number of events observed in Tasigna patients in randomized clinical trials is consistent with the rate of atherosclerosis-related diseases reported in the general population. His analysis is flawed for several reasons.

*First*, he does not address the obvious issue of a dose-related response of nilotinib versus imatinib in the ENESTnd trial. If Tasigna is not associated with an increase in vascular occlusive events, then why, in a randomized trial where risk factors are evenly distributed amongst the cohorts, are (1) the number of events in the Tasigna arms so much higher than the Gleevec arms, *and* (2) the number of events in the Tasigna 400-mg arm so much higher than in the 300-mg arm? Dr. Giles does not address this obvious evidence of causation.

*Second,* he repeatedly compares the *incidence* of events occurring in the ENESTnd trial with the *prevalence* of the disease reported in several studies. Incidence and prevalence are distinct concepts and should not be confused. Incidence measures the number or proportion of events that develop in a population during a given time frame, whereas prevalence measures the total number or proportion of events, whether pre-existing or newly developed. It is a fundamental mistake to compare the incidence in one population to the prevalence in another. Thus, comparing incidence of cases of vascular events in the ENESTnd trial to the prevalence of those events reported in other studies is not scientifically valid.

*Third*, the incidence of patients developing vascular occlusive events in the ENESTnd trial are not stratified by age (or other risk factors). As I will discuss in more detail in section II.B below, both the incidence and prevalence of vascular disease in the population increases dramatically with every 10 years, with a low incidence and prevalence prior to 50, and a markedly higher incidence and prevalence after 70. Because Dr. Giles does not stratify the ENESTnd data by age, there is no way to make a comparison between aged-matched cohorts in other studies, which is essential for any meaningful comparison.

*Fourth,* Dr. Giles fails to appreciate that the ENESTnd trial only reported *symptomatic* atherosclerosis-related disease, including peripheral arterial occlusive disease. This likely results in significant underreporting of vascular disease in the trial. For example, the vast majority of peripheral arterial disease is asymptomatic, compensated by the development of collateral arteries, and can only be detected by screening, such as taking a patient's ankle-brachial index, which the ENESTnd trial did not do. Thus, the actual incidence of vascular disease in the trial is likely significantly underreported.

This latter point cannot be lost on Dr. Giles, as he co-authored a paper on a prospective study that compared the rates of peripheral vascular disease occurring in Tasigna patients versus other controls, including Gleevec, by screening the patients with ankle-brachial index measurements.[1] The results of that study showed that 26% of first-line Tasigna patients and 35% of second-line Tasigna patients had peripheral vascular disease (as measured by ankle-brachial index) compared to 6.3% of patients in the Gleevec arm. Dr. Giles and the other authors wrote that the relative risk of peripheral vascular disease for first-line Tasigna patients versus Gleevec patients was *10.3 to 1*, a fact which Dr. Giles called "remarkable."[2] Dr. Giles further wrote that "numerous cardiovascular trials studying PAOD [peripheral arterial occlusive disease] in the normal population demonstrated frequencies of PAOD in age-matched cohorts ranging between 1.3 and 6.7%," which he noted was "comparable to the first-line imatinib group," and "*clearly suggests an elevated cardiovascular risk by nilotinib.*" (emphasis added).[3]

Dr. Giles further relies on a single paper—a paper funded by Novartis and co-authored with Novartis employees—for the proposition that the rates of peripheral vascular disease in Tasigna patients is consistent with those not taking Tasigna.[4] This was a retrospective study that attempted to compare Tasigna in some trials to non-TKI cohorts from non-Tasigna trials. The authors, including Dr. Giles, concluded that while there was an increase in the rate of peripheral vascular events in Tasigna versus Gleevec cohorts, the rate of events between the Tasigna cohort

---

[1] T.D. Kim, et al., *"Peripheral artery occlusive disease in chronic phase chronic myeloid leukemia patients treated with nilotinib or imatinib,"* Leukemia, vol. 27(6), pp. 1316-21 (June 2013).

[2] *Id.*

[3] *Id.*

[4] Giles F., et al., "*Rates of peripheral arterial occlusive disease in patients with chronic myeloid leukemia in the chronic phase treated with imatinib, nilotinib, or non-tyrosine kinase therapy: a retrospective cohort analysis*," Leukemia, vol. 27(6), 1310-15 (June 2013).

2

and the non-TKI cohort were similar. The authors speculated that Gleevec may have a protective effect against vascular disease.

Dr. Sonal Singh has addressed the flaws in this study and the use of the non-TKI cohort. I too share his concerns about the flaws and inadequacy of the non-TKI cohort as a valid control, because, among other things, the non-TKI arm was derived from clinical trials that did not involve Tasigna. In other words, the data is not derived from trials directly comparing a Tasigna cohort to a non-TKI cohort. This single study based on a flawed non-TKI control does not withstand the weight of evidence (from the United States and Europe) repeated in multiple randomized clinical trials, prospective controlled experiments, retrospective studies, and case reports consistently showing an association between Tasigna and cardiovascular events. This includes the clear association demonstrated by the ENESTnd randomized trial, where despite risk factors being evenly distributed amongst the three arms, there is a significant increase of events in the nilotinib arms in a dose-response-related manner.

Finally, Dr. Giles dismisses the numerous published case reports describing the unusual and rapidly progressing course of the observed vascular disease while on Tasigna (strikingly similar to what we observed in Mr. McWilliams' case), claiming that none of these reports are supported by evidence at baseline. This is false. As discussed in my initial report, Mirault et al. reported on the case of a 55-year-old man with no significant cardiovascular risk factors, who was *pre-screened* for arterial disease prior to Tasigna therapy and found to have none, and who within one year on Tasigna developed severe peripheral arterial disease with additional newly formed silent stenosis in his renal and mesenteric arteries as revealed on angiography.[5] This is an extraordinary and unusual progression of the disease, which coincided directly with Tasigna treatment. The authors concluded that this is direct evidence of the link between Tasigna and accelerated atherosclerosis. I strongly agree. Dr. Giles does not address this article.

### B. Response to Giles Opinion 4

In opinion 4, Dr. Giles asserts that Mr. McWilliams' "risk factors" sufficiently explain his rapidly developing atherosclerotic-related disease at the age of 48. In so doing, Dr. Giles makes several overt misrepresentations that are either unsupported or flatly contradicted by the medical record, while ignoring critical facts indicating that Mr. McWilliams' stroke was caused by Tasigna.

> *1. Dr. Giles fails to appreciate the rarity and unusual development of the events seen in Mr. McWilliams, who was 48 when diagnosed.*

To begin with, it is important to emphasize the ***rarity*** of the events that were observed in Mr. McWilliams. It is uncommon for any 48-year-old male to have critical carotid artery

---

[5] T. Mirault, et al., *"Rapid onset of peripheral artery disease in a chronic myeloid leukemia patient without prior arterial disorder: direct relationship with nilotinib exposure and clinical outcome,"* European Journal of Haematology, vol. 94(4), pp. 363-67 (April 2015).

3

stenosis leading to a stroke. Indeed, any atherosclerotic disease that manifests before 50 is considered premature and rare.

Dr. Giles makes generalized statements about the incidence and prevalence of atherosclerosis-related diseases (which are not stratified by age), suggesting that atherosclerotic-related diseases are common even for a man who is 48 years old.[6] The data proves otherwise. According to Rutherford's Vascular Surgery—the definitive reference textbook in vascular surgery—the annual incidence of stroke in white males ages 45 to 54 in the United States is 1.1 per 1,000 persons, or **0.11%**[7]:



**Figure 1 (Copied from Rutherford's Figure 97-2, annual incidence of first cerebral infarction by age, sex, and race)**

Similar statistics are consistently reported in the very source material cited by Giles—Benjamin et al.—which reports incidence rates in white males ages 45-54 ranging from 0.11% to 0.24%.[8] Indeed, Benjamin et al., notes that "strokes in the young," characterized by strokes occurring between 18 and 50, has an incidence of 0.048% in the United States.[9] All of this data confirms that strokes in white males under the age of 50 are **uncommon.**

The same holds true with all atherosclerotic-related disease. For example, peripheral artery disease is also uncommon for individuals under the age of 50, which is shown convincingly in the article by Nehler et al.[10] cited by Dr. Giles.[11] Dr. Giles cites the article for

---

[6] Giles Report, at pp. 13-16.

[7] Cronenwett, J., et al., Rutherford's Vascular Surgery, ch. 97, p. 1457 (8th Ed. 2014).

[8] Benjamin EJ, et al., *"Heart Disease and Stroke Statistics-2017 Update: A Report from the American Heart Association,"* Circulation, 2017 Mar 7, at e250-52, Charts 14-2 to 14-5.

[9] *Id.* at e245.

[10] Nehler, MR, et al. *"Epidemiology of peripheral arterial disease and critical limb ischemia in an insured national population,"* J. Vasc. Surg., vol. 60(3), pp. 686-95 (2014).

4

the general proposition that peripheral artery disease has an incidence and prevalence of 2.69% and 12.02% respectively.  This data in its aggregate form is unhelpful, because, among other things, it is not stratified by age.  Nehler et al., however, did stratify the cases of peripheral artery disease, including critical leg ischemia, by age.  Simple calculations of the stratified data show that in the 40-49 age group, the incidence and prevalence of all peripheral artery disease was **0.17% and 0.89% respectively**.[12]  For the subgroup of critical limb ischemia, the incidence and prevalence was **0.025% and 0.11% respectively**.[13]  In other words, peripheral vascular disease in individuals under the age of 50 is *extremely* rare.

Dr. Giles also fails to consider or appreciate the unusual course of Mr. McWilliams' carotid artery disease.  As I described in my original report, in January 2013, a Doppler ultrasound of Mr. McWilliams' carotid arteries as reported by the reviewing physician at that time, Dr. Sabrina Talbott, indicated that he had an estimated 50 percent stenosis in his right internal carotid artery.  I agree with that conclusion based on the velocities reported and gray scale imaging.  But the same scan taken 7 months later indicated a "severe stenosis of greater than 80%" in the right internal carotid artery, which was "substantially worse[] compared to the previous study."[14]  A subsequent more accurate MRA scan and CT angiogram revealed even worse atherosclerotic disease, i.e. a near-occlusion (99 %) in the artery, the so-called 'string sign'[15]

Consistent with my decades-long experience as a vascular surgeon, atherosclerotic disease, including disease of the carotid artery, is a slowly progressing disease that develops over decades, not months. This concept is clearly acknowledged on page 11 by one of the other defense experts, Dr. Moslehi, who states in his report that "the disease takes years to develop."

The progression that we observed in this case is inconsistent with the expected natural history of the disease.  This is not just my observation but was the observation of both the

---

[11] Giles Report, at p. 14.

[12] Nehler et al.  The calculation is as follows.  Table II.A and II.B stratify the incidence and prevalence for peripheral artery disease by subgroups, including age.  The incidence rate for all peripheral artery disease for the age 40-49 subgroup was 6.5% of the total peripheral artery disease population (which was 2.69% of the total population sampled).  The prevalence rate for the same group was 7.4% of the total peripheral artery disease population (which was 12.02% of the total population sampled).  Thus, for the 40-49 age group, the incidence was 0.17% (.065*.0269), and the prevalence was 0.89% (.074*1202).

[13] Nehler et al.  The calculation is as follows.  According to Table II.A, the incidence rate for secondary critical limb ischemia for the age 40-49 subgroup was 6.4% of the total secondary critical limb ischemia population (which was 0.16% of the total population).  According to Table II.B, the prevalence rate for the same group was 6.4% out of the total secondary critical limb ischemia population (which was 0.86% of the total population).  Thus, the incidence rate for secondary critical limb ischemia was .010% (.064*.0016) and the prevalence for the same group was 0.055% (.064*.0086).  Applying the same methodology for the primary critical limb ischemia groups, the incidence and prevalence rate for the age 40-49 subgroup was 0.015% and 0.059% respectively.  Thus, the total incidence for all critical leg ischemia in the age 40-49 subgroup was 0.025% (0.010% + 0.015%), and the total prevalence for the same group was 0.11% (0.055% + 0.059%).

[14] McWilliams-00587.

[15] MCWILLIAMS_DENNIS-FL-0030-00007 to 8.

5

treating vascular surgeon, Dr. Rene Loyola, and neurologist, Dr. Michael Maraist, who found the progression of Mr. McWilliams' disease to be "unusual" and "unexpected." This unusual and unexpected progression of the disease is strikingly consistent with the numerous published studies and reports of individuals on Tasigna developing an accelerated form of atherosclerosis.[16] Dr. Giles does not acknowledge these important facts. It is, therefore, my opinion that Tasigna caused the rapidly developing atherosclerosis that we observed in Mr. McWilliams, which caused his stroke.

### 2. Mr. McWilliams' General Risk Factors Do Not Account for the Observed Accelerated Atherosclerosis.

Dr. Giles attributes the development of atherosclerosis observed in Mr. McWilliams to general risk factors. I strongly disagree.

First, while Mr. McWilliams did at times record high blood pressure, he more often registered normal readings, as I have documented in the below table:

**Table 1. McWilliams Blood Pressure Readings**

| Date | Blood Pressure |
| --- | --- |
| 7/19/07 | 120/80 |
| 1/8/08 | 110/70 |
| 7/21/08 | 130/80 |
| 9/16/10 | 120/70 |
| 2/21/11 | 120/80 |
| 6/23/11 | 110/70 |
| 7/15/11 | 130/80 |
| 11/9/11 | 130/80 |
| 4/11/12 | 120/80 |
| 9/27/12 | 120/80 |
| 4/24/13 | 130/80 |

These measurements do not demonstrate a consistent, uncontrolled high blood pressure. Thus, even though Mr. McWilliams did at times have readings above the normal range, his purported high blood pressure was not uncontrolled and did not require any medication until 1/3/12, when his ongoing primary care physicians, Dr. Shaikh, prescribed Edarbi. Subsequent readings as shown above continue to show normal measurements. Short term high blood pressure controlled on medication simply does not explain or account for the rapid progression of atherosclerosis observed in Mr. McWilliams.

Second, contrary to Dr. Giles' assertion, Mr. McWilliams did not have hyperlipidemia prior to his stroke. The results of his lipid panel reported on June 6, 2011 showed triglycerides that where barely elevated at 156 mg/dl (the upper range of normal being 149 mg/dl). While his HDL cholesterol (referred to as "good cholesterol") was slightly low, his total cholesterol was at

---

[16] *See e.g.,* Miraul et al.; K. Aichberger et al., *"Progressive peripheral arterial occlusive disease and other vascular events during nilotinib therapy in CML,"* Am. J. Hematology, vol. 86(7), pp. 533-39 (July 2011); Mirault et al.

6

159 mg/dl, which is comfortably within the normal cholesterol range.  More importantly, the LDL or "bad cholesterol" was normal at 96, which is below the recommended threshold of 100 for prevention of atherosclerosis.  With those values, no physician would have prescribed statins.  Therefore, there is no evidence that Mr. McWilliams had hyperlipidemia prior to his stroke.  This is confirmed by the fact that prior to his stroke, none of his treating physician ever diagnosed Mr. McWilliams with hyperlipidemia or prescribed medication to treat hyperlipidemia.

Third, Mr. McWilliams' family history does not indicate he was at risk for stroke.  There is no family history of premature atherosclerosis (atherosclerosis-related diseases manifesting prior to 50) and there is no family history for stroke or carotid artery stenosis.  That his mother had coronary artery disease in her 60s and his father had coronary artery disease in his 80s does not suggest that Mr. McWilliams would develop severe premature atherosclerosis at the age of 48 resulting in a stroke.

Fourth, Mr. McWilliams' smoking history does not explain his accelerated atherosclerosis.  While smoking is a risk factor for atherosclerosis, Mr. McWilliams had quit smoking entirely for three years prior to his stroke as stated by him in my telephone interview with him.  Dr. Giles and the other Novartis-retained doctors suggest that quitting smoking is not considered a risk mitigation factor for at least 10 years.  This is incorrect.  As stated in their own source material, any discontinuation of smoking reduces the risk of stroke.[17]  While the risk reduction may increase over time, significant risk reduction can be expected year after year.  Further, and most importantly, one would not expect to see a period of rapid acceleration of atherosclerosis in a patient after three years of non-smoking, particularly in a young patient with Mr. McWilliams' health profile, *i.e.,* no major risk factor of diabetes mellitus or other lesser risk factors of hypertension, hyperlipidemia, and family history.

Finally, since the discontinuation of Tasigna, no significant atherosclerosis-related conditions have been observed in Mr. McWilliams, as evidenced by annual ultrasounds of his carotid arteries as recently as a 11/7/17 office visit with Dr. Loyola.  Further, recent testing for atherosclerosis-related diseases in his coronary and peripheral arteries have shown no signs of disease.  For example, on an office visit with Dr. Loyola on 10/2/17, it is reported that his peripheral pulses are all intact and palpable 2+ and  Mr. McWilliams was informed that he does not have peripheral vascular disease.  Despite the fact that he is being treated with medications for risk factors of hypertension and hyperlipidemia, the absence for development of atherosclerosis over the last five years, further implicates Tasigna as the causative agent. While Dr. Giles and the other Novartis-retained doctors contend that Mr. McWilliams' prior smoking history and other general risk factors are the exclusive causes of his accelerated atherosclerosis, they fail to address or attempt to explain why he has not experienced a similar recurrence in any vascular system—peripheral, coronary, or cerebral—since he stopped taking Tasigna.  The only risk factor that has been removed from the equation is Tasigna, which Dr. Giles and Moslehi both concede is associated with atherosclerotic events.  But Dr. Giles and the other Novartis-retained doctors have not even attempted to address this important issue and they exclude Tasigna as a contributing factor to Mr. McWilliams's stroke.

---

[17] Benjamin et al, e237.

In summary, while Mr. McWilliams had some general risk factors, they do not account for the rapidly developing vascular disease that occurred in his carotid arteries at the age of 48. The only agent that reasonably accounts for this development is Tasigna, which has been associated in myriad studies with accelerated atherosclerosis-related conditions, including stroke.

### C. Response to Giles Opinion 5

In Opinion 5, Dr. Giles makes the unsupported assertion that "Mr. McWilliams achieved a rapid recovery with minimal, if any, residual impairment from his cerebrovascular event." Dr. Giles makes this assertion without ever treating or assessing Mr. McWilliams' cognitive ability, at any time, following his stroke. I disagree with Dr. Giles's unsupported assertion.

First, it is important to note what a stroke is. A stroke is a cerebral infarction, an irreversible death of cerebral brain tissue. The dead portions of his brain will never reverse, never repair, and never recover. It is a permanent loss. It is thus impossible to assess the magnitude and extent of that loss absent a thorough neurolgical exam—which Dr. Giles did not perform.

Second, the only two neuorlogists who did conduct a neurological exam of Mr. McWilliams both concluded that he suffered impairments from his stroke that prevented him from continuing his employment as a police detective. On September 10, 2013, neurlgist Dr. Michael Maraist performed a neurological exam, and found, among other things, that Mr. McWilliams continued to have a mild facial droop, downward drift of his left upper extremity, and weakness throghout his left side with decreased dexterity on the left. His gait assessment was unsteady, and he had positive Romberg test results (indicating a loss of balance). Dr. Maraist concluded: "Based on the deficits from this unfortunate event, I do not feel that he is capable of returning to work."

Then, on October 4, 2013, the Board of the City of Fort Pierce Retirement and Benefit System hired an independent neurolgist, Dr. Peter Aldana, to assess Mr. McWilliams. Dr. Aldana concluded that Mr. McWilliams had "significant residual deficits from his stroke, including left hemianesthesia, left hemiparesis, as well as speech and cognitive impairment." The report further concluded that Mr. McWilliams had significant central fatigue, problems coordinating on his left side, and possible underlying visual disturbance. Dr. Aldana thus concluded: "It is my opinion that this patient is permanently disabled and is mentally and physically incapacitated for duty in his previous employment. This incapacity is permanent, and it is my opinion that this patient should retire from his current employment."

Remarkably, Dr. Giles mentions *none of this* in his conclusory statement suggesting that Mr. McWilliams has fully recovered from his stroke. This unsupported opinion, which ignores key findings by two unbiased neurologists, is unscientific, and I strongly disagree with it.

### III.  Dr. Chitra Venkatasubramanian

Dr. Venkatasubramanian opines that the course and time of Mr. McWilliams' carotid artery disease and resulting stroke is consistent with patients of similar health profiles. Her

8

opinion and reasoning are almost identical to those of Dr. Giles, the flaws of which I have addressed in detail above, and will not repeat here.  Notably, Dr. Venkatasubramanian reaches her conclusion without acknowledging or addressing the substantial literature showing an association between Tasigna and atherosclerotic-related events.  Indeed, she has not even examined the data from the ENESTnd trial, the prospective and retrospective studies, and other literature demonstrating an association between Tasigna and accelerated atherosclerosis.[18]  Thus, Dr. Venkatasubramanian has not attempted to and cannot exclude Tasigna as a cause of Mr. McWilliams' accelerated atherosclerosis.

Without acknowledging the rarity of strokes in persons under 50, or the conclusions of both Mr. McWilliams' treating vascular surgeon and neurologist that his stroke and clincial course was unexpected and unusual, Dr. Venkatasubramanian states that she encounters "not infrequently patients under 50-years old with internal carotid artery stenosis who have had a resulting stroke."  Unless Dr. Venkatasubramanian's practice focuses on a patient population with rare and premature forms of atherosclerosis, I find this claim dubious.  In my over 37 years of practice as a vascular surgeon, in which I have performed more than a thousand carotid endarterectomies, I cannot recall ever having a patient under 50 with critical stenosis of his or her carotid artery secondary to atherosclerosis that resulted in a stroke.  Colleagues of mine report a similar experience, perhaps less than a handful at best, all of us practicing in a busy urban setting. The epidemiological data, reinforced by my personal experience, proves that such events are rare.

Dr. Venkatasubramanian states, without support, that despite the conclusions of treating physician Dr. Sabrina Talbott that Mr. McWilliams' stenosis in his right internal carotid artery as of January 2013 was about 50%, that his stenosis was actually between 60-69%.  I disagree.  I have reviewed the report and the attendant imaging and fully concur with Dr. Talbott that the degree of stenosis in Mr. McWilliams was closer to 50%.  This is supported by scholarly sources, such as Rutherford, which, as described, is the definitive source for vascular surgery.  Mr. McWilliams' January 2013 report indicated an ICA/CCA ratio of less than two, at 1.7.  When describing the consensus criteria for interpretation of carotid duplex imaging, Rutherford's indicates that an ICA/CCA ratio of less than 2 is consistent with a normal carotid artery or stenosis of less than 50%.[19]  While Mr. McWilliams' peak systolic velocity of his internal carotid artery was slightly elevated, the ICA/CCA ratio, as well as the gray scale imaging, indicates, as Dr. Talbott observed, a "minimal" atheroclertoic plaque build up in the right internal carotid artery of around 50%.  Dr. Venkatasubramanian's opinion to the contrary is wholly unsupported.  Even in her own report on page 13, she states that carotid ultrasound … "does not give actual measurements of the blood vessels. It estimates a range of stenosis…."  Moreover, no matter what the precise stenosis was as of January 2013, it is undisputed that the carotid scan taken seven months later showed a "substantial worsening" of the stenosis compared to the earlier scan.  It is this rapid acceleration, which is extremely unusual, that implicates Tasigna.

Dr. Venkatasubramanian further opines that Mr. McWilliams had a transient ischemic attack (known as TIA or"mini stroke") in January 2013.  I strongly disagree.  The only symptom

---

[18] *See* Venkatasubramanian Report, Attachment B, "Material Reviewed."
[19] Rutherford's, ch. 16, pp. 238-39.

9

that Mr. McWilliams presented with in January 2013 is pre-syncope (lightheadedness or near-fainting).  Syncope or pre-syncope is ***not*** a symptom of unilateral carotid artery stenosis or occlusion.  Indeed, Rutherford's recognizes that "[u]nconsciousness (including syncope)" is a symptom "unlikely to be related to carotid disease."[20]  While pre-syncope or syncope can be associated with a global hypoperfusion secondary to multi-vessel extracranial stenosis/occlusion, it is not a symptom of a single vessel ischemia, which is what Mr. McWilliams ultimately had.

Notably, despite being evaluated for a potential stroke in January 2013, no treating physician found any signs or symptoms consistent with a stroke or transient ischemic attack.  Dr. Venkatasubramanian's opinions to the contrary are once again wholly unsupported, and against the weight of the evidence and the conclusions of the physicians who actually treated and analyzed Mr. McWilliams and his symptoms.  Therefore, it is my opinion that Mr. McWilliams did not present with symptoms of a transient ischemic attack in January 2013, and given the mild nonhemodynamically significant atherosclerosis in his carotid arteries revealed by the duplex scans, no further imaging or testing was indicated, and there was certainly no indication for an invasive revascularization procedure.

Finally, Dr. Venkatasubramanian opines that Mr. McWilliams had minimal residual impairment from his stroke, noting that the "records of the multiple physicians who have continued to follow Mr. McWilliams to this day do not provide any basis to conclude that Mr. McWilliams' August 2013 stroke has resulted in lasting disability."  This statement is false—as discussed above, at least two neurologists, after conducting full neurological exams, concluded that Mr. McWilliams could not longer continue his employment as a police detective.  One of them, Dr. Aldana—an independent neurologist hired by the Port St. Lucie retirement board—concluded that Mr. McWilliams had "significant residual deficits from his stroke" and was thus "permanently disabled and is mentally and physically incapacitated for duty in his previous employment."  Thus, Dr. Venkatasubramanian's opinion is based on the false assumption that no treating physician deemed Mr. McWilliams to have a lasting disability.  Given that a stroke results in permanent and irreversible death to portions of the brain, it is not scientifically acceptable for Dr. Venkatasubramanian to conclude that Mr. McWilliams has minimal residual impairment, when she has never seen, spoken with, or treated Mr. McWilliams, and when the two neurologists who did treat and/or examine him concluded that he had lasting or permanent disability.

## IV.    Dr. Javid Moslehi

Dr. Moslehi's report is repetitive of those of Dr. Giles and Dr. Venkatasubramanian, and I have already addressed above the points raised in his report.

I do, however, note that while Dr. Moslehi denies that causation has been "clearly established," he agrees that "the available data, including Novartis's data from ENESTnd, demonstrates an association between nilotinib and cardiovascular events, such as vascular events.  These data raise the hypothesis that nilotinib is causally related to atherosclerosis."[21]  As he indicates in his report, he has published on this admitted association.

---

[20] *Id.* at ch. 97, pp. 1467-68.
[21] Moslehi Report, at p. 5.

10

In one article published in the Journal of the American College of Cardiology, Dr. Moslehi writes:

> **Nilotinib-associated vascular toxicities and possible mechanisms.** More recently, vascular toxicities have emerged as a critical concern with nilotinib. In a retrospective analysis of 179 patients [published in 2011] who received nilotinib in 4 centers, 11 (6.15%) patients developed severe and previously unrecognized peripheral atherosclerosis that required invasive therapy, including angioplasty and limb amputation. In a 3-year follow up of a pivotal trial comparing imatinib and nilotinib in newly diagnosed CML patients, 7 patients on nilotinib developed vascular events (VE), equating to a frequency of 1.2% after a median follow-up of 3 years, whereas there were no VE in the imatinib arm. After a follow-up of 4 years, 2 additional VE have occurred in the nilotinib arm.
>
> Unfortunately, in most clinical trials with nilotinib, VE was not systematically evaluated or graded. A prospective study [published in April 2013] of 129 patients with CML systematically assessed ankle-brachial index in all patients. Peripheral arterial disease was discovered in 6.3% with first-line imatinib, 26% with first-line nilotinib, and 35.7% with second-line nilotinib—far higher than previously reported, suggesting the possibility of accelerated atherosclerosis may be the underlying cause of nilotinib-associated vascular events. Indeed, several clincial studies suggest that nilotinib is associated with elevations in glucose, total cholesterol, and LDL, which are factors in developing atherosclerosis. A more in-depth study of glucose metabolism in 10 CML patients receiving nilotinib demonstrated insulin resistance and compensatory hyperinsulinemia. Nilotinib treatment is also associated with hypothyroidism, which can affect lipid and glucose metabolism. Therefore, an accelerated metabolic dysregulation may be involved in the formation of atherosclerotic plaques and pathogenesis of vascular atherosclerosis.[22]

The article continues by recommending that doctors should pre-screen high-risk patients (including patients with diabetes) for vascular occlusive disease prior to therapy initiation, and that they should "aggressively" manage cardiovascular risk factors and surveil their patients for developing vascular disease every 3 to 6 months.[23]

In another article,[24] Dr. Moslehi summarizes some of the data in the following table, which I have copied from that article:

---

[22] Weijuan Li, Croce, MD, et al., *"Vascular and Metabolic Implications of Novel Targeted Cancer Therapies,"* J. of Am. Coll. Cardiology, vol. 66(1), pp. 1160-78 (2015).

[23] *Id.*

[24] Moslehi JJ, et al., *"Tyrosine Kinase Inhibitor–Associated Cardiovascular Toxicity in Chronic Myeloid Leukemia,"* J. Clin. Oncology, vol. 33(35), pp. 4210-4218 (2015).

11

Table 2. Reports of Cardiovascular Toxicity in Patients Receiving Nilotinib (Copied from Moslehi JJ, et al., *"Tyrosine Kinase Inhibitor–Associated Cardiovascular Toxicity in Chronic Myeloid Leukemia,"* J. Clin. Oncology, v. 33(35), pp. 4210-4218 (2015)).

| Author | Study Type | Patients | Cardiovascular End Point | Incidence |
|---|---|---|---|---|
| Le Coutre et al[56] | Retrospective, multi-institutional | N = 179; 84% treated on CT | PAD, lower limb, requiring intervention | 11 of 179 patients (6.15%); angioplasty, n = 8; stent implantation, n = 8; amputation, n = 4 |
| Aichberger et al[19] | Retrospective, single institution | N = 24; 25% treated on CT | PAD, lower limb, requiring intervention; myocardial infarction | 4 of 24 (16.7%) |
| Quintás-Cardama et al[58] | Retrospective, single institution | N = 233; 100% treated on CT | Vascular events (deemed by oncologist as related to nilotinib): Raynaud's disease; CVA; peripheral vascular events; cardiac vascular events | 5 of 233 (2.15%) |
| Larson et al[5] | ENESTnd trial, 3-year follow-up | N = 836; 100% treated on CT | PAOD, not defined; IHD, not defined | Imatinib: PAOD, 0 of 280 (0%); IHD, 1 of 280 (0.4%) Nilotinib 600 mg: PAOD, 5 of 279 (1.7%); IHD, 5 of 279 (1.8%) Nilotinib 800 mg: PAOD, 3 of 277 (1.1%); IHD, 6 of 277 (2.2%) |
| Larson et al[57] | ENESTnd trial, 6-year follow-up | N = 836; 100% treated on CT | Cardiovascular events; defined as ischemic heart disease, ischemic cerebrovascular disease, peripheral arterial disease | Imatinib: 7 of 280 (2.5%) Nilotinib 600 mg: 28 of 279 (10.0%) Nilotinib 800 mg: 44 of 277 (15.9%) |
| Levato et al[59] | Retrospective, single institution | N = 82 | PAOD or other vascular occlusive event, not defined | Imatinib: 1 of 55 (1.8%) Nilotinib: 4 of 27 (14.8%) |
| Kim et al[60] | Prospective, multiple institutions | N = 159; approx. 50% treated on CT | Peripheral arterial disease, as assessed by ankle-brachial index | Imatinib (first line): 3 of 48 (6.3%) Nilotinib (first line): 7 of 27 (26%) Nilotinib (second line): 10 of 28 (35.7%) |
| Giles et al[20] | Meta-analysis from IRIS, TOPS, ENESTnd | N = 2,390; 100% treated on CT | PAOD, atherosclerotic and thrombotic events in accordance with ACC/AHA guidelines | No TKI: 3 of 533 (0.6%) Imatinib: 2 of 1,301 (0.2%) Nilotinib: 7 of 556 (1.3%) |

Abbreviations: ACC/AHA, American College of Cardiology/American Heart Association; approx., approximately; CT, clinical trial; CVA, cerebrovascular accident; ENESTnd, Evaluating Nilotinib Efficacy and Safety in Clinical Trials–Newly Diagnosed Patients; IHD, ischemic heart disease; IRIS, International Randomized Interferon Versus STI571 Study; PAD, peripheral arterial disease; PAOD, peripheral arterial occlusive disease; TKI, tyrosine kinase inhibitor; TOPS, Tyrosine Kinase Inhibitor Optimization and Selectivity.

In the same article when describing the results of the ENESTnd trial, Dr. Moslehi states that "[i]mportantly, the dose-dependent increased risk of events in the nilotinib arms implicates a drug dependent response."[25] He further recommends that doctors monitor developing peripheral vascular disease by, among other things, taking baseline ankle-brachial-index measurements in all patients taking nilotinib, with periodic follow-ups every 3 to 6 months.[26]

Dated: March 20, 2018

Robert Wagmeister, M.D., F.A.C.S.

---

[25] *Id.*

[26] *Id.*

12