# Exhibit
# 3

```
 1            IN THE UNITED STATES DISTRICT COURT FOR

 2             THE EASTERN DISTRICT OF CALIFORNIA

 3                        ---oOo---

 4    KRISTI LAURIS, et al.,

 5          Plaintiff,

 6    vs.                            No.1:16-CV-00393

 7    NOVARTIS AG, et al.,

 8          Defendants.

 9    _____/

10

11

12

13                   DEPOSITION OF

14                 ROBERT WAGMEISTER

15                  JULY 6, 2017

16                   10:00 A.M.

17

18

19        3415 South Sepulveda Boulevard, Suite 1100

20             Los Angeles, California 90034

21

22

23

24    Reported By: Barbara Prokop, CSR No. 14190

25    Job No: 126712
```

```
 1                  I N D E X

 2                                              PAGE

 3   EXAMINATION BY MR. REISSAUS              5, 162

 4   EXAMINATION BY MR. ELIAS                  159

 5

 6

 7

 8                E X H I B I T S

 9                                             PAGE

10   DEFENDANTS'

11   Exhibit 201   Notice                       6

12   Exhibit 202   Binder of Records            8

13   Exhibit 203   Binder of Records            8

14   Exhibit 204   Binder of Records            8

15   Exhibit 205   Dr. Wagmeister's Notes,      9
                   Various Articles,
16
     Exhibit 206   Dr. Wagmeister's Notes      10
17                 From Depositions

18   Exhibit 207   Expert Reports/Defense Experts  10

19   Exhibit 208   News Releases Related to TASIGNA  11

20   Exhibit 209   Signal Assessment           12

21   Exhibit 210   Dr. Singh's/Dr. Weiss's Reports  14

22   Exhibit 211   Typewritten notes           15

23   Exhibit 212   Various Articles            16

24   Exhibit 213   Articles on nilotinib       17
                   vs imatininb
25
```

```
 1                   E X H I B I T S
                                               PAGE
 2    DEFENDANTS'

 3    Exhibit 214   Various Articles              17
                    Woodman's Deposition
 4
      Exhibit 215   E-Mail from Pascal Edrich     17
 5
      Exhibit 216   Dr. Wagmeister's             18
 6                  Curriculum Vitae

 7    Exhibit 217   Expert Report of              46
                    Dr. Wagmeister's
 8
      Exhibit 218   Supplemental Report of        46
 9                  Dr. Wagmeister's

10    Exhibit 219   Lab Results 2010              70

11    Exhibit 220   Lab Results 2011              71

12    Exhibit 221   Dr. Hoffman's File           71

13    Exhibit 222   Article                       75

14    Exhibit 223   Article                       82

15    Exhibit 224   Lab Results September 2012   100

16    Exhibit 225   Article                      102

17    Exhibit 226   Article                      109

18    Exhibit 227   Article                      113

19    Exhibit 228   Pathology Report             123

20    Exhibit 229   Article                      131

21    Exhibit 230   Novartis's Response          140

22

23

24

25
```

Page 4

```
 1              VIDEOTAPED DEPOSITION OF ROBERT WAGMEISTER

 2

 3         BE IT REMEMBERED, that pursuant to Notice, and on

 4   the 6th day of July 2017, commencing at the hour of 10:00

 5   a.m., in the offices of 3415 South Sepulveda Boulevard,

 6   Los Angeles, California 90034, before me, BARBARA PROKOP,

 7   a Certified Shorthand Reporter, State of California,

 8   personally appeared ROBERT WAGMEISTER, produced as a

 9   witness in said action, and being by me first duly sworn,

10   was thereupon examined as a witness in said cause.

11                         ---oOo---

12   APPEARANCES

13   For the Plaintiff:

14                    RICHARD ELIAS, ESQ.
                      Elias Gutzler Spicer
15                    130 South Bemiston
                      Clayton, MO 63105
16

17

     For the Defendant:
18
                      ANDREW REISSAUS, ESQ.
19                    Hollingsworth
                      1350 I Street Northwest
20                    Washington, DC 20005

21

22

23

24

25
```

Page 5

1                         ROBERT WAGMEISTER

2                         sworn as a witness

3                         testified as follows:

4              VIDEOGRAPHER:  This is the start of DVD labeled

5    No. 1, the videotaped deposition of

6    Dr. Robert Wagmeister, taken in the matter of

7    Kristi Lauris, et al., v. Novartis AG, et al. in the

8    United States District Court for the Eastern District of

9    California, Case No. 1:16-CV-OO393.  This deposition is

10   being held at 3415 South Sepulveda, Los Angeles,

11   California, on July 6th, 2017, at approximately

12   10:21 a.m.  My name is Brent Jordan, I'm the Legal Video

13   Specialist with TSG Reporting.  The Court Reporter is

14   Barbara Prokop in association with TSG.

15           Will Counsel present please identify themselves

16   for the record.

17           MR. REISSAUS:  Andrew Reissaus, for Novartis

18   Pharmaceuticals Corporation.

19           MR. ELIAS:  Richard Elias for Plaintiffs.

20   EXAMINATION BY MR. REISSAUS:

21       Q.  Doctor, could you state your name for the

22   record, please.

23       A.  Robert Wagmeister, W-A-G-M-E-I-S-T-E-R.

24       Q.  Thank you.

25           MR. REISSAUS:  I've marked as Exhibit 201 notice

1   of deposition for your deposition today, and included in

2   that is a request for documents, and it includes

3   materials considered by you or provided to you in forming

4   your opinions in this case that have not been previously

5   produced to NVC Novartis Pharmaceuticals Corporation,

6   and, identified by Bates number, your expert reports,

7   except for publicly available literature cited in your

8   report.

9         This includes notes of interviews with

10   Plaintiffs, and documents showing, reflecting,

11   discussing, or describing any statistical calculation you

12   have conducted in connection with your opinions in this

13   case, whether or not referenced in your expert report.

14         (Defendants' Exhibit No. 201 marked for

15         Identification.)

16   BY MR. REISSAUS:

17      Q.   And you've brought documents with you today;

18   correct?

19      A.   I have.

20      Q.   Okay.  I'd like to just start off by going

21   through them and having you describe what they are.

22   Let's start with -- you brought three binders with you.

23   I've looked through those quickly, and it appears that

24   two of them contain medical records, all of which are

25   stamped with the Bates prefix "Lauris."   Is that an

1    accurate description of those two binders here?

2          A.   Yes.

3          Q.   And these binders are medical records from

4    Mr. Lauris that you reviewed as a part of forming your

5    opinions in this case?

6          A.   Yes.

7          Q.   And the third binder -- I'll actually hand it to

8    you and ask you if you can describe the contents of this

9    binder?

10              MR. ELIAS:   Just in general?

11              MR. REISSAUS:   In general, yeah.

12   BY MR. REISSAUS:

13         Q.   I'm not asking -- so again, this binder also

14   contains documents with Bates stamps that begin with

15   Lauris; correct?

16         A.   Yeah.   It has to deal with pharmaceutical

17   prescribing information, labels, some articles,

18   literature.

19         Q.   Was this binder something that you put together

20   or something that was provided to you?

21         A.   Provided to me.

22         Q.   Okay.   And I noticed that, within these binders,

23   there's paper clips in certain locations.   What do those

24   indicate?

25         A.   That it may be appropriate for me to keep that

1    as a reference in going back to look over these -- it

2    could be an article, some warnings, I guess, from whoever

3    wrote this, concerning the drug TASIGNA.  Just -- how do

4    we want to refer to these drugs today?  By their generic

5    names or just brand names?  It's easier by their brand

6    names, but I'll be happy to do it any way you want.

7         Q.   We'll get to the definitions in a little bit.

8              MR. ELIAS:  TASIGNA is fine.

9              THE WITNESS:  This is another article -- another

10   article, just some ones about some adverse events that

11   somebody wrote.  Some post-market drug safety

12   evaluations.

13   BY MR. REISSAUS:

14        Q.   Okay.  We can set that off to the side.

15             MR. REISSAUS:  Could we go off the record for

16   just a second?

17             (Discussion off the record.)

18             MR. REISSAUS:  And we're going to turn to the

19   rest of these documents in front of you in a minute.  But

20   what I'd like to do is mark each of these binders as an

21   exhibit, and you'll retain those in your possession.  But

22   if we ever need to refer back to those, we'll at least

23   have an identification of what's what.  So we'll mark

24   these as 202, 203, and 204.

25             (Defendants' Exhibit Nos. 202, 203, 204 were

1          marked for Identification.)

2    BY MR. REISSAUS:

3        Q.   Doctor, if you could go ahead and describe what

4    else you have in front of you there?

5        A.   Well, the first thing is just my notes that I

6    took from the medical history, dates, events, consults,

7    course of treatment, some descriptions of articles.

8    Again, more notes from different doctors' offices.

9    That's what that would be.

10          This is the pathology autopsy report.  These

11   are, again, records from medical groups.  These are

12   reports from the Cardiac Institute care being performed

13   by Dr. Sohm, S-O-H-M.  This is a handwritten family

14   history of the Lauris family history.

15          MR. REISSAUS:  I'd like to mark that pile as an

16   exhibit and have that copied for the court reporter.

17   We'll mark that as 205.

18          (Defendants' Exhibit No. 205 marked for

19          Identification.)

20   BY MR. REISSAUS:

21       Q.   Thank you.  And if you want to just continue on?

22       A.   These are my notes taken from multiple

23   deposition transcripts from Dr. Klaus Hoffmann,

24   Dr. Randall Stern, Dr. Kanwar Mahal, Nurse Practitioner

25   Theresa Flemming, and Dr. Chen.

1          MR. REISSAUS:  Okay.  We'll mark that as

2     Exhibit 206.

3          (Defendants' Exhibit No. 206 marked for

4          Identification.)

5          THE WITNESS:  These are the reports of four

6     doctors, I guess, Defense experts.  Dr. Giles, Dr. Croce,

7     Dr. Moslehi, and Dr. Venkatasubramanian.

8     BY MR. REISSAUS:

9          Q.  Okay.  Do those have notes on them?

10         A.  Yes.  A myriad of notes.

11         MR. REISSAUS:  Let's mark that as 207.

12         (Defendants' Exhibit No. 207 marked for

13         Identification.)

14         THE WITNESS:  This is probably taken out of the

15    folder, whatever that exhibit is.

16         MR. REISSAUS:  I'll just identify this.  This is

17    a Bates numbered page, Lauris 726, and then, Lauris 1101,

18    1102, 1098, 1099, and 795, 794.

19    BY MR. REISSAUS:

20         Q.  So is it fair to describe these as news releases

21    related to TASIGNA?

22         A.  I assume it came out of that binder.

23         Q.  And there is also Lauris 1108, 1109.  Were these

24    things that you picked out from --

25         A.  I suspect --

1       Q.   -- the white binder?

2       A.   -- I did.  In the past, yes.

3       Q.   And you've made notes on these as well?

4       A.   Probably highlighted certain paragraphs.

5            MR. REISSAUS:  Let's mark that as 208.  Thank

6    you.

7            (Defendants' Exhibit No. 208 marked for

8            Identification.)

9            THE WITNESS:  I'm not sure if this was from the

10   Canadian Health Report.  I see Canada, so that may be

11   from the complete Canadian report.  I'm not sure, but it

12   says Canada on there so.

13           MR. ELIAS:  It's a public communication, the

14   dear doctor communication.

15   BY MR. REISSAUS:

16      Q.   When you say the report from Canada, you're

17   referring to the TASIGNA redaction that you're handing to

18   me now; correct?

19      A.   The what?

20      Q.   Sorry.  The TASIGNA assessment -- nilotinib,

21   TASIGNA, Atherosclerosis-related diseases, including

22   peripheral arterial occlusive disease, PAOD; correct?

23      A.   I guess.  I know that it says Canada so...

24      Q.   So both of these documents mention Canada?

25      A.   Well, Canada is on the headline there so...

Page 12

1        Q.  And was this, what you just handed me, a part of
2   a group of another group of documents or separate?
3        A.  No.  Separate.  On its own.
4        Q.  All right.  And you have a few new notes and
5   some paper clips on this one as well?
6        A.  I'd have to see.  It's been a while.  I guess I
7   see paper clips.  Yes.
8        Q.  Okay.  And in this document you just showed me,
9   I'm going to read the Bates number into the record.  It's
10  TPROD00972838.  And you've highlighted or underlined in
11  red and marked some paragraphs on pages 21 of 57, 22 of
12  57, 28 of 57, 29 of 57, and 45 of 57, but otherwise, I
13  didn't see any additional notes.
14           MR. ELIAS:  Is that a question?
15           MR. REISSAUS:  No.  I'm just stating that for
16  the record, what I saw just now.  I'm going to go ahead
17  and mark this as 209.
18           (Defendants' Exhibit No. 209 marked for
19           Identification.)
20  BY MR. REISSAUS:
21        Q.  And I noticed you have a group of Plaintiff's
22  expert reports there.  Three of those.  Your original
23  report, your supplemental report, Dr. Singh's report, and
24  Dr. Weiss's report; is that right?
25        A.  Correct.

Page 13

 1          Q.   And I guess I'll ask you -- when did you have

 2     the opportunity to review Dr. Singh's and Dr. Weiss's

 3     reports?   Was it in the last month, in the process of

 4     preparing your supplemental report?

 5          A.   Well, prior.   I mean, it wasn't the original

 6     medical records.   Without knowing exactly, sometime in

 7     the last one to two months.

 8          Q.   Okay.   Did you review any draft reports from

 9     either of those experts?

10          A.   No.

11          Q.   Okay.   So you saw the final versions that are

12     sitting in front of you there?

13          A.   Yes.

14          Q.   Okay.   Have you had any conversations with any

15     of the other experts for Plaintiff?

16          A.   No.

17          Q.   Okay.   And do you mind if I take a quick look at

18     those.   Do you have notes on your reports?

19          A.   No.   They're just clean copies.

20          Q.   Okay.   What was your purpose in reviewing the

21     reports of Dr. Weiss and Dr. Singh?

22          A.   He was the oncologist who reviewed the

23     background of the treatment, what his thoughts were in

24     relation to its side effects.

25          Q.   You're referring to Dr. Weiss's report?

Page 14

1      A.   Dr. Weiss.

2      Q.   Okay.

3      A.   And Dr. Singh, I think, is an epidemiologist, to

4  see how he correlates all the literature in a statistical

5  nature, providing that TASIGNA was the cause of

6  accelerating atherosclerosis.

7      Q.   So Dr. Singh is serving as the epidemiologist to

8  tie together all the literature?

9      A.   I'm just --

10        MR. ELIAS:  Object to the form of the question,

11  but go ahead.

12  BY MR. REISSAUS:

13      Q.   You can answer.

14      A.   Well, I'd have to look at his CV and see what he

15  calls himself.  He provided statistical analysis.

16        MR. REISSAUS:  I'm going to mark these two

17  reports of Dr. Weiss's and Dr. Wagmeister's as 210.

18        THE WITNESS:  Dr. Singh.

19        MR. REISSAUS:  Yes.  Sorry.  Dr. Singh and

20  Dr. Weiss.  Okay.

21        (Defendants' Exhibit No. 210 marked for

22        Identification.)

23  BY MR. REISSAUS:

24      Q.   And continuing to your left.

25      A.   These are handwritten notes by Mr. Lauris, as a

Page 15

1   diary about his medical course.

2          Q.   And it's also the typewritten section as well?

3          A.   Typewritten.

4          Q.   These have all been previously marked in other

5   exhibits, but you've made notes in red pen, made some

6   markings on the typewritten set.

7               MR. REISSAUS:   Let's mark that as 211, please.

8               (Defendants' Exhibit No. 211 marked for

9               Identification.)

10  BY MR. REISSAUS:

11         Q.   There are two piles of literature now in front

12  of you; is that right?

13         A.   Yes.   This is numerous, numerous articles

14  related to TASIGNA.

15         Q.   Is there -- are the two piles divided by topic?

16         A.   This one deals more with epidemiology or --

17  yeah, epidemiology, age-related events, ethnic-related

18  events, these are some internal memos or something to

19  that effect, communications.

20         Q.   It has an exhibit stamp at the bottom?

21         A.   103.

22         Q.   103?   Okay.

23         A.   So just going back, first, to this pile, dealing

24  with, as I said, age-related events or ethnic -- these

25  are generally articles that were prompted by the defense

Page 16

 1   experts' reports and many of their misrepresentations.

 2   So this one --

 3       Q.  Okay, so --

 4       A.  -- this one would be kind of a subject pile, you

 5   could call it.

 6       Q.  So the pile that's in your hand right now are

 7   articles that you considered in the process of reviewing

 8   the Novartis Pharmaceuticals Corporation's experts'

 9   reports?

10           MR. ELIAS:  Object to the form.  Misstates the

11   testimony.

12           THE WITNESS:  Yeah.  I can't really know if

13   every article here was prompted by that.  But I put these

14   together as sort of a subject topic, epidemiology or

15   ethnic reasons.

16           MR. REISSAUS:  Let's mark that as 212.

17           (Defendants' Exhibit No. 212 marked for

18           Identification.)

19   BY MR. REISSAUS:

20       Q.  And the other pile?

21       A.  So I was just now going back, this was the

22   exhibit that you had, 103, and this is excerpts from a

23   deposition of a Dr. Woodman.

24       Q.  Were those excerpts that you selected out of his

25   deposition or --

 1      A.   No.   They were given to me.

 2           MR. REISSAUS:   Okay.   We'll mark that as the

 3  deposition -- well, let's get the literature out of the

 4  way first.   Sorry.   Let's group them together.   So 212.

 5  And the second pile, which we'll mark as 213.

 6           (Defendants' Exhibit No. 213 marked for

 7           Identification.)

 8  BY MR. REISSAUS:

 9      Q.   And I believe that you identified that as

10  articles that you reviewed related to TASIGNA?

11      A.   TASIGNA and its complications, probably from

12  2010 up to near the present.

13           MR. REISSAUS:   Okay.   We'll mark the Woodman

14  excerpts as 214.   And the E-mail that has previously been

15  marked as Exhibit 103, you have some notes on that, so

16  we'll mark that as 215.

17           (Defendants' Exhibit Nos. 214 and 215 marked

18           for Identification.)

19           MR. ELIAS:   Let me see this real quick, Doctor.

20  BY MR. REISSAUS:

21      Q.   At this point, have we gone over all the

22  documents that you brought with you?

23      A.   Yes.

24      Q.   Okay.   I'm going to set these to the side, and

25  we can refer back to these as we need to.   But for the

1   sake of keeping it a little more organized, let's just --

2   and I'm going to hand you what we're going to mark as

3   Exhibit 216.

4          (Defendants' Exhibit No. 216 marked for

5          Identification.)

6   BY MR. REISSAUS:

7       Q.   Can you identify that, please?

8       A.   This is my CV, and the next page is prior

9   testimony.

10      Q.   I'll represent this is the version of your CV

11  that we received with your expert report.  Is this an

12  up-to-date CV?

13      A.   Yeah.

14      Q.   Can you -- in looking at your CV, it's not

15  entirely clear what your current work practice is or --

16      A.   I'm --

17      Q.   Can you describe what you do?

18      A.   I've been a Vascular Surgeon, Clinical Vascular

19  Surgeon, since 1980, performing all types of vascular

20  surgery interventions, peripheral disease, carotid

21  disease, aortic aneurisms, dialysis patients, venous

22  problems, the whole gambit of the practice of peripheral

23  vascular surgery.

24          Over the last eight years, I've become more

25  specialized, and I perform retroperitoneal exposures to

1   the anterior spine as co-surgeon with spine surgeons who

2   need to perform anterior lumbar fusions.  And so that

3   practice now has become exclusive in that realm, dealing

4   with the blood vessels that are on top of the spine,

5   which I have to move to provide the exposure for the

6   spine surgeon to go ahead and perform discectomies and

7   lumbar fusions.

8        Q.  In the last eight years -- so around 2008 or so,

9   is that when you would have moved into this

10  specialization?

11       A.  During that year, 2008, 2009, I transitioned.  I

12  was doing both at the time, full vascular bypass

13  surgeries, et cetera, in conjunction with the spine work,

14  which got busier.  And I was needed more around Los

15  Angeles counties, being one of the few people who are

16  able to provide this exposure.  And so I now just limit

17  my practice to that type of surgery.

18       Q.  So since 2008, your practice has been

19  specialized on assisting with vascular access for spinal

20  surgeries?

21            MR. ELIAS:  Object to the point, but go ahead.

22            THE WITNESS:  It's providing retroperitoneal

23  exposure to get to the spine -- let's say going through

24  the front.  And then there are the major blood vessels,

25  aortic, iliac, arteries, and veins that sit on top of the

Page 20

1    vertebral column that I have to mobilize to provide the

2    exposure or the space to uncover these disc areas for --

3    then the spine surgeon to be able to go and take out the

4    disc and put a new implant in its place.

5    BY MR. REISSAUS:

6        Q.   Let me try again.   So since 2008, your practice

7    has been specialized in assisting in spinal surgeries or

8    the vascular aspects of that?

9            MR. ELIAS:   Objection.   Asked and answered.

10   Misstates testimony.

11           THE WITNESS:   I've explained it to you.   I'm a

12   co-surgeon with a spine surgeon.   I don't do spine

13   surgery.   I provide the retroperitoneal exposure to the

14   anterior lumbar spine.   With that, there are, as I said

15   before, the major blood vessels, cava, aorta, iliac,

16   arteries, and veins that need to be mobilized because

17   they sit on top of the vertebral column.   And I mobilize

18   those vessels to provide the space and area to uncover

19   the discs for the spine surgeons to then go ahead and

20   perform their part of the procedure.

21   BY MR. REISSAUS:

22       Q.   Prior to 2008, how would you breakdown the

23   percentage of different types of vascular procedures you

24   were doing?

25       A.   Well, I did the entire spectrum of vascular

1  surgery.  Bypasses and aneurysm resections, carotid

2  endarterectomy, dialysis procedures, venous procedures.

3  Essentially, every chapter in the book.

4       Q.  Was it an even distribution of all of those, or

5  were there certain procedures you did more than others?

6       A.  Peripheral vascular, I'd say, bypasses that are

7  required for the lower extremities, would probably be the

8  higher number of procedures required.

9       Q.  Okay.  What percentage would you say are lower

10  extremity peripheral vascular procedures?

11       A.  I can't give you a percentage.  Each would be

12  different.  I mean --

13       Q.  Was it two thirds of the procedures you were

14  doing?

15            MR. ELIAS:  Objection.  Asked and answered.

16  BY MR. REISSAUS:

17       Q.  You can answer.

18       A.  I have no way to say.  I'd say 50 percent.  That

19  wouldn't be an educated guess, each year would be

20  different.  But the preponderant of surgery would be more

21  of the lower extremity revascularization procedures.

22            MR. ELIAS:  Preponderant in relation to the

23  original surgeries?

24            THE WITNESS:  Yeah.  It would kind of be

25  peripheral vascular disease, then you probably have

1  carotid endarterectomies, then you would deal with aortic

2  aneurisms, then there would be dialysis access

3  procedures, and then venous procedures, probably in that

4  order, besides trauma.

5  BY MR. REISSAUS:

6       Q.  Trauma would be a separate group of --

7       A.  Yeah.  Gunshots, blood vessels, stab wounds to

8  blood vessels.  I was one of the covering physicians in

9  Cedars-Sinai and St. John's for traumatic events.

10      Q.  Have you performed any of these procedures since

11 2008, within these other categories?

12      A.  Well, 2009?  No.  Other than, at times -- you do

13 get vascular complications at the surgery I do.  You can

14 get bleeding, injury to the vessels that require suture

15 repair.  I guess, similar to what Dr. Stern had to do

16 when he operated on Mr. Lauris.  So you can get that.

17 You can get some thrombosis of the iliac artery or

18 femoral artery that requires intervention to remove the

19 clot.

20      Q.  So other than treating complications of the

21 procedures that you perform today, related to the

22 arteries during spinal surgeries, you have not performed

23 a peripheral vascular bypass since 2008, 2009?

24          MR. ELIAS:  Objection.  Compound.  Asked and

25 answered.  Mischaracterizes.

Page 23

1          THE WITNESS:  Correct.

2     BY MR. REISSAUS:

3          Q.  You mentioned that you, in the past, have done

4     interventions on the carotid arteries.  Did I understand

5     that correctly?

6          A.  Yes.

7          Q.  Okay.  Have you done interventions on the

8     intracranial arteries?

9          A.  No.  That's a neurosurgeon's provence.

10          Q.  Back when you performed peripheral artery

11     interventions on the lower extremities, did you have

12     patients that were under the age of 60?

13          A.  Infrequent.  Maybe in their 50s.  Infrequent.

14     Certainly not in their 40s.  I can't remember one patient

15     in their 40s who required some type of peripheral

16     vascular intervention.

17          Q.  All right.  So you did have patients who were in

18     their 50s who came to you for peripheral vascular

19     surgeries to their lower extremities?

20          MR. ELIAS:  Mischaracterizes.

21          THE WITNESS:  One, I can't recall.  Two, I would

22     say towards 60 versus -- if I had to say anyone in their

23     50s, it would be their high 50s.  I don't recall --

24     BY MR. REISSAUS:

25          Q.  You don't recall the specifics of what patients

Page 24

1  you might have seen that were in their 40s or 50s?

2          MR. ELIAS:  Objection.  That mischaracterizes

3  the testimony.

4          THE WITNESS:  I have said that I can't recall

5  one patient in their 40s, in my 36 years of practice,

6  presenting and requiring some type of vascular surgery

7  intervention.  As far as the 50s, I can't recall.  But

8  it's certainly not something that strikes me as remotely

9  common.

10  BY MR. REISSAUS:

11      Q.  Okay.  But you have had patients that were in

12  their 50s that you performed lower extremity

13  interventions on?

14      A.  Some may have been 59.

15      Q.  Could some have been 55?

16      A.  I would say none that I can recall.

17      Q.  So how many -- do you know how many patients you

18  performed lower extremity procedures on who were in their

19  50s?

20      A.  Do I know?

21      Q.  Uh-huh.

22      A.  No.  But I would say it doesn't strike me as

23  having had any in that decade.  If any, it would be in

24  their late 50s, at best.  But I can't remember any

25  patients presenting to me in that age category.

1      Q.   You don't remember any patients in their 50s?

2      A.   As I said earlier, if there is one that's there,

3   I can't recall it.  But as a general framework of

4   recalling ages of patients, if it occurred, it would be

5   extremely uncommon.

6      Q.   Prior to 2008 and 2009, did you treat patients

7   for cerebral vascular disease?

8      A.   Yes.  I said I performed thousands of carotid

9   endarterectomies or adrenal artery operations and similar

10  extracranial artery surgeries.

11     Q.   Okay.  And in performing those procedures, if

12  there was -- strike that.

13          When we're talking about carotid

14  endarterectomies, we're talking about the arteries that

15  are feeding up to the brain, is that --

16     A.   One of the arteries that feeds the brain.  Yes.

17     Q.   Okay.  And your procedures would deal with the

18  part before you reach the brain and/or the skull?

19     A.   Yes.  That's what's called extracranial.

20     Q.   So extracranial interventions were within the

21  scope of your work, intracranial were for neurosurgeons;

22  correct?

23     A.   I may be involved in the initial evaluation of

24  the patients, but if it ended up as someone who had just

25  intracranial disease, the choice of intervention would be

Page 26

1    then up to the neurosurgeon.

2        Q.  Have you testified previously in other

3    litigation?

4        A.  Yes.  You have the prior history on the back of

5    my CV.

6        Q.  So the prior testimony that's a part of

7    Exhibit 216, is that in the last three years?

8        A.  Probably in the last five, six, seven years.

9        Q.  Okay.  How many cases would you say you've

10   provided -- you've served as an expert in in the course

11   of your career?

12       A.  I don't know, many times.  Many times I'll get a

13   call, someone will present something to me, and I may say

14   this is either nothing to proceed -- so am I an expert on

15   that type of call?  If I get a plaintiff attorney calling

16   me about what he considers may be some negligence, and he

17   tells me the story on the phone, and I say, "Well, I'll

18   be happy to review it, but I don't know if this will be a

19   fruitful case."  Am I considered an expert on such a

20   call?

21       Q.  Let me ask the question in a different way,

22   then.  How many times have you been consulted by

23   attorneys to provide your assessment of a case?

24       A.  Well, it gets back to what I'm saying.

25   Sometimes I get phone calls, you know?  And when you say

Page 27

1    "consulted," that's a phone call.  So I may get, in a

2    year's time, maybe -- maybe a dozen calls, that may just

3    be an initial call, without any follow up, review of

4    records, separate from where I'd say, "Yes.  I'd be happy

5    to review the case," whether it's for defense or

6    plaintiff, "and look at the merits of the case and give

7    you my opinion."  So I may get, oh, eight to ten, let's

8    say, new cases to review over a year's time.

9        Q.  Okay.  So you might get a dozen initial calls,

10    and then that -- over the course of the year, and that

11    may lead to eight or ten cases where you'd actually look

12    at some medical records?

13            MR. ELIAS:  Misstates.

14            THE WITNESS:  No.  That's not what I said.  I

15    said I may get up to a dozen calls where I'd say to that

16    calling attorney either, "I'm not the right person," or,

17    "I don't think this case has grounds for negligence for

18    you to pursue."  That's one side.  Separate from that, I

19    would get another eight to ten calls where I would say,

20    "I'll be happy to review it for merit and see if it's

21    something I can assist you with."

22        Q.  So you may be contacted a little less than two

23    dozen times a year by people looking to have you evaluate

24    cases for them?

25        A.  I would say less than two dozen, yes.

Page 28

1      Q.   So 20 to 22?

2      A.   Each year's different.  16, 18, 20.  It's not a

3  major part of my practice.

4      Q.   And --

5      A.   In fact, it's a small part of my practice.

6      Q.   What percentage of your time do you spend on

7  consulting for litigation cases?

8      A.   That actually become cases?  I would say maybe 5

9  percent, certainly less than 10 percent, not even close

10  to 10 percent.

11      Q.   What percent of your time would be spend

12  reviewing individual's medical -- your answer of 5 to

13  10 percent, it sounded like you were saying --

14      A.   I said certainly less than 10 percent.  The only

15  way I can do it is to look at my income and say, "Gee,

16  this year I was reimbursed so much for medical legal work

17  versus my surgical work," and I would say to you, "It's 5

18  percent, 6 percent," depending on the year.

19      Q.   Okay.  What percentage of your legal consulting

20  work is for plaintiffs?

21      A.   I would say now, it's even.  Probably evenly

22  distributed between plaintiffs and defense reviews.

23      Q.   What about over the course of your full career?

24      A.   Oh, I think way back, maybe two-thirds defense,

25  one-third plaintiff, and over the years, it's kind of

Page 29

1    evened out.

2         Q.   So overall, you would say that you've done more

3    work for defendants than for plaintiffs?

4         A.   Yes.

5         Q.   What percentage of your expert work has been in

6    medical malpractice cases?

7         A.   Most of it.  I mean, I'll sometimes get a call

8    from an insurance company, there was an auto accident,

9    their client was being sued for some possible vascular

10   injury or delayed injury.  So there would be a few of

11   those from insurance companies.

12        Q.   Have you served as an expert in a product

13   liability case before?

14        A.   I guess.  Do you consider tobacco a product

15   liability?

16        Q.   So you've served as an expert in tobacco

17   litigation?

18        A.   Yes.

19        Q.   For plaintiffs or defendants?

20        A.   For defense.

21        Q.   How many cases would you say?

22        A.   15, 20.

23        Q.   And what was your role in those cases?

24        A.   I guess people were suing the tobacco company

25   for smoke-related injuries, whether it was lung cancer --

1    but if they had some type of vascular issues, I was asked

2    to discern whether those issues were related to tobacco

3    or they were from other reasons.

4         Q.   And what time period were those 15 to 20 cases?

5         A.   It's probably been about five years now.

6         Q.   Are they on the list that you've provided?

7         A.   I have to see.  There is one listed.

8         Q.   Which one is it?

9         A.   RJ Reynolds.

10        Q.   Bush vs --

11        A.   Yes.  I believe that's the only deposition that

12   I had to do for the reviews.

13        Q.   Do you recall who the attorneys that you worked

14   with on that case were?

15        A.   No.  But they're from North Carolina.

16        Q.   Have you ever served as an expert in a case

17   involving a surgical complication of peripheral arterial

18   disease treatment?

19        A.   I'm sure.  That's what, many times, I'm asked to

20   review.

21        Q.   Have you ever -- do you recall working on a case

22   ever involving laceration of the femoral artery that

23   resulted in death?

24        A.   There may have been.

25        Q.   Okay.

1      A.   In fact, yes.   There has been.

2      Q.   What types of behaviors or actions have been

3  supportive of an opinion that malpractice occurred in

4  cases that you've evaluated as an expert?

5      A.   I don't understand the question.

6      Q.   Have you provided opinions in malpractice cases

7  that you thought malpractice occurred?

8      A.   Yes.   Again, as I said, I looked at the merits

9  of the case, and if I thought there was negligence, I

10  would tell the attorney what my opinions were and he

11  would proceed.

12      Q.   Are there certain things that you see when you

13  review a file that help you lead to a conclusion that

14  malpractice occurred?

15          MR. ELIAS:   Overbroad.   Unformed.   Hypothetical.

16  BY MR. REISSAUS:

17      Q.   You can answer.

18      A.   I look at all the records and then make an

19  opinion whether he should proceed, or many times I'll

20  say, "There isn't foundation to proceed."

21      Q.   What sorts of things do you look for to see if

22  there's a foundation to proceed with a case or not?

23          MR. ELIAS:   Overbroad.   Lacks foundation.   Any

24  specific case?

25  ////

1    BY MR. REISSAUS:

2        Q.  You can answer.

3        A.  If someone did the wrong operation, if someone

4    technically did something incorrect, if somebody didn't

5    show up to see a patient for several days, those types of

6    commissions or omissions, I'd say, which would be below

7    the standard for practicing vascular surgeons.

8        Q.  So things like failing to identify a

9    complication quickly enough, that can be a basis for

10   concluding malpractice occurred?

11       A.  I'd have to read the specific case.  I'd have to

12   see what the medical records were.

13       Q.  If a doctor fails to identify a complication

14   that he should have, that can be malpractice; correct?

15       A.  You'll have to show me that case.  You'll have

16   to tell me something more specific.

17       Q.  I'm asking you a hypothetical.

18           MR. ELIAS:  No.  He just answered your question.

19   That is a ridiculous question, and so he answered it.

20   Okay?  And if you want to ask him again and have him say,

21   "Show me a specific case," he'll do that.  But don't just

22   repeat that question again.  That's a waste of time and

23   it's annoying.  Let him answer.  There's no question

24   pending.

25           MR. REISSAUS:  There was a question pending.

Page 33

1    Can you read it back, please?

2         (Record read.)

3         MR. ELIAS:  Asked and answered.  Overbroad.

4    Lacks foundation.  Unformed hypothetical.

5         THE WITNESS:  I'll be happy to answer any

6    hypothetical credible situation or actual case to give

7    you my opinion.

8    BY MR. REISSAUS:

9         Q.  Have you ever served as an expert in a

10   pharmaceutical product liability case?

11        A.  I don't believe so.

12        Q.  Is it correct that, in your clinical practice,

13   you've seen patients with diabetes who develop

14   atherosclerosis that leads to amputations?

15        A.  Yes.

16        Q.  And is it also true that you've served as an

17   expert in cases where atherosclerosis has led to

18   amputations?

19        A.  Did you say cases that I've reviewed?  Or my

20   practice?  I didn't --

21        Q.  In litigation.

22        A.  I don't recall specifics of such cases.  There

23   could be.  As soon as a case is over, I forget them.  So

24   it's --

25        Q.  Have you seen patients who have passed away as a

Page 34

1   result of retroperitoneal bleeds arising from surgical

2   procedures?

3          MR. ELIAS:  In what context?

4          MR. REISSAUS:  In any context.

5          MR. ELIAS:  Are you asking, just so we're clear,

6   in litigation as well as in his clinical practice?

7   BY MR. REISSAUS:

8      Q.  Let me ask you the question again.  Have you

9   seen patients who have died as a result of

10  retroperitoneal bleeds arising from surgical procedures,

11  whether in your clinical practice or in your work as an

12  expert?

13     A.  Yes.

14     Q.  How often have you seen retroperitoneal bleeds

15  that resulted in death --

16     A.  When --

17     Q.  -- as a result of surgical procedures.

18     A.  Well, if you do a ruptured aneurism in a

19  retroperitoneal bleed, you're going to have people who

20  may die also.  Yes, I've seen that many times -- not many

21  times, but certainly those type of ruptured aortic

22  aneurysms can result in death.  There is a high mortality

23  related to such entities.

24          MR. ELIAS:  Aortic?

25          THE WITNESS:  Abdominal aortic aneurysms that

1   rupture and you operate on them and you do what you can,

2   but the patient succumbs in the OR or several days later.

3   BY MR. REISSAUS:

4       Q.  Let me just make sure I'm clear.  So we're

5   talking about where a patient has an aortic rupture, the

6   aorta, the artery feeding into the heart -- is that not

7   --

8       A.  So arteries come from the heart, veins go to the

9   heart.

10      Q.  So feeding out from the heart.  Excuse me.  Let

11  me try that again.

12          So the context you're talking about, patients

13  who have an aortic rupture as a result of an aneurysm who

14  then go in for surgery to try to repair that aneurysm

15  that's ruptured, they have high mortality in that

16  context?

17      A.  It can be.  Yes.

18      Q.  Okay.  In the context of the aortic rupture that

19  you're mentioning, that's just a case where the surgeon

20  was unable to save the patient who had already had the

21  bleeding going on independent of any surgical procedure?

22      A.  Well, the surgical procedure didn't cause the

23  bleeding.

24      Q.  So the rupture of the aneurysm was a

25  complication during the surgery that was trying to get --

1   let me try to simplify.

2          So is there a surgical procedure called an

3   aortic aneurysm repair?  Is that --

4      A.  Yes.  Either elective or emergency.

5      Q.  And we're talking about -- in the context of one

6   of those procedures to repair an aortic aneurysm, during

7   that procedure, the artery may rupture, resulting in a

8   retroperitoneal bleed?

9      A.  Well, in the emergent case, the artery has

10  already ruptured, precipitating the surgery.

11     Q.  And the end result of the rupture, regardless of

12  whether it happened before the procedure or during it, is

13  bleeding into the retroperitoneum?

14     A.  Yes.  'Cause the aorta is located in the

15  retroperitoneum.

16     Q.  You said that, in that context, there can be

17  high mortality?

18     A.  There can be, yes.

19     Q.  What are the causes of mortality in that

20  presentation?

21          MR. ELIAS:  Objection.  Lacks foundation.  And

22  overbroad.

23          THE WITNESS:  Intractable bleeding leading to

24  hypotension leading to organ failure.

25  ////

 1  BY MR. REISSAUS:

 2      Q.  Have you seen patients -- well, how frequently

 3  do these ruptured aortic aneurysms happen, in your

 4  experience?

 5          MR. ELIAS:  Objection.  Lacks foundation.

 6  Overly broad.

 7          THE WITNESS:  In my particular practice?  It

 8  could be ten a year.

 9  BY MR. REISSAUS:

10      Q.  How many -- out of how many procedures would you

11  see ten a year?

12      A.  Out of how many what procedures?  All my

13  procedures in a year?

14      Q.  So you just said that you see ten a year.

15      A.  Of a ruptured aneurysm that requires my surgery.

16      Q.  So these would not be bleeds that -- have you

17  seen patients who have had retroperitoneal bleeds as a

18  result of the complications of lower extremity vascular

19  procedures?

20      A.  What procedures?

21      Q.  Any.

22      A.  That's too broad.  When you say, "lower

23  extremity," where did the bypass start from?  Did it

24  start from the axillary?  Did it start from the aorta?

25  Did it start from the groin?  Everything leads to the

1  lower extremities, but there are various procedures that

2  you do to revascularize the lower extremities.

3      Q.  Okay.  So let's look at the type of intervention

4  at issue in this case -- or the type of femoral access.

5  Okay?

6      A.  Okay.

7      Q.  In the context of femoral, where the femoral

8  artery is the access site for the vascular surgeon, have

9  you seen instances of retroperitoneal bleeds resulting

10 from complications of the procedures with that access

11 point?

12     A.  If you count like what Mr. Lauris had, where the

13 catheterization of the femoral artery for some procedure

14 or cardiac catheterization, yes.

15     Q.  Is that a complication that you've experienced

16 in procedures that you've performed yourself?

17     A.  You're asking me if I caused the bleed, or I was

18 consulted to treat the bleed?

19     Q.  If the bleed occurred during a procedure that

20 you performed?

21     A.  No.  I've not had that experience.

22     Q.  Okay.  How many procedures, like the ones that

23 Mr. Lauris underwent, have you performed?

24         MR. ELIAS:  Can we be specific?  Which

25 procedures?  He underwent several, he had a bypass and he

Page 39

1    also had an angioplasty, and I think we need to be

2    specific.

3    BY MR. REISSAUS:

4        Q.   How many bypasses -- lower extremity bypasses

5    have you performed over the course of your career?

6        A.   Thousands.

7        Q.   Okay.  And in the thousands that you've

8    performed, you've not experienced a retroperitoneal bleed

9    like what Mr. Lauris experienced?

10       A.   For bypasses, of whatever nature, to lower

11   extremities?  No.  I've not had a retroperitoneal.

12       Q.   And turning now to angioplasties using a femoral

13   access.  Have you had instances of retroperitoneal bleeds

14   resulting from procedures that you've performed?

15       A.   I didn't perform percutaneous peripheral

16   angioplasties.  I had the radiologist do it in patients

17   that I had such an indication.

18       Q.   So you -- just to be clear, the procedure that

19   Mr. Lauris had in March of 2014, that angioplasty, that

20   is an intervention that you don't personally perform or

21   haven't personally performed?

22       A.   Correct.

23       Q.   And that's regardless of time?  Not just since

24   2008 when you've been specializing in procedures related

25   to the spine?

Page 40

1      A.  Correct.  I mean, I should clarify.  In my

2  fellowship in 1980, we did the angiograms and we did the

3  early -- the very early stages of doing dilatations.  And

4  so at that point, yes, I did percutaneous femoral

5  punctures, but not in my clinical practice.

6      Q.  So since about 1980; is that right?  That would

7  have been the last time you've performed -- what was the

8  procedure?

9      A.  Percutaneous femoral puncture.

10     Q.  Angiogram?

11     A.  Angiogram.  Correct.

12     Q.  All right.  Moving to the side where you're

13 coming in after the bleed has occurred.  Have you seen

14 patients who had a retroperitoneal bleed from a

15 percutaneous femoral artery access that you've treated?

16     A.  I believe I said yes before.

17     Q.  About how many times have you treated patients

18 with that complication?

19     A.  10 to 15.

20     Q.  And were you able to -- how would you describe

21 the outcomes in those 10 to 15 cases?

22          MR. ELIAS:  Overbroad.

23          THE WITNESS:  Satisfactory.

24 BY MR. REISSAUS:

25     Q.  So you were able to successfully repair the

Page 41

1    puncture -- or what was the source?  The bleeding to the

2    retroperitoneal?

3         A.  Yes.

4         Q.  Are you aware of any -- in those 10 to 15 cases

5    that you've treated, how did you -- what treatment did

6    you provide?

7              MR. ELIAS:  Overbroad.

8              THE WITNESS:  It would be similar to Dr. Stern's

9    approach, depending on -- sometimes, you would start in

10   the groin or sometimes you would start, as he did, in the

11   second incision, a low retroperitoneal incision to

12   evacuate the hematoma and repair and put a stitch in the

13   artery that had been punctured.

14   BY MR. REISSAUS:

15        Q.  In those 10 to 15 cases, how many times did you

16   have to make a second incision?

17        A.  I can't recall.  Sometimes you just make one

18   incision that goes -- starts in the groin, but you keep

19   going across the anal ligament.  So it would be

20   consistent with what he did, except you may make one

21   incision, incorporating both areas that he explored.

22        Q.  And just to make sure I understand the context

23   of when you are called in to help when there's a

24   retroperitoneal bleed, would you receive the call after

25   someone identified the bleed and -- strike that.

1          There's always -- in the 10 to 15 cases of

2    retroperitoneal bleeds that we're discussing right now,

3    you were -- you would have been the second vascular

4    surgeon involved, at least?

5          MR. ELIAS:  Objection.  Misstates.

6          THE WITNESS:  I would have been the consulting

7    surgeon.  It may be a cardiologist.  It may be

8    interventional radiologist.  I doubt, if a vascular

9    surgeon had had this bleed, he would have taken care of

10   this problem himself.  So these are mostly from

11   radiologists and cardiologists.  Actually, all of them

12   would be from those two.

13   BY MR. REISSAUS:

14       Q.  Looking back to your CV, I didn't see a section

15   on publications.  Do you have any publications that

16   didn't make it onto your CV?

17       A.  Minimal, during fellowship, and having nothing

18   to do with this type of case.

19       Q.  Have you had any teaching appointments since the

20   1980s?  I think you listed the NYU School of Medicine

21   there.

22       A.  Not formally.  But at Cedars-Sinai there would

23   be residents, there would be fellows, vascular fellows,

24   especially in the early, mid-'80s, who would operate with

25   us and round with us and learn from us.

Page 43

1        Q.   Okay.   And when did you leave Cedars-Sinai?

2        A.   I think in 2003 or maybe later.   Actually, it

3   was later, maybe 2007, sometime in the first decade of

4   the 2000s.

5        Q.   You don't treat CML, do you?

6        A.   No.

7        Q.   Are you aware of patients that you've treated

8   who had CML?

9        A.   None that I can recall.

10       Q.   Have you ever performed surgery on a patient who

11  has received TASIGNA, to your knowledge?

12       A.   To my knowledge?   No.

13       Q.   Before you were approached to work as an expert

14  in this case, had you conducted any research about

15  TASIGNA and atherosclerosis related to it?

16       A.   No.

17       Q.   And you've never published on TASIGNA; correct?

18       A.   Correct.

19       Q.   Or CML?

20       A.   Correct.

21       Q.   And you said that you didn't publish.   Sorry --

22  strike that.

23            Back during your fellowship period, you may have

24  done some writing, but that -- those weren't -- what you

25  wrote about then, wouldn't have been relevant to this

Page 44

1    case?

2         A.   Correct.

3         Q.   Can you tell me, generally, what --

4         A.   I don't even recall.

5         Q.   Okay.  It's not a memory test.

6         A.   I have not published since 1980.

7         Q.   All right.  When did you learn about a potential

8    association between TASIGNA and atherosclerosis?

9         A.   When I received, I think, a call or an E-mail

10   from Mr. Elias.

11        Q.   Okay.  It is correct that you're not an

12   epidemiologist?

13        A.   Correct.

14        Q.   You're not a statistician?

15        A.   Correct.

16        Q.   You're not a cardiologist?

17        A.   Correct.  I may know about cardiac drugs.  I'm

18   not a cardiologist.

19        Q.   And you're not a endocrinologist?

20        A.   Correct.  But I do take care of diabetic

21   patients.

22        Q.   And you take care --

23        A.   I write orders for them postoperatively.

24        Q.   Let's break that down a little bit.  The

25   diabetic patients that you treat, why did they come to

Page 45

1    see you?

2              MR. ELIAS:  Overbroad, but go ahead.

3              THE WITNESS:  They can come for anything.  They

4    can come for a venous problem, an arterial problem,

5    symptoms, concerns.

6    BY MR. REISSAUS:

7         Q.  And one of the problems that diabetic patients

8    will come to see you for is atherosclerosis?

9         A.  It could be.

10        Q.  And is it fair to say that you've treated

11   patients with diabetes who required bypass operations

12   because of atherosclerosis of the arteries of their legs?

13        A.  Yes.

14        Q.  Have you had patients with diabetes with

15   atherosclerosis in their arteries of their lower

16   extremities who have required amputation?

17        A.  Yes.

18              MR. REISSAUS:  We've been going for a little

19   bit.  Let's take a short break.

20              (Recess taken.)

21              MR. REISSAUS:  Doctor, I'm going to go ahead and

22   mark your expert report as Exhibit 217.  And just for

23   housekeeping, let's go ahead and mark your supplemental

24   report as 218.

25   ////

1          (Defendants' Exhibit Nos. 217 and 218 marked

2          for Identification.)

3    BY MR. REISSAUS:

4          Q.  We've been talking about atherosclerosis a

5    little bit, and I want to ask you a few questions about

6    it.

7               MR. ELIAS:  One quick moment.  218.  Let's see.

8    218.

9               MR. REISSAUS:  Is there a printing problem?

10              MR. ELIAS:  Yeah, I don't think this is how it

11   appeared on the -- that's fine.  Let's just -- for the

12   record, 218 has got an incorrectly printed page, page 8,

13   of the report that's got, for whatever reason, a bunch of

14   text blotted out.  So I just want to make that --

15              MR. REISSAUS:  The document -- original document

16   is available on ECF for the Court.  That's fine.

17              MR. ELIAS:  There's no issue.  Okay.

18   BY MR. REISSAUS:

19        Q.  All right.  Would you agree that atherosclerosis

20   is a systemic process?

21        A.  Yes.

22        Q.  And --

23        A.  It can occur is various regions, more or less,

24   or none at all.

25        Q.  So you'd agree that it can affect any artery in

Page 47

1    the body?

2          A.   Yes.

3          Q.   Would you agree that the presence of

4    atherosclerosis in one location means that it is more

5    likely that there may be atherosclerosis in other places

6    as well?

7               MR. ELIAS:   Objection to form.   Lacks

8    foundation.   Overbroad.

9               THE WITNESS:   I don't know what you mean by

10   "more likely."   It can occur in other anatomic regions to

11   different magnitudes or not at all.

12   BY MR. REISSAUS:

13         Q.   Let me ask it another way.

14              If you have a -- two patients, one with no known

15   atherosclerosis anywhere in their body, and the second

16   patient with atherosclerosis identified in their lower

17   extremities.   Is it more likely that the patient with

18   lower extremity atherosclerosis will have atherosclerosis

19   somewhere else in his body than the patient who has none

20   identified anywhere?

21              MR. ELIAS:   Objection.   Incomplete hypothetical.

22   Lacks foundation.

23   BY MR. REISSAUS:

24         Q.   You can answer.

25         A.   Other than I don't know what you mean by "more

Page 48

1    likely," it can occur in other anatomic areas, in a more

2    common fashion, than the person who doesn't have

3    atherosclerosis.

4           MR. REISSAUS:  Can you read back that last

5    sentence, please?

6           (Record read.)

7    BY MR. REISSAUS:

8        Q.  Would you agree that atherosclerosis typically

9    develops over the course of years?

10       A.  Yeah, in different rates of development in

11   different patients.

12       Q.  So in some patients, it will develop more

13   quickly and other patients more slowly?

14       A.  It can.

15       Q.  When we say "develop over time," we're talking

16   about the buildup of plaques within the arteries?

17       A.  Yes.

18           MR. ELIAS:  Good point.

19   BY MR. REISSAUS:

20       Q.  And with time, those plaques can calcify?

21       A.  Sometimes they calcify; sometimes they're

22   non-calcified.

23       Q.  And calcification is part of the -- would you

24   agree that atherosclerosis can occur in someone's 30s?

25       A.  I've never seen it.

Page 49

1          Q.   But you would agree it can occur?

2          A.   I assume, in the lowest percentage of incidence,

3     that it can occur, some patients may have some genetic

4     history that precipitates atherosclerosis.  That's a very

5     uncommon, rare, specific situation.

6          Q.   So that I understand your answer,

7     atherosclerosis can occur in individuals who are in their

8     30s?

9              MR. ELIAS:   Objection.  Asked and answered.  He

10    just answered it and you said you understood it.

11             THE WITNESS:   Yes.  Again, to qualify,

12    typically, someone with genetic or other mutation-type of

13    issues.

14    BY MR. REISSAUS:

15         Q.   Generally, you say?  It is possible for someone

16    who doesn't have a known genetic mutation to have

17    atherosclerosis that develops in their 30s?

18         A.   I guess there's someone out there who may have.

19    Yes.

20         Q.   Do you recall citing an article in your

21    supplemental report by Doraiswami?

22         A.   Yes.

23         Q.   Okay.  And that was a case report that's titled

24    "Premature Peripheral Arterial Disease - Difficult

25    Diagnosis and Very Early Presentation"?

Page 50

1        A.   Yes.

2        Q.   You recall that article?

3        A.   Briefly.

4        Q.   And this article talks about premature

5    peripheral arterial disease, which is --

6             MR. ELIAS:  Well, can you show him the article?

7             THE WITNESS:  I remember the first paragraph.

8    BY MR. REISSAUS:

9        Q.   Do you have a copy within your exhibit?

10       A.   I do.

11       Q.   Maybe it would be helpful if you pulled that

12   out.

13       A.   You put them all in one pile, so now I can't.

14   Yes.  I guess, when I reviewed it, I looked at it and

15   really underlined the first sentence.  That was the gist

16   of my review.

17       Q.   Okay.  And do you see there, in the abstract --

18   one, two, three -- the fourth sentence, "Patients with

19   early-onset disease, also called premature PAD, have a

20   particularly difficult course with early involvement of

21   other major arterial beds, such as the carotid and

22   coronary arteries."

23            Did I read that correctly?

24       A.   Yes.

25       Q.   Would you agree that patients with premature

1    peripheral arterial disease can have a particularly

2    difficult course in the involvement of multiple arterial

3    beds?

4         A.  I haven't seen those types of patients, but I

5    would defer to this author and what he's seen.

6         Q.  Okay.

7         A.  Well, what was paramount to me in reading the

8    article, was his first sentence, where he said the

9    prevalence of peripheral vascular occlusion before the

10   age of 50 is less than 1 percent of the population and is

11   rare.

12        Q.  Again -- but you would defer to the authors for

13   their proposition that premature PAD can have a

14   particularly difficult course with early involvement of

15   other major arterial beds?

16        A.  Right.  So what he's doing is he's making people

17   alert to the fact, so they can do earlier diagnosis and

18   treatment to minimize the morbidity and mortality.

19        Q.  Would you agree that patients can go for years

20   or decades without knowing that they have

21   atherosclerosis?

22        A.  Yes.

23        Q.  In other words, there is a silent -- there can

24   be a silent time when there's not clinical symptoms, but

25   there is atherosclerosis within the arteries?

1      A.  Well, if someone has 1 percent of

2  atherosclerosis in their artery, they have

3  atherosclerosis, they would not have symptoms.

4      Q.  And you can also have much more than 1 percent

5  and not have clinical symptoms, too?

6      A.  Yes.  It depends on the patient and their

7  arterial system.  How many collaterals they develop along

8  the course of any increase in atherosclerosis.

9      Q.  And for some of those patients who don't have

10  clinical symptoms, the first point at which they may be

11  diagnosed with atherosclerosis, as a disease, is after

12  they have an event like a stroke or a heart attack?

13          MR. ELIAS:  Objection to the form.

14          THE WITNESS:  It's possible.  They also may have

15  radiological exams, tests for other things, and someone

16  will say, "You have atherosclerosis of your aorta," or

17  other parts of the body so...

18  BY MR. REISSAUS:

19      Q.  On pages 10 through 12 of your report you

20  cite --

21          MR. ELIAS:  Which report?

22  BY MR. REISSAUS:

23      Q.  Of your original report.  You cite several

24  publications about TASIGNA with case reports of patients

25  developing atherosclerosis who have taken the drug.  Do

Page 53

1    you recall that portion of your report?

2         A.  I believe that you're telling me, or you want me

3    to look at the pages?

4              MR. ELIAS:  I object to the characterization.

5    BY MR. REISSAUS:

6         Q.  Do you recall citing the Aichberger article, for

7    example, in your report?

8         A.  I remember that report, yes.

9         Q.  And that was a case report of patients who had

10   taken TASIGNA and reported on vascular events in 8 out of

11   24 patients?

12        A.  Right.  I wouldn't call that a case report.  I

13   would call that a series of 24 patients, where he found 8

14   patients who had suffered some type of vascular event, as

15   he qualified it.

16        Q.  And I know you may defer to Dr. Singh as we go

17   into this, just let me know if that's the case.  But

18   would you agree that case reports and case series do not,

19   in and of themselves, establish causation?

20        A.  Again, I would defer to Dr. Singh, and again,

21   this is not a case report.  A case report is 1 or 2

22   individuals, this was a series of 24 patients.  So it

23   would be small, but a series.

24        Q.  And again, it's -- the limitation is that it's a

25   -- they're individual case reports that are -- he's

Page 54

1    reporting from one center?

2        A.   That's not a case report.  A case report is

3    where you have 1 individual, 2 individuals who someone's

4    trying to present some hypothesis.  This was a collection

5    of patients, of 24 patients, in which he observed certain

6    untoward events having occurred in follow up.

7        Q.   Do you have a copy of Aichberger with your --

8        A.   Of course.

9        Q.   Okay.  I wouldn't mark it again.  You can refer

10   to the one that's in your set.

11       A.   Just to reiterate, as he talks in his abstract,

12   he said he examined a series of 24 consecutive CML

13   patients.

14       Q.   In your report, you use the terms "severe

15   rapidly progressing peripheral vascular disease"?

16       A.   Okay.

17       Q.   Did I read that term correctly?

18            MR. ELIAS:  Let's go back and forth.  Let's go

19   to the exhibit, let's go to the line.

20   BY MR. REISSAUS:

21       Q.   Can you turn to page 10 in your report, please?

22   Section 5, "TASIGNA."  Are you there?

23       A.   Yes.

24       Q.   And the third sentence says, "Importantly, the

25   peer-reviewed literature describes an association between

Page 55

1    TASIGNA and the rare form of atherosclerotic-related

2    events observed in this case, i.e. severe, rapidly

3    developing, widespread atherosclerosis-related

4    conditions."

5              Did I read that correctly?

6         A.   Yes.

7         Q.   And you then proceed to discuss a number of

8    articles from the literature?

9         A.   And also what his article actually said.

10        Q.   Aichberger?  His article is what you mean?

11        A.   Yes.  That's the next paragraph.

12        Q.   In your opinion, what constitutes rapidly

13   developing?

14        A.   Well, reading his abstract, it says, "Three of

15   the 24 CML patients developed a rapidly progressing

16   Peripheral Arterial Occlusive Disease during treatment

17   with nilotinib."

18        Q.   I understand those are the words on the page,

19   but what I'm trying to understand is what that term means

20   to you, in your opinions in this case?

21        A.   Someone who developed peripheral vascular

22   disease that required surgical intervention in a brief

23   duration of time --

24        Q.   Is there --

25        A.   -- who did not have such peripheral disease

Page 56

1    known prior to that time element.

2         Q.   Uh-huh.

3         A.   As he says, "No peripheral atherosclerosis

4    disease was known before nilotinib therapy in these

5    patients."

6         Q.   Would you agree that -- let's -- I want to focus

7    on what -- you use the word "brief" now.  The

8    atherosclerosis developed over a "brief" period of time?

9         A.   I think I said the symptoms of the progressed

10   disease developed where it was not known prior to

11   nilotinib treatment, the patient now had symptomatic

12   peripheral vascular disease requiring surgical

13   intervention.

14        Q.   And what constitutes a development of symptoms

15   over a brief period of time?  Is that three months?

16   Six months?  A year?  Two years?

17            MR. ELIAS:  Object to the form.

18            THE WITNESS:  Whenever it occurred.  In fact,

19   that it wasn't present prior to a certain treatment and

20   now was overtly present during the treatment.

21   BY MR. REISSAUS:

22        Q.   Did -- are you making new notes on that article

23   there?

24        A.   Yeah.  Just according to your question.

25        Q.   Okay.

1      A.  It's nice of you to --

2      Q.  So you're attempting to chart out the clinical

3  course for the three patients in this article?

4      A.  Well, since I can't remember 30 articles, you

5  precipitated that thought in my mind.

6      Q.  In your report, do you define what time period

7  constitutes rapid development or progression of

8  atherosclerosis?

9      A.  Well, within a year, as Professor Aichberger

10  also defines "rapidly."

11      Q.  Is there a minimum time frame?

12      A.  No.  The fact that it occurs in and of itself is

13  disturbing.

14      Q.  So the fact that a patient develops clinical

15  symptoms of PAD after they start TASIGNA, that's the

16  basis for saying that it was rapidly developing?

17          MR. ELIAS:  Objection.  Misstates testimony.

18          THE WITNESS:  No.  I'm only reviewing the

19  articles of what they presented, and I agree with their

20  presentations.

21  BY MR. REISSAUS:

22      Q.  So you would agree with their conclusion in

23  their abstract?  In summary, treatment with nilotinib may

24  be associated with increased vascular or adverse affects

25  including PAD development?

Page 58

1        A.   I'm sorry.   Where are you reading that?

2        Q.   In the abstract -- one, two, three, four -- five

3   lines up, approximately.

4        A.   "In a subgroup of patients."   Is that where you

5   are?

6        Q.   No.   In summary.   Last two words on the sixth

7   line?

8        A.   Starting with "although"?

9        Q.   No.   Two more lines up.

10       A.   "In summary" --

11       Q.   ..."treatment in nilotinib may be associated

12  with an increased risk of vascular events, including POD

13  development."

14       A.   I would continue reading -- or do you want me to

15  continue reading?

16       Q.   No.   Do you agree with that conclusion there,

17  that it may be associated?   This isn't saying that the

18  association has been established.

19       A.   Back in 2011, this is one of the early articles.

20  So they were beginning investigations.   If you continue

21  to read, ..."in a subgroup of patients" --

22            MR. ELIAS:   Let him answer the question.

23            THE WITNESS:   You started the article.   "These

24  events are severe," as I have said, "and even

25  life-threatening.   Although the exact mechanisms remain

1   unknown, we recommend screening for preexisting PAOD

2   (which is peripheral arterial occlusive disease) and for

3   vascular risk factors, such as diabetes mellitus, in all

4   patients before starting nilotinib, and in the follow up

5   during nilotinib therapy."

6   BY MR. REISSAUS:

7        Q.   It's correct that, in these patients screening

8   for preexisting PAOD before they started TASIGNA, that

9   information wasn't available?

10       A.   Can you repeat the question?

11            (Record read.)

12            THE WITNESS:  I don't know if there were some

13   earlier articles, but it started with this article in

14   2011.  This is their recommendation starting in 2011.

15   BY MR. REISSAUS:

16       Q.   You're not aware of screening for PAOD that was

17   conducted in the patients described in this article?

18       A.   Well, I'd have to go through all their

19   references to see -- if you want to go through this line

20   by line, I'd be happy to.  But I will say that, at least

21   from 2011, from this author, we recommended from that day

22   screening for peripheral vascular disease.

23       Q.   I understand what the article says there.  That

24   isn't the question that I'm asking you, though.

25       A.   I would have to go through all their references

1   to see if someone else had recommended that.  I didn't do

2   that prior to this session.

3       Q.  So you're not aware of information on whether

4   these patients had preexisting non-clinically -- do you

5   understand?  Can you rule out that these patients may

6   have had undiagnosed PAOD or atherosclerosis before they

7   started TASIGNA?

8       A.  I'm not sure what you mean by "ruled out."  He

9   says that several of these patients, to his knowledge, at

10  the time they started TASIGNA, did not have peripheral

11  vascular disease.

12      Q.  But you would agree that just because someone

13  hasn't been diagnosed with PAOD doesn't mean that they

14  don't have atherosclerosis present in the arteries of

15  their legs?

16      A.  As we said, early atherosclerosis can be minimal

17  and not cause symptoms.  So what I read, ..."these

18  patients did not have symptoms," and symptoms that

19  progressed, that required multiple surgical

20  interventions.

21      Q.  So they may have had atherosclerosis before they

22  started TASIGNA that had not yet had clinical symptoms?

23      A.  They may have had 1 percent atherosclerosis.

24      Q.  It may have been more than 1 percent, too?

25      A.  Pure speculation.

Page 61

1        Q.   We just don't know?

2        A.   We know that they didn't have symptoms

3    preferable to atherosclerosis.

4        Q.   But we don't know what level of blockage these

5    patients had at baseline?

6        A.   What do you mean by "blockage"?  How do you

7    define "blockage"?

8        Q.   We don't know if they had narrowing of their

9    arteries and to what extent, before they began taking

10   TASIGNA?

11       A.   Correct.  It's unknown.  What we do know is that

12   they didn't have symptoms that required intervention that

13   appeared after they started TASIGNA.

14       Q.   All right.  You also referenced data from the

15   ENESTnd clinical study.  Do you recall that study?

16       A.   Generally, yes.

17       Q.   And actually, I was going to ask you about

18   Hochhaus 2016?

19       A.   Yeah.

20       Q.   Okay.

21       A.   He's the first author.

22       Q.   Sorry?  I misheard you.

23       A.   I didn't say anything.

24       Q.   In that study, TASIGNA is being compared to

25   Gleevec; correct?

Page 62

1        A.   Yes.   In what parameters are you expressing the

2   comparison?

3        Q.   So this study is looking at advocacy, safety, a

4   lot of different endpoints; isn't it?

5        A.   Complications, side effects, yes.

6        Q.   You understand safety to mean side effects,

7   complications?

8        A.   Well, as long as we agree, side effects and

9   complications.

10       Q.   And the two arms of that trial are -- well, the

11   three arms?

12            MR. ELIAS:   There's three arms.

13            MR. REISSAUS:   Thank you.

14   BY MR. REISSAUS:

15       Q.   Do you understand that the medications being

16   compared in the study are TASIGNA and Gleevec; correct?

17       A.   Right.   Different doses of TASIGNA.

18       Q.   And you note that there are more cardiovascular

19   events in the TASIGNA groups than Gleevec in your report;

20   right?

21       A.   That's what this article shows.  He grafted

22   beautifully.

23       Q.   And in your opinion, that raises the possibility

24   that TASIGNA caused the cardiovascular events that were

25   observed in that trial?

1     A.  Yes.  That's in this article.  He says it in his

2  abstract.

3     Q.  Would you agree that it's important to consider

4  other possible explanations for the data in that study?

5     A.  Well, this is what they considered.  This is an

6  article sponsored and funded by Novartis.  So I'm sure

7  that they looked at all the parameters that they wanted

8  to utilize in their article, and they say, "Numerically,

9  more cardiovascular events occurred in patients receiving

10  nilotinib versus imatinib.  And elevations in blood

11  cholesterol and glucose levels were also more frequent

12  with nilotinib."

13     Q.  You do understand -- well, let me ask that a

14  different way.

15        A numerical increase does not necessarily equal

16  a causal relationship, does it?

17        A.  I would defer to the epidemiologist, but in my

18  experience, I would feel strongly that this was a cause

19  showing a clear differential.  And in fact, going into

20  more subgroups, they report those patients using

21  imatinib.  There was zero percent of those patients,

22  after five years, developing peripheral vascular disease.

23     Q.  So it's very --

24     A.  I agree with the findings.

25     Q.  Yeah.  You don't question the account of the

Page 64

1  events that they're reporting here?  That there were zero

2  peripheral arterial disease events in the imatinib group?

3          A.  That's what they state clearly.

4          Q.  Yeah.  Isn't it possible -- well, zero seems

5  like an awfully low number; doesn't it?  Over the course

6  of five years, in a group of patients that are diagnosed

7  with CML, which is -- tends to be an older population?

8              MR. ELIAS:  Objection.  That lacks foundation.

9              THE WITNESS:  Are you asking me to dispute the

10 zero percent?  Zero percent is zero, it means none, nada,

11 nobody.  This is their study.  Five-year follow-up.  They

12 report zero percent.  I would consider that low.

13 BY MR. REISSAUS:

14         Q.  You would consider that low?

15         A.  I would consider that nonexistent.

16         Q.  Does that raise the possibility, in your mind,

17 that Gleevec may be providing some sort of protective

18 effect?

19             MR. ELIAS:  Objection.  That lacks foundation.

20             THE WITNESS:  One, I'm not the scientist.  Two,

21 in the internal notes of Novartis, one of their

22 scientists or whoever wrote it said, "There isn't any

23 protective event of Gleevec," and we should drop that

24 form of explanation.

25 ////

Page 65

BY MR. REISSAUS:

Q.   So you haven't conducted your own research on that hypothesis?

A.   No.   I allowed the other scientists who have done, and several other articles trying to talk about the mechanisms of TASIGNA as being proatherogenic and whatnot, which we can go into if you'd like.   But as far as my doing independent studies or research or case studies on my own patients?   No.

Because I don't take care of CML patients.   I only report what Novartis articles, what their authors, essentially, reported, zero percent of PVD after five years.   In conjunction with this wide disparity in their final graph, on the last page, showing the difference in any type of cardio vascular events between their three groups.

MR. ELIAS:   Drew, if you're looking to move to a different line, can we take a break?

MR. REISSAUS:   Yeah.

(Lunch recess taken.)

BY MR. REISSAUS:

Q.   Doctor, in reviewing Mr. Lauris's case, you performed a differential diagnosis as to his atherosclerosis; correct?

A.   Well, I looked at various items that could be

Page 66

1    involved in atherosclerosis in my original report, yes.

2         Q.   You evaluated potential causes for his

3    atherosclerosis?

4         A.   Yes.

5         Q.   And you included eight known risk factors for

6    atherosclerosis; correct?

7         A.   Do you want to count them?

8         Q.   I'm at page 8 of your report, if that would be

9    helpful.  I'm looking at the second paragraph, the second

10   sentence.

11        A.   Okay.  Yes.

12        Q.   So it's correct that diabetes mellitus is a

13   known risk factor for atherosclerosis?

14        A.   Yes.

15        Q.   It's correct that hypertension is a known risk

16   factor for atherosclerosis?

17        A.   Yes.

18        Q.   Family history can be a risk factor for

19   atherosclerosis?

20        A.   Yes.

21        Q.   Age itself, is it a risk factor for

22   atherosclerosis?

23        A.   Yes.

24        Q.   Meaning, as you progress through life,

25   atherosclerosis continues to develop and you see higher

Page 67

1   incidence as people get older?

2       A.   And it's also more common in the older-age

3   population.

4       Q.   Obesity is a well known risk factor for

5   atherosclerosis?

6       A.   Yes.

7       Q.   Lack of physical activity is a risk factor for

8   atherosclerosis?

9       A.   Yes.

10       Q.   Smoking is a risk factor?

11       A.   Yes.

12       Q.   Hyperlipidemia is a risk factor for

13   atherosclerosis?

14       A.   Yes.   All of these risk factors have different

15   relative importance, some are riskier than others.

16   Essentially, smoking and diabetes would be two of the

17   more higher risk factors.   And the other ones, which are

18   much less in the risk factor order.

19       Q.   Okay.   So diabetes and smoking, in your mind,

20   are on one level, and the rest of the risk factors are

21   also risk factors, but not to the same extent as diabetes

22   and smoking?

23       A.   Correct.

24       Q.   And each of these risk factors has been shown,

25   through literature, to be an independent factor in the

Page 68

1    development of atherosclerosis; correct?

2             MR. ELIAS:  Objection to the form.

3             THE WITNESS:  Independent or in conjunction with

4    each other, yes.

5    BY MR. REISSAUS:

6        Q.  In other words, when you say "in conjunction,"

7    do you mean, if you have more than one of them, they add

8    up and there's more risk?

9        A.  Not that they add up, it's just present -- just

10   can be more precipitating of atherosclerosis.

11       Q.  So the more risk factors, the more potential

12   precipitating?

13       A.  Yes.  And the less risk factors, as long as they

14   have no bearing on the certain individual, play no role

15   as well.

16       Q.  Okay.  I'm going to start with diabetes.  You

17   note that Mr. Lauris was diagnosed with diabetes in 2003?

18       A.  Correct.  As a type 2 diabetic at that time.  He

19   wasn't someone who had early onset childhood type 1

20   diabetes.

21       Q.  Okay.  And by the time of his diagnosis with PAD

22   in 2013, he would have had diabetes for approximately a

23   decade?

24       A.  Correct.  Just to reiterate, type 1 diabetics

25   have a much higher instance of atherosclerosis and other

1    vascular problems than type 2 diabetics.

2        Q.  By type 1 diabetes, we mean insulin-dependent

3    diabetes?

4        A.  From typically an early age.

5        Q.  I'm going to refer back to page 3 in your

6    report, which is the medical history and treatment

7    history for Mr. Lauris.  And you have a paragraph at the

8    end of page 3 and page 4 that deals with diabetes.  Do

9    you see that paragraph?

10       A.  I do.

11       Q.  In it you note that Mr. Lauris had increased

12   blood glucoses in November 2012 after he began taking

13   TASIGNA; correct?

14       A.  That's what was reported in the medical records,

15   yes.  Sugar level of 542.

16       Q.  You note a couple of weeks later, on the 29th,

17   he returned, and his records reflect that, "Despite

18   treatment, the patient was not getting better with blood

19   sugar levels in the 300s"?

20       A.  That's what the record describes.

21       Q.  I think you had said that these were very severe

22   blood sugars that he was having in this period?

23       A.  That's what his primary care doctor, Dr. Mahal,

24   testified to.  And he was asked and he testified that

25   these were really bad, on a scale of 1 to 10, it was a

Page 70

1    10, in terms of severity.

2        Q.   Mr. Lauris did have elevated blood sugars before

3    TASIGNA as well; correct?

4        A.   Yes.  But in the records that I received, I saw

5    no mention of glucose levels to the high levels that were

6    reported, that we just discussed.

7        Q.   Okay.  I'm going to hand you what I'm marking as

8    219.

9            (Defendants' Exhibit No. 219 marked for

10           Identification.)

11   BY MR. REISSAUS:

12       Q.   And you'll see this is a lab result for blood

13   that was collected on May 17th, 2010?

14       A.   Yes.

15       Q.   And so this is more than two years before he

16   began taking TASIGNA?

17       A.   Okay.

18       Q.   And the glucose level reported there, can you

19   read what that was?

20       A.   318.

21       Q.   On May 17th, 2010, Mr. Lauris had a blood

22   glucose level of 318 that had been measured by the lab?

23       A.   Correct.

24       Q.   This would be a very high blood sugar?

25       A.   That would be high.  It wouldn't be very high.

Page 71

1          Q.   And I'm going to hand you -- this will be 220.

2               (Defendants' Exhibit No. 220 marked for

3               Identification.)

4     BY MR. REISSAUS:

5          Q.   And this is a result from the next year,

6     December 2011; is that correct?

7          A.   Right.  Yes.

8          Q.   About a year-and-a-half later?

9          A.   That's no problem.

10         Q.   What was his glucose measure for the test that

11    was drawn on December 5th, 2011?

12         A.   307.

13         Q.   That was high and elevated again?

14         A.   Yes.

15         Q.   I'm handing you 221.

16              (Defendants' Exhibit No. 221 marked for

17              Identification.)

18    BY MR. REISSAUS:

19         Q.   This is a note from Dr. Hoffmann's file.  You

20    reviewed Dr. Hoffmann's file as a part of your review of

21    the case?

22         A.   Generally, yes.

23         Q.   Okay.  And on -- if you look at the note of

24    January 5th, 2011?

25         A.   Okay.

1    Q.   This is, again, before he started on TASIGNA;

2  right?

3    A.   Correct.

4    Q.   This is reporting on the lab result that we just

5  saw.  It says, "However, his glucose was 307 and

6  creatinine was 1.37."

7       Do you see that?

8    A.   Yes.

9    Q.   And then his blood pressure, at that visit, was

10  130/90?

11    A.   Correct.

12    Q.   And that would be elevated?

13    A.   Somewhat elevated, yes.

14    Q.   Then the assessment, it says, "Clinically and

15  hematologically well.  CML in molecular remission."  That

16  is talking about his cancer; right?

17    A.   Yes.

18    Q.   And then it continues, "However, hypertension

19  and diabetes control are still adequate."

20       Did I read that correctly?

21    A.   It says inadequate.

22    Q.   Thank you.  So hypertension and diabetes were

23  problems for him as of this visit in January 2012?

24    A.   Well, he needed to get more or better control or

25  different diabetic oral medications.

1    Q.   Then it states, "There's the possibility of

2   beginning renal impairment."

3         Do you see that?

4    A.   That's what he states.

5    Q.   That would be based on the elevated creatinine

6   that we looked at earlier?

7    A.   That's really normal, 1.37, usually we use 1.5

8   for creatinines.  I think this particular lab used 1.36.

9   So it's at the upper limits of normal or approaching --

10   Q.   And when you're talking about the creatinine

11  number, what we're looking at is when you run it through

12  a calculation to get an estimated GFR?

13   A.   Well, that's a whole different measurement.

14  This is serum creatinine.

15   Q.   All right.  And I just want to point to two

16  other things on this record.  March 8th, 2012, do you see

17  the blood pressure was 132/82 at that visit?

18   A.   Correct.  So it's actually an improvement, it's

19  at 132 now.

20   Q.   And another month later it's 136/86, on

21  April 12th, 2012?

22   A.   Yeah.  It's reasonable.  It's a little bit

23  elevated.

24   Q.   And you'd agree that blood pressure is important

25  to control, generally, for patients; right?

Page 74

1          A.   Yes.   And that's why his doctors were using

2     various medications to assist in that control.

3          Q.   And it's especially important in a patient with

4     diabetes who's -- given that both are risk factors that

5     work together?

6          A.   Yeah.   It's risk modification, it's the primary

7     goal to treat the patient for various effects that these

8     entities could provoke.

9          Q.   You agree that diabetes can cause peripheral

10    vascular disease?

11         A.   Yeah.   It's one of the risk factors.

12         Q.   And you agree that diabetes can cause cerebral

13    vascular disease?

14         A.   Yes.

15         Q.   And you agree that diabetes can cause coronary

16    artery disease?

17         A.   Yes.

18         Q.   So you'd agree that diabetes could be a cause

19    for the atherosclerosis that occurred in Mr. Lauris's

20    case?

21         A.   I, you know, can't answer that.   It's a risk

22    factor.   When you say "could," it could not also.

23         Q.   So --

24         A.   It's a risk factor.   It doesn't mean it's in

25    every patient who has diabetes develops peripheral

Page 75

1   disease.  It just means that it's one of the known risk

2   factors that could develop atherosclerosis in patients

3   with diabetes who have perfectly normal pulses into their

4   90s, who have been diabetic for 30, 40, 50 years.

5        Q.  There are also diabetics who develop peripheral

6   vascular disease more quickly after they're diagnosed?

7             MR. ELIAS:  Object to the form.

8             THE WITNESS:  Well, I don't know if it's more

9   quickly.  As I said, some patients can develop PVD, some

10  don't.  It's a risk factor recognized so that one tries

11  to control it with medication or insulin as needed.

12  BY MR. REISSAUS:

13       Q.  I'm going to hand you 222.

14            (Defendants' Exhibit No. 222 marked for

15            Identification.)

16  BY MR. REISSAUS:

17       Q.  And this article is entitled, "Development of

18  New Peripheral Arterial Occlusive Disease with Patients

19  with type 2 Diabetes During a Mean Follow-Up of

20  11 years;" correct?

21       A.  That's what you read.

22       Q.  Okay.  And the study looked at 130 type 2

23  diabetic patients.

24            MR. ELIAS:  First of all, have you seen this

25  article before?

Page 76

1          THE WITNESS:  No.

2          MR. ELIAS:  He needs to review the article.

3   BY MR. REISSAUS:

4      Q.  Take the time if you need to look at it.  Let me

5   know when you're ready.

6      A.  I'm not going to read the whole thing, but this

7   is an old study, first of all, which was published in

8   2003, talking about patients who were utilized for a

9   study from 1983 through 1985 in Helsinki.  And in it,

10  they, as far as I can see, don't separate the risk

11  factors of smoking, which is included in the study, as a

12  risk factor.  What would you like me to answer?

13     Q.  So my question for you was about the result

14  section in the abstract.  Out of the sample of 130 type 2

15  diabetes patients that they used here in the study, how

16  many had PAOD diagnosed at baseline?

17     A.  Well, they didn't say it's a 130 in their

18  results, all they say about PAOD is 21.

19     Q.  All right.  21 patients, at baseline, had PAOD

20  diagnosed; right?

21     A.  Yes.

22     Q.  And that was 16 percent of the patients?

23     A.  Yes.

24     Q.  If you --

25     A.  And these are patients who had a mean age of 58.

1      Q.   And this study, based on the title, the mean

2   follow up was 11 years from baseline?

3      A.   Yes.

4      Q.   Okay.  So the next sentence says, "During follow

5   up 29 of 89, 24 percent of patients, developed new PAOD"?

6      A.   Correct.

7      Q.   "And 29 patients died during follow up -- 21 --

8   72 percent of them from cardiovascular disease"?

9      A.   Yes.  That's what it says.

10      Q.   That fits with your understanding that diabetes

11   is a major risk factor for cardiovascular disease?

12      A.   I said diabetes is one of the risk factors for

13   cardiovascular disease.  But in essence, this is an old

14   study from, what?  30 years ago.  And that these patients

15   started in 1983.

16           Medications have drastically changed for

17   treatment of diabetes.  And antenna for treating these

18   patients more recently and risk modification has

19   profoundly improved the medical conditions of these

20   patients who are type 2 diabetics.

21           So although this is what this article says, this

22   is published in 2003, but started with patients in 1983.

23   The medication usage today, medications, insulin, have

24   all been modernized and updated and controlled, and

25   awareness and diet control and all the rest to treat

Page  78

1    diabetics -- much different from this study, which is in

2    Helsinki.  A totally different population, different than

3    the United States of America.

4        Q.  So you believe that the country from which a

5    population comes is significant to assessing its

6    applicability to the United States?

7        A.  Different lifestyle, could be different activity

8    style, could be different eating habits, could be

9    different availability of medications.  I don't know how

10   these patients were treated.  They say, most of the time,

11   there are more medications available to patients in the

12   United States than it would be there.

13        This article is just bringing to the attention

14   that patients can develop PAD if they're diabetic and

15   they should be monitoring, which is his last conclusion,

16   -- routine measurements and modification of risk factors,

17   is what I've expressed, to watch the patients of type 2

18   diabetics.

19        Again, this is an old study and medications and

20   awareness and risk modification has been highly improved

21   since I started my vascular career.

22        Q.  The improvement to which you refer in care and

23   treatment and available therapies for diabetes, those are

24   all dependent on whether doctors prescribe them and

25   whether patients follow up and follow the course that

1   their doctor recommended; correct?

2        A.   Yes.  When you look at the statistics as he's

3   expressed here, 25 percent of whatever number developed

4   PAD -- 24 percent?  That means 76 percent didn't.

5        Q.   76 percent who did not were -- that's not out of

6   the full group.  At the end of this study --

7        A.   Those are the newly diagnosed peripheral

8   vascular disease in the study.  Correct.

9        Q.   By the end of the study, the initial 21 patients

10   plus another 20, 21 had developed new PAOD.  So a total

11   of 42 out of the 130 had PAOD, at some point, during this

12   study?

13        A.   Yes.  But in the study, it doesn't say how they

14   were treated, how their diabetes was treated, who was

15   treating them, are they from rural areas, city areas,

16   they didn't discount these people having a smoking

17   history, these people have hyperlipidemia within their

18   risk factors.  All that is outlined.  What they didn't

19   want to say -- and cholesterol is also here.  What they

20   didn't want to say with this patient population -- we

21   need to be more aware of the potential for developing

22   peripheral vascular disease and monitor them with ABI's

23   or any other techniques.

24        Q.   In the result section on 1243, it notes, in the

25   first paragraph, of the 21 patients with PAOD at

Page 80

1    baseline, 11 were deceased?

2         A.  Where are you?  I'm sorry.

3         Q.  So you see -- where are you looking?  The very

4    first paragraph of frequent and development of PAOD and

5    the results?

6         A.  Okay.

7         Q.  And it says, "Of the 21 patients with PAOD at

8    baseline, 11 were deceased, 52 percent;" correct?

9         A.  That's what it says.

10        Q.  So over the course of 11 years of mean follow

11   up, 50 -- more than half of the patients who had PAOD, at

12   baseline, passed away?

13        A.  Correct.  And how old were those patients?  How

14   old were those patients?

15        Q.  I'm asking you the questions, Doctor.

16        A.  Well, they don't age qualify who the patients

17   were in this article, as far as who died.  Did these

18   patients have smoking history?  Were they hyperlipids?

19   All the other risk factors are all a part of this.  So

20   yes.  It says who died.  It doesn't say what ages were

21   these patients that died.  Nor were they continuing to

22   smoke.

23            As I said earlier, smoking is the highest risk

24   factor for development of atherosclerosis disease.

25        Q.  The article also notes that, of the 10 patients

1  who did not pass away during follow up, 4 out of the 10

2  had progression of their PAOD.

3      A.  Okay.  Again, are they still smokers?  Are they

4  hyperlipids?  Are they obese?  Are they inactive?  Do

5  they have a family history?  None of that is qualified

6  here.  That wasn't the essence of the article.  His

7  essence was to show that atherosclerosis disease can

8  occur more frequently in patients who are diabetics.

9          And his conclusion was that we need to monitor

10  these patients more closely and do risk modification

11  actively to try to reduce the incidence of

12  atherosclerosis events.

13      Q.  I understand that's your interpretation of the

14  authors' intent there.  The authors did include this data

15  in their published article?

16      A.  Absolutely.  Again, as I said, they didn't

17  stratify for age, they didn't stratify for smoking, they

18  just reported what occurred as an absolute number, but

19  didn't tell you were they 75-year-old smokers for the

20  last 40 years who had a heart attack and died.

21      Q.  The authors also note that PAOD was bilateral in

22  13 of 21 patient, 62 percent at baseline.

23          Do you see that?

24      A.  Yes.  Again, were they smokers?

25      Q.  So it is possible that patients with -- this

Page 82

1    article shows that patients with diabetes can, at

2    baseline here, have bilateral PAOD?

3        A.  Correct.  But again, in conjunction with

4    smoking, hyperlipidemia, activity, obesity, family

5    history, none of that is qualified.  He makes a statement

6    of the patients that he observed.  He didn't stratify any

7    of those parameters.

8        Q.  In the study, 6 of the patients suffered from

9    several PAOD, requiring major amputation.  It states

10   that, doesn't it?

11       A.  Yes.  Same holds true.  Were they smokers?  He

12   doesn't say that.

13       Q.  Well, look at Table 3.  Okay?  So it lists P

14   values down at the right column; correct?  Do you see

15   that?

16       A.  You'll have to explain P values to me.

17       Q.  So those don't mean anything to you?

18       A.  Correct.

19       Q.  Okay.  I'm going to hand you 223.

20           (Defendants' Exhibit No. 223 marked for

21           Identification.)

22   BY MR. REISSAUS:

23       Q.  Title of this article is, "Natural History of

24   Claudication:  Long-Term Serial Follow-Up Study of 1244

25   Claudicants."  In the objective it states, "The purpose

1   of this study was to delineate the natural history of

2   claudication and determine risk factors for ischemic rest

3   pain, and ischemic alteration among patients with

4   claudication."

5          Did I read that correctly?

6     A.  Yes.  I wasn't following your reading, but yes.

7          MR. ELIAS:  Are you going to ask him a bunch of

8   questions on this?  If so, he needs to review it.

9   BY MR. REISSAUS:

10    Q.  Let me ask you first:  Is this an article you've

11  reviewed previously?

12    A.  No.  I just looked at it briefly.

13    Q.  So if you look at the results in the abstract,

14  it says that the mean follow-up time in this study was

15  45 months.

16         Do you see that?

17    A.  Okay.

18    Q.  So these were patients that were followed for a

19  little -- on average, a little less than four years.  And

20  what they did was they calculated cumulative ten-year

21  risks of the development of ischemic alteration and

22  ischemic rest pain.  Do you see that?  That result?

23    A.  Yes.

24         MR. ELIAS:  Object to the form.

25  ////

Page 84

1   BY MR. REISSAUS:

2        Q.   And they note their results, which is that the

3   cumulative 10-year risks of development of IU and IRP

4   were 23 percent and 30 percent, respectively.

5             Do you see that?

6        A.   Yes.

7        Q.   And they conducted a multi-varied analysis using

8   several clinical risk factors.  They found that only DM

9   and ABI predicted the development of ischemic rest pain.

10       A.   Okay.

11       Q.   If you turn to 967, if you look at the last

12   paragraph on the left column, they note that, "We found

13   that diet-controlled diabetes was not a significant

14   predictor.  However, diabetes that required either oral

15   or insulin therapy was a strong predictor of the

16   development of these outcomes."  Meaning ischemic rest

17   pain and ischemic ulceration.

18             MR. ELIAS:  Object to the form.

19   BY MR. REISSAUS:

20       Q.   Do you see that?

21       A.   I see the sentence.

22       Q.   Would you agree -- let's step back.

23             Would you agree that patients with -- out of

24   people -- if you have two patients with claudication, the

25   patient with -- if there's a patient with diabetes and

Page 85

1    one who doesn't have diabetes?

2         A.  A patient with diabetes; a patient without

3    diabetes?

4         Q.  And if you keep the other risk factors for

5    atherosclerosis the same, like smoking, lipids, et

6    cetera, the patient with diabetes is more likely to have

7    progression of their disease than the patient without

8    diabetes.

9         A.  We've said this all along.  Diabetes is, as I

10   said, one of the two major risk factors of

11   atherosclerosis in certain patients.

12        Q.  My question is a little bit different.  I know

13   that you've answered, several times, that diabetes is a

14   major risk factor for atherosclerosis.  I was asking

15   about the progression of atherosclerosis once it's been

16   identified by its claudication, let's say, in this case?

17        A.  Well, in this study, they show that there is a

18   higher incidence of IU and IRP for people who are on

19   medications for diabetes.

20        Q.  The authors state, "Diabetes in patients with

21   peripheral arterial disease" --

22        A.  Where are you now?

23        Q.  The next sentence actually.

24             MR. ELIAS:  Where?  What page?

25   ////

Page 86

1    BY MR. REISSAUS:

2         Q.   Page 967, in that last paragraph on the left

3    column.   The sentence starts, "Diabetes in patients with

4    peripheral arterial disease tends to portend a more

5    aggressive course, with early large vessel involvement

6    coupled with microangiopathy."

7              Did I read that correctly?

8         A.   Yes.   That's known.

9         Q.   And you would agree with that general statement?

10        A.   Patients who are diabetics have more

11   microvascular disease than other patients, if smoking is

12   not also part of the history.

13        Q.   And they also have a more aggressive course than

14   diabetics versus nondiabetics?

15        A.   It's more of a concern, it needs more control.

16        Q.   But you agree that a diabetic -- all things --

17   all other things being the same, is more likely to have a

18   more aggressive course than a patient without diabetes?

19        A.   It can, in a certain number of patients.

20        Q.   Okay.

21        A.   I'm not sure -- I haven't read this whole

22   article about parameters, including smoking.   You've

23   asked me to see this at a sudden nature.   I don't know

24   about the other controlled factors, diabetes and the

25   other risk factors.

1      Q.   You've reviewed the course of Mr. Lauris's

2  diabetes as part of your review of the case?

3      A.   Generally, yes.

4      Q.   And did you look at his A1C results?  First of

5  all, do you know what an A1C is?

6      A.   Yes.

7      Q.   It's an average of a patient's blood sugars over

8  a three- to four-month period?

9      A.   Typically, three months, but yes.

10     Q.   And so you did review Mr. Lauris's A1C's for the

11  period after he received TASIGNA?

12     A.   Yes.  Either through the medical records or

13  through deposition testimony.  It's been discussed.  Yes.

14     Q.   And you note in your report that you ended up

15  excluding diabetes as a cause of Mr. Lauris's

16  atherosclerosis?

17     A.   Well, I said it's a risk factor, but in the

18  context of his history and his downhill course over the

19  last year, it did not play the role as precipitative for

20  his progressive, severe atherosclerosis over that next

21  year while he was on TASIGNA.

22     Q.   Would you agree that it's possible for a patient

23  with a decade of inadequately controlled diabetes to

24  develop peripheral arterial disease?

25     A.   Well, inadequate?  He had various times of

1  control, he had various times of lesser control.  So it

2  was a fluctuating control.  His doctors would try

3  different medications and have some element of control,

4  and then he wouldn't go in those preceding ten years.

5         However, he then developed rapidly progressive

6  atherosclerosis, which I would not implicate diabetes as

7  the cause.

8     Q.  I was asking more generally, not Mr. Lauris,

9  specifically.  In a patient -- it is possible for a

10 patient with a decade of inadequately controlled diabetes

11 to develop peripheral arterial disease?

12        MR. ELIAS:  I object to the extent that that

13 lacks foundation and is an unformed hypothetical.  It

14 doesn't include age, doesn't include other risk factors.

15 Hypothetical.

16        THE WITNESS:  Again, I was just going to

17 reiterate, it does not include any of those possible

18 coexisting risk factors, and -- including age.  As I said

19 earlier, I've not seen a patient with such

20 atherosclerosis in his 40s, even being a diabetic, that

21 required somewhat urgent intervention to revascularize

22 his lower extremities.

23    Q.  Setting aside age --

24        MR. ELIAS:  Wait a minute.

25        MR. REISSAUS:  I haven't even finished the

1   question.

2          MR. ELIAS:  I know.  But setting aside the age?

3   I don't understand how you set aside age?

4   BY MR. REISSAUS:

5      Q.  If Mr. Lauris had been -- other than you saying

6   you haven't seen a 48-year-old patient develop peripheral

7   arterial disease requiring surgical intervention in your

8   experience, you're not saying that it is impossible and

9   never happens, are you?

10     A.  No.  As you had brought up earlier, there was

11  the article by that Dr. D-, his long name -- that

12  atherosclerosis can occur in people under 50.  It's very

13  uncommon.  He said perhaps 1 percent.  So somewhere

14  there's a patient out there, and we don't know whether

15  there's genetic involvement, smoking involvement, or

16  whatever, that caused the atherosclerosis besides

17  diabetes.

18          That somewhere there is a patient who may

19  present that, I would dare say that most of my colleagues

20  have also, as Dr. Stern, Dr. Hinton, Dr. Kinter, related

21  that the presentation of Mr. Lauris to them, as a

22  vascular patient, was so uncommon in their experience as

23  well.  So there are three other vascular surgeons, on the

24  record, that are relating what I'm relating.

25     Q.  We're talking about rare events in this case;

Page 90

1    right?  The development of atherosclerosis.  You've said

2    that's a rare event; right?

3         A.  Rare event in whom?  It wasn't in the TASIGNA

4    patients.  So rare event in whom?  In someone who's less

5    than 50?  Highly uncommon.

6         Q.  The actual incidence observed is still uncommon,

7    even in TASIGNA treated patients.  We're not talking

8    about highly common events?

9              MR. ELIAS:  What?  I object to the form.  It's

10   argumentative.

11             THE WITNESS:  What's the question?

12             TASIGNA patients had a higher incidence of

13   developing peripheral vascular disease than the general

14   population?  The incidence of vascular disease in people

15   who may be 40 to 50 years old, runs anywhere from

16   .6 percent to 1 percent in multiple epidemiological

17   studies in the United States.

18   BY MR. REISSAUS:

19        Q.  So .6 to 1 percent of the population, just the

20   general population, ages 40 to 50 --

21        A.  As Dr. D. in his article -- it's a long name --

22   expresses the same, right along with the textbook of

23   vascular surgery, which is the authoritative gold

24   standard of textbooks of vascular surgery, states in his

25   textbook with a bar graph.

1     Q.   And as you start -- so that's starting with the

2    overall population, and as you look at subgroups of the

3    general population who have risk factors for

4    atherosclerosis, you expect that the incidence and

5    prevalence would be higher in those groups?

6     A.   No.  He just reports the incidence of peripheral

7    vascular disease in all patients.

8     Q.   Right.  I understand that.  But if you then were

9    to look at just people with diabetes who are 40 to 50,

10   you would expect that, since diabetes is a risk factor

11   and it would apply to everybody in that group, you would

12   see a higher incidence than you would see in the general

13   population?

14    A.   If it says you.  I haven't seen such a patient.

15   Drs. Stern, Kinder, and Hinton related the same as

16   Mr. Lauris presenting an unusual presentation to them of

17   vascular disease.  So at least the four vascular surgeons

18   who have been involved in Mr. Lauris are expressing the

19   same unusual heretofore not seen presentation of such a

20   gentleman with his scope and severity of vascular disease

21   in a 48-year-old diabetic.

22    Q.   That wasn't what I was asking.

23    A.   Yes, you did.

24    Q.   My question is:  In the -- you would expect that

25   populations with risk factors for atherosclerosis will

Page 92

1    have a higher incidence of atherosclerosis than the

2    general population as a whole?

3        A.  If people have risk factors, yeah, that's what

4    risk factors are.

5        Q.  That was what I was trying to ask.

6            MR. ELIAS:  Are you moving on to another

7    document?  I just need a bathroom break.

8            MR. REISSAUS:  Sure.  Off the record.

9            (Recess taken.)

10   BY MR. REISSAUS:

11       Q.  The next factor you include in your report is

12   hypertension; is that right?

13       A.  Yes.

14       Q.  And hypertension can be a cause of

15   atherosclerosis in the body; correct?

16       A.  Right.  As I said, it's more minor compared to

17   smoking and diabetes.

18       Q.  It's still a well known risk factor for

19   atherosclerosis?

20       A.  Yes.

21       Q.  Okay.  And you agree that Mr. Lauris did have a

22   history of hypertension?

23       A.  Yes.  He was being treated for it.

24       Q.  And is it possible that diabetes plus

25   hypertension were causes for Mr. Lauris's

Page 93

1   atherosclerosis?

2        A.   Could be, but it's not in the context of his

3   year-long, rapidly progressive atherosclerosis.

4        Q.   There are patients with peripheral arterial

5   disease whose clinical course progresses quickly;

6   correct?

7        A.   You have to explain what you mean by "clinical

8   course."

9        Q.   There are patients whose -- patients can present

10  with peripheral arterial disease without ever having had

11  symptoms of claudication?

12       A.   Not typically, no.  People first start off with

13  an exercise-related limitation in their walking.  And

14  then a small percentage of those patients go on to

15  requiring some type of surgical intervention.  It's not

16  common for a patient just to present -- if they've been

17  followed by a doctor who's been examining their pulses,

18  to have a patient, like Mr. Lauris, who was found to have

19  normal peripheral pulses and, within that first year,

20  lost his pulses.  That's not common, nor have I ever seen

21  a patient like that.

22       Q.   There are patients that the first presentation

23  that a doctor is --  would you agree that not all

24  patients with peripheral arterial disease experience

25  claudication?

1        A.   Well, you have to tell me what type of patients.

2   Are these 80-year-old sedentary people who don't walk

3   anymore because of some sedentary limits?  Have they been

4   followed by their primary care doctors who have been

5   examining pulses?  You have to specify what type of

6   patient you're referring to.  Has this person seen a

7   doctor in the last several years?

8        Q.   So there are patients that have PAD who did not

9   report symptoms of claudication?

10        A.   I've had patients referred -- come to me, who

11   haven't seen their doctor in five years, who show up with

12   maybe some gangrene of a toe, but having not seen a

13   doctor, having not been treated for any risk factor,

14   sedentary patients, obese patients, who may sit in their

15   house all day, yes, I've seen that type of patient.

16        Q.   Are you aware that the American Heart

17   Association publishes heart diseases and stroke

18   statistics periodically, approximately annually?

19        A.   If you -- I'm sure they did.

20        Q.   Is that something that you have reviewed?

21        A.   No.

22        Q.   Okay.  So would you agree with the statement

23   that approximately -- excuse me.  Would you disagree with

24   the statement that only about 10 percent of people with

25   PAD have the classic symptom of intermittent

Page 95

1   claudication?

2        A.   No.   I think that's one of your doctors who had

3   said that.

4        Q.   That's something that --

5             MR. ELIAS:   Let -- go ahead.   You guys are

6   talking over each other.

7             THE WITNESS:   I would say, yeah, that's

8   reasonable, that there are people who develop collaterals

9   that compensate for the narrowing of the blood vessels so

10  they may start out to be mildly symptomatic and then

11  maintain that level, which is not limiting to their daily

12  lifestyles.   They may then go on to risk modification and

13  stop smoking.

14            So the shorter answer is:   The smaller

15  percentage of patients who may have peripheral vascular

16  disease become symptomatic with limiting their daily

17  activities requiring further evaluation and potential

18  intervention.

19       Q.   Okay.

20       A.   I don't know if that number, 10 percent, is

21  exact, but fewer than the majority comes to surgery.

22       Q.   So whether a particular person -- some people

23  will have their disease progress to the point where they

24  develop symptoms and others will not?

25       A.   Again, it depends, are they being followed by a

Page 96

 1  physician?  Are they having their risks modified and

 2  controlled?  And just as important, of those, as you say,

 3  10 percent, a much smaller -- much smaller fraction of

 4  those patients ever progress to severe symptoms, where a

 5  foot, toe, or leg was threatened, CLI.

 6        MR. ELIAS:  Just say what that is for the

 7  record, clinical leg ischaemia.

 8        THE WITNESS:  Clinical leg ischaemia occurs in a

 9  small fraction, or even those that have intermittent

10  claudication.

11  BY MR. REISSAUS:

12     Q.  Next on your list -- so let's move to family

13  history, point 4.

14     A.  So you want to skip three, age?

15     Q.  We've talked about age a lot already.  I want to

16  ask you about family history now.

17     A.  Okay.

18     Q.  You note that Mr. Lauris's father died of a

19  heart attack in his 70s?

20     A.  I think they thought it was a heart attack.  I'm

21  not quite sure about that.  I know he had coronary bypass

22  surgery in his mid-60s.

23     Q.  And coronary artery bypass surgery is a

24  treatment for atherosclerosis in the arteries of the

25  heart that lead to the heart?

1        A.   Correct.

2        Q.   Okay.   And to your knowledge, did Mr. Lauris's

3   father have diabetes?

4        A.   Not -- I was not told that he was -- it was said

5   he was a heavy smoker.   His mother --

6        Q.   We'll take the people --

7        A.   You asked me about the family history, so I'm

8   talking about the family history.

9        Q.   I need to direct you to a specific question.

10           I was asking about the father first.   We'll --

11   let's deal with him, and then we can move on.   I've seen

12   your report and I understand -- there -- you mention his

13   mother and maternal grandmother had diabetes history?

14       A.   Yes.   Both of them reported to have diabetes,

15   with mother, I think now 78 years old, and the

16   grandmother, who may have passed away at the age of 91,

17   which had diabetes.   To my knowledge, neither of them

18   developed peripheral vascular disease.

19       Q.   And his maternal grandmother experienced a

20   stroke and had diabetes; correct?

21       A.   It's reported she had a stroke at the nice age

22   of 91.   And we don't know the cause of her stroke,

23   whether it's carotid or she had a cerebral hemorrhage.

24   There are other reasons people have strokes.

25       Q.   Not all strokes are atherosclerotic in nature?

Page 98

1       A.   Correct.

2       Q.   Would you agree that it's important to know the

3  baseline level of atherosclerosis that Mr. Lauris may

4  have had at the time he started TASIGNA?

5       A.   No.

6       Q.   No?

7       A.   All I know is he was an active, trim individual

8  who played racquetball, tennis, worked, did motocross.

9  So he wasn't symptomatic.

10       Q.   If he had been symptomatic prior to starting

11  TASIGNA, would that have been relevant to your

12  differential diagnosis?

13       A.   He wasn't symptomatic.

14       Q.   I'm asking, hypothetically, if he had been.

15       A.   You're asking me what, hypothetically?

16       Q.   If Mr. Lauris had symptoms indicative of

17  atherosclerosis prior to starting TASIGNA, would that be

18  relevant to your differential diagnosis that you

19  conducted?

20       A.   Yes.

21       Q.   In your report, do you discuss kidney disease

22  anywhere?

23       A.   In my report?

24       Q.   Uh-huh.

25       A.   I don't believe I do.  It's recognized in his

1   medical chart that he had early stages of kidney disease.

2        Q.   But that wasn't something that you included here

3   in your report?

4        A.   'Cause it had nothing to do with my report.

5        Q.   It had nothing to -- diabetes is a major cause

6   of kidney disease in the United States?

7        A.   It's one of the causes, yes.

8        Q.   In fact, it's one of the largest causes; isn't

9   it?

10       A.   Well, yes.  Diabetes, hypertension, it causes --

11  we know he had nephrosclerosis, with a mildly reduced

12  GFR, which, on the final GFR that I saw, prior to his

13  death, was 61, which kind of puts him on the borderline

14  of Grade II, Grade III, but he's in Grade II over five

15  grades.

16       Q.   So Mr. Lauris had nephrosclerosis -- and I think

17  you're referring to the autopsy findings?

18       A.   Yes.  But that's typically what diabetes and/or

19  the hypertension will provoke in the kidney.

20       Q.   So diabetes is a risk factor for atherosclerosis

21  and that includes CKD?

22       A.   CKD, meaning chronic kidney disease.  I said he

23  had that at that last stage, by definition, Grade II,

24  CKD.  But he also did not have eye problems, retinopathy,

25  according to his ophthalmologist, which is another small

Page 100

1    vessel result of being diabetic or hypotensive.

2        Q.  You have -- I want to ask you about the affect

3    of Mr. Lauris's -- I want to ask you about the impact of

4    kidney disease in Mr. Lauris's case and more generally as

5    well.

6            MR. REISSAUS:  This will be Exhibit 224.

7            (Defendants' Exhibit No. 224 marked for

8            Identification.)

9    BY MR. REISSAUS:

10       Q.  This is lab results from September 2012; is that

11   right?

12       A.  From when?

13       Q.  September 2012.

14       A.  Yes.

15       Q.  And as of September 10th, 2012, his eGFR was 34;

16   is that --

17       A.  On this specimen, yes.

18       Q.  And eGFR is a measure to estimate the granular

19   filtration rate for the functioning of the kidney; is

20   that fair?

21       A.  Correct.  Yes.  I mean, however, as I stated

22   earlier, on March 17th, 2014, at his nephrology visit,

23   his serum creatinine was 1.36 and a GFR of 61.

24       Q.  On this date, September 10th, 2012, his GFR was

25   34; right?

1        A.   Right.  And on 3/17/14, Dr. Atwal, his

2   nephrologist, says, "His renal function is slightly

3   better than before, with a GFR of 61 and serum creatinine

4   of 1.36."

5        Q.   Prior to that time, there were additional tests

6   that were below 61?

7        A.   Right.  But his last test was what I repeated.

8   The most up-to-date test was what I had just stated.

9        Q.   So it's your opinion, based on the -- well, do

10  you believe that CKD, chronic kidney disease, does have

11  an impact on a patient's life expectancy?

12       A.   It may, it may remain stable for the rest of his

13  life.

14       Q.   Right.  When we talk about life expectancy,

15  we're dealing with probabilities across large

16  populations, and we're trying to estimate what the

17  possibilities are.

18            MR. ELIAS:  Object to the form.

19            THE WITNESS:  You're asking me nothing.  I mean,

20  there's a whole slew of parameters that go into it and

21  people have formulated epidemiologic studies about life

22  expectancy, if you want to discuss that, we'll go into

23  that.

24  BY MR. REISSAUS:

25       Q.   I'm going to hand you 225.

Page 102

 1          (Defendants' Exhibit No. 225 marked for

 2          Identification.)

 3   BY MR. REISSAUS:

 4       Q.   This is an article titled, "Life Expectancy With

 5   Chronic Kidney Disease:   An Educational Review."

 6       A.   So this is what?   From the Pediatric Nephrology

 7   Journal?

 8       Q.   Uh-huh.

 9       A.   "Pediatric" meaning young patients?

10       Q.   Uh-huh.   So if you turn to the second page, 244.

11       A.   This is not in the United States?   This is in

12   London or England, this study?

13       Q.   If you turn to the second page, life expectancy

14   with CKD?

15       A.   Where are we?   Okay.

16       Q.   It states, "Life expectancy tables for people

17   with CKD have been created from a large population based

18   registry in Alberta, Canada, and stratified for different

19   levels of eGFR.   Data are calculated for men and women

20   from 30 years of age to 85 years of age by their levels

21   of kidney functions, as defined by eGFRs of greater than

22   60, greater than or equal to 60, 45-49, 30-44 and 15-29

23   ml/min/1.73 m2."

24          Did I read that correctly?

25       A.   Yes.

1        Q.   And they state that -- the authors state that,

2    "These data show that life expectancy is progressively

3    reduced with each age band of worse renal function."

4            Did I read that correctly?

5        A.   Yes.

6        Q.   And if you look in the next column, the second

7    full paragraph, the first sentence of it --

8        A.   Hold on one second.  Can I write on this?

9            MR. ELIAS:  Go ahead and write on it.

10           THE WITNESS:  Okay.  What was your question?

11   BY MR. REISSAUS:

12       Q.   So in the second column, the second full

13   paragraph --

14       A.   Oh, I'm sorry.

15       Q.   -- on page 244.

16       A.   2- -- okay, which column now?

17       Q.   The right column, the second full paragraph.

18       A.   Yes.

19       Q.   That full sentence.  Can you read that, please?

20       A.   Start me with the first two words.

21       Q.   "The excess" --

22       A.   "The excess mortality associated with renal

23   failure is due principally to the increased risk of

24   cardiovascular disease."

25       Q.   So do you agree with that?

Page 104

1        A.  Well, I'm not a nephrologist dealing with kidney

2    patients.  It's a general statement in this article.

3        Q.  Okay.  You don't have any reason to disagree

4    with that?

5            MR. ELIAS:  Object to the form.

6            THE WITNESS:  It depends on the patient, his

7    age, his risks -- if we go to the table on the next

8    page --

9    BY MR. REISSAUS:

10       Q.  We will in a second.

11       A.  Well, you've opened up the article.  So you're

12   discussing the article.

13       Q.  This is a deposition.  I'm asking you questions;

14   you answer the questions.  Just 'cause I handed you the

15   article isn't --

16       A.  Go right ahead.

17       Q.  You will have an opportunity.  We will -- I'll

18   ask you about it.

19            What I want to understand is whether or not --

20   well, what your understanding is of how CKD leads to

21   mortality.  And that's why I asked you if that was a

22   statement that you had any basis to disagree with?

23            MR. ELIAS:  Object to the form.

24            THE WITNESS:  They're making a statement that

25   there's an increased risk of cardiovascular disease

Page 105

1   and/or death in patients who have renal failure.  It

2   doesn't say what type of renal failure, what grade of

3   renal failure, so as a generalization, I would agree with

4   that statement.

5   BY MR. REISSAUS:

6       Q.  If you look at two sentences later, they say

7   that, "That's based on an unadjusted proportion of

8   patients who died of cardiovascular disease" -- excuse

9   me.  Let me start that up again.

10          The next sentence says -- after what we read, it

11  says, "An investigation of the causes of death associated

12  with CKD in Alberta revealed that the major cause of

13  death was cardiovascular, including an increase in heart

14  failure and valvular disease.  The unadjusted proportion

15  of patients who died from cardiovascular disease

16  increased with decreasing eGFR."

17          And it's looking from -- it's comparing to eGFR

18  of greater than or equal to 60, (with proteinuria) and

19  then it stratifies down to 49 to 59.9.  So it does --

20  that opening sentence we just read, does relate to

21  different levels of eGFR.  It's not just full-out kidney

22  failure they're talking about here.

23          MR. ELIAS:  Object to the form.  Compound.

24          THE WITNESS:  So am I supposed to answer now?

25          MR. ELIAS:  You can answer.

Page 106

1          THE WITNESS:  So they're comparing those

2     multiple groups to people who have greater or equal to a

3     GFR of 60.  I just read into the record that this

4     patient's GFR was 61.  So he's at the better level.  He's

5     the one being compared to; correct?

6     BY MR. REISSAUS:

7          Q.  I haven't asked about Mr. Lauris yet.

8          A.  Well, I'm dealing with Mr. Lauris.  I'm not

9     dealing with people out in the street.  Mr. Lauris has a

10    GFR of 61, the final GFR that he had.  And so I'm looking

11    at this article that you present to me, and all of those

12    stratifications are comparing it to people who are

13    greater or equal to 60, and secondly, they talk about an

14    increase in heart failure and valvular disease.

15          Mr. Lauris did not have failure and he did not

16    have disease.  So there are multiple causes of his

17    cardiovascular disease or death, not just atherosclerosis

18    coronary disease.

19          Q.  You would agree that Mr. Lauris's GFR was not

20    always above 60; correct?

21          A.  Correct.  But it was improved with the doctors

22    who were treating him, treating him for his diabetes,

23    treating him for his hypertension.  His kidney doctor was

24    monitoring him.  His creatinine was 1.36, which is,

25    essentially, normal, and eGFR was greater than 60.

1        Q.   So is it your opinion that Mr. Lauris's kidney

2    disease would not have progressed over the rest of his

3    life?

4        A.   I have no way to speculate.

5        Q.   Okay.

6        A.   But if this article that you presented to me is

7    taking groups -- I think mostly of younger people, who

8    had diminishing eGFR's, and taking that whole population

9    and comparing them to people who had eGFR's greater than

10   60, well, Mr. Lauris was, at least, in the group that was

11   greater than 60.  And it projects life expectancy there

12   for that entity.

13       Q.   If one were to use Table 1, based on the lab

14   result of September 2012, which had eGFR of 34, what

15   would Mr. Lauris's life expectancy have been?

16       A.   There's no bearing of his two-year later

17   improved kidney function as reported by his nephrologist,

18   Dr. Atwal.  What was -- what is today, with treatment,

19   caring by physicians, diabetic hypertensive kidney

20   doctors, things improve and stabilize.  That's what

21   happened with Mr. Lauris.  His eGFR improved and was at

22   61 at the time of his death.

23       Q.   This table shows that if a patient has a eGFR of

24   34, at age 45, their life expectancy would be 12.5 years.

25            MR. ELIAS:  Object to the form.  Misstates.

Page 108

1    BY MR. REISSAUS:

2         Q.  You can answer.

3              MR. ELIAS:  Is that a question?

4    BY MR. REISSAUS:

5         Q.  Is that what the table states?  I can ask again,

6    if necessary.

7         A.  The table states that a male at the age of 45

8    with a eGFR between 30 and 44 has a life expectancy of

9    12.5.  And then I don't know what is in the parentheses.

10   Is that a plus or minus?  I don't know what that refers

11   to, so you may have to tell me that.  There are numbers

12   in there, and I don't know what they represent.

13        Q.  So the 12.5 years -- and then, if you look at

14   the explanation at the bottom, it says that's the 95

15   percent confidence interval.

16        A.  So that's the range.

17        Q.  So the 10.9 to 14.2 years would be the range

18   offered by this table for a patient who's 45 with an eGFR

19   of 30 to 44.

20        A.  You mean some other patient?

21        Q.  A patient with an eGFR of 34 -- 30 to 34.

22        A.  That's what this table says.  Correct.  That's

23   not what Mr. Lauris was in March of 2014.

24        Q.  That's not what I asked.  I didn't ask -- for a

25   patient with an eGFR --

1          MR. ELIAS:  Actually, you did.  He answered the

2    question.  You wanted -- he answered your question.  You

3    can ask it again and get the same answer.

4          Let's go off the record.

5          (Recess taken.)

6    BY MR. REISSAUS:

7          Q.  I'm going to hand you what I've marked as 226.

8          (Defendants' Exhibit No. 226 marked for

9          Identification.)

10   BY MR. REISSAUS:

11         Q.  This is an article titled, "Associations of

12   Diabetes Mellitus With Total Life Expectancy and Life

13   Expectancy With and Without Cardiovascular Disease."

14         Do you see that?

15         A.  Yes.

16         Q.  Have you seen this article before?

17         A.  No.  Only the articles that your experts had

18   presented for life expectancy.

19         Q.  I'm sorry.  I thought you were looking for

20   something.

21         A.  No.  That's fine.  I'm good.

22         Q.  If you look at the background section, it says,

23   "Diabetes mellitus is a recognized risk factor for

24   cardiovascular disease and mortality."

25         You would agree with that proposition?

1        A.  Yes.

2        Q.  And their goal is to, "We aimed to calculate the

3    association of diabetes after age 50 years with life

4    expectancy and the number of years lived with and without

5    CVD."

6             Did I read that correctly?

7        A.  Yes.

8        Q.  In the result section, they note that, "Having

9    diabetes significantly increased the risk of developing

10   CVD (hazard ratio, 2.5 for women and 2.4 for men) and of

11   dying when CVD was present (hazard ratio, 2.2 for women

12   and 1.7 for men)."

13            Did I read that right?

14       A.  Yes.

15       Q.  And they state that, "Diabetic men and women

16   50 years or older lived on average 7.5, (95 percent

17   confidence interval, 5.5-9.5) years and 8.2 (95 percent

18   confidence interval, 6.1-10.4) years less than their

19   nondiabetic equivalents."

20            Did I read that correctly?

21       A.  Yes.

22       Q.  "The differences in life expectancy free of CVD

23   was 7.8 and 8.4 years, respectively."

24       A.  Yes.

25       Q.  So this article shows that, for diabetic men

1  50 years and older, they live, on average, 7.5 years less

2  than their nondiabetic equivalents; correct?

3      A.  Yes.  And that's taking a whole population.  It

4  doesn't mean everyone who has diabetes dies 7.5 years

5  earlier.  As looking at his own family history, we have a

6  mother who is 78 and a grandmother that lived to 91.

7      Q.  Some live longer than expected, some live less?

8      A.  With this man's family history, I would look at

9  him to live longer.

10      Q.  Did you cite any literature in your report for

11  that proposition?

12      A.  Which proposition?

13      Q.  That family history or the age that a family

14  member lives to is indicative of what another family

15  member will?

16      A.  No.  I'm just pointing out the fact that he has

17  two immediate relatives, mother and grandmother, who had

18  diabetes longer than he did, and at this point, reached

19  the age of 78, and the grandmother reached the age of 91.

20  It's just an observation.

21      Q.  Did -- to your knowledge, did any of his family

22  members have hypertension, diabetes, CML together?

23      A.  Well, I'm not going to talk about the CML.  I'll

24  leave that to the oncologist to talk about life

25  expectancy of CML.  To my review of the records, his

1   oncologist thought that he would live nearly a normal

2   life expectancy.

3          But you'll have to ask them about that.  I'm

4   only reporting what they stated, either in a deposition

5   or an office chart.  So the CML is a separate issue.

6          Again, you reported someone with diabetes, in

7   this study, would have a reduced life expectancy of

8   7.5 years, just as your experts had similarly expressed

9   the same general numbers, which I talked about in my

10  supplemental report.

11     Q.  Did any of Mr. Lauris's family members have both

12  diabetes and hypertension, to your knowledge?

13     A.  I don't know.

14         MR. ELIAS:  His mother did.

15         MR. REISSAUS:  Thank you, Counsel, for

16  testifying.

17         MR. ELIAS:  It's in his report.

18  BY MR. REISSAUS:

19     Q.  He just testified that he didn't know.

20     A.  I knew they had diabetes.  So what was told to

21  me -- I haven't had reported high blood pressure.

22     Q.  And to your knowledge, did any of Mr. Lauris's

23  family members have CML?

24     A.  None that was told to me.

25         MR. REISSAUS:  Counsel, thank you for directing

 1    your witness.

 2            THE WITNESS:  -- says the mother has high blood

 3    pressure for decades.  And diabetes.

 4            MR. ELIAS:  It's in his report.

 5    BY MR. REISSAUS:

 6        Q.  She did not have CML, to your knowledge?

 7        A.  It's not in my report, nor do I know that.

 8        Q.  Do you know if she had diabetes that became

 9    insulin dependent or not?

10        A.  I have no knowledge of that.  All I know is she

11    was reported to be a diabetic at the age of 78.

12        Q.  Do you know the degree of her hypertension?

13        A.  Do not.

14        Q.  All of those -- okay.  I'd like to actually mark

15    it -- the ones that you made notes on, and we can either

16    get them returned to you --

17        A.  I have them all down here.  You want me to show

18    them to you now?

19        Q.  No.  No.  No.  At the end, we'll just mark them.

20            I've handed you what's going to be marked as

21    Exhibit 227.

22            (Defendants' Exhibit No. 227 marked for

23            Identification.)

24    BY MR. REISSAUS:

25        Q.  It's titled, "Blood Pressure in Adulthood and

1  Life Expectancy of Cardiovascular Disease in Men and

2  Women."

3          Do you see that title?  Did I just read the

4  title, Doctor?

5          MR. ELIAS:  Wait a minute.

6          THE WITNESS:  I've never seen the document

7  before.

8          MR. ELIAS:  Take as much time as you need to

9  review the document.

10  BY MR. REISSAUS:

11     Q.  I was not trying to cut you off.  I was simply

12  going to ask you if you've read it before.

13     A.  I haven't read it.  It's the first time that

14  I've seen it.  And what I see -- again, this is another

15  article from outside of the United States, from the

16  Netherlands, Belgium.

17     Q.  Again, do you find having data come from outside

18  the U.S. raises potential questions about whether or not

19  it fits with the U.S. population?

20     A.  One, it's not the U.S., and two, I'm curious why

21  you haven't found articles in the United States with

22  these same titles.  Most of the articles you presented to

23  me are outside of the United States.

24     Q.  Do you -- are you aware of data that would

25  contradict the conclusion that hypertension is associated

1   with a shorter life expectancy?

2       A.  No.

3       Q.  Okay.  Would you agree that hypertension reduces

4   life expectancy?

5       A.  It's a risk factor.  I'd have to -- if you want

6   me to read this article -- but yes, it's a risk factor.

7   But then I'm curious why you haven't brought studies that

8   deal with United States's patients?

9           MR. REISSAUS:  I'm going to move to strike as

10  nonresponsive, that last part.

11  BY MR. REISSAUS:

12      Q.  In this -- in the abstract, the authors state

13  that.  "Normotensive men (22 percent of men) survived

14  7.2 years (95 percent confidence interval, 5.6 to 9.0)

15  longer without cardiovascular disease compared with

16  hypertensive and spent 2.1 (0.9 to 3.4) fewer years of

17  life with cardiovascular disease."

18          Did I read that correctly?

19      A.  Yes.

20      Q.  And then it says, "Compared with hypertensives"

21  -- I'm sorry.  Excuse me.  "Similar differences were

22  observed in women."  The next sentence, "Compared with

23  hypertensives, total life expectancy was 5.1 and

24  4.9 years longer for normotensive in men and women,

25  respectively.  Increased blood pressure in adulthood is

Page 116

1   associated with large reductions in life expectancy and

2   more years lived with cardiovascular disease."

3          Did I read all that correctly?

4   A.  Yes.

5   Q.  This indicates that life expectancy for norma-

6   -- I'm asking about what we just read to make sure that

7   it fits with your understanding of it.

8          Does it indicate, in the population they

9   studied, that men with normal blood pressure lived

10  5.1 years longer than men without?

11  A.  Yes.  That's what the conclusion was.

12  Q.  Okay.  Did you reduce your -- you stated an

13  opinion about Mr. Lauris's life expectancy in your

14  report; correct?

15  A.  Only in a response to, I believe, your experts.

16  I think quoting, you know, similar numbers that you had

17  expressed.  So yes.

18  Q.  Is it your opinion that Mr. Lauris's life

19  expectancy would be reduced as a result of his diabetes?

20  A.  Again, you're dealing with an individual versus

21  a series of patients.  So in a series of patients, they

22  reported, let's say, 7.5 reduced life expectancy with

23  diabetics.  It's possible that he would fall into that

24  category, or he would fall into the non-dying early

25  group.

1          But there's a range of people -- and as I said

2   earlier, at least in his family, his immediate relatives

3   with longer term diabetes are still alive or living into

4   their 90s.  So statistically, he could fall into that

5   category.  At worst, he would fall into that category.

6   So if the life expectancy for males is approximately

7   78 years, then, with these various studies, he could be

8   someone who would perhaps die in his early 70s, or not.

9        Q.  Did you subtract from his, Mr. Lauris's, life

10   expectancy for the fact that he had diabetes?

11        A.  Well, I took, from your experts, I utilized --

12   and I could try and find it somewhere around -- the same

13   7 to 8 years of reduced life expectancy, utilized their

14   numbers, which you have then produced in these articles,

15   and took that as a rough estimate from the projected life

16   expectancy of a male being approximately 78, and

17   subtracting 7 to 8 years, which may occur in Mr. Lauris

18   or he may have lived into his 90s, like his grandmother.

19        Q.  Did you consider any decrease in his life

20   expectancy as a result of hypertension?

21        A.  Yes.  I took your experts' statements about his

22   reduced life expectancy.  I didn't take anything into

23   consideration.  I took their statements and used

24   subtraction --

25        Q.  Let me ask you -- let's go to your supplemental

Page 118

1    report, which is Exhibit 218.

2         A.   I have mine.   Thank you.

3         Q.   I believe this section you just referenced is on

4    page 13.   And it appears that you reference those with

5    diabetes at the age of 50 will average -- on average, die

6    6 years earlier than those without it.   And you

7    discuss --

8         A.   Well, I did point out Dr. Croce -- how do you

9    pronounce it?

10        Q.   Croce.

11        A.   Croce -- he's the one who made that statement.

12        Q.   All right.   Did you further take into account

13   hypertension?

14        A.   I just -- I utilized your expert's analysis.   I

15   didn't look things up.   I used his -- I assumed he made

16   the correct analysis and reported life expectancy being

17   reduced by 5, 6, 7 years.   Whatever number, I'll agree to

18   that, to what your expert stated, and say there's a

19   potential for him to have a reduced life expectancy,

20   maybe in his early 70s.

21             If that occurred in this individual or he lived

22   like his grandmother, to his 90s.

23        Q.   So to you, it's speculation, one way or the

24   other, which would have happened in Mr. Lauris's case?

25             MR. ELIAS:   Object to the form of the question.

1          THE WITNESS:  I can't speculate.  I can only

2    say, using your expert's math, I would have expected him

3    to live to at least -- until 72, and if fortunate, he

4    would live into his 80s and 90s like the rest of his

5    family.

6    BY MR. REISSAUS:

7        Q.  Did you take into account whether or not the

8    different reductions in life expectancy for chronic

9    kidney disease, diabetes, and hypertension could act

10   synergistically?

11       A.  Again, I didn't do this analysis.  Your expert

12   did the analysis.  I assumed he read your articles and

13   presented this as a fact.  I didn't have to do any

14   analysis except answer and agree with his analysis.

15       Q.  Do you have an opinion on how old Mr. Lauris

16   would have lived to?

17       A.  You're asking me pure speculation.  I'm going

18   along with statistics that your experts analyzed,

19   reviewed, added up.  I took his analysis and did the math

20   for him, and stated it's possible he could have lived

21   until -- or he would have lived until 72.

22          And then, I go on to say, "But looking at his

23   family history, he wouldn't be one individual who stopped

24   at 72, but continues on to his 80s or 90s as his

25   relatives, his immediate relatives, have and his general

Page 120

1    relatives in his family."

2          So all I did was take your expert's analysis.  I

3    assumed he read your papers, that you just presented me

4    for the first time today, I agree with his analysis, and

5    I did the math.

6          Q.  So is it your opinion that it would be incorrect

7    to add up reductions in life expectancy from

8    hypertension, diabetes, and kidney disease in reaching a

9    life expectancy opinion?

10         A.  I didn't add up any items.  I added up what your

11   expert calculated.  I assumed he looked at all those

12   parameters very carefully and came up with his number of

13   reduced life expectancy, as reported in my report.

14         Q.  You're -- let's read -- is this the paragraph of

15   your report, on page 13, that deals with life expectancy

16   -- the analysis you've been talking about?

17         MR. ELIAS:  His what?

18         THE WITNESS:  I didn't do an analysis.  I

19   restated what your expert stated.

20   BY MR. REISSAUS:

21         Q.  Do you --

22         A.  So...

23         Q.  And you state that what this expert pointed out

24   was there are some studies showing that those with

25   diabetes at the age of 50 will, on average, die six years

Page 121

1    earlier than those without it; correct?

2        A.  Correct.

3        Q.  What I'm asking you is:  What about chronic

4    kidney disease?  Is that something that would factor into

5    -- did you consider that here in this paragraph?

6        A.  But earlier you presented me an article about

7    eGFR, and this gentleman's eGFR was 61 at the time of his

8    death, putting him into the lowest category, the one that

9    was compared to what you had presented to me.  So no.  I

10   didn't look at that.  I just took your experts' analysis

11   and did the math and will not disagree that it's possible

12   that has life expectancy could be 72 or it could be much

13   longer.

14       Because as you've asked me before -- his mother,

15   as I wrote in the report, has both diabetes and high

16   blood pressure and now she's 78.

17       Q.  So you've not independently, yourself, evaluated

18   the literature on the effect of life expectancy of

19   diabetes, hypertension, kidney disease, and CML?

20       A.  No.  Because I believed your expert had done the

21   work already, and I just stated what he analyzed and

22   reported.

23       Q.  Yup.  Let's take a couple of minutes.  I'm going

24   to change gears.

25           (Recess taken.)

1    BY MR. REISSAUS:

2         Q.  You would agree that Mr. Lauris's fetal stroke

3    was a complication of the angioplasty procedure performed

4    in March 2014; correct?

5         A.  Not directly, but it was the eventuality of his

6    course, following the angioplasty.

7         Q.  If he had not had the angioplasty performed in

8    March 2014, he would not have experienced a stroke

9    following the procedure like he did; correct?

10        A.  Correct.  I put that in my report as well.

11        Q.  And the surgery that was performed in

12   March 2014, was performed to treat peripheral vascular

13   disease in the arteries of his legs; correct?

14        A.  In his left -- I believe his left lower

15   extremity.  As to this complication that you had

16   expressed, I had already reviewed that complication

17   because I had been asked to review it by the family, by a

18   different set of lawyers, as to possible negligence on

19   the part of Dr. Stern.  It was my opinion that there

20   wasn't negligence and, the last I knew, that case had

21   been dismissed or dropped.

22        Q.  Do you know if they obtained an opinion from

23   someone else that there was merit to the claim?

24        A.  I don't know.  All I could do is express my

25   opinion to the lawyers after reviewing the case, that

Page 123

1   there wasn't negligence or anything performed below the

2   standard of care.

3       Q.  Did you create any written documentation of your

4   opinions?

5       A.  No.

6       Q.  Okay.  And in your reports, you don't state that

7   you conducted a review for medical malpractice, do you?

8       A.  It had nothing to do with this particular suit.

9       Q.  Okay.  So it isn't part of your reports?

10      A.  No.

11          MR. ELIAS:  Nor is it part of yours.

12  BY MR. REISSAUS:

13      Q.  I'm going to hand you 228.

14          (Defendants' Exhibit No. 228 marked for

15          Identification.)

16  BY MR. REISSAUS:

17      Q.  Can you identify that for me, please?  And let

18  me know if you've seen it before.

19      A.  This is the pathology report of the autopsy

20  performed by Dr. Chen.  I guess it seems to be dated

21  3/31/2014, or -- yeah.  Collected -- there's a purported

22  4/10/2014.

23      Q.  Is this a document that you've seen before?

24      A.  Yes.

25      Q.  Okay.  And in the final diagnoses section, there

Page 124

1    are three items that relate to findings in Mr. Lauris's

2    brain; is that correct?

3         A.  Yes.

4         Q.  The first two are left cerebral infarcts; is

5    that right?

6         A.  No. One is a cerebral infarct and the other one

7    is cerebellar infarct.

8         Q.  So the first one is a left cerebral infarct,

9    that's 10x4x4; correct?

10        A.  Correct.  Centimeters.  Yes.  Which is large.

11        Q.  The second is a left cerebellar infarct, 1.5

12   centimeters?

13        A.  Correct, which is small.

14        Q.  And the third finding, can you read that?

15        A.  "Atherosclerosis of middle cerebral arteries

16   with up to 70 percent narrowing of the lumen."

17        Q.  Based on these three items here, the damage

18   noted in Mr. Lauris's brain was to the left side;

19   correct?

20        A.  Yes.

21        Q.  Okay.  And there was atherosclerosis noted in

22   the middle cerebral arteries --

23        A.  Yes.

24        Q.  -- correct?  And there's two middle cerebral

25   arteries; is that right?

Page 125

1        A.   Correct.

2        Q.   One on the left and one on the right?

3        A.   Correct.

4        Q.   Okay.  And then the report continues with a

5   section that's microscopic description and then it says

6   clinical history and then gross autopsy findings and

7   microscopic findings.

8             In the clinical history section, it says -- most

9   of the way down.  I'm sorry.  It's Bates-stamped 1018,

10  it's the second page of the report.  Five lines up from

11  the bottom of that paragraph, it starts it.

12            So it says, "CT scan of the brain."

13       A.   Okay.

14       Q.   You see that part?

15       A.   Yes.

16       Q.   Okay.  And can you tell me what was found on

17  that CT scan, based on this report?

18       A.   "A CT scan of the brain, performed in the

19  evening of March 29th, 2014, showed a large left

20  hemisphere stroke, middle cerebral artery distribution."

21       Q.   Okay.  And that's consistent with Item No. 1 on

22  the list we just read?

23       A.   Yes.

24       Q.   Okay.  And if we turn to the microscopic

25  findings on the next page, there's -- the first two

1  sentences describe cells that were observed from the left

2  side of the brain; correct?

3      A.  Yes.

4      Q.  Okay.  And those findings show damage as a

5  result of the stroke?

6      A.  Correct.

7      Q.  And the next sentence says that, "The left and

8  right middle cerebral arteries show focal moderate

9  atherosclerosis with up to 70 percent narrowing of the

10  lumen."

11      A.  Yes.

12      Q.  Okay.  So this was Dr. Chen who performed this;

13  right?

14      A.  Yes.

15      Q.  So he observed atherosclerosis in both -- in

16  both of the middle cerebral arteries; is that right?

17      A.  Yes.

18      Q.  And the stroke was on the -- it was one-sided,

19  on the left?

20      A.  Well, it was a left cerebral stroke that affects

21  the right side of the body, appropriately.

22      Q.  Because if it's the left side of the brain, it

23  affects your right side of the body, like your right arm.

24  Is that what you mean?

25      A.  Correct.

1      Q.   Okay.  Are you aware of a term called "watershed

2    stroke"?

3      A.   Yes.

4      Q.   What is that?

5      A.   It means, in some people who have blockages of

6    different side arteries, that supply a certain area,

7    sometimes the area between the distribution of what those

8    arteries are supplying them may not get sufficient

9    circulation at times.  And so sometimes, in certain

10   individuals, they can develop a stroke or cerebral

11   infarct in that area, which is between the distribution

12   of those bilateral feeding arteries.

13     Q.   And in this case, you did not see any evidence

14   of a watershed event?

15     A.   I didn't, and your experts didn't either, nor

16   did the treating neurologist -- consulting neurologist.

17     Q.   You're aware of the term border zone in

18   conjunction with describing strokes?

19     A.   That's a similar terminology for watershed.

20     Q.   And again, that's the idea when blood flow is

21   reduced through an artery supplying the brain, you will

22   see cell death -- the stroke occur in the furthest points

23   away in the distribution?

24     A.   Well, it's between the distribution of feeding

25   arteries.  As I said earlier, there are -- the in between

1   area may get less effective circulation for various

2   reasons and that person may suffer a stroke in that area.

3        Q.   Am I correct that it's your opinion that

4   Mr. Lauris's stroke developed during an episode of low

5   blood pressure?

6        A.   Well, it's mine and the treating physician, the

7   neurologist who saw Mr. Lauris on March 30th,

8   Dr. Victoria Walton, who concluded that his stroke

9   occurred, quote, "Due to multiple factors and it occurred

10  two days earlier during an episode of hemorrhagic shock."

11       Q.   And by hemorrhagic shock, what do you take that

12  to mean, in your opinion?

13       A.   This patient had suffered blood loss following

14  the complication of his percutaneous angioplasty.  With

15  blood loss, you get hypotension, low blood pressure, and

16  hemorrhagic shock is just the reason for the hypotension

17  shock, meaning low blood pressure, hemorrhagic, meaning

18  blood loss.

19       Q.   And when was this -- when would the low blood

20  pressure have occurred that caused the stroke?  Was it in

21  Dr. Stern's office during --

22       A.   No.

23       Q.   -- during the repair procedure?

24       A.   Dr. Walton said it occurred two days earlier on

25  the 28th, from her consultation on the 30th as the

Page 129

1    treating physician.

2         Q.   So you're -- do you have any additional basis

3    for fixing the time when it occurred, other than that

4    statement from Dr. Walton?

5         A.   No.  I wasn't treating the patient.  I agree

6    with her assessment.

7         Q.   Okay.  Do you use pedal pulses in your practice?

8    Back in pre-2008?

9         A.   No.  Even now, I don't use pedal pulses.  I

10   examine patients with the presence or lack of pedal

11   pulses.

12        Q.   Fair enough.

13             When you examine a patient's pedal pulses, what

14   scoring system do you use?

15        A.   Scoring system is meaningless.  They're either

16   there, weak, or not there.  Some people can use 0 to 4.

17   I think most people use 0 to 2, 2 plus, 1 plus, 0.

18   Typically, in my experience, when people report trace,

19   it's 0.  We -- when we examine, you kind of feel

20   something that may feel like a pulse, it could be the end

21   of your own finger which is pulsating.

22             So either it's normal, sometimes hyperdynamic,

23   in very rare instances.  But present, weak, zero, would

24   be -- that's a 0 to 2.  So in this case, nurse, I don't

25   know if it's a nurse -- Ms. Flemming seemed to be using

Page 130

1   2, 1, trace, 0.

2        Q.   So the reason you don't add more increments is

3   just because it's not precise enough to get all the

4   intermediate points?

5        A.   Correct.   It's subjective.   By experience, you

6   know, not to disqualify nurses, but new nurses have more

7   difficulty palpating pulses, or quantifying strong, weak,

8   or not, in my opinion, in my experience.   It's either

9   there, you can feel it, or it's weaker or absent.

10       Q.   Okay.   Prior to the March 2014 procedure,

11  Dr. Stern had previously operated on Mr. Lauris's other

12  leg; correct?

13       A.   Yes.

14       Q.   He performed a right femoral to popliteal inside

15  to vein bypass graft and right profunda endarterectomy.

16  Is that --

17       A.   Correct.   Vein patch.   Yes.

18       Q.   To your knowledge, was that procedure successful

19  in proving -- in improving the circulation to his right

20  foot?

21       A.   Yes.

22       Q.   Okay.   And he had reported some improvement

23  following that procedure; correct?

24       A.   Yes.   To my knowledge, the bypass was open till

25  the day he died.

Page 131

1       Q.   By "open," you mean it was --

2       A.   Functioning.

3       Q.   Making it through?

4       A.   Yes.

5       Q.   I'm going to hand you 229.

6            (Defendants' Exhibit No. 229 marked for

7            Identification.)

8  BY MR. REISSAUS:

9       Q.   This is an article that you cited in your

10  supplemental report, I believe; is that correct?

11      A.   Yes.

12      Q.   I think you cited it for the proposition in the

13  first sentence of the --

14      A.   I'm just looking for my copy.  I want to find my

15  copy.

16      Q.   Let me know when you're ready.

17      A.   All set.

18      Q.   Okay.  Is it correct that you cited this article

19  to make a point that atherosclerotic disease in the

20  middle cerebral artery is a relatively rare condition?

21           THE WITNESS:  Can you repeat the question?

22           (Record read.)

23           THE WITNESS:  Yes.  That's one of the reasons,

24  as it stated in the opening statement of this article.

25  ////

1  BY MR. REISSAUS:

2      Q.   They note that, "When you look at patients with

3  a stroke in the MCA distribution" -- and that's what

4  Mr. Lauris had; correct?

5      A.   Correct.  Yes.

6      Q.   On the left side?

7      A.   Correct.

8      Q.   "When you looked at patients with a stroke in

9  the MCA distribution, only 7 to 8 percent of those

10  patients who have the stroke in that location have

11  atherosclerosis disease of the MCA"?

12      A.   That's convoluted.  The presence of

13  atherosclerosis disease in the middle cerebral arteries

14  is a very rare event, occurring in 7 to 8 percent of

15  patients.

16      Q.   Presenting with stroke in the MCA distribution?

17      A.   Okay.  Presenting with stroke, sure.  Yes.

18      Q.   So if 100 patients have an MCA distribution

19  stroke --

20      A.   Yes.

21      Q.   -- 7 or 8 of that 100 will have atherosclerosis

22  found in their middle cerebral arteries?

23      A.   Yes.

24      Q.   That would also mean that --

25      A.   Because there are other causes of strokes in the

1   left cerebral hemisphere, other than the middle cerebral

2   artery.

3        Q.   So 92 to 93 percent of strokes in the middle

4   cerebral artery distribution do not involve

5   atherosclerotic disease in the MCA?

6        A.   Correct.

7        Q.   Okay.  Then on the next page, on 176, in the

8   last paragraph before pathophysiology, the authors note

9   that, "Patients with symptomatic intracranial

10  atherosclerotic disease tend to be younger than those

11  with extracranial carotid disease."

12            Did I read that correctly?

13       A.   You read that correctly.

14       Q.   Do you agree with that?

15       A.   I agree with the statement, younger carry

16  lighter variabilities than somebody who is 75 with

17  extracranial disease versus someone who's 68 with

18  intracranial disease.  So that would be younger.

19       Q.   And again, so younger patients -- the patients

20  with symptomatic intracranial atherosclerotic disease

21  tend to be younger than people with external extracranial

22  carotid disease?

23            MR. ELIAS:  Asked and answered.  You just asked

24  him that question and he just answered that exact

25  question.

Page 134

1   BY MR. REISSAUS:

2        Q.  You can answer.

3        A.  Yes.  So typically, extracranial disease is the

4   elderly population.  Again, younger is relative, it has

5   no meaning other than, yes, they are younger, but at what

6   age are we comparing?

7        Q.  And it doesn't say here one way or the other?

8        A.  No, it's a generalization.

9        Q.  It also states that, "Compared with Caucasians,

10  the incidence of ischemic stroke related to MCA stenosis

11  is higher among Asians, Hispanics, Blacks, and especially

12  in the Chinese population."

13       A.  Right.  Key word is "especially in the Chinese

14  population."

15       Q.  But it does say MCA stenosis -- strike that.

16           It does say that, "Compared to Caucasians, the

17  incidence of ischemic stroke related to MCA stenosis is

18  higher among Asians."  Those are the words the authors

19  put on the page?

20       A.  Right.  And Asians include 20 different

21  countries of population.

22       Q.  Right.

23       A.  Did you want to ask what my other reasons were

24  for doing this article?  You asked me my reasons, I gave

25  you two reasons.

1        Q.   Do you have any reasons that aren't in your

2    report?

3              MR. ELIAS:  Well, it's all in the report.

4              MR. REISSAUS:  I've read your report.

5              MR. ELIAS:  He can find out now or in trial.

6    Whichever he wants.

7    BY MR. REISSAUS:

8        Q.   I'll tell you what.  What else did you study

9    this article for?

10       A.   For the ideology consistent with Mr. Lauris and

11   pathophysiology where they report hemispheric

12   hypoperfusion caused by a significant MCA obstruction and

13   inadequate collateralization as the cause of cerebral

14   strokes, which is what Mr. Lauris had.

15             This article was utilized to see how we can

16   treat patients who have disease of their cerebral --

17   carotid cerebral vessels and to see what the best

18   modalities are to treat them.  But they also talked about

19   the path of physiology of why people get strokes, with

20   his main reason being what I just read into the record,

21   as Mr. Lauris unfortunately experienced.

22       Q.   Where did you read from a moment ago?

23       A.   Same page, 176, in the pathophysiology

24   commentary, No. 3.

25       Q.   Okay.

Page 136

1      A.  Which it goes on to multiple areas in this

2  article.  So this was in here.

3      Q.  You would agree that Mr. Lauris had bilateral

4  atherosclerosis in both of his MCAs; correct?

5      A.  Yes.  You'd asked me that.  Bilateral stenosis

6  of both middle cerebral arteries.

7      Q.  And it's your opinion that that stenosis led to

8  reduced blood flow when his blood pressure dropped on

9  March 28th?

10      A.  A combination of both the stenosis and the

11  hypoperfusion and his history of having suffered a TIA,

12  which your expert pointed out in his report or sometime

13  in the previous few months he had had some numbness,

14  tingling of the right face, right hand, which goes along

15  with some problem on the left side of the brain.

16      Q.  Did you review radiology or imaging of

17  Mr. Lauris for -- in forming your opinions in this case?

18      A.  No.

19      Q.  Okay.  When you discussed the findings from --

20  in your supplemental report, I think you referred to one

21  of the CT scans that was performed in the hospital.

22  Would that -- any comment of the CT scans would have been

23  based on your review of the reports by the treating

24  physician; is that correct?

25      A.  Yes.

1      Q.   Is it -- we agree that Mr. Lauris had observed

2    bilateral atherosclerosis in his MCA, but that the stroke

3    occurred on the left side.  Is it possible that

4    atherosclerosis of the MCAs was not a factor, given that

5    the stroke was not bilateral?

6           MR. ELIAS:  Compound.  Go ahead.  You can

7    answer.

8           THE WITNESS:  Because someone has bilateral

9    stenosis or narrowings doesn't mean that both sides will

10   get a stroke.  You can have people who have bilateral

11   carotid disease, both 70 percent, one side will be more

12   susceptible, for whatever reason.  In that particular

13   distribution, collaterals aren't as good, so you don't

14   get bilateral strokes just because somebody has bilateral

15   similar disease.

16      Q.   But if a person does have bilateral disease

17   that's similar, they can have strokes that are bilateral

18   in nature?

19      A.   I've never seen it.

20      Q.   They cannot happen, then?

21          MR. ELIAS:  Misstates.

22          THE WITNESS:  I've never seen it.  I haven't

23   seen it reported.  No colleagues have told me they've

24   seen it.  I mean, there's an entity that's called global

25   hypoperfusion having nothing to do with the collateral,

Page 138

1    circle of Willis, there are lots of branches of the

2    brain, and you can get a global hypoperfusion, like, of

3    the whole brain.  But just the fact that someone has

4    bilateral MCA stenosis but may have the circle Willis

5    still open with collaterals -- again, we don't know if

6    both sides were equal in their stenosis, how extensive

7    they were, it's only reported as 70 percent.

8            But for what length, distance, what the

9    circulation was as you go past the stenosis, was it still

10   70 percent, 60 percent?  Those are unknown.  So just

11   because you have bilateral stenosis, doesn't mean you're

12   going to get bilateral cerebellar infarcts, other than

13   that entity that I called global hypoperfusion.

14        Q.  How many -- how many patients have you had with

15   MVA stenosis for which you've followed them during the

16   course of a stroke?

17            MR. ELIAS:  Object to the question.  It's vague

18   and unclear.

19   BY MR. REISSAUS:

20        Q.  Let me break it down a little bit, maybe it will

21   clarify it some.

22            If you had a patient who develops a stroke and

23   you -- at that point, you would not be -- you're not the

24   person performing surgery, if surgery needs to be done in

25   that case?

1      A.  With someone who has a stroke, intercranial

2  stenosis?

3      Q.  Uh-huh.

4      A.  I would not even be called.  I would not be

5  involved.  I mean, I may be called as a consult.  Some

6  internist may call and say, "I've got this patient,"

7  whether the stroke resolved or not, "He's already got an

8  angiogram.  Well, he's got this, what could you do?"

9  Well, that's not for me to do.  It would be -- if the

10  patient recovered -- then you get to the questions, "Did

11  the patient recover from the stroke?"

12         If they did, is there something that a

13  neurosurgeon can do?  An internal bypass, as indicated.

14  So it would not be my intervention.

15      Q.  Okay.  You mention in your report that you

16  reviewed a TASIGNA assessment, which is the one from the

17  Health Canada, which is one of the documents we marked.

18         Did you review any response by Novartis to that

19  single assessment?

20      A.  I don't recall.  I mean, I had the 57-page

21  document from Health Canada.  I don't know if, in the

22  white folder -- in that, are there responses or not?  I

23  have no knowledge about it.

24      Q.  If there is --

25      A.  I mean, if you want to show it to me --

Page 140

1        Q.  I'm going to show it to you and ask if you've

2    seen it.  I'd like to make that clear.  I will represent

3    that I have not seen it in the materials that you've

4    brought today.  But I would like you to confirm that.

5        A.  It's not in the 57-page report?

6        Q.  No.

7            MR. REISSAUS:  This is Exhibit 230.

8            (Defendants' Exhibit No. 230 marked for

9            Identification.)

10           MR. ELIAS:  This is Novartis's response.

11   BY MR. REISSAUS:

12       Q.  You'll see that it has a Novartis logo and it

13   has a Bates number in the bottom right and is a 45-page

14   document.

15       A.  Unless there are pieces of it someplace --

16   someplace else, I don't know about this response in

17   entirety, as you're presenting it to me.

18       Q.  Normally, when you're providing your expert

19   opinions in a case, do you review internal company

20   documents?

21       A.  I review what anybody sends me.

22       Q.  You said earlier that you don't perform

23   angiograms or -- well, prior to 2008 even, you didn't

24   perform angiograms and arterioplasties, like what

25   Dr. Stern did in March 2014.  Am I right?

1        A.   Correct.

2        Q.   Okay.   Why wasn't that something that was a part

3    of your practice --

4        A.   Because --

5        Q.   -- between 1980 and 2008?

6        A.   Well, because -- first of all, 1980 until 1995,

7    that wasn't the typical -- the equipment was not refined.

8    And after that, it wasn't necessary for my practice.   If

9    I had a patient who I wanted to get an angioplasty, I

10   would refer him to the interventional radiologist, who

11   would perform that procedure.

12           It doesn't mean that I wasn't aware of how the

13   procedure is done, why it's done, and what effect and

14   result we were looking for.

15       Q.   It was just a procedure that you didn't

16   personally perform?

17       A.   Correct.

18       Q.   In your work as an expert witness in litigation,

19   has a court ever limited or excluded your opinions in any

20   way?

21       A.   No.

22       Q.   I believe you indicated in your report that

23   you're being compensated at an hourly rate of $500 an

24   hour for your work on this case?

25       A.   For the review of records, not for deposition or

Page 142

1    trial.

2         Q.   What's your rate for deposition and trail

3    testimony?

4         A.   $800 an hour for depositions, and it's --

5    depending on where it is, inside Los Angeles County,

6    outside California, it's either $4,000 for a half day,

7    $5,000 for a half day, $10,000 for a whole day.  It just

8    depends on the location.

9         Q.   This case is in Fresno, California.

10        A.   That would be $8,000 to $10,000 a day, I don't

11   have it with me, since I'd be gone for the day, plus

12   expenses.

13        Q.   Let me step back a little bit.

14             When you did the review for the medical

15   malpractice case for another attorney --

16        A.   Yes.

17        Q.   -- were you compensated for that time?

18        A.   Yes.  $500 an hour.

19        Q.   How much time did you spend reviewing the case?

20        A.   I don't have those records with me.  It would be

21   review of the, obviously, more limited medical records,

22   since it really just pertained to he had a stenpop before

23   and now he was having this angioplasty at the St. Agnes

24   hospitalization, so I can't tell you how many hours, but

25   it would be a shorter record review.

1      Q.  All right.  Approximately how many hours have

2   you spent, to date, on this case?  On the products

3   liability case?

4      A.  It would be 53 hours, plus additional hours that

5   I haven't billed for, nor will.  It's at least 53 hours.

6   But I do other work or hours, and many times, when I bill

7   things, I bill for less because that's the way I feel

8   about reviewing records for attorneys and costs.  And so

9   it's at least 53 hours that I billed for, plus other

10  hours, hours enumerable, that I can't give you a figure

11  for.

12     Q.  Does that include the generation of your

13  reports?

14     A.  Yes.

15     Q.  Okay.  So that 53 hours, plus some amount you've

16  written off, is from when you started on the products

17  liability case through today, presumably, the start of

18  today?

19     A.  Up till today, yes.

20     Q.  What did you do to prepare for your deposition

21  today?

22     A.  I looked at all the records that I had reviewed

23  previously.  Everything you see here, I looked through.

24     Q.  Okay.  Did you meet with Counsel?

25     A.  The last evening when he came into town.  I'd

Page 144

1    never met him before.

2              MR. ELIAS:  In person.

3              THE WITNESS:  In person.

4    BY MR. REISSAUS:

5         Q.  Approximately how long was that meeting?

6         A.  I don't know.  30 minutes.

7         Q.  Okay.

8              MR. REISSAUS:  We can go off the record.

9              (Recess taken.)

10   BY MR. REISSAUS:

11        Q.  Doctor, we talked a little while ago about your

12   work evaluating the medical malpractice case, with regard

13   to Dr. Stern.  Approximately how many hours would you --

14   if you had to estimate -- I mean, you said it was less

15   than you've spent on this current case, the product

16   liability, but I'm trying to get a ballpark.

17        A.  That was years ago, several years ago.

18             MR. ELIAS:  I'll streamline this.  The bill was

19   about a $1,000.  So a couple of hours, three hours, I

20   think it was three hours of time.

21             THE WITNESS:  I could possibly find it at home

22   and give you an exact number.

23             MR. REISSAUS:  I'm willing to go by your

24   representation.  I was just trying to get an estimate.

25   If it's been about three hours --

1          MR. ELIAS:  I think he billed for about three

2    hours and I don't know -- and you don't always bill for

3    every hour that you spend, so it might have been

4    somewhere north of there.

5          THE WITNESS:  As I said, I told you the records

6    that I reviewed dealing with his outpatient procedure,

7    the transfer to St. Agnes hospitalization, maybe there

8    was some minor previous history leading up to the --

9    including his femoral artery bypass the previous year,

10   that would be, essentially, what I reviewed.

11   BY MR. REISSAUS:

12      Q.  Okay.  When you came to this case here, this

13   product liability case against Novartis, you had already

14   judged that Dr. Stern had not committed medical

15   malpractice?

16      A.  Yes.  I told you that hours ago.

17      Q.  You did not disclose that in your expert report?

18          MR. ELIAS:  What do you mean?

19          THE WITNESS:  Disclose it?

20          MR. ELIAS:  What do you mean?

21   BY MR. REISSAUS:

22      Q.  That you had previously evaluated this case?

23      A.  Well, for different reasons.

24          MR. ELIAS:  He's not providing an opinion on

25   Dr. Stern, Drew.  If you're implicating -- your question,

1   -- I'm just going to say this for the record, suggests

2   that he needed to disclose that in his report.  His

3   report is dealing with specific causation in this case.

4   You guys have not issued a report that is in any way,

5   shape, or form can be deemed as a report that is a

6   qualified expert report challenging Dr. Stern and the

7   standard of care.

8        And so there has been absolutely no reason for

9   him to address those issues.  The issues that he

10  addressed in his report were the issues that he was

11  retained in this case to address, and those are issues to

12  specific causation in this case.

13       So I just want to say, for the record, that I

14  don't appreciate the implication that he's been

15  withholding on not disclosing something in that report,

16  when it was not an obligation to do so.  And he told you

17  in the deposition that he did so.

18       MR. REISSAUS:  Objection noted.

19  BY MR. REISSAUS:

20     Q.  You did not disclose that in your expert report;

21  did you?

22     A.  No, nor did I feel it was anything having

23  nothing to do with Dr. stern.

24     Q.  So I could not have known before today, when you

25  told me that you played that role in the malpractice

1   evaluation?

2       A.   Correct.   Nor did I know any of the articles

3   that you were going to presented to me that I had never

4   seen before today.

5       Q.   Are you an expert in cerebral vascular strokes?

6       A.   That has no meaning.   I mean, that's a general

7   term.   Yes.   I take care of patients who have had

8   cerebral vascular strokes in my practice of vascular

9   surgery for several decades -- patient has a stroke, if

10  the ideology for that stroke involved -- most of the

11  time, some disease in the carotid artery, when the

12  patient fortunately survived, then resolved their stroke,

13  would require a carotid endarterectomy, which I would

14  perform.

15      Q.   And how about in the case of strokes with an

16  intracranial ideology, would you consider yourself an

17  expert in those?

18      A.   You asked me that, again, several hours ago.   I

19  told you I may be called in as a consultant when someone

20  has a stroke and they ask me to give my opinion when they

21  may have ascertained that he didn't have carotid disease,

22  but he had intracranial disease.   And I would offer my

23  opinion of what may be the next step in evaluation or

24  intervention.   And then, eventually, because it was

25  intracranial, it would become the aegis of the

1    neurosurgeon to then decide what: if anything, could be

2    done for that particular problem.

3         Q.   Okay.

4         A.   There isn't a vascular surgeon who performs

5    intracranial bypasses.

6         Q.   The intracranial aspects of the intervention in

7    evaluation that implicates neurology?

8         A.   But not the evaluation.  The evaluation I may be

9    involved in in getting a cerebral angiogram.  I'm looking

10   at all the vessels going to the brain, including the

11   vessels, the vertebrals, all the others, to try to find

12   out why this patient had a stroke.  And dependent on what

13   the results were would depend on how far along I would be

14   the actual person to intervene and correct the problem.

15   So I'd be intimately involved, unless this patient

16   required something that was intracerebral.

17        Q.   So the qualifications you're bringing to bear in

18   that context are those of a vascular surgeon without a

19   neurology specialty?

20             MR. ELIAS:  Object to the form of the question.

21   That misstates his testimony.

22   BY MR. REISSAUS:

23        Q.   You can answer.

24        A.   I don't truly understand the question.  I'm a

25   board-certified vascular surgeon.  I've taken the first

1    exam offered in 1993.  I've been recertified every ten

2    years.  As a vascular surgeon, who in the context of a

3    practice, deals with people who have strokes, stroke-like

4    problems, intracerebral symptoms that necessitate

5    evaluation by various modalities to come to some

6    diagnoses that may require intervention.

7            And just for the record, I don't withhold

8    information.  I give everything I have.

9        Q.  What is the average age of your patients?

10       A.  Which patients?  The last 38 years?

11       Q.  Well, let's -- we can break it down.

12       A.  Since I was an intern?

13       Q.  Let's start when you entered your practice,

14   following your fellowship.  Okay?

15       A.  Most patients who have vascular disease are in

16   their 60s, 70s, 80s.  Now, people are reaching the 90s.

17   So the practice mostly involves the older age

18   populations.  There are younger patients who have venous

19   problems, a slew of other problems, vasculitis, immune

20   vascular problems, people who have scleroderma, people

21   who have -- what is the one?  Lupus.  These can involve

22   arteries, kidney disease, the whole gamut.  Whenever a

23   vessel or artery supplies an organ or extremity, I have

24   been involved in the entire body.

25       Q.  So taking that full scope of your practice,

Page 150

1  across all those groups, what would you say the average

2  age is of your patients?

3       A.  There's no way to compute that.  As I said to

4  you, vascular patients are Medicare, typically

5  Medicare-aged patients.  Other than venous problems,

6  which can occur in any age category, or dialysis

7  patients, who have kidney disease.

8       Q.  Have you kept up on the treatment protocols for

9  peripheral arterial occlusive disease since 2008?

10      A.  Of course.  I was board-certified again in 2013.

11  So I'm totally up to date in all interventions,

12  modalities, treatments, evaluations, patient care,

13  patient problems.

14      Q.  What were you required to do for your

15  recertification, that related to treatment for PAOD?

16      A.  I was required to do nothing.  I was required to

17  tell the Board of Vascular Surgery my caseload, as you do

18  every time you take a recertifying exam -- told them

19  exactly what I was doing, and they appropriately said,

20  "Here's the exam," which I passed, and maintained my

21  board certification as a practicing vascular surgeon for

22  the last 36 years.

23      Q.  Have you ever performed a procedure where a

24  patient had a stroke, like Mr. Lauris's?

25      A.  What do you mean "a stroke like Mr. Lauris"?

1    Mr. Lauris didn't survive.  So there was nothing that I

2    could treat him for.  If a patient tolerates a stroke,

3    resolves their symptoms sometime in the future, depending

4    on their problem, as I said, they would require,

5    possibly, carotid endarterectomy or other types of

6    surgical interventions.  So a stroke like Mr. Lauris -- I

7    don't know what that means.

8         Q.  It's a complication of a procedure that you were

9    performing.  So let me ask it again a little differently

10   to hopefully clarify it.

11        Have you ever performed a procedure, a vascular

12   procedure, that resulted in -- let me start one more

13   time.

14        Have you ever performed a vascular procedure

15   where, as a result of a complication, a patient had a

16   stroke of the sort that Mr. Lauris had?

17        A.  You can't operate on a stroke.  So I'm not sure

18   what you're asking me.

19        Q.  Have you operated on a different vascular bed

20   and, as a result of a complication of that procedure, the

21   patient had a stroke that was of the sort that Mr. Lauris

22   had?

23        A.  What is "of the sort"?  A stroke where someone

24   dies?  A stroke where someone has a cerebral hemorrhage?

25   I don't know anything about a "sort of."  He had a fatal

 1  stroke.  Have I had a patient who had suffered a fatal

 2  stoke?  Yes.  Very fortunately, you know, it's not often

 3  that I have to go out and tell a family that such and

 4  such happened, but that's what happens in the elderly

 5  population.

 6      Q.  In those cases where a patient experienced a

 7  stroke, in connection with the procedure you were

 8  performing, did you ever attribute that to something

 9  other -- the stroke's occurrence to something other than

10  the surgical procedure?

11      A.  I've done thousands of the carotid

12  endarterectomies.  Unfortunately, in the rare instance

13  someone suffered a stroke, you do a carotid

14  endarterectomy.  My incidence and complication rate was

15  less than .4 percent.  So yes, in the rare instance I

16  performed so many carotid, as my colleagues do, one of

17  the unfortunate, potential complications is suffering a

18  stroke.

19      Q.  Do you know what the life expectancy of a

20  patient who had a blast crisis is?

21      A.  No.  I would defer that to an oncologist.

22          MR. ELIAS:  Are you talking about a patient in

23  remission --

24          MR. REISSAUS:  I asked the question I asked.

25  ////

Page 153

1  BY MR. REISSAUS:

2      Q.  Do you know the effect of life expectancy for

3  each successive line of therapy for CML?

4      A.  No.  Again, you asked me way back -- any of

5  those questions involving his CML, I would defer to the

6  oncologists.

7      Q.  You've provided your opinions about TASIGNA and

8  atherosclerosis.  Are you aware that Sprycel has

9  significant cardiovascular risks of its own?

10     A.  If you ask me to review Sprycel, I will be happy

11  to review Sprycel.  I was asked to review TASIGNA.

12     Q.  So you didn't take Sprycel into account in this

13  case?

14         MR. ELIAS:  For what?  For what?

15         MR. REISSAUS:  For anything.

16         THE WITNESS:  Sprycel into account of what?

17  Being in a bowl?

18  BY MR. REISSAUS:

19     Q.  Are you aware that Mr. Lauris took Sprycel after

20  --

21     A.  Yes.  Exactly.  Yes.

22     Q.  And you offered an opinion on Mr. Lauris's life

23  expectancy?

24     A.  I didn't offer an opinion.  What I did was take

25  your expert's opinion and do the math.  So that would be

Page 154

1    my opinion.  I agree with their analysis, evaluation of

2    life expectancy, as they reported it and just did the

3    math.

4         MR. ELIAS:  He's not offering an opinion on CML

5    and life expectancy related to CML.  He said that.

6    That's already been covered by Dr. Hoffman.  It's been

7    covered by Dr. Weiss.  So there's no reason to ask these

8    lines of questions.

9    BY MR. REISSAUS:

10        Q.  How many strokes have you looked at over the

11   course of your career?

12        MR. ELIAS:  What do you mean by "looked at"?

13        THE WITNESS:  What do you mean by "looked at"?

14   I mean --

15   BY MR. REISSAUS:

16        Q.  Where you've been asked to evaluate them.

17        A.  I can't quantify that.  Patients -- I've had

18   patients, neurologists, or the internist says, "I had a

19   patient who came in with the stroke, I need you to

20   evaluate the ideology for the stroke."  If the patient

21   recovers and there's an ideology that I can operate on,

22   then I'm involved in the intervention.

23        Q.  And you can't ballpark?

24        A.  Hundreds.  I don't know.

25        Q.  Is it hundreds?  I'm just --

1      A.  I have no idea.  There are people that come in

2  with TIA, there are people that come in with strokes that

3  resolved, and some of them you operate on within the

4  first two weeks.  Depending on what's going on, some

5  people you wait 6 weeks, depends on the patients.  But

6  yes, I've been involved with patients who had strokes

7  that would eventually require my surgical intervention.

8          If there was nothing to do surgically, then I

9  wouldn't be called.  I wouldn't be the first line of

10  physician to admit a patient with a stroke.  I would be

11  called in as a consultant.

12      Q.  How many patients have asked you to evaluate the

13  intracranial cause of their stroke?

14      A.  No patient ever asked me to evaluate --

15      Q.  Have you ever -- how many patients -- in how

16  many instances have you been sought out to evaluate the

17  intracranial cause of a patient's stroke?

18      A.  Typically, because of the prevalence of

19  extracranial disease, more strokes that we meet, deal

20  with the carotid arteries.  If there's no source for the

21  stroke, we would then go ahead and get a four vessel

22  angiogram, cerebral angiogram, vascular arteries,

23  archivals, arteries to see if there's an intracranial

24  problem.

25      Q.  And would you perform the cerebral angiogram?

1        A.   No.   That would be by the intervention

2    radiologist.

3        Q.   Would you review the imaging from that

4    angiogram?

5        A.   Yes.

6        Q.   Would there be a neurologist or a neurosurgeon

7    involved with that evaluation?

8        A.   Depends on what's found.  If they did the

9    angiogram and there's nothing there, they wouldn't be

10   called in, as I said earlier --

11            MR. ELIAS:  Let him finish.

12            THE WITNESS:  -- as I said earlier, if a disease

13   is found intercranial and it's felt that some

14   intervention would be helpful, benefit the patient versus

15   the risks, than a neurosurgeon would be called in to give

16   their opinion.

17   BY MR. REISSAUS:

18       Q.   I'm trying to understand the handoff that you're

19   describing?

20            MR. ELIAS:  Let him finish.

21            THE WITNESS:  It's not a hand off.  It's

22   evaluating the patient, who may have suffered a stroke,

23   and his doctors are looking for the ideology for the

24   stroke, depending on what the tests, X-rays, angiograms

25   show -- would determine who may be required to surgically

1    intervene, to benefit that patient for the long run.

2    BY MR. REISSAUS:

3         Q.   Let's make it -- tie it more back to a practical

4    case then.

5              Let's say you perform the cerebral angiogram,

6    you identified -- my understanding -- you would then

7    review the image; right?

8         A.   Correct.

9         Q.   If you identified intracranial vascular disease,

10   would you make the determination that treatment was

11   warranted or not at that point, or would you talk to a

12   neurosurgeon and consult with them in making that

13   decision?

14        A.   It would be a collaborative effort between the

15   internist, maybe a neurologist, myself, and, if

16   necessary, neurosurgeon.

17        Q.   And if intracranial intervention actually

18   happened, the ultimate decision on that rests with the

19   neurosurgeon who is going to do the procedure?

20             MR. ELIAS:  Object to the form.  That misstates.

21             THE WITNESS:  Yes.  If it requires some

22   intracranial bypass, ECIC is the typical bypass, or some

23   newer endovascular techniques, then I would look with

24   him, and then he would say, "Well, I think I can do that

25   procedure."  Or, "The disease is too extensive for me to

1    really help this patient."

2         If we felt it could be efficacious and benefit

3    the patient, then it would be the neurosurgeon who would

4    carry out the procedure.

5         Q.  We discussed the concept of hypoperfusion in the

6    context of MCA atherosclerosis and strokes.  Do you

7    recall that?

8         A.  Well, the various different discussions.  Sure.

9    Okay.

10        Q.  I'm wiring back.  Okay.  Have you reviewed CT

11   scans for anyone in which you believe experienced a

12   stroke as a result of MCA atherosclerosis and

13   hypoperfusion?

14        A.  Have I reviewed --

15        Q.  A CT?

16        A.  I would be involved in those early stages.

17        Q.  I understand.  Hypothetically?  I'm asking in

18   practice?

19        A.  In practice, I would go to the radiologist and

20   he would go over the films and then, depending on what

21   the stroke was, he would consider doing an angiogram to

22   evaluate the intracerebral vessels.

23        So the answer is yes, I've been involved in

24   those evaluations as a consultant.

25        Q.  How many instances has that happened?

1       A.  Not often, 20, 30 times.  Because the incidence

2   of my being involved in intracranial disease, which is

3   uncommon to begin with, and uncommon for many patients to

4   survive that stroke with return of motor function, which,

5   in that case, you wouldn't do anything, has been roughly

6   that number of cases.

7       Q.  Okay.  And just to make sure I understand, that

8   would be 20 or 30 cases of patients who experienced a

9   stroke as a result of hypoperfusion in the context of MCA

10  atherosclerosis?

11      A.  No.  That's -- you changed the -- I've seen very

12  few cases, probably less than ten, talking about a

13  patient who may have had hypoperfusion, hypotension, and,

14  down the line, is found to have an MCA narrowing.  As I

15  said, that's uncommon in my practice.

16      Q.  All right.

17          MR. REISSAUS:  That's all the questions I have

18  right now.

19          MR. ELIAS:  Give us one second.  Let's step

20  outside.

21          (Break taken.)

22  EXAMINATION BY MR. ELIAS:

23      Q.  Dr. Wagmeister, I have a few questions for you.

24  How long have you been a vascular surgeon?

25      A.  Since 1980.

1      Q.   And as a vascular surgeon, do you have a

2   thorough understanding of how the vascular system works?

3           MR. REISSAUS:   Objection.   Vague.

4           THE WITNESS:   Yes.   I have a full understanding

5   of the entire vascular system of the body, including all

6   organs related to arteries that perfuse those organs.

7      Q.   Okay.   And would that include intracranial

8   arteries?

9      A.   Yes.

10     Q.   As a Vascular Surgeon, do you have an

11  understanding of the pathophysiology of both intracranial

12  or extracranial strokes?

13          MR. REISSAUS:   Objection.   Vague.

14          THE WITNESS:   Well, yes.   As a busy clinical

15  vascular surgeon for the last several decades, I've

16  witnessed, diagnosed, evaluated in consultations,

17  collaborative efforts, and treated with surgery all

18  facets of the arterial venous system in the body,

19  including a significant number of carotid

20  endarterectomies, which supply the brain, and is the most

21  common cause for surgically indicated strokes.

22          As I said earlier, the only procedure that I

23  cannot perform is what's called an extracranial

24  intracranial bypass from the superficial temple artery,

25  which a neurosurgeon would perform if indicated.

Page 161

1   BY MR. ELIAS:

2       Q.  Are you qualified?  Do you consider yourself

3   qualified, based on your knowledge, training, and

4   practice, to diagnose the ideology of intracranial

5   strokes?

6       A.  In the evaluation of the reason for someone

7   having a stroke that diagnoses and evaluation may end up

8   with a finding of intracranial disease, and that's when

9   we would discuss what may be available to that patient

10  and benefit that patient, if that patient's stroke

11  resolved in a motor function or whatever neurological

12  deficits that they had lost during that stroke.

13      Q.  Okay.  And just to be clear, as a vascular

14  surgeon, are you qualified to render an opinion on the

15  ideology of a stroke that is -- whose pathophysiology is

16  intracranial in nature?

17      A.  Yes.

18      Q.  And just to be clear, in specific -- why -- what

19  makes you qualified to do that?

20      A.  Because vascular disease is similar in the whole

21  part of the body.  If you have a narrowing and it caused

22  hypoperfusion of the receptive organ, then the potential

23  for a stroke is there.  There are other reasons that

24  people have strokes, one of them being stenosis,

25  hypoperfusion, and there are other reasons.

Page 162

1           But it's fully similar, in all parts of the

2    body.  Arteries supply the nutrient oxygen to those

3    recipient organs.  If it gets compromised, those organs

4    will suffer some type of death, which is what an infarct

5    is, death of tissue.

6           MR. ELIAS:  That's all the questions that I

7    have.

8    EXAMINATION BY MR. REISSAUS:

9       Q.  How many times have you evaluated and found an

10   intracranial cause of a stroke, based on a record review

11   for a deceased patient?

12      A.  On a record review?  Probably none.

13          MR. REISSAUS:  Thank you.

14          MR. ELIAS:  Thanks.

15          (Deposition concluded 5:45 p.m.)

16

17

18

19

20       _____

21            ROBERT WAGMEISTER

22     Subscribed and sworn to before me

23   this _____ day of _____, 20__.

24   _____

25       NOTARY PUBLIC

Page 163

1    NAME OF CASE:

2    DATE OF DEPOSITION:

3    NAME OF WITNESS:

4    Reason Codes:

5          1.  To clarify the record.

6          2.  To conform to the facts.

7          3.  To correct transcription errors.

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                         _____

Page 164

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4           I, BARBARA PROKOP, a Shorthand Reporter, State of

 5      California, do hereby certify:

 6           That ROBERT WAGMEISTER, in the foregoing

 7      deposition named, was present and by me sworn as a

 8      witness in the above-entitled action at the time and

 9      place therein specified;

10           That said deposition was taken before me at said

11      time and place, and was taken down in shorthand by me, a

12      Certified Shorthand Reporter of the State of California,

13      and was thereafter transcribed into typewriting, and that

14      the foregoing transcript constitutes a full, true and

15      correct report of said deposition and of the proceedings

16      that took place;

17           That before completion of the proceedings, review

18      of the transcript was not requested.

19           IN WITNESS WHEREOF, I have hereunder subscribed

20      my hand this 19th day of July 2017.

21

22      _____

23            BARBARA PROKOP, CSR NO. 14190
                 State of California

24

25
```