# Exhibit 4

Page 1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF FLORIDA

3             FORT PIERCE DIVISION

4       Case No.: 2:17-CV-14302-ROSENBERG/MAYNARD

5    DENNIS McWILLIAMS and LORI        )

6    McWILLIAMS,                       )

7            Plaintiffs,               )

8              vs.                     )

9    NOVARTIS AG, a Global             )   Volume I

10   Healthcare Company;               )   Pages 1-141

11   NOVARTIS PHARMACEUTICALS          )

12   CORPORATION, a Delaware           )

13   Corporation,                      )

14           Defendants.               )

15

16   VIDEOTAPED DEPOSITION OF ROBERT WAGMEISTER, M.D.

17                 TAKEN ON

18          THURSDAY, APRIL 19, 2018

19

20

21

22   Reported by:

23   BRENDA R. COUNTZ, RPR-CRR

24   CSR NO. 12563

25   JOB NUMBER: 140167

1

2

3

4

5

6

7

8

9

10          Videotaped deposition of ROBERT WAGMEISTER,

11    M.D. taken at the offices of Regus, 10100 Venice

12    Boulevard, Culver City, California, on Thursday,

13    April 19, 2018, before Brenda R. Countz, CSR No.

14    12563.

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:

4            ELIAS GUTZLER SPEAR

5            BY:  RICHARD ELIAS, ESQ.

6            130 South Bemiston

7            Clayton, Missouri 63105

8

9

10

11

12   FOR THE DEFENDANTS:

13           HOLLINGSWORTH

14           BY:  ANDREW REISSAUS, ESQ.

15           1350 I Street, NW

16           Washington, DC 20005

17

18

19

20   ALSO PRESENT:

21           CHRIS JORDAN, Videographer

22

23

24

25

Page 4

1                    I N D E X

2    WITNESS                EXAMINATION BY              PAGE

3    ROBERT WAGMEISTER, M.D.

4                    Mr. Reissaus                        8

5

6

7                    E X H I B I T S

8    NO.        DESCRIPTION                        PAGE

9    Exhibit 1   Amended Notice of Deposition          8

10   Exhibit 2   Compilation of Notes and              9

11               Literature Referenced

12   Exhibit 3   Expert Report of Robert              24

13               Wagmeister, M.D.

14   Exhibit 4   Rebuttal Report of Robert            25

15               Wagmeister, M.D.

16   Exhibit 5   Notice of Settlement and             34

17               Application for Determination of

18               Good Faith

19   Exhibit 6   Complaint for Professional           38

20               Negligence

21   Exhibit 7   Carotid Doppler Evaluation           54

22   Exhibit 8   Article Entitled Vascular            59

23               Laboratory Arterial Duplex

24               Scanning

25

| 1  | Exhibit 9  | Article Entitled Carotid | 77 |
| 2  |            | Endarterectomy in Patients Less | |
| 3  |            | than 50 Years Old | |
| 4  | Exhibit 10 | Article Entitled Carotid | 85 |
| 5  |            | Endarterectomy in Patients Less | |
| 6  |            | than 50 Years Old | |
| 7  | Exhibit 11 | Major Arterial Events in Patients | 91 |
| 8  |            | With Chronic Myeloid Leukemia | |
| 9  | Exhibit 12 | Article Entitled Association | 94 |
| 10 |            | Between BCR-ABL Tyrosine Kinase | |
| 11 |            | Inhibitors | |
| 12 | Exhibit 13 | Article Entitled Long-term | 96 |
| 13 |            | Benefits and Risks of Frontline | |
| 14 |            | Nilotinib vs. Imatinib for Chronic | |
| 15 |            | Myeloid Leukemia | |
| 16 | Exhibit 14 | Dennis McWilliams Medical Record | 108 |
| 17 |            | Dated 6/11/07 from Dr. Shaikh | |
| 18 | Exhibit 15 | Dennis McWilliams Medical Record | 110 |
| 19 |            | Dated 6/20/07 from Dr. Shaikh | |
| 20 | Exhibit 16 | Dennis McWilliams Medical Record | 111 |
| 21 |            | Dated 5/26/10 from Dr. Shaikh | |
| 22 | Exhibit 17 | Progress Notes Dated 1/24/13 | 122 |
| 23 | Exhibit 18 | Initial Office Evaluation Dated | 126 |
| 24 |            | 6/16/11 | |
| 25 |            | | |

```
 1    Exhibit 19    Article Entitled Cigarette          134

 2                  Consumption and Risk of Coronary

 3                  Heart Disease and Stroke

 4

 5

 6

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          CULVER CITY, CA - THURSDAY, APRIL 19, 2018

2                         2:22 P.M.

3

4          THE VIDEOGRAPHER:  This marks the

5   beginning of the videotaped deposition of Dr.

6   Robert Wagmeister being taken in the matter of

7   Dennis McWilliams et al V Novartis AG et al,

8   being held in the United States District Court,

9   Southern District of Florida, Fort Pierce

10  Division.

11          The deposition is being held at 10100

12  Venice Boulevard, Los Angeles, California, on

13  April 19, 2018 at approximately 2:22 p.m.

14          My name is Chris Jordan with TSG

15  Reporting.  The court reporter is Brenda Countz

16  with TSG Reporting.

17          Will counsel please state your name for

18  the record.

19          MR. ELIAS:  Rich Elias for the

20  Plaintiffs.

21          MR. REISSAUS:  Andrew Reissaus for

22  Novartis Pharmaceuticals Corporation.

23

24          ROBERT WAGMEISTER, M.D.

25      having been first duly sworn, was

1          examined and testified as follows:

2

3          MR. ELIAS:  Before we get started, I

4   just wanted to put on the record that Dr.

5   Wagmeister is here pursuant to the defendant's

6   notice and that the defendants have agreed to pay

7   Dr. Wagmeister for his time.  They have not

8   brought a check today but we will provide a 1099

9   and an invoice and the defendants agree to pay

10  that.

11         MR. REISSAUS:  Thank you.  Yes, that is

12  correct.

13         Doctor, I'm handing you what I've

14  marked as Exhibit 1 which is an Amended Notice of

15  Deposition.

16         THE WITNESS:  (Perusing.)

17         (Wagmeister Exhibit 1, Amended

18         Notice of Deposition, was marked

19         for identification.)

20                EXAMINATION

21  BY MR. REISSAUS:

22     Q.   On the second page there's a

23  description of documents that you were asked to

24  bring with you.

25         It says:  "All materials considered by

1   you or provided to you in forming your opinions

2   in this case that have not been previously

3   produced to NPC and identified by Bates number in

4   your expert reports, except for

5   publicly-available literature cited in your

6   reports."

7            Have you seen that request before?

8       A.   No.

9       Q.   You did bring some documents with you

10  today?

11      A.   I brought all my documents that I used

12  to formulate my opinions and gave you all the

13  copies of them.

14            MR. REISSAUS:   I'm actually going to

15  mark as Exhibit 2 the copy that you prepared and

16  gave to me as we were starting today.

17            THE WITNESS:   (Perusing.)

18            (Wagmeister Exhibit 2, Compilation

19            of Notes and Literature

20            Referenced, was marked for

21            identification.)

22  BY MR. REISSAUS:

23      Q.   The file that you brought with you

24  today, in addition to what is in Exhibit 2, you

25  also have a binder clipped group of literature

1    that contains notes that you made; is that

2    correct?

3         A.   They are the actual articles.

4         Q.   Okay.  Let me break this down.

5              Sitting in front of you, you have three

6    groups of papers and CDs right now, correct?

7         A.   And my report.

8         Q.   And your report, okay.

9              And the first pile is what we've marked

10   as Exhibit 2, correct?

11        A.   Okay.

12        Q.   The next pile is the medical literature

13   which contains your notes that you've made on

14   copies of --

15        A.   Yes.

16        Q.   And that group of articles you brought

17   with you to your previous deposition and they

18   were marked as an exhibit there, correct?

19        A.   Correct.

20        Q.   And that group of articles, to your

21   knowledge, hasn't changed between then and now,

22   correct?

23        A.   Correct.  The only two which dealt with

24   the other one, I'm not sure that we had copied or

25   not.  I don't recall.  This is all from the

1   original box and so I took out what I thought was

2   pertinent for this case.  And I believe we copied

3   everything but I'm not sure about this article.

4        Q.   Which article is that?

5        A.   The one by Dr. Croce, C-R-O-C-E, and

6   Moslehi, M-O-S-L-E-H-I.

7        Q.   And can you read that title real

8   quickly just so we have that accurate?

9        A.   "Vascular and Metabolic Implications of

10  Novel Targeted Cancer Therapies."

11            The other one which I believe you still

12  may have but it's from the journal Blood.  The

13  senior author is Emir, E-M-I-R, but also has

14  another author named Peter Valent.

15            And that is titled "Nilotinib,"

16  N-I-L-O-T-I-N-I-B, "exerts direct

17  pro-atherogenic," A-T-H-E-R-O-G-E-N-I-C, "and

18  anti-angiogenic," A-N-G-I-O-G-E-N-I-C, "effects

19  on vascular endothelial cells:  A potential

20  explanation for drug-induced vasculopathy,"

21  V-A-S-C-U-L-O-P-A-T-H-Y, "in CML."

22        Q.   And the third pile there is just

23  radiology CDs related to Mr. McWilliams; is that

24  correct?

25        A.   Correct.

Page 12

1      Q.   I'd like to take a minute to go through

2  your notes in Exhibit 2 and ask you about those.

3           The first page that I have appears to

4  be a record of time that you have spent on the

5  case; is that correct?

6      A.   Correct.

7      Q.   And it looks like the first date on

8  this page is January 25, 2018?

9      A.   Correct.

10     Q.   And it lists -- can you describe for me

11 what --

12     A.   It describes the various medical

13 records, depositions, articles, reports that I

14 was given to utilize to review Mr. McWilliams's

15 history and present an opinion.

16     Q.   How many hours have you spent on this

17 case?

18     A.   Roughly 40 hours.

19     Q.   So between January 25th and today, you

20 have spent about 40 hours working on

21 Mr. McWilliams's case?

22     A.   Correct.

23     Q.   And have you submitted bills for that

24 time?

25     A.   Yes.

Page 13

1       Q.    It looks like there are two bills you

2    have sent to date in this case; the first for

3    $4,000 and the second for $3500; is that correct?

4       A.    Yes.

5       Q.    And there's additional 17 hours of work

6    that you've done that has not gone out as a bill

7    yet; is that correct?

8       A.    It's gone out.  It's been sent.

9       Q.    I'm sorry, I missed that note.  So that

10   was 7,000 there?

11      A.    Correct.

12      Q.    I don't know if you have your original

13   copy in front of you but the right margin is cut

14   off here.

15           Do you know what that says?

16      A.    It probably says even though I did more

17   hours I sometimes give discounted hours to

18   attorneys and don't charge for all the hours that

19   I work.  I'm very kind.

20      Q.    And you wrote on this sheet the

21   discounts that you applied.  I saw two references

22   to that, correct?

23      A.    Yes, that's basically what it is.

24      Q.    So there was one-hour discount on the

25   second bill that you sent, correct?

1      A.   Yes.

2      Q.   And then another three-hour discount on

3 the outstanding current bill, correct?

4      A.   Correct.

5      Q.   And it's correct that 40 hours is the

6 time that you've spent on this case?

7      A.   Roughly, yes.  I can add up what it

8 comes to, maybe 33, 34 that I put down but then

9 there are other hours that I may not have billed

10 for.  And I have some work that I did in

11 preparation for this deposition that I would bill

12 for.

13     Q.   What work have you done in preparation

14 for this deposition?

15     A.   Reviewed the entire case.

16     Q.   And how much time have you spent doing

17 that?

18     A.   Roughly four hours.

19     Q.   So four additional hours beyond the 33

20 or 34 plus?

21     A.   Roughly 40 already, plus now these

22 additional four hours.

23     Q.   You are also serving as an expert in

24 another case brought by Mr. Elias' firm, correct?

25     A.   Correct.

Page 15

1    Q.    Between those two cases, how much have

2    you been paid to date?

3    A.    I don't have records from the previous

4    case.  You have those as well.  So you can look

5    that up and add the two together.

6    Q.    Have you done any additional work in

7    that case since your deposition?

8    A.    I don't recall.  I don't believe so.

9    Q.    In your expert report in this case, you

10   note that you had an interview with

11   Mr. McWilliams; is that correct?

12   A.    A telephone interview, correct.

13   Q.    When did that interview occur?

14   A.    You have that sheet in my papers that

15   I've given you.  It's all in there.

16   Q.    Can you help guide me to the right

17   place?  Thank you.

18   A.    (Perusing.)

19   Q.    So it looks like you wrote down

20   February 20th at 8:00 p.m. Pacific time is when

21   you had a telephone interview?

22   A.    I think it says 8:00 a.m. Pacific

23   Standard Time, 0800.

24   Q.    Oh, I'm sorry.

25          Do you know how long that phone call

Page 16

1   lasted?

2        A.   No, I don't recall.

3        Q.   Who participated in the call?

4        A.   Mr. McWilliams.

5        Q.   Was it just you and he on the line?

6        A.   I think Mr. Elias probably arranged for

7   Mr. McWilliams to be available at that time and

8   that's when I received the call and talked with

9   Mr. McWilliams.

10            MR. ELIAS:   I was on the line.

11   BY MR. REISSAUS:

12        Q.   What was the purpose of the call?

13        A.   Well, I've never met Mr. McWilliams so

14   I wanted to talk to him and ask him about his

15   smoking history and what present medications he

16   was on; and to confirm his family history; and to

17   see what his present occupation may be and if he

18   had seen his cardiologist, Dr. Chalasani, I

19   believe.   Try C-H-A-L-A-S-A-N-I.

20            And he reported to me that he was told

21   that his heart was okay.

22        Q.   Did you have a list of questions that

23   you prepared to ask him beforehand?

24        A.   No, I knew what I was trying to

25   ascertain; what his present situation was as far

1    as medications, family history and smoking.

2         Q.    Okay.   You have not conducted a medical

3    examination face-to-face with him, correct?

4         A.    Correct.

5         Q.    And so you found out in the interview

6    that Mr. McWilliams told that you he had stopped

7    smoking at the end of 2010/January 2011?

8         A.    That's what he reported to me, correct.

9         Q.    And is that information the basis for

10   what you included in your report about

11   Mr. McWilliams' smoking history?

12        A.    I believe that some of that is in my

13   report or rebuttal report.

14        Q.    And under present medications you know

15   bisoprolol, is that a blood pressure medication?

16        A.    I believe it's an anti-hypertension

17   medication as is lisinopril.  Atorvastatin is for

18   hyperlipidemia.

19        Q.    It says thyroid?

20        A.    He may be taking some thyroid

21   maintenance medication.

22        Q.    And it says Gleevec and ASA or aspirin?

23        A.    Correct.

24        Q.    So this is what Mr. McWilliams reported

25   to you in February of 2018 when you spoke to him?

1     A.   Yes.

2     Q.   And Mr. McWilliams told you about his

3 father and mother during the call and their

4 family history?

5     A.   I asked him to confirm what I had

6 ascertained from the medical records and he did

7 confirm that.

8     Q.   So Mr. McWilliams confirmed for you

9 that his father had a history of myocardial

10 infarction and coronary artery bypass graft?

11     A.   In his eighties, correct.

12     Q.   Then it says "A & W."  Alive and well,

13 is that what you mean by that?

14     A.   Correct.

15     Q.   And Mr. McWilliams' mother also has a

16 history of myocardial infarction and coronary

17 artery bypass graft, correct?

18     A.   Correct, in her sixties.

19     Q.   And you note years after MI CADG.

20     Is that when Mr. McWilliams believes

21 that they experienced their heart attacks?

22     A.   Heart attacks and/or surgeries, yes.

23     Q.   Other than this conversation, have you

24 had any additional interactions with

25 Mr. McWilliams?

1       A.   No.

2       Q.   I notice in Exhibit 2 you have

3   handwritten notes that are in different stapled

4   or paper-clipped groups.  There's one that starts

5   with Dennis Raymond McWilliams at the top and

6   it's two pages and then it's stapled to a record

7   from Shands hospital.

8           Do you see that one in your set?

9       A.   Yes.

10      Q.   Can you describe what these pages are

11  for me?

12      A.   Well, it looks like it's a summary of

13  admissions, surgeries that he underwent.  And

14  then there are some notes and visits that he saw

15  Dr. Wingard at the Shands Institute at the

16  University of Florida for hematology, oncology.

17      Q.   When did you make these notes?

18      A.   Originally, after I reviewed records.

19      Q.   Was this a part of one of your meetings

20  with counsel or was this something that you

21  prepared independently on your own?

22      A.   One, I've never met with counsel before

23  the previous deposition and, two, these are all

24  done independently.

25      Q.   I'm sorry, I'm not sure that answer

1   matched what I was asking.

2            You didn't have conversations with

3   counsel before you issued your expert report in

4   this case, correct?

5       A.   Yes, before I formalized the report.

6   These are notes taken from the records.  All of

7   the records were sent on CDs, not the charts, so

8   I couldn't put paper clips in.

9            So what I do is I may take out and copy

10  actual documents, operations, history, physicals

11  out of the CD records.  And then I would prepare

12  this history for myself since I don't have a hard

13  copy to go back to easily.

14      Q.   And so these notes were prepared in

15  advance of any conversation you would have had

16  with counsel, correct?

17      A.   Most probably.  I can't recall.

18      Q.   So these may have been notes that you

19  made during the course of talking with Mr. Elias

20  about the case?

21      A.   Mr. Elias had nothing to do with these

22  notes, although I talked to him and said I

23  reviewed the records and I think you can proceed

24  with your case.  That would be the gist of my

25  follow-up conversation after reviewing the

Page 21

1    records.

2         Whether that call came before or after

3    I prepared all this, I can't recall.

4         Q.   Okay.  So it's your testimony that

5    these notes are not something that you generated

6    while you were talking to Mr. Elias?

7         A.   Correct.  All of this is as I'm

8    reviewing the case.  As you can see, these

9    depositions, I have notes as I'm reading the

10   depositions since it's on-line.  I write these

11   notes down as I'm reviewing those depositions.

12        Q.   When you spoke with Mr. McWilliams, did

13   he tell you that he's currently working?

14        A.   He's doing something.  I have to see

15   what exactly he said to me.  He said he was

16   working in school security.

17        Q.   And do you know when he -- let me go

18   back a moment.

19        You understand that Mr. McWilliams

20   retired medically from the Fort Pierce police

21   department in 2013 following a stroke, correct?

22        A.   Yes, I believe two neurologists deemed

23   him permanently disabled and that he could no

24   longer work at the police force.

25        Q.   And do you know when Mr. McWilliams

1  returned to work at Indian River State College?

2      A.   I do not.

3      Q.   Would it surprise you to know that he

4  applied to work in Indian River State College in

5  January of 2014?

6      A.   It wouldn't surprise me.  It wouldn't

7  mean anything to me.

8      Q.   So you are not aware one way or the

9  other when Mr. McWilliams was able to return to

10  work following his stroke?

11      A.   I guess return to this type of work.

12  He could no longer work on the police force.

13      Q.   And what's your basis for saying he

14  could not return to the police force based on his

15  condition today?

16      A.   Well, all I can go is by what two

17  independent neurologists had seen.  One was the

18  treating neurologist, Dr. Maraist, M-A-R-A-I-S-T,

19  and I guess an independent neurologist, Dr.

20  Aldana, A-L-D-N-A.  All I could do is just refer

21  to their opinions deeming him permanently

22  disabled.

23          MR. ELIAS:  I'm sorry, A-L-D-A-N-A.

24          (Discussion held off the record.)

25  BY MR. REISSAUS:

Page 23

1          Q.    Dr. Wagmeister, those evaluations by

2    the two neurologists were performed in the fall

3    of 2013, correct?

4          A.    I don't have the dates but if that's

5    what you say.

6          Q.    You don't recall when --

7          A.    I could look up Dr.

8    Aldana's -- (Perusing.)  It looks like he dated

9    something 10-8-13.

10              MR. ELIAS:  Which one was that, just

11   for the record?

12              THE WITNESS:  Something about the

13   board's physician report form.

14              MR. ELIAS:  Dr. Aldana?

15              THE WITNESS:  Dr. Aldana.

16   BY MR. REISSAUS:

17          Q.    And Dr. Maraist evaluated

18   Mr. McWilliams in that same time period, correct?

19          A.    I believe it was in that similar time

20   period.

21          Q.    And those are the two evaluations that

22   you cite in your report to establish that

23   Mr. McWilliams is permanently disabled?

24          A.    Yes, that's what they deemed.  They are

25   the ones who stated that.  I just reported their

Page 24

1   statements.

2      Q.   So you don't have an opinion yourself

3   about Mr. McWilliams' impairment or disability as

4   a result of his stroke, do you?

5         MR. ELIAS:   Object to the form.

6   Misstates his testimony.

7         You can answer.

8         THE WITNESS:   Correct.  I only have an

9   opinion that these are what the two doctors who

10  examined him specifically, his neurologists, and

11  deemed that he was permanently disabled and could

12  no longer return to the police force.

13  BY MR. REISSAUS:

14     Q.   So if those doctors subsequently saw

15  him after the times of those evaluations and

16  determined that he had improved in condition, you

17  wouldn't have a reason to dispute that, would

18  you?

19     A.   Correct.  I would defer to their

20  evaluations.

21        MR. REISSAUS:   I'm going to mark as

22  Exhibit 3 a copy of your expert report.

23        THE WITNESS:   (Perusing.)

24        (Wagmeister Exhibit 3, Expert

25        Report of Robert Wagmeister, M.D.,

Page 25

1                 was marked for identification.)

2    BY MR. REISSAUS:

3         Q.   Can you confirm that that's what that

4    is?

5         A.   Yes.

6         Q.   And it has your CV as one of the

7    attachments to that, correct?

8         A.   Yes.

9         Q.   Is that a current CV?

10        A.   Yes.

11        Q.   So no changes since the time of your

12   report that we should be taking into

13   consideration with that?

14        A.   Correct.

15        Q.   And I'm going to hand you what I've

16   marked at Exhibit 4.

17             Is it correct that this is your

18   rebuttal report in this case?

19        A.   Correct.

20             (Wagmeister Exhibit 4, Rebuttal

21             Report of Robert Wagmeister, M.D.,

22             was marked for identification.)

23   BY MR. REISSAUS:

24        Q.   I'd like to ask you about your work as

25   an expert witness in litigation over the past

Page 26

1    year since your last deposition.

2              Have you testified or been deposed in

3    any cases since your deposition last year?

4        A.   Yes.

5        Q.   Which cases?

6        A.   I don't recall names.

7        Q.   Are they listed in your report that you

8    have in front of you, Exhibit 3, the last two

9    pages of it?

10       A.   There would be a trial in California.

11   It was a personal injury car accident where I was

12   a defendant -- I was an expert for the insurance

13   company.

14       Q.   Okay.  Which case is that?

15       A.   That's not on here.

16       Q.   Oh, okay.  So when did that trial

17   testimony happen?

18       A.   It would be sometime probably after

19   your deposition to the present, sometime in the

20   last two or three months.

21       Q.   The last two or three months?

22       A.   When was your first deposition?  No

23   wait, there it is.  It's there, I'm sorry.  Stasi

24   versus Hernandez.  It's on there.

25       Q.   S-T-A-S-I.

1          And where in California was that case?

2     A.    Lancaster.

3     Q.    And what were your opinions in that

4  case?

5     A.    I was defending the insurance company.

6  Once these cases are over, I don't labor them and

7  remember them.  They just move on.  I'm too busy

8  doing surgery.

9          She was claiming some injuries of a

10  vascular nature and I was opposing those

11  complaints.

12     Q.    And you don't recall the substance of

13  your testimony that was two or three months ago?

14     A.    No, the substance, not really, not the

15  specifics.  She claimed something, that she had a

16  superior mesenteric vein thrombosis secondary to

17  the trauma and had some kind of history

18  previously where she may have suffered that type

19  of thrombosis five years ago from a different

20  operation.

21          She had a bariatric surgery, surgery

22  for people who are obese, and one of the

23  complications of that surgery is a portal vein or

24  superior mesenteric venous thrombosis.

25          So that was the essence of the case.

Page 28

1      Q.    Do you recall who the lawyer you worked

2   with was?

3      A.    Yes.  His name is Zubin, Z-U-B-I-N,

4   Farinpour, F-A-R-I-N-P-O-U-R.

5      Q.    Any other deposition or trial testimony

6   that you've given since last summer?

7      A.    I don't believe so.

8      Q.    Have you been consulted by any

9   attorneys to be an expert in any cases in the

10  course of the last year?

11         MR. ELIAS:  Since his last deposition?

12         MR. REISSAUS:  Since your last

13  deposition, yes.  Thank you.

14         THE WITNESS:  Maybe.  Without my notes

15  in front of me, my records, I don't recall.  I

16  don't believe so.  If there was one, I can't

17  recall.

18  BY MR. REISSAUS:

19     Q.    So you would say in the last year,

20  since your last deposition in the Lauris matter

21  there is only this case, McWilliams, and maybe

22  one other case in which you might have been --

23     A.    Maybe asked to review.  Again, it

24  passes quickly.  I don't keep these things unless

25  I see my list at home.  But there's nothing I

1    recall that's actively going on other than old

2    cases.

3         Q.    Okay.  Would you say that that's a

4    change from the frequency in which you've served

5    as an expert in the past?

6         A.    It comes and goes, you know.  People

7    call.  They can come with a rush.  It's not a

8    major part of my practice, as I've told you

9    before.

10        Q.    Has any court limited or excluded your

11   testimony in any case?

12        A.    No.  Well, in that last case I gave

13   testimony and they went through a whole

14   discussion between all counsel.  So part of the

15   testimony was excluded.  I would call it a local

16   decision by the judge.

17        Q.    What were you not allowed to testify

18   about?

19        A.    It was complicated.  I don't know the

20   legal --

21        Q.    Do you know the medical testimony that

22   you were not allowed --

23        A.    I had given a whole description of the

24   anatomy of what the jurors may be given to

25   understand about the superior mesenteric and

Page 30

1    portal vein thrombosis and why it was less likely

2    that this had occurred subsequent to an accident.

3              And I don't recall the legal reason

4    that the judge discounted or excluded that part

5    of the testimony.  In my mind it shouldn't have

6    been excluded.  There was nothing medically that

7    was not appropriate.

8         Q.   But the judge did make a decision to

9    limit your testimony?

10        A.   Well, if you've testified in some rural

11   areas, and Las Vegas, sometimes there are

12   decisions that I, in my testimony, can't

13   understand.

14        Q.   You're not a lawyer, though.  You are

15   not faulting the judge, are you?

16        A.   Not on the record.

17        Q.   Are you currently a party in any

18   lawsuit?

19        A.   Yes.

20        Q.   What lawsuits?

21        A.   It's been around for seven years and

22   this lawyer keeps continuing it, continuing it,

23   continuing it, and I have to put away two weeks

24   for potential trials, so since 2012.

25              Otherwise, there's no other cases.

Page 31

1    Everything else has been dismissed.

2         Q.    What is that case?

3         A.    Her name is Martinez.

4         Q.    What cases have been dismissed against

5    you?

6         A.    I think the name is Robert Blake.  Then

7    another one was dismissed recently and I forget

8    the names.  Many times I'll get carried into a

9    case as an associate surgeon and really have

10   nothing to do with the claims and then I'll be

11   dismissed.

12        Q.    Have you paid settlements to be

13   dismissed from medical malpractice cases?

14        A.    Have I had to pay in the past?

15        Q.    Yes.

16        A.    Yes.

17        Q.    How many times?

18        A.    What does it have to do with this case,

19   my personal history?

20        Q.    This is my deposition.  I can ask you

21   questions about your credentials and

22   qualifications and your history as a vascular

23   surgeon.

24             MR. ELIAS:  I'm going to allow you to

25   answer this and then we are moving on.  This has

1    nothing to do with Mr. McWilliams.  You already

2    deposed him about his credentials.  The court was

3    very clear in its order that we are limiting

4    these things to case-specific issues.

5           You have already had your opportunity.

6    We're not going to waste time.  If I have to go

7    and get a protective order from the court, I'll

8    do it.  But we're going to move on.

9           He can answer this.  I'm not going to

10   cut it off.  But you already went through his

11   credentials ad nauseam six months ago.  So that's

12   the way it's going to be.

13          If your settlements are confidential,

14   which they very well may be, I don't want you to

15   violate any confidentiality obligations.  I think

16   the question is how many times have you settled,

17   in some form, a case against you.  You can answer

18   that.

19          But if it's getting into specifics and

20   you have confidentiality obligations, I advise

21   you to heed those confidentiality obligations and

22   not divulge.

23   BY MR. REISSAUS:

24      Q.   So, Doctor, I'm not asking you to

25   violate any confidentiality agreements you may

1    have but I am asking you how many times have you

2    entered into settlements in which you provided a

3    payment or your insurer provided a payment to

4    obtain a release from a medical malpractice claim

5    against you?

6         A.   Three times.

7         Q.   And when did those occur?

8         A.   Years ago.  Seven, eight, nine years

9    ago, even more.

10        Q.   And other than this Martinez case that

11   has been going on for a number of years, there

12   are no other cases in which you are named a

13   defendant?

14        A.   Correct.

15        Q.   Do you recall entering into a

16   settlement in a case named Al Nooroz,

17   N-O-O-R-O-Z, versus Medtronic, Inc. late last

18   year?

19        A.   I was dismissed.  No payment.  That's

20   the case I couldn't think of the name.

21        Q.   And why were you dismissed from that

22   case?

23        A.   Because I had nothing to do with it.

24             MR. REISSAUS:  I'm going to hand you

25   what I've marked as Exhibit 5.

1              (Wagmeister Exhibit 5, Notice of

2              Settlement and Application for

3              Determination of Good Faith, was

4              marked for identification.)

5    BY MR. REISSAUS:

6        Q.    You see that this is a filing from the

7    Al Nooroz case and the pleading is titled "Notice

8    of Settlement and Application for Determination

9    of Good Faith Settlement by Defendant Robert

10   Wagmeister."

11             Do you see that?

12       A.    Yes, I know all about it.

13       Q.    So you said you were dismissed from

14   that case, correct?

15       A.    Correct.  That's the way the layer had

16   to do it.  There is no money involved.

17             This is ridiculous, these questions.

18   It was a total dismissal.  It had nothing to do

19   with the case.  The case is still ongoing.

20       Q.    So it's your testimony that your lawyer

21   filed this Notice of Settlement even though you

22   made no payment to the plaintiff in this case?

23       A.    Correct, I told you that three times.

24       Q.    Did you offer --

25       A.    Zero.

1       Q.    Did you agree to testify on behalf of

2    the Plaintiff?

3       A.    I have nothing to do with the case.  I

4    was dismissed.  It's over.  I'm not testifying.

5    I had a deposition.  I was dropped from the case.

6       Q.    You do understand that --

7       A.    I don't care what it says there.  I'm

8    telling you six times already.  Dismissed, gone,

9    zero payment.

10      Q.    Dr. Wagmeister, I think it's a

11   reasonable question when it says that this is a

12   Notice of Settlement that I ask you --

13      A.    Where does it say dollar amounts in

14   there?

15      Q.    And as your counsel pointed out,

16   settlement amounts are often confidential,

17   correct?

18      A.    This has nothing to do with

19   confidential.  Zero payment.  You want to get my

20   insurance company?  I'll have them call you.

21      Q.    Are you aware of an expert witness

22   directory called SEAK?

23      A.    Yes.

24      Q.    And are you listed in that?

25      A.    Yes.

Page 36

1          MR. ELIAS:  Move on, Drew.  This has

2     nothing to do with Mr. McWilliams.  I'm serious.

3     The court has ordered that you will, in good

4     faith, limit your questioning to the issues in

5     this case.

6          You are now taking a second bite of the

7     apple on his credentials which you already went

8     over and we're not doing it.

9          MR. REISSAUS:  Excuse me.  Mr. Elias,

10    this document I just asked him about is from

11    October 2017 which is after the prior case.  Now,

12    I really don't appreciate --

13         MR. ELIAS:  What is your question on

14    how -- how long have you been listed on whatever

15    he just said, a number of years?

16         THE WITNESS:  SEAK?  I don't know, five

17    to ten years.

18         MR. ELIAS:  So these are questions that

19    you could have asked and gone over in the last

20    deposition.

21         Don't answer the question.  Move on.

22         MR. REISSAUS:  Counsel, let me get my

23    question on the record then.

24         MR. ELIAS:  You can.

25         MR. REISSAUS:  And then you can direct

1   him not to answer if you wish and we will seek

2   appropriate relief where necessary.

3   BY MR. REISSAUS:

4       Q.   Have you told the SEAK expert witness

5   directory the number of times you have been

6   deposed and testified in the last four years was

7   30 times?

8       A.   I don't recall telling them that.

9       Q.   Did you provide them information to get

10  into their listing?

11      A.   Way back when I signed up.  I pay them

12  an annual fee of like $450 and that's the last

13  contact that I've had with them, except send a

14  check for approximately $450 every year.

15           Otherwise I have nothing else.  I don't

16  contact them.  I have nothing to do with them,

17  other than sometimes I'll get a call from a

18  lawyer who says he's utilized that service and

19  could I review a case.

20      Q.   Just to make sure we're clear here,

21  there are no additional current active cases in

22  which you are a defendant other than the one case

23  we discussed that was five to seven years old?

24      A.   Okay, let's get it clear.  You asked me

25  how many times I settled or had to give some

Page 38

1    monetary payment.  I told you three.

2           You asked me if I had active cases, I

3    said one.  The answer doesn't change because you

4    ask it four times.

5           MR. REISSAUS:  I'm going to hand you

6    what I've marked as Exhibit 6.

7           THE WITNESS:  (Perusing.)

8           (Wagmeister Exhibit 6, Complaint

9           for Professional Negligence, was

10          marked for identification.)

11   BY MR. REISSAUS:

12       Q.  Can you please take a look at that and

13   confirm that that's a complaint from a case

14   captioned "Restler and Hoyer versus Long Beach

15   Memorial Medical Center, Dr. Curtis Spencer; Dr.

16   Robert Wagmeister and Does 1 through 50."

17       A.  I have no knowledge of this.

18       Q.  So this is a --

19       A.  The first time.  I don't know anything

20   about this.

21       Q.  On the first page on the top right it

22   says this was filed in the Superior Court in the

23   California County of Los Angeles on October 30,

24   2017?

25       A.  Correct.  Where it is, where it's gone,

Page 39

1    I have no idea because I have never received

2    anything about this.

3              MR. ELIAS:  You have not been served?

4              THE WITNESS:  No.  This is disturbing

5    to see this but I have no knowledge about it.

6    BY MR. REISSAUS:

7         Q.   Do you recall the patient's name,

8    Heather Restler or Matthew Hoyer?

9         A.   Well, her name was Hoyer.  Her first

10   name is probably Beverly.

11        Q.   Beverly Hoyer, okay.

12             And the allegations in the complaint

13   are that you were involved in the vascular

14   aspects of a spinal surgery for this patient?

15             MR. ELIAS:  Wait a minute.  He said

16   he's never seen the complaint.  Are you reading

17   from a complaint?

18             MR. REISSAUS:  Yes.  If you will turn

19   to page three --

20             MR. ELIAS:  I mean, let him read the

21   complaint if you are going to ask him questions

22   about something he's never seen before.

23   BY MR. REISSAUS:

24        Q.   You will see in paragraph 10 it states,

25   "Plaintiffs are the children and sole heirs of

Page 40

1   Beverly Hoyer who tragically died on October 29,

2   2016 after having spinal surgery at LBMMC

3   performed by, among others, Dr. Curtis Spencer

4   and Dr. Robert Wagmeister."

5            Do you see that?

6       A.   Yes, yes.  I'm reading.

7            MR. ELIAS:  He's reading.

8   BY MR. REISSAUS:

9       Q.   Do you recall that this patient passed

10  away?

11      A.   Yes, I was gone from the surgery

12  because I did the front part and then she had the

13  posterior part and whatever blood loss occurred

14  but I was gone.

15      Q.   Paragraph 29 of the complaint states,

16  "Defendants were negligent in their care of

17  Beverly because her death should have been

18  avoided because Defendants failed to send Beverly

19  to ICU after surgery, Defendants failed to

20  carefully monitor Beverly and Defendants failed

21  to provide one-on-one nursing care and telemetry

22  monitoring.

23            "Defendants should have caught a slow

24  bleed and should have sent Beverly back to

25  surgery, cauterized the bleed or transfused her.

Page 41

1    Defendants did nothing but let Beverly slowly

2    bleed out and die."

3           That's what Plaintiffs allege, correct?

4       A.   That's what you read.  I don't know

5    anything about it.  I've never been served.  So

6    it's kind of strange to me, whatever it is now,

7    seven months later.

8           I'll take a copy of that, if you don't

9    mind.

10          MR. ELIAS:  I have it for you.

11          THE WITNESS:  Oh.

12   BY MR. REISSAUS:

13      Q.   At your last deposition you discussed

14   your clinical practice and that your practice

15   specializes in vascular access in spinal

16   surgeries.

17          Is that correct?

18      A.   Correct.

19      Q.   Is that still your specialization

20   today?

21      A.   Yes.

22      Q.   And is it correct that at some point in

23   the past you have performed carotid

24   endarterectomies?

25      A.   Thousands, yes.

Page 42

1    Q.    When was the last time you performed a

2    carotid endarterectomy?

3         A.    Probably around 2008, 2009.

4         Q.    So it's been approximately eight years

5    or so?

6         A.    Nine to ten years.

7         Q.    When was the last time in your clinical

8    practice that you diagnosed a patient with

9    carotid artery stenosis?

10        A.    Same time period.

11        Q.    When was the last time outside of

12   litigation that you formed an opinion that a

13   medication caused a patient of yours to develop

14   atherosclerosis?

15        A.    I was never asked before this Delores

16   case.

17        Q.    But outside of litigation in your

18   clinical practice, when was the last time that

19   you formed an opinion that a medication was the

20   cause of atherosclerosis in a patient of yours?

21        A.    None before.

22        Q.    I'd like you to turn to your expert

23   report, Exhibit 3, and page two?

24        A.    (Perusing.)

25        Q.    Under section four you have the second

Page 43

1    paragraph there.  I'd like to turn your attention

2    to that.

3            And the second sentence of that

4    paragraph states, "Rapid onset, accelerated

5    progression or sudden aggravation of

6    atherosclerosis is extremely rare," and you put

7    "extremely rare" in bold.

8            Did I read that correctly?

9        A.   Yes.

10       Q.   And again, what is your definition here

11   for rapid onset, accelerated progression or

12   sudden aggravation?

13       A.   Well, as I said, atherosclerosis is a

14   disease over years.  So for something to progress

15   over months is rapid accelerated progression.

16       Q.   So any observable increase in the level

17   of atherosclerosis in under a year would be

18   considered rapid?

19       A.   Not any; substantial.

20       Q.   What is substantial?

21       A.   It's not quantifiable.  In this case,

22   as most observers and treating physicians saw,

23   from January of 2013 to August of 2013 there was

24   substantial progression and stenosis in

25   Mr. McWilliams.

Page 44

1      Q.   So it's not quantifiable.  There's no

2   quantifiable way to define what a substantial

3   progression of stenosis is?

4           MR. ELIAS:  Objection, misstates.

5           THE WITNESS:  Well, when one goes from

6   mild, moderate stenosis to almost occlusion in

7   seven months, that's substantial and extremely

8   rare.

9   BY MR. REISSAUS:

10     Q.   But there's not -- would a 20 percent

11  increase be an accelerated progression to you

12  over the course of eight months?

13     A.   I said quantifiable.  That's

14  observation and experience in that having

15  patients who have no or mild disease ending up

16  with substantial disease, near occlusion, is

17  significant and extremely rare.

18     Q.   I understand, Doctor, but I'm asking

19  you would a 20 percent increase in the level of

20  stenosis over an eight-month period be considered

21  an accelerated progression to you?

22          MR. ELIAS:  Objection, that is an

23  unfirm hypothetical and an incomplete

24  hypothetical.

25  BY MR. REISSAUS:

1     Q.    You can answer.

2     A.    There is no book, lecture, article that

3   will quantify, as you are trying to do, 20

4   percent.

5     Q.    Or 10 percent or 30 percent for that

6   matter?

7     A.    When someone goes from mild to moderate

8   stenosis and in the course of seven months has a

9   near occlusion, that's substantial and extremely

10  rare.  It's not that I observed but as treating

11  physicians, Dr. Loyola and Dr. Maraist.

12          So it's not my opinion, it's also the

13  treating physicians at the time of his problem.

14    Q.    But it's your interpretation of what

15  you think they believe?

16    A.    That's what they have stated.

17    Q.    Have you ever, in your practice before

18  you -- let me start that over.

19          In your practice when you were

20  performing carotid artery interventions for

21  patients, did you ever see a patient with carotid

22  artery stenosis that progressed during the course

23  of one year?

24    A.    None that I can recall.

25    Q.    You don't recall any patient that had a

Page 46

1    progress of ten percent over the course of a

2    year?

3              MR. ELIAS:  Asked and answered.

4              THE WITNESS:  Over years,

5    atherosclerosis progresses.  So if you see a

6    patient who, let's say may have 50 percent

7    stenosis, just to throw out a number, you would

8    advise them -- and they were asymptomatic, you

9    would advise them to get a doppler ultrasound

10   probably in a year.  And you would follow the

11   course with serial ultrasounds to see if and when

12   that may progress.

13   BY MR. REISSAUS:

14        Q.   But in your experience you haven't seen

15   a patient in the course of a year have an

16   increase in the level of stenosis in their

17   carotid artery of ten percent?

18             MR. ELIAS:  Asked and answered.

19             THE WITNESS:  First of all, to quantify

20   ten percent, it's an inexact estimate when you do

21   doppler ultrasound.  You get a range.  So to say

22   10 percent is not really definable.

23             But substantial changes, I haven't seen

24   in the course of six to 12 months.

25   BY MR. REISSAUS:

1    Q.    And there's no quantifiable definition

2  for substantial that you can provide?

3              MR. ELIAS:  Misstates his testimony and

4  asked and answered.

5              THE WITNESS:  Correct.  I'm only

6  reporting what not only I have looked -- the

7  treating physicians, radiologists, vascular

8  surgeons have reported and documented in the

9  chart.

10  BY MR. REISSAUS:

11    Q.    You said something a minute ago that

12  I'd like to confirm.  You said that in your

13  clinical practice if you had somebody who had a

14  50 percent stenosis that was asymptomatic that

15  was seen by ultrasound, you would have them come

16  back in a year for reevaluation; is that correct?

17    A.    They would get serial ultrasounds,

18  correct.  Just like Mr. McWilliams has had

19  following his carotid endarterectomy, Dr. Loyola

20  has obtained probably annual ultrasounds which

21  have all been essentially normal or

22  nonhemodynamically significant.

23    Q.    When you use the term moderate degree

24  of stenosis, what does that mean to you?

25    A.    Somewhere in the mid range, as I said.

Page 48

1          Q.    Would that be 50 to 69 percent?

2          A.    No, roughly 50 percent.  It depends.

3    As I said, it's an inexact evaluation.  There is

4    technician variability when they use the probe.

5               So you only try to see if there's

6    significant progression over time and if so it

7    went from -- well, in Mr. McWilliams' case, from

8    50 percent to 99 percent, you would advise

9    surgery.

10              So you are trying to see when a

11   stenosis becomes hemodynamically significant,

12   which is typically greater than 80 percent, to

13   warrant consideration for surgery or some type of

14   intervention.

15              So it's not whether it goes up five

16   percent or 10 percent.  It's when it becomes

17   hemodynamically significant.

18         Q.    I understand, Doctor, but that wasn't

19   what I was trying to ask you.

20              MR. ELIAS:  But it is what you asked.

21   BY MR. REISSAUS:

22         Q.    No.  My question was, Doctor, what

23   would you define as a moderate degree of

24   stenosis.  It had nothing to do with time course,

25   unless you are telling me that the definition of

1  moderate takes more than --

2      A.   I gave you the answer.

3      Q.   All right.  Just to make sure I have

4  that correct, a moderate degree of stenosis to

5  you would be in the 50 percent range?

6      A.   Somewhere in there.

7      Q.   If a patient starts getting beyond the

8  50 percent range, so in the 60 to 69 percent

9  range, let's say, what would you call that then?

10     A.   Maybe in the same range.  It's not the

11  word "moderate," what it is is hemodynamically

12  significant.  That's the reason to consider

13  intervention and that's typically greater than 80

14  percent.

15          Anything less than that, unless someone

16  has symptoms referable to that side of the

17  carotid that's diseased, would warrant

18  consideration for surgery or some type of other

19  intervention, risk modification to try to limit

20  atherosclerosis, whatever it takes.

21          But it's not the word "mild,"

22  "moderate."  What it is is hemodynamically

23  significant, with or without symptoms.

24     Q.   I understand but in your report you

25  used the terms I'm asking about so I want to make

Page 50

1    sure I understand what those terms mean to you.

2           MR. ELIAS:  Just point to where it is

3    in his report so we can just be specific, please.

4    BY MR. REISSAUS:

5        Q.   Hemodynamically significant.  You just

6    used that term.  What does the term

7    hemodynamically significant mean to you?

8           MR. ELIAS:  Asked and answered.

9           Go ahead.

10          THE WITNESS:  Numerically or

11   potentially functionally.

12          Numerically, as I said to you, it's

13   something when it starts to get greater than 80

14   percent, which when you start to get greater than

15   80 percent, the potential for someone suffering a

16   TIA or stroke begins to increase over the next

17   several years.

18          And so you weigh the patient's age,

19   medical condition, whatever other risk factors to

20   decide whether this patient warrants surgical

21   intervention, depending if they are symptomatic

22   or asymptomatic.

23   BY MR. REISSAUS:

24       Q.   You mentioned in one of your previous

25   answers risk factor modification.  You would

Page 51

1    advocate risk factor modifications in patients

2    before they reach hemodynamically significant

3    stenosis, correct?

4         A.   Yes.

5         Q.   And you would recommend risk factor

6    modification and control for any patient you see

7    just because that's good medical practice,

8    correct?

9         A.   Correct.

10        Q.   In your clinical experience have you

11   had patients progress from 50 to 69 percent

12   stenosis to 90 percent stenosis over the course

13   of a year, give or take?

14        A.   Several years, not a year.

15        Q.   So you've never had a patient progress

16   from 50 to 69 percent stenosis to 90 percent

17   stenosis in under a year?

18        A.   Not that I recall.

19        Q.   You also state that surgical

20   intervention for atherosclerotic disease in

21   individuals younger than 50 is uncommon.

22             You state that in your report, correct?

23        A.   That's what's stated, yes.

24        Q.   Is that based on your experience in

25   clinical practice for the last, I think, 37

1   years, is that right?

2       A.   My clinical experience, partners'

3   experience, colleagues' experience, the

4   literature, including your own defendant's

5   literature, by Dr. Benjamin.

6            Including also Rutherford's textbook of

7   vascular surgery, reporting the incidence of

8   stroke in the young and a certain article that

9   you are aware of involving premature

10  atherosclerosis defined as less than 50 which is,

11  in that article in agreement with everyone else,

12  is rare or uncommon.

13      Q.   I want to ask you, you mentioned an

14  article with the first author Benjamin?

15      A.   That's your reference.

16      Q.   What do you mean by "your reference"?

17      A.   Your defendant experts utilized that

18  reference multiple times in their reports.

19      Q.   You're not saying that that article in

20  any way is related to Novartis in any way,

21  correct?  The authors are independent.

22      A.   I didn't say anything about Novartis, I

23  said your expert utilized that reference

24  multiple, multiple times.  And as I should say to

25  you, unless they have a different print of it,

1  they miss-footnoted every footnote that they

2  utilized and it took me a long time to find their

3  footnotes.

4      Q.   The Benjamin article is by the American

5  Heart Association, correct?

6      A.   I believe so.  And Dr. Benjamin

7  reviewed a lot of statistics, including one

8  statistic in which he talked about stroke in the

9  young where he reported in the young age

10 category, I think between 20 and 54, that the

11 stroke rate was 48 per 100,000.

12          MR. REISSAUS:  Okay, I'm going to move

13 to strike that as nonresponsive.

14 BY MR. REISSAUS:

15     Q.   That has nothing to do with my

16 question, Doctor, and things might move a little

17 more quickly --

18     A.   You were asking me things about young

19 patients, is what you asked me, and I was using

20 that as another reference in addition to

21 Rutherford and all the others.

22     Q.   Is it correct that doppler ultrasound

23 is an inexact diagnostic tool for carotid artery

24 stenosis?

25     A.   It gives you variability, as your

1   experts have expressed and as myself, Dr. Loyola

2   have all expressed.  It gives you a certain

3   evaluation which you then use your clinical

4   experience and the patient's symptoms to provide

5   further follow-up as needed.

6           MR. REISSAUS:  Doctor, I know you have

7   a copy of this in Exhibit 2.  I saw it earlier.

8           But I'm going to go ahead and mark a

9   copy of this separately as Exhibit 7 which is a

10  carotid doppler evaluation for Mr. McWilliams

11  dated January 28, 2013.

12          THE WITNESS:  Yes, I have it.  Thank

13  you.

14          (Wagmeister Exhibit 7, Carotid

15          Doppler Evaluation, was marked for

16          identification.)

17          MR. ELIAS:  Here, use the exhibit copy

18  to make sure we are on the same page.

19  BY MR. REISSAUS:

20      Q.  And this page is something that you

21  considered in forming your opinions in this case,

22  correct?

23      A.  Yes.

24      Q.  You discussed the results from this

25  carotid doppler evaluation in your rebuttal

1    report on page nine?

2            MR. ELIAS:  I think he discusses it in

3    both reports.

4    BY MR. REISSAUS:

5        Q.   Is it correct that on page nine of your

6    supplemental report, the second full paragraph

7    addresses results from this January 28, 2013

8    carotid doppler evaluation?

9        A.   Yes.

10       Q.   And you -- about halfway through you

11   say that:  "Mr. McWilliams' January 2013 report

12   indicated an ICA/CCA ratio of less than two at

13   1.7."

14           Did I read that correctly?

15       A.   Yes.

16       Q.   And that's the number, 1.7, that's

17   circled in Exhibit 7 under the ICA/CCA ratio?

18       A.   Correct.

19       Q.   And this is for the right internal

20   carotid artery?

21       A.   Correct, yes.

22       Q.   And that's the ICA, is that right?

23       A.   Internal carotid artery.

24       Q.   And there's three readings of systolic

25   velocity that were taken at this doppler imaging,

1  correct, of the ICA?

2       A.   Yes.

3       Q.   And there's a P, M and D.  The P stands

4  for proximal, the D for distal and the M for

5  medial; is that correct?

6       A.   Probably middle.

7       Q.   Middle, sorry.  All right.

8            And so it's saying starting from

9  closest to the heart and moving further away,

10 correct?

11      A.   Correct.

12      Q.   So distal is further up, closer to the

13 brain?

14      A.   Correct.

15      Q.   And the result that was elevated in

16 particular is the distal ICA, correct?

17      A.   Yes.

18      Q.   And that the systolic velocity was 156?

19      A.   Correct.

20      Q.   And the diastolic velocity was 67?

21      A.   Correct.

22      Q.   And you see in the table at the bottom

23 of the page -- well, strike that.

24           There is a handwritten note from the

25 provider within Exhibit 7 that says, "Elevated

1   velocity right ICA distribution"?

2       A.   Correct.

3       Q.   And is that consistent with your

4   interpretation of these results?

5       A.   Yes.

6       Q.   And there's a table at the bottom of

7   the page here.  The columns read, "Degree of

8   stenosis," and then it says, "ICA, PSV," which is

9   peak systolic velocity, correct?

10      A.   Correct.

11      Q.   And in the case of Mr. McWilliams'

12  right internal carotid artery, that would be the

13  156 that was measured in the distal portion of

14  the ICA, correct?

15      A.   Yes.

16      Q.   And so if you read on this table, 156

17  would fall in the 70 to 79 percent part of the

18  ICA, PSV column, correct?

19      A.   Incorrect.

20      Q.   That's not correct?

21          MR. ELIAS:  That's not correct.

22  BY MR. REISSAUS:

23      Q.   Excuse me.  Thank you.

24          60 to 69 percent is listed as under

25  150, correct?

1      A.    Yes.

2      Q.    And 41 to 59 percent is listed as under

3  120, correct?

4      A.    Yes.

5      Q.    So the concept is that as your peak

6  systolic velocity gets higher, it's indicative of

7  a higher degree of stenosis, correct?

8      A.    Partly, yes, because it also depends on

9  the ratio.

10     Q.    I was just about to ask you about the

11 ratio.  So in your report you state that

12 Rutherford's indicates that an ICA/CCA ratio of

13 less than two is consistent with a normal carotid

14 artery or stenosis of less than 50 percent,

15 correct?

16     A.    Correct.

17     Q.    And is it your opinion that

18 Mr. McWilliams had stenosis at under 50 percent

19 based on that?

20     A.    No.

21     Q.    Is it your opinion that Mr. McWilliams

22 had over 50 percent?

23     A.    Somewhere in that 50 percent range, as

24 the report by the reporting physician who writes

25 minimal atherosclerotic plaque in the distal

1    right common and proximal internal carotid

2    arteries with velocities indicating a stenosis of

3    50 to 69 percent.  However, gray scale images

4    demonstrate a stenosis close to that of 50

5    percent.

6            That was the doctor who reviewed this

7    study in his report and this was also reviewed by

8    Dr. Loyola who had a consistent interpretation of

9    this study.

10           And the parameters that I use, which is

11   Rutherford's which is a consensus opinion of

12   multiple experts in doppler ultrasound, you have

13   that chart which I've given you in the documents

14   that I gave you.

15           MR. REISSAUS:  I'm going to hand you

16   what I've marked as Exhibit 8.

17               THE WITNESS:  (Perusing.)

18               (Wagmeister Exhibit 8, Article

19               Entitled Vascular Laboratory

20               Arterial Duplex Scanning, was

21               marked for identification.)

22   BY MR. REISSAUS:

23       Q.   And this is Chapter 16 from Rutherfords

24   titled "Vascular Laboratory Arterial Duplex

25   Scanning."

1          Have you seen this before?

2     A.    No.   What edition is this?

3          MR. ELIAS:   This doesn't on its face

4    show that it's from Rutherford so I'm going to

5    object to the characterization.

6    BY MR. REISSAUS:

7     Q.    Do you have a copy of the edition that

8    you looked at here with you today?

9          MR. ELIAS:   And Drew, you've made a

10   representation.   Do you know what edition this

11   is?

12         MR. REISSAUS:   I'm not positive.

13         MR. ELIAS:   And Dr. Wagmeister, just

14   for the record it's Chapter 16 that you reference

15   in your report.   That's Chapter 97.   I don't know

16   if you brought them.

17         THE WITNESS:   I have both.   I have

18   both.   Chapter 92 in the 7th edition and Chapter

19   97 in the 8th edition.

20         MR. ELIAS:   The consensus we are

21   talking about, this is a different chapter of

22   Rutherford's.   It's Chapter 16 which is

23   referenced in your report.   I don't know if you

24   brought that.   You may not have it with you.

25         THE WITNESS:   No.   Where did that come

1   from?  I don't know.  Okay.

2   BY MR. REISSAUS:

3       Q.   So you don't believe you have that with

4   you?

5       A.   Correct.

6       Q.   It's not in the group of articles that

7   you brought with you today?

8       A.   Correct.

9            MR. ELIAS:  I'm not sure if this is

10  from Rutherford's.  It's clear that it's not the

11  eighth edition.

12           MR. REISSAUS:  I'm a little confused

13  about which edition because you don't cite an

14  edition here in footnote 19.

15           MR. ELIAS:  He does, because if you

16  look at the first citation of Rutherford's --

17           MR. REISSAUS:  The Doctor can tell me

18  what he intended to cite, unless you point that

19  out for him.

20           MR. ELIAS:  I'm pointing out exactly

21  what's on the record.  The original citation of

22  Rutherford lists the edition.

23  BY MR. REISSAUS:

24       Q.   I'd like you to turn to page 582 in

25  Exhibit 8.

1          Are you there?

2     A.    Yes.

3     Q.    There is a section titled "Severity of

4  ICA Stenosis and Velocity Criteria, PSV/EDV

5  ratio."

6          Do you see that?

7     A.    Yes.

8     Q.    It states:  "A multi-specialty panel

9  developed a consensus for estimating the severity

10  of ICA stenosis.  Parameters used to determine

11  the degree of stenosis include PSV and EDV

12  measurements with these values recorded from the

13  most stenotic ICA segment."

14          Did I read that correctly?

15     A.    Yes.

16     Q.    And it states that, "Testing data

17  allowed designation of ICA disease" --

18     A.    Where are you?  Oh.

19     Q.    Do you see where I'm at now?

20     A.    Yes.

21     Q.    "Testing data allowed designation of

22  ICA disease into categories of normal; no plaque

23  or stenosis; less than 50 percent stenosis;

24  plaque visualized, mild disease; 50 percent to 69

25  percent stenosis; greater than 70 percent

1  diameter reduction; high-grade stenosis and

2  occlusion; no flow detected.

3            "The ICA/CCA ratio also assists in

4  determining the severity of the stenosis."

5            Did I read that correctly?

6      A.   Yes.

7      Q.   And Table 16.2 says, "Consensus

8  criteria for interpretation of carotid duplex

9  imaging of internal carotid artery

10  atherosclerotic disease."

11     A.   Correct.

12     Q.   And it states:  "Under ICA, PSV a value

13  of 125 to 230 would correspond to 50 to 69

14  percent diameter reduction," correct?

15     A.   That's what it says.  What about the

16  ICA/CCA ratio?

17     Q.   I was going to ask you.  It says

18  ICA/CCA ratio between two to four, correct?

19     A.   At that level of stenosis, correct.

20     Q.   At 50 to 69 percent, thank you, yes.

21            And at the 50 to 69 percent level of

22  stenosis, ICA/EDV and diastolic value is 40 to

23  100, correct?

24     A.   Yes.

25     Q.   And under "Plaque Imaging" it says,

1    "Present greater than 50 percent DR stenosis,

2    greater than 50 percent DR stenosis" -- oh,

3    sorry.

4              "Present greater than 50 percent DR

5    stenosis," correct?

6         A.   I am at a reduction.

7         Q.   And the text in this section continues

8    and says:  "A PSV of 125 centimeters per second

9    recorded from a proximal diseased ICA segment is

10   the threshold for greater than or less than 50

11   percent stenosis."

12             Did I read that correctly?

13        A.   Yes.

14        Q.   And this is the consensus criteria

15   cited in this chapter, correct?

16        A.   Yes, it's just what I've given you in

17   my documents.

18        Q.   And it continues:  "Extensive bulky

19   plaque may be imaged at the carotid bifurcation,

20   but if PSV is in the range of 125 to 150 and the

21   ICA/CCA ratio is less than two, the approximate

22   estimation of ICA stenosis should be based

23   primarily on the PSV value."

24             Did I read that correctly?

25        A.   Yes.

1    Q.   So where you have increased peak

2  systolic velocity but an ICA/CCA ratio that's

3  under two, the appropriate estimation of stenosis

4  should be based primarily on the PSV, correct?

5    A.   That's what that sentence says.

6    Q.   And it continues:  "Grading of ICA

7  stenosis of more than 50 percent is determined by

8  the PSV and EDV values."

9         Did I read that correctly?

10   A.   Yes.

11   Q.   Do you disagree with that?

12   A.   There are other determinations such as

13  gray scale imaging of the plaque, which is what

14  you read in your -- looking at the charts, plaque

15  imaging.

16        So there is a combination of factors

17  that you utilize, recognizing the variability of

18  a technician with a probe and so you are getting

19  an estimate somewhere in that range.

20        So if you say here you are specifying

21  the 50 to 69 percent range, well, somewhere in

22  there it may very well be, whether it's 51, 55.

23  You use all the parameters to give you an

24  estimate.

25        And whether you consider that

Page 66

1  hemodynamically significant, that's really the

2  important issue.

3       Q.   Where does it say -- that one sentence

4  doesn't say any of what you just said.

5       A.   In the middle of that paragraph, as it

6  says, hemodynamic classification of disease.

7  That's what we are determining.

8       Q.   And where you see it says hemodynamic

9  classification of disease, that's in the sentence

10 where it states, "The appropriate estimation of

11 ICA stenosis should be based primarily on the PSV

12 value"?

13      A.   Yeah, the same sentence.

14      Q.   And the next sentence says that PSV

15 values of 230 to 280 are predictive of greater

16 than 70 percent stenosis, right?

17      A.   Correct.

18      Q.   And then it says:  "Interpretation of

19 greater than 70 percent stenosis should not be

20 based on PSV alone," correct?

21      A.   That's what you've read.

22      Q.   "As stenosis increases beyond 70

23 percent, EDV and the ICA/CCA ratio become

24 additional criteria for defining the degree of

25 stenosis," correct?

1    A.    Yes, that's part of the sentence, yes.

2    Q.    And it continues with:  "An EDV greater

than 100 and ICA/CCA ratio above four defining a

diameter reduction of greater than 70 percent,"

correct?

6    A.    Yes.

7    Q.    So this is the first time at which the

authors talk about using ICA/CCA ratio to

diagnose the level of stenosis and that's for 70

percent and up, correct?

11         MR. ELIAS:  Objection, lacks

foundation.

13         THE WITNESS:  No, you take all the

parameters including gray scale imaging to

determine that.  And again we're talking about a

range of anywhere from 50 to 69 percent is what

you are typically focusing on.  But again, that's

always a range.

19         So with the PSV being 156, that's

whatever it is, a third of the way past 125.  So

is the stenosis 55 percent?  Possibly.  It's an

estimate.  It's not 69 percent.

23    BY MR. REISSAUS:

24    Q.    The authors in this section do not say

all the parameters, they are defining at certain

1   levels the different parameters that should be

2   primary considerations, correct?

3       A.    In my last sentence I just said PSV was

4   156 versus the 125 so it is elevated above the

5   125 in some range, giving you the focus that

6   somewhere it may be in the 50 to 69 percent

7   range.

8           Whether that's 51 percent, 55 percent,

9   no one can say.  It's an estimate to give you an

10  evaluation of a patient to ascertain whether this

11  is some hemodynamic stenosis in correlation with

12  a patient's symptoms to determine the proper mode

13  of treatment.

14      Q.    So it's possible, given a PSV of 156,

15  that Mr. McWilliams' level of stenosis in January

16  2013 could have been as high as 69 percent?

17          MR. ELIAS:  Lacks foundation.

18          THE WITNESS:  I would categorically say

19  no to that.  I would expect him to have a

20  velocity of 225 if you want to say near the range

21  of this type of stenosis.  I would not say it's

22  69 percent in your question.

23  BY MR. REISSAUS:

24      Q.    You have testified earlier that there

25  is variability in the results that come out of

1  these doppler studies, correct?

2      A.    Variability depending on the technician

3  and how they apply the probe.

4      Q.    And in Mr. McWilliams' case in January

5  2013, there was only a single study conducted to

6  look at his carotid artery, correct?

7      A.    Correct.  And as I said earlier, the

8  reporting physician who reviewed the actual study

9  reported a stenosis closer to 50 percent, as did

10  Dr. Loyola in his evaluation of this patient who

11  came into the hospital.

12      Q.    I understand.  I'm not asking you about

13  anyone else's evaluation.

14          I'm asking you isn't it correct that

15  the consensus criteria is defined as ranges due

16  to the fact that these tests are not precise and

17  that they only provide estimates?

18      A.    Correct, and that's why I use multiple

19  parameters.

20      Q.    And so it is not possible to rule out

21  completely the possibility that the stenosis was

22  in the upper half of the 50 to 69 percent range?

23          MR. ELIAS:  Misstates his testimony and

24  asked and answered.

25          THE WITNESS:  Again, I would say no.

Page 70

1          MR. ELIAS:  I just want to make clear

2     are you saying no, it's not possible, or no, you

3     don't think it was in the upper range?

4          THE WITNESS:  No, I don't believe it's

5     in the upper range, nor did his treating

6     physicians.

7          In essence, again, this is not a

8     hemodynamically-significant stenosis in treating

9     this patient at the time that he was at the

10    hospital in January of 2013.

11         Again, I referred back to the reporting

12    physician who actually saw the study and may have

13    been there when it was done with the technician.

14    BY MR. REISSAUS:

15    Q.   You don't know if he was there or not?

16    A.   No.  I can only read her report where

17    she states closer to 50 percent, in her

18    estimation, as I would agree to that as well as

19    Dr. Loyola has.

20         MR. REISSAUS:  We're out of tape so

21    let's go off the record.

22         THE VIDEOGRAPHER:  Off the record, the

23    time is 4:04.

24         (Break taken.)

25         THE VIDEOGRAPHER:  Back on the record,

Page 71

1    the time is 4:19.

2    BY MR. REISSAUS:

3        Q.   Doctor, you would agree that

4    hypertension increases the risk of

5    atherosclerosis and stroke, right?

6        A.   It's one of the risk factors, on the

7    minor side of the risk factors for

8    atherosclerosis.

9        Q.   What is your basis for saying that

10   hypertension is a minor risk factor for

11   atherosclerosis?

12       A.   Well, there are multiple risk factors,

13   as you probably know, and smoking and diabetes

14   melitis are the major risk factors for the

15   development of atherosclerosis.

16            Other risk factors include

17   hypertension, hyperlipidemia, family history,

18   genetics, obesity, sometimes physical activity.

19   Those are lesser risk factors compared to

20   diabetes and smoking.

21       Q.   Hypertension, though, is still a

22   significant risk factor and contributes to many

23   instances of atherosclerosis and stroke in the

24   United States, correct?

25       A.   It is a risk factor.

1        Q.    You mentioned that hyperlipidemia is

2    another risk factor for atherosclerosis and

3    stroke, correct?

4        A.    Yes.

5        Q.    Obesity is also a risk factor for

6    stroke and atherosclerosis?

7        A.    Minor.

8        Q.    And by minor you mean compared to

9    diabetes and smoking, correct?

10       A.    Which are known to be more major

11   compared to these others.  Obesity usually

12   involves people who, because of their obesity,

13   may develop diabetes.  So it's not the obesity

14   per se but it's that many overweight people

15   develop glucose intolerance diabetes.

16       Q.    Are you aware of literature that

17   attempts to control for diabetes and shows that

18   obesity is an independent risk factor independent

19   of diabetes?

20       A.    I'm not aware of that literature.  It's

21   just one of the risk factors that we include when

22   somebody talks about risk factors for

23   atherosclerosis.

24       Q.    So someone who has obesity, even if

25   they don't have diagnosed diabetes, they still

1  have an increased risk of atherosclerosis or

2  stroke as a result of being overweight or obese?

3      A.   It can be but it's minor and it

4  wouldn't be the only risk factors, typically, in

5  that type of patient.

6      Q.   In your report you don't cite any data

7  to show what level of increased risk is

8  associated with diabetes or obesity, do you?

9      A.   I don't understand the question.

10     Q.   You can't -- sitting here today, you

11  can't quantify how much a patient's risk of

12  stroke or atherosclerosis increases as a result

13  of being obese, can you?

14     A.   No.  I can only say that, as I said,

15  diabetes and smoking are I think usually

16  considered like a four-to-one risk compared to

17  the other risk factors which are generally

18  included in the other pile of risk factors.

19     Q.   So what's your basis for saying that

20  smoking contributes four times more risk than

21  hypertension or hyperlipidemia or obesity?

22     A.   It's what the epidemiological studies

23  have found; that diabetes and smoking are more

24  prevalent.

25          A risk factor is when somebody has a

Page 74

1   certain disease, they find that this factor may

2   be present more often than other risk factors.

3        Q.    So there's no specific epidemiological

4   study that you can recall, sitting here today,

5   that would support a statement that hypertension,

6   obesity or hyperlipidemia poses only one-quarter

7   of the increased risk compared to smoking?

8            MR. ELIAS:  Object to the form,

9   misstates, assumes facts, asked and answered.

10  BY MR. REISSAUS:

11       Q.    You can answer.

12       A.    No, I can't quote any literature.

13  That's what's generally considered when viewing

14  patients who present with early atherosclerosis.

15       Q.    In your rebuttal report in particular

16  you cite Rutherford and the Benjamin article and

17  statistics about the incidents of stroke in

18  different age groups.

19            Do you recall that?

20       A.    Yes.

21       Q.    And the data cited in your report is

22  for the general population, correct?

23       A.    Yes.

24       Q.    So it's not limited to populations that

25  have all smoked or all have diabetes or all have

Page 75

1    hyperlipidemia or all have hypertension, are

2    they?

3          A.    Well, no.  It's all comers, every

4    person in the United States, the incidents of

5    stroke in different age categories.

6          Q.    Have you had patients under the age of

7    50 who have had critical stenosis of their

8    carotid arteries?

9          A.    As I said in my report, none that I can

10   recall.

11         Q.    You mentioned that that statement also

12   incorporated your colleagues' experience?

13         A.    I asked some people if they had ever

14   seen anyone under 50 and they said if any, in all

15   of them maybe a handful at best.

16         Q.    Who did you ask?  Are they

17   people -- let me just ask that plainly.

18               Who did you ask?

19         A.    Practicing vascular surgeons.  My

20   former partner, Dr. William Cohen.  My other

21   former partner who is now living in Israel and I

22   saw.  It is rare and uncommon, as it is stated in

23   Rutherford's statistics which --

24               MR. REISSAUS:  I'm going to move to

25   strike.  What's to follow is not responsive to my

1  question.

2  BY MR. REISSAUS:

3      Q.   My question was who you asked about

4  your clinical experience.  This is why this takes

5  a long time.

6      A.   No, it takes a long time because you

7  ask me the same question multiple times, to

8  clarify, and I'm happy to answer it every time.

9  But that's why it takes time.

10     Q.   So Doctor, you had conversations with

11 your former partner, Dr. Cohen.  A former partner

12 who is living in Israel.

13          Did you ask anyone else?

14     A.   Other vascular surgeons if I'd see

15 them.

16     Q.   When did you ask these other vascular

17 surgeons?

18     A.   Recently, whenever I would see them.

19     Q.   Did you keep notes of who you spoke

20 with?

21     A.   No.  Just to get an impression.  Was my

22 practice so different than every other vascular

23 surgeon's practice.

24          MR. REISSAUS:  I'm going to hand you

25 what I've marked as Exhibit 9.

1              THE WITNESS:  (Perusing.)

2              (Wagmeister Exhibit 9, Article

3              Entitled Carotid Endarterectomy in

4              Patients Less than 50 Years Old,

5              was marked for identification.)

6    BY MR. REISSAUS:

7         Q.   You'll see this article is titled

8    "Carotid endarterectomy in patients less than 50

9    years old."

10             Did I read that correctly?

11        A.   Yes.

12        Q.   And this article was published in the

13   Journal for Vascular Surgery in 1997, correct?

14        A.   I'm sorry, say that again.

15        Q.   This article was published in the

16   Journal for Vascular Surgery in 1997; is that

17   correct?

18        A.   Yes, I guess 21 years ago.

19        Q.   And is this a journal that you looked

20   at in the past?

21        A.   Yes.

22        Q.   And you hold it up to be a reliable

23   journal?

24        A.   Yes.

25        Q.   And it states here:  "The purpose of

1    this study" -- in the abstract it begins:  "The

2    purpose of this study was to compare the results

3    of carotid endarterectomy, CEA, in a young

4    population with premature atherosclerosis with

5    the results of an older control group, examining

6    perioperative morbidity and mortality data,

7    recurrent stenosis and symptoms, late stroke and

8    survival data."

9            Did I read that correctly?

10    A.    I assume, yes.

11    Q.    And the method states that they

12    retroactively studied 26 patients who are less

13    than 50 years old, correct?

14    A.    Yes.

15    Q.    And the mean age was 43 years old?

16    A.    Correct, plus or minus three years,

17    four years.

18    Q.    So the standard deviation.  The

19    majority of patients fell within 3.8 years below

20    or 3.8 years above 43.2 years old, correct?

21    A.    Yes.

22    Q.    And in the results they note that

23    smoking was more prevalent among young patients

24    who underwent CEA; 92 percent compared to 70

25    percent in the older population, correct?

Page 79

1        A.    Yes.

2        Q.    And that was statistically significant?

3        A.    Where does it say that?

4        Q.    You don't see that?

5        A.    Well, if you could please point that

6   out to me?

7        Q.    What does statistical significance mean

8   to you?

9        A.    That it is statistically significant,

10   that it's valid.

11              But where does it say that?

12        Q.    When you read literature --

13        A.    No, where does it say that?

14        Q.    When you read literature how do you

15   tell if something is statistically significant or

16   not?

17        A.    If someone says its statistically

18   significant.  I'm not an epidemiologist.

19              So where does it say it's --

20        Q.    Thank you, Doctor.  I will ask you a

21   question.

22        A.    Okay.

23        Q.    You said you are not a statistician,

24   correct?

25        A.    Correct.

Page 80

1    Q.    So, as a clinician and not a
2  statistician, do you have an understanding of P
3  values?
4    A.    Not essentially.
5    Q.    So when you read literature you
6  wouldn't be looking at the reported P values,
7  you'd be looking to the author's words and the
8  text?
9    A.    Yes, the words, recommendations.
10    Q.    Would you be able to define what a
11  statistically significant P value is?
12    A.    Again, I said I'm not an epidemiologist
13  and so the answer is no.
14    Q.    The results continue and state:  "Young
15  patients were also" --
16    A.    Where are you?
17    Q.    The next sentence where it says:
18  "Young patients were also more likely to be
19  symptomatic at presentation.  92 percent versus
20  57 percent."
21    A.    Yes.
22    Q.    So that means that young patients
23  undergoing a carotid endarterectomy were more
24  likely to have a symptomatic presentation than
25  the older control group, correct?

Page 81

1     A.   I don't know if they compared to the

2  control group or whether it's symptomatic versus

3  asymptomatic.

4     Q.   So, in the young group of patients, the

5  26 who were under 50 years old, 92 percent of

6  them had symptomatic disease at the time that

7  they underwent a carotid endarterectomy, correct?

8     A.   Yes.

9     Q.   And again, the authors of this article

10 are from Dallas, Texas.  They talked about 26

11 patients that they had seen who required surgical

12 intervention for carotid artery stenosis before

13 the patients turned 50 years old, correct?

14    A.   Do you want me to discuss that, about

15 Dallas?

16    Q.   That's what this reports, isn't it?

17    A.   Yes.  It's from Baylor University

18 Medical Center.

19    Q.   So at Baylor University Medical Center

20 they had 26 patients who required surgical

21 intervention for carotid artery stenosis before

22 they turned age 50?

23       MR. ELIAS:  That's not what this says.

24 BY MR. REISSAUS:

25    Q.   You can answer.

Page 82

1      A.   Baylor University, this particular

2  hospital is one of the largest hospitals in the

3  southwest and they get referrals from all over

4  Texas and the country and so their patient

5  population is not just local.  They are receiving

6  patients from all geographic regions.

7           This is Dr. DeBakey's hospital and all

8  these vascular surgeons are well-known and so

9  they receive patients from multiple geographic

10 areas.

11          So, I would say they receive patients

12 from other facilities or other regions that focus

13 into Baylor because of their reputation.

14     Q.   So at Baylor University, because they

15 are a large referral center, they get to see more

16 patients requiring more complex interventions,

17 correct?

18     A.   Well, because surrounding regions look

19 to Baylor as one of the preeminent centers and so

20 I would say that I don't believe these 26

21 patients were just in the region of Baylor

22 University.

23     Q.   In your report you don't cite any

24 statistics for how many carotid endarterectomies

25 are performed in the under 50 population in, say,

Page 83

1    the southern Florida area, do you?

2        A.    No, I only quote the incidence of

3    stroke in young patients, which was .11 percent

4    in the general population, and as you look at

5    this article --

6            MR. REISSAUS:  Counsel, I'm going to

7    ask you to take back your notes that you are

8    showing to your client on the article.

9            THE WITNESS:  I don't see anything.

10   What?

11           MR. REISSAUS:  I'm marking for the

12   record that counsel made a note on his copy of

13   the exhibit and then handed it over into the

14   witness's view, and now he wants to read in the

15   part that he flagged.

16           MR. ELIAS:  This is the exhibit you

17   provided and I'll just state for the

18   record that --

19           MR. REISSAUS:  Again, you want to

20   testify.  You were testifying, counsel.

21           MR. ELIAS:  You are accusing me --

22           MR. REISSAUS:  Yes, I'm accusing you of

23   testifying and coaching your witness.  Keep it in

24   your area.  It's irrelevant.

25           THE WITNESS:  I'm looking at you.  I

Page 84

1    don't know anything.

2           MR. REISSAUS:   Thank you, Doctor.   I

3    know.

4           THE WITNESS:   What I will say, looking

5    at this article, which is what you asked me to

6    look at, is what they say is this premature form

7    of atherosclerosis is uncommon.

8    BY MR. REISSAUS:

9       Q.   And the authors conclude that this

10   unusually aggressive, accelerated

11   atherosclerosis --

12      A.   No, they don't say that, they say it

13   could be more virulent, which means more harmful

14   to the patient.   They don't say what word you

15   just used.

16      Q.   So the authors say that they have seen

17   particularly virulent atherosclerosis in the

18   carotid arteries in patients that come to their

19   practice that are under 50 years old, correct?

20           MR. ELIAS:   Where are you seeing that?

21           MR. REISSAUS:   That's not an objection.

22           MR. ELIAS:   That misstates.

23           THE WITNESS:   What I said was they

24   state that this premature form of atherosclerosis

25   is uncommon and may be more virulent and diffuse

1    than seen in the older population.

2            What they are saying is these patients

3    may present with strokes more frequently; not

4    that this is a rapidly progressive

5    atherosclerosis but the actual disease when it

6    presents is more likely to be strokes versus

7    those in the older population.

8            But what they say is this is uncommon,

9    which is all I've stated; uncommon, rare, as the

10   statistics in the general population.  Not one

11   major referral center that gets referrals from

12   all over the country has come up with a series to

13   write a paper over 20 years ago.

14           MR. ELIAS:  I'll also note from 1981 to

15   1986 --

16           MR. REISSAUS:  Counsel, you can't

17   resist reading into the record the part that you

18   marked for him?

19           MR. ELIAS:  I didn't mark that for him.

20           MR. REISSAUS:  Actually, I'm going to

21   mark as Exhibit 10 your copy.

22           MR. ELIAS:  Great.  Here you go.

23           THE WITNESS:  Just as a note, I haven't

24   seen that copy, as you know I haven't.

25           (Wagmeister Exhibit 10, Article

Page 86

1           Entitled Carotid Endarterectomy in

2           Patients Less than 50 Years Old,

3           was marked for identification.)

4    BY MR. REISSAUS:

5        Q.   I'd like to ask you about Table 1 on

6    page 448.

7           MR. ELIAS:  By the way, I'm just saying

8    right now we stipulate to the admissibility of

9    that document at trial.  Can we stipulate to

10   that?

11          MR. REISSAUS:  No, we are not going

12   to --

13          MR. ELIAS:  Let's just stipulate to it.

14   BY MR. REISSAUS:

15       Q.   Doctor, on Table 1 it's demographics,

16   risk factors and neurologic presentation, and it

17   has columns for patients and then the control

18   group, correct?

19       A.   Yes.

20       Q.   And we already discussed the mean age

21   in the young patient group, the under 50 group

22   being 43.2, correct?

23       A.   Plus or minus the standard deviations.

24       Q.   And it lists which risk factors they

25   noted being present in that group of 26 patients,

1    correct?

2         A.    Yes.

3         Q.    And how common they were?

4         A.    Yes.

5         Q.    And smoking was the most common in 92

6    percent of the patients under 50 who required

7    carotid endarterectomy, right?

8         A.    Yes.

9         Q.    And that's consistent with your opinion

10   that smoking is a major risk factor for stroke,

11   correct?

12        A.    Well, as I said, one of the two major

13   risk factors.  Whether it's found in this

14   population or the general population, those are

15   the recognized major risk factors for

16   atherosclerosis.

17        Q.    And hypertension was present in 50

18   percent of the patients or 13 out of the 26,

19   correct?

20        A.    Yes.

21        Q.    Hyperlipidemia was present in eight out

22   of 26 or 31 percent?

23        A.    Correct.

24        Q.    And diabetes in five patients or 19

25   percent?

Page 88

1      A.    Correct.

2      Q.    So diabetes was present in fewer of the

3  patients than smoking, hypertension or

4  hyperlipidemia in this group of 26 patients,

5  correct?

6      A.    Yes.

7      Q.    And coronary artery disease is also

8  listed in 31 percent, or eight patients out of

9  the 26 had that as well?

10      A.    Yes.

11      Q.    And I'd like to turn to page 449 now.

12  The discussion section says:   "Atherosclerotic

13  carotid occlusive disease in younger patients is

14  uncommon and few studies have addressed the

15  efficacy of CEA for the prevention of stroke in

16  this population," correct?

17      A.    Yes.

18      Q.    And it continues, the authors state,

19  "Some investigators have proposed that the

20  atherosclerotic process seen in these younger

21  patients is more virulent and diffuse than that

22  seen in older populations with earlier onset

23  accelerated progression and higher incidence of

24  recurrent disease after surgical treatment."

25          Do you see that?

Page 89

1      A.   Yes.

2      Q.   So these authors note that some

3  investigators have proposed that younger patients

4  with atherosclerotic disease may have a more

5  virulent and diffuse type than that seen in older

6  populations?

7      A.   That's what you've read again, yes.

8      Q.   In the next paragraph they state, "The

9  cause of premature atherosclerosis is not clearly

10  understood but is probably multi-factorial in

11  cause," correct?

12      A.   Correct.

13      Q.   Would you agree with that?

14      A.   Yes.

15      Q.   And there's a description section at

16  the end on page 454 and one of the authors, Dr.

17  Martin, writes a response that begins at the end

18  of the first column.

19          And he writes in response to another

20  doctor, Dr. Rosenthal, "I appreciate your review

21  and your comments.  First of all, in terms of the

22  question of how to follow-up these patients that

23  have had very virulent and accelerated

24  atherosclerosis, in terms of their

25  cerebrovascular status" -- but I'll read this

Page 90

1    again.

2              Dr. Wagmeister, Dr. Martin is one of

3    the authors of the study, correct?

4         A.   Yes.

5         Q.   In this response he writes:  "First of

6    all, in terms of the question about how to follow

7    up these patients that have very virulent and

8    accelerated atherosclerosis, in terms of their

9    cerebrovascular status, given the results of our

10   study and studies performed by other

11   investigators, we believe these patients should

12   undergo routine duplex scans probably every six

13   months for the first year, and if they prove to

14   have no evidence of restenosis, just once a year

15   after that."

16              Did I read that correctly?

17        A.   Yes.

18        Q.   And that's consistent with your

19   practice when you were performing these

20   surgeries, to conduct follow-up afterwards to

21   make sure that the patients are doing alright?

22        A.   Yes.

23              MR. REISSAUS:  I'll hand you what I've

24   marked as Exhibit 11.

25              THE WITNESS:  (Perusing.)

Page 91

1              (Wagmeister Exhibit 11, Major

2              Arterial Events in Patients With

3              Chronic Myeloid Leukemia, was

4              marked for identification.)

5    BY MR. REISSAUS:

6        Q.    Can you take a look at that and let me

7    know if you've seen this article before?

8        A.    No.

9        Q.    No, you haven't seen this one before?

10       A.    Correct, I've never seen it.

11       Q.    And the title of this article is "Major

12   Arterial Events in Patients With Chronic Myeloid

13   Leukemia Treated With Tyrosine Kinase Inhibitors;

14   a Meta-Analysis," correct?

15       A.    Yes.

16       Q.    And in the abstract the authors note

17   that they have prepared incidence rates of

18   composites of major arterial events.

19             Do you see that?

20       A.    Where are you looking?

21       Q.    The fourth line down.

22       A.    Oh, in the abstract?

23       Q.    In the abstract.

24       A.    I see where you are starting to read.

25       Q.    Okay.  And it reports then a rate of .8

Page 92

1    per hundred years for non-TKI treatments,

2    correct?

3         A.   Yes.

4         Q.   And it reports a .1 per hundred patient

5    years for Imatinib, I-M-A-T-I-N-I-B?

6         A.   Yes.

7         Q.   So the authors of this metaanalysis

8    reported a lower rate of major arterial events

9    for patients receiving Gleevec than for patients

10   who received no TKI at all for their CML?

11            MR. ELIAS:   That misstates.   It's out

12   of context.

13   BY MR. REISSAUS:

14        Q.   You can answer, Doctor.

15        A.   That's what it says.

16        Q.   There is a section on page 13 of six

17   that's titled "Cerebrovascular Diseases."

18            Do you see that?

19        A.   Yes.

20        Q.   And cerebrovascular diseases would

21   include stroke, correct?

22        A.   Correct.

23        Q.   And if you look at the second sentence

24   it starts:   "The subgroup analysis by TKI showed

25   that the rates of cerebrovascular diseases were

1    .3 per hundred patient years for Nilotinib."

2          Is that right?

3      A.   Yes.

4      Q.   So that would be the equivalent of .3

5    percent incidents per year, correct?

6      A.   I don't know how to determine that.

7    I'm just reading .3 per hundred patient years.

8    I'm not sure how you are working out percentages

9    but it's 100 patient years.

10     Q.   Well, let's say you followed 1,000

11   patients --

12          MR. REISSAUS:  We can go off the

13   record.

14          THE VIDEOGRAPHER:  Off the record, the

15   time is 4:51.

16          (Break taken.)

17          THE VIDEOGRAPHER:  Back on the record,

18   the time is 4:52.

19   BY MR. REISSAUS:

20     Q.   Doctor, we were just reading that the

21   incidence they reported was .3 per hundred

22   patient years for Nilotinib for cerebral vascular

23   diseases; is that correct?

24     A.   Yes.

25     Q.   And the rate for Imatinib was less than

Page 94

1    .1 per hundred patient years, correct?

2        A.    Yes.

3        Q.    And then Dasatinib is .7 per hundred

4    patient years, correct?

5        A.    Yes.

6        Q.    Doctor, you would agree that the rate

7    of .7 per 100 patient years for Dasatinib is

8    numerically higher than the rate for Nilotinib of

9    .3 per hundred patient years, correct?

10       A.    That's what this study shows, yes.

11       Q.    And this article was not something that

12   you considered in forming your opinions in this

13   case, correct?

14       A.    Correct.

15            MR. REISSAUS:  I'm handing you what

16   I've marked as Exhibit 12 which is an article by

17   Jonathan Douxfils, D-O-U-X-F-I-L-S.

18            THE WITNESS:  (Perusing.)

19            (Wagmeister Exhibit 12, Article

20            Entitled Association Between

21            BCR-ABL Tyrosine Kinase

22            Inhibitors, was marked for

23            identification.)

24   BY MR. REISSAUS:

25       Q.    Is this an article that you've seen

Page 95

1    before?

2         A.   No.

3         Q.   And in the result section of the

4    abstract, they report risk of vascular occlusive

5    events and again break it down by different

6    medications.

7              Do you see that?

8         A.   That's the gist of the article.

9         Q.   Okay.  And for Dasatinib, it reports an

10   odds ratio of 3.86, correct?

11        A.   That's what the numbers say.

12        Q.   And for Nilotinib it reports 3.42,

13   correct?

14        A.   Yes.  I guess this is what, in

15   comparison to Imatinib.  So what does OR mean?

16        Q.   So to you just sitting here having

17   looked at just this results paragraph, "OR"

18   doesn't have a meaning to you, correct?

19        A.   No.  It just says that it's 3.42

20   compared to, I guess, zero for Imatinib as a risk

21   or ratio or whatever, which means it's more than

22   Imatinib.

23        Q.   I'm going to hand you Exhibit 13 which

24   is a Hochhaus, H-O-C-H-H-A-U-S, 2016 article.

25              You have seen this article before,

Page 96

1    correct?

2         A.    Yes.

3              (Wagmeister Exhibit 13, Article

4              Entitled Long-term Benefits and

5              Risks of Frontline Nilotinib vs.

6              Imatinib for Chronic Myeloid

7              Leukemia, was marked for

8              identification.)

9    BY MR. REISSAUS:

10        Q.    And this is a report of five-year data

11   from the ENESTnd study of Tasigna compared to

12   Imatinib, correct?

13        A.    Right.  Is this the article funded by

14   Novartis?  Is that the one that I remember?

15             MR. ELIAS:  Yes.

16   BY MR. REISSAUS:

17        Q.    I'd like you to turn to Table 3 on page

18   1052, and Table 3 is titled "Adverse Events."

19             Do you see that?

20        A.    Yes.

21        Q.    And there is a heading, "Other AEs of

22   interest."

23             Do you see that?  It's the second

24   group?

25        A.    Yes.

1     Q.    And in that list there's cardiovascular

2     events listed, do you see that?

3     A.    Yes.

4     Q.    And then it breaks that down into

5     ischemic heart disease, ischemic cerebrovascular

6     event and peripheral arterial disease?

7     A.    Um-hum.

8     Q.    And Mr. McWilliams had an ischemic

9     cerebrovascular event, correct, in the August

10    2013?

11    A.    Yes.

12    Q.    This table reports that in the

13    Nilotinib 300 milligram group, after five years

14    of data, four patients out of 279 had experienced

15    an ischemic cerebrovascular event, correct?

16    A.    Show me what you are reading now.

17    Q.    So the left column, Nilotinib 300

18    milligrams twice a day, right?

19    A.    Okay.

20    Q.    And N equals 279, right?

21    A.    Yes.

22    Q.    So that means there were 279 patients

23    in this group?

24    A.    Yes.

25    Q.    So out of the 279 patients who received

1    300 milligrams twice a day of Nilotinib for their

2    CML, four of them experienced an ischemic

3    cerebrovascular event after five years, correct?

4         A.   Yes.

5         Q.   And that equates to, after five years,

6    a 1.4 percent rate?

7         A.   Yes.

8         Q.   And if we were trying to take the fact

9    that this was after five years, 1.4 percent of

10   patients had had an ischemic cerebrovascular

11   event and then compare that to a one-year rate,

12   we would divide by five, wouldn't we?

13        A.   Not necessarily.

14        Q.   Why not?

15        A.   You don't know when it occurred.  They

16   are not stating here when these events occurred.

17   They are just saying in that five-year duration,

18   this is how many strokes occurred.

19        Q.   But if you were trying to figure out an

20   average number per year or an average percentage

21   per year, it would be one-fifth?

22        A.   That's not statistically valid.

23        Q.   Why not?

24        A.   They all could have occurred in the

25   first year.

1      Q.   So then the incidence in the first year

2   would be 1.4 percent and then it would have been

3   zero in the second, third and fourth and fifth

4   year?

5      A.   Yes, every patient is an individual.

6      Q.   Okay.

7      A.   But separate from that, there were nine

8   other strokes.

9      Q.   I'm asking about the 300 milligram

10  group right now.

11     A.   Okay.

12     Q.   So let's take your hypothetical that

13  four strokes occurred in the first year and

14  then --

15     A.   Or second year.  I can't say what year

16  or when.

17     Q.   The average each year?

18     A.   You can't take average each year.  You

19  have no idea when they occurred.  You look at

20  each individual case and say when did it occur.

21  You have a date and a time.  That's not

22  documented.

23     Q.   You didn't go to look for that data on

24  that either, did you?

25     A.   I had no need to.  I just knew in a

1  five-year retrospective study, that in this

2  clinical trial they look back at their statistics

3  in this category of 300 milligrams, they observed

4  that there were four patients who suffered a

5  stroke.  And went on to the other medications as

6  well, such as 400 milligrams and Imatinib.

7           That was their point of looking at this

8  study.

9      Q.   So how do you compare the 1.4 percent

10  rate after five years to the general population

11  data that you cite in your report?

12           MR. ELIAS:  Objection, lacks

13  foundation.

14           THE WITNESS:  Well, again, you are just

15  looking at one subset.  There were nine other

16  strokes of people taking that medication.  So now

17  we're talking about 13 strokes.

18  BY MR. REISSAUS:

19      Q.   Doctor, I'm asking about the Nilotinib

20  300 milligram group right now.  We can ask about

21  the other one in a moment.

22           I'm asking you how do you compare the

23  incidence of stroke, ischemic cerebrovascular

24  disease after five years, to the general

25  population data that you cite in your report?

1      A.   My report stratifies age.  This doesn't

2  stratify age.  These patients could be 60, 70, 80

3  years old.

4      Q.   Do you know what the average age was in

5  this study?

6      A.   No, nor did the investigators report

7  that.  It did not stratify age in this

8  retrospective analysis.  All they did was report

9  adverse vascular events.

10        And what they came up with was four in

11  the first category; nine in the 400 milligram

12  Nilotinib; and one in the Imatinib.

13        So there's a clear difference between

14  13 and one over the five years without even

15  stratifying the age.  You can't compare it to the

16  incidents of stroke in young patients without

17  telling what these age categories were.

18        But in any event, the incidence of

19  stroke as one reported by your reference of

20  Benjamin in the age category of 20 to 54 reported

21  an incidence of 48 cases out of 100,000.

22        MR. REISSAUS:  I'm going to move to

23  strike.  That was not responsive after the first

24  two sentences, or maybe three, to my question.

25        THE WITNESS:  You asked me how does it

1    compare to the general population, is what your

2    question was earlier.

3    BY MR. REISSAUS:

4         Q.   No.  My question -- the question I

5    asked you at that moment was --

6         A.   What about the first question?

7         Q.   -- do you know what the average age was

8    for the patients in this study?

9         A.   Correct.  But you started off the

10   primary question, how do I compare 1.4 percent to

11   the general population, was what your original

12   question was.

13        Q.   And you answered that and I asked

14   another question, Doctor.

15        A.   I didn't fully answer.  Now that you

16   are continuing the discussion, I'm continuing to

17   answer that question that you proposed.

18        Q.   So you are answering a different

19   question than the one I asked, thank you.

20             MR. REISSAUS:  I move to strike for

21   that reason as well.

22   BY MR. REISSAUS:

23        Q.   Doctor, sitting here today you don't

24   know what the average age was of the patients in

25   the ENESTnd study?

1    A.    Correct.  Not the average age.  I don't

2    know the age of the four people and the nine

3    people and the one person who suffered strokes in

4    this series.

5    Q.    To determine what the appropriate

6    background rate to compare to in the general

7    population, you need to know what the average age

8    of the full study group is, not just the people

9    who had events?

10    A.    No, not this, because now we're talking

11    about a different entity.  We're talking about

12    premature atherosclerosis in the young, not

13    general population, all comers.

14         MR. REISSAUS:  That's weird.  There's

15    something vibrating over there.

16    BY MR. REISSAUS:

17    Q.    So, in your view it is not appropriate

18    to compare the incidence rate of ischemic

19    cerebrovascular disease in the general population

20    to the incidence rate in patients treated with

21    Nilotinib?

22    A.    Well, if you stratify the ages, because

23    cerebrovascular disease occurs more frequently in

24    the older age, as you get older.  So this series

25    is not stratified for me to make an

1   apples-to-apples comparison.

2       Q.   So you would agree that if the patients

3   in ENESTnd were older, you would expect to see

4   more strokes, even assuming there is no

5   association --

6           MR. ELIAS:  Misstates and lacks

7   foundation.

8           MR. REISSAUS:  Let me ask my question

9   again since I didn't finish.

10          MR. ELIAS:  And way compound.

11  BY MR. REISSAUS:

12      Q.   You would agree that if the patients in

13  ENESTnd, if the average age increases, the risk

14  of stroke in that population would increase,

15  correct?

16      A.   I can't speculate on that population.

17  If you took a general population, the incidence

18  of stroke would increase across a general

19  population.

20      Q.   So in the general population, the older

21  people get, the more likely they are to have

22  strokes, right?

23      A.   Right, as your experts have also noted.

24      Q.   So let's take two hypotheticals, okay?

25  If the average patient in ENESTnd was 35 years

Page 105

1   old versus --

2        A.    Wait, wait.  You are talking about a

3   hypothetical now, not the ENEST trial.

4        Q.    This is in this study, in ENESTnd, if

5   the average age was 30 years old, you would

6   expect a lower number of strokes to occur than if

7   the average age was 55, wouldn't you?

8        A.    Well, we're not talking about average

9   incidents, we are talking about people who are

10  getting treated with medication that may have

11  some deleterious effect, you know.  So what is

12  the effect of these medications in this study.

13       Q.    Assuming that Nilotinib does not

14  increase the risk of ischemic cerebrovascular

15  disease, if you have an average age in the study

16  of 40 years, you would expect to see fewer

17  cerebrovascular events than if the average age

18  was 60?

19       A.    Well, that's what we said.  In the

20  general population you are talking about people

21  who aren't being treated with something.

22       Q.    Um-hum.

23       A.    Again, we've stated this several times.

24  As people get older, the incidence of stroke

25  increases.

1      Q.    I don't want to retread ground so let

2   me ask a question.

3          So to make sure I understand your

4   testimony last time correctly, your reports

5   focused on vascular aspects of the case and you

6   wouldn't consider yourself a CML or an oncology

7   expert, correct?

8      A.    Correct.

9      Q.    And you haven't considered what effect

10  CML in and of itself might have on a patient's

11  baseline risk for developing atherosclerosis,

12  correct?

13     A.    Right, I would defer to oncologists.

14     Q.    In your initial report you know that

15  Mr. McWilliams had a history of hypertension,

16  correct?

17     A.    More recent than past.  Relating to

18  2013 he was only first started to be treated in

19  January of 2012.

20     Q.    You address hypertension further in

21  your rebuttal report on page six.  I would ask

22  you to turn to that if you can.  You have a table

23  there of blood pressures.

24          How did you generate that list?

25     A.    From all of his treating physicians.

1   It was Dr. Walia, Dr. Shah and Dr. Shaikh.  So

2   those were office visits.  And I just jotted down

3   those blood pressures on those dates going from

4   2007 to 2013.

5        Q.   How did you select which visits to

6   include in your list?

7             THE VIDEOGRAPHER:  Off the record, the

8   time is 5:17.

9             (Break taken.)

10            THE VIDEOGRAPHER:  Back on the record,

11  the time is 5:18.

12  BY MR. REISSAUS:

13       Q.   We were looking at Table 1 of the blood

14  pressure table that you have in your rebuttal

15  report on page six.  I believe you just said that

16  you had pulled results from the records of the

17  treating physicians including Dr. Walia, Dr. Shah

18  and Dr. Shaikh, correct?

19       A.   Yes.

20       Q.   How did you select which blood

21  pressures you were including in this chart?

22       A.   I think there was a contention that

23  this gentlemen had consistent, uncontrolled high

24  blood pressure from your expert reports.  And so

25  I went into his records and pulled out all of

1   these normal blood pressures through, I guess,

2   one or two every year and did state that although

3   he did have some readings above normal, which I

4   stated, these were all normal pressures, with

5   several of them being in the same year at various

6   office visits.

7         Q.   Okay.

8         A.   And again, he wasn't treated until

9   January of 2012 when Dr. Shaikh I believe started

10  him on Edarbi, E-D-A-R-B-I.

11             MR. REISSAUS:  I hand you what I've

12  marked as Exhibit 14.

13             (Wagmeister Exhibit 14, Dennis

14             McWilliams Medical Record Dated

15             6/11/07 from Dr. Shaikh, was

16             marked for identification.)

17  BY MR. REISSAUS:

18        Q.   This is a record from Dr. Shaikh,

19  correct?

20        A.   I can't read the handwriting.

21        Q.   So you don't recall what the

22  oncologist's records looked like in this case?

23        A.   Well, he wasn't the oncologist.  Dr.

24  Shaikh was not the oncologist.  Dr. Walia --

25        Q.   Excuse me.  I misspoke if I said Dr.

1   Shaikh.

2        A.    It looks like it's signed Walia there.

3        Q.    Excuse me, thank you.  I'm sorry about

4   that.

5              Exhibit 14 is a June 11, 2007 record

6   from Dr. Walia, correct?

7        A.    Yes.

8        Q.    Thank you.  And at this visit the blood

9   pressure was 140 over 80, correct?

10       A.    Yes.

11       Q.    And that would be a hypertensive blood

12   pressure reading?

13       A.    Probably, because his diastolic is 80,

14   which is normal.

15             MR. ELIAS:  Did you say "probably" or

16   "mildly"?  What did you say?

17             THE WITNESS:  Well, mildly.  I mean

18   140.  80 is diastolic so it's normal.

19   BY MR. REISSAUS:

20       Q.    He was asking for clarification because

21   of the way the transcription was showing on the

22   screen.

23       A.    Okay.

24       Q.    That result of 140 over 80 is 20 points

25   higher on the systolic pressure than the reading

1   from July of 2007 that's in your chart, correct?

2       A.   Yes, saying that on July of 2007 it was

3   normal after this visit that you had asked me to

4   review.

5            More importantly, as I said, no

6   physicians, three of them, treated him for

7   hypertension until January of 2012.  None of his

8   physicians treated him for hypertension until

9   January of 2012.

10      Q.   You would agree that untreated

11  hypertension increases the risk of stroke,

12  correct?

13      A.   It is a risk factor.

14      Q.   I will hand you what I've marked as

15  Exhibit 15 which is a June 20, 2007 record from

16  Dr. Walia, correct?

17      A.   Um-hum.

18           (Wagmeister Exhibit 15, Dennis

19           McWilliams Medical Record Dated

20           6/20/07 from Dr. Shaikh, was

21           marked for identification.)

22  BY MR. REISSAUS:

23      Q.   And the blood pressure at this visit

24  was 160 over 90?

25      A.   Correct.

1    Q.   And that's hypertensive, correct?

2    A.   At that date, yes.  Certainly it got

3  better the next time he saw Dr. Walia, of 120

4  over 80.  Single measurement did not show

5  consistent, uncontrolled high blood pressure.

6    Q.   How many blood pressure readings in a

7  row do you need before you would say somebody has

8  hypertension that you would feel needs to be

9  treated?

10    A.   I would leave that to his treating

11  physicians, internist.  He was seeing three

12  physicians and none of them determined that he

13  had high blood pressure that required medication

14  until January of 2012.

15         MR. REISSAUS:  I'm going to hand you

16  Exhibit 16.

17         THE WITNESS:  (Perusing.)

18         (Wagmeister Exhibit 16, Dennis

19         McWilliams Medical Record Dated

20         5/26/10 from Dr. Shaikh, was

21         marked for identification.)

22  BY MR. REISSAUS:

23    Q.   And let's start at the last page of

24  this one which is April 27, 2009.  They are in

25  reverse chronological order.

1    A.   Okay.

2    Q.   Do you see the last page?

3    A.   Yes.

4    Q.   And that's dated April 27, 2009?

5    A.   Yes.

6    Q.   That's Dr. Walia again?

7    A.   Yes.

8    Q.   And he measured a blood pressure of 140

9  over 100 at this visit, correct?

10    A.   Yes.

11    Q.   So this is another elevated blood

12  pressure observed by his oncologist, correct?

13    A.   Yes.

14    Q.   And he notes medical noncompliance

15  there.  Do you see that under the second section

16  of the document?

17    A.   Yes.  What does that mean?  I don't

18  know what he means.

19    Q.   So Dr. Walia testified about this

20  record and there's a note here in the

21  bottom-right that is difficult to read but Dr.

22  Walia referred Mr. McWilliams to go see his

23  primary medical doctor about hypertension.

24         MR. ELIAS:  Misstates, lacks

25  foundation.

1   BY MR. REISSAUS:

2        Q.    Were you aware of that?

3        A.    I probably have this in my records if I

4   have all of Dr. Walia's records.

5        Q.    You didn't note that Dr. Walia found

6   poor and nonmedical compliance in the 2009

7   timeframe with regard to getting care for his

8   blood pressure, did you?

9             MR. ELIAS:  Lacks foundation and

10  misstates the record.

11            THE WITNESS:  All I can say is none of

12  his doctors treated him for high blood pressure

13  until January of 2012, despite seeing all of

14  these physicians all of these years between 2007

15  and 2012.

16  BY MR. REISSAUS:

17       Q.    The next page is October 1, 2009 and at

18  that visit the blood pressure was measured twice,

19  right?

20       A.    Yes.

21       Q.    150 over 90 and 130 over 90, correct?

22       A.    Yes.

23       Q.    And again, it says poor medical

24  compliance?

25       A.    Yes.  Again, I don't know what he is

1  referring to.  Taking his chemotherapy

2  medication?  He's not taking any blood pressure

3  medication.  When you say compliance it typically

4  means someone has been prescribed medication

5  which they are not taking.  So I'm not sure what

6  it means by poor medical compliance.

7      Q.   So sitting here you don't recall Dr.

8  Walia testifying about these entries?

9      A.   I don't have his deposition.

10     Q.   And the record the second line from the

11  bottom again says, "Check BP with primary medical

12  doctor," do you see that?

13     A.   Yes.

14     Q.   So Dr. Walia again tried to get

15  Mr. McWilliams to go see another doctor for the

16  purpose of having his blood pressure evaluated?

17          MR. ELIAS:  Objection, misstates and

18  lacks foundation.

19          THE WITNESS:  Well, he did because he

20  has all these blood pressures done over all these

21  years.  So his doctors were taking these blood

22  pressures.

23  BY MR. REISSAUS:

24     Q.   Are you saying that this record here is

25  recording from Walia telling Mr. McWilliams to

1  have his blood pressure checked, or do you think

2  that he's actually getting a referral to get care

3  to control hypertension?

4      A.   Well, he didn't get his blood pressure

5  taken in some obscure clinic.  These are all

6  documented blood pressures in his treating

7  physicians' offices.  So I'm not sure what you

8  are asking.

9      Q.   I'm asking you on October 1, 2009, is

10  it your testimony that Dr. Walia was not

11  recommending that Mr. McWilliams get his blood

12  pressure taken care of by another doctor?

13      A.   I said nothing of the sort.  I said he

14  was getting his blood pressure checked because I

15  have all these documented entries.  I said

16  nothing of the sort.

17      Q.   And you are not saying that you believe

18  Dr. Walia thought that Mr. McWilliams didn't need

19  treatment for his blood pressure?

20      A.   He wanted him to get treated or

21  evaluated by his other doctors and those doctors

22  determined that he didn't need blood pressure

23  medication until January of 2012.

24      Q.   All right.  February 2, 2010 is the

25  next record.  Blood pressure is 140 over 100,

1    correct?

2         A.    Yes.

3         Q.    That's not in your chart, right?

4         A.    In my chart, no.  As I said in my

5    paragraph there were elevated blood pressures.  I

6    don't deny that he had elevated blood pressures.

7              What I'm saying is he also had all of

8    these normal ones that his doctors determined

9    were adequate to not require treatment.

10        Q.    Your report in the rebuttal report says

11   specifically, I'm quoting, "He," Mr. McWilliams,

12   "more often registered normal readings as I

13   documented in the below table."

14             Did you write that?

15             MR. ELIAS:  First of all, let me lodge

16   the objection.

17             That is a part of one sentence.  So he

18   just said that in his report that he noted that

19   he did at times have high blood pressure, which

20   is stated in that sentence, and you are trying to

21   pick out one little part that, for whatever

22   reason, so you are reading that out of context.

23   BY MR. REISSAUS:

24        Q.    Doctor, we will read the whole

25   sentence.

1      Doctor, did you write first, "While

2  Mr. McWilliams did at times record high blood

3  pressure, he more often registered normal

4  readings as I have documented in the below

5  table"?

6      A.   Correct.

7      Q.   So it's your opinion that

8  Mr. McWilliams had normal blood pressure readings

9  more often than high blood pressure readings?

10      A.   Well, what I go on to say -- you have

11  to read the entire paragraph.  You can't just

12  leave it obscure.

13      Q.   Are you saying that this sentence is

14  incorrect on its own?

15      A.   In my documentation, that's what I

16  found.

17      Q.   Did you keep a tally of the highs

18  versus the normals?

19      A.   I didn't keep a tally.  I just showed

20  throughout the years he would always have

21  restored normal blood pressures that did not

22  require treatment, as his doctors who treated him

23  did not prescribe treatment.

24      So they were his treating physicians.

25  I'm only documenting how they treated him.

1          And as I said, these measurements do

2    not demonstrate a consistent, uncontrolled high

3    blood pressure.  That's what I said with

4    reference to my table of normal blood pressures.

5    And I do recognize and say, even though at times

6    he did have readings above the normal range, his

7    purported high blood pressure was not

8    uncontrolled and did not require any medication

9    until January of 2012.

10          MR. REISSAUS:  Okay, I'm going to move

11    to strike again.

12          THE WITNESS:  You were asking me about

13    my paragraphs there.

14    BY MR. REISSAUS:

15      Q.    The question was did you keep a tally

16    of the highs versus the normals?

17      A.    No.

18      Q.    On February 2, 2010 --

19          MR. ELIAS:  Why do you keep moving to

20    strike, by the way?  You don't need to do that.

21    It's not necessary to do that.

22          MR. REISSAUS:  I'm marking for the

23    record where the responses are --

24          MR. ELIAS:  He's going to be at trial.

25          MR. REISSAUS:  I understand that.  If

1    he's not at trial, we're not hearing from Dr.

2    Wagmeister at all.

3    BY MR. REISSAUS:

4        Q.   Dr. Wagmeister, on February 2, 2010,

5    did Dr. Walia write, "Essential hypertension,

6    medical poor compliance"?

7        A.   Yes, that's what he wrote.

8        Q.   And you don't note this in either of

9    your reports, this episode of -- on multiple

10   occasions over many months, of Dr. Walia noting

11   poor medical compliance in the context of

12   elevated blood pressure readings?

13       A.   I'm not understanding what he's

14   referring to as medical noncompliance.  He wasn't

15   given medications that he wasn't taking.  He was

16   seeing his other physicians who were recording

17   these blood pressures.

18       Q.   And again, let's go through the first

19   page of this exhibit now.

20           This is May 26, 2010, correct?

21       A.   Yes.

22       Q.   Again, blood pressure elevated, 140

23   over 88, correct?

24       A.   Yes.

25       Q.   In this record he describes it as mild

1    hypertension, correct?

2        A.    Yes, in contradistinction to what your

3    expert purported as uncontrolled high blood

4    pressure.  So he's calling it mild hypertension,

5    yes.

6        Q.    And do you see "Interval History" right

7    here?

8        A.    Yes.

9        Q.    It says no hospitalizations or change

10   in medications.  He has not gone -- and of course

11   I can't read his handwriting now.  It says he has

12   not gone to see his primary medical doctor for BP

13   evaluation, correct?

14            MR. ELIAS:  Lacks foundation.

15            THE WITNESS:  That's what he's written,

16   yes.

17   BY MR. REISSAUS:

18       Q.    And you did not have the opportunity to

19   review Dr. Walia's deposition, is that right?

20       A.    Correct.

21       Q.    And it says here at the end, second

22   line from the bottom, "Again advised him to see

23   primary medical doctor for blood pressure,"

24   correct?

25       A.    Correct.

1    Q.   So these records we've just looked at

2    span more than a year in which Dr. Walia

3    recommends that's Mr. McWilliams go have his

4    blood pressure evaluated by his primary medical

5    doctor, correct?

6    A.   Correct, and subsequently there are six

7    other times after this office visit -- or seven

8    times -- with normal blood pressures.

9    Q.   And again during this year period, in

10   these records he did not go have an evaluation,

11   did he?

12        MR. ELIAS:   Objection, that misstates

13   and lacks foundation and that is an inaccurate

14   representation of the record.

15   BY MR. REISSAUS:

16   Q.   Do you know if Mr. McWilliams had an

17   evaluation for his hypertension between April of

18   2009 and May of 2010?

19   A.   That, I don't know, but what I do know

20   is when he did go to his primary care physician

21   or Dr. Shah, that they recorded normal blood

22   pressures and I guess evaluated him and did not

23   ascertain that he required medication for another

24   almost two years following this May 26, 2010

25   office visit.

1           They did not start medication until

2    January of 2012, since these blood pressure

3    readings on my table are normal.

4        Q.    After Mr. McWilliams was started on

5    Edarbi in January 2012, he didn't have uniformly

6    controlled hypertension, did he?

7        A.    No, he would have different readings.

8    But he had, as we see in this table, several

9    normal readings of controlled high blood pressure

10   during the year 2012 into early 2013.

11           MR. REISSAUS:   This is Exhibit 17,

12   progress note dated January 24, 2013.

13              THE WITNESS:   (Perusing.)

14              (Wagmeister Exhibit 17, Progress

15              Notes Dated 1/24/13, was marked

16              for identification.)

17   BY MR. REISSAUS:

18       Q.    There's two earlier

19   failed-to-keep-appointment notes from August of

20   2012, correct?

21       A.    What's the question?

22       Q.    Do you see this is a January 24, 2013

23   record, progress note?

24       A.    Correct.

25       Q.    And this records Mr. McWilliams' blood

1    pressure on this date, correct?

2         A.   Yes.

3         Q.   And this falls within the time range

4    that's included in your Table 1, correct?

5         A.   Yes.

6         Q.   And this was after Mr. McWilliams had

7    been told to start taking Edarbi, correct?

8         A.   Yes.

9         Q.   And at this visit they took his blood

10   pressure four times that they recorded, correct?

11        A.   They did sitting and standing.  I'm not

12   sure what the other word means, supine maybe.

13   Yes.

14        Q.   So they took his blood pressure

15   sitting, then lying down and then standing up,

16   correct?

17        A.   Yes.

18        Q.   So they did that four times and you

19   would agree, wouldn't you, that all of those

20   results were hypertensive?

21        A.   Elevated, yes.

22        Q.   And again, this was after he had been

23   told to start taking medications?

24        A.   And then he returned on April 24th and

25   his pressure was normal.

1    Q.   In your view, does a blood pressure of

2    130 over 80 not increase a patient's risk of

3    cardiovascular disease?

4         MR. ELIAS:  That question is confusing

5    because of the double negative.  I'll just lodge

6    the objection.

7    BY MR. REISSAUS:

8         Q.   You can answer.

9         A.   Pressures of 130 over 80 are now

10   considered normal, essentially.  So that would be

11   a good blood pressure for most of the general

12   population to be happy with and not increase the

13   risk for atherosclerotic disease.

14        Q.   So it's your opinion that a blood

15   pressure of 130 over 80 does not confer any

16   elevated increase of atherosclerosis compared to

17   a blood pressure that's lower?

18             MR. ELIAS:  Asked and answered.

19             THE WITNESS:  As I said, 130 over 80 is

20   considered normal.

21   BY MR. REISSAUS:

22        Q.   I'm asking you a different question.

23        A.    I don't know studies that talk about

24   gradations of blood pressure where females may

25   have blood pressures of 90 over 60, whether that

Page 125

1   confers a lower risk.

2           130 over 80, 120 over 80 is normal and

3   so that would be something that would not be

4   treated.  If somebody had a generally serial

5   blood pressures of 130 over 80, that person would

6   not be treated with any concern for developing

7   atherosclerotic disease.

8       Q.   I understand that you are talking about

9   what triggers clinical treatment.  I'm asking a

10  different question.

11          My question is does having a blood

12  pressure of 130 over 80, even though it is within

13  what you would call normal and would not trigger

14  medication treatment in your opinion, does that

15  confer a greater risk of atherosclerosis compared

16  to being, let's say, below 120 over 80?

17          MR. ELIAS:  He answered that question.

18  He answered that question.  You just asked it and

19  he just answered it directly.

20          This is going to take forever.  This is

21  extremely annoying.  You just asked that question

22  and he just answered it.

23          MR. REISSAUS:  I disagree with you.

24  BY MR. REISSAUS:

25      Q.   Doctor, please?

1      A.    If someone is considered to have normal

2    blood pressure it's my knowledge, estimation,

3    that that is not someone who is considered having

4    a risk factor for atherosclerosis.

5             MR. REISSAUS:  I'm going to hand you

6    Exhibit 18 which is a June 16, 2011 initial

7    office evaluation from Dr. Shaikh.

8             THE WITNESS:  (Perusing.)

9             (Wagmeister Exhibit 18, Initial

10            Office Evaluation Dated 6/16/11,

11            was marked for identification.)

12   BY MR. REISSAUS:

13      Q.    Is this a record that you considered?

14      A.    I believe so.

15      Q.    And under past medical history it notes

16   systemic arterial hypertension controlled with

17   medication, correct?

18      A.    That's what it says.

19      Q.    So that entry would be inconsistent

20   with your understanding that Mr. McWilliams did

21   not start any medication for hypertension until

22   January 2012?

23      A.    That's the way the records showed.  I

24   don't know any other record that has shown him

25   being on medication from Dr. Walia, Dr. Shah, Dr.

1    Shaikh.

2         Q.    But Dr. Shaikh is the author of this

3    particular record, correct?

4         A.    Right, and later on he said I'm going

5    to start him on high blood pressure medicine in

6    2012.  So I don't know how these two statements

7    conflict because lower down when he talks about

8    medications, he only lists Augmentin and Gleevec.

9         Q.    In the assessment section under the

10   second page, Section 2, it says "Borderline

11   hypertension controlled with medication,"

12   correct?

13        A.    Well, he doesn't state the medication

14   anywhere in his notes.

15        Q.    Again, this wouldn't be what Dr. Shaikh

16   had prescribed at this point because this was the

17   first visit with him, correct?

18        A.    Right, but when he asks him his history

19   and he puts down medication, only Augmentin and

20   Gleevec are offered or stated in the record.

21             And following up in his plan he says

22   nothing about continuing any medication or giving

23   him new medication for blood pressure control.

24             So I'm confused about the conflicting

25   statements or nonstatements in this office visit.

1    Q.   So this record raises the possibility

2  that he might have been treated with medication

3  earlier but you haven't seen any records that

4  confirm that?

5         MR. ELIAS:  Misstates, lacks

6  foundation.

7         THE WITNESS:  Well, I haven't seen any

8  records and Dr. Shaikh does not even discuss that

9  in his plan.

10         MR. REISSAUS:  If you don't mind, I'd

11  like to take a few minute break.

12         THE WITNESS:  Absolutely.

13         THE VIDEOGRAPHER:  Off the record, the

14  time is 5:48.

15         (Break taken.)

16         THE VIDEOGRAPHER:  Back on the record,

17  the time is 5:57.

18  BY MR. REISSAUS:

19    Q.   Doctor, have you in your clinical

20  practice prescribed statins to your patients?

21    A.   No, because I don't deal with vascular

22  issues.  Even when I was practicing, doing active

23  vascular surgery, I would recommend that and have

24  their primary care doctors obviously monitor and

25  prescribe the dose that they wanted them to be

1   on.

2      Q.   You used the term premature

3   atherosclerosis in describing Mr. McWilliams'

4   family history and you said there was no family

5   history of premature atherosclerosis?

6      A.   That I can see in the records.  As I

7   said, as we discussed earlier his mother suffered

8   some probably MI and had surgery in her -- maybe

9   she was 64 years old?  And his father, a similar

10  occurrence in that gentleman's eighties.

11     Q.   Are you aware of any literature saying

12  that -- strike that.

13          You define premature atherosclerosis as

14  atherosclerosis-related diseases manifesting

15  prior to 50 years old, correct?

16     A.   That's what I do and the literature

17  discusses that.

18     Q.   Are you aware of any literature that

19  says that a family history of atherosclerosis is

20  not associated with an increased risk for the

21  children -- let me start over.  I can tell by

22  your look it's not going to work.

23          Are you aware of any literature saying

24  that atherosclerosis that is not, quote-unquote,

25  "premature" within someone's family history means

1  that it's no longer a risk factor for

2  atherosclerosis?

3      A.   No.  I can say both his parents did

4  suffer at some point later in their life, in

5  their sixties and their eighties, cardiovascular

6  disease which was generally age appropriate.

7      Q.   So the fact that his parents -- strike

8  that.  I want to ask generally.

9          The presence of, as you put it,

10  age-appropriate atherosclerosis, is it your

11  opinion that age-appropriate atherosclerosis is

12  not a risk factor when it happens in someone's

13  family history?

14      A.   What does happen, you have families who

15  have premature cardiovascular disease.  Dad may

16  have a coronary bypass in his thirties, forties.

17  That usually increases the risk for their

18  subsequent generations, sons, daughters.

19          I've known several patients whose

20  father did have significant cardiac disease in

21  their thirties and forties and subsequently their

22  sons would be concerned and be monitored closely

23  and may also have developed subsequent

24  significant cardiac disease in the early age

25  onset.

1      Q.   I'm asking you to set aside the

2  premature part.

3      A.   Okay.

4      Q.   So when someone -- let's say if your

5  parents had cardiovascular disease at 65 years

6  old, would that have been a risk factor for you

7  to develop atherosclerosis and cardiovascular

8  disease?

9      A.   Yes, it would be mild.  It would be

10  something you would recognize.  But I would

11  expect that if I was going to develop it, I would

12  also develop it in my sixties or seventies and

13  follow it more closely.

14      Q.   And if you had more significant risk

15  factors for atherosclerosis than your parents,

16  you would expect that there's a greater chance

17  you would get atherosclerosis earlier as well?

18           MR. ELIAS:  That lacks foundation.

19  That misstates.

20           THE WITNESS:  I'm not agreeing to what

21  you stated.  I'm just saying that now you are

22  talking about a separate, other risk factors.  If

23  you are just talking about family history, I

24  would agree that if parents have atherosclerotic

25  disease in their sixties and seventies that there

1   is, as I call it, a more minor risk of the child

2   for developing such atherosclerosis as well.

3           Now what you are asking me or saying,

4   well, if that child has more significant risk

5   factors, would they have a greater or earlier

6   incidence of such disease.

7           Well, that has nothing to do with the

8   family history.  Now you are adding whatever risk

9   factors you want to add and then that may have

10  some increased risk for that child.

11          But that's separate from the absolute

12  risk of family history.

13  BY MR. REISSAUS:

14     Q.   Okay.  So where you have a parent

15  with -- strike that.

16          The more risk factors someone has, the

17  more likely they are to develop atherosclerosis

18  and to develop it earlier, correct?

19          MR. ELIAS:  Object to the form, that

20  lacks foundation.

21          THE WITNESS:  They may.  Risk factors

22  only carry the fact that certain diseases may

23  have risk factors more common in those disease

24  entities.

25          If you want to just take one risk

1   factor, let's say diabetics or smokers, all

2   diabetics and smokers do not develop

3   atherosclerosis and all patients with

4   atherosclerosis are not smokers or have diabetes.

5           So there's no direct provocation.  Risk

6   factors just mean in a certain population of a

7   disease entity, certain risk factors are more

8   prevalent.

9   BY MR. REISSAUS:

10      Q.   In your rebuttal report on page seven

11  you have a paragraph that starts with fourth and

12  it deals with smoking history.

13          And it's your opinion, isn't it, that

14  when someone discontinues smoking, their risk of

15  stroke decreases with time, correct?

16      A.   As your expert's own reference stated,

17  as stated in their own source material, any

18  discontinuation in smoking reduces the risk of

19  stroke.

20      Q.   I'm not asking you what anyone else has

21  said, I'm asking what your opinion is.

22          The next sentence says, "While the risk

23  reduction may increase over time, significant

24  risk reduction can be expected year after year"?

25      A.   Correct.

1      Q.   That means that there is still risk

2    associated with the history of smoking; it's just

3    that the level of risk gets lower the further

4    away you get from smoking, correct?

5      A.   Just like you stated, yes.

6           MR. REISSAUS:  I'm handing you what

7    I've marked as 19.

8           THE WITNESS:  (Perusing.)

9           (Wagmeister Exhibit 19, Article

10          Entitled Cigarette Consumption and

11          Risk of Coronary Heart Disease and

12          Stroke, was marked for

13          identification.)

14   BY MR. REISSAUS:

15     Q.   This is an article by Hackshaw and

16   others from the British Medical Journal.

17          Is this an article that you've seen

18   before?

19     A.   No.

20     Q.   The title of the article is, "Low

21   Cigarette Consumption and Risk of Coronary Heart

22   Disease and Stroke.  Metaanalysis of 141 cohort

23   studies and 55 study reports," correct?

24     A.   Yes.

25     Q.   And the objective was to use the

1   relation between cigarette consumption and

2   cardiovascular disease to quantify the risk of

3   coronary heart disease and stroke for light

4   smoking, one to five cigarettes a day.  Okay?

5        A.   Okay.

6        Q.   And then in the conclusions the authors

7   state, "Smoking only about one cigarette per day

8   carries a risk of developing coronary heart

9   disease and stroke much greater than expected;

10  about half that for people who smoke 20 per day.

11  No safe level of smoking exists for

12  cardiovascular disease."

13           Did I read that correctly?

14       A.   Yes.

15       Q.   Would you agree that there is no safe

16  level of smoking that exists for cardiovascular

17  disease?

18       A.   I don't know.  I don't know the study.

19  I haven't evaluated it nor am I an epidemiologist

20  to see what their statistical analysis is.  So

21  I'm only agreeing to what you are reading.

22       Q.   So you don't have an opinion

23  about -- well, do you have an opinion about low

24  level of cigarette consumption and the risk of

25  stroke?

1      A.    No.

2      Q.    And smoking was one of the entities

3  that you considered in your differential

4  diagnosis, correct?

5      A.    Correct.

6      Q.    And you ruled it out?

7      A.    I said it had some type of minor effect

8  but not in comparison to the usage of Tasigna,

9  T-A-S-I-G-N-A.

10         This study only shows either you smoke

11 or you don't smoke, I think, without looking at

12 the whole article.

13     Q.    So this was not something that you

14 considered in your opinion when you concluded

15 that smoking could not adequately explain the

16 atherosclerosis that Mr. McWilliams experienced,

17 correct?

18     A.    No, I considered smoking.  It's in my

19 report.

20     Q.    Sorry, this article was not something

21 that you considered --

22         MR. ELIAS:  He's already said he's

23 never seen the article.  He already said it.

24 Come on.  He already said it.

25         THE WITNESS:  I have never seen this

1  article before and it was not part of my

2  evaluation towards my opinion.

3  BY MR. REISSAUS:

4      Q.   When you spoke with Mr. McWilliams, you

5  took notes of that discussion.  You didn't take

6  any notes about his -- any current deficits

7  related to his stroke, did you?

8      A.   No.

9      Q.   You are not offering an opinion about

10 what impairment Mr. McWilliams may or may not

11 have today as a result of his stroke, are you?

12     A.   Correct.

13          MR. ELIAS:  His opinions are stated in

14 his report and rebuttal report.

15 BY MR. REISSAUS:

16     Q.   And is it correct that it's not your

17 opinion that Mr. McWilliams has peripheral

18 vascular disease?

19     A.   According to the last visit with Dr.

20 Loyola in October of 2017, Dr. Loyola documented

21 that he had normal palpable pulses and told the

22 patient that he does not have peripheral vascular

23 disease.

24     Q.   And you don't have a basis to disagree

25 with Dr. Loyola, correct, as you sit here today?

Page 138

1        A.    Correct.

2              MR. REISSAUS:  All right.  We are

3    getting kicked out of here so I will stop here.

4              MR. ELIAS:  Okay.  Off the record.

5    Thank you.

6              THE VIDEOGRAPHER:  This concludes

7    today's deposition.  We are off the record.  The

8    time is 6:12 p.m.

9              (Whereupon, the deposition was suspended

10             at 6:12 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            DECLARATION

2

3            I hereby declare I am the deponent in

4     the within matter; that I have read the foregoing

5     deposition and know the contents thereof, and I

6     declare that the same is true of my knowledge,

7     except as to the matters which are therein stated

8     upon my information or belief, and as to those

9     matters, I believe it to be true.

10           I declare under the penalties of perjury

11    of the State of California that the foregoing is

12    true and correct.

13    DATED this _____ day of _____, 2018,

14    at _____,_____.

15

16

17    _____

18        ROBERT WAGMEISTER, M.D.

19

20    SUBSCRIBED AND SWORN BEFORE ME

21    THIS _____ DAY OF _____, 2018.

22

23    _____

24    (Notary Public)   MY COMMISSION EXPIRES:_____

25

Page 140

1   STATE OF CALIFORNIA      )   SS

2   COUNTY OF LOS ANGELES    )

3           I, BRENDA R. COUNTZ, Certified Shorthand

4   Reporter No. 12563 for the State of California,

5   do hereby certify:

6           That prior to being examined, the

7   witness named in the foregoing deposition was

8   duly sworn to testify the truth, the whole truth,

9   and nothing but the truth;

10          That said deposition was taken down by

11  me in shorthand at the time and place therein

12  named and thereafter transcribed and that the

13  same is a true, correct, and complete transcript

14  of said proceedings.

15          Before completion of the deposition,

16  review of the transcript [X] was [  ] was not

17  requested.  If requested, any changes made by the

18  deponent during the period allowed are appended

19  hereto.

20          I further certify that I am not

21  interested in the outcome of the action.

22  Witness my hand this 26th day of April, 2018

23

24  _____

25          Brenda R. Countz, CSR No. 12563

Page 141

1   NAME OF CASE:

2   DATE OF DEPOSITION:

3   NAME OF WITNESS:

4

5          Reason Codes:

6          1.  To clarify the record.

7          2.  To conform to the facts.

8          3.  To correct transcription errors.

9

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24  Page _____ Line _____ Reason _____

25  From _____ to _____