UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

**Case No.: 2:17-cv-14302-ROSENBERG/MAYNARD**

Dennis McWilliams and
Lori McWilliams,

                    Plaintiffs,

vs.

Novartis AG, a Global Healthcare
Company; Novartis Pharmaceuticals
Corporation, a Delaware Corporation,

                    Defendants.

_____/

**DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATION'S MOTION FOR
<u>SUMMARY JUDGMENT WITH SUPPORTING MEMORANDUM OF LAW</u>**

# TABLE OF CONTENTS

REQUEST FOR HEARING...............................................................................................................iii

INTRODUCTION ...........................................................................................................................1

SUMMARY OF CASE.....................................................................................................................1

I.      CML AND ITS TREATMENT. .......................................................................................1

II.     MR. MCWILLIAMS' MEDICAL HISTORY. ...............................................................2

III.    RISK FACTORS FOR STROKE. ....................................................................................2

IV.     MEDICAL LITERATURE...............................................................................................3

V.      LABELING HISTORY. ....................................................................................................3

SUMMARY JUDGMENT STANDARD.........................................................................................5

ARGUMENT ...................................................................................................................................5

I.      PLAINTIFFS HAVE FAILED TO ESTABLISH A PRIMA FACIE
        CASE FOR THEIR FAILURE-TO-WARN CLAIMS.....................................................5

        A.      Plaintiffs Have No Evidence That Different Warnings Would Have
                Prevented Dr. Walia From Prescribing Tasigna® to Mr. McWilliams. ................6

        B.      Plaintiffs Cannot Offer Any Evidence That NPC's Warnings Were
                Inadequate or Untimely.........................................................................................7

        C.      Plaintiffs Cannot Establish That Mr. McWilliams' Use Of Tasigna®
                Caused Him To Suffer A Stroke. ..........................................................................7

II.     PLAINTIFFS' STATE LAW FAILURE-TO-WARN CLAIMS ARE
        BARRED BY PRINCIPLES OF PREEMPTION. ...........................................................8

        A.      Plaintiffs' State Law Claim That NPC Should Have Updated Tasigna®'s
                Label By Adding A Boxed Warning Is Preempted. ..............................................8

        B.      There Is Clear Evidence That FDA Would Have Rejected Language Warning
                Of Risk Of Stroke In A Boxed Warning, The Warnings And Precautions
                Section, Or A Dear Health Care Provider Letter Before January 2014 If
                Proposed By NPC. .............................................................................................10

III.    PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES UNDER
        NEW JERSEY LAW OR, IN THE ALTERNATIVE, UNDER FLORIDA
        LAW, SHOULD THE COURT FIND THAT FLORIDA LAW APPLIES....................13

IV.     BECAUSE NPC IS ENTITLED TO SUMMARY JUDGMENT ON
        PLAINTIFFS' FAILURE TO WARN CLAIMS, PLAINTIFFS' DERIVATIVE
        CLAIMS FOR LOSS OF CONSORTIUM AND PUNITIVE DAMAGES ALSO
        FAIL.................................................................................................................. 16

CONCLUSION.........................................................................................................17

**<u>REQUEST FOR HEARING</u>**

Pursuant to Local Rule 7.1(b)(2), NPC hereby requests oral argument on NPC's Motion for Summary Judgment. Oral argument will afford the Court the opportunity to become more familiar with the facts and issues presented in this case and to hear directly from counsel regarding any questions the Court may have. Oral argument will further streamline the Court's consideration of NPC's Motion and allow for a more efficient resolution of the issues raised therein.

NPC proposes a full day hearing for oral argument and evidentiary hearings on this and NPC's concurrently filed pre-trial motions.

## INTRODUCTION

Novartis Pharmaceuticals Corporation ("NPC") moves for summary judgment on all claims asserted by Plaintiffs Dennis and Lori McWilliams. Plaintiffs allege that Tasigna®, a standard-of-care medication used to treat patients with chronic myeloid leukemia ("CML"), caused Mr. McWilliams to suffer a stroke. Plaintiffs assert strict liability and negligence claims based on a failure-to-warn theory, and seek punitive damages. Mrs. McWilliams alleges a subsidiary loss of consortium claim. NPC is entitled to summary judgment on all of these claims. Plaintiffs' failure-to-warn claim fails because they cannot prove (a) that a different warning would have changed the prescribing physician's decision to prescribe Tasigna® to Mr. McWilliams; (b) that NPC's warnings for stroke were inadequate, and (c) that Tasigna® caused Mr. McWilliams to suffer a stroke. Plaintiffs' state law failure-to-warn claims also are preempted. Plaintiffs are not entitled to punitive damages because punitive damages are precluded under applicable law. Mrs. McWilliams' loss of consortium claim must fail as well, as it is derivative of plaintiffs' strict liability and negligence causes of action.

## SUMMARY OF CASE

### I.    CML AND ITS TREATMENT.

CML is a rare cancer of the blood. NPC's Statement of Material Facts ("SMF") ¶1. Patients with CML usually have a genetic mutation, known as the Philadelphia chromosome (Ph), which causes production of the mutant "BCR-ABL" protein. SMF ¶2. The BCR-ABL protein prompts white blood cells to proliferate uncontrollably. SMF ¶3. In 2001, NPC's Gleevec® (imatinib) was approved for commercial use in Philadelphia positive CML (Ph+ CML) patients. SMF ¶4. Gleevec®, the first in a new class of CML medications called tyrosine kinase inhibitors (TKIs), and other TKIs work by specifically targeting and inhibiting the BCR-ABL protein. SMF ¶5. Survival rates of patients with Ph+ CML improved dramatically with the introduction of Gleevec®. SMF ¶6.

The U.S. Food and Drug Administration (FDA) first approved NPC's Tasigna® (nilotinib), another TKI medicine, in October 2007 for patients who became resistant or intolerant to Gleevec®. SMF ¶7. In 2010, Tasigna® was approved to treat patients with newly diagnosed with CML. SMF ¶8. Plaintiffs' expert witness and hematologist, Dr. Mark Weiss, agrees that Tasigna® has a "superior antileukemic effect" to Gleevec®. SMF ¶9.

1

## II.    MR. MCWILLIAMS' MEDICAL HISTORY.

In June 2007, McWilliams was diagnosed with Ph+ CML. SMF ¶10. Dr. Sanjiv Walia, McWilliams' oncologist, prescribed Gleevec® that same month. SMF ¶11. Dr. Walia's treatment goal for his CML patients is for them to obtain an undetectable BCR-ABL result – what he calls a "true remission." SMF ¶12. McWilliams' CML initially responded to Gleevec®. SMF ¶13. In May 2011, Dr. Walia ordered a quantitative Polymerase Chain Reaction (qPCR) test that determines with greater precision BCR-ABL levels. SMF ¶14. This initial qPCR test revealed an abnormal BCR-ABL level of .779. SMF ¶15. Mr. This abnormal result indicated that, even on high dose Gleevec®, McWilliams was not obtaining optimal results on Gleevec® therapy. *Id*. Dr. Walia switched McWilliams to Tasigna® in June 2011 to try to bring his BCR-ABL scores down to an undetectable level. SMF ¶16. While on Tasigna®, McWilliams' BCR-ABL level reached "non-detect." *Id.*

McWilliams suffered a stroke on August 25, 2013. SMF ¶17. Dr. Walia continued to prescribe Tasigna® therapy to McWilliams after his stroke, despite the recommendation of McWilliams' treating neurologist that he discontinue Tasigna® therapy because of the "increased risk of atherosclerotic disease" in patients treated with Tasigna®. SMF ¶27. Dr. Walia was insistent, however, that McWilliams continue treatment with Tasigna®. *Id*. Dr. Walia eventually switched McWilliams' CML medication to Sprycel in December 2013, after McWilliams obtained a second opinion. SMF ¶28. Sprycel, however, caused McWilliams to suffer multiple pleural effusions for which he was hospitalized three times. SMF ¶29.

McWilliams has had a complete recovery from his stroke. SMF ¶18.

## III.    RISK FACTORS FOR STROKE.

Cardiovascular disease ("CVD"), which includes cerebrovascular events, *e.g.*, stroke, has accounted for more deaths than any other major cause of death in the U.S. for nearly a century, and afflicts more than one third of American adults. SMF ¶30. Numerous risk factors contribute to CVD, including family history, smoking, obesity, hypertension, and hyperlipidemia. SMF ¶31. Having one major risk factor increases the lifetime risk for CVD from 1.4% to 39.6% for men, while having two or more risk factors further increase the lifetime risk for men to 49.5%. SMF ¶32. McWilliams had several major risk factors for stroke, including a decades-long history of smoking, hypertension, obesity, a significant family history of coronary artery disease and stroke, and hyperlipidemia. SMF ¶33.

## IV.     MEDICAL LITERATURE.

There were no scientific publications in the public literature that evaluated cases of stroke in patients treated with Tasigna® when Dr. Walia prescribed Tasigna® therapy to McWilliams in June 2011. SMF ¶34. Two letters to the editor published in March 2013 reported the first cases of stroke associated with Tasigna® treatment. SMF ¶35.  Each letter reported on *one* patient treated with Tasigna® who experienced a cerebrovascular event. SMF ¶36.

## V.     LABELING HISTORY.

Tasigna® therapy was approved initially by FDA on an accelerated basis, prior to completion of a Phase III study. SMF ¶38. Tasigna® received this "accelerated approval" pursuant to a federal regulation that allows a medication to be approved if it "addresses . . . high unmet medical need" and if there is "adequate evidence of safety and efficacy for the product". SMF ¶39. As part of the accelerated approval process, FDA required NPC to provide, on an annual basis, updated safety and efficacy data from ongoing Tasigna® studies. SMF ¶40. These annual updates were in addition to periodic safety reporting that NPC is required to submit yearly to FDA summarizing post-market data regarding Tasigna® therapy. SMF ¶41.

NPC identified a "weak signal" for a different adverse event, peripheral arterial occlusive disease (PAOD), in patients treated with Tasigna® in 2010. SMF ¶42. In July 2011, as part of its annual review of the Tasigna® label, NPC proposed to FDA adding PAOD to Tasigna®'s Medication Guide for patients and to the Adverse Reaction section of the label (Section 6.2). SMF ¶43. A memorandum issued by FDA on October 10, 2011 found that Tasigna® "does not markedly increase the risk of PAOD" and that "the addition of peripheral arterial occlusive disease to Section 6.2 . . . is acceptable." SMF ¶44. On October 13, 2011, FDA rejected NPC's proposal to add PAOD to the Medication Guide because PAOD was not included in the Warnings and Precautions section of the label (Section 5). SMF ¶45. In November 2011, FDA approved NPC's proposal to add PAOD to Section 6.2. SMF ¶46. In December 2012, FDA approved NPC's request to add "Arteriosclerosis" as an uncommon event to the "Vascular disorders" section of Section 6.2 of the label. SMF ¶47.

NPC informed the FDA in March 2013 that the Canadian government had required revisions to the Canadian Product Monograph in August 2012 to include information regarding cerebrovascular events observed in NPC's clinical trials. SMF ¶¶48. In April 2013, NPC notified

FDA that the Canadian government was requiring that letters be sent to health care providers that month informing them of these changes to the Canadian Product Monograph. SMF ¶49.

On September 27, 2013, NPC submitted a "Type C Meeting Request" to FDA "to seek Agency advice on the Novartis currently planned or ongoing investigations to elucidate cardiovascular adverse events (CVE) such as ischemic heart disease (IHD), cerebrovascular events (CRE) and peripheral arterial occlusive disease (PAO) occurring in patients receiving nilotinib therapy." SMF ¶50. NPC requested the meeting to discuss future label changes based on such investigations. SMF ¶51. On October 25, 2013, FDA asked that NPC add "vascular occlusive events," but not cerebrovascular events specifically, to the Tasigna® label in the Warnings and Precautions section. SMF ¶52.

On December 30, 2013, FDA released a "Post-Market Safety Summary" for Tasigna® evaluating the adverse drug reaction reports received for Tasigna® since approval of the drug by FDA on October 29, 2007. SMF ¶56. In that analysis, the FDA reviewed all available post-marketing data, including adverse events in the FDA Adverse Event Report System (FAERS), drug usage data, a literature review, a medication error analysis, and a discussion of postmarket clinical trial findings. SMF ¶57. FDA concluded, "This information will be considered in the context of the 48-month assessment of the clinical trial data to inform [Division of Hematology Product]'s decision on addition of this risk to the nilotinib label." SMF ¶57. The FDA publicly reported the results of the Post-Market Safety Summary in January 2014, stating that FDA was "evaluating" adverse event reports of cerebrovascular accidents (CVA) "to determine if any regulatory action is required." SMF ¶58.

In January 2014, the FDA approved the addition of a new Warnings and Precautions section, Section 5.4, Cardiac and Vascular Events. SMF ¶60. This section included data on the incidence of PAOD, ischemic cerebrovascular events, and ischemic heart disease-related events in patients receiving Tasigna® in NPC's clinical trial, ENESTnd.[1] *Id.* The January 2014 label reported the low incidence of ischemic cerebrovascular events *after four years of follow-up* in the ENESTnd study: 1.1% and 1.8% in the nilotinib 300 mg and 400 mg twice per day arms, and 0.7% in the imatinib arm.[2] SMF ¶62. In February 2014, NPC asked FDA to confirm that a Dear Health Care

---

[1] ENESTnd stands for Evaluating Nilotinib Efficacy and Safety Trial–Newly Diagnosed. SMF ¶61.

[2] Stroke and transient ischemic attack incidence *per year* in the general population ages 45-74 is 0.24 to 1.62 percent. SMF ¶63. This corresponds to an incidence of 0.96 to 6.48 percent *after four*

Provider (DHCP) letter was not needed regarding the January 2014 label change and FDA responded "we did not request a DHCP letter … so you do not need to submit one." SMF ¶64. To date, FDA has not requested that a DHCP letter be sent warning doctors of the risk of stroke, or any other cardiovascular adverse event. SMF ¶65.

## SUMMARY JUDGMENT STANDARD

District courts are required to grant summary judgment when "there is no genuine issue as to any material fact and . . . the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules [of Civil Procedure]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Although the opposing party is entitled to have the facts construed in their favor, they cannot rest on their pleadings' allegations, Rule 56(e), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). When deciding such motions, courts cannot consider inadmissible evidence. Furthermore, courts must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which a jury could reasonably find for the plaintiffs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a defendant's summary judgment motion. *Id.* at 252.

## ARGUMENT

## I.    PLAINTIFFS HAVE FAILED TO ESTABLISH A PRIMA FACIE CASE FOR THEIR FAILURE-TO-WARN CLAIMS.

As part of their strict liability and negligence causes of action, plaintiffs allege that NPC failed to warn of the risk of stroke. Under Florida law, "[s]trict liability and negligent failure to warn cases boil down to three elements that Plaintiff must prove: (1) that the warnings accompanying the item were inadequate; (2) that the inadequacy of the warnings proximately caused Plaintiff's injury; and (3) that Plaintiff in fact suffered an injury by using the product." *Colville v. Pharmacia & Upjohn Co.*, 565 F. Supp. 2d 1314, 1320 (N.D. Fla. 2008). Plaintiffs lack the evidence to sustain any of these elements.

---

*years.* The incidence rates after four years in ENESTnd for the nilotinib arms fall within this range.

### A.   Plaintiffs Have No Evidence That Different Warnings Would Have Prevented Dr. Walia From Prescribing Tasigna® to Mr. McWilliams.

Plaintiffs cannot meet their burden of establishing that any alleged inadequacy was the proximate cause of McWilliams' injury. *See Colville*, 565 F. Supp. 2d at 1321. "In Florida, a prescription drug manufacturer fulfills its duty to warn when it provides adequate warnings to a physician, rather than directly to the consumer." *Hosler v. Alcon Labs., Inc.*, No. 12-60025-CIV, 2012 WL 4792983, at *9 (S.D. Fla. Oct. 9, 2012). Proximate cause is *not* presumed, even when a warning is deemed to be inadequate; instead, the plaintiff must show that "the physician would not have used the [drug] in question if he or she had been warned by the manufacturer of its risks." *Edgar v. Danek Med., Inc.*, No. 96-2451-CIV-T-24A, 1999 WL 1054864, at *6 (M.D. Fla. Mar. 31, 1999) (applying Florida law); *see also Cubbage v. Novartis Pharm. Corp.*, No. 5:16-CV-129-OC-30PRL, 2016 WL 3595747, at *5 (M.D. Fla. July 5, 2016) ("[C]ausation must be demonstrated by establishing that a treating physician would not have prescribed or would have recommended that the patient cease taking the drug if a different, adequate warning had been provided."). In other words, McWilliams must provide evidence that *his* prescribing physician would have not prescribed Tasigna® or would have recommended that McWilliams stop taking Tasigna® if a different warning regarding the risk of stroke had been provided.

Plaintiffs can point to no evidence that Dr. Walia would not have prescribed Tasigna® to McWilliams in June 2011 if a different warning regarding stroke had been given. Dr. Walia testified he conducts an assessment of the benefits and risks of medications when prescribing. SMF ¶19. Dr. Walia further testified that he prescribed Tasigna® to McWilliams in 2011 because Tasigna® had a better benefits profile, *i.e.* was more efficacious in treating CML, than Sprycel, the only other TKI approved by the FDA for use after Gleevec® at the time. SMF¶22. Dr. Walia even continued to prescribe Tasigna® therapy to McWilliams after his stroke, despite the recommendation of McWilliams' treating neurologist, Dr. Maraist, that Tasigna® therapy be discontinued. SMF ¶27.

Dr. Walia continues to prescribe Tasigna® to his patients today, despite the availability of more data on the product labeling regarding the risk of stroke than was available in 2011, and the presence of language in the Warnings and Precautions section of the Tasigna® label regarding the risk of stroke. SMF ¶23. In fact, Dr. Walia prescribes Tasigna® to patients who, like McWilliams, have risk factors for stroke, such as hypertension and obesity, and who have mild atherosclerosis. SMF ¶¶24, 31, 33. Dr. Walia testified that he would still consider prescribing Tasigna® for a

6

patient, like McWilliams, who became resistant or intolerant to Gleevec® today. SMF ¶¶15, 25-26. In no instance has he told a patient currently taking Tasigna® to discontinue Tasigna® therapy. SMF ¶26. In other words, Dr. Walia's ultimate decision whether or not to prescribe Tasigna® has remained the same, even with more information regarding the association between stroke and Tasigna® readily available in the scientific literature and on the label. *See* SMF ¶¶23-26. Plaintiffs can offer no evidence that Dr. Walia would not have prescribed Tasigna® if different warnings had been given.

### B. Plaintiffs Cannot Offer Any Evidence That NPC's Warnings Were Inadequate or Untimely.

Plaintiffs cannot prove that NPC had a duty to warn of stroke associated with Tasigna® use at any time from June 2011 through December 2013. To establish strict liability for failure to warn under Florida law, the particular risk inherent in the product must have been "known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution." *See Wolicki-Gables v. Arrow Int'l, Inc.*, 641 F. Supp. 2d 1270, 1286 (M.D. Fla. 2009), *aff'd*, 634 F.3d 1296 (11th Cir. 2011); *see also Small v. Amgen, Inc.*, 134 F. Supp. 3d 1358, 1366–67 (M.D. Fla. 2015), *aff'd*, No. 17-11440, 2018 WL 501354 (11th Cir. Jan. 22, 2018). Plaintiffs can provide no evidence that the risk of stroke was "known or knowable" to NPC "in light of the generally recognized and prevailing best scientific and medical knowledge available" during the June 2011 through December 2013 time period. No articles were available in June 2011, and there were no published reports of patients treated with Tasigna® experiencing strokes until the publication in March 2013 of two letters reporting on one patient each. SMF ¶¶34-36. Even in December 2013, FDA concluded that further evaluation of the clinical trial data was needed before it could take regulatory action to update the Tasigna® label regarding stroke. SMF ¶¶ 56-58. Plaintiffs' expert witness Dr. Blume in fact concedes that more cerebrovascular adverse events (AEs) were reported in FDA's adverse event database in patients receiving imatinib than in patients treated with nilotinib in 2010, SMF ¶37, and the rates of cerebrovascular AEs for the other years analyzed by Dr. Blume (2008-09 and 2011-13) are comparable. *Id*.

### C. Plaintiffs Cannot Establish That Mr. McWilliams' Use Of Tasigna® Caused Him To Suffer A Stroke.

Plaintiffs bear the burden of offering admissible expert testimony to prove both general and specific medical causation. *See Haller v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271,

1275 (M.D. Fla. 2009) ("In order to establish medical causation in a toxic tort case such as this one, a plaintiff must show both that exposure to the alleged toxic substance can cause a particular disease (general causation), and that exposure to the alleged toxic substance was a cause of his or her individual injury (specific causation)."); *Guinn v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1239, 1242 (M.D. Fla. 2009) (granting summary judgment under Florida law when plaintiff failed to present evidence that drug "was the specific cause of her injury"), *aff'd*, 602 F.3d 1245 (11th Cir. 2010). Such evidence *must* come in the form of expert testimony. *Guinn*, 598 F. Supp. 2d at 1243 n.25; *see also Marking v. Novartis Pharm. Corp.*, No. 00-9108-CV, 2002 WL 32255405, at *3 (S.D. Fla. 2002).

NPC has moved to exclude plaintiffs' designated medical causation experts' testimony under Rule 703 and *Daubert*. If the Court excludes the specific causation opinion of Dr. Wagmeister, NPC is entitled to summary judgment because plaintiffs will have no admissible expert testimony to meet their burden to prove that Tasigna® caused McWilliams' stroke. If the Court excludes the general causation opinions of plaintiffs' retained experts, Drs. Singh and Weiss, NPC is also entitled to summary judgment. *See* NPC's contemporaneously filed *Daubert* motions.

## II.     PLAINTIFFS' STATE LAW FAILURE-TO-WARN CLAIMS ARE BARRED BY PRINCIPLES OF PREEMPTION.

### A.     Plaintiffs' State Law Claim That NPC Should Have Updated Tasigna®'s Label By Adding A Boxed Warning Is Preempted.

In *PLIVA, Inc. v. Mensing*, the Supreme Court rejected the plaintiffs' argument that a generic drug manufacturer could have strengthened its labeling by proposing stronger warnings to FDA because the private party could not do "*independently* . . . under federal law what state law requires of it." 131 S. Ct. 2567, 2579-81 (2011). In *Mutual Pharmaceutical Co. v. Bartlett*, the Supreme Court held that a plaintiff cannot argue that a brand-name drug manufacturer should have unilaterally changed its labeling where the drug manufacturer is prohibited from making those changes absent prior FDA approval. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 477 (2013). Pursuant to Section 201.57(c)(1) of Title 21 of the Code of Federal Regulations, FDA may require "[c]ertain contraindications or serious warnings, particularly those that may lead to death or serious injury, . . . to be presented in a box." The boxed warning is "the strongest warning available" and FDA therefore exercises "restraint in requiring warnings to be boxed because overuse of the box will ultimately lead to reducing its effect." *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 817 F. Supp. 2d 535, 538 (E.D. Pa. 2011); *see also* 51 Fed. Reg. 43900-01, 43902 (Dec. 5,

1986) ("[t]he intent of the box is to draw special attention to the warning"). FDA regulations prohibit NPC from including a boxed warning without FDA's prior approval. 44 Fed. Reg. 37434, 37448 (June 26, 1979) (manufacturer may not include a boxed warning without prior FDA approval; "they are permitted only when specifically required by the FDA"). NPC is prohibited from adding a boxed warning to the Tasigna® label. Accordingly, plaintiffs' claims that NPC should have done so unilaterally are preempted.

"Under FDA regulations, to change labeling (except for editorial and other minor revisions), the sponsor must submit a supplemental application fully explaining the basis for the change. The FDA permits two kinds of labeling supplements: (1) Prior approval supplements, which require FDA approval before a change is made; and (2) 'changes being effected' (CBE) supplements, which may be implemented before FDA approval, but after FDA notification." *See* Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 Fed. Reg. 3922-01 (internal citations omitted).[3] The CBE process can only be used to "add or strengthen a contraindication, warning, precaution, or adverse reaction," not a boxed warning. *See* 21 C.F.R. § 314.70(c)(iii)(A); *see also Dopson-Troutt v. Novartis Pharm. Corp.*, 975 F. Supp. 2d 1209, 1219 (M.D. Fla. 2013) (plaintiffs failed to "rebut NPC's contention that the FDA regulations prohibit NPC from adding a black box warning unless the FDA specifically requests that one be added.").[4] FDA retains exclusive control over whether and when a boxed warning may be added to a label.[5] Any claim that NPC should have added a boxed warning to comply with state law due to warn is thus preempted.

---

[3] Even under the CBE process, FDA must still be notified of the labeling change. "FDA reviews all such submission[s] and may later deny approval of the supplement, and the labeling remains subject to enforcement action if the added information makes the labeling false or misleading under section 502(a) of the act (21 U.S.C. 352)." 71 Fed. Reg. 3922-01.

[4] Courts have held that plaintiffs' claims that manufacturers could have altered an existing boxed warning are preempted. *See Amos v. Biogen Idec Inc.*, 249 F. Supp. 3d 690, 699 (W.D.N.Y. 2017) (Plaintiffs' claims preempted where "the FDA-approved labeling included a black box warning" and plaintiffs "have not proffered any explanation how defendants could have lawfully modified the black box warning absent approval from the FDA.") (citation omitted).

[5] There is no scientific or regulatory standard by which manufacturers can properly assess whether an adverse event should be made a boxed warning. *Compare* 201.57(c)(6) (additions to Warnings & Precautions section (section 5) require "reasonable evidence of a causal association with a drug") *with* 201.57(c)(1) (boxed warning "may be required by the FDA" and must be based on

**B.      There Is Clear Evidence That FDA Would Have Rejected Language
         Warning Of Risk Of Stroke In A Boxed Warning, The Warnings And
         Precautions Section, Or A Dear Health Care Provider Letter Before January
         2014 If Proposed By NPC.**

Even if this Court finds that plaintiffs' failure-to-warn claim is not preempted pursuant to
*Mensing*, *Barlett*, or *Buckman*, plaintiffs' claim is nevertheless preempted under the Supreme
Court's holding in *Wyeth v. Levine*, 555 U.S. 555 (2009). In *Levine*, the U.S. Supreme Court
established that state law failure-to-warn claims against a prescription drug manufacturer are
preempted when "clear evidence" exists that FDA would have rejected plaintiffs' alleged
"adequate" warning. *Id.* at 571.

In this case, clear evidence exists that FDA would have rejected a boxed warning for stroke,
had one been proposed by NPC. On October 31, 2013, FDA requested that the manufacturer
ARIAD suspend marketing of its TKI medicine, Iclusig (ponatinib), because of cardiovascular and
arterial adverse events. SMF ¶54. During its subsequent safety review of Iclusig, FDA found that
"similar rates of serious vascular events have not been observed in several other drugs of this
class," and, in December 2013, revised the boxed warning for Iclusig. SMF ¶55. If FDA had
wanted to add a boxed warning for Tasigna®, it could have done so at the same time that it updated
the Iclusig label. FDA could have also required—but did not—a boxed warning for stroke in
January 2014, following the addition of Cardiac and Vascular Events to the Warnings and
Precautions section of the Tasigna® label. FDA has never approved or required a boxed warning
for stroke or for any other atherosclerotic event associated with Tasigna®. SMF ¶65. FDA's
decision not to add a boxed warning for stroke to the Tasigna® label, in January 2014, and even
today, is clear evidence that FDA would not have approved a boxed warning if proposed by NPC.

Clear evidence exists that FDA would not have approved a DHCP letter had NPC proposed
sending one to warn of the risk of stroke.[6] "[A] DHCP letter is used to notify health care providers
about important new or updated information about a drug. In most cases, the information relates
to an important safety concern . . . ." *See* Guidance for Industry and FDA Staff, "Dear Health Care

---

clinical data or, if clinical data is unavailable, "serious animal toxicity"; no standard for what level
of data warrants a boxed warning is provided).

[6] A DHCP letter is also referred to as a Dear Doctor Letter (DDL) and is part of the FDA-approved
labeling. *See Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 581 (6th Cir. 2013) (citation omitted) ("The
FDA construes 'labeling' broadly, to include . . . communications with physicians . . . containing
additional warnings ('Dear Doctor' letters)").

Provider Letters: Improving Communication of Important Safety Information" (Jan. 2014) at 3 at https://www.fda.gov/downloads/drugs/guidances/ucm233769.pdf. There is no evidence that FDA asked NPC to send a DHCP letter regarding the risk of stroke in April 2013, even after NPC informed FDA that the Canadian government had requested it send such a letter summarizing recent changes to the Product Monograph, which included information regarding cerebrovascular events. SMF ¶¶48-49, 65. FDA also did not require NPC to send a DHCP letter regarding the risk of stroke in January 2014, following FDA's approval of revisions to the Tasigna® label to add Cardiac and Vascular Events, such as stroke, to the Warnings and Precautions section. SMF ¶60, 62, 64-65. When NPC asked FDA to confirm that a DHCP letter was not needed, FDA wrote back "we did not request a DHCP letter . . . so you do not need to submit one." SMF ¶64. To date, FDA has not requested that a DHCP letter be sent warning doctors of the risk of stroke, or any other cardiovascular adverse event associated with Tasigna®. SMF ¶65. These facts are clear evidence that FDA would have rejected a proposal by NPC to send a DHCP letter during the relevant time period of June 2011 through December 2013.

Clear evidence exists that FDA would not have approved the addition of stroke to the Warnings and Precautions section of the Tasigna® label at any point from June 2011 through December 2013. Courts have found failure-to-warn claims preempted when the regulatory history shows FDA actively reviewed the available information on the alleged safety risk and concluded a warning was not yet warranted. *See, e.g., Seufert v. Merck Sharp & Dohme Corp.*, 187. F. Supp. 3d 1163, 1165 (S.D. Cal. May 11, 2016) (finding plaintiff's claims preempted when, after targeted review, "FDA has concluded that evidence of a causal relationship between [the drug class] and [the safety issue] is indeterminate, unsupported by current data, and inconclusive"); *Rheinfrank v. Abbott Labs., Inc.*, 119 F. Supp. 3d 749, 766-67 (S.D. Ohio 2015) (finding preemption where FDA rejected a warning on specific issue "based on the then available scientific evidence"); *Dobbs v. Wyeth Pharm.*, 797 F. Supp. 2d 1264, 1273 (W.D. Okla. 2011) (holding claims preempted where FDA "continued to find no scientific evidence of a causal connection" between drug class and alleged risk "warranting an enhanced warning"). Here, NPC proposed adding PAOD to the Medication Guide and to the Adverse Reaction section of the label on July 15, 2011, after identifying PAOD as a weak signal. SMF ¶¶42-43. FDA requested that the language regarding PAOD be deleted from the Medication Guide on October 13, 2011, advising that PAOD should

only be included in the Medication Guide if it was also in the Warnings and Precautions section.[7] SMF ¶45. An FDA memorandum issued on October 10, 2011, just three days prior to FDA's rejection of NPC's proposed addition of PAOD to the Medication Guide, found, however, that Tasigna® "does not markedly increase the risk of PAOD," and that "the addition of peripheral arterial occlusive disease to Section 6.2," regarding clinical trials, "is acceptable." SMF ¶44. That FDA did not suggest PAOD be added to the Warnings and Precautions section of the label is clear evidence that FDA would not have approved a Warnings and Precautions for stroke, an adverse event for which even less data was available, had NPC proposed one prior to June 2011 when Dr. Walia first prescribed Tasigna® to McWilliams. FDA also did not request that stroke be added to the Warnings and Precautions section in March 2013 when NPC informed FDA that Canadian regulators had requested that the Product Monograph include a warning about cerebrovascular events reported in NPC's clinical trial. *See* SMF ¶¶48-49, 52.

When FDA did reach out to NPC about updating the Warnings and Precautions section of the Tasigna® label on October 25, 2013, FDA requested that NPC propose language to warn of the risk of vascular occlusive events generally, not stroke specifically. SMF ¶52. FDA's proposal to add vascular occlusive events came after NPC's September 27, 2013 request for a Type C meeting with FDA, in which NPC sought advice on possible revisions to the Tasigna® label based on proposed and ongoing investigations into cardiovascular adverse events, including cerebrovascular events, in patients treated with Tasigna®. SMF ¶¶50-52. That FDA proposed adding vascular occlusive events – but did not mention cerebrovascular events – to the Tasigna® label on October 25, 2013, even in light of NPC's Type C meeting request, is clear evidence that FDA would not have approved a Warnings and Precautions for stroke in October 2013.[8]

On December 30, 2013, FDA released a "Post-Market Safety Summary" consisting of an "analysis of the adverse drug reaction reports received" for Tasigna® since FDA's approval of

---

[7] Under federal law, an adverse event may be added to the Warning and Precautions section only if there is "reasonable evidence of a causal association with a drug." 201.57(c)(6); *see also Rheinfrank v. Abbott Labs., Inc.*, 119 F. Supp. 3d 749, 769 (S.D. Ohio 2015), *aff'd*, 680 F. App'x 369 (6th Cir. 2017) ("It is technically a violation of federal law to propose a CBE that is not based on reasonable evidence.") (citing to 18 U.S.C. § 1001).

[8] FDA's Project Manager informed NPC on October 25, 2013: "I don't think [FDA] will take an action on [updating the label] *until January* [2014]." SMF ¶53 (emphasis added). This is further evidence that FDA would not have approved a Warnings and Precautions for stroke at this time.

Tasigna® on October 29, 2007. SMF ¶56. FDA concluded, after reviewing all available data regarding cerebrovascular accidents in patients treated with Tasigna® that, "This information will be considered in the context of the 48-month assessment of the clinical trial data to inform [Division of Hematology Product]'s decision on addition of this risk to the nilotinib label." SMF ¶57. In January 2014, the FDA publicly reported the results of the Post-Market Safety Summary, declaring that the agency was still "evaluating" the data "to determine if any regulatory action is required" regarding cerebrovascular accidents. SMF ¶58. In contrast, FDA recommended in the Post-Market Safety Summary that PAOD "be elevated to the Warnings and Precautions section" after observing that its investigations "strongly suggest an association between nilotinib and PAOD." SMF ¶59. This evidence establishes that FDA's safety group was not prepared to add the risk of cerebrovascular events to the Warnings and Precautions section of the Tasigna® label even as late as December 2013 and, therefore, that FDA would have rejected such an addition if it had been proposed by NPC.

### III.   PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES UNDER NEW JERSEY LAW OR, IN THE ALTERNATIVE, UNDER FLORIDA LAW, SHOULD THE COURT FIND THAT FLORIDA LAW APPLIES.

This diversity case was filed in this District; therefore, Florida's choice of law rules apply. *Grupo Televisa, S.A. v. Telemundo Comm'cs Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). Plaintiffs do not dispute that a material conflict exists between the only states whose laws could logically apply to punitive damages in this case are (1) Florida, where plaintiffs reside and where McWilliams' medical treatment took place, and (2) New Jersey, where NPC is headquartered and where the conduct that allegedly gives rise to punitive damages occurred.[9] Pls.' Opp. (ECF 28). Under Florida's choice of law rules, plaintiffs' punitive damages claim is governed by New Jersey law.

In its February 27, 2018 order, the Court stated it was "not prepared to conclude" at the motion to dismiss stage that plaintiffs had failed to allege "improper conduct outside of the boundaries of New Jersey." Order (ECF 39) at *1. The Court reached this conclusion after plaintiffs claimed the Court could not "properly engage in a choice of law analysis until Plaintiffs

---

[9] NPC has already briefed the Court on Florida's choice of law rules and the material conflicts between New Jersey and Florida law on punitive damages. *See* ECF 27, 30. NPC incorporates by reference its analysis of these states' laws, as summarized in its earlier briefs.

have had an opportunity to . . . examine through discovery the statements that Novartis's sales force in Florida made to Mr. McWilliams' treating physicians."

Now that discovery is complete, and plaintiffs have had an opportunity to question McWilliams' oncologist, Dr. Walia, there remains no basis to apply Florida law to plaintiffs' punitive damages claim. Although Dr. Walia testified he met with NPC's sales representatives, Dr. Walia cannot recall who he met with, what discussions he had, or whether these representatives left him materials regarding Tasigna® prior to prescribing Tasigna® to McWilliams. SMF ¶66. There is simply no unique Florida-centric punitive damages related conduct upon which to premise a decision to apply Florida law, which is why every Florida court to evaluate this question has determined that Florida's choice of law rules require the application of New Jersey law to award punitive damages against NPC.[10]  Under New Jersey law, "FDA approval of prescription drugs conclusively prohibits an award of punitive damages in products liability actions." *Rowe v. Hoffman-La Roche, Inc.*, 917 A.2d 767, 774 (N.J. 2007); N.J.S.A. 2A:58C-5c ("Punitive damages shall not be awarded if a drug or device or food or food additive which caused the claimant's harm was subject to premarket approval or licensure by the federal Food and Drug Administration."). The one exception to the prohibition of punitive damages is for instances "where the product manufacturer knowingly withheld or misrepresented [material] information required to be submitted under the agency's regulations." *See* N.J.S.A. 2A:58C-5c. This

---

[10] *See Kirchman v. Novartis Pharm. Corp.*, No. 8:06-cv-1787-T-24-TBM, 2014 WL 2722483, at *5 (M.D. Fla. June 16, 2014) (holding, under Florida choice of law rules, that New Jersey law applies to punitive damages); *Dopson-Troutt v. Novartis Pharm. Corp.*, No. 8:06-cv-1708-T-24-EAJ, 2013 WL 3808205, at *4-5 (M.D. Fla. July 22, 2013) (same); *Guenther v. Novartis Pharm. Corp.*, No. 6:08-cv-00456-GAP-DAB, 2013 WL 1225391, at *2-4 (M.D. Fla. Mar. 27, 2013) (same); *Krause v. Novartis Pharm. Corp.*, 926 F. Supp. 2d 1306, 1311–12 (N.D. Fla. 2013) (same); *Chiles v. Novartis Pharm. Corp.*, 923 F. Supp. 2d 1330, 1333 (M.D. Fla. 2013) (same).  Numerous courts outside of Florida have held the same. *Williams v. Novartis Pharm. Corp.*, 15 F. Supp. 3d 761, 768-69 (S.D. Ohio 2014) (Ohio residents); *Mathews v. Novartis Pharm. Corp.*, 953 F. Supp. 2d 811, 816 (S.D. Ohio 2013) (same); *Stromenger v. Novartis Pharm. Corp.*, 941 F. Supp. 2d 1288, 1302 (D. Or. 2013) (Oregon resident); *Zimmerman v. Novartis Pharm. Corp,*, 889 F. Supp. 2d 757, 759-65 (D. Md. 2012) (Maryland resident); *Brown v. Novartis Pharm. Corp.*, No. 7:08-cv-130-FL, 2012 WL 3066588, at *4-9 (E.D.N.C. July 27, 2012) (North Carolina resident); *Talley v. Novartis Pharm. Corp.,* No. 3:08-CV-361-GCM, 2011 WL 2559974, at *1 (same); *Deutsch v. Novartis Pharm. Corp.,* 723 F. Supp. 2d 521, 523 (E.D.N.Y. 2010) (New York resident); *Irby v. Novartis Pharm. Corp.*, Nos. MID-L-1815-08, 278, 2011 WL 5835414, at *10 (N.J. Super. Ct. Nov. 18, 2011) (Trial Order) (Virginia resident); *Meng v. Novartis Pharm. Corp.; Bagley v. Novartis Pharm. Corp.* Nos. L-7670-07MT, L-6027-08MT, 2009 WL 4623715, at *6 (Maine and Mississippi residents).

exception, however, is preempted under *Buckman Co. v. Plaintiffs' Legal Committee.* 531 U.S. 341, 352 (2001); *McDarby v. Merck & Co., Inc.,* 401 N.J. Super. 10, 94 (App. Div. 2008), *certif. denied as improvidently granted*, 200 N.J. 267 (2009) (holding *Buckman* preempts claims for punitive damages based on allegations that manufacturer knowingly withheld or misrepresented information material to the FDA).[11]

Even if the Court finds that Florida law applies, plaintiffs are still not entitled to recover punitive damages because they cannot show by clear and convincing evidence that NPC committed "intentional misconduct" or acted with "gross negligence." Fla. Stat. Ann. § 768.72 (West). Punitive damages are appropriate when the defendant "has knowledge that its product is inherently dangerous … and that its continued use is likely to cause injury or death, but nevertheless continues to market the product without … making adequate disclosure and warning of such danger." *Ocasio v. C.R. Bard, Inc.*, No. 8:13-CV-1962-T-36AEP, 2015 WL 3496062, at *11 (M.D. Fla. June 3, 2015) (quoting *Johns–Manville Sales Corp. v. Janssens*, 463 So.2d 242, 249 (Fla. 1st DCA 1984)). Plaintiffs can point to no evidence, much less clear and convincing evidence, that NPC knew about the risk of stroke during the June 2011 through December 2013 time period in which Dr. Walia prescribed Tasigna® and intentionally failed to warn of the risk. *See* § I.B *supra*. Accordingly, summary judgment is appropriate on plaintiffs' punitive damages claim.

---

[11] Numerous Florida courts have found under *Buckman* that claims that rely on allegations of misrepresentations or omissions in information provided to federal agencies like FDA are preempted. *See Markland v. Insys Therapeutics, Inc*., No. 3:16-cv-J-34PDB, 2017 WL 4102300, at *6, 9 (M.D. Fla. Sept. 15, 2017) (precluding plaintiff's "negligent marketing" claim under *Buckman*); *Metz v. Wyeth, LLC*, 872 F. Supp. 2d 1335, 1342 n.7 (M.D. Fla. 2012), *aff'd*, 525 F. App'x 893 (11th Cir. 2013) ("To the extent Plaintiffs contend that Actavis failed to supply relevant information to the FDA, Plaintiffs' claim may be viewed as relying on a fraud-on-the-FDA theory of liability. It is undisputed that 'fraud on the FDA claims' are impliedly preempted by the FDCA."); *Kirchman*, 2014 WL 2722483, at *5 (citing *Dopson-Troutt*; *Guenther*); *Dopson-Troutt*, 2013 WL 3808205, at *5 (citing *Guenther*); *Guenther*, 2013 WL 1225391, at *3-4 (plaintiff's punitive damages claim preempted where it "requires a fact finder to make . . . determinations as a matter of state law even though federal law makes such determinations the exclusive province of the FDA.") (quoting *Zimmerman*, 889 F. Supp. 2d at 776); *Ramirez v. E.I. Dupont de Nemours & Co.*, No. 8:09-cv-321, 2010 WL 3529509, at *1-2 (M.D. Fla. Sept. 3, 2010) (*Buckman* precludes plaintiff from presenting evidence at trial that EPA approval of pesticide labeling was secured through fraud on EPA); *In re Trasylol Prods. Liab. Litig.*, 763 F. Supp. 2d 1312, 1329-30 (S.D. Fla. 2010) (finding fraud-on-the-FDA claims precluded under *Buckman*).

**IV.**     **BECAUSE NPC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FAILURE TO WARN CLAIMS, PLAINTIFFS' DERIVATIVE CLAIMS FOR LOSS OF CONSORTIUM AND PUNITIVE DAMAGES ALSO FAIL.**

Mrs. McWilliams' claim for loss of consortium and plaintiffs' claim for punitive damages, to the extent Florida law applies, "derive[] from" Mr. McWilliams' substantive causes of action. *See Olmo v. Davol, Inc.*, No. 13-62260-CIV, 2017 WL 1367231, at *7 (S.D. Fla. Apr. 10, 2017), *aff'd,* 710 F. App'x 861 (11th Cir. 2018) ("It is well established and uncontested that loss of consortium can be sustained only as a derivative claim"; "[p]unitive damages are not an independent cause of action, but rather, are 'merely a remedy that must be asserted in conjunction with a substantive claim.'"). Because plaintiffs' strict liability and negligence claims cannot survive summary judgment, their subsidiary loss of consortium and punitive damages claims must also fail.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant this motion and enter summary judgment for NPC on all claims asserted in this lawsuit.

Dated:  May 21, 2018                              Respectfully submitted,

                                                  s/ Michael J. Thomas
                                                  Michael J. Thomas
                                                  PENNINGTON, P.A.
                                                  215 South Monroe Street, 2nd Floor
                                                  Tallahassee, FL 32301
                                                  Phone: 850-222-3533
                                                  Fax: 850-222-2126
                                                  mike@penningtonlaw.com

                                                  Robert E. Johnston (admitted *pro hac vice*)
                                                  (rjohnston@hollingsworthllp.com
                                                  Andrew L. Reissaus (admitted *pro hac vice*)
                                                  (areissaus@hollingsworthllp.com)
                                                  HOLLINGSWORTH LLP
                                                  1350 I Street, NW
                                                  Washington, DC 20005
                                                  Phone: (202) 898-5800
                                                  Fax: (202) 682-1639

                                                  *Attorneys for Defendant*
                                                  *Novartis Pharmaceuticals Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 21, 2018, the foregoing was filed with the Clerk of the Court and served in accordance with the Southern District of Florida's Rules on Electronic Service upon the following parties and participants:

Bryan F. Aylstock, Esq.
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 E. Main Street, Suite 200
Pensacola, Florida 32502
Miami, FL  33130

Richard M. Elias, Esq.
Greg G. Gutzler
Tamara M. Spicer
ELIAS GUTZLER SPICER LLC
130 South Bemiston Avenue, Suite 302
St. Louis, MO  63105

James G. Onder
Evan Murphy
ONDER LAW
110 East Lockwood
St. Louis, MO

s/ Michael J. Thomas
Michael J. Thomas