**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**CASE NO. 2:17-CV-14302-ROSENBERG/MAYNARD**

Dennis McWilliams et al.,

                Plaintiffs,

vs.

Novartis AG et al.,

                Defendants.

_____/

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

**Table of Contents**

I.     INTRODUCTION ................................................................................................................. 1

II.    FACTS ................................................................................................................................. 1

   A.   Novartis Launches a Campaign to Switch Patients from Gleevec
        to Tasigna ...................................................................................................................... 1

   B.   Novartis Discovers that Tasigna Is Associated with Severe Vascular
        Disease But Refuses to Warn U.S. Doctors and Patients ................................... 3

   C.   Unaware of the Vascular Risks, McWilliams Takes Tasigna, Experiences
        Accelerated Atherosclerosis, and Has a Major Stroke........................................ 5

III.   STANDARD OF REVIEW ................................................................................................ 6

IV.    ARGUMENT ...................................................................................................................... 7

   A.   Plaintiffs Are Entitled to a Jury Trial on Their Failure to Warn Claims ........... 7

      1.   There Is a Triable Issue of Fact on Proximate Causation ............................... 7

      2.   Novartis Did Not Warn of the Vascular Occlusive Risks Associated
           with Tasigna ................................................................................................... 10

      3.   Plaintiffs Have Competent Evidence that Tasigna Caused McWilliams'
           Stroke................................................................................................................ 12

   B.   Novartis Has Not Proven and Cannot Prove Impossibility Preemption ........... 12

   C.   There Is a Triable Question of Fact on Punitive Damages ................................. 17

V.     CONCLUSION ................................................................................................................ 19

## I.       INTRODUCTION

As early as 2010, Defendant Novartis Pharmaceuticals Corporation ("Novartis") was on notice of a deadly syndrome associated with its drug Tasigna— i.e., accelerated, severe vascular events causing strokes, amputations, and heart attacks.  It was informed by its own investigators, peer-reviewed medical literature, and global health agencies of the magnitude of the risk and the need to give doctors a special warning.  Yet, driven by its overriding commercial mission of selling Tasigna as the new standard of care, at no time while Plaintiff Dennis McWilliams took the drug from June 2011 to August 2013 did Novartis warn of the risk in the U.S. label, nor did it send a simple "dear doctor letter" to U.S. doctors, as it had to doctors in Canada.  Unaware of this risk, McWilliams suffered a major and unexpected stroke at the age of 48, rendering him permanently disabled, and ending his career as a police detective for the Fort Pierce Police Department.  The issue for the Court is whether, on these facts, Novartis is entitled to judgment as a matter of law.

The answer is no.  At a minimum, there are triable issues of fact on the failure to warn, preemption, and punitive damages issues Novartis raises in its motion.  Therefore, Plaintiffs respectfully request that Novartis's motion be denied in full.

## II.       FACTS

This is an action brought by Plaintiff Dennis McWilliams, and his wife, Lori, after Dennis suffered a major stroke at the age of 48 while on Tasigna.  Plaintiffs assert that Tasigna caused an unusual accelerated atherosclerosis in Dennis McWilliams' right carotid artery, which caused a major stroke, and that Novartis intentionally failed to warn of this risk.  *See generally* First Amended Compl. ("FAC"), Doc. No. 19.  Dennis McWilliams asserts claims against Novartis for strict products liability and negligence, and Lori McWilliams asserts a claim for loss of consortium.  *Id.*

### A.       Novartis Launches a Campaign to Switch Patients from Gleevec to Tasigna

In 2001, Gleevec, Novartis's first drug developed to treat CML, was approved for commercial use.  Novartis's Statement of Material Facts ("Novartis's SMF"), Doc. No. 62, at ¶¶

1

4-5.  Gleevec is a highly effective drug in treating CML, and has been an extraordinary financial success for Novartis, earning it, historically, billions of dollars in sales per year.  Plaintiffs' Statement of Material Facts ("Plaintiffs' SMF"), ¶ 85; Ex. 37 at 11-12.[1]  For example, in 2010 alone, Gleevec generated over $3 billion dollars in sales for Novartis.  Ex. 37 at 11.

Gleevec, however, lost its patent exclusivity in major markets, including the United States and Western Europe, in 2015 and 2016 respectively.  *Id.*  This impending loss of exclusivity prompted Novartis, as early as 2010, to launch a global strategy to persuade doctors to switch their patients from Gleevec to Tasigna.  *Id.* at 11-12.  For example, according to a 2011 global company strategy document, Tasigna comprised only 10 percent of Novartis's $3.8 billion in total CML sales.  *Id.* at 11.  Thus, it became Novartis's "commercial imperative" to "rapid[ly] transition [] the business to Tasigna … given the impending loss of [Gleevec] exclusivity in major markets."  *Id.*  The document further stated that to "continue to sustain [Novartis's] CML franchise, it is crucial that the majority of patients are switched to Tasigna."  *Id.*  Thus, it was "essential" that Novartis differentiate Tasigna from Gleevec, its generic equivalent, and other competing CML drugs in the highly competitive CML market.  *Id.* at 12.

To fulfill its "commercial imperative," as early as 2010, Novartis launched a global sales campaign to persuade doctors to switch their patients from Gleevec to Tasigna.  Plaintiffs' SMF, at ¶ 85.  Novartis promoted Tasigna to doctors as the "new standard of care in CML," with an "unmatched efficacy and tolerability profile."  Ex. 38 at 2-3; Ex. 39 at 4.  To this end, Novartis implemented an initiative it coined as "Selling the Switch," which was designed "to overcome" the widespread "emotional attachment and satisfaction with [Gleevec]."  Ex. 39 at 4, 7.  Novartis also developed a "Loyalty Disruption Program," devised to undermine the "strong emotional attachment" to Gleevec by selling Tasigna as a "super-Gleevec," and inspiring "confidence through bandwagon effect."  Ex. 40 at 8.

---

[1] Unless otherwise indicated, all exhibits referenced herein are attached to Plaintiffs' SMF, filed simultaneous herewith.

2

**B.      Novartis Discovers that Tasigna Is Associated with Severe Vascular Disease But Refuses to Warn U.S. Doctors and Patients**

No later than 2010, as Novartis was implementing its "switch" and "loyalty disruption" strategy, Novartis was aware of a clear safety signal of vascular occlusive events associated with Tasigna, which came from multiple internal and external data sources.  Plaintiffs' SMF at ¶ 75. No later than 2011, Novartis should have highlighted the risk of vascular occlusive events in the Warnings and Precautions section of the U.S. label.  *Id.*  This warning should have included recommendations to monitor patients for developing disease.  *Id.*  With this label update, Novartis should have provided a companion "dear doctor letter" to U.S. doctors to describe these serious risks and the available means to monitor, mitigate, and prevent vascular occlusions.  *Id.* Novartis, however, did no such thing, failing, at all relevant times, to adequately warn of the risk. *Id.* at ¶¶ 70, 74.

Novartis's notice of these serious risks came from multiple sources.  Principal among them was Novartis's own clinical investigators—whom Novartis called "Key Opinion Leaders"—running Novartis's global clinical trial designed to test the safety and efficacy of Tasigna.  Plaintiffs' SMF at ¶ 76.  Beginning in 2010, these Key Opinion Leaders reported an accumulation of unusual, severe, and rapidly-developing cases of vascular disease occurring in Tasigna patients in their clinics.  *Id.*  They reported multiple cases of unexpected disease leading to strokes, amputations, and heart attacks.  *See, e.g.,* Ex. 4 at 1; Ex. 5 at 1; Ex. 7 at 2-6; 14 at 1; Ex. 15 at 3.  The disease often persisted and progressed despite multiple invasive surgeries.  *See, e.g.,* Ex. 4 at 1.  The Key Opinion Leaders told Novartis that it was imperative that Novartis send special dear doctor letters to all prescribers, warning them of the risk and the need to screen and monitor patients for developing disease, especially those with pre-existing risk factors.  *See, e.g.,* Ex. 8 at 1; Ex. 9 at 1-2.  Some of the Key Opinion Leaders sent Novartis formal letters, requesting that Novartis jointly approach global health agencies with the investigators to properly notify them of the nature and magnitude of the risk.  Ex. 9 at 1-2.

Novartis, however, refused—instead engaging in a campaign to "robustly defend" Tasigna against their accusations, and to "manag[e] [their] perceptions and the possible negative

influence." Plaintiffs' SMF at ¶ 77. Indeed, the marketing arm of Novartis engaged in an express campaign to "neutralize" the "body of evidence associating PAOD [peripheral arterial occlusive disease] with TASIGNA." *Id.*; Ex. 21 at 2.

Novartis also received notice of the vascular risks through multiple peer-reviewed medical journals warning of the syndrome of rapidly developing vascular disease occurring amongst Tasigna patients. Plaintiffs' SMF at ¶ 81. These articles included several retrospective and prospective controlled studies. *See generally* Ex. 45; Ex. 49; Ex. 51. Several of the articles wrote that the cases of vascular disease in Tasigna patients exceeded the rate reported in the general population and amongst Gleevec patients. Ex. 49 at 1; Ex. 51 at 5. The articles emphasized the need for doctors to monitor Tasigna patients for developing vascular disease. Ex. 45 at 1, 7; Ex. 49 at 1; Ex. 51 at 5.

Novartis also received notice of the vascular disease risks through global health agencies. In June 2012, Health Canada issued a formal notice to Novartis, notifying it that the data strongly suggested an association between Tasigna and accelerated atherosclerosis-related conditions. Plaintiffs' SMF at ¶ 78; Ex. 30 at 1, 4-6. In conjunction with the notice, the agency sent Novartis a thorough 57-page report detailing the scientific bases of its findings. Plaintiffs' SMF at ¶ 78; Ex. 31 at 41-44. As a result, Novartis started warning Canadian doctors about the risk of accelerated atherosclerosis-related conditions, and sent a dear doctor letter to Canadian doctors warning them of the same and recommending that they monitor all patients for developing disease. Plaintiffs' SMF at ¶ 79. Novartis did not send a similar letter to U.S. doctors. Novartis's global lead of regulatory affairs was incensed by the actions of Health Canada and the "global questions" its actions created, noting that the "damage to the billion dollar asset [Tasigna] is still being evaluated." *Id.* at ¶ 80; Ex. 33 at 1.

In October 2013, the FDA notified Novartis that it must add the risk of vascular occlusive events to the Warnings and Precautions section of the U.S. Tasigna label. Plaintiffs' SMF at ¶ 83. Novartis's senior leadership "pushed back" and was extremely displeased by the language proposed by the FDA. *Id.* The FDA rejected Novartis's push back, noting that it was being

4

"lenient." *Id.*; Ex. 65 at 2-3.  In January 2014, Novartis issued a revised label adding "Cardiac and Arterial Vascular Occlusive Events" in the Warnings and Precautions section.  Ex. 68 at 1, 6-7.  With this labelling change, Novartis made an internal decision to send a special dear doctor letter to doctors as a "proactive" measure, and actually drafted one, but then reversed its decision and declined to send it.  Plaintiffs' SMF at ¶ 84.

### C.   Unaware of the Vascular Risks, McWilliams Takes Tasigna, Experiences Accelerated Atherosclerosis, and Has a Major Stroke

McWilliams was diagnosed with Chronic Myeloid Leukemia in 2007.  Novartis's SMF at ¶ 10.  In 2007, McWilliams was prescribed Gleevec to treat his CML.  *Id.* at ¶¶ 10-11. McWilliams had an excellent response to Gleevec—his blood counts were normal, his CML was asymptomatic, and he was in complete cytogenetic and hematologic remission.  Plaintiffs' SMF at ¶ 15.

In June 2011, despite being in complete cytogenetic and hematologic remission, McWilliams' oncologist, Dr. Sanjiv Walia, switched McWilliams to Tasigna, when a sensitive molecular test showed microscopic levels of the CML oncogene (the BCR/ABL gene) in McWilliams' blood.  Plaintiffs' SMF at ¶¶ 15-16.  The Tasigna label that Dr. Walia relied on did not warn of the risk of developing atherosclerosis-related vascular events, including strokes, nor did it recommend monitoring patients for developing disease while on Tasigna.  *Id.* at ¶¶ 70, 74. Dr. Walia prescribed Tasigna to McWilliams, and McWilliams agreed to take it, unaware of the risk of developing atherosclerosis associated with Tasigna.  *Id.* at ¶¶ 70, 71.  McWilliams was not monitored for developing atherosclerotic disease while on Tasigna.  *Id.* at ¶ 70.

Approximately 1.5 years after starting Tasigna, in January 2013, McWilliams had a near syncopal (fainting) episode, and, as a precautionary measure, a Doppler ultrasound of his carotid arteries was taken.  Plaintiffs' SMF at ¶ 67.  The test revealed that he had only "minimal" atherosclerotic plaque in his right carotid artery, with an estimated stenosis at 50 percent.  *Id.* Given these results, McWilliams was deemed to be not at risk for a stroke and surgery was not indicated.  *Id.*

Seven months later, however, on August 28, 2013, McWilliams had an unexpected right hemispheric stroke in the distribution of his middle cerebral artery.  Plaintiffs' SMF at ¶ 68. Multiple tests indicated that the stenosis in his right internal carotid artery had progressed from 50 percent to over 90 percent in just seven months.  *Id.*  McWilliams' treating neurologist and vascular surgeon both considered this rapid progression of McWilliams' atherosclerosis to be "unusual" and "unexpected."  *Id.* at ¶¶ 33, 68.  Mr. McWilliams had an emergency carotid endarterectomy to clear the blockage in his carotid artery.  Ex. 58 at 3; Ex. 59 at 55:16-20.

Finding no reasonable explanation for the accelerated atherosclerosis, treating neurologist Dr. Maraist did his own independent research and found that there was a reported association between Tasigna and atherosclerosis, and that Novartis had sent a dear doctor letter to Canadian doctors about this risk.  Plaintiffs' SMF at ¶ 69.  Dr. Maraist concluded that McWilliams should "NOT" be given any more Tasigna pills and his Tasigna therapy was put on hold.  *Id.*  Following his stroke and his discovery of the atherosclerotic risk associated with Tasigna, McWilliams refused to take another Tasigna pill.  *Id.* at ¶ 72.

McWilliams was and is proactive in choosing his CML therapy, and asked his doctors about all of the risks associated with his therapies prior to choosing them.  *Id.* at ¶ 71.  Had McWilliams been informed about the risk of developing accelerated atherosclerosis associated with Tasigna, he would never have agreed to take a single Tasigna pill.  *Id.*  Today, McWilliams is on a generic version of Gleevec, and has consistently been in hematologic remission and molecular remission with Gleevec, with his most recent PCR test showing BCR/ABL levels of 0.00%.  *Id.* at ¶ 73.

### III.   <u>STANDARD OF REVIEW</u>

Summary judgment is only appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather the requirement is that there be no genuine issue of material fact.  *Friedel v. Park Place Community LLC*, No. 2:17-cv-14056, 2017 WL 3666440, at

*1 (S.D. Fla. Aug. 24, 2017) (citing *Anderson v. Liberty Lobby, Inc.*, 577 U.S. 242, 247-48 (1986)).  A dispute is genuine if a reasonable trier of fact could return judgment for the nonmoving party.  *Friedel*, 2014 WL 3666440, at *1 (citing *Miccosukee Tribe of Indians of Fla. v. U.S.*, 516 F.3d 1235, 1243 (11th Cir. 2008)).  A fact is material if it would affect the outcome of the suit under governing law.  *Id.*

In deciding a summary judgment motion, the court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Friedel*, 2014 WL 3666440, at *1 (citing *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006)). The court does not weigh conflicting evidence.  *Friedel*, 2014 WL 3666440, at *1 (citing *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007)).  Thus, upon discovery of a genuine dispute of material fact, the court must deny summary judgment.  *Id.*

## IV.    ARGUMENT

### A.    Plaintiffs Are Entitled to a Jury Trial on Their Failure to Warn Claims.

#### 1.    There Is a Triable Issue of Fact on Proximate Causation.

Ignoring relevant case law, Novartis incorrectly claims that Plaintiffs have failed to produce sufficient evidence of proximate causation.  To "prevail on a failure to warn claim under strict liability or negligence, [a plaintiff] must prove that the warnings to the prescribing physician were inadequate, and that the inadequate warnings proximately caused [the plaintiff's] injury."  *Kirchman v. Novartis Pharms. Corp.*, No. 8:06-cv-1787-T-24-TBM, 2014 WL 2158519, at *5 (M.D. Fla. May 23, 2014) (applying Florida law).  A plaintiff "establishes proximate cause by showing that the inadequacy of the warnings was a substantial factor in bringing about [the plaintiff's] injury."  *Id.*

Importantly, and contrary to Novartis's principal argument, Florida law does not require a showing that the treating physician would have declined to prescribe the drug if he or she had known of the association at the time of prescription.  *See Guenther v. Novartis Pharms. Corp.*, 990 F. Supp. 2d 1299, 1303-04 (M.D. Fla. 2014) (rejecting Novartis's argument that a prescribing physician must testify that he or she would have declined to prescribe the drug had

the risk at issue been known as an "[in]accurate statement of Florida law").  Rather, a plaintiff
need only show that a different warning would have prevented the harm.  *Id.*

Applying this law, multiple courts have found a triable issue of fact on causation against
Novartis where there is evidence that, had the patient been properly informed of the risk, the
patient would have declined to take the drug at issue.  For example, in *Guenther*, Novartis
argued, as it does here, that a treating oncologist's testimony that he or she still prescribes a drug
after learning of the risk at issue defeats the causation element as a matter of law.  No. 6:08-cv-
456-ORL-31DAB, 2013 WL 1498162, at *2 (M.D. Fla. Apr. 9, 2013).  The court disagreed,
holding that the plaintiff's testimony that she would have declined the drug had she been
informed of the risk created triable issue of fact: "Guenther has testified that if she had been
warned by her oncologists about the risk of ONJ, she would have refused to take Zometa, and
that she did stop taking the drug once she was told of that risk….  Guenther's testimony is
enough to create a genuine issue of material fact as to whether the allegedly insufficient warning
was a proximate cause of her injury."  *Id.*

Similarly, in *Kirchman*, *supra*, the court denied Novartis's motion for summary judgment
on causation.  2014 WL 2158519, at *4-6.  There, unlike here, the prescribing oncologist actually
testified that he would not have changed his treatment recommendation if different warnings
were given about the side effect at issue.  *Id.* at *4.[2]  There was evidence, however, that the
doctor began discussing the side effect with patients after learning about the risk, and the
plaintiff declined to take the drug after the side effect manifested.  *Id.* at *5-6.  On this evidence,
the court held that there was a triable issue of fact as to whether the doctor would have given the
plaintiff a different warning or instruction at the time of the original prescription, and that a
reasonable jury could find that, had he been given a different warning, the plaintiff would have
declined to take the drug.  *Id.*; *see also Gilliland v. Novartis Pharms. Corp.*, 34 F. Supp. 3d 960,
973 n.24 (S.D. Iowa 2014) (denying summary judgment where patient testified she would not

---

[2] By contrast, Dr. Walia did not testify that he would still have recommended Tasigna to Mr. McWilliams today had
he been adequately warned, and Novartis has not identified any such testimony.

have taken the drug had she been warned of the risk, and did in fact stop therapy after side effect manifested; citing myriad authority in accord).

Applying the above law, Novartis's arguments regarding causation are without merit. As in those cases, the evidence here shows that had Dr. Walia been properly advised of the risk of atherosclerosis, he would have informed McWilliams of that risk and, based on that instruction, McWilliams would have declined to take the drug. Specifically the evidence shows:

- At no time while McWilliams took Tasigna was Dr. Walia or McWilliams aware of the risk of vascular disease associated with Tasigna (Plaintiffs' SMF at ¶¶ 27, 70-71);

- When McWilliams had his stroke, and the association between vascular disease and Tasigna was discovered by his neurologist, two doctors recommended that McWilliams cease Tasigna therapy (*id.* at ¶ 27);

- McWilliams refused to take a single Tasigna pill following his stroke (*id.* at ¶ 72);

- McWilliams had multiple options other than Tasigna, including remaining on Gleevec, and is, in fact, in remission today on a generic version of Gleevec (*id* at ¶¶ 15, 73);

- Dr. Walia only prescribes Tasigna today "with careful warning" about the atherosclerotic risks (*id.* at ¶ 25); and

- Had McWilliams been aware of the risk of vascular disease associated with Tasigna, he would not, according to his sworn testimony, have ever agreed to take Tasigna (*id.* at ¶ 71).

This is more than sufficient to create a triable issue of fact on the issue of causation.

The primary authority upon which Novartis relies—*Edgar v. Danek Med., Inc.*, No. 96-2451-CIV-T-24A, 1999 WL 1054864 (M.D. Fla. Mar. 31, 1999)—is inapposite. There, unlike here, the doctor testified unequivocally that he *knew* of the risks that the plaintiff claimed the drug company should have warned about but prescribed the product anyway. *Id.* at *6. Courts, applying Florida law, have expressly distinguished *Edgar* on this very basis. *See In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, No. 4:08-MD-2004, 2016 WL 6138253, at *9 n.6 (M.D. Ga. Oct. 20, 2016). Here, Dr. Walia, did not know of the risks, and thus *Edgar* is inapplicable. Plaintiffs' SMF at ¶¶ 27, 70.

Finally, even if McWilliams would have still taken Tasigna, Novartis's motion still fails, because the evidence is that Dr. Walia would have monitored him for developing disease. Plaintiffs' SMF at ¶ 70.  Testimony by a treating physician that he or she would have monitored the patient is sufficient to create a triable issue of fact on causation.  *See Hill v. Novartis Pharms. Corp.*, No. 1:06-cv-00939, 2012 WL 6004161, at *4 (E.D. Cal. Nov. 30, 2012) (denying summary judgment where doctor testified he would have monitored patient); *Georges v. Novartis Pharms. Corp*., No. CV 06-5207, 2012 WL 9083365, at *6 (C.D. Cal. Nov. 2, 2012) (same); *Stanley v. Novartis Pharms. Corp.*, 11 F. Supp. 3d 987, 1003 (C.D. Cal. 2014) ("While the evidence supports that Dr. Molina and Dr. Nakamura would have prescribed Aredia or Zometa even if they knew about the potential association between these drugs and [the side effect at issue], changes to treatment and prescription procedures creates a triable question of fact on specific causation.").

For these reasons, there is a triable question of fact on proximate causation.

      **2.**      **Novartis Did Not Warn of the Vascular Occlusive Risks Associated with Tasigna.**

It is undisputed that at no time while McWilliams took Tasigna did Novartis warn of the risk of vascular occlusive risks associated with Tasigna.  Plaintiffs' SMF at ¶ 70, 74.  It is also undisputed that Novartis had been informed by its own clinical investigators, peer-reviewed literature, and health agencies across the world that the conditions observed were severe, rapidly developing, and unusual in their clinical course, and that it was imperative that doctors be warned of the risks and monitor patients for developing disease.  *Id.* at ¶ 76 (describing notice from investigators), ¶ 81 (describing notice from peer-reviewed literature), and ¶ 78 (describing notice from health authorities).  This prompted Novartis to add atherosclerotic-related events in the Warning and Precautions section of its Canadian label and to send a special notice of the risk to Canadian doctors and a recommendation that patients be monitored for developing disease. *Id.* at ¶ 79.  Novartis, however, failed to update its Warnings and Precautions section of the U.S. label and failed to send a letter to U.S doctors, like it did in Canada.  *Id.*

Despite these facts, Novartis now claims that it had no duty, *as a matter of law*, to warn of "stroke" because that risk was not known or knowable to Novartis.  In so doing, Novartis attempts to compartmentalize cerebrovascular disease, viewing it in a vacuum divorced from the larger issue of atherosclerosis.  But the risk at issue here is not simply stroke, or heart attacks, or peripheral vascular disease; rather it is the risk of systemic atherosclerosis, attacking all arteries, including those supplying blood to the legs, the heart, and the brain.

The risk at issue was consistently presented to Novartis as a system-wide issue of vascular disease, and Novartis analyzed it as such.  *See* Ex. 45 at 1 (article reporting that 8 of 24 patients in a clinic experienced a severe vascular event while on Tasigna); Ex. 9 at 1-2 (investigator warning that 25% of patients in his clinic developed "AOD" [Arterial Occlusive Disease] and urging Novartis to warn); Ex. 53 at 6, 12-14 (internal Novartis analysis of vascular risks, including the risk of cerebrovascular disease); Ex. 30 at 6 (Health Canada analysis concluding that Tasigna is associated with atherosclerotic-related diseases in general).  Among the reports, Novartis was consistently informed of Tasigna patients having strokes.  *See, e.g.*, Ex. 5 at 1 (Novartis investigator warning of a 50-year-old Tasigna patient who had a stroke); Ex. 15 at 3 (investigator warning of a 35-year-old Tasigna patient without significant risk factors who developed complete occlusion of several carotid arteries, and noting that 40% of his Tasigna patients experienced vascular events).  It is for this reason that Novartis warned in Canada about the risk of atherosclerosis-related conditions in general, including cerebrovascular events, and why it now warns in the United States about the same.  *See* Ex. 32 (Health Canada letter) at 1; Ex. 68 (2014 U.S. Label) at 1, 6.

Courts in Florida have found a triable issue of fact against Novartis on the issue of the duty to warn on evidence far less compelling than this.  *See Guenther*, 2013 WL 1498162, at *3 (finding a triable issue of fact on duty to warn based on a single medical journal article reporting a side effect being observed in rats, and 6 reports of the side effect occurring during clinical trials).  While Novartis is free to argue at trial that the risk of stroke was not known or knowable despite all of this evidence, this is a question for the jury to decide.

11

3.     **Plaintiffs Have Competent Evidence that Tasigna Caused McWilliams'
Stroke.**

Novartis's arguments regarding specific and general medical causation hinge on its
motions to exclude several of Plaintiffs' causation experts.  For the reasons stated in Plaintiffs'
oppositions to those motions, the *Daubert* motions should be denied, and, thus, Plaintiffs have
competent evidence to create a triable issue on general and specific causation.

B.     <u>**Novartis Has Not Proven and Cannot Prove Impossibility Preemption.**</u>

Novartis argues that Plaintiffs should be precluded from arguing that Novartis should
have added vascular occlusive events in the Warnings and Precautions or boxed warning
sections of the U.S. Label, or that Novartis should have sent a dear doctor letter on the issue.
Novartis argues, in essence, that its label was adequate as a matter of law because the FDA did
not require it to do more.

The Supreme Court, however, has already rejected this very argument as a "fundamental
misunderstanding" of federal drug regulation: "[I]t has remained a central premise of federal
drug regulation that the manufacturer bears responsibility for the content of its label at all times.
It is charged both with crafting an adequate label and with ensuring that its warnings remain
adequate as long as the drug is on the market."  *Wyeth v. Levine*, 555 U.S. 555, 570-571 (2009).
As the Court explained, brand drug manufacturers, such as Novartis, have the ability to
unilaterally change their label to add or strengthen a warning to improve drug safety.  *Id.* at 568-
69.   One such way is through the FDA's "changes being effected" regulation, which provides
that a manufacturer can unilaterally change its label without preapproval to, among other things,
"add or strengthen a contraindication, warning, precaution, or adverse reaction."  *Id.* at 568
(citing 21 C.F.R. §§ 314.70(c)(6)(iii)(A), (C)).  A drug manufacturer can do so upon "newly
acquired information," which "is not limited to new data, but also encompasses 'new analyses of
previously submitted data.'"  *Wyeth*, 555 U.S. at 569 (citing 73 Fed. Reg. 49604).  This rule
"accounts for the fact that risk information accumulates over time and that the same data may
take on a different meaning in light of subsequent developments."  *Wyeth*, 555 U.S. at 569.

Thus, to prevail on a defense based on FDA regulations, Novartis must prove "impossibility pre-emption." *Id.* at 572. "Impossibility pre-emption is a demanding defense" meant to represent a longstanding "presumption against preemption." *Id.* at 565, 572. To prevail on this defense, Defendants must demonstrate by "*clear evidence* that the FDA would not have approved a change" to the drug's label proposed by Plaintiffs. *Id.* at 571 (emphasis added). A recent thoughtful and well-reasoned opinion by the Third Circuit held that the "clear evidence" standard set by the Court is a "standard of proof" and the "question of whether the FDA would have approved a plaintiff's proposed warning is a question of fact for a jury." *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 852 F.3d 268, 284, 293 (3d Cir. 2017). The court defined "clear evidence" under the well-recognized clear and convincing standard, meaning "evidence indicating that the thing to be proved is highly probable or reasonably certain." *Id.* at 285-86.

Novartis's impossibility defense fails—certainly at the summary judgment stage—for several reasons. Novartis fails to explain what "clear evidence" suggests that the FDA would not have approved adding a warning about vascular occlusive events to the Warnings and Precautions section of the U.S. label when, in October 2013, ***less than two months after McWilliams had his stroke,*** the FDA mandated that Novartis do that very thing. Plaintiffs' SMF at ¶ 83. Novartis "pushed back" and battled the issue with the FDA for several months, but finally updated the Warning and Precaution section in January 2014. *Id.* This of course begs the question: what evidence suggests that the FDA would have rejected any efforts by Novartis to voluntarily warn earlier? For example, what evidence suggests that if Novartis had added the warning in June 2012 when it received the Health Canada analysis of the association between Tasigna and accelerated atherosclerosis and presented that data to the FDA, that the FDA would have said no? There is none, much less the "clear evidence" Novartis must produce to prevail on an impossibility defense.

The only evidence Novartis can muster in support of its preemption defense is the FDA's acceptance of its request to add "peripheral arterial occlusive disease" to section 6.2 of the label

in 2011.  This argument is flawed for several reasons.  First, Novartis never asked to add peripheral arterial occlusive disease or any other vascular risks to the Warnings and Precautions sections.  It simply asked to update section 6.2, which the FDA approved.  As the Supreme Court made clear in *Wyeth*, there is a clear difference between the FDA not requiring action (which does not implicate impossibility preemption) and prohibiting a warning (which does).  555 U.S. at 572-573.

Courts have consistently applied this principle in rejecting impossibility preemption defenses.  In *Motus v. Pfizer Inc.*, for example, the court rejected a drug company's argument that the FDA's failure to require a warning is evidence that it would have prohibited the warning:

> Moreover, and perhaps most importantly, although FDA did not require Pfizer to include suicide-related warnings in Zoloft's label, FDA has not prohibited Pfizer from doing so.  On the occasions cited by Pfizer that FDA considered links between suicide and SSRIs, FDA did find that the evidence did not support requiring manufacturers to include additional suicide-related warnings.  But FDA never stated that it would be impermissible to include additional warnings.

127 F. Supp. 2d 1085, 1096 (C.D. Cal. 2000).  Similarly, in *Dorsett v. Sandoz, Inc.*, the court held that the "FDA's rejection of [certain citizen petitions for warning enhancements] constituted determinations that the warnings should not be *mandated*; they were not determinations that manufacturers could not choose to add warnings that they believed were scientifically substantiated."  699 F. Supp. 2d 1142, 1157 (C.D. Cal. 2010) (citing *Motus*, 127 F. Supp. 2d at 1096) (emphasis in original).

As *Motus*, *Dorsett*, and *Wyeth* establish, the fact that the FDA accepted Novartis's application regarding section 6.2 is not evidence that it would have rejected an application to add vascular occlusive events in the Warnings and Precautions section.

Second, Novartis made material misrepresentations to the FDA in its July 2011 application to add peripheral artery disease to section 6.2 of the label.  The most disturbing of these misrepresentations was Novartis's statement that after a comprehensive literature search, it had found only one abstract on the issue reporting two cases of peripheral arterial occlusive

14

disease in two patients.  Plaintiffs' SMF at ¶ 44; Ex. 56 at 15.  This was false.  As of the time of the submission, there were at least two influential peer-reviewed articles published on the issue, both of which described a rapidly-developing, severe, and treatment refractory form of the disease, and both of which Novartis was aware.  Plaintiffs' SMF at ¶ 44.  One of the articles—Aichberger et al. (written by a group of Novartis's clinical investigators)—noted that 8 out of 24 patients in their clinic (33%) had developed vascular diseases while on Tasigna, and "highly recommended" that doctors pre-screen all Tasigna patients for vascular disease and risk factors and monitor patients periodically thereafter.  Ex. 45 at 1.  Not only did Novartis have advanced notice of this article, one of the authors, Dr. Valent, wrote a formal letter to Novartis in February 2011 requesting that Novartis bring this article to the FDA's attention in a special communication describing the catastrophic vascular disease associated with Tasigna and the need to warn all doctors of the risk.  Ex. 9 at 1-2.  Novartis did no such thing, instead concealing the existence of the article.  Importantly, the FDA reviewer who approved Novartis's request to add peripheral vascular disease to section 6.2 *expressly relied* upon Novartis's representations about its literature search and the state of the "published literature" in making his decision. Plaintiffs' SMF at ¶ 44.

In addition to misrepresenting the state of the published literature, Novartis also failed to disclose the fact that a group of its clinical investigators was about to publish another article on a multi-clinic study showing multiple cases of severe vascular disease in Tasigna patients, concluding that the rates appeared to exceed that found in the general population and that doctors should "carefully monitor" Tasigna patients for peripheral artery disease.  *Id.*; Ex. 49, le Coutre et al.; Ex. 50, email distributing advanced copy of the article to Novartis.  Novartis also failed to disclose its own internal analyses highlighting the "evidence" of Tasigna-associated vascular disease—including data from clinical trials and increased proportional reporting ratios of the events occurring in Tasigna patients versus patients taking other drugs in the class—and further failed to disclose company conclusions that all patients taking Tasigna should be monitored for developing vascular disease.  Plaintiffs' SMF at ¶ 82; Ex. 53 at 6, 12-14, 16; Ex. 54 at 15-16.

15

Thus, the FDA's approval of the section 6.2 update, based exclusively on Novartis's materially misleading submission, cannot serve as "clear evidence" that the FDA would have rejected Novartis's efforts to warn of vascular occlusive events had Novartis presented *all* the evidence.  This is confirmed by the fact that when the FDA later did its own independent analysis, it concluded (as did Health Canada and every other unbiased group that has reviewed the issue) that there is, in fact, an association and that doctors should be warned.  Commenting on the evidence, including case reports dating back to February 1, 2011, the agency concluded: "[The] findings strongly suggest an association between nilotinib and PAOD.  Therefore, [the reviewer] recommends that PAOD be elevated to the Warnings and Precautions section of the label."  Novartis Ex. 51 at p. 53 of 61.

Novartis further argues that Plaintiffs' claim that Novartis should have sent a dear doctor letter to U.S. doctors is preempted because, when it asked the FDA in 2014 if one was required, the FDA said no.  Novartis, however, neglects to disclose that in January 2014, Novartis decided to send a dear doctor letter to U.S. doctors and ***actually drafted one***.  Plaintiffs' SMF at ¶ 84. Novartis drafted internal talking points on this letter, emphasizing that this action was not required by the FDA, but was an effort by the company to be "proactive."  *Id.*  Unfortunately, senior leadership at Novartis resisted this effort and put it on hold.  *Id.*  A Novartis employee then asked an FDA employee by voicemail to confirm that the FDA had not requested them to send a dear doctor letter, and when the FDA said it had not, Novartis killed the project.  Novartis did not inform the FDA that it had decided internally to send the letter, or that it had drafted a letter that was ready to go.  Nor did it submit the draft letter or request that it be allowed to send one.

This is far from the type of "clear evidence" Novartis must present to succeed on the "demanding defense" of impossibility preemption.  To the contrary, it is affirmative evidence of a drug company scrupulously avoiding its duties to adequately inform doctors and the public of a serious public health and safety concern, while employing subtle, insidious tactics so that if one day it finds itself in court, it can claim that such basic and prudent actions were not "required."

16

Finally, Novartis argues that Plaintiffs' claims that Novartis should have added vascular occlusive events as a boxed warning are also preempted. This argument is without merit. The principal authority upon which Novartis relies—*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) and *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013)—have been held, time and again, to be inapplicable to Novartis because Novartis is a brand-name, not generic, manufacturer. *See, e.g.*, *Stanley v. Novartis Pharms. Corp.*, No. 11-03191, 2014 WL 12573393, at *11 (C.D. Cal. May 6, 2014); *Georges v. Novartis Pharms. Corp.*, No. 06-05207, 2013 WL 5217198, at *14 (C.D. Cal. Apr. 4, 2013). Accordingly, courts have consistently held that claims related to black box warnings are not preempted. *See*, *e.g., Stanley*, 2014 WL12573393, at *11 (denying Novartis's motion to exclude evidence and argument that Novartis should have included a black box warning, holding such evidence is relevant to the adequacy of the labeling); *Georges*, 2013 WL 5217198, at *14 (same).

For these reasons, Novartis's preemption arguments are without merit, and its motion should be denied.

## C.     There Is a Triable Question of Fact on Punitive Damages.

Florida law applies to the issue of punitive damages.[3] Novartis's contention to the contrary is based on the incorrect assertion that Novartis's corporate misconduct was confined exclusively to New Jersey.

In denying Novartis's prior motion to apply New Jersey law on this issue, the Court, viewing the FAC in the light most favorable to Plaintiffs, held that it was not prepared to conclude that Novartis's alleged misconduct was confined to New Jersey. *See* 2/27/2018 Order, Doc. No. 39, at 2. In so holding the Court cited to Plaintiffs' allegations that Novartis instructed its sales force throughout the country to persuade doctors to prescribe Tasigna over Gleevec through its "Selling the Switch" and "Loyalty Disruption" programs.

---

[3] Plaintiffs have already briefed the issues of why Florida law should apply over New Jersey law, and incorporates their prior brief by reference. *See* Doc. No. 28.

Plaintiffs have now proffered evidence establishing that Novartis did just that. Plaintiffs' SMF at ¶ 85. Novartis does not attempt to refute this evidence, instead claiming that Dr. Walia does not recall any of Novartis's sales efforts with respect to Tasigna. This is incorrect. Dr. Walia testified that Novartis reps visited him routinely and promoted the benefits of Tasigna over Gleevec, but never informed him of the risks of atherosclerosis associated with Tasigna. Plaintiffs' SMF at ¶ 66. While he understandably may not recall the names of the reps, or the exact words that were said, he did recall them promoting the benefits of Tasigna without warning of the serious atherosclerotic-related risks associated with the drug. Thus, Plaintiffs have shown that Novartis's conduct extended outside of New Jersey and into Florida, and Florida law should govern the issue of punitive damages.

There is a triable issue of fact on punitive damages under Florida law. As already discussed at length, Novartis, driven by its commercial directive to switch patients from Tasigna to Gleevec, intentionally failed to warn of a known deadly side effect associated with its drug. Not only did it fail to warn, its senior executives launched a campaign to "robustly defend the safety of Tasigna," "mitigate [the] perceived issue," and, most disturbingly, "neutralize the impact of [the] association particularly among community physicians." Plaintiffs' SMF at ¶ 77. In short, Novartis put profits over people. In so doing, Novartis made multiple misrepresentations directly to the FDA downplaying the substantial risk. *Id.* at ¶¶ 44, 49. Such conduct is beyond negligent—it is intentional misconduct propagated by Novartis's senior leadership. The issue of punitive damages should go to the jury.[4]

---

[4] For reasons already briefed (Doc. No. 28), even if New Jersey law applies, Plaintiffs have still created a triable issue of fact on punitive damages. Under New Jersey law, punitive damages are available "where the product manufacturer knowingly withheld or misrepresented [material and relevant] information required to be submitted under the agency's regulation." N.J.S.A. § 2A:58C-5c. Here, Plaintiffs have shown that Novartis both withheld material information related to atherosclerosis-related conditions associated with Tasigna, and further made material misrepresentations to the FDA about such information, intentionally misrepresenting to the FDA, among other things, the state of the medical literature on the association and Novartis's own internal analyses regarding the association. This is sufficient to create a triable issue of fact. Further, punitive damages under New Jersey law are not preempted. *Forman v. Novartis Pharms. Corp.*, 793 F. Supp. 2d 598, 607 (E.D.N.Y. 2011); *Chiles v. Novartis Pharms. Corp.*, No. 3:06-cv-96-J-25 JBT (M.D. Fla. Feb. 25, 2013) (Order, Doc. No. 214).

## V.   <u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully request that the Court deny Novartis's motion in its entirety.

**Dated:** June 4, 2018                    Respectfully submitted,

<div style="margin-left: 40%;">

/s/ Bryan F. Aylstock
Bryan F. Aylstock, Esq. (Bar No. 0078263)
baylstock@awkolaw.com
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 E. Main Street, Suite 20
Pensacola, Florida 32502
Phone: (850) 2020-1010
Fax: (850) 916-7449

ELIAS GUTZLER SPICER LLC
Richard M. Elias, admitted *pro hac vice*
Greg G. Gutzler, admitted *pro hac vice*
Tamara M. Spicer, admitted pro *hac vice*
130 South Bemiston Avenue, Suite 302
St. Louis, Missouri 63105
Telephone: (314) 274-3311
relias@egslitigation.com
ggutzler@egslitigation.com
tspicer@egslitigation.com

ONDER SHELTON O'LEARY PETTERSON LLC
James G. Onder, admitted *pro hac vice*
Evan C. Murphy, admitted *pro hac vice*
110 East Lockwood
St. Louis, Missouri 63119
Telephone: (314) 363-9000
onder@onderlaw.com

*Counsel for Plaintiffs*

</div>

19

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 4, 2018 the foregoing document was served upon counsel of record via electronic mail.

/s/ Bryan F. Aylstock
Bryan F. Aylstock