**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**CASE NO. 2:17-CV-14302-ROSENBERG/MAYNARD**

Dennis McWilliams et al.,

        Plaintiffs,

vs.

Novartis AG et al.,

        Defendants.
_____/

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF SONAL SINGH**

**INTRODUCTION**

Dr. Sonal Singh—a renowned epidemiologist with a focus on assessing cardiovascular risks associated with drugs—conducted a systematic review of the available literature concerning Tasigna and its potential link to vascular disease. Applying a meta-analysis across data from four randomized clinical trials, he found a statistically significant association between Tasigna and all vascular disease—including a more than *three-fold* increase in risk for stroke. This association was confirmed by four other published systematic reviews and meta-analyses finding the same thing. Dr. Singh then applied the Bradford Hill factors—well-recognized criteria that epidemiologists employ to establish causation—and concluded to a reasonable degree of scientific certainty that Tasigna causes vascular occlusive disease, including peripheral artery disease, cerebrovascular disease, and ischemic heart disease.

Despite his qualifications, his thorough review, sound statistical analysis, and systematic application of the Bradford Hill factors, Novartis nitpicks at Dr. Singh's methodology, arguing,

for instance, that the fact that he worked alone and not with a team of scientists renders his opinions unreliable. Novartis neglects to mention, however, that its arguments have already been rejected by another federal court evaluating Dr. Singh's qualifications and his identical opinions in the *Lauris v. Novartis* case pending in the Eastern District of California (Case No. 1:16-cv-00393-SEH). For the same reasons, as explained below, Novartis's motion should be denied in this case as well.

## ARGUMENT

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court and the Eleventh Circuit have interpreted Rule 702 to require that expert testimony be both relevant and reliable. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993); *U.S. v. Cox*, 391 Fed. Appx. 756, 759 (11th Cir. 2010). The basic standard of relevance is a liberal one. *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016).

In evaluating the reliability of scientific expert testimony, a district court must assess whether the methodology underlying the testimony is scientifically valid and whether it properly can be applied to the facts in issue. *U.S. v. Alabama Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013). When the methodology is sound and the evidence relied upon is sufficiently related to the

case at hand, disputes about the degree of relevance or accuracy may go to the testimony's weight, but not its admissibility.  *Id.*

The focus of the district court's analysis must be "solely on principles and methodology, not on the conclusions that they generate."  *Seamon*, 813 F.3d at 988 (quoting *Daubert*, 509 U.S. at 595).  An expert's methodology "need not be perfect, nor need he apply it perfectly."  *Sampson v. Carnival Corp.*, No. 15-24339, 2016 WL 7377226, at *6 (S.D. Fla. Dec. 16, 2016).  The Court's inquiry is a flexible one, recognizing that Rule 702 "was intended to liberalize the introduction of relevant expert evidence."  *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1340 (S.D. Fla. 1999).

**I.      Dr. Singh Is Qualified.**

In its motion to exclude Dr. Singh, Novartis does not even attempt to challenge his qualifications.  *See* Exhibit 1, Transcript of 11/17/17 Motions Hearing in *Lauris*, at 45 ("Dr. Singh is absolutely qualified by training and experience to conduct a meta-analysis and a systemic-analysis.  We do not dispute that.").  Dr. Singh is a medical doctor specializing in internal medicine, and a trained epidemiologist with a Master's in Public Health from John Hopkins University.  Doc. No. 56-3, Singh Report, at 1-2.  He served as an assistant professor in the schools of medicine and epidemiology at Wake Forest University, and then as an assistant professor of medicine at John Hopkins University, where he held appointments in the Department of International Health and Health Policy and Management, and also served as the Associate Director at the Center for Drug Safety and Effectiveness.  *Id.*

He is currently an associate professor of medicine at the University of Massachusetts Medical School.  *Id.* at 1.  In his current position, he devotes a substantial amount of his professional time to epidemiological research, with a focus on drug safety.  *Id.* at 2.  The major

3

focus of his research is directly relevant to this case—i.e., understanding the adverse effects of pharmacologic therapies with a focus on cardiovascular adverse effects of drugs. *Id.* The remainder of his time is dedicated to practicing medicine and teaching. *Id.*

He has taught courses in pharmacoepidemiology, clinical epidemiology, and systematic reviews, as well as the general practice of medicine. *Id.* He has taught epidemiological research methods on the topic of pharmacoepidemiology in the Bloomberg School of Public Health at John Hopkins University. *Id.* His expertise is sought by public and private entities across the world. He has served as a consultant to the FDA, the World Bank, World Health Organization International Agency for Research Cancer, the Agency for Health Care Research and Quality (an agency with in the U.S. Department of Health and Human Services), pharmaceutical companies, and research firms. *Id.*

Dr. Singh has co-authored more than 100 original peer-reviewed scientific articles. *Id.* at 3. These articles include multiple assessments of the cardiovascular risks associated with drugs based on systematic reviews and meta-analyses. *Id.* His work has been published in *Science, Journal of American Medical Association, British Medical Journal,* and *Lancet*. *Id.* at 3-4.

Given these credentials, Dr. Singh's qualifications to assess the causal link between Tasigna and vascular events are beyond reproach. Indeed, the *Lauris* court has already held that Dr. Singh is qualified to give the same opinions he presents here. *See* Exhibit 1, Transcript of 11/17/17 Motions Hearing in *Lauris*, at 114-15 (court recognizing "formidable" group of experts, including Dr. Singh, who are "well-qualified individuals in terms of knowledge, training, background, and experience, who meet, in the view of this Court, the basic qualifications for testimony, as experts under the federal rules of evidence").

4

## II.     Dr. Singh Assessed Causation Through a Systematic and Reliable Methodology.

The Eleventh Circuit has long held that epidemiological studies are not required to prove causation.  *Wells v. Ortho Pharm. Corp.*, 788 F.2d 741, 745 (11th Cir. 1986).  Although not required, Dr. Singh conducted his own epidemiological study, and consistent with multiple other published epidemiological studies, found a statistically-significant association between Tasigna and vascular occlusive diseases.

Dr. Singh first did a systematic search of the literature.  He developed a search query, which he ran through several medical literature databases.  Doc. No. 56-3, Singh Report, at 11-12.  Of the articles retrieved, he further reviewed the references cited therein to locate additional articles with original data.  *Id.*  After reviewing all the data and excluding irrelevant material, he identified 98 published reports relating to Tasigna and vascular occlusive disease, including 4 systematic reviews with meta-analysis, 4 randomized controlled trials, 14 controlled observational studies, 22 uncontrolled observational studies, 4 disproportionality analyses, 9 case reports, and 12 mechanistic studies (i.e., studies related to the potential mechanisms of action between Tasigna and cardiovascular events).  *Id.* at 13.

Dr. Singh then pooled data from four separate randomized clinical trials evaluating the safety and efficacy of Tasigna as compared to Gleevec, including the ENESTnd trial, and performed a statistical analysis of vascular occlusive events reported in those trials, including peripheral vascular disease, cerebrovascular disease, and ischemic heart disease.  *Id.* at 5-10.  His analysis revealed that there was a more than a three-fold increase in risk for all vascular occlusive events, with a more than three-fold increase for cerebrovascular events, a more than three-fold increase for ischemic heart events, and a more than five-fold increase for peripheral vascular events.  *Id.* at 6-9.  He further found that these findings had been independently

replicated in four other systematic reviews and meta-analyses—all of which found a statistically significant positive association between Tasigna and vascular events. *Id.* at 9-10.

He then analyzed the data from clinical trials individually, finding that a closer look at the largest of those trials, Novartis's "ENESTnd" trial, demonstrated a statistically significant increased risk for all vascular disease endpoints. *Id.* at 6-7. Strikingly, he discovered that despite a five-year follow-up, no patient in the Gleevec arm developed peripheral vascular disease, and that most of the peripheral vascular events in the Tasigna arms occurred in the first two years. *Id.*

Next, he reviewed numerous controlled observational studies. *Id.* at 20-27. He found that despite heterogeneity amongst the studies, the overwhelming majority of the studies reported a significantly increased risk of cardiovascular events with Tasigna. *Id*. at 20. After a thorough review of each study, he summarized:

> [T]he rates of cardiovascular events in the controlled observational studies consistently demonstrate an increased risk associated with [Tasigna] compared to [Gleevec]. The rates of cardiovascular events in many uncontrolled observational studies far exceeded the normal rates of cardiovascular events in the CML population. The rapid occurrence of events immediately after exposure to [Tasigna], the severity and multiplicity of atherosclerotic events, and the occurrence of events in some without risk factors are consistent with the meta-analysis of randomized controlled trials which provide evidence in support of a causal association.

*Id.* at 27.

Dr. Singh then analyzed multiple case reports, disproportionality studies, and mechanistic studies. *Id.* at 27-32. He found multiple articles that reported on in vivo and in vitro studies, which found mechanistic evidence supporting a causal association between Tasigna and vascular events. These included studies where Tasigna was found to inhibit the proliferation of human umbilical vein, human coronary artery derived endothelial cells (cells that form the lining of

6

blood vessels), and the human microvascular endothelial cell line in a dose-dependent manner. *Id.* at 30.  He also found multiple studies where Tasigna was found to induce hyperglycemia and hyperlipidemia—both of which are atherosclerotic risk factors.  *Id.* at 31.

After concluding his systematic review and meta-analysis, Dr. Singh then assessed causality by applying the Bradford Hill factors, which are generally accepted epidemiological standards used to assess whether an observed association leads to an inference of causation.  *Id.* at 32-33.  The criteria include: (1) strength of association, (2) consistency, (3) specificity, (4) temporality, (5) biological gradient, (6) plausibility, (7) coherence, (8) experiment, and (9) analogy.  *Id.* at 33.  Applying each of these factors he determined, among other things, that the association was strong, and, importantly, has been consistently replicated in different clinical settings around the world.  *Id.* at 33-34.  He also found there to be evidence of a dose-dependent response, where in the ENESTnd trial there was a nearly *two-fold* increase in vascular occlusive events in Tasigna patients treated at the 400 mg dose versus those treated at the 300 mg dose.  *Id.* at 36.  He also found that while a definitive mechanism of action is not known, multiple studies have identified several plausible mechanisms explaining a potential drug-dependent process.  *Id.* at 36-37.

Applying all the factors, Dr. Singh concluded:

> [T]he evidence strongly suggests that [Tasigna] causes cardiovascular events— including peripheral artery disease, ischemic heart disease, and stroke.  The association, based on my systematic review and meta-analysis of four randomized clinical trials, indicates a strong association (with over a three-fold relative increase in risk for cardiovascular disease in general, and an over five-fold relative increase in risk for peripheral vascular disease).  This association has been replicated in numerous other studies, including four other systematic reviews and meta-analysis.  The evidence suggests that the events are specific to [Tasigna] therapy, temporally associated, and there is evidence of a dose-dependent response.  Studies have revealed multiple plausible mechanisms of action.  Therefore, it is my opinion, to a reasonably degree of scientific certainty, that [Tasigna] causes cardiovascular events.

7

*Id.* at 38-39.  This analysis reflects a thorough, systematic, and evidence-based process, relying on objective evidence ranging from meta-analyses, clinical trials, controlled observational studies, disproportionality analyses, and case reports.

There is no basis to exclude Dr. Singh's testimony, as the *Lauris* court has already concluded.  *See* Exhibit 2, 11/17/17 Order denying Novartis's Motion to Exclude Testimony of Dr. Sonal Singh, at ¶ 2; Exhibit 1, Transcript of 11/17/17 Motions Hearing in *Lauris*, at 117 ("I am going to allow Dr. Singh to testify.  I am satisfied that his methodology and approach meets the requirements of Daubert.  And I am going to allow, without further comment at this point, Dr. Singh to testify as to those opinions as have been framed up and stated in his report.").[1]

### III. Novartis's Objections to Dr. Singh's Methodology Lack Merit, and, in any Event, Go to the Weight, Not the Admissibility, of His Testimony.

#### A. Dr. Singh Is Not Required to Employ Additional Reviewers.

Novartis claims that because Dr. Singh did not employ a second scientist to review the data, his methodology is unreliable.  This argument is without merit.  While Dr. Singh normally collaborates with other scientists in his peer-reviewed articles, he is not required to do so under Rule 702, and the fact that he worked alone does not render his methodology unreliable.

A sister court in the Eleventh Circuit recently rejected a similar argument in *M.D.P. v. Middleton*, 925 F. Supp. 2d 1272, 1274-76 (M.D. Ala. 2013).  There, plaintiff's expert prepared a life care plan but stated in his deposition that he did not rely on a group of physicians in doing so, even though he testified that making a life care plan is a team approach.  *Id.* at 1274.  The court held the expert would be allowed to testify because any purported deficiencies in the support for his opinions go to the weight, not admissibility, of his testimony.  *Id.* at 1276.  In so

---

[1] Dr. Singh's report in *Lauris* is virtually identical to his report in the case at hand.  *Compare* Singh Report in *McWilliams*, Doc. No. 56-3, to Singh Report in *Lauris*, attached hereto as Exhibit 3.

holding, the court relied primarily on the First Circuit's opinion in *Rivera v. Turbo Medical Center Partnership*, which held that an expert's failure to have a physician review his work was not fatal to the reliability of his methodology or the admissibility of his opinions. 415 F.3d 162, 171 (1st Cir. 2005) ("Although [the expert's] report might have benefitted from a physician's review of the projections regarding [plaintiff's] future needs, the court did not abuse its discretion in determining that [the expert's] methodology was sufficiently reliable for admissibility."). *See also Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235 (9th Cir. 2017) (reversing lower court for "wrongly conflat[ing] the standards for publication in a peer-reviewed journal with the standards for admitting expert testimony in a courtroom").

Here, the only deviance from Dr. Singh's normal peer-review process that Novartis identifies is that he did not collaborate with another scientist to assist him in his review. Novartis does not challenge the query he developed or how he ran it. They simply take issue with the fact that he did it alone. While, as a general matter, if resources allow, it is theoretically better to have more scientists analyzing an issue than fewer, Novartis has failed to identify why the mere absence of an assistant reviewer renders Dr. Singh's analysis invalid under Rule 702. As noted above, Novartis does not dispute he is qualified. And more importantly, despite having no less than *three* of Novartis's purported experts attempt to rebut Dr. Singh, not one of them has identified a single article that he missed or any error in any of his calculations. It is clear from the comprehensive, thorough, and systematic nature of his report, that Dr. Singh is more than capable and competent to conduct the analysis on his own.

### B. Dr. Singh Is Not Required to Consider Unverified, Non-Public Novartis Material.

Novartis claims that Dr. Singh's analysis is invalid because, as he does in every systematic review and meta-analysis, he only considered verified information obtained from

9

reliable public sources.  Specifically, Novartis claims he should have considered certain meeting minutes of an internal Novartis-sponsored committee that, many years after the fact, Novartis convened to provide a second opinion on the classification of vascular events determined by clinical investigators in its clinical trials.  Notably, the committee confirmed half of the events were properly classified, but were unable to obtain sufficient data to form an opinion on the others.  They did *not* identify any events that were misclassified.

Counsel spent many pages of record transcript in his *Lauris* deposition badgering Dr. Singh because Plaintiffs' counsel had not given him this document.  But as Dr. Singh made clear, he did not rely on Plaintiffs' counsel for *any* material: "They did not make any material available to me for evaluating.  I mean, I conducted an independent evaluation based on the systematic review and—" Singh 7/20/17 Dep. (Doc. No. 56-2) at 158:12-159:19.  Dr. Singh was then cut off and not allowed to finish his answer.  *Id.*  But when he was later asked whether the document was something he would have wanted to see, he explained, "[i]t's not verified.  I was looking at the peer-reviewed literature."  *Id.* at 169:20-24.  He later explained, "I don't approach it that way.  I approach it as what is the data available out there and is it sufficient to form a causal opinion.  And I reviewed the systematic literature, and it was sufficient for me to provide a causal opinion."  *Id.* at 170:14-23.

He further explained that there was nothing in the Novartis committee minutes regarding the after-the-fact adjudication of claims that called any of the original data into doubt.  He explained that the events were classified by the clinical investigators as cardiovascular events because that is what they observed and were obligated to report, and "unless I view those as falsification of data, which they aren't, then those are cardiovascular events."  *Id.* at 170:24-171:8.  He also pointed out that the committee minutes themselves stated that despite being able

10

to confirm all events, "[t]he committee identified a clear trend for patients' cardiovascular risk factors worsening while on treatment, particularly with [Tasigna], and concluded that there appeared to be an increased risk of events – cardiovascular events in patients treated with [Tasigna] compared with [Gleevec], though no statistical analysis was performed." *Id.* at 164:1-165:15; Doc. No. 56-5 at TPROD01556259-60.

In summary, Novartis contends that Dr. Singh should be excluded because he considered only published, verified, and reliable data in forming his opinions, and did not consider confidential, unverified minutes by a Novartis-sponsored "adjudication committee" that, years after the fact: (1) confirmed that 29 out of the 63 cardiovascular events were properly classified, (2) did not identify any events that were incorrectly classified, and (3) concluded that there appeared to be an increased risk of cardiovascular events in Tasigna patients versus Gleevec patients. If Novartis believes this is compelling evidence against Dr. Singh, they are free to cross-examine him about it at trial. But this is hardly suggestive of a methodological flaw that warrants exclusion.

### C. Dr. Singh Considered and Rejected the Hypotheses that Gleevec Is Protective.

As Novartis points out, because Gleevec is a standard of care in the treatment of CML, it is unethical for Tasigna clinical trials to be designed with a placebo control; instead, the clinical trials involve comparisons between Tasigna and Gleevec. But Novartis claims that Dr. Singh did not consider the possibility that Gleevec may reduce vascular events. This is incorrect; Dr. Singh did consider this hypothesis, and he found it unsupported and discredited by objective evidence.

The study that Novartis relies upon to support its "protective effect" hypotheses is—unsurprisingly—a study designed and co-authored by Novartis employees, including the head of

11

medical affairs for Tasigna, Richard Woodman, the then-global Tasigna program head, Neil Gallagher, and the then-brand safety leader, Frank Hong. *See* Doc. No. 56-7, *Rates of peripheral arterial occlusive disease in patients with chronic myeloid leukemia in the chronic phase treated with imatinib, nilotinib, or non-tyrosine kinase therapy: a retrospective cohort analysis*, Leukemia (2013) 27, 1310-1315. Contrary to Novartis's contentions, Dr. Singh does consider and address this study in his report, and he found it to be deeply flawed. Doc. No. 56-3, Singh Report, at 23-24 (addressing Giles et al. and its limitations). As Dr. Singh points out in his report, the objective evidence indicates that Gleevec is not protective, but that Tasigna is pro-atherogenic. This evidence includes:

- Multiple studies concluding that the rates of vascular events such as peripheral vascular disease occurring in Tasigna patients, which in some studies exceeds 30 percent, exceeds those reported in the general population. *Id.* at 23 (discussing Kim et al) and 25 (discussing le Coutre et al).[2]

- The fact that there is evidence of a dose-dependent response with Tasigna, where in the ENESTnd trial after five years of follow up, not only were the cardiovascular events higher in the Tasigna arms versus the Gleevec arms, but the Tasigna 400 mg arm had a *nearly two-fold increase* in events (14.2%) compared to the Tasigna 300 mg arm (7.8%). *Id.* at 36.

---

[2] The lack of any further discussion of the background rate of cardiovascular events in the general population does not render Dr. Singh's opinions unreliable or inadmissible. None of the cases cited by Novartis stands for such a proposition. To the contrary, one expressly holds the opposite. *See In re Denture Cream Prods. Liab. Litig.*, 795 F. Supp. 2d 1345, 1351 (S.D. Fla. 2011) (noting that background risk is only one of several reliable bases for an inference of general causation, and "a plaintiff need not present evidence of each").

- Reports of rapid clinical improvement of symptoms of peripheral artery disease in patients after discontinuing Tasigna therapy in as short as two weeks, indicating a drug-specific response. *Id.* at 29, 35.
- Reports of individuals with no significant risk factors who were prescreened extensively for vascular disease prior to starting Tasigna therapy and found to have none, unexpectedly developing symptomatic peripheral vascular disease and stenosis in renal and digestive arteries within one year of Tasigna treatment. *Id.* at 29-30.

Further, other systematic reviews conducted by groups unaffiliated with Novartis have performed meta-analyses across multiple cohorts, including those treated with tyrosine kinase inhibitors (TKI), and those who are "TKI-naïve," and reached the opposite conclusion reached by Giles et al. For example, Chai-Adisaksopha et al., which Dr. Singh discusses in his report (*Id.* at 14), performed a meta-analysis comparing arterial events between six groups—five on different TKIs, and one that was TKI-naïve. The authors found a statistically significant increase in risk of arterial events in patients taking Tasigna and one other TKI, ponatinib (brand name Iclusig®), compared to the other groups. The report concluded that this "demonstrates that patients who received [Tasigna] or [Iclusig] had a greater number of major arterial events when compared to non-TKI-, [Gleevec]-, [Sprycel]-, and [Bosulif]-treated patients." Exhibit 4, Chai-Adisaksopha, et al., *Major arterial events in patients with chronic myeloid leukemia treated with tyrosine kinase inhibitors: a meta-analysis*.

Thus, contrary to Novartis's argument, Dr. Singh did consider the hypotheses that Gleevec could be protective, and found that the evidence supporting such hypotheses is flawed and contradicted by multiple other studies. Novartis may disagree with his conclusion, but those are arguments for the jury.

13

### D. Dr. Singh's Testimony Fits the Case.

Novartis insists that Plaintiffs' case is only about cerebrovascular disease and not peripheral vascular disease or any other vascular occlusive event, and thus insists that any analysis about non-cerebrovascular events is irrelevant. This argument is meritless because the literature, health agency reports, and warning labels consistently address *all* vascular events as a group, implicating a global problem of accelerated atherosclerosis associated with Tasigna that can attack any number of vascular beds. This is the reason why Novartis is currently warning about the broad category of "vascular occlusive events" in its global product labels, and why Novartis sent a warning letter to Canadian doctors about the combined risk of atherosclerotic related events. Novartis's attempt to now segment these risks into compartments to downplay the magnitude of the aggregate problem is nothing more than a litigation ploy.

### E. The Data from Novartis's Own Clinical Trials is Reliable.

Citing irrelevant authority, Novartis contends that Dr. Singh's meta-analysis is flawed because it was based, in part, on data from a non-blinded randomized trial. In support, they cite a case discussing the limited value of a meta-analysis that combines the results of studies based on "observation." *Knight v. Kirby Inland Marine, Inc.*, 363 F. Supp. 2d 859, 866 n.13 (N.D. Miss. 2005). This is a misleading citation because observational studies are entirely different than randomized clinical trials, and have limitations that randomized trials do not, such as lack of control over the study participants. *See In re Bextra & Celebrex Marketing Sales Practices & Prods. Liab. Litig.*, 524 F. Supp. 2d 1166, 1173 (N.D. Cal. 2007) (explaining the difference between randomized clinical trials and observational studies.).

Randomized clinical trials are "the 'gold standard' for determining whether a drug is related to the risk of developing an adverse health outcome." *Id.* In such trials, subjects are

randomly assigned to, usually, two groups: one group exposed to the drug of interest and the other not exposed." *Id.* Randomization "minimizes the likelihood that there are differences in relevant characteristics between those exposed to an agent and those not exposed, such as smoking, obesity, aspirin use and so on that could account for any difference in outcome between the two groups." *Id.* (citing Federal Judicial Center, Reference Manual on Scientific Evidence 338 (2d ed. 2000)).

Novartis is now criticizing Dr. Singh for relying on not just randomized clinical trials—but a *Novartis-sponsored* randomized phase 3 clinical trial, ENESTnd, in which it has invested over $40 million dollars to evaluate the efficacy and safety of Tasigna. The trial may not be blinded, which could introduce a possibility of bias, but this does not remove this type of study from the gold standard category of randomized clinical trials. If Novartis believes its own clinical trials are yielding unreliable data about the efficacy and safety of Tasigna, it is free to so argue to the jury.

### F. Dr. Singh Reliably Applied the Bradford Hill Factors.

Novartis concedes that application of the Bradford Hill factors is appropriate when a statistically significant association is found. They contend that Dr. Singh did not find one, which is their *only* challenge to Dr. Singh's Bradford Hill analysis. But he did find one—his entire first section describes the statistically significant association he found between vascular events in the aggregate, and separately for cerebrovascular disease, peripheral artery disease, and ischemic heart disease. Doc. No. 56-3 at 5-10. This statistically significant association has been replicated by no less than four other systematic reviews and meta-analyses. *Id.* Novartis, therefore, is simply wrong.

15

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court deny Novartis's motion to exclude Dr. Singh.

**Dated:** June 4, 2018    Respectfully submitted,

/s/ Bryan F. Aylstock_____
Bryan F. Aylstock, Esq. (Bar No. 0078263)
baylstock@awkolaw.com
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 E. Main Street, Suite 20
Pensacola, Florida 32502
Phone: (850) 2020-1010
Fax: (850) 916-7449

**ELIAS GUTZLER SPICER LLC**
Richard M. Elias, admitted *pro hac vice*
Greg G. Gutzler, admitted *pro hac vice*
Tamara M. Spicer, admitted pro *hac vice*
130 South Bemiston Avenue, Suite 302
St. Louis, Missouri 63105
Telephone: (314) 274-3311
relias@egslitigation.com
ggutzler@egslitigation.com
tspicer@egslitigation.com

**ONDER SHELTON O'LEARY PETTERSON LLC**
James G. Onder, admitted *pro hac vice*
Evan C. Murphy, admitted *pro hac vice*
110 East Lockwood
St. Louis, Missouri 63119
Telephone: (314) 363-9000
onder@onderlaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

      I hereby certify that on June 4, 2018 the foregoing document was served upon counsel of record via electronic mail.

                              /s/ Bryan F. Aylstock_____
                              Bryan F. Aylstock