UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

Case No.: 2:17-cv-14302-ROSENBERG/MAYNARD

Dennis McWilliams and
Lori McWilliams,

                Plaintiffs,

vs.

Novartis AG, a Global Healthcare
Company; Novartis Pharmaceuticals
Corporation, a Delaware Corporation,

                Defendants.
_____/

**DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATION'S
REPLY IN SUPPORT OF ITS MOTION TO
<u>EXCLUDE TESTIMONY OF DR. SONAL SINGH</u>**

Plaintiffs' Opposition to Novartis Pharmaceutical Corporation's ("NPC") Motion to Exclude the Expert Testimony of Dr. Singh (ECF No. 65) ("Pls.' Opp.") fails to grapple with the bases for the motion. Instead, plaintiffs spend numerous pages describing the qualifications of Dr. Singh, which were not challenged by NPC, and misconstruing the arguments offered. Plaintiffs also seek to have this Court deny this motion based on the ruling in *Lauris* regarding Dr. Singh – which was made without an evidentiary hearing or a detailed written opinion. *See* Pls.' Opp. at 2, 3, 4, 8. However, the *Lauris* court's *Daubert* rulings regarding Singh were based on its belief that the Ninth Circuit, in its application of *Daubert* and Rules 702-03, has followed a trend to allow "at least incremental expansion of permission to testify as experts at trial." 11/17/2017 Transcript of Motions Hearing (ECF 65-1), at 115:8-15. This Court should grant NPC's motions based on *Daubert*'s requirement that the trial court "act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).

Dr. Singh should be excluded because he failed to follow *his own methodology* utilized in non-litigation work in formulating his opinions, as established by his practices in published, peer-reviewed systemic analyses he authored and other papers he authored describing the proper methodology to be employed in conducting systemic analysis. NPC does not base its arguments on whether Dr. Singh would be willing to submit his analysis in this case for publication in the peer-reviewed literature or whether it would be accepted by such a journal (rendering plaintiffs' citation to *Wendell* inapt). In *Wendell*, the Ninth Circuit held that an expert's reluctance to publish a differential diagnosis opinion in the peer reviewed literature could not form the sole basis for exclusion of expert testimony. *See Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235 (9th Cir. 2017). In contrast, here NPC argues that Dr. Singh's testimony, report and published literature on how to conduct a systemic analysis demonstrate the litigation-driven, methodological inadequacies of his analysis in this case that require exclusion of his opinions. NPC's Motion to Exclude the Expert Testimony of Dr. Sonal Singh (ECF No. 56), at 5-14 ("NPC's Mot.") (arguing that Dr. Singh failed to take into account the adjudication of patient-level data, that Gleevec® may be cardio-protective, or that the trials he relied upon were *blinded*, and failed to distinguish between cerebrovascular and other injuries). Because Dr. Singh did not follow his own prescribed methodology in several ways (discussed in NPC's Motion and reiterated briefly below), his opinions must be excluded in this case. *See Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434,

1

560 (W.D. Pa. 2003) ("In analyzing the reliability of plaintiff's experts' opinions, it is appropriate for the Court to consider whether the testimony they intend to give faithfully complies with their own views of what standards constitute the scientific method. . . . The reliability of plaintiff's experts' opinions is significantly undermined by the fact that they abandon the method that they themselves have defined. . . . The reliability of Dr. Kulig's opinions in this case is likewise undermined by his failure to follow his own standards."); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268–69 (2d Cir. 2002) (affirming exclusion of expert testimony where expert failed to apply his own methodology reliably); *In re Denture Cream Products Liability Litigation*, 795 F. Supp. 2d 1345, 1367 (S.D. Fla. 2011) (excluding expert who failed to follow his own methodology, leading the court to conclude that he did not employ "the same level of rigor that characterizes the practice of an expert in the relevant field" in reaching his diagnosis.) (quotation marks and citation omitted).

I.  **THE FAILURE TO ESTABLISH GLEEVEC® AS AN APPROPRIATE COMPARATOR RENDERS THE OPINIONS INADMISSIBLE.**

Dr. Singh failed to determine the validity of using the active medicine Gleevec® (imatinib) as the comparator against which he judged the risks of Tasigna® (nilotinib). In an article that he co-authored describing how to conduct a systematic analysis, Dr. Singh stated that, where the medicine at issue is being compared against an active comparator, the scientist conducting the analysis must determine whether the observed effect is the result of a negative effect of the medicine at issue (here Tasigna®) or a positive effect of the medicine against which the subject medicine is being compared (here Gleevec®). NPC's Mot. at 9. Dr. Singh admittedly took no steps to evaluate this question in conducting his analysis, *id.* at 12, but simply assumed that Gleevec® approximated the background rate for patients with CML not treated with a TKI. This sort of *ipse dixit* is impermissible under *Daubert*, and his opinions should be excluded on that basis alone. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (finding expert testimony unreliable based on "analytical gap" between data and conclusions). The methodological error here is compounded by Dr. Singh's strident refusal to consider the question of the possible protective effect of Gleevec®, notwithstanding peer reviewed scientific literature – much of which is cited by plaintiffs for other propositions – suggesting that Gleevec® may, in fact, have a cardioprotective

effect. NPC's Mot. at 10-11 (discussing such literature).[1] Plaintiffs contend that "Dr. Singh does consider and address [Dr. Giles'] study in his report," Pls.' Opp. at 12, but nowhere does Dr. Singh address *the potential cardioprotective effect of Gleevec®* in his initial report. There is no evidence that Dr. Singh formed any opinion regarding whether Gleevec® was an adequate comparator (as opposed to simply assuming it was) and, in fact, Dr. Singh's initial report heavily criticizes the Giles paper for including a non-TKI arm in addition to the Gleevec® arm. 2/20/2018 Expert Report of Dr. Singh, Exhibit 3 to NPC's Mot. (ECF No. 56-3) ("Singh Report") at 23-24. Also, while plaintiffs claim to have found evidence that there is a difference between the rate of cardiovascular events in Tasigna® treated patients compared to patients not treated with TKIs in the Chai et al. study, Singh Report at 14-15, Dr. Singh never offered any opinion *in his report* stating that the study establishes that Gleevec® is an appropriate comparator without cardioprotective effect. Dr. Singh failed to employ the sort of methodology used outside the context of litigation in reaching these conclusions, and his opinions should be excluded on that basis.

**II. THE FAILURE TO EVALUATE PATIENT-LEVEL DATA SHOWING HALF OF THE CASES COULD NOT BE CONFIRMED AS CARDIOVASCULAR EVENTS RENDERS THE OPINIONS INADMISSIBLE.**

Dr. Singh failed to take into account documents that were in the possession of plaintiffs' counsel in which external experts evaluated the 63 adverse events that are the subject of his expert opinion and concluded that less than *half* of those events could be confirmed as cardiovascular events. *See* "Cardiovascular Safety Review and Research Committee Meeting 2: ENESTnd Meeting Minutes", Exhibit 5 to NPC's Mot. (ECF No. 56-5), at TPROD01556256-80, discussed

---

[1] Plaintiffs, for instance, cite frequently to publications of an Austrian doctor, Peter Valent. Subsequent to the literature search that Dr. Singh conducted for this litigation, Dr. Valent published an article again noting: "In fact, in most studies, less than 1% of all patients developed [vascular adverse events] while on imatinib. It is noteworthy that in contrast to nilotinib, imatinib is lowering blood glucose levels. In addition, imatinib may suppress diabetes mellitus-associated atherosclerosis." Valent, P, et al., Risk factors and mechanisms contributing to TKI-induced vascular events in patients with CML, *Leukemia Research* 2017; 59:47–54, at 48-49 (Ex. 3).

3

at NPC's Mot. at 6-8.[2] Dr. Singh has written that misclassification of adverse events is possible in clinical trials, and agrees that where patient-level data and, in particular, adjudication data on adverse events is available, it should be taken into account in conducting a systematic analysis. NPC's Mot. at 5; *see also* Singh et al., Drug safety assessment in clinical trials: Methodological challenges and opportunities, *Trials* 2012; 13:138, at 2, (Ex. 1) ("Singh article") ("Misclassification of adverse events is possible, particularly where the outcomes are collected through spontaneous reports from trial participants rather than systematic monitoring."). Dr. Singh failed to take this information – long in the possession of plaintiffs' counsel and addressed during fact depositions, but not provided to him – into account. Given the failure to follow his own methodology regarding the use of patient-level data in meta-analysis and systematic reviews, Dr. Singh's opinions should be excluded.

Plaintiffs attempt to make light of this argument by suggesting that NPC is criticizing its own clinical trials. This argument is simply incorrect. NPC agrees that properly randomized, blinded, prospective trials are the gold standard for evaluating efficacy and safety of medicines. In some circumstances, such as those here, it would be unethical to conduct a blinded trial because of the established efficacy of the comparator product (here Gleevec®). Plaintiffs concede, as they must, that the lack of blinding may introduce bias in the resulting data. Pls.' Opp. at 12. Moreover, the trials conducted by NPC were created and statistically powered to evaluate **efficacy**. That does not, however, mean that they were adequately powered to identify causal relationships between rare adverse reactions and the study medicine. Richard Woodman Dep. at 386:18-387:8, 4/13/17, (Ex. 2) ("the objective of that study is to try and determine as best as possible the efficacy from that study design"). Moreover, the collection of safety data is subject to certain potential biases, particularly where, as here, the sorts of adverse reactions were not expected and did not have rigorous reporting requirements. *See* Singh article at 2, 5 ("While evidentiary standards for *efficacy* are well established by regulatory statutes, the evidentiary standards for ascertaining *safety*

---

[2] The fact that the document was produced by NPC and designated by NPC as confidential did not preclude plaintiffs' counsel from sharing the document with Dr. Singh under the protective order in effect in this case. *See* 4/20/2018 Stipulated Protective and Confidentiality Order (ECF No. 53), at 5, (stating that "Confidential Material may be disclosed only to the following persons and only insofar as it is reasonably necessary to the effective prosecution of the Parties' claims and defenses," including "Experts and consultants (including their employees) who are retained by a Party to assist in the litigation of this case").

are heterogeneous and encompass various data sources and study designs. . . . The inconsistencies in adverse effects reported in clinical trials can create challenges. . . . Reviewers and trialists should attempt to measure blinding failure and blinding biases when possible.") (emphasis added). It is not surprising that, upon further review, a number of outside experts determined that the collected data was insufficient to determine that more than half of the reported cases of cardiovascular events could not be confirmed. That fact is not an indictment of the clinical trials, but simply recognition of the limitations under which such trials were conducted.

Dr. Singh's opinions also should be excluded because plaintiffs' counsel "cherry-picked" the information that Dr. Singh would be made aware of and, thereby, deprived Dr. Singh of the ability to conduct the sort of analysis his publications indicate is clearly appropriate in these circumstances. In their motion to exclude NPC's expert witnesses, plaintiffs argue that the cherry picking of data by experts require their exclusion. *See* Plaintiffs' Motion to Exclude the Testimony of Javid Moslehi, MD and Frances Giles, MD (ECF 54) at 3, ("[Novartis] …cherry-picked data supporting their conclusions"). The cases cited by plaintiffs in that motion are exactly on point for the sort of plaintiff-counsel-driven control of data that occurred with respect to Dr. Singh's analysis. *See id.* at 7-8, (arguing for exclusion based on cherry-picked data). His opinions should, thus, be excluded on those grounds as well.

**III.   ANY OPINION THAT ATHEROSCLEROSIS IS RAPIDLY PROGRESSING AND SEVERE MUST BE EXCLUDED.**

There is no statistical data supporting any opinion of Dr. Singh that the sort of atherosclerosis experienced by McWilliams and others reportedly suffering atherosclerosis while taking Tasigna® is "rapidly progressing and severe." NPC's Mot. at 16, (citing Singh deposition). Importantly, plaintiffs do not even attempt to rebut this criticism. Dr. Singh's expertise is in evaluating causation based on statistical evidence,[3] he is not a cardiovascular specialist. He concedes that there is no statistical data supporting the conclusion that the atherosclerosis reported in Tasigna®-treated patients is different in any way than the atherosclerosis experienced by individuals not taking Tasigna®. *Id.* at 16. His only basis for that opinion are that certain authors of case reports have suggested that the events they observed suggested a rapidly progressing and

---

[3] Plaintiffs' effort to point to other controlled observational studies that Dr. Singh rejected in conducting his own meta-analysis because they were too heterogeneous, Pls.' Opp. at 6, is an impermissible bootstrap under *Daubert*. If plaintiffs' own expert considers those published meta-analyses as inadequate for his statistical purposes, they cannot support an opinion under *Daubert*.

5

severe form of atherosclerosis in those particular patients. *Id.* at 16. It is clear that reliance on case reports is an inadequate basis to form an opinion that can survive Rule 703. *Id.* at 16.[4] Accordingly, this opinion also must be excluded.

### IV. THE METHODOLOGY EMPLOYED VARIES FROM DR. SINGH'S STANDARD METHODOLOGIES IN OTHER IMPORTANT WAYS.

Dr. Singh admits that when he conducts a systemic analysis for non-litigation, scientific purposes he *always* has a second scientist review the papers, extract the data and conduct the analysis as a second check against bias. NPC's Mot. at 4 (discussing second reviewer). Dr. Singh did not utilize that standard methodology in this case and his opinions should, therefore, be excluded. Again, plaintiffs' citation to *Wendell* is not useful. Pls.' Opp at 9 (citing *Wendell,* 858 F.3d at 1236). The question is whether Dr. Singh followed his own standard methodology, not whether that methodology could have been made "more rigorous" in the abstract. Likewise, plaintiffs' reliance on *M.D.P. v. Middleton*, 925 F. Supp. 2d 1272 (M.D. Ala. 2013) is misplaced. The court in that case – which involved a medical life care plan, and not issues of general causation based on epidemiology – found that the evidence showed that the expert *did* in fact follow his own stated methodology. 925 F. Supp. 2d at 1275-76 (finding that the expert undertook the steps that he had identified as his standard methodology at his deposition).

Plaintiffs also suggest that the burden is on NPC to demonstrate that Dr. Singh's deviation from his standard methodology has created an error in his analysis. That is not the law under *Daubert*. The party offering expert testimony, here the plaintiffs, bears the burden of establishing the reliability of a plaintiffs' expert opinion and explaining how deviations in an expert's methodology do not invalidate the analysis. NPC's Mot. at 1- 2 (discussing burden). Plaintiffs' have failed to meet that burden here and, therefore, Dr. Singh's opinions should be excluded.

### V. THE OPINIONS DO NOT FIT.

Finally, plaintiffs profess to be confused by NPC's argument that Dr. Singh's opinions do not fit the case to the extent that they discuss peripheral arterial occlusive disease and cardiovascular disease. With respect to cardiovascular disease, Dr. Singh's opinions have no relevance to this case. McWilliams did not suffer a heart attack or other cardiac event. The cardiac

---

[4] Case reports are unreliable proof of causation because they "reflect only reported data, not scientific methodology.... Simply stated, case reports raise questions; they do not answer them." *McClain*, 401 F.3d at 1254.

data relied on by Dr. Singh does not fit the facts of this case and cannot provide the basis for an admissible opinion. Likewise, McWilliams does not have peripheral arterial occlusive disease. The issue in this case is, thus, whether McWilliams' cerebrovascular event was caused by Tasigna®. Any opinions that Dr. Singh seeks to offer in this case based on his evaluation of reports of cardiac or PAOD events should, therefore be excluded.

Dated: June 11, 2018

Respectfully submitted,

s/ Michael J. Thomas
Michael J. Thomas
PENNINGTON, P.A.
215 South Monroe Street, 2nd Floor
Tallahassee, FL 32301
Phone: 850-222-3533
Fax: 850-222-2126
mike@penningtonlaw.com

Robert E. Johnston (admitted *pro hac vice*)
(rjohnston@hollingsworthllp.com)
Andrew L. Reissaus (admitted *pro hac vice*)
(areissaus@hollingsworthllp.com)
HOLLINGSWORTH LLP
1350 I Street, NW
Washington, DC 20005
Phone: (202) 898-5800
Fax: (202) 682-1639

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2018, the foregoing was filed with the Clerk of the Court and served in accordance with the Southern District of Florida's Rules on Electronic Service upon the following parties and participants:

>Bryan F. Aylstock, Esq.
>AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
>17 E. Main Street, Suite 200
>Pensacola, Florida 32502
>Miami, FL  33130
>
>Richard M. Elias, Esq.
>Greg G. Gutzler
>Tamara M. Spicer
>ELIAS GUTZLER SPICER LLC
>130 South Bemiston Avenue, Suite 302
>St. Louis, MO  63105
>
>James G. Onder
>Evan Murphy
>ONDER LAW
>110 East Lockwood
>St. Louis, MO

                                                         s/ Michael J. Thomas
                                                         Michael J. Thomas