UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

Case No.: 2:17-cv-14302-ROSENBERG/MAYNARD

Dennis McWilliams and
Lori McWilliams,

                Plaintiffs,

vs.

Novartis AG, a Global Healthcare
Company; Novartis Pharmaceuticals
Corporation, a Delaware Corporation,

                Defendants.
_____/

**DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATION'S REPLY IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiffs' opposition fails to raise material issues of fact that would preclude the entry of summary judgment. Summary judgment is required on plaintiffs' failure-to-warn claims because, despite McWilliams' self-serving testimony that he would not have taken Tasigna® if properly warned, plaintiffs cannot show that any inadequacy in the label proximately caused McWilliams' stroke. Plaintiffs also cannot demonstrate that the label was inadequate, as nearly all of the evidence plaintiffs assert serves as "notice" does not address stroke, the injury at issue. Plaintiffs' opposition fails as well to meaningfully address NPC's arguments that their failure-to-warn claims are preempted. Plaintiffs have not offered any evidence or authority disputing that a boxed warning cannot be added by a manufacturer unilaterally without FDA's prior approval. The main legal authority plaintiffs rely on in their opposition to NPC's *Wyeth*-based preemption arguments, *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 852 F.3d 268 (3d. Cir. 2017), has been appealed to the U.S. Supreme Court and, since NPC filed its opening brief, the U.S. Solicitor General has asked the Supreme Court to reverse the decision. *See Merck Sharp & Dohme Corp. v. Albrecht*, 2018 WL 2357737 (U.S.) (Amicus Br.) (Ex. 1). Even under plaintiffs' expansive interpretation of *Wyeth*, plaintiffs have not explained why FDA's direction in 2014 that "you do not need to submit one[,]" when NPC inquired about whether to send a Dear Health Care Provider letter related to its addition of stroke and other cardiovascular events to the Warnings and Precautions section of the Tasigna® label, does not have preemptive effect. Plaintiffs' fraud-on-the-FDA arguments, such as their claim that "Novartis made multiple misrepresentations directly to the FDA,"[1] are clearly preempted, and plaintiffs do not meaningfully contend otherwise. Plaintiffs also fail to identify any basis for this Court to apply Florida's punitive damages law, rather than New Jersey's. Although plaintiffs' brief spends several pages describing purported sales and marketing strategies that were developed in New Jersey and implemented nationwide (including in Florida and New Jersey), *see* Pls.' Opp. at 1-2, 17-18, plaintiffs importantly have failed to identify any unique strategy developed in or targeted at Florida that affected the prescribing doctors' decisions and could potentially provide a basis to apply Florida law. As a result, summary judgment must be granted on plaintiffs' punitive damage claims because they are not permitted under New Jersey law, pursuant to preemption principles. For these reasons, and those in NPC's opening briefing, the Court should grant summary judgment for NPC.

---

[1] Pls.' Mem. in Opp. to Mot. for Summ. J. (Pls.' Opp.) (ECF 63) at 18.

1

### I. PLAINTIFFS HAVE FAILED TO RAISE A GENUINE ISSUE OF MATERIAL FACT REGARDING PROXIMATE CAUSATION.

Plaintiffs attempt to do an end-run around the learned intermediary doctrine by claiming that a plaintiff's testimony that he would not have taken a drug if he was properly warned is sufficient to withstand summary judgment. *See* Pls.' Opp. at 7-8 (citing *Kirchman v. Novartis*, No. 8:06-cv-1787-T-24-TBM, 2014 WL 2158519, at *4-6 (M.D. Fla. May 23, 2014) and *Guenther v. Novartis*, No. 6:08-cv-456-ORL-31DAB, 2013 WL 1498162, at *2 (M.D. Fla. Apr. 9, 2013)). The decisions cited by plaintiffs, which are not binding on this Court, are contrary to Florida's long-standing application of the learned intermediary rule stating that "the manufacturer's duty to warn of [a prescription drug's] dangerous side effects [is] directed to the physician rather than the patient." *See Felix v. Hoffmann–LaRoche, Inc.*, 540 So.2d 102, 104 (Fla.1989). In *Arnold v. Novartis*, another case from the Middle District of Florida issued after *Kirchman* and *Guenther*, the court held that plaintiff was precluded from offering evidence that she "would not have taken [the drug] if she had been warned about [the adverse event]". 28 F. Supp. 3d 1268, 1272 (M.D. Fla. 2014). The *Arnold* court specifically critiqued Judge Presnell's ruling in *Guenther* that a pharmaceutical manufacturer's duty to warn extends to "other healthcare providers," not just the prescribing physician. *Id.* at 1270 (citing *Guenther v. Novartis*, No. 6:08-CV-456-ORL-31, 2013 WL 4648449, at *8 (M.D. Fla. Aug. 29, 2013)). The *Arnold* court noted that plaintiff could point to "no authority" to expand a manufacturer's duty beyond "Florida's present rule governing a pharmaceutical manufacturer's duty to warn," the prescribing physician, *id.*, and excluded evidence of what plaintiff might have done if adequately warned "for the [same] reasons," *id.* at 1272. The court concluded that, notwithstanding the court's holding in *Guenther*, "Florida's [learned intermediary] rule has retained its force." *Arnold*, 28 F. Supp. 3d at 1272.

When properly applied, Florida's learned intermediary rule precludes plaintiffs' failure to warn claim in this case because plaintiffs have identified no evidence that Dr. Walia's prescribing decision would have materially changed if NPC had included the risk of stroke on the Tasigna® label prior to June 2011, when Dr. Walia first prescribed Tasigna® to McWilliams. *See Timmons v. Purdue Pharma Co.*, No. 8:04-CV-1479, 2006 WL 263602, at *4 (M.D. Fla. Feb. 2, 2006) (Where a plaintiff "cannot show that the inadequacy of the manufacturer's warning affected any of [the plaintiff's] doctors' use of the product," summary judgment is required). Dr. Walia's testimony that he now prescribes Tasigna® with "careful warning," Pls.' Opp. at 9, is similar to the prescribing physician's testimony in *Chase v. Novartis*: there, the doctor testified he had modified his standard

2

practice to discuss "potential taste disturbance as another side effect" after the plaintiff developed dysguesia (distortion of taste) on Lamisil therapy but still continued to prescribe Lamisil to patients. 740 F. Supp. 2d 1295, 1297-98 (M.D. Fla. 2006). Here, too, Dr. Walia continues to prescribe Tasigna®, including to patients with risk factors for stroke, despite the availability of more data on the label regarding the risk of stroke and cerebrovascular events.[2]

Any testimony by McWilliams about what he would have done had Dr. Walia received and communicated to him a different warning is self-serving, after-the-fact supposition that cannot forestall entry of summary judgment. Numerous cases have recognized that unsupported, self-serving testimony like that which McWilliams offers in this case is inadmissible and unreliable pursuant to Federal Rules of Evidence 701 and 602. *See, e.g.*, *M.W. v. Ford Motor Co.*, No. 8:14-CV-3132-T-24TBM, 2016 WL 7220107, at *9 (M.D. Fla. Apr. 27, 2016) ("Because [plaintiff's] opinion on what she *would have done* if the Focus had been equipped with an Out-of-Park alarm is not based on her perception and does little more than choos[e] up sides, her testimony violates Rule 701") (quotation marks omitted); *Brim v. Midland Credit Mgmt., Inc.*, 795 F. Supp. 2d 1255, 1268 (N.D. Ala. 2011) ("A witness's opinion about an event that did not occur is mere speculation," and "[s]peculative testimony is generally not admissible because it is not based on the witness's perception."); *see also* Fed. R. Evid. 701 Advisory Comm. Note ("If ... attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for"); *see also Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993) (testimony as to what witness "would have done had he seen the warning label" is inadmissible, self-serving speculation); *Kloepfer v. Honda Motor Co., Ltd.*, 898 F.2d 1452, 1459 (10th Cir.1990) (citing Rule 701(a) for its conclusion that speculative lay testimony by the plaintiff—as to whether she would have obeyed a warning—was properly excluded because such testimony would not have been based on the witness's perception); *Wheeler v. Estes Exp. Lines*, 53 F. Supp. 3d 1032, 1042 n.9 (N.D. Ohio 2014) ("Federal law is clear that speculative testimony as to what a witness would have done under different circumstances cannot possibly be based on the witness's perception," and is inadmissible under Rule 701(a)) (internal quotation and punctuation marks omitted); *Alfano v. BRP Inc.*, No. 2:08-CV-1704, 2010 WL 2292265, at *3 (E.D. Cal. June 4, 2010) ("[Plaintiff's] testimony that she would have acted a certain way or heeded to the warning had it

---

[2] *See* NPC's Mot. for Summ. J. (NPC's MSJ) (ECF 61) at 6-7; NPC's Statement of Material Facts (SMF) (ECF 62) ¶¶23-24.

been adequate is inadmissible as it is too speculative and self-serving").

Courts applying Florida law have repeatedly recognized that a plaintiff's speculative testimony about what he would have done in a different warnings scenario is insufficient to withstand summary judgment. *See* Pls.' Opp. at 9; *In re Trasylol Prod. Liab. Litig.*, No. 08-80401, 2010 WL 6098570, at \*8 (S.D. Fla. Mar. 8, 2010) (holding that plaintiff's self-serving testimony that she did not remember or understand what her doctors told her regarding the possible association between renal failure and Trasylol, which was documented in her medical records, was insufficient to preclude summary judgment on statute of limitations grounds); *Cf. Brooks v. Am. Broadcasting Cos.*, 999 F.2d 167, 172 (6th Cir. 1993) (unsupported, self-serving testimony should not be considered on a motion for summary judgment); *Nevada Power Co. v. Monsanto Company,* 891 F. Supp. 1406, 1415-16 (D. Nev. 1995) (no genuine issue of material fact existed based on plaintiff's "speculative and self-serving" statement that "had it known more fully the dangers of PCBs, [plaintiff] wouldn't have used the equipment at all") (quotation marks omitted). McWilliams' claim today that he would not have taken Tasigna® therapy if warned of the risk of stroke in 2011 does not alter the fact that, under Florida's learned intermediary rule, summary judgment is appropriate where the doctor "would have prescribed the drug anyway had the warnings been different." *Chase*, 740 F. Supp. 2d at 1297.

McWilliams' self-serving declaration, Pls. Ex. 44 at 2, that he would not have taken Tasigna® if he had known about the risk of stroke is also belied by his pre-litigation conduct and deposition testimony. McWilliams agreed to take Sprycel in December 2013, even after Dr. Wingard informed McWilliams that "all second generation TKIs [including Sprycel (dasatinib)] have been associated with an increased risk of arteriovascular events". Pls.' Ex. 43 at 2. McWilliams also agreed to take Tasigna® in June 2011, even though the label warned of the more dire risk of sudden death. *See* SMF ¶21.[3] The fact that multiple patients continue to use Tasigna® today, even with Dr. Walia's "careful warning," is itself indicative of what McWilliams would have done if he had

---

[3] Plaintiffs' assertion that "when McWilliams had his stroke ... two doctors recommended that McWilliams cease Tasigna therapy" misstates the record. Pls.' Opp. at 9. McWilliams' treating neurologist, Dr. Maraist, testified that he would defer to McWilliams' oncologist regarding prescribing decisions. SMF ¶27; NPC's Reply ISO SMF ¶27. In November 2013, roughly two and a half months post-stroke, Dr. Wingard gave McWilliams a second opinion, recommending either that McWilliams *continue* Tasigna®, with close monitoring of his blood pressure and cholesterol, or switch to Sprycel. Pls.' Ex. 43 at 2; NPC's Reply ISO SMF ¶27.

4

received a different warning regarding the risk of stroke. *See* NPC's MSJ at 6-7; SMF at ¶¶ 23-25.[4] McWilliams even conceded at his deposition that trying to divine whether he would have taken a drug if told about the risk of a life-threatening injury requires him to speculate.[5]

## II. PLAINTIFFS HAVE FAILED TO MEET THEIR PRIMA FACIE BURDEN TO SHOW THAT THERE WAS A DUTY TO WARN REGARDING THE INJURY AT ISSUE IN THIS CASE, STROKE.

Plaintiffs cannot meet their prima facie burden to show that NPC had a duty to warn of the injury McWilliams actually suffered, stroke, so they attempt to distract this Court with data regarding different adverse events, primarily peripheral arterial occlusive disease (PAOD).[6] Evidence of notice of *other* adverse events is insufficient to establish a duty to warn on summary judgment. *Cf. Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1199-1200 (11th Cir. 2002) ("other suspected effects" of a medication are not "reliable evidence of a link between Parlodel and hemorrhagic stroke," the injury suffered by plaintiff); *see also In re Denture Cream Prod. Liab. Litig.*, 795 F. Supp. 2d 1345, 1363 (S.D. Fla. 2011) ("Case reports suggesting a link between denture cream and 'axonal polyneuropathy' cannot act as reliable evidence of an association between Fixodent use and a

---

[4] Plaintiffs speculate that "even if McWilliams would have still taken Tasigna, Novartis's motion still fails, because … Dr. Walia would have monitored him for developing disease." Pls.' Opp. at 10. Plaintiffs have offered no expert testimony that monitoring McWilliams would have prevented his stroke, rendering this medical causation opinion inadmissible. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005) (proof of causation in products liability cases such as this "requires expert testimony"). Plaintiffs cite three cases for the proposition that "testimony by a treating physician that he or she would have monitored the patient" creates a triable issue of fact on causation; all are outside of this circuit and apply a different state's law (California), and thus are not relevant to the analysis here. Pls.' Opp. at 10 (citing *Hill v. Novartis*, No. 1:06-cv-00939, 2012 WL 6004161 (E.D. Cal. Nov. 30, 2012), *Georges v. Novartis*, No. CV 06-5207, 2012 WL 9083365 (C.D. Cal. Nov. 2, 2012), and *Stanley v. Novartis*, 11 F. Supp. 3d 987 (C.D. Cal. 2014)).

[5] *See* NPC's Resp. to Pls.' SAMF ¶71 (In response to the question "Would you have taken the drug if Dr. Walia had told you that QT prolongation could lead to sudden death," McWilliams answered "you are asking me to speculate"); *Id.* (When asked "Do you believe that if he had told you that people who took this drug had had myocardial infarctions that would have affected your decision on taking the drug," McWilliams responded "Speculation; I don't know.")

[6] Plaintiffs' claim that the "risk at issue here is ... the risk of systemic atherosclerosis" is disingenuous. Pls.' Opp. at 11. If that were the case, then NPC's addition of "arteriosclerosis" to the "Vascular disease" section of Tasigna® label in December 2012, SMF ¶47, *a fact that plaintiffs do not dispute*, would have been sufficient to adequately warn Dr. Walia. Plaintiffs do not address at all in their opposition that arteriosclerosis was added to the label while McWilliams was receiving Tasigna® treatment for his CML.

5

*myelopathy.*") (emphasis in original).[7] Plaintiffs claim that NPC was put on notice by clinical trial investigators, but the majority of the fifteen exhibits plaintiffs cite for support involve cases of PAOD or otherwise involve non-stroke or unspecified vascular events. Pls.' Opp. at 10 (citing SAMF ¶76).[8] The two exhibits that plaintiffs cite as evidence that "Novartis was consistently informed [by its investigators] of Tasigna patients having strokes" are unverified, anecdotal case reports, in which only one of the patients actually had a stroke. *See id.* at 11; Pls.' Ex. 15. This hardly constitutes "consistent" reporting sufficient to put NPC on notice of a risk of stroke associated with Tasigna®. *Cf. McClain,* 401 F.3d at 1254 (Case reports "reflect only reported data, not scientific methodology.... Simply stated, case reports raise questions; they do not answer them."). Plaintiffs also allege that NPC received notice information through peer-reviewed literature, but plaintiffs cite no peer-reviewed, published literature specifically addressing the association between stroke and Tasigna® during the time period in which McWilliams was treated. *See* Pls.' Opp at 10 (citing SAMF ¶81, which refers generally to the "association of Tasigna and atherosclerotic-related vascular events," not stroke).[9]

Plaintiffs further contend that NPC was put on notice by information from health authorities, but what plaintiffs describe as "notice" consists entirely of documents relating to regulatory actions by Health Canada, not FDA, and contain data that was already known to NPC. *Id.* at 10 (citing SAMF ¶78). For the reasons stated in NPC's Motion in Limine, foreign regulatory actions are insufficient to establish "notice" because the standards for labeling in other countries differ from those in the U.S. *See* NPC's MIL (ECF 58) at 1-5; NPC's MIL Reply at § I.

---

[7] The one case plaintiffs cite to support their argument that NPC had a duty to warn, *Guenther*, is inapposite. Pls.' Opp. at 11. In *Guenther*, the medical journal article and clinical trial reports that served as notice to NPC involved the same injury—necrotic bone—as that suffered by the plaintiff. *Guenther*, 2013 WL 1498162, at *3. Here, the evidence that plaintiffs rely upon as "notice" involve adverse events other than the injury suffered by McWilliams.

[8] *See, e.g.*, Pls.' Ex. 2 (email with abstract on PAOD); Ex. 3 (anecdotal report of myocardial infarction, *i.e.* heart attack); Ex. 4 ("arteriosclerotic occlusive disease of peripheral vessels," *i.e.*, PAOD); Ex. 6 (PAOD events during trial); Ex. 7 (slides cited discuss PAOD or non-stroke events); Ex. 8 (email referring to "PAOD problem"); Ex. 11 (email on PAOD); Ex. 13 (same).

[9] The exhibits referenced by plaintiffs in SAMF ¶81 also fail to meaningfully discuss stroke. *See, e.g.* Ex. 67 (failing to identify any article specifically addressing stroke risk); Ex. 45 (article regarding PAOD & non-stroke events); Ex. 47 (PAOD & sudden death case reports); Ex. 48 (PAOD case reports); Ex. 51 (PAOD study); Ex. 52 (letter to editor regarding papers on PAOD).

6

### III. PLAINTIFFS HAVE FAILED TO REBUT NPC'S PREEMPTION ARGUMENTS.

#### A. Plaintiffs Do Not Dispute That A Boxed Warning Cannot Be Added Without FDA's Prior Approval.

Plaintiffs fail to meaningfully respond to NPC's argument that FDA regulations prohibit adding a boxed warning regarding stroke without FDA's prior approval. Both *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2579-81 (2011), and *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2476-77 (2013), stand for the proposition that a plaintiff cannot pursue state law claims premised on labeling changes that a manufacturer is prohibited from making under federal law without prior FDA approval. Here, federal law prohibits NPC from unilaterally adding a boxed warning. *See* NPC's MSJ at 9 (boxed warnings "are permitted only when specifically required by [] FDA") (citing 44 Fed. Reg. 37434, 37448 (June 26, 1979); *id.* (CBE process can only be used to 'add or strengthen a contraindication, warning, precaution, or adverse reaction, *not a boxed warning*.') (quoting 21 C.F.R. § 314.70(c)(iii)(A)) (emphasis added). This Court should reach the same conclusion as the court in *Dopson-Troutt v. Novartis*: there, the court prohibited plaintiffs from arguing that NPC should have added a boxed warning without FDA approval because they did not "rebut NPC's contention that the FDA regulations prohibit NPC from adding a black box warning unless the FDA specifically requests that one be added. Nor do Plaintiffs address the FDA's statements in the Federal Register cited by NPC." 975 F. Supp. 2d 1209, 1219 (M.D. Fla. 2013); *see also Guenther* 2013 WL 4648449, at *5 (M.D. Fla. Aug. 29, 2013) (precluding argument that NPC should have added a boxed warning because "plaintiffs never directly dispute Novartis's contention that the FDA regulations preclude a manufacturer from adding a black box warning without preapproval").[10]

#### B. Whether There Is Clear Evidence Is A Legal Question For The Court To Decide, Not The Jury.

Contrary to plaintiffs' contentions, whether there is "clear evidence" that FDA would have approved a labeling change proposed by NPC is not a question of fact for the jury, but is a legal question that should be decided by this Court at the summary judgment stage. Pls.' Opp. at 13. In its Amicus Curiae brief recommending the Supreme Court reverse the Third Circuit's decision in

---

[10] The two California cases plaintiffs cite in support were wrongly decided. Pls.' Opp. at 17 (citing *Stanley v. Novartis*, No. 11-03191, 2014 WL 12573393, at *11 (C.D. Cal. May 6, 2014); *Georges v. Novartis*, No. 06-05207, 2013 WL 5217198, at *14 (C.D. Cal. Apr. 4, 2013)). Those courts summarily admitted evidence regarding three discrete types of label changes with no discussion of the underlying FDA regulations, which allow some changes to be made unilaterally, but not others.

7

*In re Fosamax*, the Solicitor General unequivocally stated that the meaning of an agency's action, "whether ... a notice-and-comment regulation or something less formal like [an] adjudicatory decision[,]" "is a legal question that a court should decide." Ex. 1 at *15. Here, there have been several FDA labeling decisions and this Court, not the jury, is the proper arbiter of the meaning of those actions. *See id.* at *13 ("The meaning and effect of [][an] agency action is a legal question within the exclusive province of a court."); *see* NPC's MSJ at 10-13.

### C. Even Under Plaintiffs' Expansive Interpretation of *Wyeth*, There Is Still Clear Evidence That FDA Would Not Have Approved The Label Changes Plaintiffs Propose.

FDA, even after evaluating all of the available data, still to this day has not requested or required a boxed warning on stroke. That FDA has not required a boxed warning is clear evidence that FDA would not have approved one if NPC had proposed a boxed warning between June 2011 and December 2013. *See* NPC's MSJ at 10.

FDA's response to NPC in February 2014—"we did not request a DHCP letter…so you do not need to submit one"—is clear evidence that FDA did not consider the 2014 label change to be "important new safety information" that needed to be conveyed to prescribers through a DHCP letter and, thus, would *not* have approved a letter had NPC proposed one prior to that date. SMF ¶64.[11] Plaintiffs fail to explain how NPC's drafting of a DHCP letter is at all relevant to the question at issue—whether FDA would have approved a DHCP letter. *See* Pls.' Opp. at 16.

Plaintiffs also fail to address how FDA's request that PAOD be deleted from the Medication Guide (Med. Guide) in 2011 is anything other than clear evidence under *Wyeth* that FDA would have rejected a proposal by NPC to add an even more tangentially-related risk, stroke, to the Warnings and Precautions section of the label in June 2011, when Dr. Walia first prescribed

---

[11] In contacting FDA in February 2014, NPC acted according to new guidance issued in January 2014, "Dear Health Care Provider Letters: Improving Communication of Important Safety Information" (DHCP Guid.) (Ex. 2), that discussed when and how letters should be sent. *See* SMF ¶64. The guidance stated that DHCP letters are used to notify providers about new or updated information "relat[ing] to an important safety concern" about a drug. *See* NPC's MSJ at 10-11 (Ex. 2 at 3). "FDA believes that effective communication of important new information ... can best be accomplished if FDA and the manufacturer *work together* to determine: [w]hether a DHCP letter should be used ...." Ex. 2 at 2 (emphasis added).

8

Tasigna® to McWilliams.[12] Plaintiffs overlook as well that, even in December 2013, FDA was still "evaluating" whether revisions to the Tasigna® label regarding stroke were necessary, and publicly announced this conclusion in January 2014 on its website. SMF ¶¶56-58.[13]

### D.   Plaintiffs' Allegations That NPC Misrepresented Or Failed To Disclose Information To FDA Are Preempted Under *Buckman*.

Plaintiffs claim that NPC made "material misrepresentations" to FDA in its July 2011 submission, in which it proposed to add PAOD to section 6.2 and the Med. Guide, and that FDA "expressly relied upon" NPC's representations. Pls.' Opp. at 14-16. This claim is explicitly preempted under the Supreme Court's holding in *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) ("plaintiffs' state-law fraud-on-the-FDA claims conflict with, and are therefore impliedly pre-empted by, federal law"); *see, e.g.*, *Rheinfrank v. Abbott Labs., Inc.*, 119 F. Supp. 3d 749, 767–68 (S.D. Ohio 2015), *aff'd,* 680 F. App'x 369 (6th Cir. 2017) (argument "that Abbott withheld certain information or misrepresented the results of…studies in its...submissions to [] FDA" is a preempted "fraud-on-the-FDA theory"); *see also Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1330 (11th Cir. 2017) ("failure to report" claim is preempted

---

[12] NPC's 2011 proposal to add PAOD to the Med. Guide also distinguishes this case from *Motus v. Pfizer* and *Dorsett v. Sandoz*, cited by plaintiffs, Pls.' Opp. at 14. In *Motus*, Pfizer took no action; it argued "FDA *impliedly* prohibited" more warnings based on an "excerpted comment of an FDA doctor, phrased as a hypothetical, made in ostensibly informal introductory comments to a meeting[.]" 127 F. Supp. 2d 1085, 1096 (C.D. Cal. 2000) (emphasis in original). In *Dorsett*, defendants argued that FDA's "rejection of citizen petitions *in the 1990s*," constituted "clear evidence" that FDA would have rejected "warnings ... *in July 2004*[.]" 699 F. Supp. 2d 1142, 1157 (C.D. Cal. 2010) (emphasis added). Neither case is relevant here, as NPC timely and proactively contacted FDA to strengthen its warning as part of its yearly label revision, and FDA responded with an explicit request not to include PAOD in the Med. Guide. *See* SMF ¶¶43, 45.

[13] Plaintiffs do not dispute that NPC contacted FDA to seek its advice on possible labeling revisions *prior to* FDA's request that NPC propose language to warn of vascular occlusive events. Pls.' Opp. at 13; SMF ¶50-52. Plaintiffs instead mischaracterize NPC as "push[ing] back" and "battl[ing] the issue with [] FDA," Pls.' Opp. at 13; however, FDA itself describes the "development of final labeling" as "an iterative process between the applicant and FDA," in which both parties work together to revise the label. *See* CDER 21st Century Review Process: Desk Reference Guide (2014) at 37, https://www.fda.gov/downloads/AboutFDA/CentersOffices/CDER/ManualofPoliciesProcedures/UCM218757.pdf; Guidance for Review Staff & Industry: Good Review Management Principles & Practices for PDUFA Products (Apr. 2005) at 21, https://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm079748.pdf (addressing "communication between [] FDA and applicants" during "labeling discussion").

where premised on a failure to fulfill a duty owed to FDA).[14]

## IV. PLAINTIFFS DO NOT IDENTIFY ANY FLORIDA-SPECIFIC STRATEGY THAT MIGHT INFLUENCE THE CHOICE-OF-LAW ANALYSIS.

Plaintiffs' opposition does not argue that NPC's marketing and sales strategy was somehow unique to Florida, such that Florida law should apply to plaintiffs' punitive damages claim. There is no dispute that the alleged sales and marketing strategies originated from NPC's New Jersey headquarters, and plaintiffs have not identified any way in which those strategies were implemented differently in Florida than in any other state. As noted in NPC's opening brief, numerous courts have recognized that in the absence of conduct specifically targeted at Florida, New Jersey law applies to plaintiffs' punitive damages claim.[15] This Court should conclude that evidence of such conduct is lacking here and apply New Jersey law, under which punitive damages are preempted.[16]

\*     \*     \*

For the reasons stated above and in its opening brief, NPC requests that this Court grant its

---

[14] *See Markland v. Insys Therapeutics, Inc.*, 270 F. Supp. 3d 1318, 1325-1330 (M.D. Fla. 2017) (precluding "negligent marketing" claim under *Buckman*); *Metz v. Wyeth, LLC*, 872 F. Supp. 2d 1335, 1342 n.7 (M.D. Fla. 2012), *aff'd*, 525 F. App'x 893 (11th Cir. 2013) (theory that "Actavis failed to supply relevant information to [] FDA" is preempted); *Ramirez v. E.I. Dupont de Nemours & Co.*, No. 8:09-cv-321, 2010 WL 3529509, at \*1-2 (M.D. Fla. Sept. 3, 2010) (evidence that labeling approval was secured through fraud on EPA precluded); *In re Trasylol Prods. Liab. Litig.*, 763 F. Supp. 2d 1312, 1329-30 (S.D. Fla. 2010) (fraud-on-the-FDA claims precluded); *Marsh v. Genentech, Inc.*, 693 F.3d 546, 551 n.6 (6th Cir. 2012) (same); *Lofton v. McNeil Consumer & Spec. Pharm.*, 672 F.3d 372, 380 (5th Cir. 2012) (same); *Emerson v. Novartis*, 446 F. App'x 733, 735 (6th Cir. 2011) (affirming MDL court; holding that fraud-on-the-FDA theory was preempted); *In re Aredia® & Zometa® Prods. Liab. Litig. (Fragomeli)*, No. 3-06-MD-1760, 2008 WL 913087, at \*2 (M.D. Tenn. Apr. 2, 2008), *aff'd*, 352 F. App'x 994, 995 (6th Cir. 2009) (same); *Garcia v. Wyeth-Ayerst Labs.*, 385 F.3d 961, 965 (6th Cir. 2004) (statutory fraud-on-the-FDA exception preempted); *Zimmerman v. Novartis*, 889 F. Supp. 2d 776 (D. Md. 2012) (punitive damages preempted under N.J. law); *Talley v. Novartis*, No. 3:08-CV-00361, 2011 WL 3515858, at \*3 (W.D.N.C. Aug. 11, 2011) (same).

[15] *See* NPC's MSJ at 14 n.10 (citing *Kirchman*, *Dopson-Troutt*, *Guenther*, *Krause*, & *Chiles*); Mot. to Dismiss Reply (MTD Reply) at 5 (ECF 30) (citing same five cases & *Arnold* opinion (ECF 15-10)). Plaintiffs cite the *Chiles* outlier opinion and the non-Florida case *Forman v. Novartis*, 793 F. Supp. 2d 598 (E.D.N.Y. 2011); both are premised on a non-binding opinion that has been rejected by two other circuits and the *Guenther* court (M.D. Fla.). *See* MTD Reply at 5-7 (ECF 30).

[16] *See* NPC's MSJ at 14-15 & n.11 (citing *Guenther*, *Kirchman*, and *Dopson-Troutt*; discussing New Jersey courts' application of preemption principles to punitive damages in pharmaceutical cases); *see also* MTD Reply at 5-7 (ECF 30) (same).

Motion for Summary Judgment.

Dated:  June 11, 2018

Respectfully submitted,

s/ Michael J. Thomas
Michael J. Thomas
  PENNINGTON, P.A.
  215 South Monroe Street, 2nd Floor
  Tallahassee, FL 32301
  Phone: 850-222-3533
  Fax: 850-222-2126
  mike@penningtonlaw.com

Robert E. Johnston (admitted *pro hac vice*)
(rjohnston@hollingsworthllp.com)
Andrew L. Reissaus (admitted *pro hac vice*)
(areissaus@hollingsworthllp.com)
  HOLLINGSWORTH LLP
  1350 I Street, NW
  Washington, DC 20005
  Phone:  (202) 898-5800
  Fax:  (202) 682-1639

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2018, the foregoing was filed with the Clerk of the Court and served in accordance with the Southern District of Florida's Rules on Electronic Service upon the following parties and participants:

Bryan F. Aylstock, Esq.
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 E. Main Street, Suite 200
Pensacola, Florida 32502
Miami, FL  33130

Richard M. Elias, Esq.
Greg G. Gutzler
Tamara M. Spicer
ELIAS GUTZLER SPICER LLC
130 South Bemiston Avenue, Suite 302
St. Louis, MO  63105

James G. Onder
Evan Murphy
ONDER LAW
110 East Lockwood
St. Louis, MO

s/ Michael J. Thomas
Michael J. Thomas
